Jeffrey S. Sabin
Rishi Kapoor
VENABLE LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 307-5500
Facsimile:    (212) 307-5598

Andrew J. Currie (to be admitted *pro hac vice*)
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
Telephone:  (202) 344-4000
Facsimile:  (202) 344-8300

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

|  |  |  |
|---|---|---|
| In re: | : | Chapter 11 |
|  | : |  |
| ADVANCE WATCH COMPANY LTD., <u>et al.</u>, | : | Case No. 15-12690 (___) |
|  | : |  |
| Debtors.[1] | : | (Joint Administration Requested) |
|  | : |  |

------------------------------------------------------------ x

**DEBTORS' MOTION FOR ENTRY OF INTERIM AND**
**FINAL ORDERS (I) AUTHORIZING THE DEBTORS TO OBTAIN**
**POSTPETITION FINANCING AND GRANT SECURITY INTERESTS AND**
**SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) MODIFYING THE**
**AUTOMATIC STAY; (III) AUTHORIZING THE DEBTORS TO ENTER INTO**
**AGREEMENTS WITH WELLS FARGO BANK, NATIONAL ASSOCIATION;**
**(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") file

this motion (the "**Motion**") for entry of (a) an interim order, substantially in the form of order

attached hereto as **<u>Exhibit A</u>** (the "**Interim DIP Order**"), (i) authorizing the Debtors, on an

interim basis, to (A) obtain post-petition financing on a senior secured, superpriority basis, and

(B) use the Cash Collateral (as defined in § 363 of the Bankruptcy Code), (ii) granting adequate

protection to the Pre-Petition Secured Lenders (as defined herein) in respect of their existing liens

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

and the Debtors' use of the Cash Collateral, (iii) scheduling a hearing to consider entry of a final order (the "**Final DIP Order**" and together with the Interim DIP Order, the "**DIP Orders**"), and (iv) granting related relief; and (b) the Final DIP Order, authorizing the relief granted in the Interim DIP Order on a permanent basis as described in this Motion, and in support, state as follows:

### Jurisdiction and Venue

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), and 364(d) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

### Procedural Background[2]

3.      On September 30, 2015 (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

---

[2]      A detailed description of the Debtors' businesses and the reasons for the filing of these chapter 11 cases and for the relief sought in this Motion are set forth in the Declaration of Jeffrey L. Gregg, Chief Restructuring Officer of the Debtors (I) in Support of Debtors' Chapter 11 Petitions and First-Day Filings and (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "**First-Day Declaration**"), being filed contemporaneously with this Motion.

9962971-v9

## Relief Requested

4.       By this Motion, the Debtors request entry of the two (2) DIP Orders, which, collectively, will provide the Debtors with critical and necessary access to a senior secured superpriority debtor-in-possession revolving credit and letter of credit facility of up to $18,500,000 inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,000,000 (the "**DIP Facility**"):

- **The Interim DIP Order provides:**

    ▪ <u>Cash Collateral</u>.  Authority to use the Debtors' cash that constitutes Pre-Petition Secured Lenders' Cash Collateral.  (<u>See</u> Interim DIP Order at § 2.6.)

    ▪ <u>DIP Facility</u>.  Authority to obtain a revolving credit and letter of credit facility of up to $18,500,000, inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,000,000, on an interim basis and other financial accommodations, pursuant to the terms and conditions of that certain Ratification and Amendment Agreement dated September 30, 2015 (the "**Ratification Agreement**") by and among Debtors Advance Watch Company Ltd. ("**Advance Watch**"), Sunburst Products, Inc. and GWG International, Ltd., as borrowers (collectively, the "**Borrowers**"), Binda USA Holdings, Inc., as guarantor (the "**Guarantor**"), Wells Fargo Bank, National Association ("**Wells Fargo**"), as administrative agent and collateral agent under the DIP Facility (in such capacities, the "**DIP Loan Agent**"), and the lenders from time to time party thereto (collectively, the "**DIP Lenders**"), substantially in the form attached as **Exhibit 1** to the Interim DIP Order, which ratifies and amends that certain Credit Agreement, dated as of June 21, 2013, by and among Borrowers, Guarantor, Wells Fargo, as Administrative Agent (in such capacity, the "**Pre-Petition Loan Agent**") and the DIP Lenders (in such capacity, the "**Pre-Petition Secured Lenders**") (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "**Pre-Petition Revolving Loan Agreement**", and as ratified and amended by the Ratification Agreement, the "**DIP Credit Agreement**").  (<u>See</u> Interim DIP Order at § 1.2.)

    ▪ <u>DIP Loan Documents</u>.  Authority to execute and deliver the DIP Credit Agreement and all agreements, documents and instruments contemplated by each (collectively, the "**DIP Loan Documents**"), and to take all actions necessary, appropriate or required to comply with the Debtors' obligations under the DIP Loan Documents and under the DIP Orders.  (<u>See</u> Interim DIP Order at § 1.3.)

    ▪ <u>DIP Liens and Claims</u>.  Authority to grant the DIP Loan Agent, for its own benefit and the benefit of the DIP Lenders, senior, first-priority liens on the Collateral (as defined in the DIP Credit Agreement) securing the DIP Facility, and superpriority

9962971-v9

claims in respect of the obligations under the DIP Facility.  (<u>See</u> Interim DIP Order at § 2.1.)

- **Adequate Protection**.  Approval of the Adequate Protection Liens and other Adequate Protection Obligations (in each case, as defined herein) to be provided to the Pre-Petition Loan Agent, on behalf of itself and the Pre-Petition Secured Lenders, to protect the Pre-Petition Secured Lenders' interests in the Cash Collateral, as well as to compensate for any decline in, or diminution of, the value of the Pre-Petition Secured Lenders' liens or security interests under the Pre-Petition Credit Facility (as defined herein).  (<u>See</u> Interim DIP Order at § 2.6.)

- **Final Hearing**.  A date for a hearing on the Motion to consider entry of the Final DIP Order, to be held no sooner than 15 days after the date of this Motion, and no later than 30 days after entry of the Interim DIP Order.  (<u>See</u> Interim DIP Order at § 6.)

- **The Final DIP Order provides:**

  - **Final Relief**.  Authorizing the relief granted in the Interim DIP Order on a permanent basis.

### Concise Statement Pursuant to Local Bankruptcy Rule 4001-2[3]

| Material Terms of the DIP Facility | |
|---|---|
| **Borrowers**<br>Bankruptcy Rule 4001(c)(1)(B) | Advance Watch Company Ltd., Sunburst Products, Inc. and GWG International, Ltd.  (<u>See</u> DIP Credit Agreement, Preamble; Interim DIP Order at pp. 1-2, § 1.2.) |
| **Guarantor**<br>Bankruptcy Rule 4001(c)(1)(B) | Binda USA Holdings, Inc.  (<u>See</u> DIP Credit Agreement, Preamble; Interim DIP Order at pp. 1-2, § 1.2.) |
| **DIP Lenders**<br>Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Bank, National Association and such other lenders party to the DIP Credit Agreement from time to time.  (<u>See</u> DIP Credit Agreement, Preamble; Interim DIP Order at pp. 1-2, § 1.2.) |
| **DIP Loan Agent**<br>Bankruptcy Rule 4001(c)(1)(B) | Wells Fargo Bank, National Association, as agent.  (<u>See</u> DIP Credit Agreement, Preamble; Interim DIP Order at pp. 1-2, § 1.2.) |
| **DIP Facility**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(1) | Revolving credit and letter of credit facility of up to $18,500,000 inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,000,000.  (<u>See</u> DIP Credit Agreement at § 2.1; Interim DIP Order at pp. 1-2, § 1.2.) |

---

[3] To the extent the summary of terms and conditions set forth in this Motion is inconsistent with or in conflict with the terms and conditions of the DIP Facility, the terms and conditions of the DIP Facility shall control and govern.

| Material Terms of the DIP Facility | |
|---|---|
| **Budget**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(2), (h) | Use of Cash Collateral and proceeds of DIP Facility are subject to a Budget, consisting of weekly statements of receipts and disbursements of the Debtors on a consolidated basis for the 13 weeks commencing with the first week following the Petition Date.  (See Ratification Agreement at § 5.3; Interim DIP Order at p. 9, §§ 1.2, 2.6.1.)<br><br>The Debtors believe that the Budget will be adequate, considering all available assets, to pay all administrative expenses due or accruing during the period covered by the financing or the Budget. |
| **Use of DIP Proceeds/Roll-Up Provisions**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Bankruptcy Rule 4001-2(a)(6)-(a)(7) | For working capital and general corporate purposes, including payment of Pre-Petition Obligations (as defined in the DIP Credit Agreement), in accordance with the Budget.  (See Ratification Agreement at § 5.2; Interim DIP Order at § 1.2.)<br><br>DIP Loan Agent may, in its discretion, apply any payments or proceeds first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full.<br><br>(See Ratification Agreement at § 6.6; Interim DIP Order at § 1.2) |
| **Interest Rates**<br>Bankruptcy Rule 4001(c)(1)(B) | Prime Rate plus 1.25% for Base Rate Loans (as defined in the DIP Credit Agreement) and LIBOR plus 2.75% for the LIBOR Rate Loans (as defined in the DIP Credit Agreement).<br><br>(See Ratification Agreement at § 6.2; Interim DIP Order at § 1.2) |
| **Expenses and Fees**<br>Local Rule 4001-2(a)(3) | A DIP facility fee of $50,000.<br><br>(See Ratification Agreement at § 5.6; Interim DIP Order at § 1.2) |
| **Maturity Date**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(10) | The "**Maturity Date**" is the date that is the earlier of three (3) months from the date of the DIP Credit Agreement or such later date to which DIP Loan Agent may consent in its sole and absolute discretion.  (See Ratification Agreement at § 6.3; Interim DIP Order at § 3.4.) |
| **Collateral and Priority**<br>Bankruptcy Rule 4001(c)(1)(B)(ii);<br>Local Rule 4001-2(a)(4) | The Obligations (as defined in the DIP Credit Agreement) under the DIP Facility shall be senior secured obligations.  The DIP Facility shall be afforded liens and claims, including superpriority claims, on substantially all of the property of the estates.  (See Interim DIP Order at §§ 2.1.1, 2.1.3, 2.2.1.) |
| **Conditions to Closing**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(2) | Customary borrowing conditions, including, among other things, execution of the DIP Loan Documents, entry of the Interim DIP Order approving the DIP Facility and Cash Collateral usage and granting a lien upon and security interest in the DIP collateral, payment of fees and expenses and delivery of the Budget.  (See Ratification Agreement at Art. 8; Interim DIP Order at §§ 1.2, 1.3.) |
| **Covenants**<br>Bankruptcy Rule 4001(c)(1)(B);<br>Local Rule 4001-2(a)(8) | Usual and customary for financings of this type, including, among other things:<br><br>Affirmative Covenants: Include delivery of financial and other information, maintenance of existing businesses, payment of taxes and claims, maintenance of properties and insurance, inspections, compliance with laws and achievement of the Sale Milestones (defined below).<br><br>Negative Covenants: Include limitations of indebtedness, liens, guarantees, negative pledges, restricted payments, investments, fundamental changes, disposition of assets, acquisitions, transactions with affiliates and conduct of business. |

| Material Terms of the DIP Facility | |
| --- | --- |
| | Financial Covenants:  Include delivery of the Budget and compliance with Budget (actual amounts of cash receipts must exceed 80% of the amounts budgeted and disbursements must not exceed the applicable Budget line-item in any measurement period by more than 20% per line item or 10% for all line-items). <br><br> (See Ratification Agreement, Art. 5, Art. 8; Interim DIP Order at §§ 1.2, 1.3, 4.) |
| **Events of Default** <br> Bankruptcy Rule 4001(c)(1)(B); <br> Local Rule 4001-2(a)(10) | Usual and customary for financings of this type, including non-payment of obligations, defaults under covenants, breaches of representations and warranties, judgment defaults, failure to comply with ERISA rules and regulations, appointment of bankruptcy trustee or examiner, modification to DIP Orders, dismissal or conversion of the bankruptcy cases, lifting of stay as to material assets of the Debtors, invalidity of DIP Loan Documents and confirmation of a bankruptcy plan that does not require indefeasible payment in full of the DIP Facility and the Pre-Petition Credit Facility (defined below).  (See Ratification Agreement, § 6.19; Interim DIP Order at § 3.1.) |
| **Milestones** <br> Bankruptcy Rule 4001(c)(1)(B)(vi); <br> Local Rule 4001-2(a)(10), (12) | The following milestones (the "**Sale Milestones**") with respect to the sale of all or substantially all of the Debtors' assets or equity interests pursuant to § 363 of the Bankruptcy Code, in each case, in a manner satisfactory to DIP Loan Agent: <br><br> (a)    no later than two (2) business days after the Petition Date, the filing of a motion or pleading, in each case acceptable to DIP Loan Agent, approving (i) bidding procedures for the sale of all or substantially all of the Debtors' assets in accordance with § 363 of the Bankruptcy Code (the "**Sale**"); and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses related to and required to be paid by the Debtors in connection with such Sale(s), including without limitation, reasonable broker's and/or investment banker's fees incurred with respect to the Sale(s), in each case, pursuant to a retention agreement in form and substance acceptable to DIP Loan Agent, shall be remitted to DIP Loan Agent for application against, and in permanent reduction of, the Obligations; <br><br> (b)    entry of an order, reasonably satisfactory to DIP Loan Agent, approving sale procedures (the "**Sale Procedures Order**") no later than thirty (30 days after the Petition Date; <br><br> (c)    conduct an auction (the "**Auction**"), if more than one bona fide offer meeting the conditions established by the Debtors with the approval of DIP Loan Agent is received, no later than fifty-five (55) days after the Petition Date or such later date as may be consented to by DIP Loan Agent; <br><br> (d)    entry of a final order of the Bankruptcy Court, satisfactory to DIP Loan Agent, approving the sale (the "**Sale Order**") no later than seven (7) business days after the Auction, or such later date as may be consented to by DIP Loan Agent; and <br><br> (e)    close the sale no later than two (2) business days after entry of the Sale Order. <br><br> (See Ratification Agreement at § 5.7; Interim DIP Order at §§ 1.2, 1.3.) |

| Material Terms of the DIP Facility | |
|---|---|
| **Carve-Outs**<br>Local Rule 4001-2(a)(5), (9) | There shall be a carve-out for the payment of (the "**Carve-Out Expenses**"):<br><br>(i) amounts payable pursuant to 28 U.S.C. § 1930(a)(6) and any fees due to the clerk of the Bankruptcy Court and<br><br>(ii) amounts payable in respect of certain Allowed Professional Fees (defined below) (A) incurred at any time before the Trigger Date (defined below) up to the amounts set forth in the Budget for Allowed Professional Fees through the Trigger Date and only to the extent of funds deposited into the "Carve Out Account" (as defined in the Interim DIP Order) in accordance with the terms of the DIP Orders and (B) incurred on and after the Trigger Date, provided that the aggregate amount of such Allowed Professional Fees shall not exceed (1) in the case of Professionals (defined below) retained by the Debtors, the aggregate amount of $200,000 (the "**Debtor Professional Fee Carve Out**") and (ii) in the case of Professionals retained by any creditors' committee appointed in these chapter 11 cases (the "**Committee**"), the aggregate amount of $50,000 (the "**Committee Professional Fee Carve Out**" and, collectively with the Debtor Professional Fee Carve Out, the "**Professional Fee Carve Out**"). An additional carve out of $10,000 for the Chapter 7 trustee in the event that the Debtors' bankruptcy cases convert to Chapter 7 is also provided for under the DIP Orders.<br><br>"**Trigger Date**" shall mean the first business day after the occurrence and continuation of an Event of Default (as defined in the Interim DIP Order) and delivery of written notice thereof (the "**Carve Out Notice**") by the DIP Loan Agent to the U.S. Trustee, the Debtors and counsel for the Debtors, counsel for the Committee(s) and counsel for the DIP Loan Agent.<br><br>"**Professionals**" shall mean, collectively, attorneys, accountants and other professionals retained by the Debtors or any Committee(s) under § 327 or § 1103(a) of the Bankruptcy Code.<br><br>"**Allowed Professional Fees**" shall mean the unpaid and outstanding reasonable fees and expenses of Professionals (i) actually incurred on or after the Petition Date and (ii) allowed at any time by a final order of the Court pursuant to §§ 326, 328, 330 or 331 of the Bankruptcy Code.<br><br>(See Interim DIP Order at § 2.3.1.)<br><br>At the DIP Loan Agent's discretion, DIP Loan Agent may, at any time and in any increment in accordance with the DIP Credit Agreement, establish a reserve (the "Professional Fee Reserve") against the borrowed amount of the DIP Loans in respect of the Professional Fee Carve Out and the other Carve Out Expenses.<br><br>(See Interim DIP Order at § 2.3.3.)<br><br>Prior to the Trigger Date, Debtors shall be authorized to deposit into a segregated account maintained by Debtors for the benefit of all Professionals (the "Carve Out Account") each week an amount equal to the amount of Allowed Professional Fees projected in the Budget to be incurred for such week and shall be permitted to pay Allowed Professional Fees from the Carve Out Account. Promptly following the delivery of a Carve Out Notice, the DIP Lenders shall make a Loan to the Debtors in an amount equal to $260,000, and the Debtors shall fund the proceeds of such Loan into the Carve Out Account.<br><br>(See Interim DIP Order at § 2.4.) |

7

| Material Terms of the DIP Facility | |
|---|---|
| **Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(ii); | Subject to the Interim DIP Order and Budget, used for working capital and general corporate expenditures; provided, that the Debtors cannot use the proceeds of the Loans or Cash Collateral to challenge, as opposed to investigate, the validity, perfection, priority, extent or enforceability of the Pre-Petition Credit Facility, or the liens or security interests securing the obligations under the Pre-Petition Credit Facility, or to pursue any causes of action of any kind against Agent, Lenders, the Pre-Petition Loan Agent or the Pre-Petition Secured Lenders solely in their respective capacities as agents or lenders under the Pre-Petition Credit Facility, as applicable.  No more than $50,000 of any proceeds or cash collateral shall be used by counsel to any Committee appointed in the Bankruptcy Cases to investigate the validity, perfection, priority, extent or enforceability of the Pre-Petition Credit Facility or the liens or security interests securing the obligations under the Pre-Petition Credit Facility.  (See Interim DIP Order at § 2.3.2.) |
| **Duration of Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iii) | The earlier of (i) the Maturity Date, (ii) the confirmation of a plan of reorganization for any of the Borrowers, (iii) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties or of all equity interests in Debtors, and (iv) the occurrence of an Event of Default (as defined in the DIP Credit Agreement) (the earlier to occur of clauses (i), (ii), (iii), (iv) and (v) referred to herein as the "Termination Date"). |
| **Liens, Cash Payments or Adequate Protection Provided for Use of Cash Collateral**<br>Bankruptcy Rule 4001(b)(1)(B)(iv) and (c)(1)(B)(ii) | As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral, including Cash Collateral, on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out Expenses, the DIP Loan Agent, for the benefit of itself and the DIP Lenders, will be granted pursuant to §§ 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "**Revolving Loan A/L Replacement Lien**").  The Revolving Loan A/L Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent set forth in the Interim DIP Order, (B) the Permitted Liens and Permitted Indebtedness (each as defined in the DIP Credit Agreement), and (C) DIP Loan Agent's and DIP Lenders' liens on the Collateral to secure the DIP Obligations (as defined in the DIP Credit Agreement), and shall otherwise be senior to all other security interests, in liens on, or claims against any of the Collateral.  (See Interim DIP Order at § 2.6.2.) |
| **Liens on Avoidance Actions**<br>Bankruptcy Rule 4001(c)(1)(B)(xi); | The Agent and lenders will not receive a lien on causes of action under Chapter 5 of the Bankruptcy Code or otherwise under the Interim DIP Order; however, upon entry of the Final DIP Order granting such relief, they may receive a lien on such actions.  (See Interim DIP Order at § 2.1.1.) |
| **Determination Regarding Pre-Petition Claim**<br>Bankruptcy Rule 4001(c)(1)(B)(iii) | The Interim DIP Order contains stipulated findings of fact, including those related to the validity and enforceability of the Pre-Petition Credit Facility and the liens securing the Pre-Petition Credit Facility.  (See Interim DIP Order at pp. 5-8, § 4.1.1.) |
| **Effect of Debtors' Stipulations on Third Parties**<br>Bankruptcy Rule 4001(c)(1)(B)(iii), (iv) | Subject to specified limitations in the Interim DIP Order, the stipulations and admissions contained in the Interim DIP Order shall be binding upon each Debtor, each party to the DIP Credit Agreement and any party-in interest.  (See Interim DIP Order at § 4.1.1.) |

9962971-v9

| Material Terms of the DIP Facility | |
|---|---|
| **Waiver or Modification of Automatic Stay** Bankruptcy Rule 4001(c)(1)(B)(iv) | The automatic stay is modified and vacated to the extent necessary to permit DIP Loan Agent and each DIP Lender to perform any act authorized or permitted under or by virtue of the Interim Order or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by the Interim Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the DIP Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Loan Documents and apply such payments to the Pre-Petition Obligation or DIP Obligations pursuant to the DIP Loan Documents and/or the Interim Order, as applicable, and (d) immediately upon the occurrence of an Event of Default, to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents or applicable law other than those rights and remedies against the Collateral.  Additionally, upon the occurrence of an Event of Default and after providing five (5) business days' (the "**Default Notice Period**") prior written notice (the "**Enforcement Notice**") to counsel for the Debtors, counsel for the Committee (if appointed), and the U.S. Trustee, the DIP Loan Agent, acting on behalf of itself and the DIP Lenders, shall be entitled to exercise rights and remedies against the Collateral. (See Interim DIP Order at § 3.5.) |
| **Waiver or Modification of Applicability of Non-Bankruptcy Law Relating to the Perfection or Enforcement of a Lien** Bankruptcy Rule 4001(c)(1)(B)(vii) | All security interests and liens in Collateral granted by the DIP Loan Documents shall be valid and perfected upon entry of the Interim DIP Order. (See Interim DIP Order at § 2.1.4.) |
| **Section 506(c) Waiver** Bankruptcy Rule 4001(c)(1)(B)(x) | Subject to entry of a Final DIP Order granting such relief, no costs or expenses of administration which have or may be incurred in the Debtors' bankruptcy cases shall be charged against DIP Loan Agent or any DIP Loan Lender, their respective claims or the Collateral pursuant to § 506(c) of the Bankruptcy Code without the prior written consent of DIP Loan Agent, and no such consent shall be implied from any other action, inaction or acquiescence by DIP Loan Agent or any DIP Lender. (See Interim DIP Order at § 4.3.) |
| **Release, Waivers or Limitations on any Claim or Cause of Action** Bankruptcy Rule 4001(c)(1)(B)(viii) | Subject to the challenge period, the Pre-Petition Loan Agent and the Pre-Petition Secured Lenders get a release of claims. (See Interim DIP Order at § 4.5.) |

## **Background**

## I.    **Pre-Petition Capital Structure**

5.    As of the Petition Date, the Debtors' principal capital structure consists of a secured revolving loan facility and equity.

