Jeffrey S. Sabin
Rishi Kapoor
VENABLE LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone:     (212) 307-5500
Facsimile:     (212) 307-5598

Andrew J. Currie (to be admitted *pro hac vice*)
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
Telephone: (202) 344-4000
Facsimile:  (202) 344-8300

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x
                                                             :
In re:                                                       :        Chapter 11
                                                             :
ADVANCE WATCH COMPANY LTD., et al.,                          :        Case No. 15-_____ (___)
                                                             :
                        Debtors.[1]                          :        (Joint Administration Requested)
                                                             :
------------------------------------------------------------ x

## MOTION FOR ENTRY OF ORDERS
## (I) APPROVING SALE PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) APPROVING CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) SCHEDULING AN AUCTION AND SALE HEARING, AND (V) APPROVING SUCH SALE

The above-captioned debtors and debtors in possession (collectively, the "**Debtors**") file

this motion (the "**Motion**") for entry of: (i) an order, substantially in the form attached hereto as

**Exhibit A** (the "**Bidding Procedures Order**"), (a) approving proposed bidding procedures (the

"**Bidding Procedures**") in the form attached as **Exhibit 1** to the Bidding Procedures Order, as

well as certain proposed bid protections, in connection with the sale (the "**Sale**") of certain of the

Debtors' assets (the "**Assets**") as more fully described in the Asset Purchase Agreement (the

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

"**Stalking Horse Agreement**"),[2] in the form attached as **Exhibit 2** to the Bidding Procedures Order, by and among the Debtors and Sunshine Time Inc. (the "**Stalking Horse Bidder**"), (b) scheduling an auction (the "**Auction**") and a hearing to consider approval of the Sale (the "**Sale Hearing**"), and (c) approving the form and manner of notice of the Auction, including the form and manner of service of the notice (the "**Auction Notice**") attached as **Exhibit 3** to the Bidding Procedures Order and the notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached as **Exhibit 4** to the Bidding Procedures Order (the "**Assumption and Assignment Notice**"); and (ii) an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"), approving the sale of the Assets free and clear of all liens, claims, and encumbrances to the Stalking Horse Bidder or such other party that is the successful bidder at the auction.  In support of the Motion, the Debtors respectfully state as follows:

## JURISDICTION

1.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are §§ 105, 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

---

[2]    Capitalized terms used but not otherwise defined herein shall have the definitions ascribed to them in the Stalking Horse Agreement.

## BACKGROUND[3]

3.      On September 30, 2015 (the "**Petition Date**"), each of the Debtors filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases, and no committees have been appointed or designated.

## REQUESTED RELIEF

4.      Pursuant to §§ 105, 363, 365, and 503 of the Bankruptcy Code and Rules 2002, 6004, 6006, 9007, and 9014 of the Bankruptcy Rules, the Debtors seek entry of:

    a.  the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**:

        i.  authorizing and approving the Bidding Procedures, attached as **Exhibit 1** thereto;

        ii.  authorizing and approving certain bidding protections to the Stalking Horse Bidder, including breakup fees and expense reimbursements, each subject to the occurrence of certain conditions set forth in the Stalking Horse Agreement, attached as **Exhibit 2** thereto;

        iii.  scheduling the Auction for the Assets to be held on November 9, 2015;

        iv.  scheduling the Sale Hearing to consider approval of the Sale to the Successful Bidder on November 10, 2015 at such time as is later set by the Court;

        v.  authorizing and approving the procedures for the assumption and assignment of certain of the Debtors' executory contracts and unexpired leases and the determination of cure costs (the "**Assumption and Assignment Procedures**") as set forth in the Bidding Procedures Order;

---

[3]  A detailed description of the Debtors' businesses and the reasons for the filing of these chapter 11 cases and for the relief sought in this Motion are set forth in the Declaration of Jeffrey L. Gregg, Chief Restructuring Officer of the Debtors (I) in Support of Debtors' Chapter 11 Petitions and First-Day Filings and (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "**First-Day Declaration**"), being filed contemporaneously with this Motion.

       vi.   approving various deadlines in connection with the foregoing; and

       vii.  authorizing and approving (i) notice of the Auction Notice in the forms attached as **Exhibit 3** thereto and (ii) Assumption and Assignment Notice in the form attached as **Exhibit 4** thereto; and

    b.   the Sale Order, substantially in the form attached hereto as **Exhibit B**, approving the sale of the Assets free and clear of liens, claims, interests, and other encumbrances and the assumption and assignment of executory contracts and/or unexpired leases of the Debtors that are to be assumed and assigned as part of the Sale.

## THE PROPOSED SALE

### A.    Overview of the Sale Process

5.      The consummation of a value-maximizing, going-concern sale of the Debtors' Assets is the cornerstone of these chapter 11 cases.  To that end, the Debtors secured the Stalking Horse Agreement, which represents the Stalking Horse Bidder's initial bid to acquire the Assets (the "**Stalking Horse Bid**").  The total purchase price for the Stalking Horse Bid is $15,000,000 in cash, less any Cure Amounts (defined below) in excess of $500,000, subject to certain adjustments and subject to higher or otherwise better offers, plus the assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement), and payment of all Cure Amounts (defined below).

6.      The Stalking Horse Bid is the result of extensive prepetition marketing efforts and analysis.  Given the exigencies of the Debtors' financial condition and the restrictions in the Debtors' postpetition financing and the Stalking Horse Bid itself, the immediate sale of Assets is the only means to avoid a fire-sale liquidation of all of the Debtors' estates, which would result in significantly less value for all stakeholders.

7.      Accordingly, in consultation with various stakeholders, the Debtors and their advisors developed uniform bidding and auction procedures for the sale of the Assets.  Under the Bidding Procedures, parties may submit bids for the Assets.  The Bidding Procedures are

deliberately flexible, aimed at generating the greatest level of interest and the highest or best value for the Debtors' Assets. At the same time, the Bidding Procedures are uniform, providing clarity to the bidding and auction process by establishing dates for submitting bids, conducting auctions, and approving sales.

8.      The Debtors engaged in extensive marketing efforts in connection with the contemplated sale. The Debtor identified and solicited over 100 parties regarding the proposed sale. During the marketing process, parties that executed confidentiality agreements were granted access to significant diligence and other confidential information about all of the Debtors' businesses. The Debtor entered into non-disclosure agreements with 38 parties and provided access to extensive diligence to 13 serious potential purchasers. As the result of these significant marketing efforts to potential buyers, the Debtors received 3 proposals, all of which contemplated a sale of assets free and clear of liens and claims pursuant to § 363 of the Bankruptcy Code. In evaluating the proposals, the Debtors analyzed, among other things: (i) the consideration offered by each potential buyer, (ii) licensor approval, (iii) financial strength, (iv) the proposed purchaser's ability to close, (v) benefits to the Debtor, and (vi) the likelihood that the proposed purchaser will be able to preserve employees' jobs. Additionally, the Debtors must, at all times, consider the ability of any proposed purchaser or bidder to obtain approval of the Debtors key licensors, including Kenneth Cole.

9.      After extensive deliberations with their advisors, and separate negotiations with bidders regarding the terms of an asset purchase agreement, the Debtors elected to proceed with the Stalking Horse Bid submitted by the Stalking Horse Bidder.

10.     Cognizant of their and their non-debtor affiliates' deteriorating financial condition and the tight timeline that would govern upon the commencement of these chapter 11 cases, the

Debtors accomplished as much as possible with respect to the sale process prior to the Petition Date. With the Stalking Horse Bid in place, the Debtors and their professionals are now prepared to hit the ground running. The Debtors' advisors are prepared to launch an aggressive and extensive postpetition marketing process, consistent with the limitations on publicity contained in the Stalking Horse Agreement. The proposed timeline for this marketing and sale process is reasonable and necessary under the circumstances of these chapter 11 cases and the DIP funds provide sufficient time.

11.    Absent the sale process and transactions contemplated by this Motion, the Debtors believe they will be unable to realize the maximum value of their Assets for the benefit of all stakeholders. The Debtors' declining revenues are insufficient to support the continued operation the Debtors' business as a whole. Thus, a prompt sale of the Assets is necessary to ensure that such Assets are sold at their going concern values.

**B.    The Stalking Horse Agreement**[4]

12.    The Stalking Horse Agreement represents a binding bid for the "Purchased Assets" as described in the Stalking Horse Agreement. The assets proposed to be purchased include certain unexpired leases and contracts (the "**Purchased Contracts**") and certain inventory, equipment, furnishings, books and records, and customer data. In the event that the sale to any Stalking Horse Bidder is consummated, the Debtors would assume and assign the Purchased Contracts to such Stalking Horse Bidder. The Stalking Horse Bidder is responsible for paying any cure costs (the "**Cure Amounts**") related to the assumption and assignment of Purchased Contracts, but any Cure

---

[4]    This summary of the Stalking Horse Agreement is for descriptive purposes only. To the extent there are any discrepancies between this summary and the Stalking Horse Agreement, the Stalking Horse Agreement shall control. All references to sections and schedules made herein refer to the corresponding section or schedule as it appears in the Stalking Horse Agreement.

6

Amounts in excess of $500,000 (the "**Cure Cap**") will reduce the cash amount due under the Stalking Horse Agreement on a dollar for dollar basis.

13.    The Bidding Procedures provide for standard bid protections, such as initial overbid amounts and subsequent bidding increments.  The Stalking Horse Agreement includes provisions for the payment of break-up fees and capped expense reimbursements (together, the "**Termination Payment**"), as an administrative expense, upon the Debtors' consummation of a transaction for with another bidder.

14.    The Stalking Horse Agreement includes various customary representations, warranties and covenants by and from the Debtors and the Stalking Horse Bidder (the "**Parties**"), as well as certain conditions to closing and rights of termination.  The Stalking Horse Agreement also include covenants, conditions and termination rights related to these chapter 11 cases.  The transactions contemplated by the Stalking Horse Agreement are subject to approval by the Bankruptcy Court and entry of the Bidding Procedures Order and the Sale Order.

15.    The pertinent terms of the Stalking Horse Agreement as follows:

| Purchased Assets | Section 2.1 of the Stalking Horse Agreement lists the purchased Assets, and provides that the Stalking Horse Bidder shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets. |
|---|---|
| | "Purchased Assets" shall mean all of Sellers' right, title and interest in, to and under the following assets of Sellers (but excluding Excluded Assets) as of the Closing related to the Business: (a) all Accounts Receivable of Sellers; (b) all Inventory; (c) all customer deposits and security deposits (including, without limitation, all customer deposits and security deposits for rent, electricity, telephone or otherwise, but excluding customer and security deposits relating to Excluded Assets) and other prepaid charges and expenses of Sellers; (d) subject to the provisions of Section 9.1(g), all rights of Sellers under each Real Property Lease set forth on Schedule 1.1(c), together with Sellers' interests in and to all improvements and fixtures under each such Real Property Lease, and other appurtenances thereto, and Sellers' rights in respect thereof; (e) all Furniture and Equipment; (f) all Purchased Intellectual Property; (g) all Purchased Contracts; (h) all Sellers' Documents that are used in, held for use |

in or intended to be used in, or that arise out of, the Business, including Documents relating to accounts receivable, Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (e) above, excluding any Documents exclusively related to any Excluded Assets; (i) all Permits used by Sellers in the Business, to the extent transferable; (j) all supplies owned by Sellers and used in connection with the Business; (k) to the extent transferable, all insurance policies or rights to proceeds thereof relating to the Purchased Assets (other than any directors and officers or fiduciary insurance policy, each of which shall be an Excluded Asset); (l) all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof); (m) all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors if and to the extent that such rights are assignable by operation of Law and relating to Products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets; (n) all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property owned by Sellers; (o) all Prepaids; (p) any cash refunds for Taxes received by Sellers after the Closing Date (inclusive of any interest received thereon, net of any Taxes incurred with respect thereto) with respect to Taxes paid on or prior to the Closing Date; (q) rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against the Critical Trade Vendors; (r) any rights, claims or causes of action of Sellers against third parties other than Tax authorities relating to assets, properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date other than causes of action under Chapter 5 of Title 11 of the United States Code; (s) any rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against officers, directors, employees, shareholders, members and managers of the Sellers; (t) to the extent transferable, all Tax credits of Sellers; (u) to the extent that Buyer determines, in its sole and absolute discretion, to assume any Benefit Plan, any trust or other funding vehicle associated with such Benefit Plan; (v) all purchase orders for the purchase of Inventory that have been issued by the Sellers as of the Closing but have not been completely fulfilled as of the Closing (the "<u>Open Purchase Orders</u>") in an aggregate amount not to exceed Twelve Million Dollars ($12,000,000); and (w) the assets set forth on <u>Schedule 2.1</u>.

| | |
|---|---|
| | Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until three (3) Business Days prior to the Closing Date (except that Buyer may not add as a Purchased Asset anything specifically listed in <u>Section 2.2</u> below as an Excluded Asset, other than Excluded Contracts and Intellectual Property rights); and <u>provided</u>, <u>however</u>, that no such addition shall result in any adjustment of the Purchase Price. |
| Excluded Assets | Section 2.2 of the Stalking Horse Agreement provides that nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.<br><br>"<u>Excluded Assets</u>" shall mean all assets, properties, interests and rights of Sellers other than the Purchased Assets, including without limitation each of the following assets: (a) all cash, cash equivalents, bank deposits and similar cash items of Sellers; (b) all customer and security deposits relating to Real Property Leases that are Excluded Assets; (c) all Excluded Contracts; (d) all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed to or by any Seller to or by any Affiliate of any Seller; (e) any Intellectual Property rights of Sellers other than the Purchased Intellectual Property; (f) any (i) confidential personnel and medical records pertaining to any Employee; (ii) other books and records that Sellers are required by Law to retain or that Sellers determine are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Buyer shall have, to the extent allowed by applicable Law, the right to make copies of any portions of such retained books and records that relate to the Business or any of the Assets; (iii) minute books, stock or membership interest records and corporate seals; and (iv) documents relating to proposals to acquire the Business by Persons other than Buyer; (g) all claims of privilege or protection over pre-Closing communications between or among Venable LLP and Sellers, including, without limitation, as such claims relate to any Purchased Assets; (h) any causes of action under Chapter 5 of Title 11 of the United States Code, and proceeds deriving therefrom, other than causes of action of Sellers that are Purchased Assets; (i) all of Sellers' rights under this Agreement and/or other documents and agreements executed in connection with the transactions provided for herein; (j) any trust or other funding vehicle associated with any Benefit Plan that is not a Purchased Asset; (k) the Assets set forth on <u>Schedule 2.2</u>; and (l) any equity interests in any Seller, Far East or any subsidiary of any of the foregoing.<br><br>Notwithstanding anything herein to the contrary, Buyer may, from time to time, exclude additional assets from the Purchased Assets in its sole and absolute discretion until three (3) Business Days prior to the Closing Date; |

| | |
|---|---|
| | provided, however, that no such exclusion shall result in any adjustment of the Purchase Price. |
| Purchase Price | Section 3.1 of the Stalking Horse Agreement provides that, in consideration of the transfer of the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price (the "Purchase Price) for the Purchased Assets shall be (i) (A) Fifteen Million Dollars ($15,000,000) in cash, subject to adjustment in accordance with Section 3.3, minus (B) the Excess Cure Amounts (the "Cash Purchase Price"), plus (ii) the assumption of the Assumed Liabilities by Buyer at Closing.  The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed at Closing shall be paid by Buyer on the Closing Date, and Sellers shall have no liability therefor.  Any Cure Amounts in excess of Five Hundred Thousand Dollars ($500,000) (the "Cure Cap") shall be classified as "Excess Cure Amounts" and such Excess Cure Amounts shall reduce the Cash Purchase Price on a dollar for dollar basis, as set forth in the first sentence of this section.  Notwithstanding the foregoing, if Buyer requests the assumption and assignment of any Contracts that are not set forth on Schedule 1.1(a), the Cure Amounts associated with any such Contracts shall not apply toward the Cure Cap. |
| Deposit | Section 3.2 of the Stalking Horse Agreement provides that the Stalking Horse Bidder shall deposit with Blackmore Escrow, Inc., pursuant to a mutually acceptable escrow agreement, a $750,000 deposit concurrently with execution of the Stalking Horse Agreement. |
| Purchase Price Adjustment | Section 3.3 of the Stalking Horse Agreement provides that the Purchase Price has been based on a projected value of the gross Accounts Receivable (without giving effect to any set-offs for any reserves, allowances, discounts or other deductions) and Inventory (including all Inventory on hand, in-transit and for which a deposit or prepayment has been made (in the case of any such deposit or prepayment, only to the extent of such deposit or prepayment) (the "Working Capital") as of the Closing Date of $26,000,000, which projection was determined by Sellers in good faith.  At least two (2) Business Days prior to the Closing Date, Sellers shall prepare and deliver to Buyer a certificate setting forth their good faith computation of Working Capital as of such date (the "Closing Working Capital").  Concurrently with the delivery of such certificate, Sellers shall deliver reasonable supporting materials providing the basis for the computation of Closing Working Capital as set forth in such certificate and Sellers further agree to promptly provide any additional supporting documentation as Buyer may reasonably request.  At the Closing, (i) if Closing Working Capital is less than $24,700,000 (the "Working Capital Lower Target"), the Purchase Price shall be reduced dollar-for-dollar by the amount by which Closing Working Capital is less than the Working Capital Lower Target, or (ii) if Closing Working Capital is greater than $28,600,000 |

| | |
|---|---|
| | (the "<u>Working Capital Upper Target</u>"), the Purchase Price shall be increased dollar-for-dollar by the amount by which Closing Working Capital is greater than the Working Capital Upper Target. |
| Termination | Section 4.4 of the Stalking Horse Agreement sets forth circumstances under which the Stalking Horse Agreement may be terminated. The Stalking Horse Agreement may be terminated prior to the Closing as follows: (a) by mutual written consent of Sellers and Buyer; (b) by Sellers or Buyer, as applicable, if any of the conditions set forth in <u>Section 9.3</u> shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party; (c) by Sellers or Buyer if there shall be in effect a final Order or other nonappealable final action of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of all or materially all of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence); (d) by Buyer, if the Closing shall not have occurred on or before the close of business on the date which is seven (7) Business Days after the Sale Order becomes a Final Order or such later date as determined by mutual agreement of Sellers and Buyer (the "<u>Termination Date</u>"); <u>provided</u>, <u>however</u>, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a breach of any representation, warranty, covenant or agreement contained in this Agreement by Buyer or (2) a breach by Buyer of the obligations set forth in <u>Section 8.2</u> hereof, or (b) (1) Sellers have not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Sellers have not breached the obligations set forth in <u>Section 8.2</u> hereof, then Buyer may not terminate this Agreement pursuant to this <u>Section 4.4(d)</u>; (e) by Buyer, if any of the conditions to the obligations of Buyer set forth in <u>Section 9.1</u> shall have become incapable of fulfillment, other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer; (f) by Buyer, if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in <u>Section 9.1</u> or <u>Section 9.3</u> and which breach cannot be cured or has not been cured by the later of (i) ten (10) Business Days after the giving of written notice by Buyer to Sellers of such breach and (ii) the Termination Date; (g) by Buyer or Sellers, if the Closing has not occurred within ninety (90) days after the Petition Date; <u>provided</u> that if a party is in breach of any representation, warranty, covenant or agreement contained in this Agreement, then such party shall not be entitled to terminate pursuant to this <u>Section 4.4(h)</u>; (h) by Sellers, if any condition to the obligations of Sellers set forth in <u>Section 9.2</u> shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition |

is not waived by Sellers; (i) by Sellers, if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and which breach cannot be cured or has not been cured by the later of (i) ten (10) Business Days after the giving of written notice by Sellers to Buyer of such breach and (ii) the Termination Date; (j) by Sellers, if the Closing shall not have occurred on or before the Termination Date; provided, however, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a breach of any representation, warranty, covenant or agreement contained in this Agreement by Sellers or (2) a breach by Sellers of the obligations set forth in Section 8.2 hereof, or (b) (1) Buyer has not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Buyer has not breached the obligations set forth in Section 8.2 hereof, then Sellers may not terminate this Agreement pursuant to this Section 4.4(j); (k) with no further action by either Party, if the Bankruptcy Court shall enter an Order approving a Competing Bid and the transaction contemplated by such Competing Bid is thereafter consummated; (l) [Reserved]; (m) by either Buyer or Sellers, if one or more of the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or by Buyer if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Sellers is appointed in the Bankruptcy Cases; (n) by Buyer, if (i) the Bidding Procedures Order shall not have been submitted by Sellers to the Bankruptcy Court within thirty (30) days of the Petition Date (it being understood and agreed that Sellers shall use reasonable best efforts to have the order entered as soon as possible thereafter), or (ii) at any time after entry of the Bidding Procedures Order, such Bidding Procedures Order (including, without limitation, the provisions therein relating to the bid protections set forth in Section 7.1) is reversed, stayed, vacated or otherwise materially modified by the Bankruptcy Court; or (o) by either Buyer or Sellers, if the Bankruptcy Cases have not commenced within thirty (30) days after the date hereof; provided that if Sellers have not acted in good faith in delaying such commencement, then Sellers shall not be entitled to terminate pursuant to this Section 4.4(o).

| | |
|---|---|
| Expense Reimbursement and Overbid Protections | Section 7.1 of the Stalking Horse Agreement provides that, upon the termination of the Stalking Horse Agreement, the Debtors shall pay the Stalking Horse Bidder (a) the Stalking Horse Bidder's reasonable fees, costs and expenses (including, without limitation, consultants' and attorneys' reasonable fees, costs and expenses) incurred in connection with the transactions contemplated by such Agreement through the date of termination, provided that the amount of such reimbursement does not exceed Three Hundred Thousand Dollars ($300,000) (the "Expense Reimbursement") and (b) a termination fee of Three Hundred Fifty Thousand Dollars ($350,000) (the "Breakup Fee"). In addition, the Bidding Procedures Order shall provide |

| | for an initial minimum bid increment of One Hundred Fifty Thousand Dollars ($150,000) over and above the aggregate of the Purchase Price, the Expense Reimbursement and the Breakup Fee, and minimum bid increments thereafter of One Hundred Thousand Dollars ($100,000) (the "Overbid Protection"). Buyer shall have the ability to credit bid at the Auction the amount of the Expense Reimbursement and the Breakup Fee (collectively). |
|---|---|

## BIDDING PROCEDURES

### A.    Overview

16.    The Debtors believe that the following Bidding Procedures provide an appropriate framework for selling the Assets and will enable the Debtors to review, analyze, and compare all bids received to determine which bids are in the best interests of the Debtors' estates and creditors. In accordance with the "Guidelines for the Conduct of Asset Sales" promulgated by the United States Bankruptcy Court for the Southern District of New York (the "**Guidelines**"), adopted by General Order M-331, the Debtors summarize the following key provisions of the Bidding Procedures:

a.    Cancellation of the Auction. Qualified Bids must be received by the Bid Deadline on **November 4, 2015, at 12:00 p.m. (noon) (Eastern Time)**. If a competing Qualified Bid is not received by the Bid Deadline, the Debtors will cancel the Auction and seek approval of a sale to the applicable Stalking Horse Bidder at a Sale Hearing on **November 10, 2015, at such time as is later set by the Court**.

b.    Good Faith Deposit. Potential Bidders may make one or more credit bids of some or all of their claims to the full extent permitted by § 363(k) of the Bankruptcy Code; however, to the extent that there is a cash component to the bid, such bid must be (i) accompanied by a certified check or wire transfer in the amount of $750,000 payable to the order of the Debtors (the "**Good Faith Deposit**") and (ii) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (provided, however, that the closing of the Sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction as the Debtors may reasonably request.

c.    Assessment of Qualified Bids. A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent, including, among others, (i) the amount of the Qualified Bid, (ii) the risks and timing associated with consummating a transaction with the Potential Bidder (as defined in the Bidding

Procedures), (iii) any excluded Assets or executory contracts and leases, and (iv) any other factors that the debtors may deem relevant to the Sale in consultation with the Committee (as defined in the Bidding Procedures).

d.  <u>Purchase Price; Minimum Bid</u>.  The bidding will start at the aggregate consideration for the Assets and terms proposed in the Qualified Bid that the Debtors select as the highest and best offer prior to the Auction.  The initial minimum overbid that may be offered by a bidder other than the Stalking Horse Bidder is equal to the aggregate of the Stalking Horse Bid, the Expense Reimbursement, and the Breakup Fee, plus an initial minimum bid increment of $150,000.  Further bids will continue in increments of at least $100,000.

e.  <u>Stalking Horse Credit Bid</u>. The Stalking Horse Bidder shall have the ability to credit bid at the Auction the aggregate amount of (i) the Expense Reimbursement (as defined in the Stalking Horse Agreement) in an amount equal to either (x) as of the date of the Auction, the reasonable fees, costs and expenses actually incurred by the Stalking Horse Bidder in connection with the transactions contemplated by the Stalking Horse Agreement not to exceed $300,000, or (y) an amount agreed upon by the Debtors and the Stalking Horse Bidder not to exceed $300,000; and (ii) the Breakup Fee (as defined in the Stalking Horse Agreement).

**B.    Key Dates and Deadlines**

17.    The Bidding Procedures establish the following key dates and times for the sale

process:

| October 26, 2015 | Initial Bid Deadline / Deadline to submit Indication of Interest |
|---|---|
| **November 4, 2015, at 12:00 p.m. (noon) (Eastern Time)** | Bid Deadline |
| **November 6, 2015, at 4:00 p.m. (Eastern Time)** | Deadline to Distribute Qualified Bids |
| **November 9, 2015, at 9:00 a.m. (Eastern Time)** | Auction<br>Location: Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169 |
| **November 9, 2015, at 5:00 p.m. (Eastern Time)** | Objection Deadline to Sale / Assumption and Assignment of Assigned Agreements |
| **November 10, 2015, at such time as is later set by the Court** | Sale Hearing |

18.     The Debtors believe that the time periods set forth in the Bidding Procedures are reasonable.  Under the proposed timeline, there will be 35 days between the filing of this Motion and the Bid Deadline.  This period will provide parties with sufficient time to formulate bids to purchase any Assets.  The Debtors' businesses have been extensively marketed, and information regarding all of the Debtors' Assets have been made available during the process.  As such, many parties that may have an interest in bidding at the Auction likely have already conducted diligence and evaluated the Debtors' businesses and will not be bidding in a vacuum.  In addition, potential bidders who have not previously conducted diligence on the Debtors' businesses will have immediate access to, subject to the execution of an appropriate confidentiality agreement, a substantial body of information regarding the Assets, including information gathered based upon specific due diligence requests of the Stalking Horse Bidder and other bidders.

## THE ASSUMPTION AND ASSIGNMENT PROCEDURES

19.     The Assumption and Assignment Procedures will, among other things, govern the Debtors' provision of notice to counterparties to the Assigned Agreements that such contracts may be assumed and assigned to a Stalking Horse Bidder (or another Successful Bidder) and of the Cure Amount the Debtors believe are necessary pursuant to § 365 of the Bankruptcy Code to assume and assign such contracts.

