Jeffrey S. Sabin
Rishi Kapoor
VENABLE LLP
1270 Avenue of the Americas
New York, New York 10020
Telephone:    (212) 307-5500
Facsimile:    (212) 307-5598

Andrew J. Currie (to be admitted *pro hac vice*)
VENABLE LLP
575 7th Street, NW
Washington, DC 20004
Telephone:  (202) 344-4000
Facsimile:  (202) 344-8300

*Proposed Counsel to the Debtors and Debtors in Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------- x

In re:

ADVANCE WATCH COMPANY LTD., et al.,

                Debtors.[1]

------------------------------------------------------------- x

Chapter 11

Case No. 15-12690 (___)

(Joint Administration Requested)

**DECLARATION OF JEFFREY L. GREGG, CHIEF RESTRUCTURING OFFICER OF ADVANCE WATCH COMPANY LTD. (I) IN SUPPORT OF DEBTORS' FIRST DAY MOTIONS AND (II) PURSUANT TO LOCAL BANKRUPTCY RULE 1007-2**

I, Jeffrey L. Gregg, hereby declare under penalty of perjury:

1.      I am the Chief Restructuring Officer of Advance Watch Company Ltd. ("**Advance Watch**"), a corporation organized under the laws of the State of Michigan with its principal place of business in New York City.  Advance Watch is a debtor and debtor in possession in the above-captioned cases of Advance Watch and its domestic affiliates (collectively, the "**Debtors**" or "**Company**").  I have been serving in the role of Chief Restructuring Officer for the Debtors since June 16, 2015.  Prior to that, from 2006 to September 2008, I served as the Chief Operating Officer and Chief Financial Officer of the Company, and from September 2008 to December 2013, as the

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).  A chart summarizing the equity relationships among the Debtors is provided *infra* at paragraph 7.

Chief Executive Officer, of the Company.  I am a Certified Public Accountant and Chartered Global Management Accountant.  I am familiar with the Debtors' day-to-day operations, business and financial affairs, and books and records.  I am over 18 years of age and am competent to make this Declaration and testify in these cases.[2]

2.      I submit this Declaration in accordance with Rule 1007-2 of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**") to inform this Court and parties in interest of the circumstances that led to the commencement of these chapter 11 cases, and in support of: (i) the Debtors' petitions for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**") filed on September 30, 2015 (the "**Petition Date**"); and (ii) the emergency relief that the Debtors have requested from the Court pursuant to the motions and applications filed contemporaneously with the Debtors' chapter 11 petitions and described further herein (collectively, the "**First-Day Motions**").

3.      Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my discussions with former officers and other members of the Debtors' management team, senior personnel, and advisors, my review of relevant documents and information concerning the Debtors' operations, financial affairs, and restructuring initiatives, or my opinions based upon my experience and knowledge.  If called as a witness, I could and would testify to the facts set forth in this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

4.      This Declaration is intended to provide an overview of the Debtors' business as well as the circumstances underlying the Company's need for relief under the Bankruptcy Code.

---

[2]      It is my understanding, based on information and belief, that venue for the Debtors' chapter 11 cases is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409, because Advance Watch's principal place of business in the United States is and has been New York, New York for at least one hundred and eighty (180) days prior to the Petition Date (as defined herein).

9969019

Section I describes the nature of the Debtors' businesses and operations.  Section II describes the Debtors' capital structure.  Section III describes the circumstances that led to the filing of these chapter 11 cases, including the Company's recent, prepetition restructuring efforts and the sale process that the Debtors intend to pursue in these cases.  Section IV provides a summary of Debtors' First-Day Motions and the relevant facts in support of the relief requested therein. Section V identifies the attached schedules of information required by Local Bankruptcy Rule 1007-2.

**I.      The Debtors' Business**

5.      Founded in 1974, the Company is part of a privately-held global enterprise that designs, assembles, markets, and distributes consumer watches under the trade name Geneva Watch Group.  The Company, whose corporate headquarters are located in New York City, specializes in creating and selling men's and women's timepieces under exclusive global licenses for fashion and lifestyle brands such as Kenneth Cole, Tommy Bahama, and Ted Baker London. In addition to licensed product, the Company sells watches for its portfolio of Company-owned brands, including Freestyle and Game Time.  The Company, through its non-debtor Asian affiliates, also maintained extensive sourcing and manufacturing operations in Hong Kong and China until June 2015, as discussed further below.

**A.      The Debtors' Corporate Structure**

6.      The four Debtors are: (1) Binda USA Holdings, Inc., a Delaware corporation  and the Debtors' domestic holding company ("**Binda USA**"), which is wholly owned by an Italian entity known as Binda Italia Srl ("**Binda Italy**")[3]; (2) Advance Watch (defined above), the

---

[3]     As discussed below, Binda Italy was the subject of insolvency proceedings in Italy prior to and on the Petition Date.  Notwithstanding Binda Italy's prior insolvency, based on a review of applicable law by the Debtors and their professionals, it is my understanding that the Debtors' boards of directors had the proper authority to commence the instant bankruptcy petitions.

9969019

Debtors' operating company, which is wholly owned by Binda USA; (3) GWG International, Ltd., a Delaware corporation, which is wholly owned by Advance Watch; and (4) Sunburst Products, Inc., a California corporation, which is also wholly owned by Advance Watch.  In addition, Advance Watch is the 100% owner of a foreign, Hong Kong-based affiliate known as Advanced Watch Company (Far East) Limited ("**AWC Far East**").  AWC Far East, in turn, wholly owns two non-debtor subsidiaries formed under the laws of the People's Republic of China: (i) Zhongshan Advance Electronics Company Limited ("**AWC Zhongshan**"), and (ii) Advance Far East Trading (Shenzhen) Company Ltd. ("**AWC Shenzhen**," and together with AWC Far East and AWC Zhongshan, the "**Far East Companies**").

7.     The following chart summarizes the Debtors' global organizational structure, including ownership of the Company by non-debtor Binda Italy, and the Company's ownership of

4

its non-debtor, foreign affiliates:



8.      Until June 2015, the Company worked with both its parent entity, Binda Italy, and the Far East Companies, to manufacture, distribute, and sell its products throughout the world. However, as discussed below, following (i) the Company's financial distress in 2014 and 2015, (ii) the commencement of insolvency proceedings in Italy by the Company's parent entity in June 2015, and (iii) the initiation of liquidation proceedings in Hong Kong by AWC Far East in June 2015, the Company no longer operates under common control with its foreign affiliates.

B.      **Industry Overview and Company Product Offerings**

9.      Annual consumer watch sales exceed $30 billion globally, with sales in the United States representing approximately 20% of the global market, or about $6.5 billion annually.

9969019

European sales account for 34% of the global market, or roughly $11 billion in annual sales, and sales in Asia represent 38% of the global market, or $12 billion annually, with Japan accounting for two-thirds of that amount.

10.    The current market for consumer watches can be divided into four segments, determined largely on the basis of retail prices.  The most expensive segment consists of high-end luxury watches that retail at prices ranging from $3,000 to $10,000 or more, and include such brands as Cartier, Omega, Patek Philippe, and Rolex.  The second segment consists of premium branded and designer watches ranging from $300 to $3,000, and include such brands as Gucci, Movado, Raymond Weil, Seiko, and Tag Heuer.  The third segment of the market is made up of moderately priced watches ranging from $50 to $299, and are characterized by well-known contemporary fashion brands that are sold at most major department stores and specialty stores.  The fourth, and least expensive, segment consists of watches in the $7 to $50 range, typically sold by mass marketers.

11.    The Debtors primarily compete in the third most-expensive segment of the consumer watch market, with products generally retailing in the range of $50 to $299.  The Company's offerings in this segment include its Kenneth Cole, Ted Baker, and Tommy Bahama licensed watches, among other brands, which compete against such competitor brands as Fossil, Guess?, and Michael Kors.  Until earlier this year, the Company also competed in the mass-market segment under private labels produced for Wal-Mart, Kmart, Target, and others.  The Debtors do not compete in the second most-expensive or high-end luxury segments.  Below is a list of the major branded consumer watches that the Company currently offers through either its license agreements with third parties or for its own portfolio (*i.e.*, Company-owned):

| Brand | Licensor |
|---|---|
| Kenneth Cole New York<br>Kenneth Cole Reaction<br>Kenneth Cole Unlisted | Kenneth Cole Productions (LIC), LLC and<br>Kenneth Cole Productions, Inc. |
| Sean John | Christian Casey, L.L.C. |
| Sperry Top–Sider | Sperry Top-Sider LLC and SR Holdings, LLC |
| Steve Harvey | Steve Harvey Products, Inc./Steve Harvey |
| Ted Baker | No Ordinary Designer Label Limited |
| Tommy Bahama | Tommy Bahama Group, Inc. and Tommy<br>Bahama Global Sourcing Limited |
| Zoo York | ZY Holdings LLC by assignment from IP<br>Holdings Unltd LLC |
| Game Time | Company Owned |
| Freestyle | Company Owned |
| Breil | Binda Italy |

12.    In addition to the products made under licenses for third-party fashion brands, the Company produces watches under its Game Time brand using licenses from most major professional sports leagues including the NFL, MLB, NBA, NHL, and MLS, as well as over 75 major collegiate athletic programs.

13.    Under the trade name Geneva Clock Company, the Debtors previously produced a full array of consumer alarm clocks and wall clocks for their Company-owned brands Advance, Advance Time Technology, and Geneva.  These clocks were typically sold at large retailers such as Bed Bath & Beyond, Kmart, and True Value stores, and through online retailers like Amazon.com, Walmart, and Wayfair.  As part of its clock business, the Company licensed well-known contemporary images that were incorporated into the design of its portfolio brand clocks.

14.    The Company has now exited the clock business and has sold all but a *de minimis* amount of its remaining inventory.

9969019

C.    **The Debtors' Operations**

15.    The Debtors currently conduct operations in the United States, and maintain relationships with dozens of foreign and domestic vendors, service providers, retailers, contract counterparties, and other entities located throughout the world.  Through its global distribution network, the Company's products are sold to department stores and specialty retailers in over ninety (90) countries worldwide.

16.    As of the Petition Date, the Company has 113 full-and part-time employees and three (3) independent contractors in the United States and internationally, who perform, among other roles, product design, marketing, brand management, sales, retail merchandising, customer service, supply chain and inventory management, human resources, and information technology services.

17.    In the United States, the Company's corporate headquarters and showroom are located in New York City.  The Company also has an assembly and distribution facility in Canton, Michigan, and a sales office in Costa Mesa, California.  The Company leases each of these premises.

18.    Domestically, the Company's products are sold through a diverse distribution network that includes department stores, specialty retail and watch locations, mass market stores, and online retailers.   The Company's department store customers include Bloomingdales, Nordstrom, Macy's, Dillard's, Von Maur, Bon-Ton, Boscov's, JCPenney, and Kohl's.   The products sold through these retail channels are serviced through a third-party contractor that employs a nationwide staff of merchandise coordinators who work with and within the stores to ensure the proper display and availability of Company products.  The majority of the Company's annual revenue derives from three main shopping seasons during the year: (i) the end-of-year

9969019

15-12690-mg    Doc 18    Filed 10/01/15    Entered 10/01/15 11:05:49    Main Document
Pg 9 of 74

holiday season, (ii) the back-to-school season during August and September, and (iii) the late spring/early summer period during which Mother's Day and Father's Day occur.

19.      The Company also provides a range of brand management and marketing services in connection with its licensed and Company-owned brands, including print, media, and internet advertising, point-of-sale merchandise displays, and product packaging.  It also participates in cooperative advertising programs with its major retail customers, whereby costs of certain advertising and promotional expenses are shared between the Company and the retailer.

### D.    The Debtors' Far East Operations

20.      Until June 2015, the Company also had a presence in Asia through its Far East subsidiaries.  The non-debtor Far East Companies maintained sales, product development, and manufacturing facilities, and handled the sourcing of parts and materials used in the assembly of Company products.  In addition to being a manufacturer for Geneva Watch Group, AWC Far East also hosted the information technology data center for the Company's global enterprise resources planning ("**ERP**") system, and provided product development, sourcing, vendor management, procurement, logistics and quality control testing and inspection services.  The Far East Companies had nearly 1,500 employees.

21.      As discussed further below, in June 2015, AWC Far East became the subject of liquidation proceedings under the laws of the Hong Kong Special Administrative Region of the People's Republic of China ("**Hong Kong**").  Shortly thereafter, Ernst & Young was appointed as the liquidator (the "**Far East Liquidator**") and currently maintains operational control of the Far East Companies' assets.

9969019

## II.    The Debtors' Capital Structure

### A.    The Wells Fargo Revolving Credit Facility

22.    On June 21, 2013, the Debtors entered into that certain revolving Credit Agreement (as the same has heretofore been amended, modified and/or restated prior to the Petition Date, the "**Pre-Petition Revolving Loan Agreement**"), by and among Debtors Advance Watch, Sunburst Products, Inc. and GWG International, Ltd., as borrowers (collectively, the "**Borrowers**"), Binda USA, as guarantor (the "**Guarantor**"), Wells Fargo Bank, National Association ("**Wells Fargo**"), as administrative agent (in such capacity, the "**Pre-Petition Loan Agent**"), and the lenders from time to time party thereto (collectively, the "**Pre-Petition Secured Lenders**").

23.    Under the Pre-Petition Revolving Loan Agreement, Debtor-Borrowers obtained a $45,000,000 asset-based revolving credit facility (the "**Pre-Petition Credit Facility**"), with a $5,000,000 letter of credit sub-line facility.  The total borrowing capacity under the Pre-Petition Credit Facility is based on a borrowing base, which is defined under the Pre-Petition Revolving Loan Agreement as 85% of the Debtors' eligible accounts receivable plus the lesser of (i) 65% of the value of eligible inventory, or (ii) 85% of the net recovery percentage of eligible inventory, less reserves.