6.     On June 21, 2013, the Debtors entered into the Pre-Petition Revolving Loan Agreement with the Pre-Petition Loan Agent and the Pre-Petition Secured Lenders, to obtain a $45,000,000 asset-based revolving credit facility with a $5,000,000 letter of credit sub-line facility (the "**Pre-Petition Credit Facility**").  The total borrowing capacity under the Pre-Petition Credit Facility is based on a borrowing base, which is defined under the Pre-Petition Revolving Loan Agreement as 85% of the Debtors' eligible accounts receivable plus the lesser of (i) 65% of the value of eligible inventory, or (ii) 85% of the net recovery percentage of eligible inventory, less reserves.

7.     Amounts loaned under the Pre-Petition Credit Facility bear interest, at the Debtors' option, at either a base rate or at LIBOR, plus an applicable margin based on the available Pre-Petition Credit Facility amount, less trade payables in excess of historical levels for the most recently completed calendar quarter.  The applicable margins range between 0.75% and 1.25% on base-rate borrowings and between 2.25% and 2.75% on LIBOR borrowings.  The Debtors are also required to pay an annual non-use fee of 0.375% of the unused amounts under the Pre-Petition Credit Facility, as well as other customary fees as set forth in the Pre-Petition Revolving Loan Agreement.

8.     As of the Petition Date, the Debtors were indebted to the Pre-Petition Loan Agent and the Pre-Petition Secured Lenders under the Pre-Petition Revolving Loan Agreement in respect of Loans, Letters of Credit, Bank Products, and all other Obligations (each as defined in the Pre-Petition Revolving Loan Agreement) in an aggregate outstanding principal amount of not less than $13,359,095.01, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Pre-Petition Obligations**"; for purposes hereof, the term

10

Pre-Petition Obligations shall include, without limitation, all "Pre-Petition Obligations", as such term is defined in the DIP Credit Agreement).

9.      The Debtors' obligations under the Pre-Petition Credit Facility are secured by first-priority, perfected security interests in substantially all of the Debtors' assets.  The Pre-Petition Loan Agent holds such liens, in accordance with the Pre-Petition Revolving Loan Agreement and related security documents, for the ratable benefit of the Pre-Petition Secured Lenders.

10.      Prior to the Petition Date, Debtor Advance Watch, as borrower, entered into that certain Amended and Restated Revolving Credit Agreement dated as of June 14, 2013 with Binda Italia Srl ("**Binda Italy**"), Advance Watch's ultimate parent entity, as lender, providing Advance Watch with a $35 million revolving credit facility (the "**Binda Italy Credit Facility**").  The Binda Italy Credit Facility amended and restated a Revolving Credit Agreement entered into on July 31, 2008, by Advance Watch, as borrower, and Binda SpA, as lender,[4] which agreement was subsequently amended in 2008, 2011, and 2012.  At the time of the Binda Italy Credit Facility, approximately $27.5 million in financing had been extended under the prior agreement.

11.      The Binda Italy Credit Facility was a mechanism established primarily to provide working capital from Binda Italy to the Debtors and to expatriate cash to the Debtors' Italian owners.  As the Binda Italy Credit Facility states, Binda Italy entered into the amended and restated agreement "to continue in giving financial support and to develop [Advance Watch]'s business . . . ."  In addition, the Binda Italy Credit Facility was amended to extend the maturity date from December 31, 2013 to December 31, 2018, and acknowledged that the repayment obligations are junior and subordinate to the Debtors' obligations under the Pre-Petition Credit Facility, as further

---

[4] Binda SpA is Binda Italy's predecessor in interest and merged into Binda Italy as of December 1, 2012.

memorialized in a Subordination Agreement dated as of June 21, 2013 between Wells Fargo and Binda Italy.

12.     Under the Binda Italy Credit Facility, financed amounts accrue interest at the rate of LIBOR plus 2.50%, compounded annually.  Interest payments are due on an annual basis at the end of March of the following year in which the interest accrued.  No payments of principal are due until maturity.  As of just prior to the Petition Date, approximately $26.2 million is outstanding under the Binda Italy Credit Facility.

## II.     Proposed Post-Petition Financing

### A.     The Debtors' Marketing Efforts for Post-Petition Financing

13.     On or about August 4, 2015, the Debtors engaged Imperial Capital, LLC ("**Imperial**") to identify potential strategic and financial buyers, and, ultimately, run a marketing and sale process of the Debtors' assets.  Additionally, at the request of the Debtors, Imperial identified and contacted six (6) third parties as potential sources of debtor in possession financing. The third parties solicited by Imperial included sophisticated financial institutions, hedge funds, and lower-middle-market business lenders active in the debtor in possession financing market, which Imperial had identified based on a number of factors, including their ability to quickly complete diligence and fund a transaction through debtor in possession financing.

14.     Through discussions with these potential third-party lenders, it quickly became apparent that the relatively small size of the potential loan, the Debtors' existing capital structure, including the Debtors' level of secured debt (relative to asset value) and lack of unencumbered assets, as well as the Debtors' niche market, foreclosed any opportunities for the Debtors to access unsecured or junior credit.  Further, in the absence of a successful priming fight, any debtor in possession loan provided by parties other than the Pre-Petition Secured Lenders would have required the consent of the Pre-Petition Secured Lenders, which had indicated they would not be

willing to provide.  Based on numerous conversations with the Pre-Petition Secured Lenders as part of this process, it became readily apparent that a collateral priming fight with a third-party lender would be extremely time intensive, expensive and not value accretive to the Debtors as compared to the DIP Financing negotiated with the Pre-Petition Secured Lenders.

### B.    The DIP Facility

15.    After extended good faith, arm's-length negotiations, certain of the Pre-Petition Secured Lenders, as proposed DIP Lenders, agreed to provide the DIP Facility on the terms provided in the DIP Credit Agreement, summarized above.  The proceeds of the DIP Facility, which the Debtors estimate, assuming a Sale to the stalking horse or another qualified bidder is consummated, will be sufficient to support them through the pendency of these chapter 11 cases, will be used (a) for general working capital and other purposes permitted under the DIP Credit Agreement; (b) to fund the costs of administering these chapter 11 cases; and (c) to pay all fees and expenses provided for under the DIP Credit Agreement and authorized by the Court.

16.    Terms similar to those included in the DIP Facility are standard for financing of this kind.  The Debtors also successfully negotiated for several key concessions from the DIP Lenders, including more flexible covenant defaults, an increase in the amount of the revolving loan facility, an increase in the letter of credit facility, more flexible operating tests, a more favorable DIP Facility fee, more favorable interest rates, and, during negotiations of the DIP Facility, authorization by the Pre-Petition Loan Agent to borrow funds outside the borrowing base formulas provided for under the Pre-Petition Revolving Loan Agreement.  Further, the maximum loan limit provides up to $4,000,000 of loans outside the applicable formula.  The terms of the DIP Facility, therefore, are an attractive option, especially in light of the inevitable priming fight that would occur to the extent the Debtors were to obtain financing from parties other than the Pre-Petition Secured Lenders.

13

C.      **Use of Cash Collateral**

17.      The DIP Credit Agreement also provides the Debtors with immediate access to the

Cash Collateral, subject to the terms and conditions of the DIP Credit Agreement and the Interim

DIP Order.  Immediate access to the Cash Collateral will (a) ensure that the Debtors have sufficient

working capital to, among other things, pay their employees and vendors; (b) enable the Debtors

to honor their pre-petition obligations under and in accordance with other "first-day" orders

entered by the Court; and (c) satisfy administrative expenses incurred in connection with the

commencement of these chapter 11 cases.  By providing the Debtors with the immediate right to

use the Cash Collateral in whichever of the Debtors' accounts it is currently held, the DIP Credit

Agreement also avoids any business disruptions that would result if the Debtors were required to

borrow under a post-petition facility to replenish their various operating accounts.

D.      **Adequate Protection Obligations**

18.      The Debtors and the Pre-Petition Secured Lenders have agreed on consideration

(the "**Adequate Protection Obligations**") as adequate protection for the diminution in value of

the Pre-Petition Secured Lenders' interests in the Pre-Petition Collateral, including Cash

Collateral, on account of the Debtors' use of such Pre-Petition Collateral (including Cash

Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses.

Specifically, as detailed above, the Pre-Petition Loan Agent, for the benefit of itself and the Pre-

Petition Secured Lenders, will be granted pursuant to §§ 361 and 363 of the Bankruptcy Code, the

Revolving Loan A/L Replacement Lien in all of the Collateral.   The Revolving Loan A/L

Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent

set forth in the Interim DIP Order, (B) the Permitted Liens and Permitted Indebtedness, and (C)

DIP Loan Agent's and DIP Lenders' liens on the Collateral to secure the DIP Obligations, and

shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

## Basis for Relief

I. **The Debtors Should Be Authorized to Obtain Post-Petition Financing Through the DIP Loan Documents.**

    A. **Entering into the DIP Loan Documents Is an Exercise of the Debtors' Sound Business Judgment.**

22.    For the reasons set forth in greater detail below, the Court should authorize the Debtors to enter into the DIP Loan Documents, and obtain access to the DIP Facility and the Cash Collateral, as an exercise of the Debtors' sound business judgment.  At their core, the statutory predicates for a debtor to enter into the DIP Loan Documents require the exercise of sound business judgment.

23.    Section 364 of the Bankruptcy Code authorizes a debtor to obtain secured or superpriority financing under certain circumstances as described in greater detail below.  Provided that an agreement to obtain secured credit does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant debtors considerable deference in acting in accordance with its sound business judgment in obtaining such credit.  See In re Barbara K. Enters., Inc., No. 08-11474 (MG), 2008 WL 2439649, at *14 (Bankr. S.D.N.Y. June 16, 2008) (explaining that courts defer to a debtor's business judgment "so long as a request for financing does not 'leverage the bankruptcy process' and unfairly cede control of the reorganization to one party in interest."); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 [of the Bankruptcy Code] is to be utilized on grounds that permit [a debtor's] reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit a party-in-

interest."); In re Farmland Indus., Inc., 294 B.R. 855, 881 (Bankr. W.D. Mo. 2003) ("[T]he

applicable factors can be synthesized as follows: (1) That the proposed financing is an exercise of

sound and reasonable business judgment . . . .").

24.    Furthermore, in determining whether the Debtors have exercised sound business

judgment in deciding to enter into the DIP Loan Documents, the Court should consider the

economic terms of the DIP Facility in light of current market conditions.  See, e.g., Transcript of

Record at 734-35:24-1, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009)

(recognizing that "the terms that are now available for DIP facilities in the current economic

environment aren't as desirable" as in the past).  Moreover, the Court may appropriately take into

consideration non-economic benefits to the Debtors offered by a proposed post-petition facility.

For example, in In re ION Media Networks, Inc., the Bankruptcy Court for the Southern District

of New York held that:

> Although all parties, including the Debtors and the Committee, are
> naturally motivated to obtain financing on the best possible terms,
> a business decision to obtain credit from a particular lender is
> almost never based purely on economic terms.  Relevant features
> of the financing must be evaluated, including non-economic
> elements such as the timing and certainty of closing, the impact on
> creditor constituencies and the likelihood of a successful
> reorganization.  This is particularly true in a bankruptcy setting
> where cooperation and establishing allegiances with creditor
> groups can be a vital part of building support for a restructuring
> that ultimately may lead to a confirmable reorganization plan.  That
> which helps foster consensus may be preferable to a notionally
> better transaction that carries the risk of promoting unwanted
> conflict.

No. 09-13125, 2009 WL 2902568, at *4 (Bankr. S.D.N.Y. July 6, 2009).

25.    The Debtors' execution of the DIP Loan Documents is an exercise of their sound

business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors

and their advisors undertook a detailed investigation as to the Debtors' projected financing needs

during the pendency of any chapter 11 case, and determined that the Debtors would require post-petition financing to support their operational and restructuring activities. Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside advisors, in order to obtain the required post-petition financing on terms favorable to the Debtors. Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Loan Documents provide financing on more favorable terms than any other reasonably available alternative.

26. Specifically, as noted above, the DIP Loan Documents will provide the Debtors with access of up to $4 million in excess of the pre-petition lending formulas, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases. Additionally, the DIP Loan Documents provide the Debtors with access to the Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash. Accordingly, the Debtors submit that entering into the DIP Loan Documents constitutes an exercise of the Debtors' sound business judgment that should be approved by the Court.

**B.      The Debtors Should Be Authorized to Obtain Post-Petition Financing on a Senior Secured and Superpriority Basis.**

27. Section 364 of the Bankruptcy Code authorizes a debtor to obtain, in certain circumstances, post-petition financing on a secured or superpriority basis, or both. Specifically, § 364(c) of the Bankruptcy Code provides, in pertinent part, that the Court, after notice and a hearing, may authorize a debtor that is unable to obtain credit allowable as an administrative expense under § 503(b)(1) of the Bankruptcy Code to obtain credit or incur debt:

> (1)      with priority over any or all administrative expenses of the kind specified in § 503(b) or 507(b) of [the Bankruptcy Code];

17

(2)     secured by a lien on property of the estate that is not otherwise subject to a lien; or

(3)     secured by a junior lien on property of the estate that is subject to a lien.

11 U.S.C. § 364(c).

28.     In order to satisfy the requirements of § 364(c) of the Bankruptcy Code, a debtor need only demonstrate "by a good faith effort that credit was not available" to the debtor on an unsecured or administrative expense basis.  Bray v. Shenandoah Fed. Savs. & Loan Ass'n (In re Snowshoe Co.), 789 F.2d 1085, 1088 (4th Cir. 1986).  "The statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable." Id.; see also Pearl-Phil GMT (Far East) Ltd. v. Caldor Corp., 266 B.R. 575, 584 (S.D.N.Y. 2001) (superpriority administrative expenses authorized where debtor could not obtain credit as an administrative expense).  When few lenders are likely to be able and willing to extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing."  In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd sub nom. Anchor Savs. Bank FSB v. Sky Valley, Inc., 99 B.R. 117, 120 n.4 (N.D. Ga. 1989).  See also Ames Dep't Stores, 115 B.R. at 40 (approving financing facility and holding that the debtor made reasonable efforts to satisfy the standards of § 364(c) where it approached four lending institutions, was rejected by two, and selected the most favorable of the two offers it received).

29.     As described above, Imperial identified and solicited offers from multiple potential post-petition lenders.  Notwithstanding these efforts, the Debtors were unable to obtain any post-petition financing in the form of unsecured credit or as an administrative expense.  The Debtors' significant secured debt (relative to their assets) precludes them from obtaining post-petition financing in the amount they require on terms other than on a secured and superpriority basis.

18

The Court should therefore (i) authorize the Debtors to provide the DIP Loan Agent, on behalf of itself and the DIP Lenders, senior liens on the Debtors' unencumbered property as provided in § 364(c)(3) of the Bankruptcy Code, and junior liens on the Debtors' property that is subject to valid, perfected, and unavoidable liens in existence immediately prior to the Petition Date (other than the liens primed under the DIP Facility) or to valid and unavoidable liens in existence immediately prior to the Petition Date that are perfected after the Petition Date as permitted by § 546(b) of the Bankruptcy Code, if any, as provided in § 364(c)(2) of the Bankruptcy Code; and (ii) grant the Debtors' repayment obligations under the DIP Loan Documents superpriority administrative expense status as provided for in § 364(c)(1) of the Bankruptcy Code.

### C. The Debtors Should Be Authorized to Obtain Post-Petition Financing Secured by First-Priority Priming Liens.

30.     In addition to authorizing financing under § 364(c) of the Bankruptcy Code, courts may also authorize a debtor to obtain post-petition credit secured by a lien that is senior or equal in priority to existing liens on the encumbered property, without the consent of the existing lienholders, if the debtor cannot otherwise obtain such credit and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).

31.     When determining whether to authorize a debtor to obtain credit secured by a "priming" lien as authorized by § 364(d) of the Bankruptcy Code, courts focus on whether the transaction will enhance the value of the debtors' assets.  Courts consider a number of factors, including, without limitation:

(a)     whether alternative financing is available on any other basis (i.e., whether any better offers, bids or timely proposals are before the court);

(b)     whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtors' business;

(c)    whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtors and proposed lender(s);

(d)    whether the proposed financing agreement was negotiated in good faith and at arm's length and entry therein is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors; and

(e)    whether the proposed financing agreement adequately protects prepetition secured creditors.

See, e.g., Ames Dep't Stores, 115 B.R. at 37-39; Bland v. Farmworker Creditors, 308 B.R. 109,

113-14 (S.D. Ga. 2003); Farmland Indus., 294 B.R. at 862-79, cited in Transcript of Record at

733:3-7, In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Mar. 5, 2009); Barbara K.

Enters., No. 08-11474 (MG), 2008 WL 2439649 at *10; see also 3 Collier on Bankruptcy ¶

364.04[1] (15th ed. rev. [2008]).  The DIP Loan Documents satisfy each of these factors.

32.    First, as described above, the Debtors and their advisors considered a number of different potential financing sources and ultimately determined that the DIP Lenders offered the only viable option for obtaining the post-petition financing the Debtors require.  The Debtors conducted arm's-length negotiations with the DIP Lenders regarding the terms of the DIP Loan Documents, and those agreements reflect the most favorable terms on which the DIP Lenders were willing to offer financing.  No alternative financing at the favorable terms offered in the DIP Facility is available to the Debtors, and the Debtors are not able to obtain financing from the DIP Lenders other than financing secured by first-priority priming liens.