20.     Pursuant to the Assumption and Assignment Procedures, within two (2) days after the entry of the Bidding Procedures Order, the Debtors shall file with the Court and serve on each party to the Assigned Agreements the Assumption and Assignment Notice.  Any objection to proposed Cure Amounts or to a Stalking Horse Bidder's provisions of adequate assurance of future performance (an "**Assumption/Assignment Objection**") must be filed with the Court and served on the Objection Notice Parties by **November 9, 2015 at 5:00 p.m. (Eastern Time)**:

The Debtors propose that any party seeking to (i) object to the validity of the Cure Amount as determined by the Debtors or otherwise assert that any other amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the Purchased Contracts and Real Property Leases (the "**Assigned Agreements**") in order for such lease to be assumed and assigned or (ii) object to the assumption and assignment of any Assigned Agreements on any other basis (including but not limited to, objections to adequate assurance of future performance), must file a written objection (an "**Assumption/Assignment Objection**") with the Court setting forth the cure amount the objector asserts to be due, and the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment and the support therefor, so that such objection is filed with the Court no later than **5:00 p.m. (Eastern Time) on November 9, 2015** (the "**Assumption/Assignment Objection Deadline**"), and such objection shall also be served so the same is actually received on or before the Assumption/Assignment Objection Deadline by (i) proposed counsel to the Debtors Venable, LLP at <u>both</u> Rockefeller Center, 1270 Avenue of the Americas, Twenty-Fourth Floor, New York, New York 10020 (Attn: Rishi Kapoor, Esq.) and 575 7th Street, NW, Washington, D.C. 20004 (Attn: Andrew J. Currie, Esq.) and (ii) proposed counsel to the Committee (collectively, the "**Notice Parties**").

## <u>EXTRAORDINARY PROVISIONS UNDER THE LOCAL GUIDELINES</u>

21.     Collectively, the Bidding Procedures and the Stalking Horse Agreement contain the following provisions, which the Guidelines, require to be separately disclosed:

a.  <u>Deadlines that Effectively Limit Notice</u>: As is common for auctions in chapter 11 cases, the identity of other Qualified Bidders will not be known until at least one (1) day prior to the Auction.  Additionally, the identity of the Successful Bidder at the Auction will not be known until shortly before the Sale Hearing; in this case, three (3) days before the Sale Hearing.

b.  <u>Use of Proceeds</u>:  Other than payment of a Termination Payment from the proceeds of a Competing Transaction, the Stalking Horse Agreement does not contemplate an allocation of sale proceeds.

c.  <u>Records Retention</u>:  The Stalking Horse Agreement provides that the Stalking Horse Bidder and the Debtors will both retain pre-Closing books and records related to the Debtors businesses.  The Stalking Horse Agreement grants the Debtors reasonable access to such records, and the Debtors will be able to administer their bankruptcy cases, notwithstanding the sale of any books and records.

d.  <u>Findings as to Successor Liability</u>: The proposed Sale Order contains findings of fact and conclusions of law limiting the Stalking Horse Bidder's successor liability.

e.  <u>Findings as to Fraudulent Conveyances or Transfers</u>: The proposed Sale Order contains finding of fact and conclusions of law with respect to the consideration paid and the elements of a fraudulent transfer.

f.  <u>Sale Free and Clear of Leases</u>:  The proposed Sale Order provides that the sale of the Assets will be free and clear of all liens, claims, encumbrances, and other interests except for those permitted encumbrances and Assumed Liabilities, as specified in the Stalking Horse Agreement.  At this time, the Debtors are not aware of any proposed sale of property free and clear of a possessory leasehold interest.

g.  <u>Relief from Bankruptcy Rules 6004(h) and 6006(d)</u>:  The Debtors seek relief from the fourteen (14) day stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

**THE RELIEF REQUESTED IS WARRANTED AND IN THE
BEST INTERESTS OF THE DEBTORS AND THEIR ECONOMIC STAKEHOLDERS**

A.    <u>**The Sale**</u>

22.    Ample authority exists for approval of the Sale envisioned by this Motion.  Section 363 of the Bankruptcy Code provides, in relevant part, "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in the Second Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor.  <u>See</u> <u>In re Chateaugay Corp.</u>, 973 F.2d 141 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application); <u>Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)</u>, 722 F.2d 1063, 1071 (2d Cir. 1983) (same); <u>In re Gen. Motors Corp.</u>, 407 B.R. 463, 493-94 (Bankr. S.D.N.Y. 2009).  Once a court is satisfied that there is a sound business justification for the proposed sale, the court must then determine whether (i) the debtor has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable, and (iii) the purchaser is proceeding in good faith.  <u>Gen. Motors</u>, 407 B.R. at 493-94; <u>In re Betty Owens Sch.</u>, 1997 U.S. Dist. Lexis 5877 (S.D.N.Y. 1997); <u>accord</u> <u>In re Delaware and Hudson Ry. Co.</u>, 124 B.R.

17

at 166; <u>In re Decora Indus., Inc.</u>, Case No. 00-4459, 2002 WL 32332749 at *3 (Bankr. D. Del. May 20, 2002).

23.     As described above and as will be explained in the First Day Declaration, an orderly but expeditious sale of the Business is critical to preserving and realizing its going concern value and, in turn, to maximize recovery for the Debtors' economic stakeholders.  A prompt sale is also required by the express terms of the Stalking Horse Agreement itself.  Pursuing the Stalking Horse Agreement represents a reasonable exercise of the Debtors' business judgment and is in the best interests of all parties.

24.     The notice that the Debtors propose to provide, as set forth in the Bidding Procedures Order and Bidding Procedures, is more than adequate and reasonable.  Such notice will ensure that actual notice of the Auction, Sale Hearing, and Sale will be provided to all known creditors of the Debtors, in addition to notice by publication.   Such notice, together with the authority pursuant to §§ 363 and 365 of the Bankruptcy Code, will enable the Court to make findings at the Sale Hearing and in the Sale Order that Purchaser shall not be liable under theories of successor liability in connection with the sale of the Business to a Successful Bidder.

25.     The Debtors believe that the Purchase Price is fair and reasonable, but the Court and parties in interest will be assured at the Sale Hearing, after an extended diligence period and marketing by the Debtors' advisors, that the Debtors will have selected parties with the highest or best offers for the Business.  The Debtors' compliance with the Bidding Procedures Order and the Bidding Procedures will provide the basis to find that any sale of the Business does not constitute a fraudulent transfer because the purchase price represents reasonably equivalent value and is fair and reasonable.  It will also establish that the Debtors and the Stalking Horse Bidder, or any other Successful Bidder, have proceeded in good faith.

**B.**    <u>**Sale Free and Clear of Liens, Claims, Encumbrances and Interests**</u>

26.    In the interest of attracting the best offers, the sale of the Business should be free and clear of any and all liens, claims, encumbrances and other interests in accordance with section 363(f) of the Bankruptcy Code, with any such liens, claims, encumbrances and other interests attaching to the proceeds of the sale.  Pursuant to § 363(f) of the Bankruptcy Code, a debtor in possession may sell property of the estate "free and clear of any interest in such property of an entity other than the estate" if applicable non-bankruptcy law permits sale of such property free and clear of such interest, if such entity consents, if such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, if such interest is in bona fide dispute, or if such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.  11 U.S.C. § 363(f)(1) – (5).  With respect to any party asserting a lien, claim, encumbrance or other interest against the Business, the Debtors anticipate that they will be able to satisfy one or more of the conditions set forth in section 363(f).

**C.**    <u>**Protections as a Good Faith Purchaser**</u>

27.    Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor notwithstanding that the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that:

> The reversal or modification on appeal of an authorization under [section 363(b)] … does not affect the validity of a sale … to an entity that purchased … such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale … were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) fosters the "'policy of not only affording finality to the judgment of the [B]ankruptcy [C]ourt, but particularly to give finality to those orders and judgments upon which third parties rely.'" <u>Reloeb Co. v. LTV Corp (In re Chateaugay Corp.)</u>,

No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. Lexis 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting In

re Abbotts Dairies of Pa., Inc., 788 F.2d 143, 147 3d Cir. 1986); see also Allstate Ins. Co. v.

Hughes, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers

of property will not be affected by the reversal or modification on appeal of an unstayed order,

whether or not the transferee knew of the pendency of the appeal"); In re Stein & Day, Inc., 113

B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers

are protected from the reversal of a sale on appeal unless there is a stay pending appeal").

Additionally, section 363(n) of the Bankruptcy Code provides that a trustee may avoid a sale,

recover the benefit of a collusive purchase, or punitive damages only if "the sale price was

controlled by an agreement among potential bidders at such sale."  11 U.S.C. § 363(n).

28.    The selection of Successful Bidders will be the product of arm's-length, good faith

negotiations in as competitive a purchasing process as is possible under the circumstances.  Based

upon the record to be made at the Sale Hearing, the Debtors will request a finding that the

Successful Bidder is a good faith purchaser entitled to the protections of section 363(m) of the

Bankruptcy Code and a finding that the sale cannot be avoided under section 363(n) of the

Bankruptcy Code.

### D.    Bidding Procedures

29.    The Debtors believe the Bidding Procedures are fair and reasonable and will ensure

that the bidding process and any Auction (to the extent necessary) will yield the maximum value

for the Debtors' estates and creditors.  The Bidding Procedures allow all parties in interest an

opportunity to conduct in-depth diligence.  The Bidding Procedures also provide an appropriate

framework for the Debtors to review, analyze and compare all bids received to determine which

bid(s) are in the best interests of the Debtors and their economic stakeholders.  The Bidding

Procedures clearly set forth the participation requirements for Qualified Bidders and bid requirements for Qualified Bids (as such terms are defined in the Bidding Procedures). Accordingly, approval of the Bidding Procedures, including the dates established thereby for the Auction and the Sale Hearing, is warranted.

### E.     The Termination Payments and Other Bid Protections

30.     The Bidding Procedures contain certain bid protections for the Stalking Horse Bidder, such as the initial overbid requirement and the subsequent bidding increments.   The Stalking Horse Agreement contains additional bid protections; namely, the provision of a Termination Payment (including a break-up fee and expense reimbursement), which is payable in the event that a higher or better competing bid is consummated (such Termination Payment, together with the initial and subsequent bid increments, the "**Bid Protections**").

31.     Approval of termination fees and expense reimbursements as an administrative expense claim as a form of bidder protection in connection with a sale of assets pursuant to § 363 of the Bankruptcy Code has become a recognized practice in chapter 11 cases because it enables a debtor to ensure a sale to a contractually committed buyer at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.[5]  Courts in this District have held that break-up fees should be approved as long as (i) the

---

[5]     See, e.g., In re Finlay Enters., Inc., et al., Case No. 09-14873 (JMP) (Bankr. S.D.N.Y. Aug. 20, 2009) (approving break-up fee); In re Lehman Bros. Holdings Inc., et al., Case No. 08-13555 (JMP) (Bankr. S.D.N.Y. Oct. 22, 2008) (approving break-up fee and expense reimbursement); In re Steve & Barry's Manhattan LLC, et al., Case No. 08- 12579 (ALG) (Bankr. S.D.N.Y. Aug. 5, 2008) (approving break-up fee and expense reimbursement); In re Fortunoff Fine Jewelry and Silverware, LLC, Case No. 08-10353 (JMP) (Bankr. S.D.N.Y. Feb. 22, 2008) (approving break-up fee); In re Bally Total Fitness of Greater New York, Inc., Case No. 07-12395(BRL) (Bankr. S.D.N.Y. Aug. 21, 2007) (approving break-up fee and expense reimbursement); In re G+G Retail, Inc., Case No. 06-10152 (RDD) (Bankr. S.D.N.Y. Jan. 30, 2006); In re Footstar, Inc. Case No. 04-22350 (ASH) (Bankr. S.D.N.Y. Apr. 6, 2004) (authorizing the debtors to enter into purchase agreements with break-up fees); Official Comm. of Subordinated Bondholders v. Integrated Res., Inc., (In re Integrated Res., Inc.), 147 B.R. 650 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993) (approving break-up fee and expense reimbursement); In re Twinlab Corp., et al., Case No. 03-15564 (CB) (Bankr. S.D.N.Y. 2003) (approving break-up fee and expense reimbursement); In re Adelphia Business Solutions, Inc., et al., Case No. 02-11389 (REG) (Bankr. S.D.N.Y. 2002) (approving break-up fee and expense reimbursement).

relationship between the parties is not tainted by self-dealing, (ii) the fee does not hamper bidding, and (iii) the amount of the fee is reasonable in relation to the size of the transaction. See, e.g., Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 657 (S.D.N.Y. 1992), appeal dismissed, 3 F.3d 49 (2d Cir. 1993). Bankruptcy courts have approved bidding incentives similar to the ones contemplated in the Stalking Horse Agreement under the "business judgment rule," pursuant to which courts typically grant deference to the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment.

32.     The Bid Protections provided in the Bidding Procedures and Stalking Horse Agreement meet the "business judgment rule" standard.   These protections, individually and collectively, were a material inducement for, and condition of, the Stalking Horse Bidder's entry into, the Stalking Horse Agreement.  The Stalking Horse Bidder is unwilling to commit to hold open their offers under the terms of the Stalking Horse Agreement unless assured of payment of the applicable Termination Payment under the conditions set forth in the Stalking Horse Agreement.  The Termination Payment promotes more competitive bidding by inducing the Stalking Horse Bidder to hold its offer open as a minimum or floor bid on which other bidders – and the Debtors – can rely.  The Stalking Horse Bid increases the likelihood that the price at which the Business is sold will reflect its true worth, and the Stalking Horse Bidder is entitled to be compensated as a result.

33.     The Termination Payment is fair and reasonable in amount under the circumstances, particularly because the Termination Payment will be paid out of the proceeds of any Successful Bid.  Further, there is ample precedent for approving (i) a break-up fee of 1.5% and an expense reimbursement of up to $4.5 million (Acme Markets, Inc.); (ii) a break-up fee of

3% and an expense reimbursement of up to $1 million (The Stop & Shop Supermarket Company,

LLC); and (iii) a break-up fee of 3% and an expense reimbursement of $250,000 (Key Food Stores

Co-Operative, Inc.).  See, e.g., In re Hostess Brands, Inc., Case No. 12-22052 (Bankr. S.D.N.Y.

2013) (break-up fee equal to 3.5%); In re Global Crossing Ltd., Case No. 02-40187 (Bankr.

S.D.N.Y. 2002) (break-up fee equal to 4%); In re LTV Steel Company, Inc., Case No. 00-43866

(Bankr. N.D. Ohio 2000) (break-up fee equal to 7.5%); In re Fruit of the Loom, Inc., Case No. 99-

4497 (Bankr. D. Del. 1999) (break-up fee equal to 3.59%); In re Graham-Field Health Products,

Inc., Case No. 99-4457 (Bankr. D. Del. 1999) (break-up fee equal to 4.65%).

34.    The foregoing Bid Protections will not deter or chill bidding, are reasonable, and

their availability to the Debtors will enable the Debtors to maximize the value of their estates.

### F.    Assumption and Assignment of Liabilities

35.    Section 365(a) of the Bankruptcy Code provides that a debtor in possession "subject

to the court's approval, may assume or reject any executory contract or unexpired lease of the

debtor."  11 U.S.C. § 365(a).  Upon finding that a debtor has exercised its sound business judgment

in determining to assume an executory contract or unexpired lease, courts will approve the

assumption under section 365(a) of the Bankruptcy Code.  See Nostas Assocs. v. Costich (In re

Klein Sleep Prods., Inc.), 78 F.3d 18, 25 (2d Cir. 1996); Orion Pictures Corp. v. Showtime

Networks, Inc. (In re Orion Pictures Corp.), 4 F.3d 1095, 1099 (2d Cir. 1993).

36.    In connection with the Sale, the Debtors will assume and assign only the Assumed

Liabilities (as defined in the Stalking Horse Agreement).  The Debtors' assumption of the Assumed

Liabilities will be contingent upon payment or reserve of Cure Costs and effective only upon the

Closing.  Further, § 365(k) of the Bankruptcy Code provides that assignment by the debtor to an

entity of a contract or lease "relieves the trustee and the estate from any liability for any breach of

such contract or lease occurring after such assignment." 11 U.S.C. § 365(k). Pursuant to § 365(k), the Debtors will therefore be relieved from any liability for any breach of any Assumed Liability after an assignment to the Successful Bidder. As such, the assumption of the Assumed Liabilities constitutes an exercise of the Debtors' sound business judgment.

37.    Section 365(b)(1) of the Bankruptcy Code requires that any outstanding defaults under the Assumed Liabilities must be cured or that adequate assurance be provided that such defaults will be promptly cured. As set forth above, the Debtors propose to file with the Court, and serve on each counterparty to an Assumed Liability, an Assumption and Assignment Notice indicating the Debtors' calculation of the Cure Costs for each such Assumed Liability. Counterparties shall have the opportunity to lodge any objections to the proposed assumption and assignment to the Successful Bidder and, if applicable, the proposed Cure Amount.

38.    Pursuant to § 365(f)(2) of the Bankruptcy Code, a debtor may assign an executory contract or unexpired lease of nonresidential real property if "adequate assurance of future performance by the assignee of such contract or lease is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988) (citation omitted); see also In re Natco Indus., Inc., 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent); In re Bon Ton Rest. & Pastry Shop, Inc., 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance."). Among other things, adequate assurance may be given by demonstrating the assignee's financial health and experience in managing the type of enterprise or

property assigned.  See In re Bygaph, Inc., 56 B.R. 596, 605- 06 (Bankr. S.D.N.Y. 1986) (adequate

assurance of future performance is present when prospective assignee of lease has financial

resources and expressed willingness to devote sufficient funding to business to give it strong

likelihood of succeeding; in the leasing context, chief determinant of adequate assurance is

whether rent will be paid).

39.    At the Sale Hearing, to the extent necessary, the Debtors will be prepared to proffer

testimony or present evidence to demonstrate the ability of each Successful Bidder to perform

under the applicable Assumed Liability.  The Sale Hearing, therefore, will provide the Court and

other interested parties with the opportunity to evaluate the ability of each Successful Bidder to

provide adequate assurance of future performance, as required by § 365(b)(1)(C) of the

Bankruptcy Code.  Accordingly, it is requested that at the conclusion of the Sale Hearing, the

proposed assumption and assignment of the applicable Assumed Liabilities be approved.

40.    To facilitate the assumption and assignment of Assumed Liabilities, the Debtors

further request the Court find all anti-assignment provisions of the applicable Transferred

Contracts and Additional contracts to be unenforceable under section 365(f) of the Bankruptcy

Code.[6]

### G.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)

41.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease

of property . . . is stayed until the expiration of fourteen (14) days after entry of the order, unless

---

[6]    Section 365(f)(1) provides in part that, "notwithstanding a provision in an executory contract or unexpired lease
of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease,
the trustee may assign such contract or lease…"  11 U.S.C. § 365(f)(1).  Section 365(f)(3) further provides that
"[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that
terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or
a right or obligation under such contract or lease on account of an assignment of such contract or lease, such
contract, lease, right, or obligation may not be terminated or modified under such provision because of the
assumption or assignment of such contract or lease by the trustee."  11 U.S.C. § 365(f)(3).

the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides

that an "order authorizing the trustee to assign an executory contract or unexpired lease under §

365(f) is stayed until the expiration of fourteen (14) days after the entry of the order, unless the

court orders otherwise." Fed. R. Bankr. P. 6006(d).

42.    In light of the current circumstances and financial condition of the Debtors, the

Debtors believe that in order to maximize value, the Sale should be consummated as soon as

practicable.  Accordingly, the Debtors request that the Sale Order be effective immediately upon

entry of such order and that the fourteen (14) day stay under Bankruptcy Rules 6004(h) and

6006(d) be waived.

## NO PREVIOUS REQUEST

43.    No prior motion for the relief requested herein has been made by the Debtors to this

or any other court.

## NOTICE

44.    The Debtors have provided notice of this Motion to: (a) the Office of the United

States Trustee for the Southern District of New York (United States Trustee's Office Region 2,

U.S. Federal Office Building, 201 Varick Street, Suite 1006, New York, New York 10014); (b)

the entities listed on the Consolidated List of Creditors Holding the 30 Largest Unsecured Claims,

filed pursuant to Bankruptcy Rule 1007(d); (c) the administrative agent under the Debtors' first

lien credit facility (Wells Fargo Bank National Association, 100 Park Avenue, 14th Floor, New

York, New York 10017, Attn: Portfolio Manager - Advance Watch, with a copy to Otterbourg,

Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169, Attn: Daniel

F. Fiorillo, Esq.); (d) Binda Italia Srl, Via Montefeltro, 4, 20156 Milano, Attention: Simone Binda,

CEO, sbinda@bindagroup.com; (e) the Internal Revenue Service (Internal Revenue Service,

Centralized Insolvency Operations, P.O. Box 7346, Philadelphia, Pennsylvania 19101-7346); (f) the United States Securities and Exchange Commission (U.S. Securities and Exchange Commission, New York Regional Office, Brookfield Place, 200 Vesey Street, Suite 400, New York, New York 10281-1022); (g) all parties who have requested notice pursuant to Bankruptcy Rule 2002; (h) all entities known or reasonably believed to have asserted a lien, encumbrance, claim or other interest in any of the assets offered for sale; and (i) parties to executory contracts and unexpired leases proposed to be assumed and assigned, or rejected as part of the proposed transaction. In light of the nature of the relief requested, the Debtors respectfully submit that no other or further notice is necessary.

45.    Following the entry of the Bidding Procedures Order, the Auction Notice will be served on all parties provided with notice of this Motion and all parties identified by the Debtors as potentially interested purchasers.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested herein and such other and further relief as is just.

*[Remainder of page left intentionally blank]*

Dated: New York, New York
      September 30, 2015

                  Respectfully submitted,

                  */s/ Jeffrey S. Sabin*
                  Jeffrey S. Sabin
                  Rishi Kapoor
                  Venable LLP
                  1270 Avenue of the Americas
                  New York, New York 10020
                  Telephone:    (212) 307-5500
                  Facsimile:    (212) 307-5598

                  and

                  Andrew J. Currie (to be admitted *pro hac vice*)
                  Venable LLP
                  575 7th Street, NW
                  Washington, DC 20004
                  Telephone:    (202) 344-4000
                  Facsimile:    (202) 344-8300

                  *Proposed Counsel to the Debtors*
                  *and Debtors in Possession*

## EXHIBIT A

**Proposed Bidding Procedures Order**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- x
                                    :

In re:                              :          Chapter 11
                                      :

ADVANCE WATCH COMPANY LTD., et al.,  :      Case No. 15-_____ (___)
                                      :

             Debtors.[1]            :        (Joint Administration Requested)
                                      :

---------------------------------------------------------------- x

## ORDER (I) APPROVING SALE PROCEDURES FOR THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS AND ENCUMBRANCES PURSUANT TO SECTION 363 OF THE BANKRUPTCY CODE, (II) APPROVING CERTAIN BIDDING PROTECTIONS, (III) APPROVING THE FORM AND MANNER OF NOTICE OF THE SALE AND ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (IV) SCHEDULING AN <u>AUCTION AND SALE HEARING,</u>

Upon the motion (the "**Motion**"), of Binda USA Holdings, Inc., Advance Watch Company Ltd., Sunburst Products, Inc., and GWG International, Ltd., the debtors and debtors-in-possession (collectively, the "**Debtors**"), pursuant §§ 105, 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") for entry of an order (i) an order, substantially in the form attached to the Motion as **<u>Exhibit A</u>** (the "**Bidding Procedures Order**"), (a) approving proposed bidding procedures (the "**Bidding Procedures**") in the form attached as **<u>Exhibit 1</u>** to the Bidding Procedures Order, as well as certain proposed bid protections, in connection with the sale (the "**Sale**") of certain of the Debtors' assets (the "**Assets**") as more fully described in the Asset Purchase Agreement (the "**Stalking Horse Agreement**"), in

---

[1]   The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

the form attached as **Exhibit 2** to the Bidding Procedures Order, by and among the Debtors and Sunshine Time Inc. (the "**Stalking Horse Bidder**"),[2] (b) scheduling an auction (the "**Auction**") and a hearing to consider approval of the Sale (the "**Sale Hearing**"), and (c) approving the form and manner of notice of the Auction, including the form and manner of service of the notice (the "**Auction Notice**") attached as **Exhibit 3** to the Bidding Procedures Order and the notice of the proposed assumption and assignment of executory contracts and unexpired leases in the form attached as **Exhibit 4** to the Bidding Procedures Order (the "**Assumption and Assignment Notice**"); and (ii) an order, substantially in the form attached hereto as **Exhibit B** (the "**Sale Order**"),[3] approving the sale of the Assets free and clear of all liens, claims, and encumbrances to the Stalking Horse Bidder or such other party that is the successful bidder at the auction; the Court having conducted a hearing to consider the relief requested therein (the "**Bidding Procedures Hearing**"); and the Court having considered the statements of counsel and the evidence presented at the Bidding Procedures Hearing;

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The Debtors have articulated good and sufficient reasons for, and the bests interests of their estates will be served by, the Court granting the relief requested in the Motion, including the approval (i) the Bidding Procedures, attached hereto as **Exhibit 1**, (ii) the Bid Protections on the terms set forth in this Order, and (iii) the form and manner of notice of the Auction Notice and Assumption and Assignment Notice described in the Motion and attached hereto, respectively, as **Exhibit 3** and **Exhibit 4**.

---

[2]    Capitalized terms used but not otherwise defined herein shall have the definitions ascribed to them in the Motion.
[3]    The Exhibits referenced in the Sale Order will be filed and served in accordance with the procedures set forth in the Bidding Procedures Order and the Assumption and Assignment Notice.

B.      The proposed notice of the sale of the Assets and Bidding Procedures, as set forth in the Motion, is good, appropriate, adequate, and sufficient, and is reasonably calculated to provide all interested parties with timely and proper notice of the Sale and the Bidding Procedures, and no other or further notice is required for the sale of the Assets to the Successful Bidder and the assumption and assignment of any executory contracts and unexpired leases contemplated in the Successful Bid, or the Bidding Procedures, as set forth herein and in the Motion.

C.      The Debtors have articulated good and sufficient reasons for, and the best interests of their estates will be served by, this Court scheduling an Auction and considering approval of the Sale and the transfer of the Assets to the Successful Bidder free and clear of all liens, claims, interests, and encumbrances pursuant to section 363 of the Bankruptcy Code.

D.      The Expense Reimbursement of up to $300,000 and the Breakup Fee of $350,000 to be paid to the Stalking Horse Bidder, under the circumstances described herein and the Stalking Horse Agreement, are: (i) actual and necessary costs and expenses of preserving the Debtors' estates, within the meaning of § 503(b) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) reasonable and appropriate in light of the size and nature of the proposed Sale and comparable transactions; and (iv) necessary to induce the Stalking Horse Bidder to continue to pursue the Sale.

E.      Moreover, the Bid Protections are an essential inducement to and condition relating to the Stalking Horse Bidder's entry into, and continuing obligations under, the Stalking Horse Agreement.  The Bid Protections induced the Stalking Horse Bidder to submit a bid that will serve as a minimum floor bid on which the Debtors, their creditors, and other bidders can rely.  The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible price for the Assets will be received.  Accordingly,

3

the Bid Protections are reasonable and appropriate and represent the best method for maximizing

value to the Debtors' estates.

In light of the foregoing, IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED to the extent provided herein.

2.      The Bidding Procedures are hereby approved, are incorporated herein by this

reference, and shall govern all bids and bid proceedings related to the Assets.  The Debtors are

authorized to take any and all actions necessary or appropriate to implement the Bidding

Procedures.