24.    Amounts loaned under the Pre-Petition Credit Facility bear interest, at the Debtors' option, at either a base rate or at LIBOR, plus an applicable margin based on the available Pre-Petition Credit Facility amount less trade payables in excess of historical levels for the most recently completed calendar quarter.  The applicable margins range between 0.75% and 1.25% on base-rate borrowings and between 2.25% and 2.75% on LIBOR borrowings.  The Debtors are also required to pay an annual non-use fee of 0.375% of the unused amounts under the Pre-Petition Credit Facility, as well as other customary fees as set forth in the Pre-Petition Revolving Loan Agreement.

25.     As of the Petition Date, the Debtors were indebted to the Pre-Petition Loan Agent and the Pre-Petition Secured Lenders under the Pre-Petition Revolving Loan Agreement in respect of Loans, Letters of Credit, Bank Products, and all other Obligations (each as defined in the Pre-Petition Revolving Loan Agreement) in an aggregate outstanding principal amount of $13,359,095.01, consisting of $11,537,859.31 of funded debt, $ 1,131,453.34 of standby letters of credit, and $689,782.36 of commercial letters of credit, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Pre-Petition Obligations**").

26.     The Debtors' obligations under the Pre-Petition Credit Facility are secured by first-priority, perfected security interests in substantially all of the Debtors' assets wherever located worldwide.  The Pre-Petition Loan Agent holds such liens, in accordance with the Pre-Petition Revolving Loan Agreement and related security documents, for the ratable benefit of the Pre-Petition Secured Lenders.  The Pre-Petition Revolving Loan Agreement also requires that Debtors maintain a lock box account arrangement whereby all cash received by the Company is deposited into a lock box account under the control of Wells Fargo and used to pay down the Debtors' obligations under the Pre-Petition Credit Facility, and, accordingly, to create availability to re-borrow.

27.     The Pre-Petition Revolving Loan Agreement was ratified and modified by that certain Ratification and Amendment Agreement dated as of September 30, 2015, as described further in Section IV(B)(7) below.

**B.      The Binda Italy Credit Facility**

28.     Debtor Advance Watch, as borrower, entered into that certain Amended and Restated Revolving Credit Agreement dated as of June 14, 2013 with Binda Italy (defined above),

11

Advance Watch's ultimate parent entity, as lender, providing Advance Watch with a $35 million revolving credit facility (the "**Binda Italy Credit Facility**").  The Binda Italy Credit Facility is unsecured and subordinate in payment priority to the Pre-Petition Revolving Loan Agreement. The Binda Italy Credit Facility amended and restated a Revolving Credit Agreement entered into on July 31, 2008, by Advance Watch, as borrower, and Binda SpA, as lender,[4] which agreement was subsequently amended in 2008, 2011, and 2012.  At the time of the Binda Italy Credit Facility, approximately $27.5 million in financing had been extended under the prior agreement.

29.    This Binda Italy Credit Facility was a mechanism primarily established to provide working capital from Binda Italy to the Debtors and to expatriate cash to the Company's Italian owners.  During the two-year period preceding the Petition Date, roughly $687,000 was paid to Binda Italy by the Company under the Binda Italy Credit Facility.  As the Binda Italy Credit Facility states, Binda Italy entered into the amended and restated agreement "to continue in giving financial support and to develop [Advance Watch]'s business . . . ."  In addition, the Binda Italy Credit Facility was amended to extend the maturity date from December 31, 2013 to December 31, 2018, and Binda Italy acknowledged that the repayment obligations are junior and subordinate to the Debtors' obligations under the Pre-Petition Revolving Credit Facility, as further memorialized in a Subordination Agreement dated as of June 21, 2013, between Wells Fargo and Binda Italy.

30.    Under the Binda Italy Credit Facility, financed amounts accrue interest at the rate of LIBOR plus 2.50%, compounded annually.  Interest payments are due on an annual basis at the end of March of the following year in which the interest accrued.  No payments of principal are

---

[4]    Binda SpA is Binda Italy's predecessor in interest and merged into Binda Italy as of December 1, 2012.

due until maturity.  As of just prior to the Petition Date, approximately $26.2 million is outstanding under the Binda Italy Credit Facility.

### C.    Unsecured Trade Debt

31.    The Debtors' unsecured trade creditors include various vendors, shipping-relating services, licensors, marketing services, professionals, and other services necessary to run the Company's business on a day-to-day basis.  According the Debtors' books and records, as of the Petition Date, the Debtors have, on a consolidated basis, approximately $6.7 million in unsecured trade vendor debt, exclusive of any amounts that may arise from contracts to be rejected.

### D.    Intercompany Payable to AWC Far East

32.    Non-debtor affiliate AWC Far East claims that the Company owes it approximately $30 million (not including any fair price adjustments or transfer pricing adjustments or amounts) relating to unpaid purchase orders for inventory and related services.  AWC Far East has been the subject of liquidation proceedings in Hong Kong since June 2015, as described further below.  In August 2015, Advance Watch entered into an agreement with AWC Far East, among others, regarding the return of Company inventory and IT systems held by the Hong Kong entity, but parties' agreement did not address the alleged intercompany payable.

### III.    The Circumstances that Led to the Commencement of These Chapter 11 Cases and the Debtors' Prepetition Restructuring Efforts

33.    In September 2008, the Company was acquired by the predecessor entity to Binda Italy (defined above), an Italian-owned producer and distributor of watches.  From fiscal year 2009 through 2012,[5] the Company experienced steady sales growth, with gross revenue increasing from approximately $171.6 million in 2009 to $221 million in 2012.

---

[5]    The Company's fiscal year ends in March of the following calendar year.

13

34.     In 2013, the Company's revenue and profitability started declining.  At the time, the Company's revenue was roughly divided evenly between two business lines: the moderately-priced licensed and Company-owned fashion brands, and the lower-priced mass-market watches manufactured under private labels for stores like Wal-Mart, Kmart, and Target, among others.

35.     The Company's declining revenue and profitability initially resulted from the termination of two branded licenses that accounted for a significant portion of the Company's revenue.  First, in 2010, the Company's license to produce and sell timepieces for Betsey Johnson terminated, which accounted for $8.1 million in annual revenue.  Then, in 2013, Binda Italy's license to produce and sell timepieces for luxury fashion company Dolce & Gabbana—which the Company distributed in the Americas, as well as manufactured through its Far East Companies— expired without being renewed, causing an additional decrease of $25 to $30 million in annual revenue for the Company.  Nevertheless, the Company remained profitable through the continuation of growth in its remaining product lines and the addition of other, smaller licensed brands.

36.     In addition, through a favorable USA Movement supplier agreement, the Company previously benefitted from acquiring watch movements at duties reduced by 75% to 80%.  That supplier arrangement ended in September 2010, leading to increased production costs by approximately $5 million annually.

37.     The Company continued to lose revenue and incur significant operating losses through calendar years 2014 and 2015 due to operational challenges, weakness in the domestic watch market, failed new product launches, and the failure to align overhead costs to regain profitability.  Additionally, the Company was hampered by significant cost overruns and performance failures in connection with the failure to effectively manage the transition to a new

14

9969019

ERP system in 2014. In addition to the ERP system difficulties, approximately $7 million of losses that accumulated during calendar year 2014 were discovered in late 2014 as a result of financial recordkeeping errors in 2014, requiring the Company to restate its interim financials for 2014.

38.     In June 2015, for reasons unrelated to the Debtors' operations or financial status, their ultimate Italian parent, Binda Italy, became the subject of insolvency proceedings in Italy. As a result, the Company was no longer able to access financing from Binda Italy.

39.     The inability to access financing from Binda Italy had a negative impact on the Company's operations.  The Company was unable to make payments to many of the vendors in its supply and distribution chain, causing inventory delays and product shortages.  This, in turn, led to declining revenues, further impairing the Company's liquidity, while also causing the Company's relationships with its licensors and retailers to suffer as the Company was unable to fulfill requests for products or generate royalty payments due under its license agreements.  Beset by declining cash flow and revenues, the Company's ability to access financing under the Wells Fargo loan deteriorated, forcing the Company to explore a restructuring of the business.

40.     The Company's financial difficulties were not limited to its domestic operations.  It is my understanding that, as a result of the cash flow problems, the Far East Companies were similarly unable to pay their suppliers on a timely basis, preventing the Company from obtaining support for the development and shipment of products needed to fulfill customer obligations.

41.     The liquidity constraints, which prevented the Company from paying past due amounts to its vendors, escalated to a level that necessitated the decision to exit certain key businesses that could no longer be supported without the requisite support from the vendor base to develop and manufacture product to support customer programs.  As vendors were refusing to accept orders from the Company for the production of goods and/or completion of services needed

to fulfill customer commitments, the decision was made to exit the low margin, working-capital intensive lower price-point private label product lines supporting the mass, mid-tier and OEM markets, and allocate the remaining liquidity to the higher margin businesses.   The exited business represented nearly half of the Company's sales volume and traditionally supported a significant amount of the overhead cost of the Far East Companies' operations, as well as a significant portion of the Company's overhead in the United States, so exiting this business segment would require a dramatic reduction in overhead costs to offset the margin lost as a result.

42.     In early 2015, the Far East Companies' operational hurdles came to a head.   On or around June 9, 2015, the Far East Companies' management received personal threats believed to relate to the past due amounts owed to the Far East Companies' suppliers.   As a result, the Far East Companies' management shut down operations—including their manufacturing facilities— immediately.   While the initial intention was to shut down operations temporarily and resume operations shortly thereafter, on or around Friday, June 12, 2015, the Far East Companies notified their suppliers and other vendors that they would be permanently ceasing operations.

43.     As of Monday, June 15, 2015, the Far East Companies ceased conducting business of any kind and all outgoing payments were frozen.   Operational control of the Far East Companies was divested from the entities' existing management, who were replaced by FTI Consulting, the acting provisional liquidator.   A week later, on June 22, 2015, AWC Far East formally commenced liquidation proceedings under Hong Kong law.

44.     The loss of operational control of the Far East Companies further challenged the Company's ability to maintain operations without disruption.   As mentioned above, in 2014, the Company implemented an upgraded, global ERP system—which was housed in Hong Kong—to integrate its domestic and foreign operations under a single system.   Following the commencement

16

of liquidation proceedings in Hong Kong, the Company worked with the Far East Liquidator (and, prior to that, FTI Consulting, as provisional liquidator) to regain access to and control of its ERP system to support its operations.  The Company also engaged in discussions with the Far East Liquidator regarding the release and return of millions of dollars' (at retail prices) worth of the Company's licensed product inventory and components for sale in the U.S. market held by the Far East Companies and necessary to support the Debtors' immediate and future business needs.

45.    After one (1) month of not having access to the ERP system, and nearly two (2) months of negotiating with the Far East Liquidator, the Company reached an agreement on August 26, 2015 for the release of a portion of the remaining inventory and the Company's computer systems held by the Far East Companies.  Under the agreement, Advance Watch agreed to pay $200,000 for the IT systems and all associated data, software, and licenses (to the extent transferable), and $500,000 for the product inventory, subject to an adjustment based on the parties' inspection and determination of any excess or missing inventory, plus storage costs.  The agreement does not address or affect the Far East Companies' alleged intercompany claim.

46.    Unfortunately, the majority of the Company's inventory held by the Far East Companies was lost or destroyed and significant damage was done to the IT systems following the commencement of the Hong Kong liquidation proceedings in June 2015.  The inventory that remained had significantly diminished in value due to extended delays during the process of negotiating their purchase with the Far East Liquidator.  As a result, a downward adjustment was made to the purchase price of the inventory.

47.    Importantly, under the parties' agreement, no releases were given by the Company in favor of the Far East Companies or the Far East Liquidator, or vice versa.

17

48.     In addition to the undelivered inventory and loss of access to the Company's ERP system, the liquidation of the Far East Companies required the Debtors to quickly rebuild critical supply chain capabilities to support a go-forward business model.  The Company is working directly with the Far East Companies' former suppliers to finalize supply chain functions such as reconciling work in process and identifying future production needs, go-forward payment terms, quality control inspections and logistics arrangements.  Establishing direct vendor relationships with the Far East Companies' former suppliers was critical to the Company's ability to reinstate operations with as little disruption and delay as possible due to (i) the suppliers' familiarity with Company products, (ii) their access to tooling specific to the branded products manufactured for the Company, and (iii) certain suppliers having possession of finished or partially completed Company product at the time of Far East Companies' liquidation.

49.     Moreover, in an attempt to address the deteriorating financial condition of the Company, in June 2015, the Company's former management began a series of cost-cutting measures. As part of these measures, several senior employees were terminated in early June, including managers in charge of sales, finance, operations, marketing, and other key functions in the Company.  The loss of these employees caused further deterioration of the Company's ability to operate due to, among other things, the negative impact on customer and vendor relationships, Company morale, and the loss of institutional knowledge.

50.     On June 16, 2015, I was hired as the Company's Chief Restructuring Officer.  I immediately began a process to stabilize the Company's operations and critical stakeholder relationships to chart a path forward to maintain long term viability of the remaining business.

51.     One of the first steps I took to stabilize the business was to replace the loss of senior management by recruiting and hiring a small team of experienced personnel who could provide

18

9969019

the Company with much-needed operational support, financial expertise, and had intimate knowledge of the Company and its operations.