33.    Second, the Debtors need the funds to be provided under the DIP Loan Documents to preserve the value of their estates.  Absent access to the DIP Facility and use of the Cash Collateral, the Debtors will be unable to operate their business or prosecute their chapter 11 cases, which will threaten the Debtors' going-concern value.  Providing the Debtors with the liquidity

9962971-v9

necessary to preserve their going-concern value through the pendency of these chapter 11 cases is in the best interest of their stakeholders.

34.       Third, the DIP Loan Documents will provide the Debtors with immediate access to the post-petition financing that the Debtors and their advisors have independently determined is sufficient and, as discussed in greater detail below, necessary to allow the Debtors to maintain their operations and their relationships with key constituents notwithstanding the commencement of these chapter 11 cases.  Further, the DIP Loan Documents provide the Debtors with use of the Cash Collateral, which will maintain the Debtors' ability to access liquidity in the same accounts as prior to the Petition Date, without the disruption or delay that would result if the Debtors were required to set aside that cash and re-fund their accounts with new post-petition borrowings. Accordingly, the terms of the DIP Loan Documents are reasonable and the DIP Facility and the Cash Collateral are sufficient to support the Debtors' operations and restructuring activities through the pendency of these chapter 11 cases.

35.       Fourth, as described in greater detail above and in the First Day Declaration, the Debtors and the DIP Lenders negotiated the DIP Loan Documents in good faith and at arm's-length, and the Debtors' entry into the DIP Loan Documents is an exercise of their sound business judgment and is in the best interests of their estates, creditors, and other parties in interest.

36.       Fifth, as described below, the Debtors will provide adequate protection for the Pre-Petition Secured Lenders' liens on and security interests in the Cash Collateral, as well as any decline in, or diminution of, the value of the Pre-Petition Secured Lenders' liens or security interests under the Pre-Petition Credit Facility.  Furthermore, the Pre-Petition Secured Lenders have consented to the adequate protection package to be provided.

9962971-v9

37.    Based on the foregoing, the DIP Facility will enhance the value of the debtors' assets and should be approved.

**D.    The Interests of the Pre-Petition Secured Lenders Are Adequately Protected.**

38.    A debtor may obtain post-petition credit "secured by a senior or equal lien on property of the estate that is subject to a lien only if" the debtor, among other things, provides "adequate protection" to those parties whose liens are primed.  See 11 U.S.C. § 364(d)(1)(B).  What constitutes adequate protection is decided on a case-by-case basis, and adequate protection may be provided in various forms, including payment of adequate protection fees, payment of interest, or granting of replacement liens or administrative claims.  In re Mosello, 195 B.R. 277, 289 (Bankr. S.D.N.Y. 1996) ("The determination of adequate protection is a fact-specific inquiry.  'Its application is left to the vagaries of each case . . . .'" (citation omitted)); In re Realty Sw. Assocs., 140 B.R. 360 (Bankr. S.D.N.Y. 1992); In re Beker Indus. Corp., 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986) (the application of adequate protection "is left to the vagaries of each case, but its focus is protection of the secured creditor from diminution in the value of its collateral during the reorganization process." (citations omitted)).

39.    The adequate protection provided by the Adequate Protection Obligations, as described in detail above and set forth in the DIP Orders, is fair and reasonable, and is sufficient to satisfy the requirements of § 364(d)(1)(B) of the Bankruptcy Code.

40.    Accordingly, the Court should find that the Adequate Protection Obligations are fair and reasonable, and satisfy the requirements of § 364(d)(1)(B) of the Bankruptcy Code.

**II.    The Debtors Should Be Authorized to Use the Cash Collateral.**

41.    Section 363(c) of the Bankruptcy Code restricts a debtor's use of a secured creditor's cash collateral.  Specifically, that provision provides, in pertinent part, that:

The trustee may not use, sell, or lease cash collateral . . . unless—

22

>    (A)    each entity that has an interest in such cash
> collateral consents; or
>
>    (B)    the court, after notice and a hearing, authorizes such
> use, sale, or lease in accordance with the provisions of this
> § [363].

11 U.S.C. § 363(c)(2). Further, § 363(e) provides that "on request of an entity that has an interest

in property . . . proposed to be used, sold or leased, by the trustee, the court, with or without a

hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate

protection of such interest." 11 U.S.C. § 363(e).

42.    The Debtors have satisfied the requirements of § 363(c)(2) and (e), and should be

authorized to use the Cash Collateral.

43.    First, pursuant to the DIP Loan Documents, the Pre-Petition Loan Agent and the

DIP Lenders have consented to the Debtors' use of the Cash Collateral.

44.    Second, the Pre-Petition Secured Lenders' interests in the Cash Collateral are

adequately protected in satisfaction of § 363(e) of the Bankruptcy Code.[5] As described above,

the Debtors are providing the Pre-Petition Secured Lenders with the Adequate Protection

Obligations, which are fair and reasonable, and adequately protect the Pre-Petition Secured

Lenders' interests in the collateral securing the Debtors' pre-petition obligations from diminution

caused by the DIP Facility, including by the Debtors' use of the Cash Collateral pursuant to the

terms thereof. Accordingly, the Court should authorize the Debtors to use the Cash Collateral

under § 363(c)(2) of the Bankruptcy Code.

---

[5]    The Debtors are not aware of any entity other than the Debtors and the Pre-Petition Secured Lenders that has, or
purports to have, an interest in the Cash Collateral.

9962971-v9

### III.    The Provisions of the DIP Financing Agreements Are Appropriate.

45.    As described above, the Debtors have agreed, subject to Court approval, to pay to the DIP Lenders, in exchange for their providing the DIP Facility, a fee of $50,000.  This fee, together with the other provisions of the DIP Loan Documents, represent the most favorable terms to the Debtors on which the DIP Lenders would agree to make the DIP Facility available.  The Debtors considered the fee described above when determining in their sound business judgment that the DIP Loan Documents constituted the best terms on which the Debtors could obtain the post-petition financing necessary to continue their operations and prosecute their chapter 11 cases, and paying the fee in order to obtain the DIP Facility is in the best interests of the Debtors' estates, creditors and other parties in interest.

46.    Courts routinely authorize debtors to pay fees similar to those the Debtors propose to pay, where the associated financing is, in the debtors' business judgment, beneficial to the debtors' estates.  See, e.g., In re Insight Health Services Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011) (approving 2.0% DIP closing fee); In re NR Liquidation III Co. (f/k/a Neff Corp.), No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010) (approving 3.1% DIP and exit facility fee); In re The Reader's Digest Ass'n, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009) (approving 3% exit fee), In re Lear Corp., No. 14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009) (approving 5.0% up-front fee and a 1.0% exit/conversion fee); In re Gen. Growth Prop., Inc., No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009) (approving 3.75% exit fee); In re Aleris Int'l. Inc., No. 09-10478 (Bankr. D. Del. Mar. 18, 2009) (approving 3.5% exit fee and 3.5% front-end net adjustment against each lender's initial commitment); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Jan. 13, 2009) (approving an up-front 3% facility fee); In re Lyondell Chem. Co., No. 09-10023 (Bankr. S.D.N.Y. Jan. 8, 2009) (approving exit fee of 3%);

In re DJK Residential, No. 08-10375 (Bankr. S.D.N.Y. Feb. 29, 2008) (approving 3% fee in connection with post-petition financing).[6]  Accordingly, the Court should authorize the Debtors to pay the fee provided under the DIP Loan Documents in connection with entering into those agreements.

47.    The terms of the DIP Loan Documents, including the key provisions described above, constitute, on the whole, the most favorable terms on which the Debtors could obtain needed post-petition financing.

**IV.    The Scope of the Carve-Out Is Appropriate.**

48.    The proposed DIP Facility subjects the security interests and administrative expense claims of the DIP Lender to the Carve-Out Expenses.  Such carve outs for professional fees have been found to be reasonable and necessary to ensure that a debtor's estate and any statutory committee can retain assistance from counsel.  See, e.g., Ames Dep't Stores, 115 B.R. at 40.  The DIP Facility does not directly or indirectly deprive the Debtors' estates or other parties in interest of possible rights and powers by restricting the services for which professionals may be paid in these cases.  See id. at 38 (observing that courts insist on carve outs for professionals representing parties-in-interest because "[a]bsent such protection, the collective rights and expectations of all parties-in-interest are sorely prejudiced.").  In addition, the carve-out ensures that proceeds of the DIP Facility may be used for the payment of U.S. Trustee fees and professional fees of the Debtor and any future Committee notwithstanding the grant of superpriority and administrative liens and claims under the DIP Facility.

---

[6]    Because of the voluminous nature of the orders cited herein, such orders have not been attached to the Motion. Copies of these orders are available upon request to the Debtors' proposed counsel.

9962971-v9

## V.    The DIP Lenders Should Be Deemed Good Faith Lenders Under § 364(e).

49.    Section 364(e) of the Bankruptcy Code protects a good faith lender's right to collect on loans extended to a debtor, and its right in any lien securing those loans, even if the authority of the debtor to obtain such loans or grant such liens is later reversed or modified on appeal.  Specifically, § 364(e) provides that:

> The reversal or modification on appeal of an authorization under this section [364 of the Bankruptcy Code] to obtain credit or incur debt, or of a grant under this section of a priority or a lien, does not affect the validity of any debt so incurred, or any priority or lien so granted, to an entity that extended such credit in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and the incurring of such debt, or the granting of such priority or lien, were stayed pending appeal.

11 U.S.C. § 364(e).

50.    As explained in detail herein and in the First-Day Declaration, the DIP Loan Documents are the result of the Debtors' reasonable and informed determination that the DIP Lenders offered the most favorable terms on which to obtain needed post-petition financing, and of extended arm's-length, good faith negotiations between the Debtors and the DIP Lenders.  The terms and conditions of the DIP Loan Documents are fair and reasonable, and the proceeds under the DIP Facility will be used only for purposes that are permissible under the Bankruptcy Code.  Further, no consideration is being provided to any party to the DIP Loan Documents other than as described herein.  Accordingly, the Court should find that the DIP Lenders are "good faith" lenders within the meaning of § 364(e) of the Bankruptcy Code, and are entitled to all of the protections afforded by that section.

## VI.    Modification of the Automatic Stay Is Warranted.

51.    The DIP Loan Documents and the proposed Interim DIP Order contemplate that the automatic stay arising under § 362 of the Bankruptcy Code shall be vacated or modified to the

extent necessary to permit the DIP Lenders to exercise, upon the occurrence and during the continuation of any Event of Default (as such term is defined in the DIP Credit Agreement), all rights and remedies provided for in the DIP Credit Agreement, and to take various other actions without further order of or application to the Court. The DIP Loan Documents provide, however, that the DIP Lenders must provide the Debtors, the United States Trustee for the Bankruptcy Court for the Southern District of New York and counsel to any Committee with five (5) business days' prior written notice before exercising any enforcement rights or remedies against the Collateral, which will allow the Debtors and other interested parties to seek an expedited hearing before the Court for the purpose of determining whether, in fact, an Event of Default has occurred and is continuing.

52.    Stay modification provisions of this sort are ordinary features of debtor in possession financing facilities and, in the Debtors' business judgment, are reasonable under the circumstances. See, e.g., In re Hawker Beechcraft, Inc., No. 12-11873 (SMB) (Bankr. S.D.N.Y. June 1, 2012); In re Velo Holdings Inc., No. 12-11384 (MG) (Bankr. S.D.N.Y. Apr. 23, 2012); In re United Retail Grp., Inc., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 23, 2012); In re Hostess Brands, Inc., No. 12-22052 (RDD) (Bankr. S.D.N.Y. Feb. 3, 2012); In re Insight Health Servs. Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); In re NR Liquidation III Co. (f/k/a Neff Corp.), No. 10-12610 (SCC) (Bankr. S.D.N.Y. June 30, 2010); In re The Reader's Digest Ass'n, No. 09-23529 (RDD) (Bankr. S.D.N.Y. Oct. 6, 2009); In re Lear Corp., No. 14326 (ALG) (Bankr. S.D.N.Y. Aug. 4, 2009); In re Gen. Growth Prop. Inc., No. 09-11977 (Bankr. S.D.N.Y. May 14, 2009); In re Tronox Inc., No. 09-10156 (Bankr. S.D.N.Y. Feb. 6, 2009); In re

9962971-v9

Chemtura Corp., No. 09-11233 (Bankr. S.D.N.Y. Apr. 23, 2009); In re Wellman, Inc., No. 08-10595 (Bankr. S.D.N.Y. Apr. 7, 2008); In re Musicland Holding Corp., No. 06-10064 (Bankr. S.D.N.Y. Feb. 21, 2006).

**VII.     The Debtors Require Immediate Access to the Cash Collateral and DIP Facility.**

53.     The Court may grant interim relief in respect of a motion filed pursuant to § 363(c) or 364 of the Bankruptcy Code where, as here, interim relief is "necessary to avoid immediate and irreparable harm to the estate pending a final hearing."  Fed. R. Bankr. P. 4001(b)(2) and (c)(2).  In examining requests for interim relief under this rule, courts in this jurisdiction generally apply the same business judgment standard applicable to other business decisions.  See, e.g., Ames Dep't Stores, 115 B.R. at 36.

54.     As discussed in the First-Day Declaration, the Debtors and their estates will suffer immediate and irreparable harm if the interim relief requested herein, including authorizing the Debtors to use the Cash Collateral and to borrow under the DIP Loan Documents, is not granted promptly after the Petition Date.  Further, the Debtors anticipate that the commencement of these chapter 11 cases will significantly and immediately increase the demands on their liquidity as a result of, among other things, the costs of administering these chapter 11 cases, implementing critical restructuring initiatives, and addressing key constituents' concerns regarding the Debtors' financial health and ability to continue operations in light of these chapter 11 cases.  Accordingly, the Debtors have an immediate need for access to liquidity to, among other things, continue the operation of their business, maintain important relationships with customers, landlords and franchisees, meet payroll, procure goods and services from vendors and suppliers and otherwise satisfy their working capital and operational needs, all of which are required to preserve and maintain the Debtors' going concern value for the benefit of all parties in interest.

28

55.     The importance of a debtor's ability to secure post-petition financing to prevent immediate and irreparable harm to its estate has been repeatedly recognized in this district in similar circumstances.   See, e.g., In re United Retail Grp., Inc., No. 12-10405 (SMB) (Bankr. S.D.N.Y. Feb. 2, 2012) (same); In re Sbarro, Inc., No. 11-11527 (SCC) (Bankr. S.D.N.Y. Apr. 5, 2011) (same); In re MSR Resort Golf Course LLC, No. 11-10372 (SHL) (Bankr. S.D.N.Y. Mar. 16, 2011) (same); In re Insight Health Servs. Holdings Corp., No. 10-16564 (AJG) (Bankr. S.D.N.Y. Jan. 4, 2011); In re Great Atl. & Pac. Tea Co., No. 10-24549 (RDD) (Bankr. S.D.N.Y. Dec. 13, 2010) (same); In re The Reader's Digest Assoc., No. 09-23529 (RDD) (Bankr. S.D.N.Y. Aug. 26, 2009) (same); In re Tronox Inc., No. 09-10156 (ALG) (Bankr. S.D.N.Y. Jan. 13, 2009) (same); In re Lyondell Chem. Co., No. 09-10023 (REG) (Bankr. S.D.N.Y. Jan. 8, 2009) (same); In re Lenox Sales, Inc., No. 08-14679 (ALG) (S.D.N.Y. Nov. 25, 2008) (same); In re Wellman, Inc., No. 08-10595 (SMB) (S.D.N.Y. Feb. 27, 2008) (same).   Accordingly, for all of the reasons set forth above, prompt entry of the Interim DIP Order is necessary to avert immediate and irreparable harm to the Debtors' estates and is consistent with, and warranted under, Bankruptcy Rules 4001(b)(2) and (c)(2).

## **Request for a Final Hearing**

56.     Pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2), the Debtors request that the Court set a date, which is no sooner than 15 days after the date of this Motion and no later than 30 days after the entry of the Interim DIP Order, to hold a hearing to consider entry of the Final DIP Order and the permanent approval of the relief requested in this Motion.[7]   The Debtors also request authority to serve a copy of the signed Interim DIP Order, which fixes the time and date for the filing of objections, if any, to entry of the Final DIP Order, by first-class mail upon

---

[7]   The DIP Credit Agreement requires that the Final DIP Order be entered no later than 35 days after entry of the Interim DIP Order.   See DIP Credit Agreement at § 6.9 (definition of "Termination Date").

9962971-v9

the notice parties listed below, and further request that the Court deem service thereof sufficient notice of the hearing on the Final DIP Order under Bankruptcy Rule 4001(c)(2).

## Reservation of Rights

57.    Nothing contained in this Motion is intended or should be construed as an admission as to the validity of any claim against the Debtors, a waiver of the Debtors' rights to dispute any claim, or an approval or assumption of any agreement, contract, or lease under § 365 of the Bankruptcy Code.  The Debtors expressly reserve their right to contest any claim related to the relief sought herein.  Likewise, if the Court grants the relief sought herein, any payment made pursuant to an order of the Court is not intended to be nor should it be construed as an admission as to the validity of any claim or a waiver of the Debtors' rights to subsequently dispute such claim.

## Notice

19.    The Debtors have provided notice of this Motion to: (a) the Office of the United States Trustee for the Southern District of New York (United States Trustee's Office Region 2, U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014); (b) the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims, filed pursuant to Bankruptcy Rule 1007(d); (c) the administrative agent under the Debtors' first lien credit facility (Wells Fargo Bank National Association, 100 Park Avenue, 14th Floor, New York, New York 10017, Attn: Portfolio Manager - Advance Watch, with a copy to Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, Attn: Daniel F. Fiorillo, Esq.); (d) Binda Italia Srl, Via Montefeltro, 4, 20156 Milano, Attention: Simone Binda, CEO, sbinda@bindagroup.com); (e) the Internal Revenue Service (Internal Revenue Service, Centralized Insolvency Operations, P.O. Box 7346, Philadelphia, Pennsylvania 19101-7346); (f) the United States Securities and Exchange Commission (U.S. Securities and Exchange

Commission, New York Regional Office, Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281-1022); and (g) all parties who have requested notice pursuant to Bankruptcy Rule 2002. In light of the nature of the relief requested, the Debtors respectfully submit that no other or further notice is necessary.

**No Prior Request**

20.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtors respectfully request entry of an interim order, substantially in the form attached hereto as **Exhibit A**, (i) granting the relief requested herein and (ii) granting such other relief as is just and proper.