3.      Within two (2) business days of the entry of this Order, the Stalking Horse Bidder

will disseminate Adequate Assurance Information to the counterparties of the Assigned

Agreements.

4.      The deadline for submitting an Indication of Interest (as such term in the Bidding

Procedures) shall be **October 26, 2015** (the "**Initial Bid Deadline**").

5.      The deadline for submitting a Qualified Bid (as such term is defined in the Bidding

Procedures) shall be **November 4, 2015 at 12:00 p.m. (noon) (Eastern Time)** (the "**Bid

Deadline**").

6.      If the Debtors receive a Qualified Bid prior to the Bid Deadline which the Debtors

believe to be higher or better than the Stalking Horse Bid, the Debtors will, as soon as reasonably

practicable, disseminate Adequate Assurance Information relating to the Qualified Bidder to the

counterparties to the Assigned Agreements via facsimile or email (if available), otherwise via

overnight mail.

7.      To the extent at least one Qualified Bid, other than the Stalking Horse Bidder's bid,

is timely received, the Debtors shall conduct the Auction on **November 9, 2015 at 9:00 a.m.**

4

**(Eastern Time) at Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169** or such other time or such other place as the Debtors shall designate upon notice to all Qualified Bidders who have submitted Qualified Bids..  Only the Stalking Horse Bidder and any other Qualified Bidder will be permitted to participate in the Auction.  If the Auction occurs, the Stalking Horse Bidder shall have the ability to credit bid at the Auction the aggregate amount of (i) the Expense Reimbursement (as defined in the Stalking Horse Agreement) in an amount equal to either (x) as of the date of the Auction, the reasonable fees, costs and expenses actually incurred by the Stalking Horse Bidder in connection with the transactions contemplated by the Stalking Horse Agreement not to exceed $300,000, or (y) an amount agreed upon by the Debtors and the Stalking Horse Bidder not to exceed $300,000; and (ii) the Breakup Fee (as defined in the Stalking Horse Agreement).  The Auction will be transcribed or videotaped.

8.      As soon as reasonably practicable following the conclusion of the Auction, the Debtors shall file a notice identifying the Successful Bidder and will serve such notice on the counterparties to the Assigned Agreements via facsimile or email (if available), otherwise via overnight mail.

9.      The Stalking Horse Agreement is a Qualified Bid, and the Stalking Horse Bidder is a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that the Potential Bidders must satisfy to be a Qualified Bidder.

10.     If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, the Debtors will not hold an auction, the Stalking Horse Agreement will be the Successful Bid, and the Stalking Horse Bidder will be named the Successful Bidder.

9955594v1

11.     All Bidders submitting a Qualified Bid are deemed to have submitted to the exclusive jurisdiction of this Court with respect to all matters related to the Auction and the terms and conditions of the transfer of the Assets.

12.     The Court will consider approval of the Sale to the Successful Bidder at the Sale Hearing on **November 10, 2015, at ___:_____ __.m. (Eastern Time)**.

13.     Any party seeking to (i) object to the validity of the Cure Amount as determined by the Debtors or otherwise assert that any other amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the Purchased Contracts and Real Property Leases (the "**Assigned Agreements**") in order for such lease to be assumed and assigned or (ii) object to the assumption and assignment of any Assigned Agreements on any other basis (including but not limited to, objections to adequate assurance of future performance), must file a written objection (an "**Assumption/Assignment Objection**") with the Bankruptcy Court setting forth the cure amount the objector asserts to be due, and the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment and the support therefor, so that such objection is filed with the Court no later than **5:00 p.m. (Eastern Time) on November 9, 2015** (the "**Assumption/Assignment Objection Deadline**"), and such objection shall also be served so the same is actually received on or before the Assumption/Assignment Objection Deadline by (i) proposed counsel to the Debtors, Venable, LLP at <u>both</u> Rockefeller Center, 1270 Avenue of the Americas, Twenty-Fourth Floor, New York, New York 10020 (Attn: Rishi Kapoor, Esq.) and 575 7th Street, NW, Washington, D.C. 20004 (Attn: Andrew J. Currie, Esq.) and (ii) proposed counsel to the Committee (collectively, the "**Notice Parties**").

14.     Objections to approval of the Sale, including the sale of Assets free and clear of liens, claims, encumbrances, and interests, must be in writing, state the basis of such objection

with specificity, and be filed with the Court and served so as to be received by the Notice Parties on or before **November 9, 2015 at 5:00 p.m. (Eastern Time).**

15.    In the event that the Expense Reimbursement or Breakup Fee is payable under the terms of the Stalking Horse Agreement, the Debtors are authorized and directed to pay to the Stalking Horse Bidder, without further order of the Court, the Expense Reimbursement up to $300,000 for the reasonable fees, costs and expenses actually incurred by the Stalking Horse Bidder, and a Breakup Fee of $350,000, on the terms set forth in the Stalking Horse Agreement.

16.    The Auction Notice and the Assumption and Assignment Notice, substantially in the form attached hereto as **Exhibit 3** and **Exhibit 4**, respectively, are good and sufficient for all purposes.  Within two (2) days of the entry of this Order, the Debtors will serve the Auction Notice on all parties provided with the notice of the Motion, all parties identified by the Debtors as potentially interested purchasers, and all parties on the Debtors' consolidated list of creditors. Additionally, the Debtors will publish the Auction Notice as soon as practicable after entry of this Order.  The Debtors will, within two (2) days of the entry of this Order, serve the Assumption and Assignment Notice on all nondebtor parties to the executory contracts and unexpired leases potentially to be assumed and assigned in connection with the Sale.  No other further notice shall be required.  No finding or ruling is made in this Order as to the adequacy of any proposed sale, it being intended that such approval will be sought at the Sale Hearing.

17.    All bidders at the Auction shall be deemed to have consented to the core jurisdiction of this Court and waived any right to jury trial in connection with any disputes relating to the Auction, the sale of the Assets, and the construction and enforcement of the Stalking Horse Agreement.

9955594v1

18.     Each bidder participating at the Auction will be required to confirm that it has not engaged in any collusion with respect to the bidding or the sale.

19.     The Court shall retain jurisdiction over any matter or dispute arising from or relating to the implementation of this Order.


Dated: _____, 2015
          New York, New York


                                        _____
                                        United States Bankruptcy Judge

8

## EXHIBIT 1

**The Bidding Procedures**

## BIDDING PROCEDURES

### Overview

On September 30, 2015, Binda USA Holdings, Inc., Advance Watch Company Ltd., Sunburst Products, Inc., and GWG International, Ltd., the debtors and debtors-in-possession (collectively, the "**Debtors**") filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to section 1107(a) and 1108 of the Bankruptcy Code.

On _____, 2015, the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") entered an order (the "**Bidding Procedures Order**"), which, among other things, authorized the Debtors to solicit bids and approved these procedures (the "**Bidding Procedures**") for the consideration of the highest or otherwise best price for the sale (the "**Sale**") of certain assets of the Debtors (the "**Assets**"), on the terms and conditions set forth herein.

A stalking horse bid (the "**Stalking Horse Bid**") has been submitted by Sunshine Time Inc. (the "**Stalking Horse Bidder**"). The Stalking Horse Bidder has executed a separate agreement (the "**Stalking Horse Agreement**") for the purchase of the Business. Copies of the Stalking Horse Agreement are available for free by (i) sending a written request to the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, 777 Third Avenue, Third Floor, New York, New York 10017 (Attn: Pamela Corrie) or (ii) by accessing Epiq's website (www.epiqsystems.com/bankruptcy/chapters-9-11-15-bankruptcy/).

The Debtors reserve the right to extend any of the bidding deadlines or other dates set forth in the Bidding Procedures without further Order of the Bankruptcy Court subject to providing notice as described below; provided that nothing herein shall authorize the Debtors to unilaterally extend any date or deadlines set forth in a Stalking Horse Agreement.

## I.    The Sale Hearing

The Debtors will seek entry of an order from the Bankruptcy Court approving and authorizing the Sale to the Successful Bidder (as defined below) on terms and conditions consistent with the Stalking Horse Agreement (as modified solely to the extent accepted by the Debtors, in consultation with the Committee (as defined below) and in accordance with these Bidding Procedures.

## II.    Participation Requirements

Unless otherwise ordered by the Bankruptcy Court for cause shown, to participate in the Bidding Process, each person or entity must deliver (unless previously delivered) to the Debtors, on or before **October 26, 2015** (the "**Initial Bid Deadline**"), an executed confidentiality agreement in form and substance satisfactory to the Debtors (the "**Confidentiality Agreement**") and (b) a letter describing (i) the material terms of such person's or entity's bid, (ii) the identity of each entity that will be bidding or otherwise participating in connection with such bid (including each

equity holder or other financial backer of such entity if such entity is an entity formed for the purpose of consummating the proposed transaction contemplated by such bid) and the complete terms of any such participation, (iii) evidence of such person's or entity's capacity to consummate the sale set forth in its bid with cash on hand or committed financing documented to the Debtors' reasonable satisfaction and (iv) a description of such person's or entity's experience in the watch industry and/or the global distribution of branded fashion products (collectively with the Confidentiality Agreement, the "**Indication of Interest**"). Each person or entity that delivers the Indication of Interest to the Debtors on or before the Initial Bid Deadline is hereinafter referred to as a "**Potential Bidder**."

After a Potential Bidder delivers the Indication of Interest, the Debtors shall deliver or make available (unless previously delivered or made available) to each Potential Bidder certain designated information and financial data with respect to the Assets.

## III.    Determination by the Debtors

The Stalking Horse Bid is subject to higher or better offers submitted in accordance with the terms and conditions of the Bidding Procedures. The Debtors, after consultation with any official committee of unsecured creditors appointed in these cases (the "**Committee**") shall: (a) coordinate the efforts of Potential Bidders in conducting their respective due diligence; (b) evaluate bids from Potential Bidders; (c) negotiate any bid made to acquire the Assets; (d) make such other determinations as are provided in these Bidding Procedures (collectively, the "**Bidding Process**"). Neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Assets to any person who is not a Potential Bidder.

## IV.    Due Diligence

The Debtors shall afford any Potential Bidder such due diligence access or additional information as may be reasonably requested by the Potential Bidder that the Debtors, in their business judgment, determine to be reasonable and appropriate. The Debtors may designate a representative to coordinate all reasonable requests for additional information and due diligence access from such Potential Bidders. No additional due diligence will be required to be made available to Potential Bidders after the Bid Deadline (as defined below).

## V.    Bid Deadline

A Potential Bidder that desires to make a bid shall deliver copies of its bid by mail to

(a)    proposed counsel to the Debtors, Venable LLP Venable, LLP at <u>both</u> Rockefeller Center, 1270 Avenue of the Americas, Twenty-Fourth Floor, New York, New York 10020 (Attn: Rishi Kapoor, Esq.) and 575 7th Street, NW, Washington, D.C. 20004 (Attn: Andrew J. Currie, Esq.); and

(b)    proposed counsel to the Committee.

Such bids must be received no later than **November 4, 2015 at 12:00 p.m. (noon) (Eastern Time)** (the "**Bid Deadline**").

9955594v1

VI.    **Bid Requirements**

All bids must:

(i)    be accompanied by a letter:

      (a)    offering to acquire the Assets, accompanied by an agreement attached to the letter, marked to show any proposed amendments and modifications to the Stalking Horse Agreement and its schedules and exhibits (the "**Marked Agreement**");

      (b)    agreeing that the Potential Bidder's offer is binding and irrevocable until 48 hours of the earlier of (1) the closing of the sale of the Assets, (2) the withdrawal of the Assets for sale by the Debtors, or (3) 30 days after the Sale Hearing; and

      (c)    offering to pay a purchase price greater than the aggregate consideration offered by the Stalking Horse Bidder pursuant to the Stalking Horse Agreement by at least the sum of the Breakup Fee and the Expense Reimbursement plus an initial minimum bid increment of $150,000; and

(ii)    be accompanied by adequate assurance information the ("**Adequate Assurance Information**"), including:

      (a)    information about the Potential Bidder's financial condition, such as federal tax returns for two years, a current financial statement, or bank account statements;

      (b)    a description of the intended use of the Assets (if applicable);

      (c)    the exact name of the proposed assignee; and

      (d)    such additional information regarding the Potential Bidder as the Potential Bidder may elect to include.

By submitting a bid, Potential Bidders agree that the Debtors may disseminate their Adequate Assurance Information to affected landlords in the event that the Debtors determine such bid to be (i) a Qualified Bid and (ii) a higher and better bid than the Stalking Horse Bid.

Potential Bidders may make one or more credit bids of some or all of their claims to the full extent permitted by § 363(k) of the Bankruptcy Code; however, to the extent that there is a cash component to the bid, such bid must be (a) accompanied by a certified check or wire transfer in the amount of $750,000 payable to the order of the Debtors (the "**Good Faith Deposit**") and (b) written evidence of available cash, a commitment for financing or ability to timely obtain a satisfactory commitment if selected as the Successful Bidder (provided, however, that the closing of the Sale shall not be contingent in any way on the Successful Bidder's financing) and such other evidence of ability to consummate the transaction as the Debtors may reasonably request.

9955594v1

The Debtors, in consultation with the Committee, will review each bid received from a Potential Bidder to ensure that it meets the requirements set forth above.  A bid received from a Potential Bidder that meets the above requirements will be considered a "**Qualified Bid**" and each Potential Bidder that submits a Qualified Bid will be considered a "**Qualified Bidder**."  The Debtors, in consultation with the Committee, will determine whether each bid meets the requirements of a Qualified Bid.  The Stalking Horse Agreement is a Qualified Bid and the Stalking Horse Bidder is a Qualified Bidder, for all purposes and requirements pursuant to the Bidding Procedures, notwithstanding the requirements that Potential Bidders must satisfy to be a Qualified Bidder.

A Qualified Bid will be valued by the Debtors based upon any and all factors that the Debtors deem pertinent, including, among others, (a) the amount of the Qualified Bid, (b) the risks and timing associated with consummating a transaction with the Potential Bidder, (c) any excluded Assets or executory contracts and leases, (d) the likelihood that the Debtors' key licensors would approve or reject such Qualified Bid, and (e) any other factors that the debtors may deem relevant to the Sale in consultation with the Committee.

The Debtors, in their business judgment, and in consultation with the Committee, reserve the right to reject any such bid if such bid:

(a)    is on terms that are more burdensome or conditional than the terms of the Stalking Horse Agreement;

(b)    requires any indemnification of such Potential Bidder in its Marked Agreement;

(c)    is not received by the Bid Deadline; or

(d)    is subject to any due diligence, financing condition or other contingencies (including representations, warranties, covenants, and timing requirements) of any kind of any other conditions precedent to such party's obligation to acquire the Assets other than as may be included in the Stalking Horse Agreement.

Additionally, the Debtors' key licensors must approve any potential bid and Potential Bidder.  Any bid rejected pursuant to this paragraph shall not be deemed a Qualified Bid.

## VII.    <u>Auction Participation</u>

Unless otherwise ordered by the Bankruptcy Court for cause shown, only the Stalking Horse Bidder and each Potential Bidder who has submitted a Qualified Bid are eligible to participate at the Auction (as defined below).  At least one business day prior to the Auction, each Qualified Bidder must inform the Debtors whether it intends to participate in the Auction.  The Debtors will promptly thereafter inform in writing each Qualified Bidder who has expressed its intent to participate in the Auction of the identity of all other Qualified Bidders that may participate in the Auction and shall provide copies of the Qualified Bids to the Stalking Horse Bidder.  If the Debtors do not receive any Qualified Bids other than the Stalking Horse Agreement, it will not hold an Auction, the Stalking Horse Agreement will be the Successful Bid (as defined below) and the Stalking Horse Bidder will be named the Successful Bidder.

## VIII.    Auction

If at least one Qualified Bid other than the Stalking Horse Agreement is received by the Bid Deadline, the Debtors will conduct an auction (the "**Auction**").  The Auction shall take place at **9:00 a.m. (Eastern Time) on November 9, 2015, at Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169**, or such other time or such other place as the Debtors shall designate upon notice to all Qualified Bidders who have submitted Qualified Bids.  Only a Qualified Bidder who has submitted a Qualified Bid will be eligible to participate at the Auction.  Professionals of the Committee and any other parties the Debtors deem appropriate shall be able to attend and observe the Auction.

At the Auction, participants will be permitted to increase their bids.  The bidding will start at the aggregate consideration for the Assets and terms proposed in the Qualified Bid that the Debtors select as the highest and best offer prior to the Auction.  Further bids will continue in increments of at least $100,000.  The Stalking Horse Bidder shall have the ability to credit bid at the Auction the aggregate amount of (i) the Expense Reimbursement (as defined in the Stalking Horse Agreement) in an amount equal to either (x) as of the date of the Auction, the reasonable fees, costs and expenses actually incurred by the Stalking Horse Bidder in connection with the transactions contemplated by the Stalking Horse Agreement not to exceed $300,000, or (y) an amount agreed upon by the Debtors and the Stalking Horse Bidder not to exceed $300,000; and (ii) the Breakup Fee (as defined in the Stalking Horse Agreement).  The Debtors may, in consultation with the Committee, announce at the Auction additional procedural rules (*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction so long as the rules are not inconsistent with these Bidding Procedures.

The Debtors, in consultation with the Committee, will: (a) review each bid made at the Auction on the basis of financial and contractual terms and such factors relevant to the sale process, including those factors affecting the speed and certainty of consummating the Sale; (b) identify the highest and best bid for the Assets of the Debtors at the Auction (the "**Successful Bid**"); and (c) notify all Potential Bidders at the Auction, prior to the conclusion, of the name or names of the maker of the Successful Bid (the "**Successful Bidder**"), and the amount and other material terms of the Successful Bid.

## IX.    Acceptance of Qualified Bids

The Debtors may (a) determine, in their reasonable business judgment, in consultation with the Committee, which Qualified Bid is the Successful Bid and the next best bid (the "**Next Best Bid**"); and (b) reject any bid, other than the Stalking Horse Agreement, that, in the Debtors' reasonable judgment, after consultation with the Committee, is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bankruptcy Code, the Bidding Procedures, or the terms and conditions of the Sale, or (iii) contrary to the best interests of the Debtors and their estates.

The Debtors presently intended to convey the Assets to the Qualified Bidder that submits the Successful Bid, whether such entity is the Stalking Horse Bidder or another Qualified Bidder. The Debtors' presentation to the Bankruptcy Court for approval of the selected bid as the Successful Bid does not constitute the Debtors' acceptance of the bid.  The Debtors will have

9955594v1

accepted a Qualified Bid only when such Qualified Bid has been approved by the Court at the Sale Hearing. The Debtors and the Successful Bidder will close the Sale on or before a date that is three (3) business days after the Sale Order becomes a Final Order, unless another time or date, or both, are agreed to in writing by the Debtors and the Successful Bidder (the "**Closing Date**"). If the Successful Bidder does not close the Sale by the Closing Date, then the Debtors will be authorized, but not required, to close with the party that submitted the Next Best Bid (the "**Next Best Bidder**") without further court order. If the Debtors decide to close with the Next Best Bidder, the Debtors and the Next Best Bidder will have an additional fifteen (15) days after the Closing Date to close the Sale.

## X.     No Fees for Potential Bidders or Qualified Bidders

Potential Bidders or Qualified Bidders (other than the Stalking Horse Bidder) shall not be allowed any breakup, termination, or similar fee. Moreover, all Potential Bidders and Qualified Bidders waive any right to seek a claim for substantial contribution in connection with the Debtors' bankruptcy cases.

## XI.    Return of Good Faith Deposit

The Good Faith Deposits of all Potential Bidders shall be held in escrow by the Debtors, but shall not become property of the Debtors' estates absent a further order of the Bankruptcy Court. The Good Faith Deposits of all Potential Bidders shall be retained by the Debtors, notwithstanding Bankruptcy Court approval of a Sale, until 48 house after the earlier of (a) the closing of the Sale or (b) withdrawal of the Assets for sale by the Debtors, but in any event, not later than 45 days after the Sale Hearing. At the closing of the Sale contemplated by the Successful Bid, the Successful Bidder will be entitled to a credit for the amount of its Good Faith Deposit. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon.

9955594v1

# EXHIBIT 2

**The Stalking Horse Agreement**

*Execution Version*

ASSET PURCHASE AGREEMENT

BY AND AMONG

BINDA USA HOLDINGS, INC.,

ADVANCE WATCH COMPANY LTD.,

SUNBURST PRODUCTS, INC.,

GWG INTERNATIONAL, LTD.

AND

SUNSHINE TIME INC.

Dated as of September 29, 2015

## TABLE OF CONTENTS

Page(s)

ARTICLE I        DEFINITIONS.................................................................................1

Section 1.1        Certain Definitions................................................................1

Section 1.2        Other Definitional and Interpretive Matters ...........................9

ARTICLE II        PURCHASE AND SALE OF ASSETS; ASSUMPTION
OF LIABILITIES...................................................................10

Section 2.1        Purchase and Sale of Assets................................................10

Section 2.2        Excluded Assets.................................................................12

Section 2.3        Assumption of Liabilities; Excluded Liabilities ...................13

Section 2.4        Purchased Assets................................................................15

Section 2.5        Further Conveyances and Assumptions...............................15

Section 2.6        Transitional Matters...........................................................15

Section 2.7        Bulk Sales Laws................................................................15

ARTICLE III        CONSIDERATION ................................................................16

Section 3.1        Purchase Price; Assumed Liabilities....................................16

Section 3.2        Deposit............................................................................16

Section 3.3        Purchase Price Adjustment .................................................16

ARTICLE IV        CLOSING AND TERMINATION................................................17

Section 4.1        Closing Date......................................................................17

Section 4.2        Deliveries by Sellers ..........................................................17

Section 4.3        Deliveries by Buyer ...........................................................17

Section 4.4        Termination of Agreement...................................................17

Section 4.5        Procedure Upon Termination...............................................19

Section 4.6        Effect of Termination..........................................................20

i

ARTICLE V        REPRESENTATIONS AND WARRANTIES OF SELLERS......................20

Section 5.1        Authorization of Agreement ................................................20

Section 5.2        Title to Purchased Assets ...................................................21

Section 5.3        Real Property ......................................................................21

Section 5.4        Tangible Personal Property .................................................21

Section 5.5        Intellectual Property...........................................................21

Section 5.6        Financial Advisors ..............................................................22

Section 5.7        Litigation.............................................................................22

Section 5.8        Compliance with Laws .......................................................22

Section 5.9        Permits ................................................................................22

Section 5.10       Inventory ............................................................................22

Section 5.11       Contracts .............................................................................22

Section 5.12       Taxes...................................................................................23

Section 5.13       Employee Benefits .............................................................23

Section 5.14       Labor Matters.....................................................................24

Section 5.15       Sellers' Representations and Warranties Generally............24

ARTICLE VI       REPRESENTATIONS AND WARRANTIES OF BUYER...........................24

Section 6.1        Organization and Good Standing.......................................25

Section 6.2        Authorization of Agreement ...............................................25

Section 6.3        Financial Advisors ..............................................................25

Section 6.4        Litigation.............................................................................25

Section 6.5        Financial Capability ...........................................................25

Section 6.6        Condition of the Business ..................................................25

ARTICLE VII      BANKRUPTCY COURT APPROVAL........................................................26

Section 7.1        Approval of Expense Reimbursement and Overbid Protection..........26

ii

Section 7.2          Competing Transaction ..................................................................26

Section 7.3          Bankruptcy Court Filings ..............................................................27

ARTICLE VIII      COVENANTS ......................................................................................27

Section 8.1          Access to Information .....................................................................27

Section 8.2          Further Assurances...........................................................................27

Section 8.3          Confidentiality .................................................................................28

Section 8.4          Preservation of Records ..................................................................28

Section 8.5          Publicity ...........................................................................................29

Section 8.6          Operation of Business .....................................................................29

Section 8.7          Section 363(b)(1)(A) .......................................................................29

Section 8.8          Adequate Assurances Regarding Purchased Contracts
                     and Certain Real Property Leases ...................................................29

Section 8.9          Material Adverse Effect...................................................................29

Section 8.10         Employee Matters ............................................................................29

Section 8.11         Stayed Tax Liens..............................................................................30

Section 8.12         Cooperation ......................................................................................30

Section 8.13         Schedules ..........................................................................................30

Section 8.14         Corporate Names .............................................................................31

Section 8.15         Letters of Credit ...............................................................................31

ARTICLE IX        CONDITIONS TO CLOSING .............................................................31

Section 9.1          Conditions Precedent to Obligations of Buyer ......................................31

Section 9.2          Conditions Precedent to Obligations of Sellers .....................................32

Section 9.3          Condition Precedent to Obligations of Buyer and Sellers ..................33

Section 9.4          Frustration of Closing Conditions........................................................33

ARTICLE X         NO SURVIVAL......................................................................................33

Section 10.1         No Survival of Representations and Warranties..................................33

iii

ARTICLE XI     TAX MATTERS..................................................................................34

    Section 11.1     Transfer Taxes ................................................................34

    Section 11.2     Purchase Price Allocation...............................................34

    Section 11.3     Audits, Claims and Proceedings ....................................34

ARTICLE XII    MISCELLANEOUS ..........................................................................34

    Section 12.1     Expenses .........................................................................34

    Section 12.2     Submission to Jurisdiction; Consent to Service of Process .................34

    Section 12.3     Waiver of Right to Trial by Jury.....................................35

    Section 12.4     Entire Agreement; Amendments and Waivers ...............35

    Section 12.5     Governing Law ...............................................................35

    Section 12.6     Notices ............................................................................35

    Section 12.7     Severability .....................................................................37

    Section 12.8     Binding Effect; Assignment............................................37

    Section 12.9     Counterparts....................................................................37

    Section 12.10    Attorney-Client Privilege................................................37

iv

## EXHIBITS

| | |
|---|---|
| Exhibit A | Bidding Procedures Order |
| Exhibit B | Sale Order |

## SCHEDULES[1]

| | |
|---|---|
| Schedule 1.1(a) | Contracts; Leases; Intellectual Property |
| Schedule 1.1(c) | Purchased Contracts |
| Schedule 1.1(d) | Purchased Intellectual Property |
| Schedule 2.1 | Additional Purchased Assets |
| Schedule 2.1(r) | Critical Trade Vendors |
| Schedule 2.2 | Additional Excluded Assets |
| Schedule 2.3(a) | Assumed Liabilities |
| Schedule 5.7 | Litigation |
| Schedule 5.12 | Tax |
| Schedule 5.13 | Employee Benefit Plans |
| Schedule 5.14(a) | Labor Matters |
| Schedule 5.14(e) | Employment and Consulting Agreements |
| Schedule 8.14 | Seller Names |
| Schedule 9.1(f) | Cure Amounts |

---

[1]    All Schedules to be delivered pursuant to <u>Section 8.13</u> of this Agreement.

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of September 29, 2015 (this "Agreement"), is entered into by and among Binda USA Holdings, Inc., a Delaware corporation ("Parent"), Advance Watch Company, Ltd., a Michigan corporation ("AWC"), Sunburst Products, Inc., a California corporation ("Sunburst"), and GWG International, Ltd., a Delaware corporation ("GWG" and, together with Parent, AWC and Sunburst, each a "Seller" and collectively, "Sellers"), and SUNSHINE TIME INC., a Delaware corporation ("Buyer").