52.    I also took immediate action to stabilize the Company's relationships with (i) Wells Fargo, the Company's senior secured lender which holds a first lien on the Company's assets, to ensure that the Company had access to the necessary liquidity to continue operating, and (ii) key licensors, customers, vendors, and employees.   As part of these efforts, the Company communicates with Wells Fargo multiple times per week regarding the ongoing stabilization and restructuring efforts and the Company's ability to meet its obligations under the Pre-Petition Revolving Credit Facility.

53.    I have also met with representatives of the major brands that the Company licenses as well as many of its significant retailers.  Through these meetings, the Company has obtained commitments from those brands and many of its key retailers to continue stocking Company products notwithstanding recent delays in shipping new inventory.  The Company has received significant commitments of support from its key stakeholders to work through the restructuring process.

54.    In addition to stabilizing the Company's immediate business operations, the Company must develop a long-term strategy.  The Company had already attempted to pursue additional equity or debt financing through a failed process in the spring of 2015, so our focus was directed to the sale of assets to create liquidity for short-term survival while evaluating sale options.

55.    After considering numerous alternatives, including whether to sell some or all of the Company's key brands, I concluded that a sale of the Company or substantially all of the Company's assets would best position the Company to maximize its value and achieve long-term viability.  Over the past few months, the Company has worked closely with Wells Fargo to find a

buyer, establish a comprehensive sales process, and ensure operational functionality so that the Company can maintain, and ultimately maximize, its value, and to ensure that the Company has access to postpetition financing.

56.     To facilitate a sale of Company assets, the Company undertook a process to research and identify potential buy-side candidates including several U.S. and international companies that had the necessary capacity, business expertise, and interest to establish a position in the consumer watch market in the United States and abroad.  In addition, we identified previous stakeholders in the Company who were familiar with its operations and considered financial buyers with an interest in the industry through other investments.

57.     Our initial focus was primarily on strategic industry buyers that would have the financial means and business wherewithal to complete the transaction on a relatively short-term basis, while maintaining sufficient working capital to stabilize and grow the business following a sale.  I started the sale process with twenty-two (22) candidates and, prior to bankruptcy, nine (9) companies expressed significant interest and entered into Non-Disclosure Agreements with the Company to undertake a diligence review of the Company.

58.     To further aid in the sale of the business, in August 2015, the Company hired the well-known investment banking firm Imperial Capital, LLC ("**Imperial**") to identify additional strategic and financial buyers, and, ultimately, run a marketing and sale process of the Company's assets.  Following Imperial's efforts, a total 153 potential buyers were identified, of which 148 were contacted and 38 entered into Non-Disclosure Agreements as of the Petition Date.

59.     After contacting potential candidates, the Company reviewed the business situation and sale opportunity with the candidate's business teams and professionals.  The Company has provided extensive information during this process through the use of an electronic data room,

9969019

calls with the candidates and their professionals, responses to information requests, and in-person meetings.

60.        As the result of these significant marketing efforts to attract potential buyers, the Debtors received three (3) proposals, all of which contemplated a sale of assets free and clear of liens and claims pursuant to § 363 of the Bankruptcy Code.  These efforts ultimately culminated in a signed purchase agreement (the "**Stalking Horse Agreement**"), which will serve as the potential purchaser's (the "**Stalking Horse Bidder**") stalking horse bid in a bankruptcy auction process, and is designed to maximize value for the bankruptcy estate and has few conditions to close.  The Debtors believe that the bankruptcy auction contemplated under the Stalking Horse Agreement will interest other bidders such that the total consideration for the assets will increase after the auction.  The bid procedures contemplate that any qualified bid by a proposed purchaser will be assessed on, among other things, the bidder's ability to obtain approval of the Debtors key licensors, including but not limited to Kenneth Cole.

61.        The Stalking Horse Agreement represents a binding bid for the "Purchased Assets" of the Company as described in the Stalking Horse Agreement, including include certain unexpired leases and contracts (the "**Purchased Contracts**") and certain inventory, equipment, furnishings, books and records, and customer data.  The total purchase price for the Stalking Horse Bid is $15,000,000 in cash, less any cure amounts in excess of $500,000, subject to certain adjustments and subject to higher or otherwise better offers, plus the assumption of the Assumed Liabilities and payment of all Cure Amounts (as those terms defined in the Stalking Horse Agreement).  In the event that the sale to the Stalking Horse Bidder or another qualified bidder is consummated, the Debtors would, subject to applicable law, assume and assign the Purchased Contracts to such Stalking Horse Bidder.

21

62.    In addition, the Company has negotiated and obtained a commitment from Wells Fargo to provide critical postpetition financing, as discussed further in Section IV(B)(7) below, *infra* at paragraph 89.  Assuming a sale to the Stalking Horse Bidder or another qualified bidder is consummated, I anticipate that the postpetition financing should be sufficient to support the Company through these chapter 11 cases.  The Company and Wells Fargo have agreed to a revolving postpetition facility that will provide for availability based on collections of receivables and additional inventory sales.  This facility will provide the Debtors with up to $18,500,000 of postpetition financing inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,000,000.  The revolver will continue in accordance with the post-petition facility, the interim order, and the budget set forth in the DIP Motion (as discussed further below).

## IV.    **First-Day Motions**

63.    The Debtors have filed their First-Day Motions contemporaneously herewith to ensure that the Debtors' businesses continue to function during these chapter 11 cases.  For the reasons below, the relief requested in the First-Day Motions is necessary to (i) stabilize the Debtors' business operations, (ii) operate with minimal disruption during the pendency of these cases, (iii) maintain and maximize value of the Debtors', and (iv) facilitate the efficient and economical administration of these cases, and, therefore, the First-Day Motions should be granted. A description of the relief requested and the facts supporting each of the First-Day Motions is set forth below.[6]

---

[6]    Capitalized terms used but not otherwise defined in this Section shall have the meanings ascribed to them in the applicable First Day Motion.

9969019

A.    **Administrative Motions**

1.    **Debtors' Motion for Entry of an Order Directing Joint Administration of Chapter 11 Cases ("Joint Administration Motion")**

64.    Pursuant to the Joint Administration Motion, the Debtors request entry of an order (a) directing procedural consolidation and joint administration of these chapter 11 cases and (b) granting related relief.    Given the integrated nature of the Debtors' operations, joint administration of these chapter 11 cases will provide significant administrative convenience and cost savings without harming the substantive rights of any party in interest.    Many of the motions, hearings, and orders in these chapter 11 cases will affect each and every Debtor entity.    For example, virtually all of the relief sought by the Debtors in the First Day Motions is sought on behalf of all of the Debtors.    The entry of an order directing joint administration of these chapter 11 cases will reduce fees and costs by avoiding duplicative filings and objections.    Joint administration of the these chapter 11 cases under a single docket entry will also ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as a single joint proceeding instead of four independent chapter 11 cases.    The Joint Administration Motion is for procedural purposes only and does not seek to substantively consolidate the Debtors' estates.

65.    I believe that the relief requested in the Joint Administration Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.    Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

9969019

2.    **Debtors' Motion for an Order (I) Approving Case Management and Notice Procedures and (II) Granting Debtors Authority to File a List of Creditors and Equity Security Holders in Lieu of a Creditor Matrix ("Case Management Motion")**

66.    Pursuant to the Case Management Motion, the Debtors seek authority to (i) establish case management procedures (the "**Case Management Procedures**") and (ii) file a list of creditors in lieu of a creditor matrix.  Among other things, the proposed Case Management Procedures will establish uniform requirements for filing and serving notice, motions, and other papers in these chapter 11 cases, provide mandatory guidelines governing hearings and objections, and limit matters that are required to be heard by the Court.  To the extent such Case Management Procedures are inconsistent or conflict with the Bankruptcy Rules or the Local Bankruptcy Rules, the Debtors request that the Case Management Procedures shall govern and supersede such rules.

67.    The proposed Case Management Procedures set forth in the proposed order attached to the Case Management Motion are in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

68.    Given the size and scope of the chapter 11 cases, the proposed Case Management Procedures will facilitate service of Court papers in a manner that will be less burdensome and costly than serving such pleadings on every potentially interested party, which, in turn, will maximize the efficiency and orderly administration of these chapter 11 cases.  I expect there will be numerous parties in interest in these chapter 11 cases and anticipate that a significant number of parties will file requests for service of filings.  The costs and burdens that might arise absent adoption of the proposed procedures—such as, for example, those associated with multiple hearings per month, plus the costs associated with copying, mailing, delivering, or otherwise

serving paper copies of all such documents—could impose significant economic and administrative burdens on the Debtors' estates and the Court.

69.     Moreover, permitting the Debtors to file a consolidated list of creditors in lieu of submitting separate mailing matrices for each Debtor is also in the best interests of the Debtors' estates, their creditors, and all other parties in interest.   The Debtors propose to retain Epiq Bankruptcy Solutions, LLC ("**Epiq**" or "**Claims Agent**") as notice and claims agent to assist the Debtors in preparing creditor lists and mailing initial notices in these chapter 11 cases.  With such assistance, the Debtors can file a computer-readable, consolidated list of creditors upon request and will be capable of undertaking all necessary mailings.  Indeed, because the Debtors have hundreds of creditors, converting the Debtors' computerized information to a format compatible with the matrix requirements would be an exceptionally burdensome task and would greatly increase the risk and recurrence of error with respect to information already intact on computer systems maintained by the Debtors.  In addition, consolidating the Debtors' computer records into a creditor database will be sufficient to permit notice to be served promptly on those parties who are required to receive notice under the Case Management Procedures.  Maintaining electronic-format lists of creditors rather than preparing and filing separate matrices will maximize efficiency and accuracy and reduce costs.

70.     Accordingly, on behalf of the Debtors, I respectfully submit that the Case Management Motion should be approved.

### 3.     Debtors' Motion to Extend Deadline for Filing Schedules, Statement of Financing Affairs, and Rule 2015.3 Reports ("<u>Schedules Extension Motion</u>")

71.     Pursuant to the Schedules Extension Motion, the Debtors request an order extending the deadline to file the Schedules, the SOFA, and related other documents as set forth in § 521 of the Bankruptcy Code, Bankruptcy Rule 1007, and Local Bankruptcy Rule 1007-1 to

forty-five (45) days after the Petition Date for cause pursuant to § 105(a) of the Bankruptcy Code and Bankruptcy Rule 1007(c).  Additionally, the Debtors request an extension of the deadline to file the 2015.3 Reports pursuant to Bankruptcy Rule 2015.3(d) to thirty (30) days after the date first set for the meeting of creditors pursuant to § 341(a) of the Bankruptcy Code.  The Debtors request the foregoing extensions without prejudice to the Debtors' rights to request additional time should it become necessary.  Cause exists to grant the requested continuances in light of the many competing demands on the Debtors' time and resources as well as the significant complexity involved in reviewing the Debtors' assets and liabilities.

72.    On the Petition Date, the Debtors filed with the Court a consolidated list of creditors holding secured claims and the 30 largest unsecured claims against the Debtors' estates.  However, given the size, geographic scope, and complexity of the Debtors' operations, the Debtors anticipate that they will be unable to complete their Schedules, SOFA, and 2015.3 Reports in the short amount of time provided under Bankruptcy Rules 1007(c) and 2015.3(a).  The Debtors hold an aggregate of approximately $41,457,000 in assets and approximately $98,057,000 in liabilities.  The Debtors estimate that they have approximately 300 creditors on a combined basis and approximately 4,000 customers.

73.    To prepare the Schedules, SOFA, and 2015.3 Reports, the Debtors must compile information from books, records, and other documents relating to, among other things, purchase agreements, letters of intent, release requests, purchase orders, capital and leveraged leases, employee wages and benefits, and vendor and supplier agreements located at various locations. This task is complicated due to the liquidation proceedings currently pending in Hong Kong with respect to AWC Far East.  Collecting the necessary information to prepare the Schedules, SOFA,

and 2015.3 Reports requires an enormous expenditure of time and effort on the part of the Debtors and their employees.

74.     This task is further complicated by the fact that the Debtors must continue to operate while responding to the demands of these bankruptcy cases.  While the Debtors, with the assistance of their professional advisors, are mobilizing their employees to work diligently and expeditiously in preparation of the Schedules, SOFA and 2015.3 Reports, the Debtors resources are strained.  Given the amount of work entailed in completing the documents, and the competing demands on the Debtors' employees and professionals to support the restructuring efforts and assist in efforts to stabilize business operations during the initial postpetition period, the Debtors likely will not be able to properly and accurately complete the Schedules, SOFA, and 2015.3 Reports within the required time periods.

75.     I believe that the relief requested in the Schedules Extension Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without or with minimal disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Schedules Extension Motion should be approved.

**4.      Debtors' Application for Order under 28 U.S.C. § 156(c), 11 U.S.C. § 503(b)(1)(A), Fed. R. Bankr. P. 2014(a) and 2016, and Local Bankruptcy Rule 5075-1 Authorizing the Employment and Retention of Epiq Bankruptcy Solutions, LLC as Notice and Claims Agent ("<u>Notice and Claims Agent Application</u>")**

76.     Pursuant to the Notice and Claims Agent Application, the Debtors seek an order authorizing the employment and retention of Epiq as their notice and claims agent in these chapter 11 cases in accordance with the terms and conditions set forth in that certain engagement letter dated as of August 14, 2015, by and between the Debtors and Epiq (the "**Engagement Letter**").

9969019

77.    The Debtors believe that their estates and their creditors will benefit from Epiq's retention because Epiq has developed efficient and cost-effective methods in this area of expertise. The Debtors believe that the rates negotiated with Epiq are reasonable and appropriate for the services to be rendered during these chapter 11 cases.  Prior to retaining Epiq, the Debtors solicited proposals from other firms that provide comparable services and believe that Epiq's rate structure is more than reasonable in light of their experience and reputation for handling large chapter 11 cases.