Dated: New York, New York
        September 30, 2015

                                        Respectfully submitted,


                                        _____/s/ Jeffrey S. Sabin_____
                                        Jeffrey S. Sabin
                                        Rishi Kapoor
                                        Venable LLP
                                        1270 Avenue of the Americas
                                        New York, New York 10020
                                        Telephone:    (212) 307-5500
                                        Facsimile:    (212) 307-5598

                                        and

                                        Andrew J. Currie (to be admitted *pro hac vice*)
                                        Venable LLP
                                        575 7th Street, NW
                                        Washington, DC 20004
                                        Telephone:    (202) 344-4000
                                        Facsimile:    (202) 344-8300

                                        *Proposed Counsel to the Debtors
                                        and Debtors in Possession*

# **EXHIBIT A**

**Proposed Interim Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x
                              :

In re:                      :        Chapter 11
                              :

ADVANCE WATCH COMPANY LTD., <u>et al.</u>,  :    Case No. 15-12690 (___)
                              :

        Debtors.[1]             :    (Joint Administration Requested)
                              :

---------------------------------------------------------------- x

**INTERIM ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN
POSTPETITION FINANCING AND GRANT SECURITY INTERESTS AND
SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) MODIFYING THE
AUTOMATIC STAY; (III) AUTHORIZING THE DEBTORS TO ENTER INTO
AGREEMENTS WITH WELLS FARGO BANK, NATIONAL ASSOCIATION;
(IV) SCHEDULING A FINAL HEARING; AND (V) GRANTING RELATED RELIEF**

Upon the motion (the "**Motion**")[2] of the above-captioned debtors and debtors in

possession (collectively, the "**Debtors**") pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2)

and 364(c)(3) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002,

4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and

Rules 4001-2 and 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New

York (the "**Local Bankruptcy Rules**"), seeking, among other things:

      (1)     authorization for Debtors Advance Watch Company Ltd. ("**Advance**"), Sunburst

               Products, Inc. ("**Sunburst**") and GWG International, Ltd. ("**GWG**" and together

               with Advance and Sunburst, the "**Borrowers**") to obtain and for Debtor Binda

               USA Holdings, Inc. (the "**Guarantor**") to guarantee, unconditionally, on a joint

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

[2]    Capitalized terms used but not defined in this Order shall have the same meanings ascribed to such terms in the Motion.

and several basis, a post-petition revolving credit and letter of credit facility of up to $18,500,000, inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,000,000, as set forth in the Pre-Petition Revolving Loan Agreement (as defined below), as ratified and amended by that certain Ratification and Amendment Agreement dated as of September 30, 2015 and attached hereto as **Exhibit 1** (as amended, supplemented or otherwise modified from time to time in accordance with this order (the "**Interim Order**"), the "**DIP Credit Agreement**"), made by and among the Borrowers, the Guarantor, Wells Fargo Bank, National Association, as administrative agent and collateral agent ("**DIP Loan Agent**"), and the Lenders (as defined in the DIP Credit Agreement) (the "**DIP Lenders**"), and the other DIP Loan Documents (as defined in the DIP Credit Agreement), and in accordance with this Interim Order, secured by first-priority security interests in and liens upon all of the Collateral (as defined below) pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

(2)    authorization for Borrowers and Guarantor (a) to the extent not fully repaid from the proceeds of the Loans (as defined in the DIP Credit Agreement) incurred by the Borrowers pursuant to the DIP Loan Documents and this Interim Order, to gradually roll up the Loans provided under the Pre-Petition Loan Documents and all other Pre-Petition Obligations (each as defined below) into the DIP Obligations (as defined in the DIP Credit Agreement); and (b) to deem such rolled-up Pre-Petition Obligations to have been issued or provided, as applicable, under the DIP Credit Agreement and the other DIP Loan Documents;

(3)     authorization for the Debtors to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to the DIP Loan Agent, for the benefit of itself and the other DIP Lenders, in respect of all DIP Obligations;

(4)     as set forth below, approval of certain stipulations by the Debtors as set forth in this Interim Order with respect to the Pre-Petition Revolving Loan Agreement (as defined below) and the liens and security interests arising therefrom;

(5)     as set forth below, adequate protection to the DIP Loan Agent and the DIP Lenders (each in their respective capacities under the Pre-Petition Loan Documents (as defined below));

(6)     subject only to and effective upon entry of a Final Financing Order (as defined below), the waiver of the Debtors' right to assert claims to surcharge against the Collateral (as defined below) pursuant to § 506(c) of the Bankruptcy Code, to the extent set below;

(7)     modification of the automatic stay to the extent hereinafter set forth; and

(8)     the setting of a final hearing on the Motion ("**Final Hearing**") to consider entry of a final order (the "**Final Financing Order**") authorizing, among other things, the borrowing under the DIP Loan Documents on a final basis, as set forth in the Motion and the DIP Credit Agreement filed with the Court.

The initial hearing on the Motion having been held by this Court on October __, 2015 (the "**Interim Hearing**"), and upon the record made by the Debtors at the Interim Hearing, including the Motion, the Declaration of Jeffrey L. Gregg, Chief Restructuring Officer of the Debtors (I) in Support of Debtors' Chapter 11 Petitions and First-Day Filings and (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "**First-Day Declaration**"), and the filings and pleadings in

the above-captioned chapter 11 proceedings (the "**Cases**"), the Court having found that the relief requested in the Motion is in the best interests of Debtors, their estates, their creditors and other parties in interest; and appropriate notice of the Motion, the relief requested therein, and the Interim Hearing (the "**Notice**") was appropriate under the circumstances; and the Notice having been served by the Debtors in accordance with Rule 4001(c) on (i) counsel to the DIP Loan Agent, (ii) the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"), (iii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates (the "**30 Largest Unsecured Creditors**"), (iv); the Internal Revenue Service, (v) Wells Fargo Bank, National Association (the "**Blocked Account Bank**"), (vi) the Pension Benefit Guaranty Corporation, (vii) all appropriate state taxing authorities, (viii) all landlords, owners, and/or operators of premises at which any of the Debtors' inventory and/or equipment is located, and (ix) certain other parties identified in the certificate of service filed with the Court, including, without limitation, all creditors who have filed or recorded pre-petition liens or security interests against any of the Debtors' assets (collectively, the "**Noticed Parties**") and the opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     Petition.  On September 30, 2015 (the "**Petition Date**"), each Debtor filed a voluntary petition (each, a "**Petition**") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

B.     <u>Disposition</u>.   The Motion is granted on an interim basis in accordance with the

terms of this Interim Order.  Any objections to the Motion with respect to the entry of the Interim

Order that have not been withdrawn, waived or settled are hereby denied and overruled.

C.     <u>Jurisdiction and Venue</u>.   The Court has jurisdiction of this proceeding and the

parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a

"core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Cases

and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     <u>Notice</u>.   The Notice was given in the manner described in the Motion.  Under the

circumstances, the Notice given by the Debtors of the Motion, the Interim Hearing and the relief

granted under this Interim Order constitutes due and sufficient notice thereof and complies with

Bankruptcy Rules 4001(b) and 4001(c).

E.     <u>Debtors' Acknowledgments and Agreements</u>.   Without prejudice to the rights of

any creditors' committee appointed in these chapter 11 cases (the "**Committee**") or other parties-

in-interest as and to the extent set forth in Section 4.1.1 of this Interim Order, the Debtors admit,

stipulate, acknowledge and agree that:

(i)     <u>Pre-Petition Loan Documents</u>.   Prior to the commencement of the Cases,

DIP Loan Agent and the DIP Lenders made loans, advances and provided other financial

accommodations to Borrowers pursuant to the terms and conditions set forth in: (1) that certain

Credit Agreement, dated as of June 21, 2013, by and among Borrowers, Guarantor, DIP Loan

Agent and the DIP Lenders (as the same has heretofore been amended, supplemented, modified,

extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "**Pre-**

**Petition Revolving Loan Agreement**," a copy of which is on file with counsel to the Debtors

and available upon reasonable request); and (2) all other agreements, documents and instruments

executed and/or delivered with, to, or in favor of DIP Loan Agent or any DIP Lender, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Pre-Petition Revolving Loan Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "**Pre-Petition Loan Documents**").  Copies of the operative Pre-Petition Loan Documents are on file with counsel to the Debtors and available upon reasonable request.

(ii)     <u>Pre-Petition Obligations</u>.   As of the Petition Date, the Debtors were indebted to the DIP Loan Agent and the DIP Lenders under the Pre-Petition Loan Documents in respect of Loans, Letters of Credit, Bank Products, and all other Obligations (each as defined in the Pre-Petition Loan Documents) in an aggregate outstanding principal amount of not less than $13,359,095.01, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Pre-Petition Obligations**"; for purposes hereof, the term Pre-Petition Obligations shall include, without limitation, all "Pre-Petition Obligations", as such term is defined in the DIP Credit Agreement).   The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which

would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

(iii)    <u>Pre-Petition Collateral</u>.    As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens granted by Debtors to DIP Loan Agent, for the benefit of itself and the other DIP Lenders under the Pre-Petition Loan Documents, upon all of the Pre-Petition Collateral (as defined in the DIP Credit Agreement and hereinafter referred to as the "**Pre-Petition Collateral**"), subject only to the liens specifically permitted under Section 6.2 of the Pre-Petition Revolving Loan Agreement[3] to the extent that such security interests, liens or encumbrances are (1) valid, perfected and non-avoidable security interests, liens or encumbrances  existing as of the Petition Date, and (2) senior to and have not been or are not subject to being subordinated to DIP Loan Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral under the Pre-Petition Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "**Permitted Encumbrances**").  The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of DIP Loan Agent's and DIP Lenders' liens, claims or security interests in the Pre-Petition Collateral.

---

[3]    Section 6.2 of the Pre-Petition Revolving Loan Agreement limited the ability of the Debtors or their affiliates to create, incur, assume, or suffer to exist, directly or indirectly, any Lien (as defined in the Pre-Petition Revolving Loan Agreement) on or with respect to any of the Debtors' prepetition assets except for the Permitted Liens (as defined in the Pre-Petition Revolving Loan Agreement).

(iv)    <u>Proof of Claim</u>.    The acknowledgment by Debtors of the Pre-Petition

Obligations and the liens, rights, priorities and protections granted to or in favor of DIP Loan

Agent and DIP Lenders in respect of the Pre-Petition Collateral as set forth herein and in the Pre-

Petition Loan Documents shall be deemed a timely filed proof of claim on behalf of DIP Loan

Agent and the DIP Lenders in these Cases.

F.    <u>Findings Regarding the Post-Petition Financing</u>.

(i)    <u>Post-Petition Financing</u>.    The Debtors have requested from each of the

DIP Loan Agent and the DIP Lenders, and the DIP Loan Agent and DIP Lenders are willing to

extend certain loans, advances and other financial accommodations on the terms and conditions

set forth in this Interim Order and the DIP Loan Documents, respectively.

(ii)    <u>Need for Post-Petition Financing</u>.    The Debtors do not have sufficient

available sources of working capital, including cash collateral, to operate their businesses in the

ordinary course of business without the financing requested in the Motion.  The Debtors' ability

to maintain business relationships with their vendors, suppliers and customers, to pay their

employees, and to otherwise fund their operations is essential to the Debtors' continued viability

as the Debtors seek to maximize the value of the assets of the Estates (as defined below) for the

benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working

capital and liquidity through the proposed post-petition financing arrangements with the DIP

Loan Agent and DIP Lenders as set forth in this Interim Order and the DIP Credit Agreement, as

applicable, is vital to the preservation and maintenance of the going concern values of the

Debtors.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing

in order to, among other things, permit the orderly continuation of the operation of their

businesses, minimize the disruption of their business operations, and preserve and maximize the

value of the assets of the Debtors' bankruptcy estates (as defined under § 541 of the Bankruptcy

Code, the "**Estates**") in order to maximize the recovery to all creditors of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors are unable to

procure financing in the form of unsecured credit allowable under § 503(b)(1) of the Bankruptcy

Code, as an administrative expense under § 364(a) or (b) of the Bankruptcy Code, or in exchange

for the grant of an administrative expense priority pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3)

of the Bankruptcy Code, without granting liens on assets.  The Debtors have been unable to

procure the necessary financing on terms more favorable, taken as a whole, than the financing

offered by each of the DIP Loan Agent and DIP Lenders pursuant to the DIP Loan Documents.

(iv)    <u>Budget</u>.  The Debtors have prepared and delivered to DIP Loan Agent and

DIP Lenders an initial 13-week budget (as defined in the DIP Credit Agreement, the "**Budget**").

Such Budget has been thoroughly reviewed by the Debtors and their management and sets forth,

among other things, the projected receipts and disbursements of the Debtors for the periods

covered thereby.  The Debtors represent that the Budget is achievable in accordance with the

terms of the DIP Loan Documents and this Interim Order and will allow the Debtors to operate at

all times during these Cases without the accrual of unpaid administrative expenses.  The DIP

Loan Agent and DIP Lenders are relying upon the Debtors' compliance with the Budget in

accordance with Section 5.3 of the DIP Credit Agreement, the other DIP Loan Documents, and

this Interim Order in determining to enter into the post-petition financing arrangements provided

for herein.

(v)    <u>Business Judgment and Good Faith Pursuant to § 364(e)</u>.  The terms of the

DIP Loan Documents and this Interim Order are fair, just and reasonable under the

circumstances, are ordinary and appropriate for secured financing to debtors-in-possession,

reflect the Debtors' exercise of their prudent business judgment consistent with their fiduciary duties, and are supported by reasonably equivalent value and fair consideration. The terms and conditions of the DIP Loan Documents and this Interim Order have been negotiated in good faith and at arms' length by and among the Debtors and DIP Loan Agent, with all parties being represented by counsel. Any credit extended under the terms of this Interim Order shall be deemed to have been extended in good faith by the DIP Loan Agent and DIP Lenders, as that term is used in § 364(e) of the Bankruptcy Code.

        (vi)   <u>Good Cause</u>. The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

        (vii)   <u>Immediate Entry</u>. Sufficient cause exists for immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(c)(2). No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Interim Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

        Based upon the foregoing, and after due consideration and good cause appearing therefor;

        IT IS HEREBY ORDERED THAT:

Section 1.     <u>Authorization and Conditions to Financing.</u>

        1.1   <u>Motion Granted</u>. The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in this Interim Order. Except as otherwise expressly

provided in this Interim Order, any objection to the entry of this Interim Order that has not been

withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

1.2    <u>Authorization to Borrow and Use Loan Proceeds</u>.  Borrowers are hereby

authorized and empowered to immediately borrow and obtain Loans, Letters of Credit and to

incur indebtedness and other DIP Obligations pursuant to the terms and conditions of this Interim

Order, the DIP Credit Agreement, and the other DIP Loan Documents during the period

commencing on the date of this Interim Order through and including the date of the Final

Hearing as set forth in Section 6 of this Interim Order (the "**Interim Financing Period**") in the

amounts set forth in the Budget covered by the Interim Financing Period.  Subject to the terms

and conditions contained in this Interim Order and the DIP Loan Documents, Borrowers shall

use the proceeds of the Loans, Letters of Credit and other credit and financial accommodations

provided by DIP Loan Agent and DIP Lenders under the DIP Loan Documents for payment of

expenses set forth in the Budget and amounts owing to DIP Loan Agent and DIP Lenders in

accordance with the terms and conditions of the DIP Loan Documents and this Interim Order.

1.3    <u>DIP Loan Documents</u>

1.3.1    <u>Authorization</u>.  Debtors are hereby authorized and directed to enter

into, execute, deliver, perform, and comply with all of the terms, conditions and covenants of the

DIP Credit Agreement and the other DIP Loan Documents.  Upon execution and delivery of the

DIP Loan Documents, the DIP Loan Documents shall constitute valid and binding obligations of

the Debtors, enforceable against each Debtor party thereto in accordance with the terms of the

DIP Loan Documents and this Interim Order.  No obligation, payment, transfer or grant of

security under the DIP Loan Documents or this Interim Order shall be stayed, restrained,

voidable, or recoverable under the Bankruptcy Code or under any applicable law (including,

without limitation, under § 502(d) of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or counterclaim.

1.3.2   <u>Approval; Evidence of Borrowing Arrangements</u>.   All terms, conditions and covenants set forth in the DIP Loan Documents (including, without limitation, the DIP Credit Agreement) are approved to the extent necessary to implement the terms and provisions of this Interim Order.   All such terms, conditions and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among Debtors, DIP Loan Agent and DIP Lenders, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Credit Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of DIP Loan Agent's and DIP Lenders' consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the DIP Loan Documents.

1.3.3   <u>Amendment</u>.   Subject to the terms and conditions of the DIP Credit Agreement and the other DIP Loan Documents, Debtors, DIP Loan Agent and DIP Lenders may amend, modify, supplement or waive any provision of the DIP Loan Documents (a "**DIP Loan Amendment**") without further approval or order of the Court so long as (a) such DIP Loan Amendment is not material (for purposes hereof, a "material" DIP Loan Amendment shall mean, any DIP Loan Amendment that operates to increase the interest rate other than as currently provided in the DIP Loan Documents, increase the principal amount of the DIP Loans, add specific new events of default or enlarge the nature and extent of default remedies available to the DIP Loan Agent and DIP Lenders following an event of default, or otherwise modify any

terms and conditions in any DIP Loan Document in a manner materially less favorable to Debtors) and is undertaken in good faith by DIP Loan Agent, DIP Lenders and Debtors; (b) the Debtors provide prior written notice of the DIP Loan Amendment (the "**DIP Loan Amendment Notice**") to (i) the U.S. Trustee, (ii) counsel to any Committee, or in the event no such Committee is appointed at the time of such DIP Loan Amendment, the 30 Largest Unsecured Creditors, and (iii) counsel to the DIP Loan Agent; (c) the Debtors file the DIP Loan Amendment Notice with the Court; and (d) no objection to the DIP Loan Amendment is filed with the Court within two (2) business days from the later of the date the DIP Loan Amendment Notice is served or the date the DIP Loan Amendment Notice is filed with the Court in accordance with this Section. Any material DIP Loan Amendment to the DIP Loan Documents must be approved by the Court to be effective.

1.4    Payment of Prepetition Debt. The Debtors are authorized to repay all Pre-Petition Obligations in accordance with the DIP Loan Documents and Sections 1.5 and 1.6 of this Interim Order.

1.5    Payments and Application of Payments. The Debtors are authorized and directed to make all payments and transfers of Estate property to the DIP Loan Agent as provided for, permitted and/or required under the DIP Credit Agreement and the other DIP Loan Documents, which payments and transfers shall not be avoidable or recoverable from the DIP Loan Agent or any DIP Lender under §§ 547, 548, 550, 553 or any other section of the Bankruptcy Code, or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise. All proceeds of the Pre-Petition Collateral received by the DIP Loan Agent or any DIP Lender, and any other amounts or payments received by the DIP Loan Agent or any DIP Lender in respect of the DIP Obligations,

may be applied or deemed to be applied by the DIP Loan Agent, in its discretion, first to the repayment in full of the Pre-Petition Obligations, and then in repayment of the DIP Obligations, all in accordance with the DIP Credit Agreement, the other DIP Loan Documents and this Interim Order.  Without limiting the generality of the foregoing, the Debtors are authorized and directed, without further order of this Court, to pay or reimburse DIP Loan Agent and the DIP Lenders for all present and future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by the DIP Loan Agent and the DIP Lenders in connection with the financing transactions as provided in this Interim Order and the DIP Loan Documents, all of which shall be and are included as part of the principal amount of the DIP Obligations and secured by the Collateral.

      1.6    <u>Continuation of Pre-Petition Procedures</u>.  Except to the extent expressly set forth in the DIP Loan Documents, all pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the delivery of property to the DIP Loan Agent and the DIP Lenders, including the Blocked Account Agreements (as such term is defined in the DIP Credit Agreement) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Cases.

Section 2.    <u>Post-Petition Lien; Superpriority Administrative Claim Status.</u>

      2.1    <u>Post-Petition Lien</u>.

      2.1.1    <u>Post-Petition Lien Granting</u>.  To secure the prompt payment and performance of any and all DIP Obligations of Debtors to the DIP Loan Agent and DIP Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, DIP Loan Agent, for the benefit of itself and the other DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first-priority security interests and

liens, superior to all other liens, claims or security interests that any creditor of the Debtors'

Estates may have (but subject to the Permitted Liens and Claims (as defined below), as and to the

extent expressly provided in Section 2.1.3 below), in and upon all of the Collateral (as defined in

the DIP Credit Agreement and referred to herein as the "**Collateral**"), provided, however, that

any lien on property recovered as a result of transfers or obligations avoided or actions

maintained or taken pursuant to the Avoidance Actions (as defined below) shall be subject to

entry of the Final Financing Order.

2.1.2    DIP Loan Lien Priority.  The liens and security interests of the DIP

Loan Agent and the DIP Lenders granted under the Pre-Petition Loan Documents in the Pre-

Petition Collateral shall be and shall continue to be first and senior in priority to all other

interests and liens of every kind, nature and description, whether created consensually, by an

order of the Court or otherwise, including, without limitation, liens or interests granted in favor

of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or

other applicable law; provided, however that DIP Loan Agent's and DIP Lenders' liens on and

security interests in the Pre-Petition Collateral shall be subject only to (a) Permitted

Encumbrances, and (b) the Carve Out Expenses (as defined below) solely to the extent provided

for in Sections 2.3, 2.4 and 2.6 of this Interim Order (the foregoing clauses (a) and (b) are

collectively referred to herein as the "**Permitted Liens and Claims**").