## W I T N E S S E T H:

WHEREAS, promptly after the date hereof, Sellers shall commence cases (the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Code (as it may be amended from time to time as applicable to the Bankruptcy Cases, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the date of such commencement being referred to as the "Petition Date");

WHEREAS, Sellers shall retain possession of their assets and be authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities as more specifically provided herein; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Accounts Receivable" means all accounts, accounts receivable, contract rights to payment, notes, and notes receivable of Sellers related to the Business.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Proposal" has the meaning set forth in Section 7.2.

"Assets" means collectively, the Purchased Assets and the Excluded Assets.

"Assumed L/Cs" has the meaning set forth in Section 2.3(d).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Auction Working Capital" has the meaning set forth in Section 3.3(b).

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plan" has the meaning set forth in Section 5.13(a).

"Bidding Procedures Order" means an Order of the Bankruptcy Court, in substantially the form attached hereto as Exhibit A or as otherwise mutually agreed by the Parties in good faith, approving the bid procedures with respect to the Auction, the Expense Reimbursement, the Breakup Fee and the Initial Minimum Overbid, and providing that if no qualified Competing Bid is received by the bid deadline established in accordance with the Auction, Buyer's bid shall be determined to be the winning bid for the Purchased Assets.

"Breakup Fee" has the meaning set forth in Section 7.1.

"Business" means the business and operations of Sellers relating to the wholesale and retail sale of clothing and accessories.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Documents" has the meaning set forth in Section 6.2.

"Cash Purchase Price" has the meaning set forth in Section 3.1.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Working Capital" has the meaning set forth in Section 3.3.

"COBRA" has the meaning set forth in Section 5.13(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 7.2(a).

2

"Contract" means any contract, agreement, indenture, note, bond, lease, Real Property Lease, Personal Property Lease or other agreement (including, without limitation, employment and consulting agreements) to which any Seller is a party, relating to the Business, as set forth on Schedule 1.1(a).

"Critical Trade Vendors" means those entities, if any, set forth on Schedule 2.1(r) (such schedule to be updated by Buyer in its sole and absolute discretion from time to time until one (1) Business Day prior to the Closing Date; provided, however, that no such update shall result in an adjustment of the Purchase Price).

"Critical Vendor Motion" means a critical vendor motion in form and substance satisfactory to Buyer in its sole and absolute discretion.

"Cure Amounts" means any and all amounts required, as a condition to assumption or assignment, to be paid to a non-debtor party to a Purchased Contract pursuant to Section 365(b) of the Bankruptcy Code.

"Cure Cap" has the meaning set forth in Section 3.1.

"Deposit" has the meaning set forth in Section 3.2.

"DIP Financing" means that certain Ratification and Amendment Agreement by and among Sellers and Wells Fargo Bank, National Association, as the same may be amended, restated, ratified, supplemented or modified from time to time.

"DIP Order" means any Order of the Bankruptcy Court authorizing and approving the DIP Financing.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets, in each case whether or not in electronic form.

"Dollars" or "$" means US Dollars.

"Employee Claims" means any claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not limited to, any Employment Claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other federal, state or local, statutory or decisional Law regarding employment discrimination.

3

"Employee Obligations" means all wages, bonuses, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment in respect of the Business of the Employees.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Sellers in connection with the Business, together with individuals who are hired in respect of the Business after the date hereof and prior to the Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agreement" has the meaning set forth in Section 3.2.

"Excess Cure Amounts" has the meaning set forth in Section 3.1.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts other than Purchased Contracts.

"Excluded Liabilities" has the meaning set forth in Section 2.3.

"Expense Reimbursement" has the meaning set forth in Section 7.1.

"Far East" means Advance Watch Company (Far East) Limited, a company incorporated under the laws of Hong Kong.

"Final Order" means an Order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or leased by Sellers in the conduct of the Business, including all artwork, desks, chairs, tables, computer and computer-related hardware (including, computers, file servers, facsimile servers, scanners, printers, and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles, cash registers, point-of-sale equipment, warehouse equipment, and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Indebtedness" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the

4

payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all worldwide intellectual property rights used or useful by Sellers in connection with the Purchased Assets, including all (i) patents, patent applications and inventions, (ii) trademarks, service marks, trade names and trade dress, which expressly includes the goodwill and any common law rights associated with the foregoing, (iii) domain names, (iv) copyrights, including copyrights in computer software, (v) confidential and proprietary information, including trade secrets and know-how ("Trade Secrets"), (vi) licenses relating to any of the foregoing and (vi) registrations and applications for registration of the foregoing.

"Inventory" means all of Sellers' now owned or hereafter acquired inventory and goods, wherever located, relating to the Business including, without limitation, all inventory and goods that (a) are leased by any Seller as lessor, (b) are held by such Seller for sale or lease or to be furnished under a Contract of service, (c) are furnished by any Seller under a Contract of service, or (d) consist of raw materials, work in process, finished goods or material used or consumed in connection with the Business.

"Kenneth Cole License" means that certain Omnibus License Agreement Renewal among Kenneth Cole Productions (LIC), LLC, Kenneth Cole Productions, Inc. and AWC.

"Knowledge" means, with respect to Sellers, as to a particular matter, the actual knowledge as of the date of inquiry or verification, and without independent verification or investigation, of the Chief Restructuring Officer of Sellers.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or Order.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or encumbrance; provided,

10011784-v14

however, that Assumed Liabilities which pertain to particular Purchased Assets shall not constitute Liens.

"Material Adverse Effect" means a material adverse effect on the business, assets, results of operations or financial condition of Sellers (taken as a whole), the Business or the Purchased Assets (in each case except for the Bankruptcy Cases), other than (i) the effect of any change resulting from any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby or with respect to Sellers, or any effect resulting from the filing of the Bankruptcy Cases; (ii) a generally applicable change in applicable Law or GAAP or interpretation thereof; (iii) the effect of any change or action taken by any Person resulting from any public announcement of this Agreement; (iv) any actions or inactions by Sellers in accordance with this Agreement; (v) changes in conditions generally affecting the industries in which Sellers conduct the Business that do not affect the Business, the Purchased Assets or the Assumed Liabilities in a disproportionate manner when compared to the effect of the same on other Persons engaged in such industries; or (vi) general economic, political or financial market conditions.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with the past practice of the Business through the date hereof, subject to any duties, restrictions and obligations imposed on Sellers under the Bankruptcy Code, the DIP Financing and the DIP Order.

"Open Purchase Orders" has the meaning set forth in Section 2.1(v).

"Parties" means Sellers and Buyer.

"Permits" means any approvals, authorizations, consents, licenses, permits or certifications of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way, encumbrances and Liens reflected in policies of title insurance which have been made available to or are obtained by Buyer and that would not interfere with the use of the Purchased Assets or conduct of the Business in accordance with historical practice; (ii) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; and (vi) the Assumed Liabilities as pertain to particular Purchased Assets.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

6

"Personal Property Leases" has the meaning set forth in Section 5.4.

"Petition Date" has the meaning set forth in the Recitals.

"Prepaids" means, as of a particular date, all deposits with vendors or suppliers, all prepaid expenses, royalties and the like and all claims for refunds and rights of offset of Sellers that relate to the Purchased Assets.

"Products" means any and all products developed, manufactured, procured, marketed or sold by Sellers, whether work in progress or in final form, in connection with the Business.

"Prospective Employees" has the meaning set forth in Section 8.10(a).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Contracts" means the Contracts set forth on Schedule 1.1(c), as such Schedule may be amended from time to time in accordance with this Agreement.

"Purchased Intellectual Property" means the Intellectual Property and related Software and Technology of the Sellers relating to the Business, all as set forth on Schedule 1.1(d).

"Purchased Names" has the meaning set forth in Section 8.14(a).

"Qualified Critical Trade Vendor" means any Critical Trade Vendor that agrees to the terms and conditions set forth in the Critical Trade Vendor Motion; provided, that the Critical Trade Vendor Motion has been approved by Final Order of the Bankruptcy Court.

"Real Property Leases" has the meaning set forth in Section 5.3.

"Sale Order" means an Order of the Bankruptcy Court, in the substantially the form attached hereto as Exhibit B or as otherwise mutually agreed to by the Parties in good faith, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Buyer of all of the Purchased Assets (assuming that either Buyer is the winning bidder at the Auction contemplated hereby or no Competing Bid is submitted for the Purchased Assets by the deadline for such bids set forth in the Bidding Procedures Order), and approving and authorizing Sellers to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Liens specifically assumed or created by Buyer and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and interests (including Liens, claims, encumbrances and interests of any Governmental Body), such Liens, claims, encumbrances and interests to attach to the proceeds of sale of the Purchased Assets (it being understood and agreed that the Sellers shall have the right to direct the Buyer to remit the net proceeds to the agent under the DIP Financing in satisfaction of the debt owing to the lenders under the DIP Financing by Sellers), (ii) the Purchased Contracts may be assumed by Sellers and assigned to Buyer under Section 365 of the Bankruptcy Code, (iii) Buyer has acted in "good

7

faith" within the meaning of Section 363(m) of the Bankruptcy Code, (iv) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (v) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 12.2 hereof, and (vi) this Agreement and the transactions contemplated hereby are binding upon, and not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of Sellers.

"Sale Procedures Motion" means the motion or motions of Sellers, in form and substance reasonably acceptable to Buyer and Sellers, to be filed with the Bankruptcy Court seeking approval and entry of the Bidding Procedures Order and, in the event that Buyer is the winning bidder at the Auction or no Competing Bid is submitted, the Sale Order.

"Schedule Delivery Deadline" means 5:00 pm Eastern time five (5) Business Days prior to the Auction.

"Sellers" has the meaning set forth in the Preamble.

"Seller Documents" has the meaning set forth in Section 5.1.

"Software" means, except to the extent generally available for purchase from third Persons, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, relating to the Business.

"Stayed Tax Liens" has the meaning set forth in Section 5.12(b)(iii).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not

8

specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business or in the design, development, reproduction, maintenance or modification of, any of the Products.

"Termination Date" has the meaning set forth in Section 4.4(d).

"Trade Secrets" has the meaning set forth in Section 1.1 (in the definition of Intellectual Property).

"Transfer Taxes" means sales, use, stamp, documentary stamp, recording, transfer or similar fees or Taxes or governmental charges (including any interest, fine, penalty, additions to Tax or additional amount thereon) payable in connection with the Sellers' transfer of the Purchased Assets to Buyer pursuant to this Agreement.

"Transferred Employees" has the meaning set forth in Section 8.10(b).

"Working Capital" has the meaning set forth in Section 3.3.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state Law related thereto.

"Working Capital Lower Target" has the meaning set forth in Section 3.3.

"Working Capital Upper Target" has the meaning set forth in Section 3.3.

Section 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule unless explicitly cross-referenced thereto.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

10011784-v14

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets. "Purchased Assets" shall mean all of Sellers' right, title and interest in, to and under the following assets of Sellers (but excluding Excluded Assets) as of the Closing related to the Business:

(a)    all Accounts Receivable of Sellers;

(b)    all Inventory;

(c)    all customer deposits and security deposits (including, without limitation, all customer deposits and security deposits for rent, electricity, telephone or otherwise, but excluding customer and security deposits relating to Excluded Assets) and other prepaid charges and expenses of Sellers;

(d)    subject to the provisions of Section 9.1(g), all rights of Sellers under each Real Property Lease set forth on Schedule 1.1(c), together with Sellers' interests in and to all improvements and fixtures under each such Real Property Lease, and other appurtenances thereto, and Sellers' rights in respect thereof;

(e)    all Furniture and Equipment;

(f)    all Purchased Intellectual Property;

10

(g)    all Purchased Contracts;

(h)    all Sellers' Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business, including Documents relating to accounts receivable, Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, excluding any Documents exclusively related to any Excluded Assets;

(i)    all Permits used by Sellers in the Business, to the extent transferable;

(j)    all supplies owned by Sellers and used in connection with the Business;

(k)    to the extent transferable, all insurance policies or rights to proceeds thereof relating to the Purchased Assets (other than any directors and officers or fiduciary insurance policy, each of which shall be an Excluded Asset);

(l)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(m)    all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors if and to the extent that such rights are assignable by operation of Law and relating to Products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets;

(n)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property owned by Sellers;

(o)    all Prepaids;

(p)    any cash refunds for Taxes received by Sellers after the Closing Date (inclusive of any interest received thereon, net of any Taxes incurred with respect thereto) with respect to Taxes paid on or prior to the Closing Date;

(q)    rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against the Critical Trade Vendors;

(r)    any rights, claims or causes of action of Sellers against third parties other than Tax authorities relating to assets, properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date other than causes of action under Chapter 5 of Title 11 of the United States Code;

11

(s)    any rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against officers, directors, employees, shareholders, members and managers of the Sellers;

(t)    to the extent transferable, all Tax credits of Sellers;

(u)    to the extent that Buyer determines, in its sole and absolute discretion, to assume any Benefit Plan, any trust or other funding vehicle associated with such Benefit Plan;

(v)    all purchase orders for the purchase of Inventory that have been issued by the Sellers as of the Closing but have not been completely fulfilled as of the Closing (the "Open Purchase Orders") in an aggregate amount not to exceed Twelve Million Dollars ($12,000,000); and

(w)    the assets set forth on Schedule 2.1.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until three (3) Business Days prior to the Closing Date (except that Buyer may not add as a Purchased Asset anything specifically listed in Section 2.2 below as an Excluded Asset, other than Excluded Contracts and Intellectual Property rights); and provided, however, that no such addition shall result in any adjustment of the Purchase Price.

Section 2.2    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean all assets, properties, interests and rights of Sellers other than the Purchased Assets, including without limitation each of the following assets:

(a)    all cash, cash equivalents, bank deposits and similar cash items of Sellers;

(b)    all customer and security deposits relating to Real Property Leases that are Excluded Assets;

(c)    all Excluded Contracts;

(d)    all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed to or by any Seller to or by any Affiliate of any Seller;

(e)    any Intellectual Property rights of Sellers other than the Purchased Intellectual Property;

(f)    any (i) confidential personnel and medical records pertaining to any Employee; (ii) other books and records that Sellers are required by Law to retain or that Sellers determine are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Buyer shall have, to the extent allowed by applicable Law, the right to make copies of any portions of such retained books and records that relate to the Business or any of the Assets; (iii) minute books,

12

stock or membership interest records and corporate seals; and (iv) documents relating to proposals to acquire the Business by Persons other than Buyer;

(g)    all claims of privilege or protection over pre-Closing communications between or among Venable LLP and Sellers, including, without limitation, as such claims relate to any Purchased Assets;

(h)    any causes of action under Chapter 5 of Title 11 of the United States Code, and proceeds deriving therefrom, other than causes of action of Sellers that are Purchased Assets;

(i)    all of Sellers' rights under this Agreement and/or other documents and agreements executed in connection with the transactions provided for herein;

(j)    any trust or other funding vehicle associated with any Benefit Plan that is not a Purchased Asset;

(k)    the Assets set forth on Schedule 2.2; and

(l)    any equity interests in any Seller, Far East or any subsidiary of any of the foregoing.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, exclude additional assets from the Purchased Assets in its sole and absolute discretion until three (3) Business Days prior to the Closing Date; provided, however, that no such exclusion shall result in any adjustment of the Purchase Price.

Section 2.3    Assumption of Liabilities; Excluded Liabilities.  On and subject to the terms and conditions of this Agreement, Buyer shall assume and become responsible for all of the Assumed Liabilities at the Closing.  Buyer will not assume or have any responsibility, however, with respect to any other obligation or liability of Sellers not included within the definition of Assumed Liabilities, including, without limitation: (i) Taxes (x) imposed on any Seller for any period or (y) related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending on or prior to the Closing (except, in each case, as expressly provided below); (ii) any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases (except as expressly provided below); (iii) liabilities to the extent relating to the Excluded Assets, including Liabilities relating to Excluded Contracts; (iv) Liabilities and obligations of Sellers under this Agreement; (v) all Liabilities and obligations arising under any Purchased Contract (and all liabilities for any breach, act or omission under any Purchased Contract) arising prior to the Closing other than any Cure Amounts paid in respect thereof pursuant to Section 3.1; (vi) all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed by any Seller to any Affiliate of any Seller; (vii) other than as set forth in Section 2.3(h), any Employee Obligations to any Employee arising out of such Employee's employment by Sellers prior to the Closing; (viii) any Employee Claim of any Employee arising out of such Employee's employment by Sellers prior to the Closing; and (ix) all other Liabilities and obligations for which Buyer does not expressly assume any liability (collectively, the

13

"Excluded Liabilities"). Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated. From and after the Closing Date, Buyer shall pay, perform and discharge, as and when due or as may otherwise be agreed between Buyer and the obligee, all of the Assumed Liabilities. The "Assumed Liabilities" are specifically as follows:

(a)    all Liabilities of Sellers set forth on Schedule 2.3(a);

(b)    all Cure Amounts required to be paid in respect of the Purchased Contracts;

(c)    all Liabilities under the Purchased Contracts arising after the Closing;

(d)    all Liabilities associated with any letters of credit securing Open Purchase Orders and other Purchased Contracts (the "Assumed L/Cs"), in an aggregate amount not to exceed Four Million Dollars ($4,000,000);

(e)    all Liabilities arising from the sale of Products after the Closing pursuant to product warranties, product returns, rebates and otherwise;

(f)    all Liabilities with respect to the Business or the Purchased Assets arising after the Closing;

(g)    all allowed pre-petition Liabilities to Qualified Critical Trade Vendors to the extent that such Liabilities have not previously been paid by Sellers;

(h)    all undisputed post-petition Liabilities to Critical Trade Vendors that have not agreed to the terms and conditions set forth in the Critical Trade Vendor Motion to the extent that such Liabilities have not previously been paid by Sellers;

(i)    all Liabilities associated with (i) Employee vacation and sick leave accruals with respect to Transferred Employees and (ii) severance benefits, determined in accordance with Sellers' severance policy, for any Employee who is not a Transferred Employee, in each case only to the extent that any such Liability is an allowed administrative claim in the Bankruptcy Cases;

(j)    all real property Taxes to the extent required for Buyer to assume any Real Property Lease that is a Purchased Contract;

(k)    all Liabilities relating to amounts required to be paid by Buyer hereunder;

(l)    Transfer Taxes; and

(m)    all WARN Act Liabilities.

Notwithstanding anything herein to the contrary, Buyer may, from time to time and in its sole and absolute discretion, amend Schedule 2.3(a) so as to assume additional Liabilities of

14

Sellers until three (3) Business Days prior to the Closing Date. Buyer shall notify Sellers of any such amendments in writing. Any such additional Liabilities shall be Assumed Liabilities for all purposes hereunder.

Section 2.4    Purchased Assets. At Closing, pursuant to Section 363 and Section 365 of the Bankruptcy Code, Sellers shall sell or assume and assign to Buyer and Buyer shall buy or take an assignment from Sellers, as the case may be, the Purchased Assets and Assumed Liabilities.

Section 2.5    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents and to assure fully to Sellers and their respective Affiliates and their respective successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(b)    If following the Closing, the Sellers receive or become aware that they hold any property, right, claim, demand or asset which constitutes a Purchased Asset then the Sellers shall transfer such property, right, claim, demand or asset to the Buyer as promptly as practicable for no additional consideration.

(c)    If following the Closing, the Buyer receives or becomes aware that it holds any property, right, claim, demand or asset which constitutes an Excluded Asset, then the Buyer shall transfer such property, right, claim, demand or asset to the Sellers as promptly as practicable for no additional consideration.

Section 2.6    Transitional Matters.

(a)    From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets and Excluded Liabilities.

(b)    Buyer will retain and make available to Sellers, for a period of six (6) years following the Closing Date (or longer if reasonably requested), the Documents delivered by Sellers to Buyer, if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably cooperate to minimize inconvenience to Buyer.

Section 2.7    Bulk Sales Laws. Buyer hereby acknowledges that it has no objection to Sellers not complying with the requirements and provisions of any "bulk-transfer" Laws of any

15

jurisdiction that may otherwise be applicable with respect to the sale of any or all of the Purchased Assets to Buyer.

## ARTICLE III
## CONSIDERATION

Section 3.1    Purchase Price; Assumed Liabilities.  In consideration of the transfer of the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price (the "Purchase Price") for the Purchased Assets shall be (i) (A) Fifteen Million Dollars ($15,000,000) in cash, subject to adjustment in accordance with Section 3.3, minus (B) the Excess Cure Amounts (the "Cash Purchase Price"), plus (ii) the assumption of the Assumed Liabilities by Buyer at Closing.  The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such defaults under the Purchased Contracts assumed at Closing, shall be paid by Buyer on the Closing Date, and Sellers shall have no liability therefor.  Any Cure Amounts in excess of Five Hundred Thousand Dollars ($500,000) (the "Cure Cap") shall be classified as "Excess Cure Amounts" and such Excess Cure Amounts shall reduce the Cash Purchase Price on a dollar for dollar basis, as set forth in the first sentence of this section.  Notwithstanding the foregoing, if Buyer requests the assumption and assignment of any Contracts that are not set forth on Schedule 1.1(a), the Cure Amounts associated with any such Contracts shall not apply toward the Cure Cap.

Section 3.2    Deposit.  Concurrently with the execution and delivery of this Agreement by the Parties, Buyer shall deposit with Blackmore Escrow, Inc., pursuant to a mutually acceptable escrow agreement (the "Escrow Agreement"), cash in an amount equal to Seven Hundred Fifty Thousand Dollars ($750,000) as a deposit (the "Deposit").

Section 3.3    Purchase Price Adjustment.  Sellers and Buyer acknowledge and agree that the Purchase Price has been based on a projected value of the gross Accounts Receivable (without giving effect to any set-offs for any reserves, allowances, discounts or other deductions) and Inventory (including all Inventory on hand, in-transit and for which a deposit or prepayment has been made (in the case of any such deposit or prepayment, only to the extent of such deposit or prepayment) (the "Working Capital") as of the Closing Date of $26,000,000, which projection was determined by Sellers in good faith.  At least two (2) Business Days prior to the Closing Date, Sellers shall prepare and deliver to Buyer a certificate setting forth their good faith computation of Working Capital as of such date (the "Closing Working Capital").  Concurrently with the delivery of such certificate, Sellers shall deliver reasonable supporting materials providing the basis for the computation of Closing Working Capital as set forth in such certificate and Sellers further agree to promptly provide any additional supporting documentation as Buyer may reasonably request.  At the Closing, (i) if Closing Working Capital is less than $24,700,000 (the "Working Capital Lower Target"), the Purchase Price shall be reduced dollar-for-dollar by the amount by which Closing Working Capital is less than the Working Capital Lower Target, or (ii) if Closing Working Capital is greater than $28,600,000 (the "Working Capital Upper Target"), the Purchase Price shall be increased dollar-for-dollar by the amount by which Closing Working Capital is greater than the Working Capital Upper Target.

16

**ARTICLE IV**
**CLOSING AND TERMINATION**

Section 4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Venable LLP (or at such other place as the Parties may designate in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and no later than a date that is three (3) Business Days after the Sale Order becomes a Final Order, unless extended by mutual agreement of Sellers and Buyer.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date," and the Closing shall be deemed effective at the close of business on the Closing Date.

Section 4.2    Deliveries by Sellers.  At the Closing, Sellers shall deliver to Buyer:

(a)    a duly executed bill of sale and assignment;

(b)    duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. patent and trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    the officer's certificate required to be delivered pursuant to Section 9.1(a) and Section 9.1(b); and

(d)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer.

Section 4.3    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Sellers:

(a)    the Cash Purchase Price (as adjusted pursuant to Section 3.3) less the Deposit;

(b)    the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b); and

(c)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Sellers, as may be necessary to convey the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities.

Section 4.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer;

17

10011784-v14

(b)    by Sellers or Buyer, as applicable, if any of the conditions set forth in Section 9.3 shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party;

(c)    by Sellers or Buyer if there shall be in effect a final Order or other nonappealable final action of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of all or materially all of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)    by Buyer, if the Closing shall not have occurred on or before the close of business on the date which is seven (7) Business Days after the Sale Order becomes a Final Order or such later date as determined by mutual agreement of Sellers and Buyer (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a breach of any representation, warranty, covenant or agreement contained in this Agreement by Buyer or (2) a breach by Buyer of the obligations set forth in Section 8.2 hereof, or (b) (1) Sellers have not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Sellers have not breached the obligations set forth in Section 8.2 hereof, then Buyer may not terminate this Agreement pursuant to this Section 4.4(d);

(e)    by Buyer, if any of the conditions to the obligations of Buyer set forth in Section 9.1 shall have become incapable of fulfillment, other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(f)    by Buyer, if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and which breach cannot be cured or has not been cured by the later of (i) ten (10) Business Days after the giving of written notice by Buyer to Sellers of such breach and (ii) the Termination Date;

(g)    by Buyer or Sellers, if the Closing has not occurred within ninety (90) days after the Petition Date; provided that if a party is in breach of any representation, warranty, covenant or agreement contained in this Agreement, then such party shall not be entitled to terminate pursuant to this Section 4.4(h);

(h)    by Sellers, if any condition to the obligations of Sellers set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(i)    by Sellers, if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and which breach

18

cannot be cured or has not been cured by the later of (i) ten (10) Business Days after the giving of written notice by Sellers to Buyer of such breach and (ii) the Termination Date;

(j)    by Sellers, if the Closing shall not have occurred on or before the Termination Date; provided, however, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a breach of any representation, warranty, covenant or agreement contained in this Agreement by Sellers or (2) a breach by Sellers of the obligations set forth in Section 8.2 hereof, or (b) (1) Buyer has not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Buyer has not breached the obligations set forth in Section 8.2 hereof, then Sellers may not terminate this Agreement pursuant to this Section 4.4(j);

(k)    with no further action by either Party, if the Bankruptcy Court shall enter an Order approving a Competing Bid and the transaction contemplated by such Competing Bid is thereafter consummated;

(l)    [Reserved];

(m)    by either Buyer or Sellers, if one or more of the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or by Buyer if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Sellers is appointed in the Bankruptcy Cases;

(n)    by Buyer, if (i) the Bidding Procedures Order shall not have been submitted by Sellers to the Bankruptcy Court within thirty (30) days of the Petition Date (it being understood and agreed that Sellers shall use reasonable best efforts to have the order entered as soon as possible thereafter), or (ii) at any time after entry of the Bidding Procedures Order, such Bidding Procedures Order (including, without limitation, the provisions therein relating to the bid protections set forth in Section 7.1) is reversed, stayed, vacated or otherwise materially modified by the Bankruptcy Court; or

(o)    by either Buyer or Sellers, if the Bankruptcy Cases have not commenced within thirty (30) days after the date hereof; provided that if Sellers have not acted in good faith in delaying such commencement, then Sellers shall not be entitled to terminate pursuant to this Section 4.4(o).

Section 4.5    Procedure Upon Termination.

(a)    In the event of termination and abandonment by Buyer or Sellers, or both such Parties, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Buyer or Sellers. If this Agreement is terminated as provided herein each Party shall return all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(b)    If this Agreement is terminated:

19

(i)      pursuant to Sections 4.4(a), (d), (f), (g), or (o) (as to Section 4.4(g), only if Buyer is not in breach of any representation, warranty, covenant or agreement contained in this Agreement), Sellers shall pay the Expense Reimbursement to Buyer and immediately return the Deposit in accordance with the terms and conditions of the Escrow Agreement;

(ii)      pursuant to Section 4.4(k), Sellers shall pay the Expense Reimbursement and the Breakup Fee to Buyer and immediately return the Deposit in accordance with the terms and conditions of the Escrow Agreement; provided, that the Breakup Fee shall only be paid from the proceeds of a Competing Bid;

(iii)      pursuant to Section 4.4(i), Sellers shall retain the Deposit and such Deposit shall be the sole and exclusive remedy of the Sellers for any and all losses that may be suffered based upon, resulting from or arising out of the circumstances giving rise to such termination; or

(iv)      pursuant to Sections 4.4(b), (c), (e), (h), (j), (l), (m) or (n), Sellers shall immediately return the Deposit in accordance with the terms and conditions of the Escrow Agreement.