78.    Prior to the Petition Date, the Debtors provided Epiq a retainer in the amount of $10,000.  Epiq may apply its retainer to all prepetition invoices, which retainer shall be replenished to the original retainer amount, and thereafter, Epiq may hold its retainer under the Service Agreement during these chapter 11 cases as security for the payment of fees and expenses incurred under the Service Agreement.

79.    Accordingly, on behalf of the Debtors, I respectfully submit that the Notice and Claims Agent Application should be approved.

**5.    Debtors' Application under Section 327 of the Bankruptcy Code and Bankruptcy Rule 2014(a) for Authority to Employ and Retain Epiq Bankruptcy Solutions, LLC as Administrative Agent *Nunc Pro Tunc* to the Petition Date ("<u>Administrative Agent Application</u>")**

80.    Pursuant to the Administrative Agent Application, the Debtors seek authorization for an order authorizing the employment and retention of Epiq as administrative agent *nunc pro tunc* to the Petition Date on substantially the terms and conditions set forth in the Services Agreement.  Appointing Epiq as the administrative agent in these chapter 11 cases will provide the most cost-effective and efficient administrative service.   Based on Epiq's experience, reputation, and the reasonableness of its fees, Epiq is well qualified to serve as administrative agent and that such retention is in the best interests of the Debtors' estates and their creditors.

9969019

81.     The Debtors seek to retain Epiq to provide, among other things, the necessary bankruptcy and administrative services set forth in the Administrative Agent Application. Appointing Epiq as administrative agent is in the best interest of the Debtors' estates because the administration of these cases will be expedited by relieving the Debtors and the Debtors' professionals of handling these administrative services.

82.     The Debtors respectfully submit that the fees Epiq will charge in connection with its services to the Debtors, as set forth in the Services Agreement, are competitive and comparable to the rates Epiq's competitors charge for similar services.  Indeed, the Debtors conducted a bidding process and competitive comparison of two other firms prior to selecting Epiq as administrative agent.  The Debtors believe Epiq's rates are reasonable given the quality of Epiq's services and Epiq's prior bankruptcy expertise.  In addition, Epiq will maintain detailed records of all services showing dates, category of services, fees charged and expenses incurred.

83.     Accordingly, on behalf of the Debtors, I respectfully submit that the Notice and Claims Agent Application should be approved.

### 6.     Debtors' Motion for Entry of an Order Authorizing the Retention and Compensation of Certain Professionals Utilized in the Ordinary Course of Business ("Ordinary Course Professionals Motion")

84.     Pursuant to the Ordinary Course Professional Motion, the Debtors request that the Court enter an order authorizing the Debtors to continue to retain and compensate certain ordinary course professionals ("OCPs") on a postpetition basis in accordance with the Ordinary Course Professional Procedures set forth in the Ordinary Course Professional Motion, without the need for each OCP to file formal applications for retention and compensation.

85.     The Debtors retain various attorneys in the ordinary course of their businesses, including the OCPs, which render a wide range of services to the Debtors in a variety of matters unrelated to these chapter 11 cases, including labor and employment, intellectual property,

litigation, customs and taxes, as well as other services that have a direct and significant impact on the Debtors' day-to-day operations.

86.     The Debtors submit that the continued employment and compensation of the OCPs is in the best interests of the Debtors' estates, creditors, and other parties in interest.  Although the Debtors anticipate that the OCPs will wish to continue to represent the Debtors during these chapter 11 cases, it is likely some or all of the OCPs would not be in a position to do so if the Debtors cannot pay them on a regular basis.  Without the background knowledge, expertise, and familiarity that the OCPs have relative to the Debtors and their operations, the Debtors would incur additional and unnecessary time and expenses in educating and retaining replacement professionals.  The Debtors' estates and their creditors are best served by avoiding any disruption in the professional services that are required for the day-to-day operation of the Debtors' business. Moreover, the Debtors have consciously limited the number of OCPs to just three, and given the costs associated with the preparation of employment applications for professionals (who will receive relatively modest fees), the Debtors submit that it would be inefficient and costly for the Debtors and their counsel to prepare and submit individual applications and proposed retention orders for each such professional.

87.     Although the OCPs may hold relatively small unsecured claims against the Debtors in connection with services rendered to the Debtors prepetition, I do not believe that any of the OCPs have an interest materially adverse to the Debtors, their creditors, or other parties in interest. Under the Ordinary Course Professionals Motion, the Debtors are not requesting authority to pay prepetition amounts owed to OCPs.

88.     The Debtors have prepared, and submit to the Court for approval, the Ordinary Course Professional Procedures which are included in the Ordinary Course Professional Motion.

9969019

I believe that the continued retention and payment of the OCPs in accordance with the Ordinary Course Professional Procedures will allow the Debtors to continue to utilize and benefit from the OCPs' services. I believe that the continued retention and compensation of the OCPs is in the best interests of the Debtors' estates, creditors, and other parties in interest, and therefore request that the Court grant the Ordinary Course Professional Motion.

### B.    Operational Motions Requesting Immediate Relief

> 7.    **Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Obtain Postpetition Financing and Grant Security Interests and Superpriority Administrative Expense Status; (II) Modifying the Automatic Stay; (III) Authorizing the Debtors to Enter into Agreements with Wells Fargo Bank, National Association; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief ("DIP Motion")**

89.    Pursuant to DIP Motion, the Debtors request entry of an interim order, substantially in the form of order attached to the DIP Motion (the "**Interim DIP Order**"), (i) authorizing the Debtors, on an interim basis, to obtain post-petition financing on a senior secured, superpriority basis, and use the Cash Collateral (as defined in § 363 of the Bankruptcy Code), and (ii) granting adequate protection to the Pre-Petition Secured Lenders in respect of their existing liens and the Debtors' use of the Cash Collateral, among other things. Debtors also request that the Court enter a final order (the "**Final DIP Order**" and together with the Interim DIP Order, the "**DIP Orders**") authorizing the relief granted in the Interim DIP Order on a permanent basis as described in the DIP Motion.

90.    The DIP Orders will provide the Debtors with critical and necessary access to a senior secured superpriority debtor-in-possession revolving credit and letter of credit facility of up to $18,500,000, inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,000,000 (the "**DIP Facility**"), pursuant to the terms and conditions of that certain Ratification and Amendment Agreement dated as of September 30, 2015 (the "**Ratification Agreement**") by

and among Debtors Advance Watch, Sunburst Products, Inc. and GWG International, Ltd., as

Borrowers, Binda USA, as Guarantor, Wells Fargo, as administrative agent and collateral agent

under the DIP Facility (in such capacities, the "**DIP Loan Agent**"), and the lenders from time to

time party thereto (collectively, the "**DIP Lenders**"), substantially in the form attached as

**Exhibit 1** to the Interim DIP Order, which ratifies and amends the Pre-Petition Revolving Credit

Agreement (as ratified and amended by the Ratification Agreement, the "**DIP Credit**

**Agreement**").[7]

> (i)    The Debtors' Marketing Efforts for Post-Petition Financing

91.    As described above, on or about August 4, 2015, the Debtors engaged Imperial to

identify potential strategic and financial buyers, and, ultimately, run a marketing and sale process

of the Debtors' assets.    Additionally, at the request of the Debtors, Imperial identified and

contacted six (6) third parties as potential sources of debtor in possession financing.  The third

parties solicited by Imperial included sophisticated financial institutions, hedge funds, and lower-

middle-market business lenders active in the debtor in possession financing market, which

Imperial had identified based on a number of factors, including their ability to quickly complete

diligence and fund a transaction through debtor in possession financing.  Through discussions with

these potential third-party lenders, it quickly became apparent that the relatively small size of the

potential loan, the Debtors' existing capital structure, including the Debtors' level of secured debt

(relative to asset value) and lack of unencumbered assets, as well as the Debtors' niche market,

foreclosed any opportunities for the Debtors to access unsecured or junior credit.  Further, in the

absence of a successful priming fight, any debtor in possession loan provided by parties other than

---

[7]    It is my understanding that the DIP Loan Agent has represented that, in accordance with the bank's policy, the
DIP Loan Agent has executed the Ratification Agreement and will release the signature pages upon entry of an
order granting the relief sought in the DIP Motion.

9969019

the Pre-Petition Secured Lenders would have required the consent of the Pre-Petition Secured

Lenders, which had indicated they would not be willing to provide.    Based on numerous

conversations with the Pre-Petition Secured Lenders as part of this process, it became readily

apparent that a collateral priming fight with a third-party lender would be extremely time intensive,

expensive and not value accretive to the Debtors as compared to the DIP Financing negotiated

with the Pre-Petition Secured Lenders.

(ii)    <u>The DIP Facility</u>

92.    After extended good faith, arm's-length negotiations, certain of the Pre-Petition

Secured Lenders, as proposed DIP Lenders, agreed to provide the DIP Facility on the terms

provided in the DIP Credit Agreement, summarized above.    The proceeds of the DIP Facility,

which the Debtors estimate, assuming a sale to the stalking horse or another qualified bidder is

consummated, will be sufficient to support them through the pendency of these chapter 11 cases,

will be used (a) for general working capital and other purposes permitted under the DIP Credit

Agreement; (b) to fund the costs of administering these chapter 11 cases; and (c) to pay all fees

and expenses provided for under the DIP Credit Agreement and authorized by the Court, as more

fully set forth in the interim order.

93.    Based on my experience and understanding, terms similar to those included in the

DIP Facility are standard for financing of this kind.    The Debtors successfully negotiated for

several key concessions from the DIP Lenders, including more flexible covenant defaults, an

increase in the amount of the revolving loan facility, an increase in the letter of credit facility, more

flexible operating tests, a more favorable DIP Facility fee, and, during pre-petition negotiations of

the DIP Facility, authorization by the Pre-Petition Loan Agent to borrow funds outside the

borrowing base formulas provided for under the Pre-Petition Revolving Loan Agreement.  Further,

the maximum loan limit provides up to $4,000,000 of pre-petition loans outside the applicable

33

9969019

formula.[8]  The terms of the DIP Facility, therefore, are an attractive option, especially in light of the inevitable priming fight that would occur to the extent the Debtors were to obtain financing from parties other than the Pre-Petition Secured Lenders.  Moreover, the DIP Facility is necessary to maximize the going concern value of the Debtors during these chapter 11 cases because the Debtors need operating funds, which would otherwise be unavailable, to continue sales operations during the upcoming holiday season.

(iii)    Use of Cash Collateral

94.    The DIP Credit Agreement also provides the Debtors with immediate access to the Cash Collateral, subject to the terms and conditions of the DIP Credit Agreement and the Interim DIP Order.  Immediate access to the Cash Collateral will (a) ensure that the Debtors have sufficient working capital to, among other things, pay their employees and vendors; (b) enable the Debtors to honor their pre-petition obligations under and in accordance with other "first-day" orders entered by the Court; and (c) satisfy administrative expenses incurred in connection with the commencement of these chapter 11 cases.  By providing the Debtors with the immediate right to use the Cash Collateral in whichever of the Debtors' accounts it is currently held, the DIP Credit Agreement also avoids any business disruptions that would result if the Debtors were required to borrow under a post-petition facility to replenish their various operating accounts.

(iv)    Adequate Protection Obligations

95.    The Debtors and the Pre-Petition Secured Lenders have agreed on consideration (the "**Adequate Protection Obligations**") as adequate protection for the diminution in value of

---

[8]    This $4 million pre-petition overadvance (the "**Overadvance**") is included as part of the DIP Facility and will be paid down, or gradually "rolled up", through payments made from post-petition operating revenue (from inventory, receivables, collateral, or otherwise).  As a result, availability of funds under the DIP Facility revolver will increase as the Debtors' borrowing base improves, all in accordance with the Budget.  The gradual roll-up of the Overadvance will be subject to the challenge rights of parties in interest provided for in the Bankruptcy Code, Bankruptcy Rules and Local Bankruptcy Rules.

the Pre-Petition Secured Lenders' interests in the Pre-Petition Collateral, including Cash Collateral, on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses. Specifically, the Pre-Petition Loan Agent, for the benefit of itself and the Pre-Petition Secured Lenders, will be granted pursuant to §§ 361 and 363 of the Bankruptcy Code, the Revolving Loan A/L Replacement Lien.[9]    The Revolving Loan A/L Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent set forth in the Interim DIP Order, (B) the Permitted Liens and Permitted Indebtedness, and (C) DIP Loan Agent's and DIP Lenders' liens on the Collateral to secure the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or claims against any of the Collateral.

96.    I believe that the Debtors' execution of the DIP Loan Documents is an exercise of their sound business judgment that warrants approval by the Court.  Prior to the Petition Date, the Debtors and their advisors undertook a detailed investigation as to the Debtors' projected financing needs during the pendency of any chapter 11 case, and determined that the Debtors would require post-petition financing to support their operational and restructuring activities.  Accordingly, the Debtors negotiated the DIP Loan Documents with the DIP Lenders in good faith, at arm's-length, and with the assistance of outside advisors, in order to obtain the required post-petition financing on terms favorable to the Debtors.  Based on the advice of counsel and other professionals, and the Debtors' own analysis, the Debtors have determined in their sound business judgment that the DIP Loan Documents provide financing on more favorable terms than any other reasonably available alternative.

---

[9]    The Debtors' obligations under the Pre-Petition Credit Facility are secured by first-priority, perfected security interests in inventory of the Debtors that is, as of the Petition Date, in the United States or otherwise released by the U.S. Customs and Border Protection Agency.