2.1.3    DIP Loan Lien Priority.  The liens and security interests of DIP

Loan Agent and DIP Lenders granted under the DIP Loan Documents and this Interim Order in

the Collateral shall be first and senior in priority to all other interests and liens of every kind,

nature and description, whether created consensually, by an order of the Court or otherwise,

including, without limitation, liens or interests granted in favor of third parties in conjunction

with §§ 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that DIP Loan Agent's and DIP Lenders' liens on and security interests in the Collateral shall be subject only to the Permitted Liens and Claims.

2.1.4    Post-Petition Lien Perfection.    This Interim Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with the Blocked Account Bank or with any other financial institution(s) holding a Controlled Account (as defined in the DIP Credit Agreement) or other depository account consisting of Collateral (a "**Perfection Act**").  Notwithstanding the foregoing, if DIP Loan Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then DIP Loan Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by DIP Loan Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Interim Order notwithstanding the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law.  DIP Loan Agent may choose to file, record or present a certified copy of this Interim Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Interim Order in accordance with applicable law.  Should DIP Loan Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure

in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Interim Order.

2.1.5    <u>Nullifying Pre-Petition Restrictions to Post-Petition Financing</u>. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under the DIP Loan Documents, any provision that restricts, limits or impairs in any way any Debtor from granting DIP Loan Agent security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Loan Documents or this Interim Order, as applicable, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or of the DIP Loan Documents, shall not (a) be effective and/or enforceable against any such Debtor(s), DIP Loan Agent or DIP Loan Lender(s), as applicable, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to DIP Loan Agent and DIP Lenders pursuant to this Interim Order or the DIP Loan Documents, in each case, to the maximum extent permitted under the Bankruptcy Code and other applicable law.

2.2    <u>Superpriority Administrative Expenses</u>.

2.2.1    <u>DIP Loans</u>.    For all DIP Obligations now existing or hereafter arising pursuant to this Interim Order, the DIP Loan Documents or otherwise, DIP Loan Agent, for the benefit of itself and the other DIP Lenders, is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of

payment over any and all other obligations, liabilities and indebtedness of Debtors, whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (the "**DIP Loan Superpriority Claim**").

  2.3  Carve Out Expenses.

    2.3.1 Carve Out Expenses.  Upon the declaration by the DIP Loan Agent of the occurrence of an Event of Default (as defined in the DIP Credit Agreement), DIP Loan Agent's and DIP Lenders' liens, claims and security interests in the Collateral and their DIP Loan Superpriority Claims, shall each be subject only to the right of payment of the following expenses (the "**Carve Out Expenses**"):

    (a)  statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6);

    (b)  fees payable to the Clerk of this Court;

    (c)  subject to the terms and conditions of this Interim Order, Allowed Professional Fees (as defined below) incurred by attorneys, accountants and other professionals retained by the Debtors and any Committee(s) under § 327 or § 1103(a) of the Bankruptcy Code (collectively, the "**Professionals**") (i) incurred at any time before the Trigger Date (defined below) up to the amounts of professional fees set forth in the Budget through the Trigger Date and only to the extent of the funds deposited

into the Carve Out Account (defined below) in accordance with Section 2.4 below, and (ii) incurred on and after the Trigger Date, provided that the aggregate amount of such Allowed Professional Fees included in the Carve Out Expenses pursuant to this clause (c)(ii) shall not exceed (i) in the case of Professionals retained by the Debtors, $200,000 (the "**Debtor Professional Fee Carve Out**") and (ii) in the case of Professionals retained by the Committee(s), the aggregate amount of $50,000 (the "**Committee Professional Fee Carve Out**" and, collectively with the Debtor Professional Fee Carve Out, the "**Professional Fee Carve Out**"); and

(d)    $10,000 for the Chapter 7 Trustee(s) appointed in the Debtors' bankruptcy cases in the event the Debtors' Chapter 11 cases are converted to Chapter 7.

For the avoidance of doubt, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

For purposes of this Interim Order, the term "**Allowed Professional Fees**" shall mean the unpaid and outstanding reasonable fees and expenses of Professionals (i) actually incurred on or after the Petition Date and (ii) allowed at any time by a final order of the Court pursuant to §§ 326, 328, 330 or 331 of the Bankruptcy Code.

2.3.2    <u>Excluded Professional Fees</u>.    Notwithstanding anything to the contrary in this Interim Order, neither the Professional Fee Carve Out nor the proceeds of Collateral or any Loans, Letters of Credit or any other credit or financial accommodations provided under or in connection with the DIP Loan Documents shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:

(a)      an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of (A) the Pre-Petition Obligations, DIP Loan Agent's and any DIP Lender's liens on and security interests in the Pre-Petition Collateral, or (B) the DIP Obligations, DIP Loan Agent's or DIP Lenders' liens on and security interests in the Collateral; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Pre-Petition Obligations, the DIP Loan Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral, or (B) the DIP Obligations, DIP Loan Agent's or DIP Lenders' liens on and security interests in the Collateral; or (iii) preventing, hindering or delaying DIP Loan Agent's or DIP Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Interim Order;

(b)      a request to use the Cash Collateral (as such term is defined in section 363 of the Bankruptcy Code) without the prior written consent of DIP Loan Agent in accordance with the terms and conditions of this Interim Order;

(c)      a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to section 364(c) or § 364(d) of the Bankruptcy Code, other than as provided in this Interim Order, without the prior written consent of each of DIP Loan Agent;

(d)      the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against DIP Loan Agent, any DIP Lender, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors

or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from DIP Loan Agent or any DIP Loan Lender under chapter 5 of the Bankruptcy Code (the "**Avoidance Actions**");

(e)      the cost of investigation into any claims against DIP Loan Agent or any DIP Lender arising under or in connection with the Pre-Petition Loan Documents in excess of $50,000; or

(f)      any act which has or could materially and adversely modify or compromise the rights and remedies of DIP Loan Agent or any DIP Loan Lender, or which results in the occurrence of an Event of Default under the DIP Loan Documents, or this Interim Order.

2.3.3   Carve Out Reserve.   At the DIP Loan Agent's discretion, DIP Loan Agent may, at any time and in any increment in accordance with the DIP Credit Agreement, establish a reserve (the "**Professional Fee Reserve**") against the borrowed amount of the DIP Loans in respect of the Professional Fee Carve Out and the other Carve Out Expenses. For the avoidance of doubt, the maximum amount of the Professional Fee Reserve shall not exceed the sum of the Professional Fee Carve Out and the other Carve Out Expenses.

2.3.4   Trigger Date.   The "**Trigger Date**" shall mean the first business day after the occurrence and continuation of an Event of Default (as defined below) and delivery of written notice thereof (the "**Carve Out Notice**") by the DIP Loan Agent to the U.S. Trustee, the Debtors and counsel for the Debtors, counsel for the Committee(s) and counsel for the DIP Loan Agent.

2.4     Funding the Professional Fee Carve Out.   Prior to the Trigger Date, Debtors shall be authorized to deposit into a segregated account maintained by Debtors for the

benefit of all Professionals (the "**Carve Out Account**") each week an amount equal to the amount of Allowed Professional Fees projected in the Budget to be incurred for such week and shall be permitted to pay Allowed Professional Fees from the Carve Out Account.  Promptly following the delivery of a Carve Out Notice, the DIP Lenders shall make a Loan to the Debtors in an amount equal to $260,000, and the Debtors shall fund the proceeds of such Loan into the Carve Out Account. The proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Professional Fee Carve Out, and the DIP Loan Agent and DIP Lenders (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve Out Account and (ii) shall have security interests in any residual interests in the Carve Out Account available following satisfaction in full of all obligations benefitting from the Professional Fee Carve Out. The Collateral shall not be subject to any further carve out for any cost or expenses of the Debtors' estates.

2.5    Payment of Carve Out Expenses.

2.5.1    Following the DIP Lenders making the $260,000 Loan to the Debtors following the delivery of a Carve Out Notice in accordance with Section 2.4 above, DIP Agent's and DIP Lenders' obligation to fund or otherwise ensure the payment of any Carve Out Expenses pursuant to this Order shall be fully and finally satisfied and discharged, and DIP Agent and DIP Lenders shall have no obligation or responsibility to fund or otherwise ensure the payment of any Carve Out Expenses or any other professional fees or expenses of the Debtors or the Committee.

2.5.2    Payment of any Carve Out Expenses, whether by or on behalf of the DIP Loan Agent or any DIP Lender, shall not and shall not be deemed to reduce the DIP Obligations, and shall not and shall not be deemed to subordinate any of any of DIP Loan

Agent's or DIP Lender's liens and security interests in the Pre-Petition Collateral, any other

Collateral, the Revolving Loan A/L Adequate Protection Superpriority Claim (as defined below),

or the DIP Loan Superpriority Claim to any junior pre- or post-petition lien, interest or claim in

favor of any other party.  Except and to the extent set forth in Section 2.5 of this Interim Order,

DIP Loan Agent and DIP Lenders shall not, under any circumstance, be responsible for the direct

payment or reimbursement of any fees or disbursements of any Professionals incurred in

connection with the Case under any chapter of the Bankruptcy Code, and nothing in Section 2.3,

2.3.31, or 2.3.3 of this Interim Order shall be construed to obligate the DIP Loan Agent or any

DIP Lender in any way, to pay compensation to or to reimburse expenses of any Professional, or,

except as provided in Section 2.4 of this Interim Order, to ensure that the Debtors have sufficient

funds to pay such compensation or reimbursement.

2.6    <u>Use of Cash Collateral; Adequate Protection.</u>

2.6.1    <u>Authorization to Use Cash Collateral</u>.    Subject to the terms and

conditions of this Interim Order, the DIP Loan Documents, and in accordance with the Budget,

Debtors shall be and are hereby authorized to use the Cash Collateral (as defined in section 363

of the Bankruptcy Code) subject to the pre-petition liens and security interests granted to the DIP

Loan Agent and the DIP Lenders. Nothing in this Interim Order shall authorize the disposition of

any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's

use of Cash Collateral or other proceeds resulting therefrom, except as permitted in this Interim

Order, the DIP Loan Documents and in accordance with the Budget.

2.6.2    <u>Replacement Liens</u>.

(a)    As adequate protection for the diminution in value of their interests

in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use

of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, the DIP Loan Agent, for the benefit of itself and the DIP Lenders, is hereby granted pursuant to §§ 361 and 363 of the Bankruptcy Code, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "**Revolving Loan A/L Replacement Lien**"). The Revolving Loan A/L Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent set forth herein, (B) the Permitted Liens and Claims, and (C) DIP Loan Agent's and DIP Lenders' liens on the Collateral to secure the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

2.6.3    <u>Section 507(b) Priority Claims</u>.

(a)    As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out-Expenses, the DIP Loan Agent, for the benefit of itself and DIP Lenders, is hereby granted as and to the extent provided by section 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any successor bankruptcy cases (the "**Revolving Loan A/L Adequate Protection Superpriority Claim**").  The Revolving Loan A/L Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out Expenses, and (B) the DIP Loan Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.

Section 3.    <u>Default; Rights and Remedies; Relief from Stay</u>.

3.1    <u>Events of Default</u>.    The occurrence of any of the following events shall

constitute an "**Event of Default**" under this Interim Order: (a) any Debtor's failure to perform, in

any respect, any of the terms, conditions or covenants or their obligations under this Interim

Order; or (b) an "Event of Default" under the DIP Credit Agreement or any of the other DIP

Loan Documents.

3.2    <u>Rights and Remedies upon Event of Default</u>.    Upon the occurrence of and

during the continuance of an Event of Default, (a) the Debtors shall be bound by all restrictions,

prohibitions and other terms as provided in this Interim Order, the DIP Credit Agreement and the

other DIP Loan Documents, and (b) the DIP Loan Agent shall be entitled to take any act or

exercise any right or remedy (subject to Section 3.5 below) as provided in this Interim Order or

any DIP Loan Document, as applicable, including, without limitation, declaring all DIP

Obligations immediately due and payable, accelerating the DIP Obligations, ceasing to extend

Loans or provide or arrange for Letters of Credit on behalf of Debtors, setting off any DIP

Obligations with Collateral or proceeds in DIP Loan Agent's possession, and enforcing any and

all rights with respect to the Collateral.    DIP Loan Agent and DIP Lenders shall have no

obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any

other financial accommodations to Debtors, immediately upon or after the occurrence of an

Event of Default or upon the occurrence of any act, event, or condition that, with the giving of

notice or the passage of time, or both, would constitute an Event of Default.

3.3    <u>Expiration of Revolving Loan Commitment</u>.    Upon the expiration of

Borrowers' authority to borrow and obtain other credit accommodations from DIP Loan Agent

and DIP Lenders pursuant to the terms of this Interim Order and the DIP Loan Documents

(except if such authority shall be extended with the prior written consent of DIP Loan Agent,

which consent shall not be implied or construed from any action, inaction or acquiescence by

DIP Loan Agent or any DIP Loan Lender), unless an Event of Default set forth in Section 3.1

above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.5 of

this Interim Order, all of the DIP Obligations shall immediately become due and payable and

DIP Loan Agent and DIP Lenders shall be automatically and completely relieved from the effect

of any stay under section 362 of the Bankruptcy Code, any other restriction on the enforcement

of its liens upon and security interests in the Collateral or any other rights granted to DIP Loan

Agent and DIP Lenders pursuant to the terms and conditions of the DIP Loan Documents or this

Interim Order, and DIP Loan Agent, acting on behalf of itself and the other DIP Lenders, shall be

and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided

to it in this Interim Order, the DIP Loan Documents or applicable law which DIP Loan Agent

may deem appropriate and to proceed against and realize upon the Collateral or any other

property of the Debtors' Estates.

        3.4   <u>Maturity of DIP Loans</u>.  Upon the Maturity Date (as defined in the DIP

Credit Agreement) (except if the Maturity Date shall be extended with the prior written consent

of DIP Loan Agent, which consent shall not be implied or construed from any action, inaction or

acquiescence by DIP Loan Agent or any DIP Loan Lender), unless an Event of Default set forth

in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to

Section 3.5 of this Interim Order all of the DIP Obligations shall immediately become due and

payable and DIP Loan Agent and DIP Lenders shall be automatically and completely relieved

from the effect of any stay under section 362 of the Bankruptcy Code, any other restriction on

the enforcement of its liens upon and security interests in the DIP Loan Collateral or any other

rights granted to DIP Loan Agent and DIP Lenders pursuant to the terms and conditions of the

DIP Loan Documents or this Interim Order, and DIP Loan Agent, acting on behalf of itself and

the other DIP Lenders, shall be and is hereby authorized, in its sole discretion, to take any and all

actions and remedies provided to it in this Interim Order, the DIP Loan Documents or applicable

law which DIP Loan Agent may deem appropriate and to proceed against and realize upon the

DIP Loan Collateral or any other property of the Debtors' Estates.

3.5     Relief from Automatic Stay.  The automatic stay provisions of section 362

of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable

law are hereby modified and vacated without further notice, application or order of the Court to

the extent necessary to permit DIP Loan Agent and each DIP Lender to perform any act

authorized or permitted under or by virtue of this Interim Order or the DIP Loan Documents, as

applicable, including, without limitation, (a) to implement the post-petition financing

arrangements authorized by this Interim Order and pursuant to the terms of the DIP Loan

Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security

interest, right or claim in the Collateral, (c) to assess, charge, collect, advance, deduct and

receive payments with respect to the Pre-Petition Obligations or the DIP Obligations, as

applicable, including, without limitation, all interests, fees, costs and expenses permitted under

the DIP Loan Documents and apply such payments to the Pre-Petition Obligation or DIP

Obligations pursuant to the DIP Loan Documents and/or this Interim Order, as applicable, and

(d) immediately upon the occurrence of an Event of Default, to take any action and exercise all

rights and remedies provided to it by this Interim Order, the DIP Loan Documents or applicable

law other than those rights and remedies against the Collateral as provided in the following

sentence.  In addition, and without limiting the foregoing, upon the occurrence of an Event of

Default and after providing five (5) business days (the "**Default Notice Period**") prior written

notice (the "**Enforcement Notice**") to counsel for the Debtors, counsel for the Committee (if appointed), and the U.S. Trustee, the DIP Loan Agent, acting on behalf of itself and the DIP Lenders, shall be entitled to take any action and exercise all rights and remedies provided to it by this Interim Order, the DIP Loan Documents or applicable law DIP Loan Agent may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the DIP Loan Agent, for the benefit of itself and the applicable DIP Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations. Notwithstanding anything to the contrary, any action taken by the DIP Loan Agent to (i) terminate the commitments under the DIP Loan Documents, (ii) accelerate the Loans, (iii) send blocking notices or activation notices to the Blocked Account Bank, (iv) repay any amounts owing in respect of the DIP Obligations (including, without limitation, fees, indemnities and expense reimbursements) and (v) cash collateralize Letters of Credit and/or Bank Products issued pursuant to the DIP Loan Documents, in each case, shall not require any advance notice to the Debtors.  In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors shall not be entitled to seek relief, including, without limitation, under section 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Loan Agent or the DIP Lenders set forth in this Interim Order or the DIP Loan Documents.

Section 4.      <u>Representations; Covenants; and Waivers.</u>

       4.1      <u>Objections to Pre-Petition Obligations</u>.

           4.1.1      <u>Objections to Pre-Petition Obligations</u>.  Notwithstanding anything to the contrary in the Interim Order, any action, claim, defense complaint, motion or other

written opposition (hereinafter, an "**Objection**") that seeks to object to, challenge, contest or

otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction,

disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition

Obligations, or (b) the extent, legality, validity, perfection or enforceability of DIP Loan Agent's

and DIP Lenders' pre-petition liens and security interests in the Pre-Petition Collateral shall be

properly filed with the Court (x) by any Committee, and no other party, within sixty (60)

calendar days from the entry date of the Final Financing Order, or (y) in the event no Committee

is appointed within the thirty (30) days following the Petition Date, by any party in interest with

requisite standing within seventy-five (75) calendar days from the date of entry of this Interim

Order.  If any such Objection is timely and properly filed and successfully pursued, nothing in

this Interim Order shall prevent the Court from granting appropriate relief with respect to the

Pre-Petition Obligations or DIP Loan Agent's or DIP Lenders' pre-petition liens on the Pre-

Petition Collateral.  If no Objection is timely and properly filed, or if an Objection is timely and

properly filed but denied, (i) the Pre-Petition Obligations shall be deemed allowed in full, shall

not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall

not be subject to any further objection or challenge by any party at any time, and DIP Loan

Agent's and DIP Loan Lenders' pre-petition liens on and security interest in the Pre-Petition

Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all

purposes and of first and senior priority, subject to only the Permitted Liens and Claims, and (ii)

the DIP Loan Agent and the DIP Lenders and each of their respective participants, agents,

officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed

released and discharged from any and all claims and causes of action related to or arising out of

the Pre-Petition Loan Documents and shall not be subject to any further objection or challenge

by any party at any time.  Nothing contained in this Section 4.1.1 or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to DIP Loan Agent or any DIP Lenders in connection with all post-petition Loans and Letters of Credit, and any other post-petition financial and credit accommodations provided by DIP Loan Agent and the DIP Lenders to Debtors in reliance on section 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Interim Order and the DIP Loan Documents.

4.2    Debtors' Waivers.  At all times during the Cases, and whether or not an Event of Default has occurred, the Debtors irrevocably waive any right that they may have to seek further authority (a) to use Cash Collateral of DIP Loan Agent and DIP Lenders under section 363 of the Bankruptcy Code, (b) to obtain post-petition loans or other financial accommodations pursuant to section 364(c) or 364(d) of the Bankruptcy Code, other than as provided in this Interim Order or as may be otherwise expressly permitted pursuant to the DIP Loan Documents, (c) to challenge the application of any payments authorized by this Interim Order as pursuant to section 506(b) of the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-Petition Obligations, (d) to propose, support or have a plan of reorganization or liquidation that does not provide for the indefeasible payment in cash in full and satisfaction of all DIP Obligations on the effective date of such plan in accordance with the terms and conditions set forth in the DIP Credit Agreement, or (e) to seek relief under the Bankruptcy Code, including without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of DIP Loan Agent or any DIP Lender as provided in this Interim Order and the DIP Loan Documents or DIP Loan Agent's or any DIP Loan Lender's exercise of such rights or remedies; provided, however, that DIP Loan Agent may otherwise consent in writing, but no such consent shall be implied

from any other action, inaction, or acquiescence by DIP Loan Agent or any DIP Loan Lender,

and the consent of DIP Loan Agent shall be required in order to relieve the Debtors' of their

obligations under this Section 4.2.