(c)      Following the termination of this Agreement, the Parties shall have no further obligations to one another except for any obligations that, by their terms, survive the termination of this Agreement, as described in Section 4.6(a).

Section 4.6      Effect of Termination.

(a)      In the event that this Agreement is validly terminated in accordance with Section 4.4, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers; provided, however, that this Section 4.6 and the obligations of the Parties set forth in Section 4.5, Section 8.3, Section 8.5 and Article XII hereof shall survive any such termination and shall be enforceable hereunder; and provided further, however, no termination shall relieve any party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(b)      Remedies. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer that:

Section 5.1      Authorization of Agreement. Subject to the entry of the Sale Order: (a) each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their

20

respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (b) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.2    Title to Purchased Assets.  Other than the real property subject to the Real Property Leases and the personal property subject to the Personal Property Leases, Sellers have good title to the Purchased Assets and, at the Closing, the Buyer, pursuant to the Sale Order, shall acquire good title in, to and under (subject to the Purchased Contracts (other than Purchased Contracts assumed or assigned post-Closing) being assumed and assigned in accordance with Section 2.1) all of such Purchased Assets, in each case free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets include all of the properties and assets required to operate, in all material respects, the Business in the Ordinary Course of Business.  For the sake of clarity, the right to use any assets included in the Purchased Assets in which Sellers have leasehold or non-ownership rights to use shall be assigned to Buyer only through the assumption and assignment of the Purchased Contracts in accordance with and subject to this Agreement.

Section 5.3    Real Property.  Schedule 1.1(a) sets forth a complete list of all real property and interests in real property leased by Sellers (individually, a "Real Property Lease" and collectively, the "Real Property Leases") as lessee or lessor in connection with the Business.  Sellers have a valid and enforceable leasehold interest under each Real Property Lease under which it is a lessee.

Section 5.4    Tangible Personal Property.  Schedule 1.1(a) sets forth all leases of personal property ("Personal Property Leases") relating to material personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.  Each Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee.

Section 5.5    Intellectual Property.  Schedule 1.1(a) sets forth an accurate and complete list of all material Intellectual Property used in the Business.  To Sellers' Knowledge, Sellers own all right, title and interest to, or are licensees with respect to, the Purchased Intellectual Property, and can convey such property free and clear of Liens pursuant to the Sale Order.  To the Knowledge of Sellers, (i) no Person is engaging in any activity that materially infringes any Purchased Intellectual Property and (ii) no claim has been asserted to any Seller that the use of any Purchased Intellectual Property or the operation of the Business infringes or violates the Intellectual Property of any third party.

21

Section 5.6    Financial Advisors.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Sellers in respect thereof.

Section 5.7    Litigation.  Except as set forth on Schedule 5.7 and other than in connection with the Bankruptcy Cases, there is no material suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the Sellers' Knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, is reasonably likely to adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Sellers have no Knowledge of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

Section 5.8    Compliance with Laws.  Sellers have conducted and are presently conducting the Business in compliance with all applicable Laws, except where such non-compliance would not result in a Material Adverse Effect.

Section 5.9    Permits.  Sellers are in compliance with the material terms of all applicable Permits, and all such Permits are valid and in full force and effect, except in each case where such non-compliance or non-validity would not result in a Material Adverse Effect, and no proceeding is pending or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

Section 5.10    Inventory.

(a)    The Inventory is not materially damaged in any significant way, including, but not limited to, damage caused by water, except for any such damage which would not have a Material Adverse Effect on the Inventory taken as a whole;

(b)    To Sellers' Knowledge, the Inventory has not been part of a current or past product recall; and

(c)    The Inventory is in material compliance with United States federal guidelines for such products as of the date hereof, except for such compliance failure which would not have a Material Adverse Effect on the Inventory taken as a whole.

Section 5.11    Contracts.  The Contracts set forth on Schedule 1.1(a) include all Contracts material to the ownership and/or operation of the Business. Except as set forth on Schedule 5.7, Sellers have not, and, to Sellers' Knowledge, no other party to any Purchased Contract has, commenced any action against any of the parties to any Purchased Contract or given or received any written notice of any default or violation under any Purchased Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts. Each Purchased Contract is, or will be upon the Closing and payment of the applicable Cure Amounts, valid, binding and in full force and effect in accordance with its terms.

22

Section 5.12    <u>Taxes</u>.

(a)    All income Tax Returns required to have been filed by Sellers for each of the Sellers' tax years ended through March 31, 2014 have been filed.

(b)    Except as set forth on <u>Schedule 5.12</u>:

(i)    To the Knowledge of the Sellers, no federal or state income Tax Return audits are pending with respect to any Seller;

(ii)    No Seller has received written notice from any Governmental Body of future federal or state income Tax Return audits;

(iii)    There are no material liens with respect to Taxes upon any of the Purchased Assets, other than (A) Permitted Exceptions and (B) Liens that may arise to the extent payment of such Taxes is stayed as a result of the Bankruptcy Cases ("<u>Stayed Tax Liens</u>"); and

(iv)    No Seller has (A) waived any statute of limitations in respect of any Tax Returns that have not been filed as of the date hereof or (B) agreed to any extension of time with respect to the assessment of Taxes for which such Taxes have not been paid as of the date hereof, in each case other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business.

Section 5.13    <u>Employee Benefits</u>.

(a)    <u>Schedule 5.13</u> sets forth all "employee benefit plans", as defined in Section 3(3) of ERISA, and all other material employee benefit arrangements, employment agreements or payroll practices maintained by Sellers or to which Sellers contribute or are obligated to contribute thereunder for Employees (the "<u>Benefit Plans</u>").  Neither Sellers nor any of their affiliates and any trade or business (whether or not incorporated) which is or has ever been under common control, or which is or has ever been treated as a single employer, with any of them under Section 414(b), (c), (m) or (o) of the Code has in the last six years contributed or has been obligated to contribute to any "employee pension plans", as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, including a "multiemployer plan", as defined in Section 3(37) of ERISA.  None of the Seller Plans provide for post-employment life or health insurance, benefits or coverage for any participant or any beneficiary of a participant, except as may be required under the Consolidate Omnibus Budget Reconciliation Act of 1985, as amended, ("<u>COBRA</u>") and at the expense of the participant or the participant's beneficiary.

(b)    True, correct and complete copies of the following documents, with respect to each of the Benefit Plans, have been made available or delivered to Buyer by Sellers, to the extent applicable: (i) any plans, all amendments thereto and related trust documents, and amendments thereto; (ii) the most recent Forms 5500 and all schedules thereto; (iii) the most recent IRS determination letter; (iv) the most recent summary plan descriptions; (v) written communications to employees relating to the Benefit Plans; and (vi) written descriptions of all non-written agreements relating to the Benefit Plans.

23

(c)      The Benefit Plans have been maintained, in all material respects, in accordance with their terms and with all provisions of ERISA, the Code and other applicable federal and state laws and all contributions required to have been made under any of the Benefit Plans to any funds or trusts established thereunder or in connection therewith have been made, in all material respects, by the due date thereof (including any valid extension).

Section 5.14    Labor Matters.

(a)      Other than as set forth on Schedule 5.14(a), (i) no Seller is a party to any labor or collective bargaining agreement with respect to its Employees, (ii) no Employee of any Seller is represented by any labor organization, (iii) no labor organization or group of Employees of any Seller has made a pending demand for recognition or request for certification, (iv) and there are no representation or certification proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller.

(b)      There are no material strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller.

(c)      Except as set forth on Schedule 5.7, there are no unfair labor practice charges, arbitrations, grievances or complaints pending or, to the Knowledge of Sellers, threatened in writing against any Seller relating to the employment or termination of employment of any individual by any Seller except those which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d)      Except as set forth on Schedule 5.7, there are no complaints, charges, administrative proceedings or claims against any Seller pending or, to the Knowledge of Sellers, threatened in writing to be brought or filed with any Governmental Body based on or arising out of the employment by any Seller of any Employee except those which, individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

(e)      The employment of each Employee of Sellers is at-will.  Schedule 5.14(e) lists all written employment and consulting agreements to which any Seller is a party or by which it is bound.

Section 5.15    Sellers' Representations and Warranties Generally.  Sellers' representations and warranties herein (including as made or qualified in the Schedules hereto) are made by Sellers in their respective corporate or limited liability company capacity, without personal liability to Sellers' directors, officers, members or counsel, or Sellers' signatory, other than with respect to fraudulent or criminal activity with respect to the transactions contemplated hereby.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

24

Section 6.1    <u>Organization and Good Standing</u>.  Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 6.2    <u>Authorization of Agreement</u>.  Buyer has full corporate or limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby (the "<u>Buyer Documents</u>"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer.  This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly executed and delivered by Buyer, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer, in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3    <u>Financial Advisors</u>.  No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and no person is entitled to any fee or commission or like payment in respect thereof, other than India Brook Partners, LLC.

Section 6.4    <u>Litigation</u>.  There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Buyer's knowledge, threatened against or relating to Buyer or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, is reasonably likely to adversely affect the ability of Buyer to enter into this Agreement or to consummate the transactions contemplated hereby and Buyer is not aware of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

Section 6.5    <u>Financial Capability</u>.  Buyer (i) has, or has firm commitments for, as of the date hereof, and will have as of the Closing, sufficient funds to pay the Purchase Price and the Cure Amounts, assume the Assumed Liabilities, and pay any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement; (ii) has, as of the date hereof, and will have as of the Closing, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (iii) has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or Liability of any kind which would impair or is reasonably likely to adversely affect such resources and capabilities.

Section 6.6    <u>Condition of the Business</u>.  Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Sellers and each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives are not making any representation or warranty whatsoever, express or

25

implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis.

# ARTICLE VII
# BANKRUPTCY COURT APPROVAL

Section 7.1    Approval of Expense Reimbursement and Overbid Protection.  Subject to the entry of the Bidding Procedures Order, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay to Buyer promptly upon the effective date of termination of this Agreement in accordance with, and only to the extent provided in, Section 4.5 hereof (a) Buyer's reasonable fees, costs and expenses (including, without limitation, consultants' and attorneys' reasonable fees, costs and expenses) incurred in connection with the transactions contemplated by this Agreement through the date of termination, provided that the amount of such reimbursement does not exceed Three Hundred Thousand Dollars ($300,000) (the "Expense Reimbursement") and (b) a termination fee of Three Hundred Fifty Thousand Dollars ($350,000) (the "Breakup Fee").  In addition, the Bidding Procedures Order shall provide for (x) an initial minimum overbid equal to the aggregate of the Purchase Price, the Expense Reimbursement and the Breakup Fee, plus an initial minimum bid increment of One Hundred Fifty Thousand Dollars ($150,000), and (y) minimum bid increments thereafter of One Hundred Thousand Dollars ($100,000), and Buyer shall have the ability to credit bid at the Auction the amount of the Expense Reimbursement and the Breakup Fee (collectively).

Section 7.2    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (each a "Competing Bid").  From the date hereof (and any prior time) and until the completion of the Auction or as otherwise directed by the Bankruptcy Court, Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, Sellers shall be permitted to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (each, an "Alternative Proposal"), provided that such Person enters into a non-disclosure agreement in favor of Sellers, and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of Sellers to prospective buyers.  No later than two (2) Business Days prior to the Auction, Sellers shall provide to Buyer a copy of any such Alternative Proposal and any written response of Sellers thereto and regularly update Buyer as to the status of any negotiations therewith.

(b)    Following completion of the Auction, Sellers are not permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its agents and

26

representatives) in connection with any sale or other disposition of the Purchased Assets.  In addition, unless otherwise directed by the Bankruptcy Court, Sellers shall not after completion of the Auction respond to any Alternative Proposal or perform any other acts related thereto, including supplying information relating to the Business and the assets of Sellers to prospective buyers of the Purchased Assets.

Section 7.3    Bankruptcy Court Filings.  Sellers shall use commercially reasonable efforts (A) to file the Sale Procedures Motion with the Bankruptcy Court on or promptly after the Petition Date, and (B) to seek entry of the Bidding Procedures Order and the Sale Order.  Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code.  In the event the entry of the Bidding Procedures Order and the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

**ARTICLE VIII**
**COVENANTS**

Section 8.1    Access to Information.  Sellers agree that, prior to the Closing Date, Buyer shall be entitled, through their respective officers, employees and representatives (including their respective legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books, records and financial condition of the Business, the Purchased Assets and the Assumed Liabilities as they reasonably request and to make extracts and copies of such books and records.  Any such investigation and examination shall be conducted during regular business hours upon reasonable advance written notice and under reasonable circumstances and shall be subject to restrictions under applicable Law.  Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with Sellers and their respective representatives and shall use their reasonable efforts to minimize any disruption to the Business.

Section 8.2    Further Assurances.  Each of Sellers and Buyer shall use commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Termination Date, (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement and (c) promptly inform the other party at the earliest practicable date of such other party's deficiency, failure to perform or failure to fulfill a condition to consummation of the transactions contemplated by this Agreement, so that such other party may timely fulfill its obligations under clause (b) hereof.  Notwithstanding anything in this Agreement to the contrary, including, without limitation this Section 8.2, where a party is permitted, pursuant to this Agreement, to act in its discretion, actions pursuant to such discretion shall not be subject to the provisions of clauses (a) or (b) of the prior sentence.

27

Section 8.3    Confidentiality.

(a)    Buyer acknowledges that the confidential information provided to them in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of that certain non-disclosure agreement between Sellers and Buyer.

(b)    Following the completion of the Auction, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware.  Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft.  In furtherance and not in limitation of the foregoing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.3(b) or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than Buyer (provided that such third party Person is not and was not prohibited from disclosing such confidential information to such Seller by any legal, fiduciary or contractual obligation), or (b) any of the discussions or negotiations conducted with Buyer in connection with this Agreement, provided, that Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases, other Persons bidding on assets of Sellers, (ii) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), Legal Proceeding or Governmental Authority, or (iii) any information to Sellers' counsel and financial advisor; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.  Notwithstanding anything in this Section 8.3 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any Trade Secrets of the Business shall be maintained for so long as such Trade Secrets continue to be entitled to protection as Trade Secrets of the Business.

Section 8.4    Preservation of Records.  Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it relating to the pre-Closing Business for a period of six (6) years from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Buyer or any of their respective Affiliates or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during such six (6) year period, such Party shall first

28

give twenty (20) days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that twenty (20) day period, to take possession of the records within thirty (30) days after the date of such notice.

Section 8.5    Publicity.  Neither Sellers, on the one hand, nor Buyer, on the other hand, shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Buyer or Sellers, disclosure is otherwise required by applicable Law or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement. Notwithstanding the foregoing, the Parties may publicly disclose the existence of this Agreement.

Section 8.6    Operation of Business.  Until the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to operate the Business in the Ordinary Course of Business (among other things, Sellers will not incur unreasonable liabilities, including, without limitation, inappropriate increases in Inventory or factoring of accounts receivable). Sellers shall use commercially reasonable efforts to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), (E) pay all of their respective post-petition obligations in the Ordinary Course of Business, and (F) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers.

Section 8.7    Section 363(b)(1)(A).  Buyer shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

Section 8.8    Adequate Assurances Regarding Purchased Contracts and Certain Real Property Leases.  With respect to each Purchased Contract and Real Property Lease set forth on Schedule 1.1(c), Buyer shall provide adequate assurance of the future performance of such Purchased Contract and Real Property Lease by Buyer as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

Section 8.9    Material Adverse Effect.  Sellers shall promptly inform Buyer in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect.

Section 8.10    Employee Matters.

(a)      Sellers shall reasonably assist Buyer to engage, in Buyer's sole and absolute discretion, the services of Sellers' current employees ("Prospective Employees"), on

terms and conditions satisfactory to Buyer and such Prospective Employees. Buyer shall be provided access to, and be allowed to communicate with, such Prospective Employees. Sellers shall not, and shall not attempt to, engage or transfer the services of any of the Prospective Employees to any other business operated by Sellers or their successors; provided, however, that in the event Buyer engages and then later terminates the services of any Prospective Employee, Sellers may later re-engage the services of such individuals.

(b)      Buyer shall, in consultation with Sellers, identify the names of the Prospective Employees whose services it wishes to engage at least five (5) days prior to the Closing Date. Such individuals who accept such offer or otherwise continue employment with Buyer are hereinafter referred to as the "Transferred Employees." Nothing herein shall obligate Buyer to employ any Transferred Employee for any particular length of time following the Closing Date.

(c)      Effective as of the Closing Date, Buyer shall either (i) assume the Benefit Plans or (ii) provide the Transferred Employees with employee benefit plans substantially similar, in the aggregate, to the Benefit Plans provided to such Transferred Employees by Sellers immediately prior to Closing (which could include a combination of assumed Benefit Plans and newly established employee benefit plans) and such Transferred Employees shall be credited for service earned on and prior to the Closing Date with Sellers in addition to service earned with Buyer on or after the Closing Date to the extent that any Benefit Plan that is a Purchased Asset or the employee benefit plans of Buyer, as applicable, take into account service for purposes of eligibility, vesting or the calculation of vacation, sick days, severance, layoff and similar benefits (but not for purposes of pension benefit accruals).

Section 8.11    Stayed Tax Liens. Prior to the Closing, Sellers shall notify Buyer within three (3) Business Days after any Stayed Tax Lien arises.

Section 8.12    Cooperation. Sellers, on the one hand, and Buyer, on the other hand, will provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes (such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax authorities). In addition, Buyer shall make available to Sellers, without charge to Sellers, such office space and employee support reasonably necessary to assist Sellers to wind up Sellers' operations following the Closing, resolve the Bankruptcy Cases, dissolve any or all of the Sellers and prepare and file the Tax Returns. Any information obtained under this Section 8.12 shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

Section 8.13    Schedules. On or before the Schedule Delivery Deadline, Sellers and Buyer shall deliver all Schedules to this Agreement not theretofore delivered, which Schedules shall be in form and substance satisfactory to Buyer and Sellers.

Section 8.14    Corporate Names.

(a)    Sellers hereby acknowledge and agree that, as a Purchased Asset, Buyer is purchasing Sellers' rights to the names "Geneva Watch Group", "Advance Watch Company, Ltd.", "Sunburst Products, Inc." and "GWG International, Ltd." as well as the names set forth on Schedule 8.14 (the "Purchased Names"), and that Buyer shall have the exclusive right to obtain in its own name copyrights, trademarks and all other forms of protection with respect thereto. No Seller nor any of its Affiliates will at any time claim any right, title or interest to the Purchased Names.

(b)    Within one (1) Business Day after the Closing, Sellers shall make all necessary filings to change the corporate names of each Seller in their respective states of incorporation or organization and in all states in which they are authorized to transact business on the Closing Date, to a name that does not contain any words similar or reasonably likely to be confused with the Purchased Names.

Section 8.15    Letters of Credit.  Upon the Closing, Buyer shall replace, assume or provide a back-to-back letter of credit for each of the Assumed L/Cs that will be outstanding as of the Closing, as set forth on Schedule 8.15 (such schedule to be delivered by Sellers to Buyers at least five (5) days prior to the Closing); provided, that the aggregate amount of the Assumed L/Cs set forth on such schedule or otherwise shall not exceed Four Million Dollars ($4,000,000), in each case in a manner satisfactory to the issuing bank(s) of such Assumed L/Cs.

## ARTICLE IX
## CONDITIONS TO CLOSING

Section 9.1    Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed

31

that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(c)    Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in <u>Section 4.2</u>;

(d)    From the date hereof through the Closing Date, there shall have been no Material Adverse Effect;

(e)    The Purchased Contracts shall be sold and assumed and assigned to Buyer by Order of the Bankruptcy Court satisfactory to Buyer in its reasonable discretion, except for any Purchased Contracts to be assumed and assigned after the Closing;

(f)    The aggregate Cure Amounts as determined by the Bankruptcy Court shall not be more than 125% (exclusive of "Common Area Maintenance" adjustments for the applicable lease year in which the Closing occurs pursuant to the terms of Real Property Leases that are Purchased Assets) of the aggregate Cure Amounts set forth on <u>Schedule 9.1(f)</u>;

(g)    The Bidding Procedures Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer);

(h)    The Sale Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer);

(i)    Kenneth Cole Productions (LIC), LLC, Kenneth Cole Productions, Inc. (collectively, "<u>KC</u>") and Buyer shall have entered into a reasonably mutually agreeable license agreement on the terms and conditions previously agreed to by Buyer and KC, it being understood that, in connection therewith, Buyer shall pay to KC the amount of the Guaranteed Minimum Royalty and the minimum Advertising Fee (as such terms are defined in the Kenneth Cole License) that are otherwise due on October 1, 2015 under the Kenneth Cole License; and

(j)    The licenses set forth on <u>Schedule 9.1(j)</u> shall have each been assumed by Sellers and assigned to Buyer as of the Closing and any necessary consents in respect thereof shall have been obtained.

Section 9.2    <u>Conditions Precedent to Obligations of Sellers</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability company (not personal) capacity (it

32

being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(b)    Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(c)    To the extent that Buyer determines, in its sole and absolute discretion, to assign its rights, interests and obligations hereunder to one or more of its designees, such designee(s) shall deliver to Sellers the certificates required to be delivered pursuant to Section 9.2(a) and Section 9.2(b) hereof, certifying to such matters with respect to itself or themselves;

(d)    Buyer shall have delivered, or caused to be delivered, to Sellers the Purchase Price; and

(e)    the Sale Order shall have been entered and be effective, not subject to any stay.

Section 9.3    Condition Precedent to Obligations of Buyer and Sellers. The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of the following conditions (which may be waived by Buyer and Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

Section 9.4    Frustration of Closing Conditions. Neither Sellers nor Buyer may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused by such Party's breach of this Agreement.

## ARTICLE X
## NO SURVIVAL

Section 10.1    No Survival of Representations and Warranties. The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof. The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

33

## ARTICLE XI
## TAX MATTERS

Section 11.1   <u>Transfer Taxes</u>.  Buyer shall be responsible for all Transfer Taxes.

Section 11.2   <u>Purchase Price Allocation</u>.  Within sixty (60) days after the Closing Date, Buyer and Sellers will agree to a certificate of allocation detailing the allocation of the Purchase Price  and Assumed Liabilities among the Purchased Assets.  Buyer and Sellers will treat Sellers' transfer of the Purchased Assets to Buyer as an exchange governed by Section 1001 and Section 1060 of the Code and, in accordance with such treatment, will each file an Internal Revenue Service Form 8594 "Asset Acquisition Statement under Section 1.1060-1" at the times and in the manner as required by Treasury Regulation 1060-1 consistent with the certificate of allocation.  The certificate of allocation will be conclusive and binding on the Parties for all purposes, including reporting and disclosure requirements under the Code and any foreign, state, or local Tax authority, except as provided by a change in applicable Tax Law or the good faith resolution of a Tax contest.

Section 11.3   <u>Audits, Claims and Proceedings</u>.  Sellers shall have the right to control the conduct of the defense of any audit, claim, proceeding, investigation, or other controversy relating to Taxes ("<u>Tax Claim</u>") of Sellers for any taxable period ending on or prior to, or including, the Closing Date; provided, however, that Sellers will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to materially adversely affect Buyer without first obtaining Buyer's written consent, such consent to not be unreasonably withheld, conditioned or delayed.

## ARTICLE XII
## MISCELLANEOUS

Section 12.1   <u>Expenses</u>.  Except for the Expense Reimbursement that may be owed by Sellers to Buyer pursuant to <u>Section 4.5</u>, if any, each of Sellers and Buyer shall bear their own fees, costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 12.2   <u>Submission to Jurisdiction; Consent to Service of Process</u>.

(a)   Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in <u>Section 12.6</u> hereof; provided, however, that if the Bankruptcy Cases have not been commenced or have been closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the courts of the State of New York located in the County of New York and any appellate court thereof, for the

34

resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)    Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.6.

Section 12.3    Waiver of Right to Trial by Jury. Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 12.4    Entire Agreement; Amendments and Waivers. This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 12.5    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in the State of New York.

Section 12.6    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

10011784-v14

If to Sellers, to:

> c/o Advance Watch Company Ltd.
> 1407 Broadway Avenue, Suite 400
> New York, NY 10018
> Attention:  Jeff Gregg, CRO
> Fax:  (646) 304-8027
> Email:  JGregg@genevawg.com

with a copy to:

> Venable LLP
> 2049 Century Park East, Suite 2100
> Los Angeles, CA  90067
> Attention:  Ronn S. Davids
> Fax:        (310) 229-9901
> Email:  RDavids@venable.com

with an additional copy to:

> Otterbourg P.C.
> 230 Park Avenue
> New York, NY  10169
> Attention:  Daniel F. Fiorillo
> Fax:        (212) 682-6104
> Email:  DFiorillo@otterbourg.com

If to Buyer, to:

> C/O Time Watch Investments Limited
> 27/F., CEO Tower, 77 Wing Hong Street
> Cheung Sha Wan, Kowloon, Hong Kong
> Attention: Ms. Clara Cheung ,Chief Financial Officer
> Fax:        (852) 2413 1103
> Email:   claracheung@timewatch.com.hk

with an additional copy to:

> Baker & Hostetler LLP
> 45 Rockefeller Plaza
> New York, NY, 10024
> Attention:  Christoph Lange
> Fax:        (212) 589-4267
> Email:      clange@bakerlaw.com

10011784-v14

Each Party entitled to notice may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving all other Parties notices in the manner herein set forth.

Section 12.7    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 12.8    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for Sellers' estates or any trustee appointed in a chapter 7 case if the Bankruptcy Cases are converted from chapter 11. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, on the one hand, or Buyer, on the other hand (by operation of law or otherwise), without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer may, without the consent of Sellers, assign its rights, interests, and obligations hereunder to one or more of its designees; provided, that Buyer shall remain obligated as Buyer hereunder.

Section 12.9    Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 12.10    Attorney-Client Privilege.  The parties hereto hereby acknowledge that Venable LLP has acted as counsel to Sellers from time to time prior to the transactions contemplated by this Agreement as well as with respect thereto.  The following provisions in this Section 12.10 apply solely to the attorney-client relationship between (a) Sellers and Venable LLP prior to the Closing and (b) Sellers and Venable LLP following the Closing.  Subject to the exceptions below, each of the parties hereto agrees that:  (i) it will not seek to disqualify Venable LLP, based solely on its prior representation of Sellers, from acting and continuing to act as counsel to any of the Sellers either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to the transactions contemplated by this Agreement; (ii) Sellers have a reasonable expectation of privacy with respect to their communications (including any e-mail communications using Seller's email system) with Venable LLP prior to Closing to the extent that such communications were subject to the attorney-client privilege and/or the attorney work product doctrine; and (iii) Sellers (and, following the Closing, not Buyer or any of its Affiliates) shall have access to all such privileged communications (provided

37

that Buyer shall not be required to maintain Sellers' ongoing access to email or other electronic systems of the Business post-Closing).