9969019

97.    Specifically, the DIP Loan Documents will provide the Debtors with access of up to $4 million in excess of the pre-petition lending formulas, which the Debtors and their advisors have independently determined should be sufficient to support the Debtors' ongoing operations and reorganization activities through the pendency of these chapter 11 cases. Additionally, the DIP Loan Documents provide the Debtors with access to the Cash Collateral, which relieves the Debtors of the cost of borrowing additional amounts to replace that cash. Accordingly, because entering into the DIP Loan Documents constitutes an exercise of the Debtors' sound business judgment, I respectfully request that the DIP Motion should be approved by the Court.

**8.    Debtors' Motion for (I) Authority to (A) Continue Using Existing Cash Management System, (B) Maintain Existing Bank Accounts and Business Forms, and (II) Related Relief ("Cash Management Motion")**

98.    Pursuant to the Cash Management Motion, the Debtors seek entry of an order (1) authorizing the Debtors to (a) continue using their prepetition Cash Management System, including the maintenance of existing bank accounts (the "**Bank Accounts**") at which they are maintained (the "**Banks**")—which does not include any accounts of non-debtor foreign affiliates— consistent with their prepetition practices, and (b) maintain existing business forms, and (2) granting related relief.

(i)    Continued Use of Current Cash Management System

99.    In connection with the Cash Management System, the Debtors maintain five Bank Accounts at Wells Fargo: the Operating Account, the Lockbox Account, the Checking Account, the Payroll and Benefits Account, and the Professional Fee Carve Out Account. Advance Watch owns and maintains these Cash Management System accounts, and funds are routinely transferred between and among the four of the five Bank Accounts in the ordinary course of business. The Operating Account was formerly funded from funds received through the Advance Watch's depository account, *i.e.*, the Lockbox Account, and holds funds for disbursement to (i) a controlled

36

disbursement account, *i.e.*, the Checking Account, (ii) the Payroll and Benefits Account, and (iii) a separate controlled disbursement account, *i.e.*, the Professional Fee Carve Out Account.  All bank fees incurred from the various Bank Accounts are billed to the Operating Account.

100.    The Cash Management System is comparable to the centralized cash management systems used by similarly situated companies to manage the cash of operating units in a cost-effective, efficient manner.  The Debtors utilize a centralized Cash Management System in the ordinary course of their businesses to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting.  The Debtors' accounting department maintains daily oversight over the Cash Management System and implements cash management controls for entering, processing, and releasing funds.  Further details about the Cash Management System accounts, including bank fees, current balances, and agreements that govern the flow of funds among the accounts are provided in the Cash Management Motion.

101.    The Debtors have utilized the Cash Management System as a part of their ordinary and usual business practices.  The Debtors' continued use of the Cash Management System will minimize disruptions to the Debtors' business operations and will preserve estate value.  The Cash Management System provides significant benefits to the Debtors, including the ability to control and centrally manage corporate funds, ensure the availability of funds when necessary, reduce administrative costs by facilitating the movement of funds, and develop more timely and accurate balance and presentment information.

102.    Indeed, strict adherence to the United States Trustee's Guidelines regarding the creation of postpetition bank accounts, payment limitations, and limits on the use of petty cash would significantly impair the Debtors' reorganization efforts.  The Debtors will require significant time and resources to modify the Cash Management System to one consistent with the

9969019

United States Trustee's Guidelines and the Debtors' business operations will be significantly impaired during this critical time if the Debtors are required to open new accounts, revise cash management procedures, and instruct customers to redirect payments.

103.    An order expressly granting the Banks authority to continue administering the Bank Accounts without interruption and in the ordinary course of business will ensure that all postpetition checks, drafts, or wires issued from the Bank Accounts will not be delayed or otherwise negatively impact the Debtors' postpetition operations.  As soon as practicable, the Debtors will provide written direction to the Banks identifying which checks should and should not be honored and informing the Banks should continue to administer the Bank Accounts postpetition.

(ii)    <u>Existing Business Forms and Checks</u>

104.    Debtors also request relief to waive the requirements that the Debtors make additional, unnecessarily burdensome modifications to the documents with which Debtors conduct ordinary course business operations.  The Debtors utilize a multitude of check types, including electronic checks (the "**Checks**").  Additionally, the Debtors use a variety of correspondence and business forms, including, but not limited to, purchase orders, and other business forms (collectively, the "**Business Forms**").  Such relief will minimize the expense to the Debtors' estates associated with developing or purchasing entirely new Checks and Business Forms, the delay in conducting business prior to obtaining such forms, and the confusion of supplier and other vendors.  The Debtors will use their reasonable best efforts to mark "debtor in possession" on newly purchased Checks and Business Forms as soon as reasonably practicable following the Petition Date.

38

9969019

105.    I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in chapter 11 without disruption.

106.    Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

> **9.    Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Pay Prepetition Wages, Salaries, Other Compensation and Reimbursable Expenses, and (II) Continue Employee Benefits Programs ("<u>Wage Motion</u>")**

107.    Pursuant to the Wage Motion, the Debtors request entry of an order (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable expenses, and (ii) continue employee benefits programs in the ordinary course of business, including payment of certain prepetition obligations related thereto, (b) scheduling a final hearing to consider entry of the Final Order, and (c) granting related relief.

108.    The Debtors' operations generally consist of designing and distributing consumer watches and clocks.  The Debtors, through Advance Watch, currently employ 113 individuals on a full-time basis and one individual on a part-time basis (collectively, the "**Employees**"), all of whom are eligible to receive certain Employee Compensation and Benefits.  No Employee is represented by a collective bargaining unit.

109.    To supplement their workforce, the Debtors currently utilize three independent contractors (collectively, the "**Independent Contractors**"), who provide critical services to the Debtors, including information technologies, customer relations, and restructuring-related services.  To further supplement their workforce, the Debtors also utilize temporary employees from time to time (the "**Temporary Employees**"), who perform certain functions at the Debtors' warehouses.  The Debtors had an average of eight daily Temporary Employees as of the Petition

Date.  In addition, the Debtors utilize 65 independent sales personnel (the "**Independent Sales Representatives**") to conduct on-site sales of merchandise.

110.    The Employees, Independent Contractors, and Independent Sales Representatives perform a wide variety of functions crucial to the administration of these chapter 11 cases and the Debtors' operations.  Their skills, knowledge, and understanding of the Debtors' operations and infrastructure are essential to preserving operational stability and efficiency.  The Employees and Independent Contractors include highly trained personnel who cannot easily be replaced.  Accordingly, without the continued, uninterrupted services of the Employees and Independent Contractors, the Debtors' reorganization will be materially impaired.

111.    Additionally, the vast majority of the Employees and Independent Contractors rely exclusively on their compensation and benefits to pay their daily living expenses and to support their families.  Thus, the Employees and Independent Contractors will be exposed to significant financial constraints if the Debtors are not authorized to continue paying wages and salaries, providing benefits, and maintaining certain programs benefiting those individuals in the ordinary course of business.  The Debtors, therefore, respectfully submit that the relief requested in the Wage Motion is necessary and appropriate under the facts and circumstances of these chapter 11 cases.

112.    As detailed in the Wage Motion, the Debtors request authority to pay and honor certain prepetition claims and/or continue to honor obligations on a postpetition basis, as applicable, relating to, among other things, wages, contractor fees, payroll processing, reimbursable expenses, corporate credit cards, federal and state withholding taxes and other amounts withheld (including garnishments, transit and parking costs, 401(k) contributions, and Employees' share of insurance premiums and taxes), health insurance benefits, health savings

9969019

accounts, standard life and accidental death and dismemberment ("**AD&D**") insurance, short- and long-term disability benefits, the workers' compensation program, the 401(k) plan, paid time off benefits, and miscellaneous other benefits the Debtors have historically provided to Employees and/or Independent Contractors (collectively, the "**Employee Compensation and Benefits**").  In total, through the Wage Motion, the Debtors seek authorization to pay prepetition Employee Compensation and Benefits in the approximate amount of $536,096 on an interim basis and approximately $568,872 on a final basis.  The Debtors also seek to continue to honor the Employee Compensation and Benefits provided to Employees and Independent Contractors on a postpetition basis in the ordinary course of business and pay all necessary costs incident to these arrangements.

113.    I believe that paying prepetition amounts owed on account of the Employee Compensation and Benefits will benefit the Debtors' estates and their stakeholders by allowing the Debtors' business operations to continue without interruption.  Indeed, I believe that without the requested relief, the Employees and Independent Contractors may seek alternative opportunities, perhaps with the Debtors' competitors.  Such a development would deplete the Debtors' workforce, hindering the Debtors' ability to maintain and maximize value for its stakeholders.  The loss of valuable Employees and Independent Contractors and the resulting need to recruit new personnel to replenish the Debtors' workforce would be distracting and counterproductive at this critical time in these chapter 11 cases.  Further, if the Debtors lose valuable Employees and Independent Contractors, they will incur recruiting expenses in locating replacements.  Accordingly, there can be no doubt that the Debtors must do their utmost to retain their workforce by, among other things, continuing to honor the Employee Compensation and Benefits that accrued prepetition.  Based on the foregoing, I respectfully submit that the Wage Motion should be approved.

9969019

10.    **Debtors' Motion for Entry of Interim and Final Orders Authorizing the Debtors to (I) Maintain and Administer Customer Programs and (II) Honor Prepetition Obligations Related Thereto ("Customer Programs Motion")**

114.    Pursuant to the Customer Programs Motion, the Debtors seek entry of an order authorizing the Debtors, in their sole discretion, to (a) honor outstanding obligations (including, without limitation, returns and refunds, special pricing arrangements, and credits) earned by and owing to their customers under customer-based programs (the "**Customer Programs**"),[10] regardless of whether such obligation was incurred before or after the Petition Date, including accrued prepetition obligations in the approximate amount of $3,500,000 in the aggregate (collectively, the "**Customer Program Obligations**") and (b) continue to honor the Customer Programs postpetition in the ordinary course of business.

115.    Generally, the Debtors have two types of customers: retailers and consumers.  The Debtors' retailer-customers purchase product from the Debtors in volume for sale to consumers at the retailers' locations.  The Debtors' consumer-customers purchase product directly from the Debtors through online purchases.  To develop and sustain a positive reputation for the Debtors' goods in the marketplace and to attract new customers and enhance loyalty and sales among the Debtors' existing customer base, in the ordinary course of their businesses, the Debtors offer their certain Customer Programs, which generally can be categorized as (a) customer discounts and accommodations and (b) merchandise returns and credits.

116.    For the reasons detailed in the Customer Programs Motion, I believe the Customer Programs are integral to the Debtors' success because they help maintain the confidence and goodwill of the Debtors' customer base.  Restricting or canceling the Customer Programs could jeopardize customer relations and irreparably harm the Debtors' reputation.  Indeed, the Debtors'

---

[10]    It is my understanding that the Customer Programs obligations will be assumed by any purchaser of the Debtors.

9969019

customer relationships are their estates' most valuable assets, and the Debtors must do everything possible to preserve and stabilize those relationships. Any disruption to the Customer Programs would seriously harm the Debtors and their estates. Based on the foregoing, I respectfully submit that the Customer Programs Motion should be approved.

> **11.      Debtors' Motion for an Order Authorizing, but Not Directing, Debtors to Pay Certain Prepetition Shipping Charges, Warehousing Charges, Possessory Liens Related Thereto, Customs Duties, and Charges Related to Prepetition Orders ("Shipping Motion")**

117.    Pursuant to the Shipping Motion, the Debtors seek entry of an order authorizing, but not requiring, the Debtors to (i) pay prepetition charges to Shippers, Warehousers, and Other Lien Claimants conditioned on customary trade terms and the release of any liens, (ii) pay outstanding Customs Duties and Prepetition Orders, and (iii) continue to pay such charges postpetition. As of the Petition Date, the Debtors estimate that $23,067.13 in Shipping and Warehousing Charges, $165,778.02 potential Other Lien Claimant charges, and $30,690.95 of Customs and Duties. During the first thirty (30) days postpetition, the Debtors anticipate that they will incur approximately $121,206 in Shipping and Warehouse Charges.

118.    In addition approximately $4,900,530 in Prepetition Orders remain outstanding for Goods ordered by the Debtors that have not yet been delivered to the Debtors' facilities. The receipt of inventory under the Prepetition Orders also provides collateral to the DIP Lenders, which increases the Debtors' access to credit in accordance with the proposed terms of the DIP Facility, DIP Orders, and Budget (as those terms are defined in the DIP Motion). I believe that the total amount the Debtors propose to pay to the Vendors in connection with the Prepetition Orders is minor relative to the importance and necessity of the Goods.

119.    Debtors request authority to pay certain prepetition amounts owed to parties that may be able to assert possessory liens against the Debtors and their property that the Debtors

determine, in the exercise of their business judgment, to be necessary or appropriate to obtain the release of Goods held by potential Lien Claimants, and pay prepetition Customs Duties as the Debtors determine, in the exercise of their business judgment, to be necessary or appropriate to obtain Goods in transit and to satisfy any related liens.

120.    To meet their inventory and maintain uninterrupted operations, the Debtors rely heavily on third-parties, including Shippers who transport Goods for the Debtors and Warehousemen who store Goods while they are in transit.  Certain Goods may be held by Other Lien Claimants utilized in the ordinary course of business, such as watch repair service providers, who may be able to assert possessory liens.  Because of the commencement of these chapter 11 cases, certain shippers and warehousemen who hold Goods for delivery to or from the Debtors may refuse to release the Goods pending receipt of payment.