4.3    Section 506(c) Claims.    Subject to entry of a Final Financing Order

granting such relief, no costs or expenses of administration which have or may be incurred in the

Cases shall be charged against DIP Loan Agent or any DIP Loan Lender, their respective claims

or the Collateral pursuant to § 506(c) of the Bankruptcy Code without the prior written consent

of DIP Loan Agent, and no such consent shall be implied from any other action, inaction or

acquiescence by DIP Loan Agent or any DIP Lender.

4.4    Collateral Rights.    Until all Obligations shall have been indefeasibly paid

and satisfied in full:

(a)    no other party shall foreclose or otherwise seek to enforce any

junior lien or claim in Collateral; and

(b)    upon and after the declaration of the occurrence of an Event of

Default, and subject to DIP Loan Agent obtaining relief from the automatic stay as

provided for herein, in connection with a liquidation of any of the Collateral, DIP Loan

Agent (or any of its employees, agents, consultants, contractors or other professionals)

shall have the right, at the sole cost and expense of Debtors, to: (i) enter upon, occupy

and use any real or personal property, fixtures, equipment, leasehold interests or

warehouse arrangements owned or leased by Debtors and (ii) use any and all trademarks,

trade names, copyrights, licenses, patents or any other similar assets of Debtors, which

are owned by or subject to a lien of any third party and which are used by Debtors in their

businesses.  DIP Loan Agent and DIP Lenders will be responsible for the payment of any

applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of

such property for the period of time that DIP Loan Agent actually uses the equipment or

the intellectual property (but in no event for any accrued and unpaid fees, rentals or other

amounts due for any period prior to the date that DIP Loan Agent actually occupies or

uses such assets or properties or for any fees, rentals or other amounts that may become

due following the end of DIP Loan Agent's occupation or use).

    4.5    <u>Releases</u>.

    4.5.1   Upon the earlier of (a) the entry of a Final Financing Order

approving the Motion or (b) the entry of an order extending the Interim Financing Period beyond

thirty (30) calendar days after the date of this Interim Order, and in each instance, subject to

Section 4.1 above, in consideration of DIP Loan Agent and DIP Lenders permitting Debtors to

use the Pre-Petition Collateral (including Cash Collateral) and providing other credit and

financial accommodations to the Debtors pursuant to the provisions of the DIP Loan Documents

and this Interim Order, each Debtor, on behalf of itself and its successors and assigns,

(collectively, the "**Releasors**"), shall, forever release, discharge and acquit DIP Loan Agent and

each DIP Lender and their respective successors and assigns, and their present and former

shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys,

employees and other representatives (collectively, the "**Pre-Petition Releasees**") of and from

any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action,

indebtedness and obligations, of every kind, nature and description, including, without limitation,

any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or

may have against Pre-Petition Releasees as of the date hereof, in respect of events that occurred

on or prior to the date hereof with respect to the Debtors, the Obligations, Loan Documents and

any Loans, Letters of Credit, Bank Products or other financial accommodations made by DIP
Loan Agent and/or the DIP Lenders to Debtors pursuant to the DIP Loan Documents.    In
addition, upon the repayment of all Obligations (as defined in the DIP Credit Agreement) owed
to the DIP Loan Agent and the DIP Lenders by Debtors and termination of the rights and
obligations arising under the DIP Loan Documents (which payment and termination shall be on
terms and conditions acceptable to the DIP Loan Agent), the DIP Loan Agent and the DIP
Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities
and causes of action arising or occurring in connection with or related to the DIP Loan
Documents, this Interim Order or the Final Financing Order (including without limitation any
obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due,
primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out
Expenses and/or the Professional Fee Carve Out in accordance with Section 2.5 of this Interim
Order or otherwise), on terms and conditions acceptable to the DIP Loan Agent.

Section 5.    <u>Other Rights and DIP Obligations</u>.

     5.1    <u>No Modification or Stay of This Interim Order</u>.  Notwithstanding (a) any
stay, modification, amendment, supplement, vacating, revocation or reversal of this Interim
Order, the DIP Loan Documents or any term hereunder or thereunder, (b) the failure to obtain a
Final Financing Order pursuant to Bankruptcy Rule 4001(c)(2), or (c) the dismissal or
conversion of one or more of the Cases (each, a "**Subject Event**"), (x) the acts taken by each of
the DIP Loan Agent and the DIP Lenders in accordance with this Interim Order, and (y) the DIP
Obligations incurred or arising prior to DIP Loan Agent's actual receipt of written notice from
Debtors expressly describing the occurrence of such Subject Event shall, in each instance, be
governed in all respects by the original provisions of this Interim Order, and the acts taken by
DIP Loan Agent and DIP Loan Lender in accordance with this Interim Order, and the liens

granted to DIP Loan Agent and DIP Loan Lender in the Collateral, and all other rights, remedies, privileges, and benefits in favor of DIP Loan Agent and each DIP Lenders pursuant to this Interim Order and the DIP Loan Documents shall remain valid and in full force and effect pursuant to section 364(e) of the Bankruptcy Code.  For purposes of this Interim Order, the term "appeal", as used in section 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Interim Order by this Court or any other tribunal.

5.2    Power to Waive Rights; Duties to Third Parties.  DIP Loan Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Interim Order in respect of DIP Loan Agent and DIP Lenders (the "**DIP Loan Lender Rights**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Loan Lender Right(s).  Any waiver by DIP Loan Agent of any DIP Loan Lender Rights shall not be or constitute a continuing waiver. Any delay in or failure to exercise or enforce any DIP Loan Lender Right shall neither constitute a waiver of such DIP Lender Right, subject DIP Loan Agent or any DIP Loan Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to DIP Loan Agent or any DIP Loan Lender.

5.3    Disposition of Collateral.  Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of DIP Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Loan Agent or any DIP Lenders) and an order of this Court, except for

sales of Debtors' Inventory in the ordinary course of their business or otherwise expressly permitted pursuant to the terms of the DIP Credit Agreement.

5.4   <u>Inventory</u>.  Debtors shall not, without the consent of the DIP Loan Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of section 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

5.5   <u>Reservation of Rights</u>.   The terms, conditions and provisions of this Interim Order are in addition to and without prejudice to the rights of DIP Loan Agent and each DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

5.6   <u>Binding Effect</u>.

5.6.1   The provisions of this Interim Order and the DIP Loan Documents, the DIP Obligations, the Revolving Loan A/L Adequate Protection Superpriority Claim, the DIP Loan Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of each of the DIP Loan Agent and the DIP Lenders provided or acknowledged in this Interim Order, and any actions taken pursuant thereto, shall be effective immediately upon entry of this

Interim Order pursuant to Bankruptcy Rules 6004(g) and 7062, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

5.6.2   Any order dismissing one or more of the Cases under section 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (a) the DIP Loan Superpriority Claim and DIP Loan Agent's and DIP Lenders' liens on and security interests in the Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Interim Order shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

5.6.3   In the event this Court modifies any of the provisions of this Interim Order or the DIP Loan Documents following a Final Hearing, such modifications shall not affect the rights or priorities of DIP Loan Agent and DIP Lenders pursuant to this Interim Order with respect to the Collateral or any portion of the Obligations which arises or is incurred or is advanced prior to such modifications, and this Interim Order shall otherwise remain in full force and effect.

5.6.4   This Interim Order shall be binding upon Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of any Debtor.  This Interim Order shall also inure to the benefit of DIP Loan Agent, DIP Lenders, Debtors and their respective successors and assigns.

5.7    Restrictions on Cash Collateral Use, Additional Financing, Plan Treatment.

5.7.1    All post-petition advances and other financial accommodations under the DIP Credit Agreement and the other DIP Loan Documents are made in reliance on this Interim Order and there shall not at any time be entered in the Cases, or in any subsequently converted case under chapter 7 of the Bankruptcy Code, any order (other than the Final Financing Order) which (a) authorizes the use of cash collateral of Debtors in which DIP Loan Agent or DIP Lenders have an interest, or the sale, lease, or other disposition of property of any Debtor's Estate in which DIP Loan Agent or DIP Lenders have a lien or security interest, except as expressly permitted hereunder or in the DIP Loan Documents, or (b) authorizes under section 364 of the Bankruptcy Code the obtaining of credit or the incurring of indebtedness secured by a lien or security interest which is equal or senior to a lien or security interest in property in which DIP Loan Agent or DIP Lenders hold a lien or security interest, or which is entitled to priority administrative claim status which is equal or superior to that granted to DIP Loan Agent and DIP Lenders herein; unless, in each instance (x) DIP Loan Agent shall have given its express prior written consent with respect thereto, no such consent being implied from any other action, inaction or acquiescence by DIP Loan Agent or any DIP Loan Lender, or (y) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied in full in accordance with the terms of the DIP Credit Agreement and the other DIP Loan Documents, including, without limitation, all debts and obligations of Debtors to DIP Loan Agent and DIP Lenders which arise or result from the obligations, loans, security interests and liens authorized herein, on terms and conditions acceptable to DIP Loan Agent.  The security interests and liens granted to or for the benefit of DIP Loan Agent and DIP Lenders hereunder

and the rights of DIP Loan Agent and DIP Lenders pursuant to this Interim Order and the DIP

Loan Documents with respect to the DIP Obligations and the Collateral are cumulative and shall

not be altered, modified, extended, impaired, or affected by any plan of reorganization or

liquidation of Debtors and, if DIP Loan Agent shall expressly consent in writing that the DIP

Obligations shall not be repaid in full upon confirmation thereof, shall continue after

confirmation and consummation of any such plan.

      5.8    <u>No Owner/Operator Liability</u>.

      5.8.1  Subject to the entry of the Final Financing Order granting such

relief, neither the DIP Loan Agent nor any DIP Lender shall be deemed to be in control of the

operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with

respect to the operation or management of the Debtors (as such terms, or any similar terms, are

used in the United States Comprehensive Environmental Response, Compensation and Liability

Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

      5.9    <u>Marshalling</u>.  Subject to entry of the Final Financing Order granting such

relief, in no event shall DIP Loan Agent or any DIP Lender be subject to the equitable doctrine

of "marshalling" or any similar doctrine with respect to the Collateral.  Each DIP Loan Agent

and DIP Lender shall be entitled to all of the rights and benefits of section 552(b) of the

Bankruptcy Code, and the "equities of the case" exception under section 552(b) of the

Bankruptcy Code shall not apply to DIP Loan Agent or any DIP Lender with respect to proceeds,

products, offspring or profits of any of the Collateral, as applicable.

      5.10   <u>Right of Setoff</u>.

      5.10.1  To the extent any funds were on deposit with DIP Loan Agent as

of the Petition Date, including, without limitation, all funds deposited in, or credited to, an

account of any Debtor with DIP Loan Agent or any DIP Lender immediately prior to the filing of

the Cases (regardless of whether, as of the Petition Date, such funds had been collected or made

available for withdrawal by any such Debtor), such funds (the "**Deposited Funds**") are subject to

rights of setoff.  By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor

of DIP Loan Agent or the applicable DIP Lenders pursuant to §§ 506(a) and 553 of the

Bankruptcy Code.

        5.11   <u>Right to Credit Bid</u>.

        5.11.1  The DIP Loan Agent, on behalf of itself and the DIP Lenders, shall

have the right to "credit bid" the amount of its and their claims arising under the terms of the DIP

Loan Documents, during any sale of all or substantially all of the Debtors' assets, including

without limitation, sales occurring pursuant to section 363 of the Bankruptcy Code or included as

part of any restructuring plan subject to confirmation under section 1129(b)(2)(A)(ii)-(iii) of the

Bankruptcy Code.

        5.12   <u>Term; Termination</u>.

        5.12.1 Notwithstanding any provision of this Interim Order to the

contrary, the term of the financing arrangements among Debtors, DIP Loan Agent and DIP

Lenders authorized by this Interim Order may be terminated pursuant to the terms of the DIP

Credit Agreement.

        5.13   <u>Limited Effect</u>.   In the event of a conflict between the terms and

provisions of any of the DIP Loan Documents and this Interim Order, the terms and provisions

of this Interim Order shall govern, interpreted as most consistent with the terms and provisions of

the DIP Loan Documents.

5.14   Objections Overruled.  All objections to the entry of this Interim Order are, to the extent not withdrawn, hereby overruled.

Section 6.   Final Hearing and Response Dates.

The Final Hearing on the Motion pursuant to Bankruptcy Rule 4001(c)(2) is scheduled for _____, ____, at _____ before this Court.  The Debtors shall promptly mail copies of this Interim Order to the Noticed Parties, and to any other party that has filed a request for notices with this Court and to any Committee after same has been appointed, or such Committee's counsel, if same shall have filed a request for notice.  Any party in interest objecting to the relief sought at the Final Hearing shall serve and file written objections, which objections shall be served upon (a) proposed counsel to the Debtors (Andrew J. Currie, Venable LLP, 575 7th Street, NW, Washington, DC 20004, rdavids@venable.com, rkapoor@venable.com, ajcurrie@venable.com, Fax: (212) 682-6104); (b) counsel for the DIP Loan Agent, Otterbourg, P.C., 230 Park Avenue, New York, New York 10169-0075; Attn: Daniel F. Fiorillo, Esq., Fax: (212) 682-6104; (c) counsel to any Committee; and (d) the U.S. Trustee; and shall be filed with the Clerk of the United States Bankruptcy Court for the Southern District of New York, in each case, to allow actual receipt of the foregoing no later than _____, prevailing Eastern time on October ___, 2015.

Dated:  New York, New York

_____, 2015

_____
UNITED STATES BANKRUPTCY JUDGE

**<u>EXHIBIT 1</u>**

**DIP Credit Agreement**

## RATIFICATION AND AMENDMENT AGREEMENT

This RATIFICATION AND AMENDMENT AGREEMENT (the "Ratification Agreement") dated as of September 30, 2015, is by and among Wells Fargo Bank, National Association, ("Wells Fargo"), in its capacity as agent for the Lenders (in such capacity, "Agent") acting for and on behalf of the financial institutions from time to time party to the Credit Agreement (as defined below) as lenders (collectively with Agent, the "Lenders"), Binda USA Holdings, Inc., ("Parent"), Advance Watch Company Ltd. ("Advance Watch"), Sunburst Products, Inc. ("Sunburst"), and GWG International, Ltd. ("GWG" and together with Advance Watch and Sunburst, each individually, a "Borrower" and collectively "Borrowers").

## W I T N E S S E T H:

WHEREAS, Parent and each Borrower has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York, and Parent and each Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Cases (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers as set forth in the Existing Financing Agreements (as defined below);

WHEREAS, the Bankruptcy Court (as defined below) has entered a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers as set forth in the Financing Order and the DIP Loan Documents (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Borrowers shall execute and deliver this Ratification Agreement;

WHEREAS, Borrowers desire to reaffirm their obligations to Agent and Lenders pursuant to the Existing Financing Agreements and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Borrowers; and

WHEREAS, Borrowers have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Borrowers and make certain amendments to the Credit Agreement (as defined below), and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders and Borrowers mutually covenant, warrant and agree as follows:

1.    <u>DEFINITIONS</u>.

1.1    <u>Additional Definitions</u>.  As used herein, the following terms shall have the respective meanings given to them below and the Credit Agreement and the other Existing Financing Agreements shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

(a)    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

(b)    "Budget" shall mean the budget to be delivered to Agent and Lenders in accordance with Section 5.3(a) hereof (a summary of which is attached hereto as Exhibit A), in form and substance satisfactory to Agent together with any subsequent or amended budget(s) thereto delivered to Agent and Lenders, in form and substance satisfactory to Agent, in accordance with the terms and conditions hereof.

(c)    "Chapter 11 Cases" shall mean the Chapter 11 cases of Parent and Borrowers which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

(d)    "Debtors" shall mean Borrowers and Parent, each as Debtor and Debtor-in-Possession in the Chapter 11 Cases.

(e)    "DIP Loan Documents" shall mean the Existing Credit Agreement and the Existing Loan Documents, as amended, modified, ratified, assumed and adopted as provided in this Ratification Agreement.

(f)    "DIP Obligations" shall mean all Obligations (as defined in the Existing Credit Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to this Ratification Agreement, the Credit Agreement, the other Existing Financing Agreements, a Financing Order, by operation of law or otherwise, and whether incurred by such Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(g)    "Existing Credit Agreement" shall mean the Credit Agreement dated June 21, 2013 by and among Agent, Lenders, Borrowers and Parent as amended by the First Amendment to the Credit Agreement dated June 30, 2014, and the Second Amendment to the Credit Agreement, dated as of August 17, 2015, each as in effect immediately prior to the Petition Date.

(h)    "Existing Financing Agreements" shall mean the Loan Documents (as defined in the Existing Credit Agreement), including, without limitation, the Existing Credit Agreement, in each case, as in effect immediately prior to the Petition Date.

2

(i)    "Financing Order" shall mean the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

(j)    "Interim Financing Order" shall have the meaning set forth in Section 9.7 hereof.

(k)    "Lenders" shall have the meaning set forth in the Existing Credit Agreement.

(l)    "Permanent Financing Order" shall have the meaning set forth in Section 9.8 hereof.

(m)    "Petition Date" shall mean the date of the commencement of the Chapter 11 Cases.

(n)    "Post-Petition Collateral" shall mean, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent, for the benefit of each of the Secured Parties, pursuant to the DIP Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

    i.    all of such Debtor's Accounts;

    ii.    all of such Debtor's Books;

    iii.    all of such Debtor's Chattel Paper;

    iv.    all of such Debtor's Commercial Tort Claims, including, without limitation, those identified on Schedule 1.1 to this Agreement;

    v.    all of such Debtor's Deposit Accounts;

    vi.    all of such Debtor's Equipment;

    vii.    all of such Debtor's Farm Products;

    viii.    all of such Debtor's Fixtures;

    ix.    all of such Debtor's General Intangibles;

    x.    all of such Debtor's Inventory;

    xi.    all of such Debtor's Investment Property;

10066135-v8

xii.  all of such Debtor's Intellectual Property and Intellectual Property Licenses;

xiii.  all of such Debtor's Negotiable Collateral;

xiv.  all of such Debtor's Pledged Interests (including all of such Debtor's Pledged Operating Agreements and Pledged Partnership Agreements);

xv.  all of such Debtor's Securities Accounts;

xvi.  all of such Debtor's Supporting Obligations;

xvii.  all of such Debtor's money, Cash Equivalents, or other assets of such Debtor that now or hereafter come into the possession, custody, or control of Agent (or its agent or designee) or any other member of the Lender Group;

xviii. all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including, without limitation, proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect to the Intellectual Property included in the Collateral, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, and the right to sue for past, present, and future infringements of the Intellectual Property included in the Collateral, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Debtor or Agent from time to time with respect to any of the Investment Property;

xix.  from and after the entry of the Permanent Financing Order, all claims, rights, interests, assets and properties recovered by or on behalf of each Debtor or any trustee of such Debtor (whether in the Chapter 11 Cases or any subsequent case to which any of the Chapter 11 Cases is converted) including,

4

without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Section 544, 545,547, 548, 549,550, 551, and 553 of the Bankruptcy Code; and

xx.   to the extent not otherwise described above, all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

xxi.  to the extent not otherwise described above, all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (1) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (2) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (3) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (4) deposits by and property of account debtors or other persons securing the obligations of account debtors;

xxii. to the extent not otherwise described above, all (1) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (2) monies, credit balances, deposits and other property of any Borrower now or hereafter held or received by or in transit to Agent, any Lender or its Affiliates or at any other depository or other institution from or for the account of any Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

xxiii. to the extent not otherwise described above to the extent not otherwise described above, all Receivables;

xxiv. to the extent not otherwise described above all Records; and

xxv.  to the extent not otherwise described above, all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

(o)   "Pre-Petition Collateral" shall mean, collectively, (i) all "Collateral" as such term is defined in the Existing Credit Agreement as in effect immediately prior to the Petition Date, and (ii) all other security and collateral for the Pre-Petition Obligations as provided in the Existing Credit Agreement and the other Existing Financing Agreements immediately prior to the Petition Date.