Notwithstanding any of the foregoing: (a) Sellers agree that they will not waive, or cause to be waived, any claim of privilege or protection over pre-Closing communications between or among Venable LLP and the Sellers, without first obtaining the written consent of Buyer, which consent shall not be unreasonably withheld; (b) nothing herein shall prevent Buyer from requesting, using or accessing all communications between or among Venable LLP and the Sellers in connection with any claim arising under or in connection with this Agreement or the transactions contemplated hereby or otherwise, so long as such communications are not subject to the attorney-client privilege or work product protection; and (c) in the event that a dispute or investigation or audit arises after the Closing between Buyer, on the one hand, and a third party, on the other hand, Buyer shall notify the Sellers if Buyer requires access to any privileged or protected pre-Closing communications between Venable LLP and Sellers in order to assist in the Buyer's response to or defense of the third-party claim, investigation, or audit, and such access shall not unreasonably be refused.

[*Signature Pages Follow*]

38

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**                              BINDA USA HOLDINGS, INC.

By:    _____
       Name:  Jeffrey L. Gregg
       Title:   Chief Restructuring Officer


ADVANCE WATCH COMPANY LTD.

By:    _____
       Name:  Jeffrey L. Gregg
       Title:   Chief Restructuring Officer


SUNBURST PRODUCTS, INC.

By:    _____
       Name:  Jeffrey L. Gregg
       Title:   Chief Restructuring Officer


GWG INTERNATIONAL, LTD.

By:    _____
       Name:  Jeffrey L. Gregg
       Title:   Chief Restructuring Officer


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**BUYER:**

SUNSHINE TIME INC.

By: _____

Name: Tung Koon Ming

Title: President

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

*Execution Version*

## SCHEDULE 1.1(a)

### Contracts; Leases; Intellectual Property

1.  Omnibus License Agreement Renewal, dated as of January 1, 2012, by and among Advance Watch Company Ltd., Kenneth Cole Productions (LIC), and Kenneth Cole Productions, Inc.

2.  Trademark License Agreement, dated as of March 12, 2009, by and between Advance Watch Company Ltd. and Tommy Bahama Group, Inc., as extended by that certain Extension of Trademark License Agreement for Renewal Period dated September 11, 2012, as amended by that certain First Amendment to Trademark License Agreement dated March 22, 2012, as further amended by that certain Second Amendment to Trademark License Agreement dated May 5, 2015.

3.  License Agreement, dated as of November 7, 2007, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker, as amended by that certain First Amendment to License Agreement dated as of January 1, 2012, as further amended by that certain Second Amendment to License Agreement dated as of February 23, 2015.

4.  Commercial Street Contribution Agreement, dated December 19, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker.

5.  License Agreement, dated as of August 10, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Christian Casey L.L.C.

6.  Retail Product License Agreement, dated as of August 7, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NBA Properties, Inc., as amended by that certain First Amendment to Retail Product License Agreement dated August 24, 2014.

7.  License Agreement, dated as of April 1, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NFL Properties LLC.

8.  Retail License Agreement, dated July 18, 2013, by and among Advance Watch Company Ltd. d/b/a Game Time LLC, NHL Enterprises, L.P. and NHL Enterprises Canada, L.P.

9.  Standard Retail Product License Agreement, dated as of July 13, 2012, by and between Advance Watch Company Ltd. and Collegiate Licensing Company, as amended by that certain Addendum dated December 18, 2014.

10. Trademark License Agreement, dated as of May 22, 2012, by and between Advance Watch Company Ltd. and Michigan State University.

11. License Agreement, dated as of July 31, 1996, by and between Advance Watch Company Ltd. and Burwood Products Company, as amended by that certain Letter Agreement

dated February 6, 2006, as further amended by that certain Letter Agreement dated November 24, 2014.

12. Licensing Agreement, dated October 22, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and The Curtis Publishing Company, as amended by that certain Addendum to Licensing Agreement dated May 10, 2012, as further amended by that certain Addendum to Licensing Agreement dated January 13, 2014.

13. Licensing Agreement, dated as of December 20, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sundance Group.

14. License Agreement, dated as of January 1, 2015, by and between Geneva Watch Group, Inc. and Morning Glory Licensing, LLC.

15. License Agreement, dated August 13, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and KMJ Brand Holdings LLC.

16. License Agreement, dated as of January 1, 2015, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group and HBI Branded Apparel Enterprises.

17. License Agreement, dated as of September 1, 2011, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group, Sperry Top-Sider LLC and SR Holdings, LLC, as amended by that certain First Amendment to License Agreement dated December __, 2014.

18. License Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Steve Harvey Products, Inc./ Steve Harvey.

19. License Agreement, dated as of March 31, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and IP Holdings Unltd LLC, as amended by that certain Amendment to License Agreement dated March 11, 2011, as further amended by that certain Second Amendment to License Agreement dated January 8, 2014 by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and ZY Holdings LLC (by assignment from IP Holdings Unltd).

20. Letter Agreement, dated as of _____, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and US Lacrosse, Inc.

21. License Agreement, dated as of April 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Soccer United Marketing, LLC.

22. Distribution Agreement, dated as of May 1, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Arista Singapore Pte Ltd.

23. Distribution Agreement, dated as of September 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Carmen Jewelers.

2

24. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and GDL Manufacturing Ltd.

25. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Global Tic Sales Inc.

26. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Priority Marketing PVT. Ltd.

27. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Timestore AG.

28. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Chronosoft PTE LTD.

29. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CNB Distributors, LLC.

30. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Comercializadora E-Akluck, S.A. de C.V.

31. Distribution Agreement, dated as of March 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Marlox AG.

32. Distribution Agreement, dated as of November 6, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Merkez Saat Tic.A.S.

33. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New City, Inc.

34. Distribution Agreement, dated as of June 15, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New Sense Development Ltd.

35. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and PT. Sukses Sinar Abadi.

36. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

37. Distribution Agreement, dated as of September 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

38. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and TBN Time Distribution LLC.

39. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Time Deco Corporation Limited.

9942447-v6

40. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Paidel Watch Co., Ltd.

41. Distribution Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Styleright Global Corporation.

42. Letter Agreement, dated June 13, 2013, by and among Advance Watch Company Ltd., Kenneth Cole Productions, Inc. and Wells Fargo Bank, National Association.

43. Credit Agreement, dated as of June 21, 2013, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, Sunburst Products, Inc., GWG International, Ltd., Binda USA Holdings, Inc., Wells Fargo Bank, National Association, and the Lenders that are parties thereto, as amended by that certain Amendment No. 1 to Credit Agreement dated as of June 30, 2014, as amended by that certain Amendment No. 2 to Credit Agreement dated as of August 17, 2015.

44. Standard Vendor Agreement for Merchandise, dated February 24, 2015, by and between Geneva Watch Group and Boscov's Department Store, LLC.

45. Vendor Agreement, dated _____, 2014, by and between Advance Watch Company Ltd. and Helzberg's Diamond Shops, Inc.

46. Amazon Vendor Terms and Conditions effective March 21, 2015 for various brands.

47. Freight Allowance Agreement No. 7409330, dated on or around April 1, 2015, by and between Geneva Clock Company and Amazon Fulfillment Services, Inc.

48. Freight Allowance Agreement No. 7178800, dated on or around April 1, 2015, by and between Breil Milano and Amazon Fulfillment Services, Inc.

49. Trading Terms Agreement, dated February 1, 2014, by and between Geneva Watch Group and The Nuance Group.

50. Letter Agreement regarding Acquisition of "Mathey Tissot" Trademark, dated March 11, 1996, by and among Geneva Watch Company, Mathey Tissot International, Ltd. and Mathey Tissot S.A.

51. Letter Agreement regarding Agreement regarding Mathey Tissot Watch Product, dated May 16, 1996, by and among Geneva Watch Company, JBM Venture Co., Inc. and Jan Bell Marketing, Inc.

52. Letter Agreement regarding grant of license, dated August 17, 2015, by and among Geneva Watch Group and LaCrosse Technology.

53. Agreement, dated August 26, 2015, by and among Advance Watch Company (Far East) Limited, Advance Watch Company Ltd., Wells Fargo Bank, National Association, Koo Chi Sum and Yen Ching Wai, David c/o Ernst and Young Transactions Limited.

9942447-v6

54. Escrow Agreement, dated August 26, 2015, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, and Koo Chi Sum and Yen Ching Wai c/o Ernst & Young Transactions Limited.

55. Irrevocable Transferable Standby Letter of Credit, dated August 19, 2015, by and among Israel Discount Bank of New York and Allura Imports, Inc.

Real Property Leases:

56. Lease Agreement, dated as of September 6, 2001, by and between Advance Watch Company Limited and Ashley Canton, LLC, as amended by that certain First Amendment dated April 15, 2002, as further amended by that certain Second Amendment dated May 28, 2002, that certain Third Amendment dated June 18, 2006, that certain Fourth Amendment dated March 8, 2010, and that certain Fifth Amendment to Lease dated March 26, 2013, as assigned by landlord to 47440 Michigan Ave, LLC.

57. Lease, dated February 18, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and 1407 Broadway Real Estate, LLC, as assigned by landlord to SRI Eleven 1407 Broadway Operator, LLC.

58. Lease Agreement, dated September 28, 2011, by and between Geneva Watch Group and Pinnacle Plaza, LLC, as amended by that certain Addendum I to Original Lease dated October 3, 2012, as further amended by that certain Addendum II to Original Lease dated May 11, 2015.

59. Sublease Agreement, dated January 30, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Allura Imports, Inc.

60. Multi-Tenant Building Lease, dated May 1, 2009, by and between Advance Watch Company Ltd. and C.J. Segerstrom & Sons, as amended by that certain First Amendment of Lease Agreement dated May 22, 2012, and by that certain Second Amendment of Lease Agreement dated July 28, 2015.

61. Renewal Lease Form, dated July 10, 2015, by and between Binda USA Holdings Inc. and Columbus 60th Realty LLC.

Personal Property Leases:

62. Lease Agreement, dated July 21, 2014, by and between Advance Watch Company Ltd. and CIT Finance LLC.

63. Lease Agreement, dated July 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CIT Finance LLC.

9942447-v6

64. Lease Agreement (Lease No. 001-007914733-002), dated August 5, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

65. Lease Agreement (Lease No. 001-007914733-003), dated September 8, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

66. ValuePlan Lease Agreement, dated March 16, 2015, by and between Geneva Watch Group and IBM Credit LLC.

67. Lease Agreement, dated May 28, 2013, by and between Advance Watch Company Ltd. and LDI Color Toolbox.

6

Patents:

| TITLE | OWNER | COUNTRY | APPLICATION NO. | FILE DATE | ISSUE DATE | PATENT NO. | STATUS |
|---|---|---|---|---|---|---|---|
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | USA | 29/448824 | 14-Mar-2013 | | | Pending |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | China (People's Republic) | 201330443790.7 | 16-Sep-2013 | 14-May-2014 | ZL201330443790.7 | Granted |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | Japan | 2013-021312 | 13-Sep-2013 | 21-Nov-2014 | 1514206 | Granted |
| WATCH BAND RETAINER | Advance Watch Company Ltd. | USA | 29/320106 | 20-Jun-2008 | 09-Mar-2010 | D611378 | Granted |
| WATCH CASE | Advance Watch Company Ltd. | USA | 29/320107 | 20-Jun-2008 | 29-May-2012 | D660725 | Granted |
| WATCH | Advance Watch Company Ltd. | USA | 29/391844 | 13-May-2011 | 18-Mar-2014 | D701128 | Granted |
| TOUCH SCREEN WATCH | Advance Watch Company Ltd. | USA | 12/911205 | 25-Oct-2010 | 02-Sept-2014 | 8824245 | Granted |
| WATCH | Advance Watch Company Ltd. | USA | 29/448819 | 14-Mar-2013 | | | Pending |
| WATCH | Advance Watch Company Ltd. | USA | 29/448820 | 14-Mar-2013 | | | Pending |
| WATCH | Advance Watch Company Ltd. | USA | 29/448825 | 14-Mar-2013 | | | Pending |
| WATCH | Advance Watch Company Ltd. | USA | 29/448827 | 14-Mar-2013 | | | Pending |
| DISPLAY SCREEN SURROUNDED BY A WATCH CASE | Advance Watch Company Ltd. | Australia | 14610/2013 | 13-Sept-2013 | 21-Oct-2013 | 351413 | Granted |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | European Community | 001384317-0001 | 13-Sep-2013 | 13-Sep-2013 | 001384317-0001 | Granted |

7

| TITLE | OWNER | COUNTRY | APPLICATION NO. | FILE DATE | ISSUE DATE | PATENT NO. | STATUS |
|---|---|---|---|---|---|---|---|
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | China (People's Republic) | 201330443790.7 | 16-Sep-2013 | 14-May-2014 | ZL201330443790.7 | Granted |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | India | 256436 | 13-Sep-2013 | | | Pending |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | Japan | 2013-021312 | 13-Sep-2013 | | | Pending |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | USA | 29/448824 | 14-Mar-2013 | | | Pending |
| WRISTWATCH HAVING ROTATABLE CROWN AND CROWN CAP | Advance Watch Company Ltd. | USA | 14/221876 | 21-Mar-2014 | | | Pending |
| WATCH CASE | Sunburst Products, Inc. | USA | 29/127486 | 04-Aug-2000 | 05-Jun-2001 | D443221 | Granted |
| WATCH CASE | Sunburst Products, Inc. | USA | 29/127487 | 04-Aug-2000 | 12-Jun-2001 | D443527 | Granted |

Trademarks:

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Argentina | ADVANCE CLASSIC | Advance Watch Company, Ltd. | 2554827 | 16-Nov-2004 | 2090769 | 06-Jun-2006 | Registered | 06-Jun-2016 |
| Argentina | ADVANCE LTD | Advance Watch Company, Ltd. | 2554828 | 16-Nov-2004 | 2090771 | 06-Jun-2006 | Registered | 06-Jun-2016 |
| Argentina | AQUATECH | Advance Watch Company, Ltd. | 2554826 | 16-Nov-2004 | 2090768 | 06-Jun-2006 | Registered | 06-Jun-2016 |
| Argentina | EZ READ | Advance Watch Company, Ltd. | 2555098 | 17-Nov-2004 | 2149525 | 28-Mar-2007 | Registered | 28-Mar-2017 |
| Argentina | SHARK TOOTH | Sunburst Products, Inc. | 3368742 | 18-Nov-2014 | | | Pending | |
| Australia | ADVANCE | Advance Watch Company, Ltd. | 516923 | 11-Aug-1989 | A516,923 | 04-Nov-1991 | Registered | 11-Aug-2016 |

8

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Australia | **FREE STYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 433,074 | 12-Sep-1985 | A433,074 | 12-Sep-1985 | Registered | 12-Sep-2016 |
| Australia | **FREESTYLE** | Sunburst Products, Inc. | 433073 | 12-Sep-1985 | 433073 | 04-Aug-1988 | Registered | 12-Sep-2016 |
| Australia | **FYI** | Advance Watch Company, Ltd. | 1539093 | 05-Feb-2013 | 1539093 | 29-Oct-2014 | Registered | 05-Feb-2023 |
| Australia | **SHARK FIN DESIGN** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 630328 | 20-May-1994 | 630328 | 20-May-1994 | Registered | 20-May-2024 |
| Austria | **FREESTYLE** | Sunburst Products, Inc. | 174,858 | 31-Mar-1998 | 174,858 | 31-Mar-1998 | Registered | 31-Mar-2018 |
| Bahamas | **SHARK TOOTH** | Sunburst Products, Inc. | | 19-Dec-2014 | | | Pending | |
| Barbados | **SHARK TOOTH** | Sunburst Products, Inc. | | 31-Dec-2014 | | | Pending | |
| Belize | **SHARK TOOTH** | Sunburst Products, Inc. | | 11-Dec-2014 | | | Pending | |
| Benelux | **FREE STYLE** | Sunburst Products, Inc. | 435,452 | 21-May-1997 | 435,452 | 21-May-1997 | Registered | 21-May-2017 |
| Brazil | **2 COOL** | Advance Watch Company, Ltd. | 826810713 | 13-Aug-2004 | | | Pending | |
| Brazil | **AQUATECH** | Advance Watch Company, Ltd. | 826810705 | 13-Aug-2004 | 826810705 | 06-Nov-2007 | Registered | 06-Nov-2017 |
| Brazil | **AVANTI** | Advance Watch Company, Ltd. | 826810691 | 13-Aug-2004 | 826810691 | 20-Oct-2009 | Registered | 20-Oct-2019 |
| Brazil | **FREE STYLE (Stylized)** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 814626947 | 20-Dec-1988 | 814626947 | 13-Aug-1996 | Registered | 13-Aug-2016 |
| Brazil | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 829753680 | 09-Jun-2008 | 829753680 | 22-Feb-2012 | Registered | 22-Feb-2022 |

9

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Brazil | FYI | Advance Watch Company, Ltd. | 906268478 | 21-May-2013 | | | Published | |
| Brazil | FYI | Advance Watch Company, Ltd. | 908623844 | 19-Nov-2014 | | | Pending | |
| Brazil | PANACHE | Advance Watch Company, Ltd. | 826838774 | 25-Aug-2004 | 826838774 | 06-Nov-2007 | Registered | 06-Nov-2017 |
| Brazil | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 819223794 | 27-Mar-2001 | 819223794 | 27-Mar-2001 | Registered | 27-Mar-2021 |
| Brazil | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 829753745 | 09-Jun-2008 | 829753745 | 13-Sep-2011 | Registered | 13-Sep-2021 |
| Brazil | SHARK TOOTH | Sunburst Products, Inc. | 908641435 | 24-Nov-2014 | | | Published | |
| California | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | | | 104,154 | 25-Aug-1998 | Renewed | 25-Aug-2018 |
| Canada | ADRENALINE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 1380337 | 23-Jan-2008 | 788241 | 21-Jan-2011 | Registered | 21-Jan-2026 |
| Canada | ADVANCE | Advance Watch Company, Ltd. | 581130 | 31-Mar-1987 | 370,822 | 20-Jul-1990 | Registered | 20-Jul-2020 |
| Canada | ADVANCE TIME TECHNOLOGY | Advance Watch Company, Ltd. | 1479258 | 30-Apr-2010 | 861238 | 25-Sep-2013 | Registered | 25-Sep-2028 |
| Canada | AQUATECH | Advance Watch Company, Ltd. | 626551 | 02-Mar-1989 | 377,995 | 11-Jan-1991 | Registered | 11-Jan-2021 |
| Canada | AVANTI | Advance Watch Company, Ltd. | 601996 | 03-Mar-1988 | 370267 | 06-Jul-1990 | Registered | 06-Jul-2020 |
| Canada | FREE STYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 810,042 | 15-Apr-1996 | 487,971 | 21-Jan-1998 | Registered | 21-Jan-2028 |
| Canada | GC (Stylized) | Advance Watch Company, Ltd. | 1390081 | 04-Apr-2008 | 855574 | 18-Jul-2013 | Registered | 18-Jul-2028 |

10

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Canada | icvrd and Design | Advance Watch Company, Ltd. | 1537399 | 27-Jul-2011 | TMA888929 | 29-Oct-2014 | Registered | 29-Oct-2029 |
| Canada | JULES & JAMES | Advance Watch Company, Ltd. | 1509266 | 23-Dec-2010 | | | Published | 20-Sep-2015 |
| Canada | MAKE A FACE | Advance Watch Company, Ltd. | 1639271 | 13-Aug-2013 | | | Published | 13-Aug-2016 |
| Canada | NITRO | Advance Watch Company, Ltd. | 1501239 | 26-Oct-2010 | 806779 | 14-Sep-2011 | Registered | 14-Sep-2026 |
| Canada | PANACHE | Advance Watch Company, Ltd. | 1206107 | 11-Feb-2004 | 680331 | 25-Jan-2007 | Registered | 25-Jan-2022 |
| Canada | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 728,343 | 06-May-1993 | 444,553 | 30-Jun-1995 | Registered | 30-Jun-2025 |
| Canada | SHARK TOOTH | Sunburst Products, Inc. | 1703959 | 21-Nov-2014 | | | Pending | |
| Canada | SLUMBERBUG | Advance Watch Company, Ltd. | 1390080 | 04-Apr-2008 | 797362 | 12-May-2011 | Registered | 12-May-2026 |
| China | CONNECTEDEVICE | Advance Watch Company, Ltd. | 12186430 | 22-Feb-2013 | 12186430 | 07-Feb-2015 | Registered | 06-Feb-2025 |
| China | FREESTYLE | Sunburst Products, Inc. | 7175033 | 20-Jan-2009 | 7175033 | 21-Sep-2011 | Registered | 20-Sep-2021 |
| China | FREESTYLE with Chinese Characters and SHARK FIN DESIGN | Sunburst Products, Inc. | 3336249 | 15-Oct-2002 | 3336249 | 07-Apr-2009 | Registered | 06-Apr-2019 |
| China | FREESTYLE with Chinese Characters and SHARK FIN DESIGN | Sunburst Products, Inc. | 3336247 | 15-Oct-2002 | 3336247 | 07-Feb-2008 | Registered | 06-Feb-2018 |
| China | FYI | Advance Watch Company, Ltd. | 12186431 | 22-Feb-2013 | 12186431 | 14-Dec-2014 | Registered | 13-Dec-2024 |
| China | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 7175032 | 20-Jan-2009 | 7175032 | 21-Sep-2011 | Registered | 20-Sep-2021 |

11

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| China | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 7175031 | 20-Jan-2009 | 7175031 | 21-Sep-2010 | Registered | 20-Sep-2020 |
| Colombia | SHARK TOOTH | Sunburst Products, Inc. | 14264884 | 02-Dec-2014 | | | Published | |
| Costa Rica | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-003565 | 18-Apr-2008 | 182887 | 05-Dec-2008 | Registered | 05-Dec-2018 |
| Costa Rica | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-003564 | 18-Apr-2008 | 182716 | 21-Nov-2008 | Registered | 21-Nov-2018 |
| Costa Rica | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-003563 | 18-Apr-2008 | 182715 | 21-Nov-2008 | Registered | 21-Nov-2018 |
| Costa Rica | SHARK TOOTH | Sunburst Products, Inc. | 20140111035 | 17-Dec-2014 | | | Pending | |
| CTM | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 7304413 | 10-Oct-2008 | 7304413 | 13-Oct-2011 | Registered | 10-Oct-2018 |
| CTM | FYI | Advance Watch Company, Ltd. | 11545183 | 05-Feb-2013 | 11545183 | 28-Jun-2013 | Registered | 05-Feb-2023 |
| CTM | icvrd and Design | Advance Watch Company, Ltd. | 10159747 | 28-Jul-2011 | 10159747 | 08-Dec-2011 | Registered | 28-Jul-2021 |
| CTM | NIGHT VISION | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 752469 | 19-Feb-1998 | 752469 | 16-Jun-1999 | Registered | 19-Feb-2018 |
| CTM | SHARK | Sunburst Products, Inc. | 253,112 | 03-May-1996 | 253,112 | 22-Sep-1998 | Registered | 03-May-2016 |

12

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| CTM | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 6811996 | 09-Apr-2008 | 6811996 | 20-Jan-2009 | Registered | 09-Apr-2018 |
| CTM | SHARK TOOTH | Sunburst Products, Inc. | 013477369 | 20-Nov-2014 | | | Opposed | |
| Dominican Republic | SHARK TOOTH | Sunburst Products, Inc. | 201435635 | 12-Dec-2014 | | | Pending | |
| France | FREE STYLE | Sunburst Products, Inc. | 641,106 | 20-May-1987 | 1,409,671 | 13-Nov-1987 | Registered | 20-May-2017 |
| France | FREE STYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 1217342 | 14-Aug-1992 | 1217342 | 28-Sep-1992 | Registered | 29-Sep-2022 |
| France | SHARK TOOTH | Sunburst Products, Inc. | 14/4135225 | 20-Nov-2014 | 14/4135225 | 13-Mar-2015 | Registered | 20-Nov-2024 |
| Germany | AFFINITY | Advance Watch Company, Ltd. | 30458799.0 | 13-Oct-2004 | 30458799 | 23-Nov-2004 | Registered | 13-Oct-2024 |
| Germany | FREE STYLE | Sunburst Products, Inc. | 397 11 407.9 | 31-Mar-1997 | 39711407 | 25-Feb-2000 | Registered | 31-Mar-2017 |
| Germany | SWERVE | Advance Watch Company, Ltd. | 30458798.2 | 13-Oct-2004 | 30458798 | 23-Nov-2004 | Registered | 31-Oct-2024 |
| Germany | WHIZ KIDS | Advance Watch Company, Ltd. | 30458800.8 | 13-Oct-2004 | 30458800 | 23-Nov-2004 | Registered | 13-Oct-2024 |
| Greece | FREE STYLE | Sunburst Products, Inc. | 133741 | 02-Jul-1997 | 133741 | 17-Nov-1999 | Registered | 02-Jul-2017 |
| India | FYI | Advance Watch Company, Ltd. | 2502139 | 25-Mar-2013 | | | Pending | |
| India | FYI | Advance Watch Company, Ltd. | 2645253 | 18-Dec-2013 | | | Pending | |
| Italy | FREE STYLE | Sunburst Products, Inc. | 499,591 | 04-Jun-1987 | 1276485 | 09-Nov-1988 | Registered | 04-Jun-2017 |
| Italy | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | RM2010C004146 | 25-Jun-2010 | 1423551 | 24-Feb-2011 | Registered | 25-Jun-2020 |

13

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Jamaica | SHARK TOOTH | Sunburst Products, Inc. | 66128 | 12-Dec-2014 | | | Pending | |
| Japan | CONNECTEDEVICE | Advance Watch Company, Ltd. | 2013-011011 | 19-Feb-2013 | 5606589 | 09-Aug-2013 | Registered | 09-Aug-2023 |
| Japan | FREE STYLE | Sunburst Products, Inc. | 2,495,556 | 29-Jan-1993 | 2,495,556 | 29-Jan-1993 | Registered | 29-Jan-2023 |
| Japan | FREE STYLE in Katakana | Sunburst Products, Inc. | 1,344,958 | 29-Sep-1998 | 1,344,958 | 29-Sep-1998 | Registered | 29-Sep-2018 |
| Japan | FYI | Advance Watch Company, Ltd. | 2013-011010 | 19-Feb-2013 | 5598680 | 12-Jul-2013 | Registered | 12-Jul-2023 |
| Japan | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2,529,554 | 28-Apr-1993 | 2,529,554 | 28-Apr-1993 | Registered | 28-Apr-2023 |
| Japan | SHARK FIN DESIGN | Sunburst Products, Inc. | 2008-029372 | 15-Apr-2008 | 5180897 | 14-Nov-2008 | Registered | 14-Nov-2018 |
| Japan | SHARK TOOTH | Sunburst Products, Inc. | 2014099168 | 25-Nov-2014 | 5751505 | 20-Mar-2015 | Registered | 20-Mar-2025 |
| Korea | FREESTYLE | Sunburst Products, Inc. | 40-2013-84520 | 17-Dec-2013 | 40-1064419 | 14-Oct-2014 | Registered | 14-Oct-2024 |
| Mexico | 2 COOL | Advance Watch Company, Ltd. | 687598 | 12-Nov-2004 | 865120 | 10-Jan-2005 | Registered | 12-Nov-2024 |
| Mexico | ADVANCE | Advance Watch Company, Ltd. | 8122 | 14-Apr-1986 | 331,079 | 14-Apr-1986 | Registered | 14-Apr-2026 |
| Mexico | ADVANCE LTD | Advance Watch Company, Ltd. | 687599 | 12-Nov-2004 | 865121 | 10-Jan-2005 | Registered | 12-Nov-2024 |
| Mexico | AQUALITE | Advance Watch Company, Ltd. | 923032 | 27-Mar-2008 | 1036046 | 21-Apr-2008 | Registered | 27-Mar-2018 |
| Mexico | AQUATECH | Advance Watch Company, Ltd. | 687597 | 12-Nov-2004 | 865119 | 10-Jan-2005 | Registered | 12-Nov-2024 |
| Mexico | BNY | Advance Watch Company, Ltd. | 954848 | 14-Aug-2008 | 1103586 | 04-Jun-2009 | Registered | 14-Aug-2018 |
| Mexico | DURANGO | Advance Watch Company, Ltd. | 1099759 | 25-Jun-2010 | 1168885 | 15-Jul-2010 | Registered | 25-Jun-2020 |
| Mexico | FOXY | Advance Watch Company, Ltd. | 923031 | 27-Mar-2008 | 1036045 | 21-Apr-2008 | Registered | 27-Mar-2018 |
| Mexico | FREESTYLE | Sunburst Products, Inc. | 151,364 | 02-Oct-1992 | 659,825 | 02-Oct-1992 | Registered | 02-Oct-2022 |