121.    Additionally, the Debtor utilizes international distribution channels to receive and distribute manufactured Goods.  As a result, the Debtor must timely pay Customs Duties to the U.S. Customs Service as well as third party Customs Brokers.  These payments include the Customs Duties which are ultimately paid by the Customs Brokers to the U.S. Customs Service and non-U.S. customs authorities as well as related fees charged by the Customs Brokers.  The Imported/Exported Goods include components, parts and equipment vital to the Debtors' business operations that the Debtors could not readily obtain from other suppliers.  If Customs Duties are not timely paid, the U.S. Customs Service and non-U.S. customs authorities may demand liquidated damages, assess interest, or impose other sanctions, including by asserting liens against the Imported/Exported Goods

122.    For the reasons detailed in the Shipping Motion, I believe the Debtors' continued payment of the foregoing shipping-related charges are integral to the Debtors' success because

they help maintain uninterrupted operation of the Debtors' supply and distribution chains.  Altering or impeding the Debtors' ability to ship and receive Goods could jeopardize customer relations and irreparably harm the Debtors' reputation.  Indeed, the Debtors' ability to continue to distribute Goods for retail is critical to maintain the Debtors' going-concern value.  Any disruption would seriously harm the Debtors and their estates.  Based on the foregoing, I respectfully submit that the Shipping Motion should be approved.

> **12.    Debtors Motion for Interim and Final Orders Authorizing the Debtors to (i) Maintain, Continue, and Renew Their Property, Casualty, Liability and Other Insurance Policies and Agreements, and (ii) Honor All Obligations in Respect Thereof ("Insurance Motion")**

123.    Pursuant to the Insurance Motion, the Debtors request an order authorizing but not directing them to: (a) maintain, continue and renew their Insurance Programs (defined below) and to honor all the obligations thereunder; and (b) honor all of their prepetition and postpetition obligations under and in connection with the Insurance Programs on an uninterrupted basis and in accordance with the same practices and procedures as were in effect before the Petition Date.  In connection therewith, the Debtors request authority to (x) renew or obtain new insurance policies as needed in the ordinary course of business and (y) pay any prepetition obligations under the Insurance Programs, including premiums and the Broker's Fees (collectively, the "**Insurance Obligations**").

> (i)    The Debtors' Insurance Programs

124.    In the ordinary course of their businesses, the Debtors maintain various liability, property, and other insurance programs (the "**Insurance Programs**"), as summarized in **Exhibit 1** attached to the Proposed Orders and in the Insurance Motion.  The Insurance Programs provide coverage for, among other things, liabilities and losses related to the Debtors' property, operation of business vehicles, directors' and officers' duties, employment practices and fiduciary duties,

crime, kidnap and ransom, and other property-related and general liabilities.[11]   The Insurance

Programs are essential to the preservation of the Debtors' businesses, properties, and assets, and

in many cases, coverage is required by various laws and contracts that govern the Debtors' business

conduct.

125.    The Debtors request that they be permitted to maintain their insurance under the

Insurance Programs.   Absent the relief requested, the Debtors would be required to obtain

replacement insurance on an expedited basis and at significant cost to the Debtors' estates.

126.    Accordingly, the Debtors request to pay all amounts owed under the Premium

Financing Agreement as and when such amounts come due is essential to the continuation of the

Debtors' business and to the ability of the Company to maximize value for the Debtors' estates.

(ii)    The Debtors' Insurance Financing Arrangements

127.    All of the Debtors' insurance programs, including the Insurance Programs that are

the subject of the Insurance Motion, require annual premium payments to be made at the beginning

of the applicable policy period.   Because it is not economically advantageous for the Debtors to

pay premiums on a lump-sum basis, the Debtors finance their premiums.   The Debtors finance

such premiums pursuant to a commercial premium financing agreement (the "**Premium

Financing Agreement**") entered into with McGriff, Seibels & Williams, Inc. (the "**Broker**"), the

Debtors' insurance broker.   Under Premium Financing Agreement, the Debtors finance all of the

premium payments for the Insurance Programs, which totaled $309,628.50[12] for the policy period

---

[11]   The named insureds under the Insurance Programs include certain of the non-debtor Far East Companies.  The
Debtors do not seek authorization to pay any Insurance Program Obligations with respect to any non-debtor
insureds, except as required under applicable law or where necessary or appropriate to preserve the value of the
Debtors and their estates during the pendency of their chapter 11 cases.

[12]   This amount includes the premiums for the Insurance Programs listed on Exhibit 1 to the Interim and Final
Proposed Orders attached to the Insurance Motion, as well as the premiums for (i) the Debtors' workers'
compensation program, which is described in detail in the Wage Motion, and (ii) marine stock throughput
insurance, which is described in both the Insurance Motion and the Shipping Motion.

from May 30, 2015 through May 30, 2016 (which amount does not include finance charges totaling $4,598.90). The financed premium payments were paid by the Broker to the Debtors' respective insurance carriers when due at the beginning of the applicable policy period. In exchange, under the Premium Financing Agreement, the Debtors agreed to make ten monthly payments to the Broker, each in the amount of $31,422.74. As part of the Premium Financing Agreement, the Debtors granted the Broker a security interest in, among other things, any and all unearned premiums or dividends which may become payable for any reason under the insurance programs financed. If the Debtors do not satisfy their obligations under the Premium Financing Agreement, the Broker has the right to terminate any covered insurance programs.

128.     As of the Petition Date, the Debtors are current on payments owed to the Broker under the Premium Finance Agreement. The next monthly installment of $31,422.74 will come due on October 30, 2015. Monthly installments will continue to come due under the Premium Finance Agreement on the 30th day of each month until the final installment payment is paid on February 29, 2016. The Debtors request the authority (but not direction) to continue to pay the amounts due under the Premium Finance Agreement.

(iii)     The Insurance Broker

129.     The Debtors employ the Broker to assist them with the procurement and negotiation of certain of their Insurance Programs. The Broker provides services to and receives compensation and, where applicable, commissions (the "**Broker's Fees**") from the Debtors pursuant to certain contracts with the Debtors. The Broker's Fees are paid by the Debtors' insurance carriers. The Debtors do not believe there are any outstanding prepetition amounts due on account of the Broker's Fees.

130.     I believe that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to

47

continue to operate their businesses in chapter 11 without disruption.  Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

> **13.    Debtors' Motion Pursuant to 11 U.S.C. §§ 366 and 105(a) for Entry of an Order (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment to Utilities, (II) Establishing Procedures for Resolving Objections by Utility Companies, and (III) Prohibiting Utilities from Altering, Refusing, or Discontinuing Service ("Utilities Motion")**

131.    Pursuant to the Utilities Motion, the Debtors seek an order (i) restraining utility service providers and their brokers (the "**Utility Companies**") from altering refusing, or discontinuing the Debtors' access to an uninterrupted supply of water, electricity, natural gas, waste management, telephone, internet, and other utility services (the "**Utility Services**"), as that term is defined in § 366 of the Bankruptcy Code, because of the commencement of these chapter 11 cases or a debt owed by the Debtors for Utility Services rendered prior to the Petition Date, (ii) approving the Proposed Adequate Assurance, and (iii) establishing procedures for resolving objections by the Utility Companies relating to the adequacy of the Proposed Adequate Assurance.

132.    To operate their businesses, manage their properties, and fulfill their contractual obligations, including their online marketing efforts, the Debtors obtain Utility Services from a number of the Utility Companies.  The Utility Companies, and their affiliates, that provide Utility Services to the Debtors as of the Petition Date, include, but are not limited to, those listed on **Exhibit 1** to the Interim Order (the "**Utility Company List**").[13]  Prior to the Petition Date, the Debtors' average monthly cost of Utility Services was approximately $81,000.  The Debtors

---

[13]    The inclusion of any entity on, as well as the omission of any entity from, **Exhibit 1** to the Interim Order attached to the Utilities Motion, and the description thereof is not an admission or concession that such entity is, or is not, a utility within the meaning of § 366 of the Bankruptcy Code, and the Debtors reserve all rights and defenses with respect thereto.

currently owe approximately $34,373.48 in outstanding payments for prepetition Utility Services.[14]

133.    Uninterrupted Utility Services are essential to the Debtors' ongoing operations, and, therefore, the success of the Debtors' bankruptcy cases.  Indeed, any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations and service their contractual obligations, including their obligations to engage in marketing and distribution efforts.  This disruption would adversely impact business relationships and result in a decline in the Debtors' revenues and profits.  Such a result could seriously jeopardize the Debtors' bankruptcy efforts and, ultimately, the value of the Debtors' estates and creditor recoveries.  It is, therefore, critical that Utility Services continue uninterrupted during these chapter 11 cases.

134.    The Debtors intend to timely pay all postpetition obligations owed to the Utility Companies and anticipate having sufficient funds to do so.  The Debtors expect that availability under their proposed postpetition credit facilities and cash generated by the Debtors during their chapter 11 cases will be more than sufficient to pay all postpetition utility obligations.  Notwithstanding the foregoing, to provide adequate assurance of payment to the Utility Companies pursuant to § 366(c) of the Bankruptcy Code, the Debtors propose, within twenty (20) days from the Petition Date, to deposit into an interest-bearing, segregated account (the "**Utility Deposit Account**"), an amount equal to two weeks of Utility Services, calculated based on the historical average of the Debtors' utility expenses, which is generally calculated by averaging payment to the Utility Companies on the Utility Company List for a twelve-month period prior to the Petition Date (the "**Adequate Assurance Deposit**").  The Adequate Assurance Deposit will not, however, include any amount on account of any Utility Company that (a) agrees to a lesser amount, (b)

---

[14]    The total outstanding prepetition utilities amount includes approximately $4,915.93 in utilities payments that are incorporated into rent payments for the Debtors' Michigan and New York facilities.  See Utility Company List.

already holds a deposit, letter of credit, surety bond, or other type of instrument securing the

Debtors' performance equal to or greater than two weeks of Utility Services, or (c) is paid in

advance for its Utility Services.  Based on the foregoing calculation, the Debtors estimate that the

total amount of the Adequate Assurance Deposit will be approximately $37,500.

135.     Accordingly, on behalf of the Debtors, I respectfully submit that the relief requested

in the Utilities Motion should be granted.

> **14.    Debtors' Motion Pursuant to 11 U.S.C. §§ 105(a), 363(b), 507(a)(8), and
> 541 for Entry of an Order (I) Authorizing, but Not Directing, Debtors
> to Pay Prepetition Taxes and Assessments, and (II) Authorizing and
> Directing Financing Institutions to Honor and Process Related Checks
> and Transfers ("Taxes Motion")**

136.     Pursuant to the Taxes Motion, the Debtors request an order (1) authorizing, but not

requiring, Debtors to pay, at their sole discretion, in the ordinary course of business, (a) all

prepetition taxes, including sales, use, franchise, income, unemployment and other taxes in the

operation of their businesses (collectively, the "**Taxes**") and (b) all prepetition regulatory, permit,

inspection, and other similar fees and assessments  in connection with obtaining licenses and

permits necessary to operate their businesses (collectively, the "**Fees**"); and (2) granting related

relief.

137.     In the Taxes Motion, the Debtors also request that the Court authorize and direct

the banks and other financial institutions at which the Debtors maintain disbursement accounts, at

the Debtors' direction, to receive, process, honor, and pay, to the extent of funds on deposit, any

and all checks drawn or electronic fund transfers requested or to be requested by the Debtors

relating to the Prepetition Taxes and Assessments.  Further, the Debtors also seek authority to issue

new postpetition checks, or effect new electronic fund transfers, on account of the Prepetition

Taxes and Assessments to replace any prepetition checks or electronic fund transfer requests that

may be lost, dishonored, or rejected as a result of the commencement of these chapter 11 cases.

138.    The Debtors currently are unaware of any prepetition, delinquent tax liabilities with the exception of a disputed commercial activity tax liability alleged by the State of Ohio.  The State of Ohio alleges that the Debtors are delinquent in the approximate amount of $126,300 for prepetition commercial activities taxes.  It is my understanding that, in September 2015, the State of Ohio asserted that it may be entitled to a lien in the amount of $13,579 related to the alleged outstanding amount of prepetition commercial activity taxes.  The Debtors dispute the existence of any lien and believe that they are liable for no more than $25,000 in prepetition commercial activity tax payments.  The Debtors are still in the process of identifying prepetition tax liabilities, including determining outstanding local tax liabilities.  The Debtors believe that they will incur *de minimis* postpetition tax liabilities in the amount of approximately $25,000 during the first thirty (30) days following the Petition Date.  Even though the Debtors dispute, and are currently negotiating, the amount alleged by the State of Ohio, the Debtors believe it is in the best interests of their creditors and the estates for the Court to grant the Debtors authority, but not require them, to pay the foregoing tax liabilities and any additional tax liabilities that the Debtors may later identify as set forth in the Taxes Motion.

139.    Accordingly, on behalf of the Debtors, I respectfully submit that the Taxes Motion should be approved.

9969019

C.    **Sale Motion**

15.    **Debtor's Motion for Entry of Orders (I) Approving Sale Procedures for the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing, and (V) Approving Such Sale ("Sale Motion")**

140.    Pursuant to the Sale Motion, the Debtors request an order establishing bid procedures for the sale of substantially all of their assets the ("**Bid Procedures**"), including approval of the Stalking Horse Agreement, Bidding Protections, and Auction Notice (the "**Bidding Procedures Order**"), and an order approving the sale of substantially all of the Debtors' assets free and clear of liens, claims, encumbrances and other interests, and approving the assumption and assignment of certain executory contracts and unexpired leases (the "**Sale Order**").

141.    The total purchase price for the Stalking Horse Bid is $15,000,000 in cash, less any Cure Amounts in excess of $500,000, subject to certain adjustments and subject to higher or otherwise better offers, plus the assumption of the Assumed Liabilities (as defined in the Stalking Horse Agreement), and payment of all Cure Amounts.