(p)   "Pre-Petition Obligations" shall mean all Obligations (as such term is defined in the Existing Credit Agreement) arising at any time before the Petition Date, whether

5

incurred by Parent or such Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(q)     "Ratification Agreement" shall mean this Ratification and Amendment Agreement by and among Parent, Borrowers, Agent and Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(r)     "Specified Defaults" means all Defaults and Events of Default that are listed in <u>Exhibit 1</u> hereto together with any Defaults or Events of Default arising due specifically to the commencement of the Bankruptcy Cases.  Agent and Lenders have not waived, are not by this Ratification Agreement waiving, and have no intention of waiving any Events of Default which may have occurred on or prior to the date hereof, whether or not continuing on the date hereof, or which may occur after the date hereof (whether the same or similar to the Specified Events of Default or otherwise), other than the Specified Events of Default. The foregoing waiver shall not be construed as a bar to or a waiver of any other or further Event of Default on any future occasion, whether similar in kind or otherwise and shall not constitute a waiver express or implied, of any of the rights and remedies of Agent and Lenders arising under the terms of the Credit Agreement or any other Existing Financing Agreements on any future occasion or otherwise.

1.2     <u>Amendments to Definitions</u>.

(a)     <u>Collateral</u>.  All references to the term "Collateral" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(b)     <u>Credit Agreement</u>.  All references to the term "Loan Agreement" or "Credit Agreement" in the Existing Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to mean the Existing Credit Agreement, as amended by this Ratification Agreement and as ratified, assumed and adopted by each Borrower pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(c)     <u>Debtors</u>.  All references to Debtors, including, without limitation, to the terms "Borrower" and "Borrowers" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to mean and include the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the

Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

          (d)      <u>Eligible Accounts</u>.  Subclause (A) of clause (i) in section (i) in the definition of Eligible Accounts is hereby amended by deleting such subclause in its entirety and replacing it with the following: "(A) more than thirty-five (35%) percent of the aggregate amount of all Eligible Accounts, solely in the case of Accounts owing to Borrowers by Target Corporation and Wal-Mart Stores, Inc., and".

          (e)      <u>Eligible Inventory</u>.  Clause (ii) of section (k) of the definition of Eligible Inventory is hereby amended by deleting the reference to the amount "$3,000,000" contained therein and replacing it with the following: "$2,500,000".

          (f)      <u>Financing Agreements</u>.  All references to the term "Loan Documents" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Financing Agreements, as ratified, assumed and adopted by each Borrower pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

          (g)      <u>Material Adverse Effect</u>.  All references to the term "Material Adverse Effect", "material adverse effect" or "material adverse change" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that, the commencement of the Chapter 11 Cases shall not constitute a Material Adverse Effect or material adverse change".

          (h)      <u>Maximum Revolver Amount</u>.  The defined term "Maximum Revolver Amount" is hereby amended by deleting such term in its entirety and replacing it with the following:

          "'<u>Maximum Revolver Amount</u>' means $18,500,000."

          (i)      <u>Obligations</u>.  All references to the term "Obligations" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

          (j)      <u>Supplemental Loan Limit</u>.  The term "Supplemental Loan Limit" is hereby amended and restated as follows: "Supplemental Loan Limit" shall mean $3,500,000; <u>provided</u>, that (i) during the period commencing on November 16, 2015 and ending on November 20, 2015, in Agent's sole and absolute discretion, the Supplemental Loan Limit may be increased up to $4,000,000; <u>provided</u> <u>further</u>, that the Supplemental Loan Limit shall be reduced down to $3,500,000 upon the earlier of (x) November 23, 2015, or (y) one (1) business day following Agent's demand for such reduction."

7

(k)    <u>US Borrowing Base</u>.  The definition of US Borrowing Base is hereby amended as follows:

(i)    Section (c) is hereby deleted in its entirety.

(ii)    Clause (i) of section (d) is hereby amended by deleting such clause in its entirety and replacing it with the following: "(i) $3,000,000, and".

(l)    <u>Far East</u>.  All references to the terms "Subsidiaries" or "Affiliates" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements when used in connection with any Borrower or the Parent shall be deemed to exclude Far East and its direct and indirect Subsidiaries.

1.3.    <u>Interpretation</u>.

(a)    For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Existing Credit Agreement.

(b)    All references to the term "Agent", "Lender," "Borrower," "Parent," "Debtor" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(c)    All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)    All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.    ACKNOWLEDGMENT.

2.1    <u>Pre-Petition Obligations</u>.    Each Borrower and Parent hereby acknowledges, confirms and agrees that, as of September 30, 2015, Borrowers are, jointly and severally, indebted to Agent and Lenders in respect of (a) all Pre-Petition Obligations in the aggregate principal amount of not less than  $13,359,095.01, consisting of: (i) Revolving Loans in the aggregate principal amount of not less than $11,537,859.31, and (ii) Obligations relating to Letters of Credit in the aggregate amount of not less than $1,821,235.70, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and expenses), and (b) other charges now or hereafter owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by Borrowers, jointly and severally, to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2    <u>Acknowledgment of Security Interests</u>.  Each Borrower and Parent hereby acknowledges, confirms and agrees that Agent, for the benefit of each of the Secured Parties, has

8

and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent pursuant to the Existing Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of each of the Secured Parties, under the Financing Order or hereunder or under any of the other Existing Financing Agreements or otherwise granted to or held by Agent, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent and Lenders.

2.3    Binding Effect of Documents.    Each Borrower and Parent hereby acknowledges, confirms and agrees that: (a) each of the Existing Financing Agreements to which it is a party was duly executed and delivered to Agent and Lenders by such Borrower or Parent and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Parent contained in the Existing Financing Agreements constitute the legal, valid and binding obligations of such Borrower and Parent enforceable against it in accordance with the terms thereof, and such Borrower and Parent has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Existing Financing Agreements and the Financing Order.

3.    ADOPTION AND RATIFICATION.

Each Borrower and Parent hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Existing Financing Agreements to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Financing Agreements, as amended by this Ratification Agreement, and in accordance with the Financing Order. All of the Existing Financing Agreements are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Parent, each as Debtor and Debtor-in-Possession, and considered as agreements between such Borrowers and Parent, on the one hand, and Agent and Lenders, on the other hand. Each Borrower and Parent hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and Parent agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Existing Financing Agreements to which such Borrower is a party.

4.    GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the DIP Obligations), Borrowers and Parent, each as Debtor and Debtor-in-Possession, hereby grant, pledge and assign to Agent, for the benefit of each of the Secured Parties, and also confirm, reaffirm and restate the prior grant to Agent of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

5.    <u>ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS</u>.

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Borrowers to Agent and Lenders, whether pursuant to the Existing Financing Agreements or otherwise, and not in limitation thereof, each Borrower hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Loans by Agent and Lenders or the issuance of Letters of Credit:

5.1.    <u>Financing Order</u>.  The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Permanent Financing Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal, stay or motion for reconsideration as to which an effective stay exists.

5.2.    <u>Use of Proceeds</u>.  All Loans provided by Agent or any Lender to Borrowers or Letters of Credit issued pursuant to the Financing Orders, the Credit Agreement or otherwise, shall be used by Borrowers only in accordance with the Budget as set forth in Section 5.3. Unless otherwise provided for in the Budget or authorized by the Bankruptcy Court and approved by Agent in writing, no portion of any administrative expense claim relating to the Chapter 11 Cases or any other claim against the Borrowers shall be paid with the proceeds of such Loans or Letters of Credit provided or issued by (or on behalf of) Agent and Lenders to Borrowers, other than those administrative claims and other claims relating to the Chapter 11 Cases directly attributable to the operation of the business of any Borrower or Parent in the ordinary course of such business in accordance with the Financing Agreements and the Budget.

5.3.    <u>Budget</u>.

(a)    Borrowers have prepared and delivered to Agent and Lenders a post-petition Budget covering the period commencing with the week beginning on September 30, 2015 and ending on December 25, 2015; provided that the Budget may be amended (to the extent such amended Budget is approved by Agent in writing).  The Budget has been thoroughly reviewed by the Borrowers, their management and their restructuring advisors and sets forth, for the periods covered thereby, projected weekly operating cash disbursements and cash receipts for each week covered by the Budget.

(b)    Not later than 5:00 p.m. (Eastern time) on the Wednesday of each week commencing on October 16, 2015, Borrowers shall furnish to Agent, in form and substance satisfactory to Agent, a report (the "Budget Compliance Report") that sets forth, on both a week by week basis and a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of the actual cash disbursements to the projected cash disbursements and the actual cash receipts to the projected cash receipts, each as set forth in the Budget for such Measurement Period, together with a certification from the Borrowers' Chief Restructuring Officer that no Material Budget Deviation (as defined below) has occurred.

10

(c)    It shall constitute a Material Budget Deviation and an additional Event of Default under the Credit Agreement if (i) commencing with the week ending October 30, 2015, and each week thereafter, the actual aggregate cash receipts for the trailing four (4) week period are less than eighty percent (80%) of the projected aggregate cash receipts set forth in the Budget for such trailing four (4) week period; (ii) commencing with the week ending October 16, 2015 actual aggregate cash disbursements for any line item in the Budget for the immediately preceding week is more than one hundred and twenty (120%) percent of the projected weekly amount of such disbursements in the Budget; and (iii) commencing with the week ending October 23, 2015, actual aggregate cash disbursements each week on a trailing four (4) week basis (or for the period from the Petition Date through the week then ended if prior to the fourth week covered in the Budget) on an aggregate cumulative basis are more than one hundred and ten (110%) of the projected aggregate cash disbursements for such period set forth in the Budget.  For purposes hereof, the first week of the Budget shall be deemed to be the period beginning on the Petition Date and ending on October 9, 2015.

(d)    Each Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Agent, (i) a failure to maintain the deviations in the Budget as set forth in Section 5.3(c) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii) the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(b) hereof shall constitute an Event of Default.  Notwithstanding any approval by Agent or any Lender of the Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to provide any Loans or Letters of Credit to the Borrowers pursuant to the Budget and shall provide only Loans in accordance with the terms and conditions set forth in the Credit Agreement as amended by this Ratification Agreement, the other Existing Financing Agreements and the Financing Order unless and until the Credit Agreement, as amended by this Ratification Agreement and the other Existing Financing Agreements and the Financing Order has been amended and supplemented to provide for the funding of the amounts provided for in the Budget.  Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(e)    To the extent the amount of any Loans or Letters of Credit exceeds the formula set forth in the Credit Agreement as amended by this Ratification Agreement and the Financing Orders, such excess amounts shall be deemed to be Supplemental Loans.

(f)    Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and Lenders that are reimbursable by Borrowers or any other amounts owing by Borrowers to Agent and Lenders (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Existing Financing Agreements, such projections shall not limit, impair, modify or waive the Borrowers' obligation to pay the actual amounts due to Agent and/or Lenders in respect of such costs, expenses and other amounts owing to Agent and Lenders in accordance with the Credit Agreement and the other Existing Financing Agreements.

5.4    <u>Ratification of Blocked Account Agreements</u>.  To the extent Agent deems it necessary in its discretion and upon Agent's reasonable request, Borrowers shall promptly use

11

their best efforts to provide Agent with evidence, in form and substance reasonably satisfactory to Agent, that all deposit account arrangements provided for under the Existing Financing Agreements (the "Blocked Account Agreements") have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Agent, to reflect the commencement of the Chapter 11 Cases, that each Borrower, as Debtor and Debtor in Possession is the successor in interest to such Borrower, that the Obligations include both the Pre-Petition Obligations and the DIP Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for herein.

       5.5   ERISA.  Each Borrower hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower.

       5.6.   DIP Facility Fee.  A Debtor in Possession facility fee of $50,000, on account of the financing provided by the Agent and Lenders in the Chapter 11 Cases, shall be fully earned and due and payable to Agent by the Debtors upon the entry of the Interim Order.

       5.7   Sale Process.  Without the prior written consent of Agent:

       (a)   Not later than two (2) Business Days after the Petition Date, Debtors shall have filed a motion or pleading (the "Sale Motion"), in each case, acceptable to Agent, seeking approval of (i) the bidding procedures for the sale of all or substantially all of the Debtors' assets in accordance with Section 363 of the Bankruptcy Code (the "Sale"); and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from, and required to be paid by the Loan Parties in connection with, such Sale(s), including without limitation, reasonable broker's and/or investment banker's fees incurred with respect to the Sale(s), in each case, pursuant to a retention agreement in form and substance acceptable to Agent, shall be remitted to Agent for application against, and in permanent reduction of, the Obligations.

       (b)   Not later than thirty (30) days after the Petition Date, Debtors shall obtain the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent, approving bid procedures, including, without limitation, an acceptable form of asset purchase agreement to be used for the Sale (the "Bid Procedures Order").

       (c)   Not later than fifty-five (55) days after the Petition Date, Debtors shall conduct an auction (the "Auction") if more than one bona fide offer meeting the conditions set forth in the Bid Procedures Order is received.

       (d)   Not later than seven (7) Business Days after the Auction, an order, in form and substance satisfactory to Agent, shall have been entered by the Bankruptcy Court approving the Sale(s) (the "Sale Order").

(e)      Not later than two (2) Business Days after the Sale Order is entered, the closing of the Bankruptcy Court-approved Sale(s) shall have occurred.

(f)      Debtors confirm, acknowledge and agree that notwithstanding anything to the contrary contained in the Credit Agreement, any failure to comply with the requirements set forth in this Section 5.7 shall constitute an additional immediate Event of Default under the Existing Financing Agreements.

6.      AMENDMENTS TO EXISTING FINANCING AGREEMENTS.

6.1      Bankruptcy Code.  The definition of "Bankruptcy Code" set forth in the Credit Agreement is hereby amended by deleting such definition in its entirety and replacing it with the following:

"Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

6.2      Interest Rate.  The definition of "Applicable Margin" set forth in Schedule 1.1 of the Credit Agreement is hereby amended by deleting such definition in its entirety and replacing it with the following:

"'Applicable Margin' means, as of any date of determination and with respect to Base Rate Loans or LIBOR Rate Loans, as applicable, the applicable margin set forth below:

| Applicable Margin Relative to Base Rate Loans (the "Base Rate Margin") | Applicable Margin Relative to LIBOR Rate Loans (the "LIBOR Rate Margin") |
|---|---|
| 1.25% | 2.75%" |

6.3      Maturity Date.  The definition of "Maturity Date" set forth in Schedule 1.1 of the Credit Agreement is hereby deleting such definition in its entirety and replacing it with the following:

"'Maturity Date' means the date that is the earlier of three (3) months from the date of this Agreement or such later date to which Agent may consent in its sole and absolute discretion."

6.4      Reserves.  The definition of "Reserves" set forth in Schedule 1.1 of the Credit Agreement is hereby amended by (i) deleting the reference to the word "and" at the end of clause (a) of such definition; (ii) deleting the reference to the word "." at the end of clause (b) of such definition; and (iii) adding the following clause (c) at the end of the last sentence:

13

"; and (c) to reflect reserves provided for in the Financing Order, including, without limitation, in respect of the Professional Fee Carve Out and the other Carve Out Expenses (as each term is defined in the Financing Order)"

6.5     Limits and Sublimits.   Section 2.1 of the Credit Agreement is hereby amended by adding the following new clause (c) at the end thereof:

"(c)     All limits and sublimits set forth in this Agreement, and any formula or other provisions to which a limit or sublimit may apply shall, subject to Section 5.3(d) above, be subject to the Budget, giving effect to the variances and sublimits permitted in the Ratification Agreement."

6.6     Payments.   Section 2.3 of the Credit Agreement is hereby amended by adding the following new clause (d) at the end thereof:

"(g) Without limiting the generality of the foregoing, Agent may, in its discretion, apply any such payments or proceeds first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full; provided, that, Agent's and Lenders' failure to apply any payments or proceeds first to the Pre-Petition Obligations until such obligations are paid in full shall not limit or affect the gradual conversion of Pre-Petition Obligations into DIP Obligations to the extent of all payment or proceeds received by Agent and Lenders in accordance with the Financing Order and the Loan Documents."

6.7     Letters of Credit.

a.   The reference to the amount "$5,000,000" in clause (i) of Section 2.10(b) of the Credit Agreement is hereby deleted and replaced with "$4,000,000".

b.   Notwithstanding anything to the contrary contained in Section 2.10 of the Credit Agreement or otherwise, Agent and Lenders shall have absolutely no obligation whatsoever to issue any Letters of Credit under or in connection with this Agreement that are not, in the Agent's sole determination, to be assumed, cash collateralized, replaced or otherwise addressed, in each case, on terms and conditions acceptable to Agent in its sole discretion, in connection with any Sale provided for in Section 5.7 of the Ratification Agreement.

6.8     Conditions Precedent to All Extensions of Credit.   Section 3.2(a) of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

14

"(a)    the representations and warranties of Loan Parties and its Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct, other than with respect to the Specified Defaults, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct, other than with respect to the Specified Defaults, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);"

6.9    <u>Maturity</u>.   Section 3.3 of the Credit Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

"3.3    This Agreement and the other Loan Documents shall continue in full force and effect for a term ending on the earlier to occur of (i) the Maturity Date, (ii) the confirmation of a plan of reorganization for any Borrower in the Chapter 11 Cases, (iii) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties or of all equity interests in Debtors, (iv) the last termination date set forth in the Interim Financing Order, unless the Permanent Financing Order has been entered prior to such date, and in such event, then the last termination date set forth in the Permanent Financing Order, or (v) the occurrence of an Event of Default (the earlier to occur of clauses (i), (ii), (iii), (iv) and (v) referred to herein as the "Termination Date").

6.10    <u>Additional Financial Reporting Requirements</u>.   Section 5.1 of the Credit Agreement is hereby amended by (i) deleting the reference to the word "and" at the end of clause (b), (ii) deleting the reference to the "." at the end of clause (c) and adding the following new clause (d) at the end thereof:

", and (d) deliver to Agent copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of any Borrower to the Bankruptcy Court, or the U.S. Trustee or to any creditors' committee or such Borrower's shareholders, concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be."

6.11    <u>Borrowing Base and Other Reporting</u>.   Notwithstanding anything to the contrary in Schedule 5.2 of the Credit Agreement or otherwise, Borrowers shall provide to Agent, on a weekly basis, all items contemplated or described in clauses (iii) through and including (xiii) of Schedule 5.2 of the Credit Agreement.

6.12    <u>Financial Covenant</u>.   Section 7 of the Credit Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

15

"7.    **Reserved.**"

6.13    <u>Indebtedness</u>.    Notwithstanding anything to the contrary contained in Section 6.1 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, the Borrowers and Parent will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume, guarantee, or otherwise become directly or indirectly, liable with respect to any Indebtedness (other than (a) Permitted Indebtedness existing as of the Petition Date, (b) Indebtedness evidenced by the Credit Agreement and the other Existing Financing Agreements and (c) Permitted Indebtedness incurred after the Petition Date, <u>provided</u>, <u>that</u>, all such Permitted Indebtedness incurred after the Petition Date is specifically provided for in the Budget), without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

6.14    <u>Encumbrances</u>.    Notwithstanding anything to the contrary contained in Section 6.2 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, the Borrowers and Parent will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume or suffer to exist, directly or indirectly, any lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom (other than (a) Permitted Liens existing on the Petition Date, (b) liens securing the Obligations, (c) liens arising after the Petition Date; provided, that, the priority of such liens are junior and subordinate to the priority of all liens securing the Obligations, and (d) any lien granted or permitted pursuant to the Financing Orders.

6.15    <u>Sale of Assets</u>.    Notwithstanding anything to the contrary contained in Section 6.4 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, the Borrowers and Parent may not convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any portion of any Borrower's, Parent's or any Subsidiaries' Collateral or other assets including without limitation, assume, reject or assign any leasehold interest or enter into any agreement to return Inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise (other than Permitted Dispositions; provided that such sales or dispositions are permitted by Section 5.7 of the Ratification Agreement or are in accordance with the Budget) without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action , inaction or acquiescence by Agent or any Lender).