14

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Mexico | GC (Stylized) | Advance Watch Company, Ltd. | 925856 | 10-Apr-2008 | 1051824 | 31-Jul-2008 | Registered | 10-Apr-2018 |
| Mexico | GENEVA ART KLOK | Advance Watch Company, Ltd. | 1403665 | 15-Aug-2013 | 1458369 | 29-May-2014 | Registered | 15-Aug-2023 |
| Mexico | icvrd and Design | Advance Watch Company, Ltd. | 1199396 | 01-Aug-2011 | 1262191 | 24-Jan-2012 | Registered | 01-Aug-2021 |
| Mexico | LTD | Advance Watch Company, Ltd. | 1202494 | 11-Aug-2011 | 1260429 | 13-Jan-2012 | Registered | 11-Aug-2021 |
| Mexico | MAKE A FACE | Advance Watch Company, Ltd. | 1403661 | 15-Aug-2013 | 1445258 | 31-Mar-2014 | Registered | 15-Aug-2023 |
| Mexico | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 151,365 | 02-Oct-1992 | 539,626 | 07-Jan-1997 | Registered | 02-Oct-2022 |
| Mexico | SHARK TOOTH | Sunburst Products, Inc. | 1552647 | 26-Nov-2014 | 1515454 | 20-Feb-2015 | Registered | 26-Nov-2024 |
| Mexico | SLUMBERBUG | Advance Watch Company, Ltd. | 925855 | 10-Apr-2008 | 1051405 | 30-Jul-2008 | Registered | 10-Apr-2018 |
| New Zealand | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 787544 | 14-Apr-2008 | 787544 | 16-Oct-2008 | Registered | 14-Apr-2018 |
| New Zealand | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 787257 | 09-Apr-2008 | 787257 | 13-Aug-2009 | Registered | 09-Apr-2018 |
| Nicaragua | FREESTYLE | Sunburst Products, Inc. | 2014004294 | 18-Nov-2014 | | | Pending | |
| Nicaragua | SHARK TOOTH | Sunburst Products, Inc. | 2014004434 | 01-Dec-2014 | | | Pending | |
| Panama | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 176881 | 12-Nov-2008 | 176881 | 23-Jul-2009 | Registered | 12-Nov-2018 |
| Panama | SHARK | | 176882 | 12-Nov-2008 | 176882 | 12-Nov-2008 | Registered | 12-Nov-2018 |

15

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Panama | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 176883 | 12-Nov-2008 | 176883 | 23-Jul-2009 | Registered | 12-Nov-2018 |
| Panama | SHARK TOOTH | Sunburst Products, Inc. | 23747001 | 29-Dec-2014 | | | Pending | |
| Paraguay | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 6536/2009 | 02-Mar-2009 | | | Pending | |
| Peru | FREESTYLE | Sunburst Products, Inc. | 0355576-2008 | 30-May-2008 | 143111 | 17-Sep-2008 | Registered | 17-Sep-2018 |
| Peru | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 036733 | 15-Apr-1997 | 039643 | 26-Sep-1997 | Registered | 26-Sep-2017 |
| Peru | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 0355577-2008 | 30-May-2008 | 144027 | 09-Oct-2008 | Registered | 09-Oct-2018 |
| Peru | SHARK FREESTYLE and Shark Fin Design | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 487054 | 16-Mar-2012 | 189011 | 18-Jun-2012 | Registered | 18-Jun-2022 |
| Peru | SHARK TOOTH | Sunburst Products, Inc. | 5989782014 | 05-Dec-2014 | 00222727 | 26-Mar-2015 | Registered | 26-Mar-2025 |
| Philippines | SHARK TOOTH | Sunburst Products, Inc. | 42014014359 | 19-Nov-2014 | | | Allowed | 09-Jul-2015 |
| Singapore | FREE STYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 5691/83 | 28-Oct-1994 | 56911/83 | 28-Oct-1994 | Registered | 28-Oct-2024 |
| Singapore | FREESTYLE | Sunburst Products, Inc. | T97/03188A | 20-Mar-1997 | T97/03188A | 20-Mar-1997 | Registered | 20-Mar-2017 |
| South Africa | FREE STYLE | Sunburst Products, Inc. | 97/3990 | 14-Mar-1997 | 1997/03990 | 14-Mar-1997 | Registered | 14-Mar-2017 |

16

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| South Africa | **FREE STYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 97/3991 | 14-Mar-1997 | 1997/03991 | 14-Mar-1997 | Registered | 14-Mar-2017 |
| South Africa | **SHARK** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 97/3992 | 14-Mar-1997 | 97/3992 | 14-Mar-1997 | Registered | 14-Mar-2017 |
| South Africa | **SHARK TOOTH** | Sunburst Products, Inc. | 201432005 | 24-Nov-2014 | | | Pending | |
| UAE | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 119136 | 14-Sep-2008 | 164708 | 22-Feb-2012 | Registered | 14-Sep-2018 |
| UAE | **SHARK** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 119135 | 14-Sep-2008 | 164709 | 22-Feb-2012 | Registered | 14-Sep-2018 |
| UAE | **SHARK TOOTH** | Sunburst Products, Inc. | 226098 | 02-Feb-2015 | | | Pending | |
| UK | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2499890 | 10-Oct-2008 | 2499890 | 01-May-2009 | Registered | 10-Oct-2018 |
| Uruguay | **SHARK TOOTH** | Sunburst Products, Inc. | 460253 | 19-Nov-2014 | | | Pending | |
| US | **ADRENALINE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/413206 | 02-Jan-1998 | 2358207 | 13-Jun-2000 | Registered | 13-Jun-2020 |
| US | **ADVANCE** | Advance Watch Company, Ltd. | 73/079824 | 11-Mar-1976 | 1070973 | 09-Aug-1977 | Registered | 09-Aug-2017 |
| US | **ADVANCE TIME TECHNOLOGY** | Advance Watch Company, Ltd. | 77/919310 | 25-Jan-2010 | 3936428 | 29-Mar-2011 | Registered | 29-Mar-2021 |
| US | **AQUALITE** | Advance Watch Company, Ltd. | 75/002033 | 05-Oct-1995 | 1998355 | 03-Sep-1996 | Registered | 03-Sep-2016 |

17

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---------|-----------|-------|---------|-------------|---------|----------|--------|-------------|
| US | **AQUATECH** | Advance Watch Company, Ltd. | 73/759275 | 24-Oct-1988 | 1542449 | 06-Jun-1989 | Registered | 06-Jun-2019 |
| US | **AVANTI** | Advance Watch Company, Ltd. | 73/634245 | 08-Dec-1986 | 1453155 | 18-Aug-1987 | Registered | 18-Aug-2017 |
| US | **CONNECT** | Advance Watch Company, Ltd. d/b/a Geneva Watch Group | 86/177431 | 28-Jan-2014 | 4732697 | 05-May-2015 | Registered | 05-May-2025 |
| US | **DIGI-TOUCH** | Advance Watch Company, Ltd. | 85/024910 | 28-Apr-2010 | | | Published | |
| US | **FIELD RANGER** | Advance Watch Company, Ltd. | 74/735783 | 29-Sep-1995 | 2159260 | 19-May-1998 | Registered | 19-May-2018 |
| US | **FREE STYLE** | Sunburst Products, Inc. | 73/446900 | 06-Oct-1983 | 1319293 | 12-Feb-1985 | Registered | 12-Feb-2025 |
| US | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/813941 | 05-Oct-1999 | 2562830 | 23-Apr-2002 | Registered | 23-Apr-2022 |
| US | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 86/552594 | 04-Mar-2015 | | | Pending | 11-Dec-2015 |
| US | **FYI** | Advance Watch Company, Ltd. | 85/751862 | 11-Oct-2012 | | | Allowed | 05-Nov-2015 |
| US | **GAME TIME** | Advance Watch Company, Ltd. | 77/201014 | 08-Jun-2007 | 3489779 | 19-Aug-2008 | Registered | 19-Aug-2018 |
| US | **GC and Design** | Advance Watch Company, Ltd. | 77/304064 | 15-Oct-2007 | 4215797 | 02-Oct-2012 | Registered | 02-Oct-2022 |
| US | **H HIP HOP and Design** | Advance Watch Company, Ltd. | 85/493571 | 13-Dec-2011 | 4266995 | 01-Jan-2013 | Registered | 01-Jan-2023 |
| US | **HYDRO PUSHERS** | Advance Watch Company, Ltd. d/b/a Geneva Watch Gro | 77/448206 | 15-Apr-2008 | 3755354 | 02-Mar-2010 | Registered | 02-Mar-2020 |
| US | **icvrd and Design** | Advance Watch Company, Ltd. | 85/267304 | 15-Mar-2011 | 4089062 | 17-Jan-2012 | Registered | 17-Jan-2022 |
| US | **JULES + JAMES** | Advance Watch Company, Ltd. | 85/116591 | 26-Aug-2010 | 4210628 | 18-Sep-2012 | Registered | 18-Sep-2022 |

18

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| US | LTD | Advance Watch Company, Ltd. | 74/495213 | 28-Feb-1994 | 1913219 | 22-Aug-1995 | Registered | 22-Aug-2015 |
| US | MAKE A FACE | Advance Watch Company, Ltd. | 86/031576 | 07-Aug-2013 | | | Allowed | |
| US | MAKO | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/335150 | 04-Aug-1997 | 2250895 | 08-Jun-1999 | Registered | 08-Jun-2019 |
| US | NITRO | Advance Watch Company, Ltd. | 85/182260 | 22-Nov-2010 | 4119335 | 27-Mar-2012 | Registered | 27-Mar-2022 |
| US | ORGANTICK | Advance Watch Company, Ltd. | 77/863759 | 03-Nov-2009 | 4056858 | 15-Nov-2011 | Registered | 15-Nov-2021 |
| US | QUICKTOUCH | Advance Watch Company, Ltd. | 77/967275 | 24-Mar-2010 | | | Opposed | |
| US | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 74/063824 | 29-May-1990 | 1640415 | 09-Apr-1991 | Registered | 09-Apr-2021 |
| US | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 74/375056 | 01-Apr-1993 | 1809077 | 07-Dec-1993 | Registered | 07-Dec-2023 |
| US | SHARK TIDE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/335059 | 04-Aug-1997 | 2578975 | 11-Jun-2002 | Registered | 11-Jun-2022 |
| US | SHARK TOOTH | Sunburst Products, Inc. | 86/452417 | 21-Nov-2014 | | | Published | |
| US | TIME READY TECHNOLOGY | Advance Watch Company, Ltd. | 77/437047 | 01-Apr-2008 | 3815024 | 06-Jul-2010 | Registered | 06-Jul-2020 |
| US | TOUCH&GO | Advance Watch Company, Ltd. | 85/001891 | 30-Mar-2010 | | | Published | |
| US | ULTIMATE | Advance Watch Company, Ltd. | 74/489548 | 14-Feb-1994 | 2018602 | 26-Nov-1996 | Registered | 26-Nov-2016 |
| US | ULTRATECH | Advance Watch Company, Ltd. | 75/738986 | 29-Jun-1999 | 2422222 | 16-Jan-2001 | Registered | 16-Jan-2021 |
| Venezuela | FREESTYLE | Sunburst Products, Inc. | 2008-021598 | 03-Nov-2008 | P305651 | 06-Oct-2010 | Registered | 06-Oct-2025 |

19

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Venezuela | **SHARK FIN DESIGN** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-021600 | 03-Nov-2008 | P311764 | 10-Nov-2011 | Registered | 10-Nov-2026 |
| Venezuela | **SHARK TOOTH** | Sunburst Products, Inc. | 2014-017603 | 14-Nov-2014 | | | Pending | |

20

## SCHEDULE 1.1(c)

### Purchased Contracts

1. Omnibus License Agreement Renewal, dated as of January 1, 2012, by and among Advance Watch Company Ltd., Kenneth Cole Productions (LIC), and Kenneth Cole Productions, Inc.

2. Trademark License Agreement, dated as of March 12, 2009, by and between Advance Watch Company Ltd. and Tommy Bahama Group, Inc., as extended by that certain Extension of Trademark License Agreement for Renewal Period dated September 11, 2012, as amended by that certain First Amendment to Trademark License Agreement dated March 22, 2012, as further amended by that certain Second Amendment to Trademark License Agreement dated May 5, 2015.

3. License Agreement, dated as of November 7, 2007, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker, as amended by that certain First Amendment to License Agreement dated as of January 1, 2012, as further amended by that certain Second Amendment to License Agreement dated as of February 23, 2015.

4. Commercial Street Contribution Agreement, dated December 19, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker.

5. License Agreement, dated as of August 10, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Christian Casey L.L.C.

6. Retail Product License Agreement, dated as of August 7, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NBA Properties, Inc., as amended by that certain First Amendment to Retail Product License Agreement dated August 24, 2014.

7. License Agreement, dated as of April 1, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NFL Properties LLC.

8. Retail License Agreement, dated July 18, 2013, by and among Advance Watch Company Ltd. d/b/a Game Time LLC, NHL Enterprises, L.P. and NHL Enterprises Canada, L.P.

9. Standard Retail Product License Agreement, dated as of July 13, 2012, by and between Advance Watch Company Ltd. and Collegiate Licensing Company, as amended by that certain Addendum dated December 18, 2014.

10. Trademark License Agreement, dated as of May 22, 2012, by and between Advance Watch Company Ltd. and Michigan State University.

11. License Agreement, dated as of September 1, 2011, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group, Sperry Top-Sider LLC and SR Holdings,

LLC, as amended by that certain First Amendment to License Agreement dated December __, 2014.

12. License Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Steve Harvey Products, Inc./ Steve Harvey.

13. Letter Agreement, dated as of _____, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and US Lacrosse, Inc.

14. License Agreement, dated as of April 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Soccer United Marketing, LLC.

15. Distribution Agreement, dated as of May 1, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Arista Singapore Pte Ltd.

16. Distribution Agreement, dated as of September 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Carmen Jewelers.

17. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and GDL Manufacturing Ltd.

18. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Global Tic Sales Inc.

19. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Priority Marketing PVT. Ltd.

20. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Timestore AG.

21. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Chronosoft PTE LTD.

22. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CNB Distributors, LLC.

23. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Comercializadora E-Akluck, S.A. de C.V.

24. Distribution Agreement, dated as of March 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Marlox AG.

25. Distribution Agreement, dated as of November 6, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Merkez Saat Tic.A.S.

26. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New City, Inc.

27. Distribution Agreement, dated as of June 15, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New Sense Development Ltd.

28. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and PT. Sukses Sinar Abadi.

29. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

30. Distribution Agreement, dated as of September 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

31. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and TBN Time Distribution LLC.

32. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Time Deco Corporation Limited.

33. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Paidel Watch Co., Ltd.

34. Distribution Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Styleright Global Corporation.

35. Letter Agreement, dated June 13, 2013, by and among Advance Watch Company Ltd., Kenneth Cole Productions, Inc. and Wells Fargo Bank, National Association.

36. Credit Agreement, dated as of June 21, 2013, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, Sunburst Products, Inc., GWG International, Ltd., Binda USA Holdings, Inc., Wells Fargo Bank, National Association, and the Lenders that are parties thereto, as amended by that certain Amendment No. 1 to Credit Agreement dated as of June 30, 2014, as amended by that certain Amendment No. 2 to Credit Agreement dated as of August 17, 2015.

37. Standard Vendor Agreement for Merchandise, dated February 24, 2015, by and between Geneva Watch Group and Boscov's Department Store, LLC.

38. Vendor Agreement, dated _____, 2014, by and between Advance Watch Company Ltd. and Helzberg's Diamond Shops, Inc.

39. Amazon Vendor Terms and Conditions effective March 21, 2015 for various brands.

40. Freight Allowance Agreement No. 7409330, dated on or around April 1, 2015, by and between Geneva Clock Company and Amazon Fulfillment Services, Inc.

41. Freight Allowance Agreement No. 7178800, dated on or around April 1, 2015, by and between Breil Milano and Amazon Fulfillment Services, Inc.

42. Trading Terms Agreement, dated February 1, 2014, by and between Geneva Watch Group and The Nuance Group.

43. Letter Agreement regarding Acquisition of "Mathey Tissot" Trademark, dated March 11, 1996, by and among Geneva Watch Company, Mathey Tissot International, Ltd. and Mathey Tissot S.A.

44. Letter Agreement regarding Agreement regarding Mathey Tissot Watch Product, dated May 16, 1996, by and among Geneva Watch Company, JBM Venture Co., Inc. and Jan Bell Marketing, Inc.

45. Letter Agreement regarding grant of license, dated August 17, 2015, by and among Geneva Watch Group and LaCrosse Technology.

46. Agreement, dated August 26, 2015, by and among Advance Watch Company (Far East) Limited, Advance Watch Company Ltd., Wells Fargo Bank, National Association, Koo Chi Sum and Yen Ching Wai, David c/o Ernst and Young Transactions Limited.

47. Irrevocable Transferable Standby Letter of Credit, dated August 19, 2015, by and among Israel Discount Bank of New York and Allura Imports, Inc.

Real Property Leases:

48. Lease Agreement, dated as of September 6, 2001, by and between Advance Watch Company Limited and Ashley Canton, LLC, as amended by that certain First Amendment dated April 15, 2002, as further amended by that certain Second Amendment dated May 28, 2002, that certain Third Amendment dated June 18, 2006, that certain Fourth Amendment dated March 8, 2010, and that certain Fifth Amendment to Lease dated March 26, 2013, as assigned by landlord to 47440 Michigan Ave, LLC.

49. Lease, dated February 18, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and 1407 Broadway Real Estate, LLC, as assigned by landlord to SRI Eleven 1407 Broadway Operator, LLC.

50. Sublease Agreement, dated January 30, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Allura Imports, Inc.

51. Multi-Tenant Building Lease, dated May 1, 2009, by and between Advance Watch Company Ltd. and C.J. Segerstrom & Sons, as amended by that certain First Amendment of Lease Agreement dated May 22, 2012, and by that certain Second Amendment of Lease Agreement dated July 28, 2015.

52. Renewal Lease Form, dated July 10, 2015, by and between Binda USA Holdings Inc. and Columbus 60th Realty LLC.

9942447-v6

<u>Personal Property Leases</u>:

53. Lease Agreement, dated July 21, 2014, by and between Advance Watch Company Ltd. and CIT Finance LLC.

54. Lease Agreement, dated July 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CIT Finance LLC.

55. Lease Agreement (Lease No. 001-007914733-002), dated August 5, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

56. Lease Agreement (Lease No. 001-007914733-003), dated September 8, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

57. ValuePlan Lease Agreement, dated March 16, 2015, by and between Geneva Watch Group and IBM Credit LLC.

58. Lease Agreement, dated May 28, 2013, by and between Advance Watch Company Ltd. and LDI Color Toolbox.

## SCHEDULE 1.1(d)

## Purchased Intellectual Property

All Intellectual Property and related Software and Technology of the Sellers relating to the Business, including, without limitation, those items set forth on Schedule 1.1(a).

9942447-v6

## SCHEDULE 2.1

## Additional Purchased Assets

None.

## SCHEDULE 2.1(r)

### Critical Trade Vendors

BROADVIEW NETWORKS

CHANG SHENG DA ENTERPRISE DEVE

DISPLAY & PACKAGING LIMITED

DOUG BROWN PACKAGING PRODUCTS

FEDEX

FEDEX FREIGHT

FEDEX TRUCKLOAD BROKERAGE

GLOBAL EXCHANGE SERVICES

HGC

INNOVATION INDUSTRIAL LTD.

INTELIGENCIA INC

INTERNATIONAL PACKAGING

JBC PLATFORM

JOLLY COME INTERNATIONAL LIMITED

KELVIN PRECISION PRODUCTS CO.,

NATIONALPAK LTD

PAC TEAM AMERICA, INC

PERFECT PRODUCTS CO LTD

PITNEY BOWES CREDIT CORP

PRECISION TIME

PRIME TIME INTERNATIONAL LIMITED

QUALIPAK MANUFACTURING LIMITED

RIVER RUN NETWORK

STINGMARS LIMITED

SUN'S UNION WATCH MANUFACTURER

TMH SECURITY SERVICE INCORPORATED

TOLL GLOBAL FORWARDING USA INC

X O COMMUNICATIONS

**SCHEDULE 2.2**

**Additional Excluded Assets**

None.

9942447-v6

**SCHEDULE 2.3(a)**

**Assumed Liabilities**

None.

9942447-v6

## SCHEDULE 5.7

### Litigation

1. **Tissot SA**: Tissot SA opposed Advance Watch Company Ltd.'s trademark application, Serial #: 85024910, with the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Case No.: 91197947-OPP, filed December 21, 2010.

2. **Staffing Network, LLC**: Staffing Network, LLC brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Staffing Network, LLC v. Advance Watch Company Ltd.,* Circuit Court of Cook County, Illinois, Case No.: 2015L007893.

3. **Aura Merchandising, Ltd.**: Aura Merchandising, Ltd. brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Aura Merchandising, Ltd. v. Advance Watch Company Ltd. d/b/a Geneva Watch Group*, Supreme Court of the State of New York, Index No.: 158041/2015, filed August 6, 2015.

4. **Talenthub Worldwide, Inc.**: Talenthub Worldwide, Inc. brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Talenthub Worldwide, Inc. v. Advance Watch Company Ltd., d/b/a Geneva Watch Group*, Supreme Court of the State of New York, Index No.: 157647/2015, filed July 27, 2015.

5. **LHI Liquidation Co., Inc.**: LHI Liquidation Co., Inc. brought a preference claim against Geneva Watch Group Inc., captioned *Peter S. Kravitz, Litigation Trustee For the LHI Liquidation Co., Inc. et al. Litigation Trust v. Geneva Watch Group, Inc.*, United States Bankruptcy Court, Southern District of New York, Case No.: 13-14050 (MG).

6. **Noreen Deleon-Moreno**: Noreen Deleon-Moreno brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Noreen Deleon-Moreno v. Advance Watch Company Ltd., d/b/a Geneva Watch Group*, Civil Court of the City of New York, County of New York, Index No.: CV-019130-15/NY.

7. **KMJ Brand Holdings LLC**: A judgment was issued against Advance Watch Company Ltd., d/b/a Geneva Watch Company, captioned *KMJ Brand Holdings LLC v. Advance Watch Company Ltd., d/b/a Geneva Watch Company*, Supreme Court of the State of New York, Index No.: 159367/2015, filed September 18, 2015.

9942447-v6

**SCHEDULE 5.12**

**Tax**

None.

## SCHEDULE 5.13

### Employee Benefit Plans

401(K) Plan

Medical Insurance provided through CIGNA

Dental Insurance provided through CIGNA

Vision Service Plan provided through CIGNA

Basic Life Insurance & Accidental Death & Dismemberment provided through CIGNA

Voluntary Life Insurance provided through CIGNA

Long Term Disability Insurance provided through CIGNA

Short Term Disability Insurance provided through CIGNA

Flexible Spending Accounts provided through ADP

Health Savings Accounts

The Company has a Compensated Time Off Allowance that provides each employee a number of paid days off, ranging between ten (10) and twenty-five (25), each calendar year depending on length of service with the Company.

The Company has ten (10) paid holidays scheduled each calendar year.

## SCHEDULE 5.14(a)

### Labor Matters

None.

## SCHEDULE 5.14(e)

## Employment and Consulting Agreements

Consultant Agreement between the Company and Gary Bollinger.

Consultant Agreement between the Company and Peter Leung.

**SCHEDULE 9.1(f)**

**Cure Amounts**

The aggregate Cure Amount (exclusive of "Common Area Maintenance" adjustments for the applicable lease year in which the Closing occurs pursuant to the terms of Real Property Leases that are Purchased Assets) of the Purchased Contracts set forth on <u>Schedule 1.1 (c)</u> is $500,000.

## **Schedule 9.1(j)**

- Kenneth Cole
- Ted Baker
- Tommy Bahama
- Sperry
- Sean John
- The sports league licenses associated with the Game Time brand.

## **EXHIBIT 3**

**The Auction Notice**

Jeffrey S. Sabin                         Andrew J. Currie (to be admitted *pro hac vice*)
Rishi Kapoor                             VENABLE LLP
VENABLE LLP                              575 7th Street, NW
1270 Avenue of the Americas              Washington, DC 20004
New York, New York 10020                 Telephone:  (202) 344-4000
Telephone:    (212) 307-5500             Facsimile:  (202) 344-8300
Facsimile:    (212) 307-5598

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                         :
In re:                                   :    Chapter 11
                                         :
ADVANCE WATCH COMPANY LTD., et al.,      :    Case No. 15-_____ (___)
                                         :
            Debtors.[1]                  :    (Joint Administration Requested)
                                         :
------------------------------------------------------------ x

**NOTICE OF SALE AND SOLICITATION OF BIDS TO ACQUIRE**
**CERTAIN OF THE DEBTORS' ASSETS, TERMS, AND**
**CONDITIONS OF BIDDING PROCEDURES AND ASSUMPTION AND**
**ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

1.     Binda USA Holdings, Inc., Advance Watch Company Ltd., Sunburst Products, Inc.,

and GWG International, Ltd., the debtors and debtors-in-possession (collectively, the "**Debtors**")

have entered into an Asset Purchase Agreement (the "**Stalking Horse Agreement**") in the form

attached as **Exhibit 2** to the Bidding Procedures Order (defined below), by and among the Debtors

and Sunshine Time Inc. (the "**Stalking Horse Bidder**"), to sell certain assets of the Debtors (the

"**Assets**") including, but not limited to (i) accounts receivable; (ii) inventory; (iii) furniture,

fixtures, and equipment; (iv) intellectual property (including patents, copyrights, trademarks, trade

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

secrets, and proprietary information); (v) goodwill; (vi) certain executory contracts (including executory agreements and licenses) and lease real property interests (collectively "**Assigned Agreements**") that are to be assumed by the Debtors and assigned to the Stalking Horse Bidder; (vii) documents; and et cetera as further defined in the Stalking Horse Agreement.  The purchase price (the "**Purchase Price**") for the Assets shall be $15,000,000 in cash less any Cure Amounts (defined below) in excess of $500,000, plus the assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement), and payment of all Cure Amounts (defined below).