142.    The Stalking Horse Bid is the result of extensive prepetition marketing efforts and analysis.  Given the exigencies of the Debtors' financial condition and the restrictions in the Debtors' postpetition financing and the Stalking Horse Bid itself, the immediate sale of assets is the only means to avoid a fire-sale liquidation of all of the Debtors' estates, which would result in significantly less value for all stakeholders.

143.    Accordingly, in consultation with various stakeholders, the Debtors and their advisors developed uniform bidding and auction procedures for the sale of the Assets.  Under the Bidding Procedures, parties may submit bids for the Assets.  The Bidding Procedures are

52

deliberately flexible, aimed at generating the greatest level of interest and the highest or best value for the Debtors' Assets. At the same time, the Bidding Procedures are uniform, providing clarity to the bidding and auction process by establishing dates for submitting bids, conducting auctions, and approving sales.

144.    The Debtors engaged in extensive marketing efforts in connection with the contemplated sale. The Debtor identified and solicited over 140 parties regarding the proposed sale. During the marketing process, parties that executed confidentiality agreements were granted access to significant diligence and other confidential information about all of the Debtors' businesses. The Debtor entered into non-disclosure agreements with 38 parties and provided access to extensive diligence to 13 serious potential purchasers. As discussed above, the Debtors ultimately received three (3) proposals, all of which contemplated a sale of assets free and clear of liens and claims pursuant to § 363 of the Bankruptcy Code. In evaluating the proposals, the Debtors analyzed, among other things: (i) the consideration offered by each potential buyer, (ii) licensor approval, (iii) financial strength, (iv) the proposed purchaser's ability to close, (v) benefits to the Debtor, and (vi) the likelihood that the proposed purchaser will be able to preserve employees' jobs. Additionally, the Debtors must, at all times, consider the ability of any proposed purchaser or bidder to obtain approval of the Debtors key licensors, including Kenneth Cole.

145.    Cognizant of their and their non-debtor affiliates' deteriorating financial condition and the tight timeline that would govern upon the commencement of these chapter 11 cases, the Debtors accomplished as much as possible with respect to the sale process prior to the Petition Date. With the Stalking Horse Bid in place, the Debtors and their professionals are now prepared to hit the ground running. The Debtors' advisors are prepared to launch an aggressive and extensive postpetition marketing process, consistent with the limitations on publicity contained in

9969019

the Stalking Horse Agreement. The proposed timeline for this marketing and sale process is reasonable and necessary under the circumstances of these chapter 11 cases.

146.    Absent the sale process and transactions contemplated by the Sale Motion, I believe the Debtors will be unable to realize the maximum value of their assets for the benefit of all stakeholders.  The Debtors' declining revenues are insufficient to support the continued operation the Debtors' business as a whole.  Thus, a prompt sale of the Assets is necessary to ensure that such Assets are sold at their going concern values.

## D.    Retention Related Motions

### 16.    Debtors' Application for Entry of an Order Authorizing the Debtors to Retain Jeffrey L. Gregg as Debtors' Chief Restructuring Officer *Nunc Pro Tunc* to the Petition Date ("CRO Motion")

147.    The Debtors respectfully request entry of an authorizing and approving my employment as Chief Restructuring Officer ("**CRO**") for the Debtors *nunc pro tunc* to the Petition Date.  Given my familiarity with the Company through my former tenure from 2006-2013, and recent tenure as CRO over the past three and a half months, and my extensive experience with product development, sourcing operations, supply chain management, and quality control, and my knowledge of the Debtors' industry, I respectfully submit that I am sufficiently qualified to act as CRO of the Company and my retention as CRO is necessary to maintain and maximize the Company's value for the benefit of all stakeholders.

### 17.    Debtors' Application for Entry of an Order Authorizing the Retention and Employment of Venable LLP as Attorneys for the Debtors and Debtors in Possession *Nunc Pro Tunc* to the Petition Date ("Venable Retention Motion")

148.    The Debtors seek to retain Venable LLP as their attorneys in these chapter 11 cases.  Venable LLP has extensive experience and knowledge in, and an excellent reputation for providing, high-quality legal services in the field of debtor protections, creditor rights, and

business reorganizations under chapter 11 of the Bankruptcy Code.  In preparing for these chapter 11 cases, Venable LLP has become familiar with the Debtors' businesses and the legal issues that may arise in these chapter 11 cases.  I believe that Venable LLP is well-qualified and uniquely able to represent the Debtors in these chapter 11 cases and respectfully submit that the Venable Retention Motion should be approved.

> **18.** **Debtors' Application for an Order Authorizing the Debtors to Retain and Employ Imperial Capital, LLC as Investment Banker *Nunc Pro Tunc* to the Petition Date ("<u>Imperial Capital Retention Motion</u>")**

149.    Given the complexity of these chapter 11 cases, I believe the Debtors require a qualified and experienced investment banker with the resources, capabilities, and experience of Imperial to assist them in their current efforts to maintain and maximize value of the Company for the benefit of all stakeholders, marketing the Company's assets for sale, and facilitating a sale process designed to achieve the highest and best offer for such a sale.  Further, I believe that the Debtors' estates, and particularly their creditors, will benefit from Imperial's services. Imperial is a preeminent investment banking, financial advisory, and asset management firm that has considerable experience in advising and marketing the sale of financially distressed companies, both in an out of bankruptcy court.

150.    Accordingly, I believe that the investment banking services provided by Imperial Capital are crucial to the Debtors during these chapter 11 cases and, therefore, I respectfully submit that the Court approve the Imperial Capital Retention Motion.

> **19.** **Application for Entry of an Order Authorizing the Debtors to Retain Tanner De Witt as Special Hong Kong Counsel *Nunc Pro Tunc* to the Petition Date ("<u>Hong Kong Counsel Motion</u>")**

151.    Debtors request entry of an order authorizing and approving the employment of Tanner De Witt as Special Counsel for the Debtors *nunc pro tunc* to the Petition Date to render legal services and legal advice in connection with the Hong Kong liquidation proceedings of

9969019

Debtors' affiliate AWC Far East.  I believe that Tanner De Witt is both well qualified and uniquely able to represent the Debtors in their chapter 11 cases in an efficient and timely manner given Tanner De Witt's recognized expertise and extensive experience in the field of insolvency and restructuring in Hong Kong.

152.    Accordingly, I believe that the legal services provided by Tanner De Witt are crucial to the Debtors during these chapter 11 cases and, therefore, I respectfully submit that the Court approve the Hong Kong Counsel Motion.

## V.    Information Required Under Local Bankruptcy Rule 1007-2

153.    The following information and Schedules 1-10 attached hereto are provided in accordance with Local Bankruptcy Rule 1007-2.[15]

154.    No committees have been organized prior to the Petition Date, and, accordingly, no information is submitted pursuant to Local Rule 1007-2(a)(3).

155.    Pursuant to Local Rule 1007-2(a)(4), **Schedule 1** hereto lists the following information with respect to each of the holders of the Debtors' thirty (30) largest unsecured claims on a consolidated basis, excluding claims of insiders: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the name(s) of persons(s) familiar with the Debtors' accounts, the approximate amount of the claim, and an indication of whether the claim is contingent, unliquidated, disputed, or partially secured.

---

[15]    The information contained in the attached schedules shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim listed herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. The descriptions of the collateral securing the underlying obligations are intended only as brief summaries. In the event of any inconsistencies between the summaries set forth and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

9969019

156.    Pursuant to Local Rule 1007-2(a)(5), **Schedule 2** hereto provides the following information with respect to each of the holders of the five (5) largest secured claims against the Debtors on a consolidated basis: the creditor's name, address (including the number, street, apartment or suite number, and zip code, if not included in the post office address), and telephone number; the approximate amount of the claim; a brief description of the collateral securing the claim; an estimate of the value of the collateral, and whether the claim or lien is disputed.

157.    Pursuant to Local Rule 1007-2(a)(6), **Schedule 3** hereto provides a summary of the (unaudited) consolidated assets and liabilities for the Debtors.

158.    The Debtors' stock, debentures, and other securities are not publicly held, and therefore no information is provided pursuant to Local Bankruptcy Rule 1007-2(a)(7).

159.    Pursuant to Local Rule 1007-2(a)(8), **Schedule 4** hereto provides a list of all of the Debtors' property in the possession or custody of any custodian, public officer, mortgagee, pledgee, assignee of rents, secured creditor, or agent for any such entity, giving the name, address, and telephone number of each such entity and the location of the court in which any proceeding relating thereto is pending.

160.    Pursuant to Local Rule 1007-2(a)(9), **Schedule 5** hereto provides a list of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses.

161.    Pursuant to Local Rule 1007-2(a)(10), **Schedule 6** hereto provides the location of the Debtors' substantial assets, the location of their books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States.

162.    Pursuant to Local Rule 1007-2(a)(11), **Schedule 7** hereto provides a list of the nature and present status of each action or proceeding, pending or threatened, against the Debtors

or their property where a judgment against the Debtors or a seizure of their property may be imminent.

163.    Pursuant to Local Rule 1007-2(a)(12), **Schedule 8** hereto provides a list of the names of the individuals who comprise the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their relevant responsibilities and experience.

164.    Pursuant to Local Rule 1007-2(b)(1)-(2)(A), **Schedule 9** hereto provides the estimated amount of weekly payroll to the Debtors' employees (not including officers, directors, stockholders, and partners) and the estimated amount to be paid to officers, stockholders, directors, members of any partnerships, and financial and business consultants retained by the Debtors for the thirty (30) day period following the filing of the Debtors' chapter 11 petitions as the Debtors intend to continue to operate their businesses.

165.    Pursuant to Local Rule 1007-2(b)(3), **Schedule 10** hereto provides, for the thirty (30) day period following the filing of the chapter 11 petitions, a list of estimated cash receipts and disbursements, net cash gain or loss, obligations, and receivables expected to accrue that remain unpaid, other than professional fees.

*[Remainder of page intentionally left blank; Declarant's signature on following page]*

9969019

I declare under penalty of perjury that, to the best of my knowledge after reasonable

inquiry, the foregoing is true and correct.

Dated: September 30, 2015
       New York, New York

                                                Jeffrey L. Gregg
                                                Chief Restructuring Officer

## <u>SCHEDULE 1</u>

**Consolidated List of the Holders of the Debtors' Thirty (30) Largest Unsecured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(4), the following is a consolidated list of the Debtors' creditors holding the 30 largest unsecured claims (the "**Consolidated Creditor List**") based on the Debtors' unaudited books and records as of the Petition Date. The Consolidated Creditor List has been prepared in accordance with Bankruptcy Rule 1007(d) and does not include (i) persons who come within the definition of "insider" set forth in section 101(31) of the Bankruptcy Code or (ii) secured creditors, unless the value of the collateral is such that the unsecured deficiency places the creditor among the holders of the 50 largest unsecured claims.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors. The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt. In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Rank | Name of Creditor | Complete mailing address and Telephone No., and employees, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 1 | Dillard's Department Store | 1600 CANTRELL ROAD LITTLE ROCK, AR 72201 PH: (501) 399-7901 Don Powers don.powers@dillards.com | Customer Programs | | $532,390.78 |
| 2 | G&Y Company Limited | UNIT 2608 GREENFIELD TOWER, CONCORDIA PLAZA HONG KONG, CHINA FAX: (852) 2620-6808 Winston@greatpower.ca; Elain@gny.com.hk | Trade Debt | | $481,027.82 |
| 3 | State Electronics Ltd. | UNIT1013, 10/F, BLOCK B, HONG KONG INDUSTRIAL CENTRE, HONG KONG, CHINA FAX: (852) 248-12347 info@statewatches.com.hk | Trade Debt | | $463,986.90 |

**SCHEDULE 1 (Cont.)**

| Rank | Name of Creditor | Complete mailing address and Telephone No., and employees, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 4 | Prime Time International Limited | FLAT 5, 17/F, WANG LUNG IND BLDG HONG KONG, CHINA FAX: (852) 2410-9961 Raymond Tsui raymond@primetime.com.hk | Trade Debt | | $327,688.12 |
| 5 | Moore Wallace an RR Donnelley | PO BOX 13654 NEWARK, NJ 07188-0664 PH: (859) 905-5248 Jeanne Lenhof Jeanne.lenhof@rrd.com | Trade Debt | | $215,371.48 |
| 6 | Itsy Bitsy Media, Inc. | 114 TROUTMAN ST .#411 BROOKLYN, NY 11206 jeff@itsybitsymedia.com | Trade Debt | | $205,694.55 |
| 7 | Rebel Interactive Group, LLC | P.O. BOX 223 GLASTONBURY, CT 6033 PH: 860-930-1105 bryn@rebelinteractivegroup.com | Trade Debt | | $194,242.00 |
| 8 | Staffing Network LLC | 3347 EAGLE WAY, CHICAGO, IL 60678 PH: 313-908-5290 billing@staffingnetwork.com | Trade Debt | | $188,903.61 |
| 9 | Precision Time | 9298 SOUTH 500 WEST SANDY, UT 84070 PH: (385) 290-3135 Jvicchrilli@precisiontime.com | Trade Debt | | $165,778.02 |
| 10 | Stingmars Limited | UNIT 1212, KODAK HOUSE II, HONG KONG, CHINA FAX: 852-2865-2836 PH: 852-9632-1294 Oren Lavi oren@stingmars.com | Trade Debt | | $142,749.44 |
| 11 | 47440 Michigan Ave, LLC | PO BOX 673428, DETROIT, MI 48267-3428 Rhonda McKay rmckay@signatureassociates.com | Other | | $128,677.02 |