6.16    <u>Restricted Payments</u>.    Notwithstanding anything to the contrary contained in Section 6.7 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, each Borrower and Parent shall not, directly or indirectly, declare or pay any dividends on account of any shares of any class of Capital Stock of such Borrower or Parent now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the

foregoing, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

        6.17   <u>Investments; Controlled Investments</u>.  Notwithstanding anything to the contrary contained in Section 6.9 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, Borrowers and Parent will not, and will not permit any Subsidiary, after the date hereof, to, directly or indirectly, make or acquire any investment or incur any liabilities (including contingent obligations) for or in connection with any investment, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Budget.

        6.18   <u>Outstanding Loans</u>.  Notwithstanding anything to the contrary contained in the Credit Agreement or otherwise, Agent and Lenders shall have no obligation whatsoever to make any Loan to the Borrowers to the extent that, immediately after giving effect to the making of such Loan, the then aggregate outstanding amount of Loans and other Obligations other than Letter of Credit Usage would exceed $15,000,000 as determined by Agent in its sole discretion.

        6.19   <u>Events of Default</u>.  Section 8 of the Credit Agreement is hereby amended by adding the following the following:

"8.12  <u>Financing Order</u>.

        (a) The occurrence of any condition or event which permits Agent, and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in the Financing Order);

        (b)  the termination or non-renewal of the DIP Loan Documents as provided for in the Financing Order;

        (c)  any act, condition or event occurring after the Petition Date that has or would reasonably expect to result in the occurrence of a Material Adverse Effect upon the assets of any Borrower, or the Collateral, or the ability of any Debtor to perform under and comply with the Budget in accordance with the terms and conditions hereof, or the rights and remedies of the Secured Parties under the Credit Agreement or any other DIP Loan Documents or the Financing Order;

        (d)  conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

        (e)  dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

        (f)  the grant of a lien on or other interest in any property of any Borrower, other than a lien permitted under Section 9.8 hereof

17

or a lien or encumbrance permitted by the Financing Order, which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral;

(g)  the grant of an administrative expense claim in any Chapter 11 Case, other than such administrative expense claim permitted by the Financing Order or the Ratification Agreement, which is superior to or ranks in parity with Agent's Superpriority Claim (as defined in the Financing Order);

(h)  the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any Lender);

(i)  the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(j)  the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(k)  the filing of a plan of reorganization or liquidation by or on behalf of any Borrower, to which Agent has not consented in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(l)  the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Borrower, to which Agent has not consented to in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(m)  entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property of the Debtors having a value in excess of $1,000,000 without the prior written consent of the Agent and the Required Lenders;

(n)  the filing of a motion by any Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Agent or any of the Lenders directly) any costs or expenses of preserving or

18

disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise); or

(o) If a Borrower or any of its Subsidiaries suspends or discontinues or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Borrowers and their Subsidiaries, taken as a whole, or a trustee, receiver or custodian is appointed for any Borrower or any of its Subsidiaries, or any of their respective properties, except to the extent such suspension or discontinuance of business occurs in accordance with the terms of the Ratification Agreement;"

6.20    Notices.    Section 11 of the Credit Agreement is hereby amended by changing the notice address of Otterbourg, P.C. to the following addresses:

| | |
|---|---|
| If to Agent with a copy to: | Otterbourg P.C.<br>230 Park Avenue<br>New York, New York  10169<br>Facsimile No.: (212) 682-6104<br>Attn: Jonathan N. Helfat, Esq.<br>Daniel F. Fiorillo, Esq. |

6.21    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Section 8(a) of the Credit Agreement is hereby amended by deleting the period and adding the following at the end thereof:  ", except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing."

7.    RELEASE.

7.1    Release of Pre-Petition Claims.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of the Secured Parties contained herein and the making of any Loans by Agent and Lenders, each Borrower, pursuant to the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges each of the Secured Parties and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (each of the Secured Parties and all such other parties, in their capacities as such, being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever

19

(individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Borrower, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, as amended and supplemented through the date hereof, and the other Existing Financing Agreements.

(b)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Borrower, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower pursuant to this Section 7.1.  If any Borrower violates the foregoing covenant, Borrowers agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

7.2    Release of Post-Petition Claims. Upon (a) the receipt by Agent, on behalf of itself and the other Lenders, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Agent to secure any Obligations that survive or continue beyond the termination of the Existing Financing Agreements, and (b) the termination of the Existing Financing Agreements (the "Payment Date"), in consideration of the agreements of the Secured Parties contained herein and the making of any Loans by Agent and Lenders, each Borrower hereby covenants and agrees to execute and deliver in favor of each of the Secured Parties a valid and binding termination and release agreement, in form and substance satisfactory to Agent.  If any Borrower violates such covenant, the Borrowers agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

7.3    Releases Generally.

(a)    Each Borrower understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof  may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)    Each Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

8.    CONDITIONS PRECEDENT.

20

In addition to any other conditions contained herein or the Credit Agreement, as in effect immediately prior to the Petition Date, with respect to the Loans and other financial accommodations available to Borrowers (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend any Loans or other advances or financial accommodations to Borrowers pursuant to the Credit Agreement:

8.1    Borrowers and Parent shall furnish to Agent and Lenders all financial information, projections, budgets, business plans, cash flows and such other information as Agent and Lenders shall reasonably request from time to time;

8.2    as of the Petition Date, the Existing Financing Agreements shall not have been terminated;

8.3    no trustee, examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code or receiver or the like shall have been appointed or designated with respect to any Borrower, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

8.4    the execution and delivery of this Ratification Agreement and all other DIP Loan Documents by the Borrowers, Agent and Lenders, and the payment to Agent by Borrowers of the DIP Facility Fee;

8.5    the Interim Financing Order or other Order(s) of the Bankruptcy Court shall ratify and amend the deposit account arrangements of the Borrowers to reflect the commencement of the Chapter 11 Cases, that each Debtor, as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower, as the case may be, that the Obligations include both the Pre-Petition Obligations and the DIP Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Ratification Agreement;

8.6    the execution or delivery to Agent and Lenders of all other DIP Loan Documents, and other agreements, documents and instruments which, in the good faith judgment, of Agent are necessary or appropriate, and the implementation of the terms of this Ratification Agreement and the other DIP Loan Documents, as modified pursuant to this Ratification Agreement, all of which contain provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;

8.7    Each Borrower shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules, and an Interim Financing Order shall have been entered by the Bankruptcy Court (the "Interim Financing Order") authorizing the secured financing under the Existing Financing Agreements as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and granting the senior security interest in liens in favor of Agent described in this Ratification

21

Agreement and in the Financing Order, and granting super-priority expense claims to Agent and Lenders with respect to all obligations due Agent and Lenders. The Interim Financing Order shall authorize post-petition financing under the terms set forth in this Ratification Agreement in an amount consistent with the Budget, and it shall contain such other terms or provisions as Agent and its counsel shall require;

8.8    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Agent (for the benefit of each of the Secured Parties) the senior security interests and liens described above and super-priority administrative expense claims described above (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Agent and its counsel (the "Permanent Financing Order"). Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order with respect to which an effective stay exists;

8.9    other than the voluntary commencement of the Chapter 11 Cases, no material impairment of the priority of Agent's security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent to the Petition Date; and

8.10    no Event of Default other than the Specified Defaults shall have occurred or be existing under any of the Existing Financing Agreements, as modified pursuant hereto, and assumed by Borrowers.

9.    <u>MISCELLANEOUS</u>.

9.1    <u>Amendments and Waivers</u>. Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

9.2    <u>Further Assurances</u>. Each Borrower shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and Lenders of all the rights and remedies hereunder, under any of the other Existing Financing Agreements, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent and Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Existing Financing Agreements or the Financing Order. Upon the request of Agent, at any time

and from time to time, each Borrower shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

9.3    Headings.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

9.4    Counterparts.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

9.5    Additional Events of Default.  The parties hereto acknowledge, confirm and agree that the failure of any Borrower to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Borrower in connection herewith shall constitute an immediate Event of Default under the DIP Loan Documents.

9.6    Costs and Expenses.  Borrowers shall pay to Agent and Lenders on demand all costs and expenses that Agent or Lenders pay or incur in connection with the negotiation, preparation, consummation, administration, enforcement, defense (whether in connection with any adversary proceeding or otherwise) and termination of this Ratification Agreement and the other DIP Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent and Lenders; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other DIP Loan Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of the Borrowers and Parent under the DIP Loan Documents or the Financing Order that Borrowers and Parent fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including reasonable travel, lodging, and meals for

23

inspections of the Collateral and the Debtors' operations by Agent or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Cases; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations of the Collateral and Debtors' operations, plus a per diem charge at the rate of $950 per person per day for Agent's examiners in the field and office; and (h) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent, sell or otherwise realize upon the Collateral, defend against, or respond in connection with, any action or proceeding relating to the Debtors, the DIP Loan Documents or the Financing Order, and otherwise enforce the provisions of this Ratification Agreement, the other DIP Loan Documents and the Financing Order, or to defend any claims made or threatened against any of the Secured Parties arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters). The foregoing shall not be construed to limit any other provisions of the DIP Loan Documents regarding costs and expenses to be paid by Borrowers. All sums provided for in this Section 9.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the DIP Loan Documents. Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Borrower.

       9.7    <u>Effectiveness</u>. This Ratification Agreement shall become effective upon the execution hereof by Borrowers, Parent, Agent and Lenders and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

BORROWERS:

**ADVANCE WATCH COMPANY LTD.**

By:    _____

Name: _____

Title:  _____

**SUNBURST PRODUCTS, INC.**

By:    _____

Name: _____

Title:  _____

**GWG INTERNATIONAL, LTD.**

By:    _____

Name: _____

Title:  _____

GUARANTOR:

**BINDA USA HOLDINGS, INC**.

By:    _____

Name: _____

Title:  _____

**[SIGNATURES CONTINUED ON NEXT PAGE]**

[Signature Pages to Ratification and Amendment to Credit Agreement]

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

**AGENT:**                                **WELLS FARGO BANK, NATIONAL
                                          ASSOCIATION**, as Agent and as a Lender

By:    _____

Name:  _____

Title:  _____

## **Schedule 1.1**

Commercial Tort Claims

None

## <u>Exhibit 1</u>

**Specified Defaults**

The shutdown of, and the appointment of a liquidator under the laws of Hong Kong for, Far East and all Events of Default arising therefrom.

The Loan Parties' failure to timely deliver the financial statements and certificates required pursuant to clauses (i), (ii), (iii), (iv), (v) and (vi) of Schedule 5.1 to the Credit Agreement.

The Loan Parties' failure to delivery on a monthly basis the reports required pursuant to clauses (xiii), (xiv) and (xv) of Schedule 5.2 to the Credit Agreement.

The Loan Parties' failure to comply with the financial covenant set forth in Section 7 of the Credit Agreement.

**Exhibit A**

**Budget**

| Cash Flow Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 10-2 to 12-25 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| Week Ending Date (Friday) | | 10/2/2015 | 10/9/2015 | 10/16/2015 | 10/23/2015 | 10/30/2015 | 11/6/2015 | 11/13/2015 | 11/20/2015 | 11/27/2015 | 12/4/2015 | 12/11/2015 | 12/18/2015 | 12/25/2015 | Total |
| *Receipts* | | | | | | | | | | | | | | | |
| Collections | | 1,025,298 | 1,258,757 | 987,670 | 993,346 | 1,268,007 | 1,247,864 | 1,242,189 | 929,850 | - | - | - | - | - | 8,952,982 |
| Other | | | | | | | | | | - | - | - | - | - | - |
| *Total Receipts* | | 1,025,298 | 1,258,757 | 987,670 | 993,346 | 1,268,007 | 1,247,864 | 1,242,189 | 929,850 | - | - | - | - | - | 8,952,982 |
| | | | | | | | | | | | | | | | |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Inventory | | (706,958) | (445,602) | (924,097) | (78,715) | (296,211) | (238,859) | (191,302) | (14,468) | | | | | | (2,896,211) |
| Inventory - LC @ Sight | | (228,039) | | | | (38,158) | (216,140) | | (8,585) | | | | | | (490,922) |
| Inventory - Domestic Frt/Customs/Movements | | (65,516) | (154,382) | (44,560) | (92,410) | (7,872) | (33,437) | (45,500) | (19,130) | | | | | | (462,806) |
| Cash paid for salaries and related | | (230,761) | (428,000) | (45,761) | (428,000) | (190,761) | (468,000) | (65,761) | (748,000) | | | | | | (2,605,045) |
| Cash used for royalties | | | | | | | | | | | | | | | |
| Cash used for operating expenses | | (592,102) | (364,453) | (161,572) | (395,844) | (225,344) | (523,564) | (433,450) | (215,637) | | | | | | (2,911,965) |
| Other | | | | | | | | | | | | | | | |
| *Total Operating Disbursements* | | (1,823,375) | (1,392,437) | (1,175,991) | (994,968) | (758,345) | (1,480,000) | (736,014) | (1,005,820) | - | - | - | - | - | (9,366,950) |
| | | | | | | | | | | | | | | | |
| *Non-Operating Disbursements* | | | | | | | | | | | | | | | |
| Cash used for Restructuring Activities | | (199,000) | (275,000) | (75,000) | (50,000) | (700,000) | (200,000) | (50,000) | (585,000) | (100,000) | | 75,000 | (25,000) | (215,000) | (2,399,000) |
| Interest and Fees | | (50,000) | (50,000) | | | (60,000) | | | | (60,000) | | | | | (220,000) |
| | | | | | | | | | | | | | | | |
| *Weekly Cash Paydown/(Need) - Prior to filing* | | (1,047,077) | (458,679) | (263,320) | (51,622) | (250,339) | (432,136) | 456,176 | (985,970) | | | | | | (3,032,968) |
| | | | | | | | | | | | | | | | |
| *Cumulative Cash Paydown/(Need) - Prior to filing* | | (1,047,077) | | | | | | | | | | | | | (1,047,077) |
| *Cumulative Cash Paydown/(Need) - DIP Requirement* | | | (458,679) | (722,000) | (773,622) | (1,023,961) | (1,456,097) | (999,921) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) |
| | | | | | | | | | | | | | | | |
| **A/R** | | | | | | | | | | | | | | | |
| Beginning A/R | | 10,414,263 | 10,988,939 | 11,823,758 | 13,326,804 | 14,102,045 | 15,212,793 | 15,255,139 | 14,989,842 | | | | | | |
| A/R from Sales | | 1,599,974 | 2,093,576 | 2,490,716 | 1,768,588 | 2,378,754 | 1,290,211 | 976,892 | 1,868,333 | | | | | | |
| Collections (sales reduced by 12% for dilution & ineligibles) | | (1,025,298) | (1,258,757) | (987,670) | (993,346) | (1,268,007) | (1,247,864) | (1,242,189) | (929,850) | | | | | | |
| Subtotal - A/R | | 10,988,939 | 11,823,758 | 13,326,804 | 14,102,045 | 15,212,793 | 15,255,139 | 14,989,842 | 15,928,325 | - | - | - | - | - | |
| Ineligible | | 4,201,746 | 4,176,746 | 4,151,746 | 4,151,746 | 4,151,746 | 3,876,746 | 3,876,746 | 3,876,746 | - | - | - | - | - | |
| Eligible | | 6,787,194 | 7,647,012 | 9,175,058 | 9,950,300 | 11,061,048 | 11,378,394 | 11,113,096 | 12,051,580 | - | - | - | - | - | |
| ABL Eligibility | 85% | 5,769,115 | 6,499,961 | 7,798,799 | 8,457,755 | 9,401,890 | 9,671,635 | 9,446,132 | 10,243,843 | - | - | - | - | - | |
| | | | | | | | | | | | | | | | |
| **Inventory** | | | | | | | | | | | | | | | |
| Beginning Inventory | | 15,152,903 | 14,763,179 | 14,427,101 | 13,428,298 | 13,517,149 | 12,067,154 | 11,719,182 | 11,679,284 | | | | | | |
| Purchases | | 574,010 | 1,028,496 | 490,162 | 1,268,433 | 123,695 | 490,665 | 595,082 | 273,556 | | | | | | |
| COGS | | 963,733 | 1,364,574 | 1,488,965 | 1,179,582 | 1,573,690 | 838,637 | 634,980 | 1,222,817 | | | | | | |
| Subtotal - Inv | | 14,763,179 | 14,427,101 | 13,428,298 | 13,517,149 | 12,067,154 | 11,719,182 | 11,679,284 | 10,730,023 | - | - | - | - | - | |
| Ineligible | | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | | | | | | |
| Eligible | | 10,144,992 | 9,808,914 | 8,810,111 | 8,898,961 | 7,448,966 | 7,100,995 | 7,061,097 | 6,111,836 | - | - | - | - | - | |
| ABL Eligibility | 51% | 5,131,337 | 4,961,349 | 4,456,154 | 4,501,095 | 3,767,683 | 3,591,683 | 3,571,503 | 3,091,367 | - | - | - | - | - | |
| | | | | | | | | | | | | | | | |
| **LC Availability** | 51% | 327,761 | 212,419 | 212,419 | 515,899 | 819,379 | 1,002,398 | 1,095,395 | 1,171,265 | | | | | | |
| | | | | | | | | | | | | | | | |
| **ABL Over Advance (B)** | | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | | | | | | |
| **ABL Loan Availability - Gross** | | 13,728,213 | 14,173,728 | 14,967,372 | 15,974,749 | 16,488,957 | 16,765,716 | 16,613,029 | 17,006,474 | | | | | | |
| | | | | | | | | | | | | | | | |
| **ABL - Revolving Line of Credit** | | | | | | | | | | | | | | | |
| Funded Debt - Beg. Balance | | 11,944,896 | 12,991,973 | 13,450,653 | 13,713,973 | 13,765,595 | 14,015,934 | 14,448,070 | 13,991,894 | | | | | - | |
| Add: | | | | | | | | | | | | | | | |
| Advances | | 1,844,336 | 1,717,437 | 1,250,991 | 1,044,968 | 1,480,187 | 1,463,860 | 786,014 | 1,907,235 | | | | | | |
| LC @ Sight | | 228,039 | - | - | - | 38,158 | 216,140 | - | 8,585 | | | | | | |
| Less: | | | | | | | | | | | | | | | |
| Cash Sweep (Dominion) | | 1,025,298 | 1,258,757 | 987,670 | 993,346 | 1,268,007 | 1,247,864 | 1,242,189 | 929,850 | | | - | | | |
| Cash Balance at W/E | | | | | | | | | | | | | | | |
| Funded Debt - End. Balance | | 12,991,973 | 13,450,653 | 13,713,973 | 13,765,595 | 14,015,934 | 14,448,070 | 13,991,894 | 14,977,864 | - | - | - | - | - | |
| | | | | | | | | | | | | | | | |
| Net Availability / (Deficit) | | 736,240 | 723,076 | 1,253,399 | 2,209,154 | 2,473,023 | 2,317,647 | 2,621,135 | 2,028,611 | | | | | | |
| | | | | | | | | | | | | | | | |
| Beginning LC | | 1,779,459 | 1,551,419 | 1,551,419 | 2,151,419 | 2,751,419 | 3,113,261 | 3,297,121 | 3,447,121 | | | | | - | |
| Issue/(Draw) | | (228,039) | - | 600,000 | 600,000 | 361,842 | 183,860 | 150,000 | (8,585) | | | | | | |
| Ending LC | | 1,551,419 | 1,551,419 | 2,151,419 | 2,751,419 | 3,113,261 | 3,297,121 | 3,447,121 | 3,438,536 | - | - | - | - | - | |
| Availability / (Deficit) including LC (A) | | (815,180) | (828,344) | (898,020) | (542,266) | (640,238) | (979,474) | (825,986) | (1,409,926) | | | | | | |
| Total Debt | | 14,543,393 | 15,002,072 | 15,865,392 | 16,517,014 | 17,129,195 | 17,745,191 | 17,439,015 | 18,416,400 | | | | | | |
| | | | | | | | | | | | | | | | |
| **Total Availability w/o Overadvance (A-B)** | | (3,315,180) | (3,328,344) | (3,398,020) | (3,042,266) | (3,140,238) | (3,479,474) | (3,325,986) | (3,909,926) | | | | | | |

1