2.       The Debtors are inviting bids on the Assets.  The Bankruptcy Court has entered an order (the "**Bidding Procedures Order**") approving the auction and sale process (the "**Bidding Procedures**") for the Assets.[2]

3.       The Debtors propose to: (i) sell the Assets free and clear of all liens, claims, or encumbrances thereon (except for certain assumed liabilities and permitted exceptions, if any, specifically described in the Stalking Horse Agreement or an agreement with another Successful Bidder); and (ii) assume and assign the Assigned Agreements as described in the Stalking Horse Agreement or an agreement with another Successful Bidder.  Copies of the Stalking Horse Agreement are available for free by (i) sending a written request to the Debtors' claims and noticing agent, Epiq Bankruptcy Solutions, LLC, 777 Third Avenue, Third Floor, New York, New York 10017 (Attn:    Pamela    Corrie)    or    (ii)    by    accessing    Epiq's    website (www.epiqsystems.com/bankruptcy/chapters-9-11-15-bankruptcy/).  On _____, the Debtors filed a schedule of cure obligations (the "**Cure Schedule**") for all potential Assigned Agreements [Docket No. ___].  The Cure Schedule includes a description of each of the Debtors' contracts and leases potentially to be assumed and assigned under the Stalking Horse Agreement and the amount,

---

[2]      A copy of the Bidding Procedures is attached hereto as **Exhibit 1**.  A copy of the Bidding Procedures Order can be obtained for free from Epiq Bankruptcy Solutions, LLC at the address and website indicated, above.

9955594v1

if any, the Debtors believe is necessary to cure such agreements pursuant to § 365 of the Bankruptcy Code.  A copy of the Cure Schedule, together with a copy of the Assumption and Assignment Notice, was served on each of the nondebtor parties listed on the Cure Schedule by first class mail on _____.

4.    The Bankruptcy Court has scheduled an auction of the Assets (the "**Auction**") for **November 9, 2015 at 9:00 a.m. (Eastern Time) at Otterbourg, Steindler, Houston & Rosen, P.C., 230 Park Avenue, New York, New York 10169**, or such other time or such other place as the Debtors shall designate upon notice to all Qualified Bidders who have submitted Qualified Bids.  All interested parties are invited to submit a qualifying bid to acquire the Assets.

5.    A hearing to approve the sale of the Assets to the Stalking Horse Bidder or a Successful Bidder other than the Stalking Horse Bidder is scheduled to be conducted on **November 10, 2015, at ___:_____ __.m. (Eastern Time)**.

6.    Any party seeking to (i) object to the validity of the Cure Amount as determined by the Debtors or otherwise assert that any other amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the Purchased Contracts and Real Property Leases (the "**Assigned Agreements**") in order for such lease to be assumed and assigned or (ii) object to the assumption and assignment of any Assigned Agreements on any other basis (including but not limited to, objections to adequate assurance of future performance), must file a written objection (an "**Assumption/Assignment Objection**") with the Bankruptcy Court setting forth the cure amount the objector asserts to be due, and the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment and the support therefor, so that such objection is filed with the Court no later than **5:00 p.m. (Eastern Time) on November 9, 2015** (the "**Assumption/Assignment Objection Deadline**), and such objection shall also be served so the

3

same is actually received on or before the Assumption/Assignment Objection Deadline by (i) proposed counsel to the Debtors, Venable, LLP at <u>both</u> Rockefeller Center, 1270 Avenue of the Americas, Twenty-Fourth Floor, New York, New York 10020 (Attn: Rishi Kapoor, Esq.) and 575 7th Street, NW, Washington, D.C. 20004 (Attn: Andrew J. Currie, Esq.) and (ii) proposed counsel to the Committee (collectively, the "**Notice Parties**").

7.       Objections to approval of the Sale, including the sale of Assets free and clear of liens, claims, encumbrances, and interests, must be in writing, state the basis of such objection with specificity, and be filed with the Court and served so as to be received by the Notice Parties on or before **November 9, 2015 at 5:00 p.m. (Eastern Time)**.

8.       The Sale Hearing (at which the Court will consider approval of the proposed Sale) may be adjourned, from time to time, without further notice to creditors or parties in interest other than by announcement of the adjournment in open court or on the Court's calendar.

*[Remainder of page left intentionally blank]*

4

Dated:  New York, New York
         _____ ___, 2015

                            Respectfully submitted,

                            VENABLE LLP

By:  _____
        Jeffrey S. Sabin
        Rishi Kapoor
        1270 Avenue of the Americas, 24th Floor
        New York, New York 10020
        Telephone: (212) 307-5500
        Facsimile: (212) 307-5598
        jssabin@venable.com
        rkapoor@venable.com

                - and -

        Andrew J. Currie (to be admitted *pro hac vice*)
        575 7th Street, NW
        Washington, DC 20004
        Telephone: (202) 344-4000
        Facsimile: (202) 344-8300
        ajcurrie@venable.com

        *Proposed Counsel to the Debtors*
        *and Debtors in Possession*

9955594v1

## EXHIBIT 4

**The Assumption and Assignment Notice**

Jeffrey S. Sabin
Rishi Kapoor
VENABLE LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 307-5500
Facsimile:    (212) 307-5598

Andrew J. Currie (to be admitted *pro hac vice*)
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
Telephone: (202) 344-4000
Facsimile: (202) 344-8300

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x
                                                                :
In re:                                                          :     Chapter 11
                                                                :
ADVANCE WATCH COMPANY LTD., et al.,                             :     Case No. 15-_____ (___)
                                                                :
                      Debtors.[1]                               :     (Joint Administration Requested)
                                                                :
-------------------------------------------------------------- x

**NOTICE OF (I) DEBTORS' INTENT TO**
**ASSUME AND ASSIGN CERTAIN EXECUTORY CONTRACTS AND**
**UNEXPIRED LEASES RELATED AND (II) CURE AMOUNTS**

    **PLEASE TAKE NOTICE** that, the above-captioned debtors and debtors in possession
(collectively, the "**Debtors**") have requested that the United States Bankruptcy Court for the
Southern District of New York (the "**Bankruptcy Court**") approve an order (the "**Bidding
Procedures Order**") authorizing the Debtors to conduct an auction to sell certain assets (the
"**Assets**") to the highest and best qualified bidder (the "**Successful Bidder**").  A hearing (the "**Sale
Hearing**") will be scheduled in the Bankruptcy Court to consider (i) the sale of the Assets to the
Successful Bidder free and clear of liens, claims, and encumbrances (except for any assumed
liabilities and permitted liens) and (ii) the assumption and assignment of executory contracts and
unexpired leases in connection with the sale.   At the Sale Hearing, the Debtors will ask the
Bankruptcy Court to enter an order (the "**Sale Order**") approving the sale.

    **PLEASE TAKE FURTHER NOTICE** that, pursuant to the proposed Sale Order, the
Debtors may assume and assign to the Successful Bidder those executory contracts and unexpired
leases listed on **Schedule A** attached hereto (collectively, the "**Assigned Agreements**" and each
an "**Assigned Agreement**"), pursuant to § 365 of title 11 of the United States Code (the

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification
number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc.
(5972), and GWG International, Ltd. (2468).

"**Bankruptcy Code**").  For the purposes of this paragraph, the "**Successful Bidder**" shall include Potential Bidders (as defined in the Bidding Procedures Order).

**PLEASE TAKE FURTHER NOTICE** that any party seeking to (i) object to the validity of the Cure Amount as determined by the Debtors or otherwise assert that any other amounts, defaults, conditions, or pecuniary losses must be cured or satisfied under any of the Assigned Agreements in order for such contract or lease to be assumed and assigned or (ii) object to the assumption and assignment of any Assigned Agreements on any other basis (including but not limited to, objections to adequate assurance of future performance), must file a written objection (an "**Assumption/Assignment Objection**") with the Bankruptcy Court setting forth the cure amount the objector asserts to be due, and the specific types and dates of the alleged defaults, pecuniary losses and conditions to assignment and the support therefor, so that such objection is filed with the Court no later than **5:00 p.m. (Eastern Time) on November 9, 2015** (the "**Assumption/Assignment Objection Deadline**"), and such objection shall also be served so the same is actually received on or before the Assumption/Assignment Objection Deadline by (i) proposed counsel to the Debtors, Venable, LLP at both Rockefeller Center, 1270 Avenue of the Americas, Twenty-Fourth Floor, New York, New York 10020 (Attn: Rishi Kapoor, Esq.) and 575 7th Street, NW, Washington, D.C. 20004 (Attn: Andrew J. Currie, Esq.) and (ii) proposed counsel to the Committee (collectively, the "**Notice Parties**"); provided, however, that in the event the Auction results in a Successful Bidder other than the Stalking Horse Bidder (as defined in the Bidding Procedures Order), the Debtors shall file a notice identifying such Successful Bidder with the Court and serve such notice upon each party identified in the Cure Schedule, and the deadline for objecting to the assignment of the Assigned Agreement to such Successful Bidder on the basis of adequate assurance of future performance shall be the commencement of the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that unless an Assumption/Assignment Objection is filed and served before the Assumption/Assignment Objection Deadline, all parties shall (i) be forever barred from objecting to the Cure Amount and from asserting any additional cure or other amounts with respect to the Assigned Agreements, and the Debtors and the Successful Bidder shall be entitled to rely solely upon the Cure Amount; (ii) be deemed to have consented to the assumption and assignment, and (iii) be forever barred and estopped from asserting or claiming against the Debtors or the Successful Bidder that any additional amounts are due or other defaults exist, that conditions to the assignment must be satisfied under such Assigned Agreements or that there is any objection or defense to the assumption and assignment of such Assigned Agreements.

**PLEASE TAKE FURTHER NOTICE** that hearings with respect to the Assumption/Assignment Objections may be held (i) at the Sale Hearing or (ii) at such other date as the Bankruptcy Court may designate upon motion by the Successful Bidder and the Debtors. Where a nondebtor counterparty to an Assigned Agreement files an objection asserting a cure amount higher than the proposed Cure Amount (the "**Disputed Cure Amount**"), then (i) to the extent that the parties are able to consensually resolve the Disputed Cure Amount prior to the Sale Hearing, the Debtors shall promptly provide the Committee, if any, and the Successful Bidder notice and an opportunity to object to such proposed resolution or (ii) to the extent the parties are unable to consensually resolve the dispute prior to the Sale Hearing, then the amount to be paid under § 365 of the Bankruptcy Code with respect to such Disputed Cure Amount will be determined at the Sale Hearing or at such other date and time as may be fixed by this Court.

2

**PLEASE TAKE FURTHER NOTICE** that if you agree with the Cure Amount indicated on **Schedule A** and otherwise do not object to the Debtors' assignment of your lease or contract, you need not take any further action.

**PLEASE TAKE FURTHER NOTICE** that the Debtors' decision to assume and assign the Assigned Agreements is subject to Bankruptcy Court approval and the consummation of the sale of the Assets. Accordingly, the Debtors shall be deemed to have assumed and assigned each of the Assigned Agreements as of the date of, and effective only upon, the closing of the sale of the Assets, and absent such a closing, each of the Assigned Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to further administration under the Bankruptcy Code. Inclusion of any document on the list of the Assigned Agreements shall not constitute or be deemed to be a determination or admission by the Debtors or the Successful Bidder that such document is, in fact, an unexpired lease or executory contract within the meaning of the Bankruptcy Code, all rights with respect thereto being expressly reserved. For the purposes of this paragraph "**Successful Bidder**" shall include Potential Bidders.

Dated: New York, New York
       _____ ___, 2015

                                        Respectfully submitted,

                                        VENABLE LLP

                               By:  _____
                                        Jeffrey S. Sabin
                                        Rishi Kapoor
                                        1270 Avenue of the Americas, 24th Floor
                                        New York, New York 10020
                                        Telephone: (212) 307-5500
                                        Facsimile: (212) 307-5598
                                        jssabin@venable.com
                                        rkapoor@venable.com

                                              - and -

                                        Andrew J. Currie (to be admitted *pro hac vice*)
                                        575 7th Street, NW
                                        Washington, DC 20004
                                        Telephone: (202) 344-4000
                                        Facsimile: (202) 344-8300
                                        ajcurrie@venable.com

                                        *Proposed Counsel to the Debtors
                                        and Debtors in Possession*

3

# SCHEDULE A

**List of Executory Contracts and Unexpired Leases Potentially to be Assumed and Assigned at Closing**

# <u>EXHIBIT B</u>

**Proposed Sale Order**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
------------------------------------------------------------ x
                                        :
In re:                                  :   Chapter 11
                                        :
ADVANCE WATCH COMPANY LTD., et al.,     :   Case No. 15-_____ (___)
                                        :
        Debtors.¹                       :   (Joint Administration Requested)
                                        :
------------------------------------------------------------ x
```

### ORDER (I) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND BUYER, (II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS AND ASSUMPTION OF CERTAIN LIABILITIES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (III) APPROVING ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) DETERMINING AMOUNTS NECESSARY TO CURE SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Binda USA Holdings, Inc., Advance Watch Company Ltd., Sunburst Products, Inc., and GWG International, Ltd., the debtors and debtors-in-possession (collectively, the "**Debtors**") having filed their *Motion for Entry of Orders (I) Approving Sale Procedures for the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing, and (V) Approving Such Sale* [Docket No. _____] (the "**Sale Motion**") seeking, among other things, entry of an order: (a) approving the sale of certain of the Debtors' assets pursuant to that certain Asset Purchase

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

Agreement, dated September _____, 2015 (the "**Asset Purchase Agreement**"),[2] by and between

the Debtors and Sunshine Time Inc. (the "**Buyer**"); (b) providing for the sale by the Debtors to the

Buyer of the Purchased Assets[3] and the assumption, assignment, and sale to Buyer of the Purchased

Contracts and Assumed Liabilities; and (c) authorizing the consummation of the transactions

contemplated therein (the "**Transaction**"); and this Court having entered an order on

_____, 2015 (the "**Bidding Procedures Order**") approving, among other things, the

bidding procedures with respect to, and notice of, the Transaction; and an auction having been set

for **November 9, 2015, at 9:00 a.m. (Eastern Time)** in accordance with the Bidding Procedures

Order; and no Qualified Bidders (as that term is defined in the Bidding Procedures Order) having

submitted competing bids for the Debtors' assets; and the Debtors, after consultation with the

Unsecured Creditors' Committee (the "**Committee**"), having determined that the Asset Purchase

Agreement represents the highest or otherwise best bid for the Purchased Assets, Purchased

Contracts, and Assumed Liabilities; and a hearing having been held on **November 10, 2015, at**

**__:___ __.m. (Eastern Time)** (the "**Sale Hearing**") to consider approval of the sale of the

Purchased Assets to the Buyer (as well as the assumption by the Debtors and assignment and sale

to the Buyer of the Purchased Contracts) pursuant to the terms and conditions of the Asset Purchase

Agreement; and adequate and sufficient notice of the Sale Motion having been given to all parties

in interest in these cases; and all such parties having been afforded due process and an opportunity

to be heard with respect to the Sale Motion and all relief requested therein; and the Court having

reviewed and considered: (a) the Sale Motion; (b) the objections to the Sale Motion, if any; and

---

[2]    A true and correct copy of the Asset Purchase Agreement is attached hereto as **Exhibit 1**.

[3]    All capitalized terms not otherwise defined shall have the same meaning as set forth in the Asset Purchase
Agreement.

9955594v1

(c) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and the Sale Hearing having been held; and after due deliberation and sufficient cause appearing;

IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.    This Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of these cases and Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    The statutory bases for the relief requested herein are §§ 105, 363, 365, and 503 of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007, and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**").

C.    As evidenced by the affidavits of service on file with the Court, (i) due, proper, timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with respect to the Sale Motion and the relief requested therein has been provided in accordance with the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Bidding Procedures Order, and the Asset Purchase Agreement; (ii) such notice was good, sufficient, and appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion shall be required.

D.    The bidding related procedures established by the Bidding Procedures Order have been complied with in all material respects by the Debtors and Buyer.  The Debtors, in consultation with the Committee, have determined that the Asset Purchase Agreement represents the highest or

---

[4]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact where appropriate.  See Fed. R. Bankr. P. 7052.

3

otherwise best bid for the Purchased Assets, Purchased Contracts, and Assumed Liabilities.  No other Qualified Bidders submitted competing bids for the Debtors' assets.

E.        Upon entry of this Sale Order, the Debtors shall have full authority to consummate the Transaction contemplated by the Asset Purchase Agreement.

F.        Approval of the Asset Purchase Agreement and consummation of the Transaction is in the best interests of the Debtors, the estates, creditors, and other parties in interest.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the sale to Buyer pursuant to § 363(b) of the Bankruptcy Code.

G.        The Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and Buyer without collusion, in good faith, and from arm's length bargaining positions. The Debtors and Buyer have not engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under § 363(n) of the Bankruptcy Code.

H.        The Buyer is a good faith purchaser under § 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  Buyer is acting in good faith within the meaning of § 363(m) in consummating the Transaction.

I.        The consideration to be provided by Buyer pursuant to the Asset Purchase Agreement: (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Purchased Assets; (iii) will provide greater recovery for the Debtors' creditors than would be provided by any other practically available alternative; and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

J.        The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets and, except as provided in the Asset Purchase Agreement, will

4

vest the Buyer with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all liens, claims (other than Assumed Liabilities), encumbrances, interests, and other interests of any kind and every kind whatsoever (including liens, claims, encumbrances, and interests of any Governmental Body); provided, however, that all such liens, claims, encumbrances, and interests shall attach to the proceeds of the sale in order of priority.

K.      Subject to the provisions of this Sale Order and except as may be provided in the Asset Purchase Agreement, the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in § 363(f)(1) through (5) of the Bankruptcy Code have been satisfied.

L.      The (i) transfer of Purchased Assets to the Buyer and (ii) assumption by the Debtors and assignment and sale to the Buyer of the Purchased Contracts will not subject the Buyer to any liability whatsoever (including any successor liability) with respect to the operation of the Business prior to the Closing or by reason of such transfer, except that the Buyer shall remain liable for all Assumed Liabilities and any other liabilities that the Buyer has specifically agreed to assume pursuant to the Asset Purchase Agreement.

M.      The Asset Purchase Agreement is a valid and binding contract between the Debtors and Buyer, which is and shall be enforceable according to its terms.

N.      Notice of the Sale Motion has been provided to each non-debtor party to a Purchased Contract, together with a statement therein from the Debtors with respect to the amount, if any, to be paid to such non-debtor party to cure any defaults under, and to otherwise comply with the requirements of § 365 of the Bankruptcy Code with respect to the Purchased Contract to which such non-debtor is a party (the "**Cure Amounts**").  As to each Purchased Contract, payment

5

of the Cure Amounts, as set forth in **Exhibit 2** hereto, is sufficient for the Debtors to comply fully

with the requirements of § 365(b) of the Bankruptcy Code. In addition, the Buyer has provided

adequate assurance of its ability to perform its obligations under each of the Purchased Contracts

within the meaning of § 365(c) of the Bankruptcy Code. Therefore, the Purchased Contracts may

be assumed by the Debtors and assigned and sold to the Buyer.

O.    There is other good and sufficient cause to grant the relief requested in the Sale

Motion and approve the Asset Purchase Agreement and the Transaction.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.    The Sale Motion is GRANTED and approved in all respects.

2.    Any objections to the entry of this Sale Order or the relief granted herein and

requested in the Sale Motion that have not been withdrawn, waived, or settled, and all reservations

of rights included therein, are hereby DENIED and OVERRULED,

3.    The Asset Purchase Agreement, including all of its terms and conditions, and the

Transaction are hereby approved.

4.    Pursuant to §§ 363 and 365 of the Bankruptcy Code, the Debtors are authorized and

directed to execute, deliver, and perform under, consummate, and implement the Asset Purchase

Agreement together with all additional instruments and documents that are requested by the Buyer

and may be reasonably necessary or desirable to implement the Asset Purchase Agreement, and to

take any and all actions as it deems necessary, appropriate, or advisable for the purpose of

assigning, transferring, granting, conveying, and conferring to the Buyer or reducing to possession,

the Purchased Assets, or as may be necessary or appropriate to the performance of obligations as

contemplated by the Asset Purchase Agreement, including, without limitation, any and all actions

reasonably requested by Buyer which are consistent with the Asset Purchase Agreement.

6

9955594v1

5.      Pursuant to §§ 105(a), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing: (i) the transfer of the Purchased Assets to the Buyer pursuant to the Asset Purchase Agreement shall constitute a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest in and to the Purchased Assets; (ii) the Purchased Assets shall be transferred to the Buyer free and clear of all Liens (other than Liens specifically assumed by Buyer and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and interests, and other interests of any kind and every kind whatsoever (including Liens, claims, encumbrances and interests of any Governmental Body) against such assets, in accordance with § 363(f) of the Bankruptcy Code, with any such Liens, claims, encumbrances and interests to attach to the proceeds of the Transaction, in the order of their priority, with the same validity, force, and effect which they had against the Purchased Assets prior to the entry of this Sale Order, subject to any rights, claims, and defenses the Debtors and all interested parties may possess with respect thereto; and (iii) each of the Purchased Contracts shall be deemed assumed by the Debtors and assigned and sold to the Buyer as of the Closing of the Transaction.

6.      This Sale Order is and shall be effective as a determination that all Liens, claims, encumbrances and interests shall be and are, without further action by any person or entity, released with respect to the Purchased Assets as of the Closing Date, except as may otherwise be set forth in the Asset Purchase Agreement.

7.      Buyer shall not be deemed or considered a successor to the Debtors or the Debtors' estates by reason of any theory of law or equity and Buyer has not assumed nor is in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except as otherwise expressly provided in the Asset Purchase Agreement or this Sale Order.

9955594v1

8.      Except for the Excluded Assets, on the Closing Date, all of the Debtors' and the estates' rights, claims, and causes of action against (i) Critical Trade Vendors set forth in Schedule 2.1(r) to the Asset Purchase Agreement, (ii) third parties except tax authorities relating to the assets, properties, Business or operations of the Debtors arising out of events occurring on or prior to the Closing Date other than causes of action arising under chapter 5 of the Bankruptcy Code, including, but not limited to, claims arising under §§ 510, 544, 547, 548, 549, or 550 of the Bankruptcy Code, and (iii) against officers, directors, employees, shareholders, members and managers of the Debtors arising under chapter 5 of the Bankruptcy Code, shall be assigned, sold, and transferred to the Buyer.

9.      Pursuant to § 365 of the Bankruptcy Code, the Debtors are authorized to assume the Purchased Contracts designated in the Asset Purchase Agreement, cure the same (in the Cure Amounts set forth on **Exhibit 2** hereto, or by further order of the Court, with such Cure Amounts to be paid by Buyer) as set forth in the Asset Purchase Agreement, and assign and sell the Purchased Contracts to the Buyer.

10.     The Purchased Contracts, consistent with the provisions contained herein, shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Purchased Contract (including those of the type described in § 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to § 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Purchased Contracts (except as set forth in the Asset Purchase Agreement) after such assignment and sale to the Buyer.

11.     All defaults or other obligations of the Debtors under the Purchased Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any

8

default provisions of the kind specified in § 365(b)(2) of the Bankruptcy Code) shall be deemed cured, upon payment of the Cure Amount by the Buyer, and the Buyer shall have no liability or obligation arising or accruing under the Purchased Contracts on or prior to the Closing, except as otherwise provided in the Asset Purchase Agreement.  The non-debtor parties to the Purchased Contracts are barred from asserting against the Debtors, Buyer, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Purchased Contracts arising or incurred prior to the Closing, other than the Cure Amounts.

12.    The consideration (including the Purchase Price and Assumed Liabilities) provided by the Buyer for the Purchased Assets under the Asset Purchase Agreement is fair and reasonable and the Transaction may not be avoided under § 363(n) of the Bankruptcy Code.

13.    The Transaction is undertaken by the Buyer in good faith, as that term is used in § 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the sale of the Purchased Assets to the Buyer, unless such authorization is duly stayed pending such appeal.  The Buyer is a good faith purchaser of the Purchased Assets and is entitled to all of the benefits and protections afforded by § 363(m) of the Bankruptcy Code.

14.    This Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or related to this Sale Order, the Asset Purchase Agreement, or any related agreements, including without limitation: (a) any actual or alleged breach or violation of this Sale Order, the Asset Purchase Agreement or any related agreements and (b) the enforcement of any injunctive provision or relief granted in this Sale Order or otherwise, as set forth in the Asset Purchase Agreement.

9

15.     All persons and entities that are presently, or on Closing may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer as of the Closing.

16.     This Sale Order is and shall be binding upon and shall govern acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee of the Purchased Assets free and clear (all such entities being referred to as "**Recording Officers**").  All Recording Officers are authorized and specifically directed to strike recorded claims, liens, and interests against the Purchased Assets recorded prior to the date of this Sale Order that the Buyer is acquiring free and clear.

17.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Transactions authorized herein and in the Asset Purchase Agreement.

18.     The terms and provisions of the Asset Purchase Agreement, the ancillary agreements, and this Sale Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Buyer, and their respective affiliates, successors and assigns, and any affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code or conversion of this case to a case under chapter 7, as to which trustee(s) such terms and provisions likewise shall be binding.  The Asset Purchase Agreement, the Transaction, and this Sale Order shall be binding upon, and shall not be subject to rejection or avoidance by, any Chapter 7 or Chapter 11 Trustee appointed in the Bankruptcy Cases.  Further,

10

9955594v1

nothing contained in any plan of reorganization (or liquidation) or any other order entered in these cases shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Sale Order.

19.     The Asset Purchase Agreement and any related agreements, documents, or other instruments may be amended by the parties in a writing signed by such parties without further order of the Court, provided that: (i) any such amendment does not have a material adverse effect on the Debtors or the Debtors' estates and (ii) notice of any such amendment shall be provided to the Committee.

20.     The failure to include specifically any particular provision of the Asset Purchase Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

21.     To the extent of any inconsistency between the provisions of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in the Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith shall govern, in that order.

22.     To the extent permitted by the Asset Purchase Agreement, the Debtors shall file updated Schedules to the Asset Purchase Agreement as soon as practicable, but in no event later than five (5) Business Days following the Closing Date.

23.     The provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of all Liens (other than Liens specifically assumed and Permitted Exemptions), claims (other than Assumed Liabilities), encumbrances and interests, and other interests of any kind and every kind whatsoever (including Liens, claims, encumbrances and

11

interests of any Governmental Body) against such assets shall be self-executing.  Notwithstanding

the failure of the Debtors, Buyer, or any other party to execute, file or obtain releases, termination

statements, assignments, consents or other instruments to effectuate, consummate and/or

implement the provisions hereof, all Liens (other than Liens specifically assumed or created by

Designee and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and

interests of any kind and every kind whatsoever (including Liens, claims, encumbrances, and

interests of any Governmental Body) on or against such Purchased Assets, if any, shall be deemed

released, discharged, and terminated.

24.    Notwithstanding the provisions of Bankruptcy Rule 6004(g) and 6006(d), this Sale

Order shall be effective and enforceable immediately and shall not be stayed.

Dated: _____, 2015
       New York, New York

_____
United States Bankruptcy Judge