9974367

**SCHEDULE 1 (Cont.)**

| Rank | Name of Creditor | Complete mailing address and Telephone No., and employees, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 12 | Jeff Smith Consulting, LLC | 20820 ROUNDUP ROAD, ELKHORN, NE 68022 jeff.smith@jeffsmithconsulting.com, | Trade Debt | | $125,000.00 |
| 13 | Publicis Kaplan Thaler | 4 HERALD SQUARE, 950 SIXTH AVE 9TH FLOOR, NEW YORK, NY 10001 PH: 917-344-7604 Tom Shaffer | Trade Debt | | $123,705.00 |
| 14 | Jolly Come International Limited | UNIT 1705, 17/F, APEC PLAZA HONG KONG, CHINA FAX: 852-3909-1467 sam@jollycome.com.hk, | Trade Debt | | $121,192.67 |
| 15 | Deloitte & Touche LLP | Two World Financial Center, 7th floor New York, NY 10281 PH: (212) 436-3143 Michael Savarese msavarese@deloitte.com | Professional Fees | | $118,000.00 |
| 16 | Douglas R. Bennett | 385 WE GO CT DEERFIELD, IL 60015 bennett_d_r@yahoo.com | Trade Debt | | $115,532.98 |
| 17 | ZY Holdings LLC | C/O ICONIX BRAND GROUP NEW YORK, NY 10018 PH: 212-730-0030 Marcia Mclaughlin mmaclaughlin@iconixbrand.com | License Royalties | | $107,000.00 |
| 18 | Allari Solutions | P.O. BOX 1627 BONITA SPRINGS, FL 34133-1627 PH: 239-896-6602 Cathy Allen callen@allari.com | Trade Debt | | $103,991.25 |

3

**SCHEDULE 1 (Cont.)**

| Rank | Name of Creditor | Complete mailing address and Telephone No., and employees, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|------|------------------|------------------------------------------------------------------------------------|---------------------------------------|--------------------------------------------------------------------------------|------------------------------------------------------------|
| 19 | Masterson Staffing Solutions | 505 HIGHWAY 169 NORTH WATERFORD PARK, SUITE 700, PLYMOUTH, MN 55441 PH:(734) 677-2600 Tracy Lazar TracyL@MastersonStaffing.com | Trade Debt | | $102,638.05 |
| 20 | Cindy Riccio Communications, I | 1133 BROADWAY, SUITE 102 NEW YORK, NY 10010 PH: 646-205-3573 Cindy Riccio cindy@cricciocom.com | Trade Debt | | $99,619.26 |
| 21 | Rodale Inc. | P.O. BOX 415173, BOSTON, MA 02241-5173 PH: 800-324-8641 RodaleBooks@cdsfulfillment.com | Trade Debt | | $91,631.09 |
| 22 | HBI Branded Apparel Enterprise | HBI OAK SUMMIT,1000 E.HANES MILL RD, WINSTON-SALEM, NC 27105 PH: 336-519-3958 Don Burton Don.burton@hanes.com | License Royalties | | $80,526.24 |
| 23 | Grand Glory Manufacturing Ltd. | RM1006, 10/F. RILEY HOUSE HONG KONG, CHINA FAX: (852)2425-0371 gglory@netvigator.com | Trade Debt | | $78,348.47 |
| 24 | Second Nature Technologies Inc. | 5075 CRAWFORD RD, DRYDEN, MI 48424-9719 PH: 810-895-9521 secondnaturetechnology@secondnaturetechnology.com | Trade Debt | | $76,919.84 |

4

9974367

**<u>SCHEDULE 1 (Cont.)</u>**

| Rank | Name of Creditor | Complete mailing address and Telephone No., and employees, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 25 | Burwood Products Co. | 111 2ND AVENUE NE, SUITE 1250, ST. PETERSBURG, FL 33701 PH: (727) 897-5636 Barry Shapiro barry@andersongroup.com | License Royalties | | $75,000.00 |
| 26 | Socialyte Collective | ROOSEVELT FIELD MALL MANAGEMENT OFFICE, REGION ID#4631 GARDEN CITY, NY 11530 PH: 917-475-8590 Michelle Johnson | Trade Debt | | $69,500.00 |
| 27 | Ultimos Manufacturing PTE LTD. | 16th Floor, So Tao Centre, 11-15 Kwai Sau Road, Kwai Chung, N.T. Hong Kong, China PH: (852) 9261-2063 FAX (852) 2614-1878 Alan Ho alan@ultimos-macau.com | Trade Debt | | $69,301.13 |
| 28 | Conde Nast Publications | DIV. OF ADV MAGAZINE PUBLISHERS PO BOX 5350 NEW YORK, NY 10087-5350 Lynda Maloney lynda_maloney@condenast.com | Trade Debt | | $67,249.95 |
| 29 | Costco Wholesale | PO Box 34622 Vendor 37095-00 Seattle, WA 98124 PH: 425-427-7370 Jeff Beatty jbeatty@costco.com | Customer Programs | x | Contingent, unliquidated and subject to set off |

5

### SCHEDULE 1 (Cont.)

| Rank | Name of Creditor | Complete mailing address and Telephone No., and employees, agents, or department familiar with claim | Nature of claim (trade debt, bank loan, government contracts, etc.) | Indicate if claim is contingent, unliquidated, disputed, or subject to set off | Amount of claim (if secured, also state value of security) |
|---|---|---|---|---|---|
| 30 | Macys | PO Box 415774<br>Cincinnati, OH 45241-5774<br>PH: (646) 825-1535<br>Christa Cavanah<br>Christa.Cavanah@macys.com | Customer Programs | x | Contingent, unliquidated and subject to set off |

6

## SCHEDULE 2

**Consolidated List of the Holders of the Debtors' Five (5) Largest Secured Claims**

Pursuant to Local Bankruptcy Rule 1007-2(a)(5), the following is a list of creditors holding the five largest secured claims against the Debtors, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.  The descriptions of the collateral securing the underlying obligations are intended only as brief summaries.  In the event of any inconsistencies between the summaries set forth below and the respective corporate and legal documents relating to such obligations, the descriptions in the corporate and legal documents shall control.

| Name of Creditor and Address | Amount of Claim | Collateral Description and Value |
|---|---|---|
| 1.  Wells Fargo Bank, National Association<br>100 Park Avenue, 14th Floor<br>New York, NY 10017<br>Attn:  Robert Strack<br>        Portfolio Manager – Advance Watch | $13,359,095 | First priority perfected security interests in substantially all the Debtors' assets |

7

9974367

# SCHEDULE 3

## Summary of the Debtors' Assets and Liabilities

Pursuant to Local Bankruptcy Rule 1007-2(a)(6), the following are estimates of the Debtors' total assets and liabilities on a consolidated basis.  The following financial data is the latest available information and reflects the Debtors' financial condition, on a consolidated basis, as of the Petition Date.

The information contained herein shall not constitute an admission of liability by, nor is it binding on, the Debtors.  The Debtors reserve all rights to assert that any debt or claim included herein is a disputed claim or debt, and to challenge the priority, nature, amount, or status of any such claim or debt.

**Total Assets (Book Value):**          $41,457,000
**Total Liabilities (Book Value):**     $98,057,000

9974367

## **SCHEDULE 4**

### **Summary of Debtors' Property Held by Third Parties**

Pursuant to Local Rule 1007-2(a)(8), the following lists the Debtors' property, as of the Petition Date, that is in the possession or custody of any custodian, public officer, mortgagee, pledge, assignee of rents, secured creditor, or agent for any such entity.

In the ordinary course of business, on any given day, property of the Debtors (including inventory and security deposits) is likely to be in the possession of various third parties, including, shippers, common carriers, materialmen, logistics vendors, tooling vendors, distributors, processors, expeditors, warehousemen, other related service providers, or agents, where the Debtors' ownership is not affected. Because of the constant movement of this property, providing a comprehensive list of the property that is in the possession or custody of such persons and a list of the persons or entities in possession of such property, their addresses and telephone numbers, and the location of any court proceeding affecting the property would be impractical.

9

## **SCHEDULE 5**

**Summary of Debtors' Property From Which the Debtors' Operate Their Business**

Pursuant to Local Bankruptcy Rule 1007-2(a)(9), the following lists the location of the premises owned, leased, or held under other arrangement from which the Debtors operate their businesses as of the Petition Date.[1]

| Property Address | City | State | Country | Owned or Leased |
|---|---|---|---|---|
| 1407 Broadway, Suite 400 | New York | New York | U.S.A. | Leased |
| 47440 Michigan Ave., Suite 130 | Canton | Michigan | U.S.A. | Leased |
| 1570 Corporate Drive, Suite F | Costa Mesa | California | U.S.A. | Leased |

---

[1]    The classification of the contractual agreements listed herein as real property leases is not binding on the Debtors.

9974367

## SCHEDULE 6

**Location of the Debtors' Substantial Assets, Books and Records, and Nature and Location of Debtors' Assets Outside the United States**

Pursuant to Local Bankruptcy Rule 1007-2(a)(10), the following provides the location of the Debtors' substantial assets, books and records, and the nature, location, and value of any assets held by the Debtors outside the territorial limits of the United States as of the Petition Date.

### Location of Debtors' Substantial Assets

The Debtors' substantial assets are located at its United States facilities in New York and Michigan.

### Books and Records

The Debtors' books and records are located in New York, New York and Canton, Michigan.

### Debtors' Assets Outside of the United States

The Debtors, in addition to their non-Debtor affiliates, have significant assets worldwide, including significant assets held outside of the United States through direct and indirect subsidiaries of the Debtors, including:

- Advance Watch Company (Far East) Limited interest: Unknown value

- Advance Far East Trading (Shenzhen) Company Ltd. interest: Unknown value

- Zhongshan Advance Electronics Company Limited interest: Unknown value

11

9974367

## SCHEDULE 7

### Summary of Legal Actions Against the Debtors

Pursuant to Local Bankruptcy Rule 1007-2(a)(11), the following lists material actions and proceedings pending or threatened against the Debtors or their properties where a judgment against the Debtors or a seizure of their property may be imminent as of the Petition Date. This list reflects actions or proceedings considered material by the Debtors and, if necessary, will be supplemented in the corresponding schedules to be filed by the Debtors in these chapter 11 cases.

| Entity | Counterparty | Nature of the Claim | Status | Case No. | Court and Jurisdiction |
|---|---|---|---|---|---|
| Advance Watch Company Ltd. | Tissot SA | Opposed Company's Trademark Application | Pending | 91197947-OPP | U.S. Patent and Trademark Office, Trademark Trial and Appeal Board |
| Advance Watch Company Ltd. | Staffing Network, LLC | Breach of Contract | Pending | 2015L007893 | Circuit Court of Cook County, Illinois |
| Advance Watch Company Ltd. | Aura Merchandising, Ltd. | Breach of Contract; Unjust Enrichment; Account Stated | Pending | 158041/2015 | Supreme Court of the State of New York |
| Advance Watch Company Ltd. | Talenthub Worldwide, Inc. | Breach of Contract; Account Stated | Pending | 157647/2015 | Supreme Court of the State of New York |
| Geneva Watch Group, Inc. | LHI Liquidation Co., Inc. | Preference Claim | Pending | 13-14050 (MG) | United States Bankruptcy Court, Southern District of New York |
| Advance Watch Company Ltd. | KMJ Brand Holdings LLC | Judgment by Confession | Pending | 159367/2015 | Supreme Court of the State of New York |

12

# SCHEDULE 8

## Debtors' Senior Management

Pursuant to Local Bankruptcy Rule 1007-2(a)(12), the following provides the names of the individuals who constitute the Debtors' existing senior management, their tenure with the Debtors, and a brief summary of their responsibilities and relevant experience as of the Petition Date.

| Name / Petition | Relevant Experience / Responsibility | Tenure |
|---|---|---|
| Jeffrey L. Gregg<br>*Chief Restructuring Officer* | Mr. Gregg is the Chief Restructuring Officer of the Debtors. From 2006 through December 2013, he served as the company's Chief Operations Officer, Chief Financial Officer, and Chief Executive Officer. He is a Certified Public Accountant and Chartered Global Management Accountant. Mr. Gregg also has prior experience as the Chief Restructuring Officer of unrelated companies. | 2006 to December 2013; June 16, 2015 to Present |

13

## SCHEDULE 9

**Debtors' Payroll for the Thirty (30) Day Period Following the Filing of
the Debtors' Chapter 11 Petitions**

Pursuant to Local Rules 1007-2(b)(1)-(2)(A) and (C), the following provides for the 30-day period following the Petition Date, the estimated amount of weekly payroll to the Debtors' employees (exclusive of officers, directors, and stockholders), the estimated amount paid and proposed to be paid to officers, stockholders, and directors, and the amount paid or proposed to be paid to financial and business consultants retained by Debtors.

| Group | Estimated Amount |
|---|---|
| **Employees (Not Including Officers, Directors, and Stockholders)** | $215,000 |
| **Officers, Stockholders, and Directors** | $75,000 |
| **Financial and Business Consultants** | $52,000 |

14

## SCHEDULE 10

**Debtors' Estimated Cash Receipts, Disbursements, Net Cash Gain
or Loss, Unpaid Obligations and Receivables for the Thirty (30)
Day Period Following the Filing of the Chapter 11 Petitions**

Pursuant to Local Rule 1007-2(b)(3), the following provides, for the 30-day period following the Petition Date, the Debtors' estimated cash receipts and disbursements, net cash gain or loss, and obligations and receivables expected to accrue that remain unpaid, other than professional fees.

**Cash Receipts:**           $4,300,000

**Cash Disbursements:**      $5,500,000

**Net Cash Gain/Loss:**      ($1,200,000)

**Unpaid Obligations:**      $1,850,000 (post-petition only)

**Unpaid Receivables:**      $14,100,000

15