**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------ x

In re:

ADVANCE WATCH COMPANY LTD., <u>et al.</u>,

Debtors.[1]

------------------------------------------------------------ x

:
:
:
:
:
:
:
:
:

Chapter 11

Case No. 15-12690 (MG)

(Jointly Administered)

## FINAL ORDER (I) AUTHORIZING THE DEBTORS TO OBTAIN POSTPETITION FINANCING AND GRANT SECURITY INTERESTS AND SUPERPRIORITY ADMINISTRATIVE EXPENSE STATUS; (II) MODIFYING THE AUTOMATIC STAY; (III) AUTHORIZING THE DEBTORS TO ENTER INTO AGREEMENTS WITH WELLS FARGO BANK, NATIONAL ASSOCIATION; AND (IV) GRANTING RELATED RELIEF

Upon the motion [Doc. 9] (the "**Motion**")[2] of the above-captioned debtors and debtors in possession (collectively, the "**Debtors**") pursuant to §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2) and 364(c)(3) of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rules 4001-2 and 9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local Bankruptcy Rules**"), seeking, among other things:

(1)     authorization for Debtors Advance Watch Company Ltd. ("**Advance**"), Sunburst Products, Inc. ("**Sunburst**") and GWG International, Ltd. ("**GWG**" and together with Advance and Sunburst, the "**Borrowers**") to obtain and for Debtor Binda USA Holdings, Inc. (the "**Guarantor**") to guarantee, unconditionally, on a joint

---

[1]    The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

[2]    Capitalized terms used but not defined in this Order shall have the same meanings ascribed to such terms in the Motion.

and several basis, a post-petition revolving credit and letter of credit facility of up to $18,500,000, inclusive of revolving loans in excess of pre-petition lending formula limits of up to $4,000,000, as set forth in the Pre-Petition Revolving Loan Agreement (as defined below), as ratified and amended by that certain Ratification and Amendment Agreement dated as of September 30, 2015 and attached hereto as **Exhibit 1** (as amended, supplemented or otherwise modified from time to time in accordance with this final order (the "**Final Financing Order**"), the "**DIP Credit Agreement**"), made by and among the Borrowers, the Guarantor, Wells Fargo Bank, National Association, as administrative agent and collateral agent ("**DIP Loan Agent**"), and the Lenders (as defined in the DIP Credit Agreement) (the "**DIP Lenders**"), and the other DIP Loan Documents (as defined in the DIP Credit Agreement), and in accordance with the interim order attached to the Motion (the "**Interim Order**") (as extended by the second interim order entered on October 23, 2015 [Doc. 104] (the "**Second Interim Order**") and the third interim order entered on November 2, 2015 [Doc. 125] (the "**Third Interim Order**," and together with the Interim Order and the Second Interim Order, the "**Interim Orders**")) and this Final Financing Order, secured by first-priority security interests in and liens upon all of the Collateral (as defined below) pursuant to §§ 364(c)(2) and 364(c)(3) of the Bankruptcy Code;

(2)     authorization for Borrowers and Guarantor (a) to the extent not fully repaid from the proceeds of the Loans (as defined in the DIP Credit Agreement) incurred by the Borrowers pursuant to the DIP Loan Documents, the Interim Orders, and this Final Financing Order, to gradually roll up the Loans provided under the Pre-

2

Petition Loan Documents and all other Pre-Petition Obligations (each as defined below) into the DIP Obligations (as defined in the DIP Credit Agreement); and (b) to deem such rolled-up Pre-Petition Obligations to have been issued or provided, as applicable, under the DIP Credit Agreement and the other DIP Loan Documents;

(3)    authorization for the Debtors to grant superpriority administrative claim status, pursuant to § 364(c)(1) of the Bankruptcy Code, to the DIP Loan Agent, for the benefit of itself and the other DIP Lenders, in respect of all DIP Obligations;

(4)    as set forth below, approval of certain stipulations by the Debtors as set forth in this Final Financing Order with respect to the Pre-Petition Revolving Loan Agreement (as defined below) and the liens and security interests arising therefrom;

(5)    as set forth below, adequate protection to the DIP Loan Agent and the DIP Lenders (each in their respective capacities under the Pre-Petition Loan Documents (as defined below));

(6)    upon entry of this Final Financing Order, the waiver of the Debtors' right to assert claims to surcharge against the Collateral (as defined below) pursuant to § 506(c) of the Bankruptcy Code, to the extent set forth below;

(7)    modification of the automatic stay to the extent hereinafter set forth; and

(8)    the setting of a final hearing on the Motion ("**Final Hearing**") to consider entry of this Final Financing Order authorizing, among other things, the borrowing under the DIP Loan Documents on a final basis, as set forth in the Motion and the DIP Credit Agreement filed with the Court.

The initial hearing on the Motion having been held by this Court on October 5, 2015, at 3:00 p.m. (the "**Interim Hearing**"), and a subsequent hearing on the Motion having been held by this Court on October 21, 2015, at 10:00 p.m. (the "**Second Interim Hearing**," and together with the "**Interim Hearing**," the "**Interim Hearings**"), and upon the record made by the Debtors at the Interim Hearings, including the Motion, the Declaration of Jeffrey L. Gregg, Chief Restructuring Officer of the Debtors (I) in Support of Debtors' Chapter 11 Petitions and First-Day Filings and (II) Pursuant to Local Bankruptcy Rule 1007-2 (the "**First-Day Declaration**"), and the filings and pleadings in the above-captioned chapter 11 proceedings (the "**Cases**"), the Court having found that the relief requested in the Motion is in the best interests of Debtors, their estates, their creditors and other parties in interest; and appropriate notice of the Motion, the relief requested therein, the Interim Hearings, and the Final Hearing (the "**Notice**") was appropriate under the circumstances; and the Notice of the Final Hearing and of this Final Financing Order having been served by the Debtors in accordance with Rule 4001(c) on (i) counsel to the DIP Loan Agent, (ii) the United States Trustee for the Southern District of New York (the "**U.S. Trustee**"), (iii) the holders of the thirty (30) largest unsecured claims against the Debtors' estates (the "**30 Largest Unsecured Creditors**"), (iv) counsel to the Official Committee of Unsecured Creditors (the "**Committee**"), (v) the Internal Revenue Service, (vi) Wells Fargo Bank, National Association (the "**Blocked Account Bank**"), (vii) the Pension Benefit Guaranty Corporation, (viii) all appropriate state taxing authorities, (ix) all landlords, owners, and/or operators of premises at which any of the Debtors' inventory and/or equipment is located, and (x) certain other parties identified in the certificate of service filed with the Court, including, without limitation, all creditors who have filed or recorded pre-petition liens or security interests against any of the Debtors' assets (collectively, the "**Noticed Parties**"), and the

opportunity for a hearing on the Motion was appropriate and no other notice need be provided; and after due deliberation sufficient cause appearing therefor;

THE COURT HEREBY MAKES THE FOLLOWING FINDINGS OF FACT AND CONCLUSIONS OF LAW:

A.     Petition.  On September 30, 2015 (the "**Petition Date**"), each Debtor filed a voluntary petition (each, a "**Petition**") under chapter 11 of the Bankruptcy Code.  The Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code.

B.     Disposition.  The Motion is granted on a final basis in accordance with the terms of this Final Financing Order.  Any objections to the Motion with respect to the entry of the Final Financing Order that have not been withdrawn, waived or settled are hereby denied and overruled.

C.     Jurisdiction and Venue.  The Court has jurisdiction of this proceeding and the parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.  The Motion is a "core" proceeding as defined in 28 U.S.C. §§ 157(b)(2)(A), (D) and (M).  Venue of the Cases and the Motion in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

D.     Committee Formation.  On October 8, 2015, the Committee was formed in these cases.

E.     Notice.  The Notices were given in the manner described in the Motion and in the affidavits of service on file in the Cases.  Under the circumstances, the Notices given by the Debtors of the Motion, the Interim Hearings and the Final Hearing, and the relief granted under the Interim Orders and this Final Financing Order, constitutes due and sufficient notice thereof and complies with Bankruptcy Rules 4001(b) and 4001(c).

F.    <u>Debtors' Acknowledgments and Agreements</u>.  Without prejudice to the rights of the Committee, or other parties-in-interest as and to the extent set forth in Section 4.1.1 of this Final Financing Order, the Debtors admit, stipulate, acknowledge and agree that:

(i)    <u>Pre-Petition Loan Documents</u>.  Prior to the commencement of the Cases, DIP Loan Agent and the DIP Lenders made loans, advances and provided other financial accommodations to Borrowers pursuant to the terms and conditions set forth in: (1) that certain Credit Agreement, dated as of June 21, 2013, by and among Borrowers, Guarantor, DIP Loan Agent and the DIP Lenders (as the same has heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, the "**Pre-Petition Revolving Loan Agreement**," a copy of which is on file with counsel to the Debtors and available upon reasonable request); and (2) all other agreements, documents and instruments executed and/or delivered with, to, or in favor of DIP Loan Agent or any DIP Lender, including, without limitation, all security agreements, notes, guarantees, mortgages, Uniform Commercial Code financing statements and all other related agreements, documents and instruments executed and/or delivered in connection therewith or related thereto (all of the foregoing, together with the Pre-Petition Revolving Loan Agreement, as all of the same have heretofore been amended, supplemented, modified, extended, renewed, restated and/or replaced at any time prior to the Petition Date, collectively, the "**Pre-Petition Loan Documents**").  Copies of the operative Pre-Petition Loan Documents are on file with counsel to the Debtors and available upon reasonable request.

(ii)    <u>Pre-Petition Obligations</u>.  As of the Petition Date, the Debtors were indebted to the DIP Loan Agent and the DIP Lenders under the Pre-Petition Loan Documents in respect of Loans, Letters of Credit, Bank Products, and all other Obligations (each as defined in

the Pre-Petition Loan Documents) in an aggregate outstanding principal amount of not less than $13,359,095.01, plus interest accrued and accruing thereon, together with all costs, fees, expenses (including attorneys' fees and legal expenses) and other charges accrued, accruing or chargeable with respect thereto (collectively, the "**Pre-Petition Obligations**"; for purposes hereof, the term Pre-Petition Obligations shall include, without limitation, all "Pre-Petition Obligations", as such term is defined in the DIP Credit Agreement). The Pre-Petition Obligations constitute allowed, legal, valid, binding, enforceable and non-avoidable obligations of Debtors, and are not subject to any offset, defense, counterclaim, avoidance, recharacterization or subordination pursuant to the Bankruptcy Code or any other applicable law, and Debtors do not possess, shall not assert, hereby forever release, and are forever barred from bringing any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of the Pre-Petition Obligations.

(iii)   <u>Pre-Petition Collateral</u>.   As of the Petition Date, the Pre-Petition Obligations were fully secured pursuant to the Pre-Petition Loan Documents by valid, perfected, enforceable and non-avoidable first-priority security interests and liens granted by Debtors to DIP Loan Agent, for the benefit of itself and the other DIP Lenders under the Pre-Petition Loan Documents, upon all of the Pre-Petition Collateral (as defined in the DIP Credit Agreement and hereinafter referred to as the "**Pre-Petition Collateral**"), subject only to the liens specifically permitted under Section 6.2 of the Pre-Petition Revolving Loan Agreement[3] to the extent that

---

[3]   Section 6.2 of the Pre-Petition Revolving Loan Agreement limited the ability of the Debtors or their affiliates to create, incur, assume, or suffer to exist, directly or indirectly, any Lien (as defined in the Pre-Petition Revolving Loan Agreement) on or with respect to any of the

(Footnote Continued)

such security interests, liens or encumbrances are (1) valid, perfected and non-avoidable security interests, liens or encumbrances existing as of the Petition Date, and (2) senior to and have not been or are not subject to being subordinated to DIP Loan Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral under the Pre-Petition Loan Documents or otherwise avoided, and, in each instance, only for so long as and to the extent that such encumbrances are and remain senior and outstanding (hereinafter referred to as the "**Permitted Encumbrances**").  The Debtors do not possess and will not assert any claim, counterclaim, setoff or defense of any kind, nature or description which would in any way affect the validity, enforceability and non-avoidability of any of DIP Loan Agent's and DIP Lenders' liens, claims or security interests in the Pre-Petition Collateral.

(iv)    Proof of Claim.  The acknowledgment by Debtors of the Pre-Petition Obligations and the liens, rights, priorities and protections granted to or in favor of DIP Loan Agent and DIP Lenders in respect of the Pre-Petition Collateral as set forth herein and in the Pre-Petition Loan Documents shall be deemed a timely filed proof of claim on behalf of DIP Loan Agent and the DIP Lenders in these Cases.

G.    Findings Regarding the Post-Petition Financing.

(i)    Post-Petition Financing.  The Debtors have requested from each of the DIP Loan Agent and the DIP Lenders, and the DIP Loan Agent and DIP Lenders are willing to extend certain loans, advances and other financial accommodations on the terms and conditions

---

Debtors' prepetition assets except for the Permitted Liens (as defined in the Pre-Petition Revolving Loan Agreement).

set forth in the Interim Orders, this Final Financing Order and the DIP Loan Documents, respectively.

(ii)    <u>Need for Post-Petition Financing</u>.    The Debtors do not have sufficient available sources of working capital, including cash collateral, to operate their businesses in the ordinary course of business without the financing requested in the Motion.  The Debtors' ability to maintain business relationships with their vendors, suppliers and customers, to pay their employees, and to otherwise fund their operations is essential to the Debtors' continued viability as the Debtors seek to maximize the value of the assets of the Estates (as defined below) for the benefit of all creditors of the Debtors.  The ability of the Debtors to obtain sufficient working capital and liquidity through the proposed post-petition financing arrangements with the DIP Loan Agent and DIP Lenders as set forth in the Interim Orders, this Final Financing Order and the DIP Credit Agreement, as applicable, is vital to the preservation and maintenance of the going concern values of the Debtors.  Accordingly, the Debtors have an immediate need to obtain the post-petition financing in order to, among other things, permit the orderly continuation of the operation of their businesses, minimize the disruption of their business operations, and preserve and maximize the value of the assets of the Debtors' bankruptcy estates (as defined under § 541 of the Bankruptcy Code, the "**Estates**") in order to maximize the recovery to all creditors of the Estates.

(iii)    <u>No Credit Available on More Favorable Terms</u>.  The Debtors are unable to procure financing in the form of unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code, as an administrative expense under § 364(a) or (b) of the Bankruptcy Code, or in exchange for the grant of an administrative expense priority pursuant to § 364(c)(1), 364(c)(2) or 364(c)(3) of the Bankruptcy Code, without granting liens on assets.  The Debtors have been unable to

procure the necessary financing on terms more favorable, taken as a whole, than the financing

offered by each of the DIP Loan Agent and DIP Lenders pursuant to the DIP Loan Documents.

(iv)     <u>Budget</u>.  The Debtors have prepared and delivered to DIP Loan Agent and

DIP Lenders an initial 13-week budget (as defined in the DIP Credit Agreement, the "**Budget**"").

Such Budget has been thoroughly reviewed by the Debtors and their management and sets forth,

among other things, the projected receipts and disbursements of the Debtors for the periods

covered thereby.   The Debtors represent that the Budget is achievable in accordance with the

terms of the DIP Loan Documents and this Final Financing Order and will allow the Debtors to

operate at all times during these Cases without the accrual of unpaid administrative expenses.

The DIP Loan Agent and DIP Lenders are relying upon the Debtors' compliance with the Budget

in accordance with Section 5.3 of the DIP Credit Agreement, the other DIP Loan Documents, the

Interim Orders, and this Final Financing Order in determining to enter into the post-petition

financing arrangements provided for herein.

(v)     <u>Business Judgment and Good Faith Pursuant to § 364(e)</u>.  The terms of the

DIP Loan Documents, the Interim Orders and this Final Financing Order are fair, just and

reasonable under the circumstances, are ordinary and appropriate for secured financing to

debtors-in-possession, reflect the Debtors' exercise of their prudent business judgment consistent

with their fiduciary duties, and are supported by reasonably equivalent value and fair

consideration.   The terms and conditions of the DIP Loan Documents, the Interim Orders and

this Final Financing Order have been negotiated in good faith and at arms' length by and among

the Debtors and DIP Loan Agent, with all parties being represented by counsel.   Any credit

extended under the terms of the Interim Orders or this Final Financing Order shall be deemed to

have been extended in good faith by the DIP Loan Agent and DIP Lenders, as that term is used in § 364(e) of the Bankruptcy Code.

(vi)    <u>Good Cause</u>.  The relief requested in the Motion is necessary, essential and appropriate, and is in the best interest of and will benefit the Debtors, their creditors and their Estates, as its implementation will, among other things, provide the Debtors with the necessary liquidity to (1) minimize disruption to the Debtors' businesses and on-going operations, (2) preserve and maximize the value of the Debtors' Estates for the benefit of all the Debtors' creditors, and (3) avoid immediate and irreparable harm to the Debtors, their creditors, their businesses, their employees, and their assets.

(vii)    <u>Immediate Entry</u>.  Sufficient cause exists for immediate entry of this Final Financing Order pursuant to Bankruptcy Rules 4001(c)(2).  No party appearing in the Cases has filed or made an objection to the relief sought in the Motion or the entry of this Final Financing Order, or any objections that were made (to the extent such objections have not been withdrawn) are hereby overruled.

Based upon the foregoing, and after due consideration and good cause appearing therefor;

IT IS HEREBY ORDERED THAT:

Section 1.    <u>Authorization and Conditions to Financing.</u>

1.1    <u>Motion Granted</u>.  The Motion is granted in accordance with Bankruptcy Rule 4001(c)(2) to the extent provided in the Interim Orders and this Final Financing Order. Except as otherwise expressly provided in this Final Financing Order, any objection to the entry of this Final Financing Order that has not been withdrawn, waived, resolved or settled, is hereby denied and overruled on the merits.

1.2    <u>Authorization to Borrow and Use Loan Proceeds</u>.  Borrowers were under the Interim Orders and are hereby, on a final basis, authorized and empowered to immediately

borrow and obtain Loans, Letters of Credit and to incur indebtedness and other DIP Obligations

pursuant to the terms and conditions of the Interim Orders, this Final Financing Order, the DIP

Credit Agreement, and the other DIP Loan Documents in the amounts set forth in the Budget.

Subject to the terms and conditions contained in the Interim Orders, this Final Financing Order

and the DIP Loan Documents, Borrowers shall use the proceeds of the Loans, Letters of Credit

and other credit and financial accommodations provided by DIP Loan Agent and DIP Lenders

under the DIP Loan Documents for payment of expenses set forth in the Budget and amounts

owing to DIP Loan Agent and DIP Lenders in accordance with the terms and conditions of the

DIP Loan Documents, the Interim Orders, and this Final Financing Order.

      1.3     <u>DIP Loan Documents</u>

      1.3.1   <u>Authorization</u>.  Debtors are hereby authorized and directed, on a

final basis, to enter into, execute, deliver, perform, and comply with all of the terms, conditions

and covenants of the DIP Credit Agreement and the other DIP Loan Documents.  Upon

execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute

valid and binding obligations of the Debtors, enforceable against each Debtor party thereto in

accordance with the terms of the DIP Loan Documents and this Final Financing Order.  No

obligation, payment, transfer or grant of security under the DIP Loan Documents, the Interim

Orders or this Final Financing Order shall be stayed, restrained, voidable, or recoverable under

the Bankruptcy Code or under any applicable law (including, without limitation, under § 502(d)

of the Bankruptcy Code), or be subject to any defense, reduction, setoff, recoupment or

counterclaim.

      1.3.2   <u>Approval; Evidence of Borrowing Arrangements</u>.    All terms,

conditions and covenants set forth in the DIP Loan Documents (including, without limitation, the

DIP Credit Agreement) are approved on a final basis to the extent necessary to implement the terms and provisions of this Final Financing Order.  All such terms, conditions and covenants shall be sufficient and conclusive evidence of the borrowing arrangements by and among Debtors, DIP Loan Agent and DIP Lenders, and of each Debtor's assumption and adoption of all of the terms, conditions, and covenants of the DIP Credit Agreement and the other DIP Loan Documents for all purposes, including, without limitation, to the extent applicable, the payment of all DIP Obligations arising thereunder, including, without limitation, all principal, interest, fees and other expenses, including, without limitation, all of DIP Loan Agent's and DIP Lenders' consultant fees, professional fees, attorney fees and legal expenses, as more fully set forth in the DIP Loan Documents.

      1.3.3    <u>Amendment</u>.  Subject to the terms and conditions of the DIP Credit Agreement and the other DIP Loan Documents, Debtors, DIP Loan Agent and DIP Lenders, in consultation with the Committee, may amend, modify, supplement or waive any provision of the DIP Loan Documents (a "**DIP Loan Amendment**") without further approval or order of the Court so long as (a) such DIP Loan Amendment is not material (for purposes hereof, a "material" DIP Loan Amendment shall mean, any DIP Loan Amendment that operates to increase the interest rate other than as currently provided in the DIP Loan Documents, increase the principal amount of the DIP Loans, add specific new events of default or enlarge the nature and extent of default remedies available to the DIP Loan Agent and DIP Lenders following an event of default, or otherwise modify any terms and conditions in any DIP Loan Document in a manner materially less favorable to Debtors) and is undertaken in good faith by DIP Loan Agent, DIP Lenders and Debtors; (b) the Debtors provide prior written notice of the DIP Loan Amendment (the "**DIP Loan Amendment Notice**") to (i) the U.S. Trustee, (ii) counsel to the

Committee, and (iii) counsel to the DIP Loan Agent; (c) the Debtors file the DIP Loan Amendment Notice with the Court; and (d) no objection to the DIP Loan Amendment is filed with the Court within two (2) business days from the later of the date the DIP Loan Amendment Notice is served or the date the DIP Loan Amendment Notice is filed with the Court in accordance with this Section.  Any material DIP Loan Amendment to the DIP Loan Documents must be approved by the Court to be effective.

      1.4     <u>Payment of Prepetition Debt</u>.  The Debtors were by the Interim Orders and are hereby authorized, on a final basis, to repay all Pre-Petition Obligations in accordance with the DIP Loan Documents and Sections 1.5 and 1.6 of the Interim Order and of this Final Financing Order.

      1.5     <u>Payments and Application of Payments</u>.  The Debtors were by the Interim Orders and hereby are authorized and directed, on a final basis, to make all payments and transfers of Estate property to the DIP Loan Agent as provided for, permitted and/or required under the DIP Credit Agreement and the other DIP Loan Documents, which payments and transfers shall not be avoidable or recoverable from the DIP Loan Agent or any DIP Lender under §§ 547, 548, 550, 553 or any other section of the Bankruptcy Code, or any other claim, charge, assessment, or other liability, whether by application of the Bankruptcy Code, other law or otherwise.  All proceeds of the Pre-Petition Collateral received by the DIP Loan Agent or any DIP Lender, and any other amounts or payments received by the DIP Loan Agent or any DIP Lender in respect of the DIP Obligations, may be applied or deemed to be applied by the DIP Loan Agent, in its discretion, first to the repayment in full of the Pre-Petition Obligations, and then in repayment of the DIP Obligations, all in accordance with the DIP Credit Agreement, the other DIP Loan Documents and this Final Financing Order.  Without limiting the generality of

the foregoing, upon ten (10) days after the Debtors' and Committee's receipts of invoices therefor, the Debtors are authorized and directed, without further order of this Court, to pay or reimburse DIP Loan Agent and the DIP Lenders for all present and future costs and expenses, including, without limitation, all professional fees, consultant fees and legal fees and expenses paid or incurred by the DIP Loan Agent and the DIP Lenders in connection with the financing transactions as provided in this Final Financing Order and the DIP Loan Documents, provided, however, that the Debtors and Committee shall have ten (10) days from receipt of any invoice to object thereto, and if no objection is made then payment of the amounts requested may be made by the Debtors, all of which shall be and are included as part of the principal amount of the DIP Obligations and secured by the Collateral.

1.6    Continuation of Pre-Petition Procedures.    Except to the extent expressly set forth in the DIP Loan Documents, all pre-petition practices and procedures for the payment and collection of proceeds of the Collateral, the turnover of cash, the delivery of property to the DIP Loan Agent and the DIP Lenders, including the Blocked Account Agreements (as such term is defined in the DIP Credit Agreement) and any other similar lockbox or blocked depository bank account arrangements, are hereby approved and shall continue without interruption after the commencement of the Cases.

Section 2.    Post-Petition Lien; Superpriority Administrative Claim Status.

2.1    Post-Petition Lien.

2.1.1    Post-Petition Lien Granting.    To secure the prompt payment and performance of any and all DIP Obligations of Debtors to the DIP Loan Agent and DIP Lenders of whatever kind, nature or description, absolute or contingent, now existing or hereafter arising, DIP Loan Agent, for the benefit of itself and the other DIP Lenders, shall have and is hereby granted, effective as of the Petition Date, valid and perfected first-priority security interests and

liens, superior to all other liens, claims or security interests that any creditor of the Debtors'

Estates may have (but subject to the Permitted Liens and Claims (as defined below), as and to the

extent expressly provided in Section 2.1.3 below), in and upon all of the Collateral (as defined in

the DIP Credit Agreement and referred to herein as the "**Collateral**"), provided, however, that as

used in this Final Financing Order, "Collateral" shall not include the Debtors' or Estates' (i)

claims or causes of action under Sections 502(d), 544 or 547-551 of the Bankruptcy Code, (ii)

any other avoidance action under the Bankruptcy Code or applicable state law, including any

fraudulent conveyance or recovery claims or derivative claims or causes of action against any

and all current and former officers, directors, shareholders, members, mangers, employees,

affiliates or insiders of the Debtors, or (iii) any commercial tort claims to the extent such

commercial tort claims do not constitute Pre-Petition Collateral (as defined in the DIP Credit

Agreement) (the "**Avoidance and Other Actions**") or any proceeds or property recovered,

encumbered or otherwise the subject of Avoidance and Other Actions ("**Litigation Proceeds**").

   2.1.2 <u>DIP Loan Lien Priority</u>.  The liens and security interests of the DIP

Loan Agent and the DIP Lenders granted under the Pre-Petition Loan Documents in the Pre-

Petition Collateral shall be and shall continue to be first and senior in priority to all other

interests and liens of every kind, nature and description, whether created consensually, by an

order of the Court or otherwise, including, without limitation, liens or interests granted in favor

of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or

other applicable law; provided, however that DIP Loan Agent's and DIP Lenders' liens on and

security interests in the Pre-Petition Collateral shall be subject only to (a) Permitted

Encumbrances, and (b) the Carve Out Expenses (as defined below) solely to the extent provided

for in Sections 2.3, 2.4 and 2.6 of this Final Financing Order (the foregoing clauses (a) and (b) are collectively referred to herein as the "**Permitted Liens and Claims**").

       2.1.3    <u>DIP Loan Lien Priority</u>.  The liens and security interests of DIP Loan Agent and DIP Lenders granted under the DIP Loan Documents, the Interim Orders and this Final Financing Order in the Collateral shall be first and senior in priority to all other interests and liens of every kind, nature and description, whether created consensually, by an order of the Court or otherwise, including, without limitation, liens or interests granted in favor of third parties in conjunction with §§ 363, 364 or any other section of the Bankruptcy Code or other applicable law; provided, however, that DIP Loan Agent's and DIP Lenders' liens on and security interests in the Collateral shall be subject only to the Permitted Liens and Claims.

       2.1.4    <u>Post-Petition Lien Perfection</u>.  This Final Financing Order shall be sufficient and conclusive evidence of the priority, perfection and validity of the post-petition liens and security interests granted herein, effective as of the Petition Date, without any further act and without regard to any other federal, state or local requirements or law requiring notice, filing, registration, recording or possession of the Collateral, or other act to validate or perfect such security interest or lien, including without limitation, control agreements with the Blocked Account Bank or with any other financial institution(s) holding a Controlled Account (as defined in the DIP Credit Agreement) or other depository account consisting of Collateral (a "**Perfection Act**").  Notwithstanding the foregoing, if DIP Loan Agent, shall, in its sole discretion, elect for any reason to file, record or otherwise effectuate any Perfection Act, then DIP Loan Agent is authorized to perform such act, and the Debtors are authorized and directed to perform such act to the extent necessary or required by DIP Loan Agent, which act or acts shall be deemed to have been accomplished as of the date and time of entry of this Final Financing Order notwithstanding

the date and time actually accomplished, and in such event, the subject filing or recording office is authorized to accept, file or record any document in regard to such act in accordance with applicable law. DIP Loan Agent may choose to file, record or present a certified copy of this Final Financing Order in the same manner as a Perfection Act, which shall be tantamount to a Perfection Act, and, in such event, the subject filing or recording office is authorized to accept, file or record such certified copy of this Final Financing Order in accordance with applicable law. Should DIP Loan Agent so choose and attempt to file, record or perform a Perfection Act, no defect or failure in connection with such attempt shall in any way limit, waive or alter the validity, enforceability, attachment, or perfection of the post-petition liens and security interests granted herein by virtue of the entry of this Final Financing Order.

2.1.5    <u>Nullifying Pre-Petition Restrictions to Post-Petition Financing</u>. Notwithstanding anything to the contrary contained in any pre-petition agreement, contract, lease, document, note or instrument to which any Debtor is a party or under which any Debtor is obligated, except as otherwise permitted under the DIP Loan Documents, any provision that restricts, limits or impairs in any way any Debtor from granting DIP Loan Agent security interests in or liens upon any of the Debtors' assets or properties (including, among other things, any anti-lien granting or anti-assignment clauses in any leases or other contractual arrangements to which any Debtor is a party) under the DIP Loan Documents, the Interim Orders or this Final Financing Order, as applicable, or otherwise entering into and complying with all of the terms, conditions and provisions hereof or of the DIP Loan Documents, shall not (a) be effective and/or enforceable against any such Debtor(s), DIP Loan Agent or DIP Loan Lender(s), as applicable, or (b) adversely affect the validity, priority or enforceability of the liens, security interests, claims, rights, priorities and/or protections granted to DIP Loan Agent and DIP Lenders pursuant

to this Final Financing Order, the Interim Orders, or the DIP Loan Documents, in each case, to the maximum extent permitted under the Bankruptcy Code and other applicable law.

2.2    <u>Superpriority Administrative Expenses</u>.

2.2.1    <u>DIP Loans</u>.    For all DIP Obligations now existing or hereafter arising pursuant to the Interim Orders, this Final Financing Order, the DIP Loan Documents or otherwise, DIP Loan Agent, for the benefit of itself and the other DIP Lenders, is granted an allowed superpriority administrative claim pursuant to § 364(c)(1) of the Bankruptcy Code, having priority in right of payment over any and all other obligations, liabilities and indebtedness of Debtors, whether now in existence or hereafter incurred by Debtors, and over any and all administrative expenses or priority claims of the kind specified in, or ordered pursuant to, inter alia §§ 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1), 546(c), 726, 1113 or 1114 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment, which allowed superpriority administrative claim shall be payable from and have recourse to all pre-petition and post-petition property of the Debtors and all proceeds thereof (the "**DIP Loan Superpriority Claim**"); provided, that the DIP Loan Superpriority Claim shall not extend or apply to Avoidance and Other Actions or Litigation Proceeds.

2.3    <u>Carve Out Expenses</u>.

2.3.1    <u>Carve Out Expenses</u>.    Upon the declaration by the DIP Loan Agent of the occurrence of an Event of Default (as defined in the DIP Credit Agreement), DIP Loan Agent's and DIP Lenders' liens, claims and security interests in the Collateral and their DIP Loan Superpriority Claims, shall each be subject only to the right of payment of the following expenses (the "**Carve Out Expenses**"):

(a)     statutory fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) and interest thereon pursuant to 31 U.S.C. § 3717;

(b)     fees payable to the Clerk of this Court;

(c)     subject to the terms and conditions of this Final Financing Order, Allowed Professional Fees (as defined below) incurred by attorneys, accountants and other professionals retained by the Debtors and any Committee(s), under § 327 or § 1103(a) of the Bankruptcy Code (collectively, the "**Professionals**") (i) incurred at any time before the Trigger Date (defined below) up to the amounts of professional fees set forth in the Budget through the Trigger Date and only to the extent of the funds deposited into the Carve Out Account (defined below) in accordance with Section 2.4 below, and (ii) incurred on and after the Trigger Date, provided that the aggregate amount of such Allowed Professional Fees included in the Carve Out Expenses pursuant to this clause (c)(ii) shall not exceed (i) in the case of Professionals retained by the Debtors, $200,000 (the "**Debtor Professional Fee Carve Out**") and (ii) in the case of Professionals retained by the Committee(s), the aggregate amount of $50,000 (the "**Committee Professional Fee Carve Out**" and, collectively with the Debtor Professional Fee Carve Out, the "**Professional Fee Carve Out**"); and

(d)     $10,000 for the Chapter 7 Trustee(s) appointed in the Debtors' bankruptcy cases in the event the Debtors' Chapter 11 cases are converted to Chapter 7.

For the avoidance of doubt, nothing herein shall be construed to impair the ability of any party to object to the fees, expenses, reimbursement or compensation described herein.

For purposes of this Final Financing Order, the term "**Allowed Professional Fees**" shall mean the unpaid and outstanding reasonable fees and expenses of Professionals (i) actually

20

incurred on or after the Petition Date and (ii) allowed at any time by a final order of the Court pursuant to §§ 326, 328, 330 or 331 of the Bankruptcy Code.

2.3.2    <u>Excluded Professional Fees</u>.    Notwithstanding anything to the contrary in this Final Financing Order, neither the Professional Fee Carve Out nor the proceeds of Collateral or any Loans, Letters of Credit or any other credit or financial accommodations provided under or in connection with the DIP Loan Documents shall be used to pay any Allowed Professional Fees or any other fees or expenses incurred by any Professional in connection with any of the following:

(a)    an assertion or joinder in any claim, counter-claim, action, proceeding, application, motion, objection, defense or other contested matter seeking any order, judgment, determination or similar relief: (i) challenging the legality, validity, priority, perfection, or enforceability of (A) the Pre-Petition Obligations, DIP Loan Agent's and any DIP Lender's liens on and security interests in the Pre-Petition Collateral, or (B) the DIP Obligations, DIP Loan Agent's or DIP Lenders' liens on and security interests in the Collateral; (ii) invalidating, setting aside, avoiding or subordinating, in whole or in part, (A) the Pre-Petition Obligations, the DIP Loan Agent's and DIP Lenders' liens on and security interests in the Pre-Petition Collateral, or (B) the DIP Obligations, DIP Loan Agent's or DIP Lenders' liens on and security interests in the Collateral; or (iii) preventing, hindering or delaying DIP Loan Agent's or DIP Lenders' assertion or enforcement of any lien, claim, right or security interest or realization upon any Collateral in accordance with the terms and conditions of this Final Financing Order;

(b)      a request to use the Cash Collateral (as such term is defined in § 363 of the Bankruptcy Code) without the prior written consent of DIP Loan Agent in accordance with the terms and conditions of this Final Financing Order;

(c)      a request for authorization to obtain debtor-in-possession financing or other financial accommodations pursuant to § 364(c) or § 364(d) of the Bankruptcy Code, other than as provided in this Final Financing Order, without the prior written consent of each of DIP Loan Agent;

(d)      the commencement or prosecution of any action or proceeding of any claims, causes of action or defenses against DIP Loan Agent, any DIP Lender, or any of their respective officers, directors, employees, agents, attorneys, affiliates, successors or assigns, including, without limitation, any attempt to recover or avoid any claim or interest from DIP Loan Agent or any DIP Loan Lender under chapter 5 of the Bankruptcy Code;

(e)      the cost of investigation into any claims against DIP Loan Agent or any DIP Lender arising under or in connection with the Pre-Petition Loan Documents in excess of $50,000; or

(f)      any act which has or could materially and adversely modify or compromise the rights and remedies of DIP Loan Agent or any DIP Loan Lender, or which results in the occurrence of an Event of Default under the DIP Loan Documents, or this Final Financing Order.

2.3.3    <u>Carve Out Reserve</u>.    At the DIP Loan Agent's discretion, DIP Loan Agent may, at any time and in any increment in accordance with the DIP Credit Agreement, establish a reserve (the "**Professional Fee Reserve**") against the borrowed amount

of the DIP Loans in respect of the Professional Fee Carve Out and the other Carve Out Expenses. For the avoidance of doubt, the maximum amount of the Professional Fee Reserve shall not exceed the sum of the Professional Fee Carve Out and the other Carve Out Expenses.

2.3.4    Trigger Date.  The "**Trigger Date**" shall mean the first business day after the occurrence and continuation of an Event of Default (as defined below) and delivery of written notice thereof (the "**Carve Out Notice**") by the DIP Loan Agent to the U.S. Trustee, the Debtors and counsel for the Debtors, counsel for the Committee and counsel for the DIP Loan Agent.

2.4    Funding the Professional Fee Carve Out.  Prior to the Trigger Date, Debtors shall be authorized to deposit into a segregated account maintained by Debtors for the benefit of all Professionals (the "**Carve Out Account**") each week an amount equal to the amount of Allowed Professional Fees projected in the Budget to be incurred for such week and shall be permitted to pay Allowed Professional Fees from the Carve Out Account.  Promptly following the delivery of a Carve Out Notice, the DIP Lenders shall make a Loan to the Debtors in an amount equal to $260,000, and the Debtors shall fund the proceeds of such Loan into the Carve Out Account. The proceeds on deposit in the Carve Out Account shall be available only to satisfy obligations benefitting from the Professional Fee Carve Out, and the DIP Loan Agent and DIP Lenders (i) shall not sweep or foreclose on cash of the Debtors necessary to fund the Carve Out Account and (ii) shall have security interests in any residual interests in the Carve Out Account available following satisfaction in full of all obligations benefitting from the Professional Fee Carve Out. The Collateral shall not be subject to any further carve out for any cost or expenses of the Debtors' estates.

2.5    Payment of Carve Out Expenses.

2.5.1    Following the DIP Lenders making the $260,000 Loan to the

Debtors following the delivery of a Carve Out Notice in accordance with Section 2.4 above, DIP

Agent's and DIP Lenders' obligation to fund or otherwise ensure the payment of any Carve Out

Expenses pursuant to this Order shall be fully and finally satisfied and discharged, and DIP

Agent and DIP Lenders shall have no obligation or responsibility to fund or otherwise ensure the

payment of any Carve Out Expenses or any other professional fees or expenses of the Debtors or

the Committee.

2.5.2    Payment of any Carve Out Expenses, whether by or on behalf of

the DIP Loan Agent or any DIP Lender, shall not and shall not be deemed to reduce the DIP

Obligations, and shall not and shall not be deemed to subordinate any of any of DIP Loan

Agent's or DIP Lender's liens and security interests in the Pre-Petition Collateral, any other

Collateral, the Revolving Loan A/L Adequate Protection Superpriority Claim (as defined below),

or the DIP Loan Superpriority Claim to any junior pre- or post-petition lien, interest or claim in

favor of any other party.  Except and to the extent set forth in Section 2.5 of this Final Financing

Order, DIP Loan Agent and DIP Lenders shall not, under any circumstance, be responsible for

the direct payment or reimbursement of any fees or disbursements of any Professionals incurred

in connection with the Case under any chapter of the Bankruptcy Code, and nothing in Section

2.3 of this Final Financing Order shall be construed to obligate the DIP Loan Agent or any DIP

Lender in any way, to pay compensation to or to reimburse expenses of any Professional, or,

except as provided in Section 2.4 of this Final Financing Order, to ensure that the Debtors have

sufficient funds to pay such compensation or reimbursement.

2.6    Use of Cash Collateral; Adequate Protection.

2.6.1    Authorization to Use Cash Collateral.    Subject to the terms and conditions of this Final Financing Order, the DIP Loan Documents, and in accordance with the Budget, Debtors shall be and are hereby authorized, on a final basis, to use the Cash Collateral (as defined in § 363 of the Bankruptcy Code) subject to the pre-petition liens and security interests granted to the DIP Loan Agent and the DIP Lenders.    Nothing in this Final Financing Order shall authorize the disposition of any assets of the Debtors or their Estates outside the ordinary course of business, or any Debtor's use of Cash Collateral or other proceeds resulting therefrom, except as permitted in this Final Financing Order, the DIP Loan Documents and in accordance with the Budget.

2.6.2    Replacement Liens.

(a)    As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve Out-Expenses, the DIP Loan Agent, for the benefit of itself and the DIP Lenders, was by the Interim Orders and is by this Final Financing Order hereby granted, pursuant to §§ 361 and 363 of the Bankruptcy Code, on a final basis, valid, binding, enforceable and perfected replacement liens upon and security interests in all Collateral (the "**Revolving Loan A/L Replacement Lien**").    The Revolving Loan A/L Replacement Lien shall be junior and subordinate only to (A) the Carve-Out Expenses to the extent set forth herein, (B) the Permitted Liens and Claims, and (C) DIP Loan Agent's and DIP Lenders' liens on the Collateral to secure the DIP Obligations, and shall otherwise be senior to all other security interests in, liens on, or

claims against any of the Collateral.  Notwithstanding anything herein to the contrary, the Revolving Loan A/L Replacement Lien shall not be payable from and have recourse to or be satisfied from (i) Avoidance or Other Actions, or (ii) Litigation Proceeds.

2.6.3    <u>Section 507(b) Priority Claims</u>.

(a)    As adequate protection for the diminution in value of their interests in the Pre-Petition Collateral (including Cash Collateral) on account of the Debtors' use of such Pre-Petition Collateral (including Cash Collateral), the imposition of the automatic stay and the subordination to the Carve-Out-Expenses, the DIP Loan Agent, for the benefit of itself and DIP Lenders, was by the Interim Orders and is by this Final Financing Order hereby granted as and to the extent provided by § 507(b) of the Bankruptcy Code an allowed superpriority administrative expense claim in each of the Cases and any successor bankruptcy cases (the "**Revolving Loan A/L Adequate Protection Superpriority Claim**").  The Revolving Loan A/L Adequate Protection Superpriority Claim shall be junior only to (A) the Carve-Out Expenses, and (B) the DIP Loan Superpriority Claim, and shall otherwise have priority over all administrative expense claims and unsecured claims against Debtors and their Estates now existing or hereafter arising, of any kind or nature whatsoever.  Notwithstanding anything herein to the contrary, the Revolving Loan A/L Adequate Protection Superpriority Claim shall not be payable from and have recourse to or be satisfied from (i) Avoidance or Other Actions, or (ii) Litigation Proceeds.

**Section 3.**    <u>Default; Rights and Remedies; Relief from Stay</u>.

3.1    <u>Events of Default</u>.  The occurrence of any of the following events shall constitute an "**Event of Default**" under this Final Financing Order: (a) any Debtor's failure to perform, in any respect, any of the terms, conditions or covenants or their obligations under this

Final Financing Order; or (b) an "Event of Default" under the DIP Credit Agreement or any of the other DIP Loan Documents.

        3.2    <u>Rights and Remedies upon Event of Default</u>.  Upon the occurrence of and during the continuance of an Event of Default, (a) the Debtors shall be bound by all restrictions, prohibitions and other terms as provided in this Final Financing Order, the DIP Credit Agreement and the other DIP Loan Documents, and (b) the DIP Loan Agent shall be entitled to take any act or exercise any right or remedy (subject to Section 3.5 below) as provided in this Final Financing Order or any DIP Loan Document, as applicable, including, without limitation, declaring all DIP Obligations immediately due and payable, accelerating the DIP Obligations, ceasing to extend Loans or provide or arrange for Letters of Credit on behalf of Debtors, setting off any DIP Obligations with Collateral or proceeds in DIP Loan Agent's possession, and enforcing any and all rights with respect to the Collateral.  DIP Loan Agent and DIP Lenders shall have no obligation to lend or advance any additional funds to or on behalf of Debtors, or provide any other financial accommodations to Debtors, immediately upon or after the occurrence of an Event of Default or upon the occurrence of any act, event, or condition that, with the giving of notice or the passage of time, or both, would constitute an Event of Default.

        3.3    <u>Expiration of Revolving Loan Commitment</u>.  Upon the expiration of Borrowers' authority to borrow and obtain other credit accommodations from DIP Loan Agent and DIP Lenders pursuant to the terms of this Final Financing Order and the DIP Loan Documents (except if such authority shall be extended with the prior written consent of DIP Loan Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by DIP Loan Agent or any DIP Loan Lender), unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to

Section 3.5 of this Final Financing Order, all of the DIP Obligations shall immediately become due and payable and DIP Loan Agent and DIP Lenders shall be automatically and completely relieved from the effect of any stay under § 362 of the Bankruptcy Code, any other restriction on the enforcement of its liens upon and security interests in the Collateral or any other rights granted to DIP Loan Agent and DIP Lenders pursuant to the terms and conditions of the DIP Loan Documents or this Final Financing Order, and DIP Loan Agent, acting on behalf of itself and the other DIP Lenders, shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Final Financing Order, the DIP Loan Documents or applicable law which DIP Loan Agent may deem appropriate and to proceed against and realize upon the Collateral or any other property of the Debtors' Estates.

    3.4    <u>Maturity of DIP Loans</u>.  Upon the Maturity Date (as defined in the DIP Credit Agreement) (except if the Maturity Date shall be extended with the prior written consent of DIP Loan Agent, which consent shall not be implied or construed from any action, inaction or acquiescence by DIP Loan Agent or any DIP Loan Lender), unless an Event of Default set forth in Section 3.1 above occurs sooner and the automatic stay has been lifted or modified pursuant to Section 3.5 of this Final Financing Order all of the DIP Obligations shall immediately become due and payable and DIP Loan Agent and DIP Lenders shall be automatically and completely relieved from the effect of any stay under § 362 of the Bankruptcy Code, any other restriction on the enforcement of its liens upon and security interests in the DIP Loan Collateral or any other rights granted to DIP Loan Agent and DIP Lenders pursuant to the terms and conditions of the DIP Loan Documents or this Final Financing Order, and DIP Loan Agent, acting on behalf of itself and the other DIP Lenders, shall be and is hereby authorized, in its sole discretion, to take any and all actions and remedies provided to it in this Final Financing Order, the DIP Loan

28

Documents or applicable law which DIP Loan Agent may deem appropriate and to proceed against and realize upon the DIP Loan Collateral or any other property of the Debtors' Estates.

        3.5     <u>Relief from Automatic Stay</u>.  The automatic stay provisions of § 362 of the Bankruptcy Code and any other restriction imposed by an order of the Court or applicable law are hereby modified and vacated without further notice, application or order of the Court to the extent necessary to permit DIP Loan Agent and each DIP Lender to perform any act authorized or permitted under or by virtue of this Final Financing Order or the DIP Loan Documents, as applicable, including, without limitation, (a) to implement the post-petition financing arrangements authorized by this Final Financing Order and pursuant to the terms of the DIP Loan Documents, (b) to take any act to create, validate, evidence, attach or perfect any lien, security interest, right or claim in the Collateral, and (c) to assess, charge, collect, advance, deduct and receive payments with respect to the Pre-Petition Obligations or the DIP Obligations, as applicable, including, without limitation, all interests, fees, costs and expenses permitted under the DIP Loan Documents and apply such payments to the Pre-Petition Obligation or DIP Obligations pursuant to the DIP Loan Documents and/or this Final Financing Order, as applicable.  In addition, and without limiting the foregoing, upon the occurrence of an Event of Default and after providing five (5) business days (the "**Default Notice Period**") prior written notice (the "**Enforcement Notice**") to counsel for the Debtors, counsel for the Committee, and the U.S. Trustee, the DIP Loan Agent, acting on behalf of itself and the DIP Lenders, shall be entitled to take any action and exercise all rights and remedies provided to it by this Final Financing Order, the DIP Loan Documents or applicable law DIP Loan Agent may deem appropriate in its sole discretion to proceed against and realize upon the Collateral or any other assets or properties of Debtors' Estates upon which the DIP Loan Agent, for the benefit of itself

and the applicable DIP Lenders, has been or may hereafter be granted liens or security interests to obtain the full and indefeasible repayment of all DIP Obligations. Notwithstanding anything to the contrary, any action taken by the DIP Loan Agent to (i) terminate the commitments under the DIP Loan Documents, (ii) accelerate the Loans, (iii) send blocking notices or activation notices to the Blocked Account Bank, (iv) repay any amounts owing in respect of the DIP Obligations (including, without limitation, fees, indemnities and expense reimbursements) and (v) cash collateralize Letters of Credit and/or Bank Products issued pursuant to the DIP Loan Documents, in each case, shall not require any advance notice to the Debtors.  In any hearing regarding any exercise of rights or remedies (which hearing must take place within the Default Notice Period), the only issue that may be raised by any party in opposition thereto shall be whether, in fact, an Event of Default has occurred and is continuing, and the Debtors shall not be entitled to seek relief, including, without limitation, under § 105 of the Bankruptcy Code, to the extent such relief would in any way impair or restrict the rights and remedies of the DIP Loan Agent or the DIP Lenders set forth in this Final Financing Order or the DIP Loan Documents.

Section 4.         Representations; Covenants; and Waivers.

           4.1         Objections to Pre-Petition Obligations.

                  4.1.1         Objections to Pre-Petition Obligations.  Notwithstanding anything to the contrary in this Final Financing Order, any action, claim, defense complaint, motion or other written opposition (hereinafter, an "**Objection**") that seeks to object to, challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (a) the existence, validity or amount of the Pre-Petition Obligations, or (b) the extent, legality, validity, perfection or enforceability of DIP Loan Agent's and DIP Lenders' pre-petition liens and security interests in the Pre-Petition Collateral, or (c) otherwise asserts or prosecutes an action for preferences, fraudulent transfers or conveyances,

other avoidance powers or claims, counterclaims or causes of action, objections, contests or defenses against the DIP Loan Agent or DIP Lenders shall be properly filed with the Court by the Committee, and no other party, within sixty (60) calendar days from the entry date of this Final Financing Order. If any such Objection is timely and properly filed and successfully pursued, nothing in this Final Financing Order shall prevent the Court from granting appropriate relief with respect to the Pre-Petition Obligations or DIP Loan Agent's or DIP Lenders' pre-petition liens on the Pre-Petition Collateral. If no Objection is timely and properly filed, or if an Objection is timely and properly filed but denied, (i) the Pre-Petition Obligations shall be deemed allowed in full, shall not be subject to any setoff, recoupment, counterclaim, deduction or claim of any kind, and shall not be subject to any further objection or challenge by any party at any time, and DIP Loan Agent's and DIP Lenders' pre-petition liens on and security interest in the Pre-Petition Collateral shall be deemed legal, valid, perfected, enforceable, and non-avoidable for all purposes and of first and senior priority, subject to only the Permitted Liens and Claims, and (ii) the DIP Loan Agent and the DIP Lenders and each of their respective participants, agents, officers, directors, employees, attorneys, professionals, successors, and assigns shall be deemed released and discharged from any and all claims and causes of action related to or arising out of the Pre-Petition Loan Documents and shall not be subject to any further objection or challenge by any party at any time (the relief described in clauses (i) and (ii) above is hereinafter referred to as the "DIP Lender Discharge"). Nothing contained in this Section 4.1.1 or otherwise shall or shall be deemed or construed to impair, prejudice or waive any rights, claims or protections afforded to DIP Loan Agent or any DIP Lenders in connection with all post-petition Loans and Letters of Credit, and any other post-petition financial and credit accommodations provided by DIP Loan Agent and the DIP Lenders to Debtors in reliance on

§ 364(e) of the Bankruptcy Code and in accordance with the terms and provisions of this Final

Financing Order and the DIP Loan Documents.   Notwithstanding anything to the contrary

contained in this Section 4.1.1 or any other provision of this Final Financing Order, upon the

date on which the Settlement Conditions (as defined in Section 5.13 of this Final Financing

Order) occur, DIP Loan Agent and DIP Lenders shall receive the DIP Lender Discharge, and all

rights of the Committee expressly provided for under this Section 4.1.1 shall be terminated.

　　　　　4.2　　　Debtors' Waivers.  Without prejudice to the rights of the Committee, or

other parties-in-interest as and to the extent set forth in Section 4.1.1 of this Final Financing

Order, at all times during the Cases, and whether or not an Event of Default has occurred, the

Debtors irrevocably waive any right that they may have to seek further authority (a) to use Cash

Collateral of DIP Loan Agent and DIP Lenders under § 363 of the Bankruptcy Code, (b) to

obtain post-petition loans or other financial accommodations pursuant to §§ 364(c) or 364(d) of

the Bankruptcy Code, other than as provided in this Final Financing Order or as may be

otherwise expressly permitted pursuant to the DIP Loan Documents, (c) to challenge the

application of any payments authorized by this Final Financing Order as pursuant to § 506(b) of

the Bankruptcy Code, or to assert that the value of the Pre-Petition Collateral is less than the Pre-

Petition Obligations, (d) to propose, support or have a plan of reorganization or liquidation that

does not provide for the indefeasible payment in cash in full and satisfaction of all DIP

Obligations on the effective date of such plan in accordance with the terms and conditions set

forth in the DIP Credit Agreement, or (e) to seek relief under the Bankruptcy Code, including

without limitation, under § 105 of the Bankruptcy Code, to the extent any such relief would in

any way restrict or impair the rights and remedies of DIP Loan Agent or any DIP Lender as

provided in this Final Financing Order and the DIP Loan Documents or DIP Loan Agent's or any

DIP Loan Lender's exercise of such rights or remedies; provided, however, that DIP Loan Agent may otherwise consent in writing, but no such consent shall be implied from any other action, inaction, or acquiescence by DIP Loan Agent or any DIP Loan Lender, and the consent of DIP Loan Agent shall be required in order to relieve the Debtors' of their obligations under this Section 4.2.

4.3    Section 506(c) Claims.    No costs or expenses of administration which have or may be incurred in the Cases shall be charged against DIP Loan Agent or any DIP Loan Lender, their respective claims or the Collateral pursuant to § 506(c) of the Bankruptcy Code without the prior written consent of DIP Loan Agent, and no such consent shall be implied from any other action, inaction or acquiescence by DIP Loan Agent or any DIP Lender.

4.4    Collateral Rights.    Until all Obligations shall have been indefeasibly paid and satisfied in full:

(a)    no other party shall foreclose or otherwise seek to enforce any junior lien or claim in Collateral; and

(b)    upon and after the declaration of the occurrence of an Event of Default, and subject to DIP Loan Agent obtaining relief from the automatic stay as provided for herein, in connection with a liquidation of any of the Collateral, DIP Loan Agent (or any of its employees, agents, consultants, contractors or other professionals) shall have the right, at the sole cost and expense of Debtors, to: (i) enter upon, occupy and use any real or personal property, fixtures, equipment, leasehold interests or warehouse arrangements owned or leased by Debtors; and (ii) use any and all trademarks, trade names, copyrights, licenses, patents or any other similar assets of Debtors, which are owned by or subject to a lien of any third party and which are used by Debtors in their

businesses. DIP Loan Agent and DIP Lenders will be responsible for the payment of any applicable fees, rentals, royalties or other amounts due such lessor, licensor or owner of such property for the period of time that DIP Loan Agent actually uses the equipment or the intellectual property (but in no event for any accrued and unpaid fees, rentals or other amounts due for any period prior to the date that DIP Loan Agent actually occupies or uses such assets or properties or for any fees, rentals or other amounts that may become due following the end of DIP Loan Agent's occupation or use).

4.5    Releases.

4.5.1    Without prejudice to the rights of the Committee, or other parties-in-interest as and to the extent set forth in Section 4.1.1 of this Final Financing Order, in consideration of DIP Loan Agent and DIP Lenders permitting Debtors to use the Pre-Petition Collateral (including Cash Collateral) and providing other credit and financial accommodations to the Debtors pursuant to the provisions of the DIP Loan Documents, the Interim Orders and this Final Financing Order, each Debtor, on behalf of itself and its successors and assigns (collectively, the "**Releasors**"), hereby, forever releases, discharges and acquits DIP Loan Agent and each DIP Lender and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (collectively, the "**Pre-Petition Releasees**") of and from any and all claims, demands, liabilities, responsibilities, disputes, remedies, causes of action, indebtedness and obligations, of every kind, nature and description, including, without limitation, any so-called "lender liability" claims or defenses, that Releasors had, have or hereafter can or may have against Pre-Petition Releasees as of the date hereof, in respect of events that occurred on or prior to the date hereof with respect to the Debtors, the Obligations, Loan Documents and

any Loans, Letters of Credit, Bank Products or other financial accommodations made by DIP

Loan Agent and/or the DIP Lenders to Debtors pursuant to the DIP Loan Documents.   In

addition, upon the repayment of all Obligations (as defined in the DIP Credit Agreement) owed

to the DIP Loan Agent and the DIP Lenders by Debtors and termination of the rights and

obligations arising under the DIP Loan Documents (which payment and termination shall be on

terms and conditions acceptable to the DIP Loan Agent), the DIP Loan Agent and the DIP

Lenders shall be released from any and all obligations, liabilities, actions, duties, responsibilities

and causes of action arising or occurring in connection with or related to the DIP Loan

Documents, the Interim Orders or this Final Financing Order (including without limitation any

obligation or responsibility (whether direct or indirect, absolute or contingent, due or not due,

primary or secondary, liquidated or unliquidated) to pay or otherwise fund the Carve-Out

Expenses and/or the Professional Fee Carve Out in accordance with Section 2.5 of this Final

Financing Order or otherwise), on terms and conditions acceptable to the DIP Loan Agent.

Section 5.    <u>Other Rights and DIP Obligations</u>.

      5.1    <u>No Modification or Stay of This Final Financing Order</u>.  Notwithstanding

(a) any stay, modification, amendment, supplement, vacating, revocation or reversal of this Final

Financing Order, the DIP Loan Documents or any term hereunder or thereunder, or (b) the

dismissal or conversion of one or more of the Cases (each, a "**Subject Event**"), (x) the acts taken

by each of the DIP Loan Agent and the DIP Lenders in accordance with the Interim Orders and

this Final Financing Order, and (y) the DIP Obligations incurred or arising prior to DIP Loan

Agent's actual receipt of written notice from Debtors expressly describing the occurrence of such

Subject Event shall, in each instance, be governed in all respects by the original provisions of the

Interim Orders and this Final Financing Order, and the acts taken by DIP Loan Agent and DIP

Loan Lender in accordance with the Interim Orders and this Final Financing Order, and the liens

granted to DIP Loan Agent and DIP Loan Lender in the Collateral, and all other rights, remedies, privileges, and benefits in favor of DIP Loan Agent and each DIP Lenders pursuant to the Interim Orders, this Final Financing Order and the DIP Loan Documents, shall remain valid and in full force and effect pursuant to § 364(e) of the Bankruptcy Code.  For purposes of this Final Financing Order, the term "appeal", as used in § 364(e) of the Bankruptcy Code, shall be construed to mean any proceeding for reconsideration, amending, rehearing, or re-evaluating this Final Financing Order by this Court or any other tribunal.

5.2    <u>Power to Waive Rights; Duties to Third Parties</u>.  DIP Loan Agent shall have the right to waive any of the terms, rights and remedies provided or acknowledged in this Final Financing Order in respect of DIP Loan Agent and DIP Lenders (the "**DIP Loan Lender Rights**"), and shall have no obligation or duty to any other party with respect to the exercise or enforcement, or failure to exercise or enforce, any DIP Loan Lender Right(s).  Any waiver by DIP Loan Agent of any DIP Loan Lender Rights shall not be or constitute a continuing waiver.  Any delay in or failure to exercise or enforce any DIP Loan Lender Right shall neither constitute a waiver of such DIP Lender Right, subject DIP Loan Agent or any DIP Loan Lender to any liability to any other party, nor cause or enable any other party to rely upon or in any way seek to assert as a defense to any obligation owed by the Debtors to DIP Loan Agent or any DIP Loan Lender.

5.3    <u>Disposition of Collateral</u>.  Debtors shall not sell, transfer, lease, encumber or otherwise dispose of any portion of the Collateral without the prior written consent of DIP Loan Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by the DIP Loan Agent or any DIP Lenders) and an order of this Court, except for

sales of Debtors' Inventory in the ordinary course of their business or otherwise expressly permitted pursuant to the terms of the DIP Credit Agreement.

5.4     <u>Inventory</u>.  Debtors shall not, without the consent of the DIP Loan Agent, (a) enter into any agreement to return any inventory to any of their creditors for application against any pre-petition indebtedness under any applicable provision of § 546 of the Bankruptcy Code, or (b) consent to any creditor taking any setoff against any of its pre-petition indebtedness based upon any such return pursuant to § 553(b)(1) of the Bankruptcy Code or otherwise.

5.5     <u>Reservation of Rights</u>.  The terms, conditions and provisions of this Final Financing Order are in addition to and without prejudice to the rights of DIP Loan Agent and each DIP Lender to pursue any and all rights and remedies under the Bankruptcy Code, the DIP Loan Documents or any other applicable agreement or law, including, without limitation, rights to seek adequate protection and/or additional or different adequate protection, to seek relief from the automatic stay, to seek an injunction, to oppose any request for use of cash collateral or granting of any interest in the Collateral, as applicable, or priority in favor of any other party, to object to any sale of assets, and to object to applications for allowance and/or payment of compensation of Professionals or other parties seeking compensation or reimbursement from the Estates.

5.6     <u>Binding Effect</u>.

5.6.1    The provisions of this Final Financing Order and the DIP Loan Documents, the DIP Obligations, the Revolving Loan A/L Adequate Protection Superpriority Claim, the DIP Loan Superpriority Claim and any and all rights, remedies, privileges and benefits in favor of each of the DIP Loan Agent and the DIP Lenders provided or acknowledged in this Final Financing Order, and any actions taken pursuant thereto, shall be effective

immediately upon entry of this Final Financing Order pursuant to Bankruptcy Rules 6004(h) and 7062, *nunc pro tunc* to the Petition Date, shall continue in full force and effect, and shall survive entry of any such other order, including without limitation any order which may be entered confirming any plan of reorganization, converting one or more of the Cases to any other chapter under the Bankruptcy Code, or dismissing one or more of the Cases.

5.6.2   Any order dismissing one or more of the Cases under § 1112 or otherwise shall be deemed to provide (in accordance with §§ 105 and 349 of the Bankruptcy Code) that (a) the DIP Loan Superpriority Claim and DIP Loan Agent's and DIP Lenders' liens on and security interests in the Collateral and all other claims, liens, adequate protections and other rights granted pursuant to the terms of this Final Financing Order shall continue in full force and effect notwithstanding such dismissal until the Obligations are indefeasibly paid and satisfied in full, and (b) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purposes of enforcing all such claims, liens, protections and rights.

5.6.3   In the event this Court modifies any of the provisions of this Final Financing Order or the DIP Loan Documents following a Final Hearing, such modifications shall not affect the rights or priorities of DIP Loan Agent and DIP Lenders pursuant to this Final Financing Order with respect to the Collateral or any portion of the Obligations which arises or is incurred or is advanced prior to such modifications, and this Final Financing Order shall otherwise remain in full force and effect.

5.6.4   This Final Financing Order shall be binding upon Debtors, all parties in interest in the Cases and their respective successors and assigns, including any trustee or other fiduciary appointed in the Cases or any subsequently converted bankruptcy case(s) of

any Debtor. This Final Financing Order shall also inure to the benefit of DIP Loan Agent, DIP

Lenders, Debtors and their respective successors and assigns.

    5.7  <u>Restrictions on Cash Collateral Use, Additional Financing, Plan</u>

<u>Treatment</u>.

    5.7.1  All post-petition advances and other financial accommodations

under the DIP Credit Agreement and the other DIP Loan Documents are made in reliance on the

Interim Orders and this Final Financing Order and there shall not at any time be entered in the

Cases, or in any subsequently converted case under chapter 7 of the Bankruptcy Code, any order

(other than this Final Financing Order) which (a) authorizes the use of cash collateral of Debtors

in which DIP Loan Agent or DIP Lenders have an interest, or the sale, lease, or other disposition

of property of any Debtor's Estate in which DIP Loan Agent or DIP Lenders have a lien or

security interest, except as expressly permitted hereunder or in the DIP Loan Documents, or (b)

authorizes under § 364 of the Bankruptcy Code the obtaining of credit or the incurring of

indebtedness secured by a lien or security interest which is equal or senior to a lien or security

interest in property in which DIP Loan Agent or DIP Lenders hold a lien or security interest, or

which is entitled to priority administrative claim status which is equal or superior to that granted

to DIP Loan Agent and DIP Lenders herein; unless, in each instance (x) DIP Loan Agent shall

have given its express prior written consent with respect thereto, no such consent being implied

from any other action, inaction or acquiescence by DIP Loan Agent or any DIP Loan Lender, or

(y) such other order requires that all DIP Obligations shall first be indefeasibly paid and satisfied

in full in accordance with the terms of the DIP Credit Agreement and the other DIP Loan

Documents, including, without limitation, all debts and obligations of Debtors to DIP Loan

Agent and DIP Lenders which arise or result from the obligations, loans, security interests and

liens authorized herein, on terms and conditions acceptable to DIP Loan Agent.  The security interests and liens granted to or for the benefit of DIP Loan Agent and DIP Lenders hereunder and the rights of DIP Loan Agent and DIP Lenders pursuant to this Final Financing Order and the DIP Loan Documents with respect to the DIP Obligations and the Collateral are cumulative and shall not be altered, modified, extended, impaired, or affected by any plan of reorganization or liquidation of Debtors and, if DIP Loan Agent shall expressly consent in writing that the DIP Obligations shall not be repaid in full upon confirmation thereof, shall continue after confirmation and consummation of any such plan.

5.8    No Owner/Operator Liability.

5.8.1    Neither the DIP Loan Agent nor any DIP Lender shall be deemed to be in control of the operations of the Debtors or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtors (as such terms, or any similar terms, are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601 et seq., as amended, or any similar federal or state statute).

5.9    Marshalling.  In no event shall DIP Loan Agent or any DIP Lender be subject to the equitable doctrine of "marshalling" or any similar doctrine with respect to the Collateral.

5.10    Right of Setoff.

5.10.1  To the extent any funds were on deposit with DIP Loan Agent as of the Petition Date, including, without limitation, all funds deposited in, or credited to, an account of any Debtor with DIP Loan Agent or any DIP Lender immediately prior to the filing of the Cases (regardless of whether, as of the Petition Date, such funds had been collected or made

available for withdrawal by any such Debtor), such funds (the "**Deposited Funds**") are subject to rights of setoff. By virtue of such setoff rights, the Deposited Funds are subject to a lien in favor of DIP Loan Agent or the applicable DIP Lenders pursuant to §§ 506(a) and 553 of the Bankruptcy Code.

5.11    Term; Termination.    Notwithstanding any provision of this Final Financing Order to the contrary, the term of the financing arrangements among Debtors, DIP Loan Agent and DIP Lenders authorized by this Final Financing Order may be terminated pursuant to the terms of the DIP Credit Agreement.

5.12    Limited Effect.    In the event of a conflict between the terms and provisions of any of the DIP Loan Documents and this Final Financing Order, the terms and provisions of this Final Financing Order shall govern, interpreted as most consistent with the terms and provisions of the DIP Loan Documents.

5.13    Settlement of Committee Objections.

5.13.1 The Debtors, the Committee, the DIP Loan Agent, and Sunshine Time Inc. have entered into a settlement, the terms of which are generally set forth on Exhibit 2 to this Final Financing Order and incorporated herein. Upon the occurrence of (i) the closing of the sale of the Debtors' assets to Sunshine Time Inc. (the "**Sale**") in accordance with the *Order (I) Approving Asset Purchase Agreement between Debtors and Buyer, (II) Approving Sale of Substantially All Assets and Assumption of Certain Liabilities Free and Clear of All Liens, Claims, Encumbrances, and Other Interests, (III) Approving Assumption, Assignment, and Sale of Certain Executory Contracts and Unexpired Leases, and (IV) Determining Amounts Necessary to Cure Such Executory Contracts and Unexpired Leases* (the "**Sale Order**"), entered on the date of this Final Financing Order, pursuant to which, among other things, all proceeds of

the Sale shall be paid at closing to DIP Loan Agent for the permanent application and payment

of all Pre-Petition Obligations and DIP Obligations, and (ii) Debtors' receipt of the proceeds of a

special over-advance in excess of the Supplemental Loan Limit (as defined in the DIP Credit

Agreement) made by DIP Loan Agent and DIP Lenders on the closing date of the Sale in the

amount of $175,000 (the "**Special Sale Overadvance**") (the conditions described in clauses (i)

and (ii) above are referred to herein as the "**Settlement Conditions**"), then (a) the financing

arrangements relating to the Loans as between Debtors, on one hand, and DIP Loan Agent and

DIP Lenders, on the other hand, pursuant to the DIP Loan Documents shall be terminated,

cancelled and of no further force and effect except for those provisions of the DIP Loan

Documents that survive termination of such documents, (b) DIP Loan Agent and DIP Lenders

shall have no further obligation to make any Loans, provide any Letters of Credit or provide

other financial or credit accommodations or have any other duties or responsibilities in

connection with the DIP Loan Documents and this Final Financing Order, including, without

limitation, with respect to the Carve Out Expenses or funding any other expenses or claims of the

Debtors or their estates, (c) all security interests and liens upon any and all properties and assets

of Debtors heretofore granted by Debtors to DIP Loan Agent and/or any DIP Lenders pursuant to

the DIP Loan Documents shall be released and terminated in accordance with a payoff letter in

form and substance satisfactory to DIP Loan Agent and Debtors, and (d) DIP Loan Agent and

DIP Lenders shall waive any deficiency claim relating to the Special Sale Overadvance.

       5.13.2 Without limiting any of DIP Loan Agent's and DIP Lenders'

rights, liens, claims and priorities provided for in this Final Financing Order and the DIP Loan

Documents, with respect to receiving payment from and having recourse to the Avoidance and

Other Actions and the Litigation Proceeds, DIP Loan Agent and DIP Lenders are hereby granted

an administrative priority claim in respect of all Obligations arising under the DIP Loan Documents; provided, that, (i) such administrative expense claim solely with respect to the Avoidance and Other Actions and the Litigation Proceeds shall be subject to the payment of Allowed Professional Fees (without prejudice to DIP Loan Agent's and DIP Lenders' rights to object to the allowance of any such fees), (ii) DIP Loan Agent and DIP Lenders shall first apply any available Collateral proceeds against the Obligations prior to seeking a distribution from the Avoidance and Other Actions and the Litigation Proceeds in respect of the administrative claim granted pursuant to this section, (iii) the Debtors and the Committee, and their respective representatives and successors, shall not distribute or pay any claims (other than Allowed Professional Fees) with Avoidance and Other Actions or the Litigation Proceeds until such time as DIP Loan Agent and DIP Lenders are entitled to receive a distribution from such estate assets in accordance with the terms of this section 5.13.2.

       5.14   <u>Objections Overruled</u>.  All objections to the entry of this Final Financing Order are, to the extent not withdrawn, hereby overruled.

**IT IS SO ORDERED.**

Dated:  November 16, 2015.
       New York, New York

                                **_/s/Martin Glenn_**
                                 MARTIN GLENN
               United States Bankruptcy Judge

## **EXHIBIT 1**

**DIP Credit Agreement**

<u>RATIFICATION AND AMENDMENT AGREEMENT</u>

This RATIFICATION AND AMENDMENT AGREEMENT (the "Ratification Agreement") dated as of September 30, 2015, is by and among Wells Fargo Bank, National Association, ("Wells Fargo"), in its capacity as agent for the Lenders (in such capacity, "Agent") acting for and on behalf of the financial institutions from time to time party to the Credit Agreement (as defined below) as lenders (collectively with Agent, the "Lenders"), Binda USA Holdings, Inc., ("Parent"), Advance Watch Company Ltd. ("Advance Watch"), Sunburst Products, Inc. ("Sunburst"), and GWG International, Ltd. ("GWG" and together with Advance Watch and Sunburst, each individually, a "Borrower" and collectively "Borrowers").

<u>W I T N E S S E T H</u>:

WHEREAS, Parent and each Borrower has commenced a case under Chapter 11 of Title 11 of the United States Code in the United States Bankruptcy Court for the Southern District of New York, and Parent and each Borrower has retained possession of its assets and is authorized under the Bankruptcy Code to continue the operation of its businesses as a debtor-in-possession;

WHEREAS, prior to the commencement of the Chapter 11 Cases (as defined below), Agent and Lenders made loans and advances and provided other financial or credit accommodations to Borrowers secured by substantially all assets and properties of Borrowers as set forth in the Existing Financing Agreements (as defined below);

WHEREAS, the Bankruptcy Court (as defined below) has entered a Financing Order (defined below) pursuant to which Agent and Lenders may make post-petition loans and advances, and provide other financial accommodations, to Borrowers secured by substantially all the assets and properties of Borrowers as set forth in the Financing Order and the DIP Loan Documents (as defined below);

WHEREAS, the Financing Order provides that as a condition to the making of such post-petition loans, advances and other financial accommodations, Borrowers shall execute and deliver this Ratification Agreement;

WHEREAS, Borrowers desire to reaffirm their obligations to Agent and Lenders pursuant to the Existing Financing Agreements and acknowledge their continuing liabilities to Agent and Lenders thereunder in order to induce Agent and Lenders to make such post-petition loans and advances, and provide such other financial accommodations, to Borrowers; and

WHEREAS, Borrowers have requested that Agent and Lenders make post-petition loans and advances and provide other financial or credit accommodations to Borrowers and make certain amendments to the Credit Agreement (as defined below), and Agent and Lenders are willing to do so, subject to the terms and conditions contained herein.

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and agreements contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Agent, Lenders and Borrowers mutually covenant, warrant and agree as follows:

1.    <u>DEFINITIONS</u>.

    1.1    <u>Additional Definitions</u>.  As used herein, the following terms shall have the respective meanings given to them below and the Credit Agreement and the other Existing Financing Agreements shall be deemed and are hereby amended to include, in addition and not in limitation, each of the following definitions:

    (a)    "Bankruptcy Court" shall mean the United States Bankruptcy Court for the Southern District of New York.

    (b)    "Budget" shall mean the budget to be delivered to Agent and Lenders in accordance with Section 5.3(a) hereof (a summary of which is attached hereto as Exhibit A), in form and substance satisfactory to Agent together with any subsequent or amended budget(s) thereto delivered to Agent and Lenders, in form and substance satisfactory to Agent, in accordance with the terms and conditions hereof.

    (c)    "Chapter 11 Cases" shall mean the Chapter 11 cases of Parent and Borrowers which are being jointly administered under the Bankruptcy Code and are pending in the Bankruptcy Court.

    (d)    "Debtors" shall mean Borrowers and Parent, each as Debtor and Debtor-in-Possession in the Chapter 11 Cases.

    (e)    "DIP Loan Documents" shall mean the Existing Credit Agreement and the Existing Loan Documents, as amended, modified, ratified, assumed and adopted as provided in this Ratification Agreement.

    (f)    "DIP Obligations" shall mean all Obligations (as defined in the Existing Credit Agreement) arising on and after the Petition Date and whether arising on or after the conversion or dismissal of the Chapter 11 Cases, or before, during and after the confirmation of any plan of reorganization in the Chapter 11 Cases, and whether arising under or related to this Ratification Agreement, the Credit Agreement, the other Existing Financing Agreements, a Financing Order, by operation of law or otherwise, and whether incurred by such Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, debtor-in-possession facility fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

    (g)    "Existing Credit Agreement" shall mean the Credit Agreement dated June 21, 2013 by and among Agent, Lenders, Borrowers and Parent as amended by the First Amendment to the Credit Agreement dated June 30, 2014, and the Second Amendment to the Credit Agreement, dated as of August 17, 2015, each as in effect immediately prior to the Petition Date.

    (h)    "Existing Financing Agreements" shall mean the Loan Documents (as defined in the Existing Credit Agreement), including, without limitation, the Existing Credit Agreement, in each case, as in effect immediately prior to the Petition Date.

2

(i)    "Financing Order" shall mean the Interim Financing Order, the Permanent Financing Order and such other orders relating thereto or authorizing the granting of credit by Agent and Lenders to Borrowers on an emergency, interim or permanent basis pursuant to Section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Cases.

(j)    "Interim Financing Order" shall have the meaning set forth in Section 9.7 hereof.

(k)    "Lenders" shall have the meaning set forth in the Existing Credit Agreement.

(l)    "Permanent Financing Order" shall have the meaning set forth in Section 9.8 hereof.

(m)    "Petition Date" shall mean the date of the commencement of the Chapter 11 Cases.

(n)    "Post-Petition Collateral" shall mean, collectively, all now existing and hereafter acquired real and personal property of each Debtor's estate, wherever located, of any kind, nature or description, including any such property in which a lien is granted to Agent, for the benefit of each of the Secured Parties, pursuant to the DIP Loan Documents, the Financing Order or any other order entered or issued by the Bankruptcy Court, and shall include, without limitation:

       i.     all of such Debtor's Accounts;

       ii.    all of such Debtor's Books;

       iii.   all of such Debtor's Chattel Paper;

       iv.   all of such Debtor's Commercial Tort Claims, including, without limitation, those identified on Schedule 1.1 to this Agreement;

       v.    all of such Debtor's Deposit Accounts;

       vi.   all of such Debtor's Equipment;

       vii.  all of such Debtor's Farm Products;

       viii.  all of such Debtor's Fixtures;

       ix.   all of such Debtor's General Intangibles;

       x.    all of such Debtor's Inventory;

       xi.   all of such Debtor's Investment Property;

3

xii.   all of such Debtor's Intellectual Property and Intellectual Property Licenses;

xiii.   all of such Debtor's Negotiable Collateral;

xiv.   all of such Debtor's Pledged Interests (including all of such Debtor's Pledged Operating Agreements and Pledged Partnership Agreements);

xv.   all of such Debtor's Securities Accounts;

xvi.   all of such Debtor's Supporting Obligations;

xvii.   all of such Debtor's money, Cash Equivalents, or other assets of such Debtor that now or hereafter come into the possession, custody, or control of Agent (or its agent or designee) or any other member of the Lender Group;

xviii.  all of the proceeds (as such term is defined in the Code) and products, whether tangible or intangible, of any of the foregoing, including, without limitation, proceeds of insurance or Commercial Tort Claims covering or relating to any or all of the foregoing, and any and all Accounts, Books, Chattel Paper, Deposit Accounts, Equipment, Fixtures, General Intangibles, Inventory, Investment Property, Intellectual Property, Negotiable Collateral, Securities Accounts, Supporting Obligations, money, or other tangible or intangible property resulting from the sale, lease, license, exchange, collection, or other disposition of any of the foregoing, the proceeds of any award in condemnation with respect to any of the foregoing, any rebates or refunds, whether for taxes or otherwise, and all proceeds of any such proceeds, or any portion thereof or interest therein, and the proceeds thereof, and all income, license fees, royalties, damages, and payments now and hereafter due or payable under and with respect to the Intellectual Property included in the Collateral, including payments under all licenses entered into in connection therewith and damages and payments for past, present, or future infringements thereof, and the right to sue for past, present, and future infringements of the Intellectual Property included in the Collateral, and all proceeds of any loss of, damage to, or destruction of the above, whether insured or not insured, and, to the extent not otherwise included, any indemnity, warranty, or guaranty payable by reason of loss or damage to, or otherwise with respect to any of the foregoing (the "Proceeds").  Without limiting the generality of the foregoing, the term "Proceeds" includes whatever is receivable or received when Investment Property or proceeds are sold, exchanged, collected, or otherwise disposed of, whether such disposition is voluntary or involuntary, and includes proceeds of any indemnity or guaranty payable to any Debtor or Agent from time to time with respect to any of the Investment Property;

xix.   from and after the entry of the Permanent Financing Order, all claims, rights, interests, assets and properties recovered by or on behalf of each Debtor or any trustee of such Debtor (whether in the Chapter 11 Cases or any subsequent case to which any of the Chapter 11 Cases is converted) including,

without limitation, all property recovered as a result of transfers or obligations avoided or actions maintained or taken pursuant to Section 544, 545,547, 548, 549,550, 551, and 553 of the Bankruptcy Code; and

xx.   to the extent not otherwise described above, all letters of credit, banker's acceptances and similar instruments and including all letter-of-credit rights;

xxi.  to the extent not otherwise described above, all supporting obligations and all present and future liens, security interests, rights, remedies, title and interest in, to and in respect of Receivables and other Collateral, including (1) rights and remedies under or relating to guaranties, contracts of suretyship, letters of credit and credit and other insurance related to the Collateral, (2) rights of stoppage in transit, replevin, repossession, reclamation and other rights and remedies of an unpaid vendor, lienor or secured party, (3) goods described in invoices, documents, contracts or instruments with respect to, or otherwise representing or evidencing, Receivables or other Collateral, including returned, repossessed and reclaimed goods, and (4) deposits by and property of account debtors or other persons securing the obligations of account debtors;

xxii. to the extent not otherwise described above, all (1) investment property (including securities, whether certificated or uncertificated, securities accounts, security entitlements, commodity contracts or commodity accounts) and (2) monies, credit balances, deposits and other property of any Borrower now or hereafter held or received by or in transit to Agent, any Lender or its Affiliates or at any other depository or other institution from or for the account of any Borrower, whether for safekeeping, pledge, custody, transmission, collection or otherwise;

xxiii. to the extent not otherwise described above to the extent not otherwise described above, all Receivables;

xxiv. to the extent not otherwise described above all Records; and

xxv.  to the extent not otherwise described above, all products and proceeds of the foregoing, in any form, including insurance proceeds and all claims against third parties for loss or damage to or destruction of or other involuntary conversion of any kind or nature of any or all of the other Collateral.

(o)      "Pre-Petition Collateral" shall mean, collectively, (i) all "Collateral" as such term is defined in the Existing Credit Agreement as in effect immediately prior to the Petition Date, and (ii) all other security and collateral for the Pre-Petition Obligations as provided in the Existing Credit Agreement and the other Existing Financing Agreements immediately prior to the Petition Date.

(p)      "Pre-Petition Obligations" shall mean all Obligations (as such term is defined in the Existing Credit Agreement) arising at any time before the Petition Date, whether

5

incurred by Parent or such Borrower as principal, surety, endorser, guarantor or otherwise and including, without limitation, all principal, interest, financing charges, letter of credit fees, unused line fees, servicing fees, line increase fees, early termination fees, other fees, commissions, costs, expenses and attorneys', accountants' and consultants' fees and expenses incurred in connection with any of the foregoing.

(q)    "Ratification Agreement" shall mean this Ratification and Amendment Agreement by and among Parent, Borrowers, Agent and Lenders, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(r)    "Specified Defaults" means all Defaults and Events of Default that are listed in <u>Exhibit 1</u> hereto together with any Defaults or Events of Default arising due specifically to the commencement of the Bankruptcy Cases.  Agent and Lenders have not waived, are not by this Ratification Agreement waiving, and have no intention of waiving any Events of Default which may have occurred on or prior to the date hereof, whether or not continuing on the date hereof, or which may occur after the date hereof (whether the same or similar to the Specified Events of Default or otherwise), other than the Specified Events of Default. The foregoing waiver shall not be construed as a bar to or a waiver of any other or further Event of Default on any future occasion, whether similar in kind or otherwise and shall not constitute a waiver express or implied, of any of the rights and remedies of Agent and Lenders arising under the terms of the Credit Agreement or any other Existing Financing Agreements on any future occasion or otherwise.

1.2    <u>Amendments to Definitions</u>.

(a)    <u>Collateral</u>.  All references to the term "Collateral" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements, or any other term referring to the security for the Pre-Petition Obligations, shall be deemed, and each such reference is hereby amended to mean, collectively, the Pre-Petition Collateral and the Post-Petition Collateral.

(b)    <u>Credit Agreement</u>.  All references to the term "Loan Agreement" or "Credit Agreement" in the Existing Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to mean the Existing Credit Agreement, as amended by this Ratification Agreement and as ratified, assumed and adopted by each Borrower pursuant to the terms hereof and the Financing Order, as the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(c)    <u>Debtors</u>.  All references to Debtors, including, without limitation, to the terms "Borrower" and "Borrowers" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to mean and include the Debtors as defined herein, and their successors and assigns (including any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of such corporation whether under Chapter 11 of the

6

Bankruptcy Code or any subsequent Chapter 7 case and its successor upon conclusion of the Chapter 11 Case of such corporation).

(d)     Eligible Accounts.  Subclause (A) of clause (i) in section (i) in the definition of Eligible Accounts is hereby amended by deleting such subclause in its entirety and replacing it with the following: "(A) more than thirty-five (35%) percent of the aggregate amount of all Eligible Accounts, solely in the case of Accounts owing to Borrowers by Target Corporation and Wal-Mart Stores, Inc., and".

(e)     Eligible Inventory.  Clause (ii) of section (k) of the definition of Eligible Inventory is hereby amended by deleting the reference to the amount "$3,000,000" contained therein and replacing it with the following: "$2,500,000".

(f)     Financing Agreements.  All references to the term "Loan Documents" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to include, in addition and not in limitation, this Ratification Agreement and all of the Existing Financing Agreements, as ratified, assumed and adopted by each Borrower pursuant to the terms hereof, as amended and supplemented hereby, and the Financing Order, as each of the same now exists or may hereafter be amended, modified, supplemented, extended, renewed, restated or replaced.

(g)     Material Adverse Effect.  All references to the term "Material Adverse Effect", "material adverse effect" or "material adverse change" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to add at the end thereof:  "provided, that, the commencement of the Chapter 11 Cases shall not constitute a Material Adverse Effect or material adverse change".

(h)     Maximum Revolver Amount.  The defined term "Maximum Revolver Amount" is hereby amended by deleting such term in its entirety and replacing it with the following:

"'Maximum Revolver Amount' means $18,500,000."

(i)     Obligations.  All references to the term "Obligations" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements shall be deemed, and each such reference is hereby amended, to mean both the Pre-Petition Obligations and the Post-Petition Obligations.

(j)     Supplemental Loan Limit.  The term "Supplemental Loan Limit" is hereby amended and restated as follows: "Supplemental Loan Limit" shall mean $3,500,000; provided, that (i) during the period commencing on November 16, 2015 and ending on November 20, 2015, in Agent's sole and absolute discretion, the Supplemental Loan Limit may be increased up to $4,000,000; provided further, that the Supplemental Loan Limit shall be reduced down to $3,500,000 upon the earlier of (x) November 23, 2015, or (y) one (1) business day following Agent's demand for such reduction."

7

(k)      US Borrowing Base.  The definition of US Borrowing Base is hereby amended as follows:

(i)      Section (c) is hereby deleted in its entirety.

(ii)      Clause (i) of section (d) is hereby amended by deleting such clause in its entirety and replacing it with the following: "(i) $3,000,000, and".

(l)      Far East.  All references to the terms "Subsidiaries" or "Affiliates" in the Credit Agreement, this Ratification Agreement or the other Existing Financing Agreements when used in connection with any Borrower or the Parent shall be deemed to exclude Far East and its direct and indirect Subsidiaries.

1.3.      Interpretation.

(a)      For purposes of this Ratification Agreement, unless otherwise defined or amended herein, including, but not limited to, those terms used or defined in the recitals hereto, all terms used herein shall have the respective meanings assigned to such terms in the Existing Credit Agreement.

(b)      All references to the term "Agent", "Lender," "Borrower," "Parent," "Debtor" or any other person pursuant to the definitions in the recitals hereto or otherwise shall include its respective successors and assigns.

(c)      All references to any term in the singular shall include the plural and all references to any term in the plural shall include the singular unless the context of such usage requires otherwise.

(d)      All terms not specifically defined herein which are defined in the Uniform Commercial Code, as in effect in the State of New York as of the date hereof, shall have the meaning set forth therein, except that the term "Lien" or "lien" shall have the meaning set forth in § 101(37) of the Bankruptcy Code.

2.      ACKNOWLEDGMENT.

2.1      Pre-Petition Obligations.      Each Borrower and Parent hereby acknowledges, confirms and agrees that, as of September 30, 2015, Borrowers are, jointly and severally, indebted to Agent and Lenders in respect of (a) all Pre-Petition Obligations in the aggregate principal amount of not less than  $13,359,095.01, consisting of: (i) Revolving Loans in the aggregate principal amount of not less than $11,537,859.31, and (ii) Obligations relating to Letters of Credit in the aggregate amount of not less than $1,821,235.70, together with interest accrued and accruing thereon, and all costs, expenses, fees (including attorneys' fees and expenses), and (b) other charges now or hereafter owed by Borrowers to Agent and Lenders, all of which are unconditionally owing by Borrowers, jointly and severally, to Agent and Lenders, without offset, defense or counterclaim of any kind, nature and description whatsoever.

2.2      Acknowledgment of Security Interests.  Each Borrower and Parent hereby acknowledges, confirms and agrees that Agent, for the benefit of each of the Secured Parties, has

8

and shall continue to have valid, enforceable and perfected first priority and senior security interests in and liens upon all Pre-Petition Collateral heretofore granted to Agent pursuant to the Existing Financing Agreements as in effect immediately prior to the Petition Date to secure all of the Obligations, as well as valid and enforceable first priority and senior security interests in and liens upon all Post-Petition Collateral granted to Agent, for the benefit of each of the Secured Parties, under the Financing Order or hereunder or under any of the other Existing Financing Agreements or otherwise granted to or held by Agent, in each case, subject only to liens or encumbrances expressly permitted by the Credit Agreement and any other liens or encumbrances expressly permitted by the Financing Order that may have priority over the liens in favor of Agent and Lenders.

2.3     Binding Effect of Documents.     Each Borrower and Parent hereby acknowledges, confirms and agrees that: (a) each of the Existing Financing Agreements to which it is a party was duly executed and delivered to Agent and Lenders by such Borrower or Parent and each is in full force and effect as of the date hereof, (b) the agreements and obligations of such Borrower or Parent contained in the Existing Financing Agreements constitute the legal, valid and binding obligations of such Borrower and Parent enforceable against it in accordance with the terms thereof, and such Borrower and Parent has no valid defense, offset or counterclaim to the enforcement of such obligations, and (c) Agent and Lenders are and shall be entitled to all of the rights, remedies and benefits provided for in the Existing Financing Agreements and the Financing Order.

3.     ADOPTION AND RATIFICATION.

Each Borrower and Parent hereby (a) ratifies, assumes, adopts and agrees to be bound by all of the Existing Financing Agreements to which it is a party and (b) agrees to pay all of the Pre-Petition Obligations in accordance with the terms of such Existing Financing Agreements, as amended by this Ratification Agreement, and in accordance with the Financing Order. All of the Existing Financing Agreements are hereby incorporated herein by reference and hereby are and shall be deemed adopted and assumed in full by Borrowers and Parent, each as Debtor and Debtor-in-Possession, and considered as agreements between such Borrowers and Parent, on the one hand, and Agent and Lenders, on the other hand. Each Borrower and Parent hereby ratifies, restates, affirms and confirms all of the terms and conditions of the Existing Financing Agreements, as amended and supplemented pursuant hereto and the Financing Order, and each Borrower and Parent agrees to be fully bound, as Debtor and Debtor-in-Possession, by the terms of the Existing Financing Agreements to which such Borrower is a party.

4.     GRANT OF SECURITY INTEREST.

As collateral security for the prompt performance, observance and payment in full of all of the Obligations (including the Pre-Petition Obligations and the DIP Obligations), Borrowers and Parent, each as Debtor and Debtor-in-Possession, hereby grant, pledge and assign to Agent, for the benefit of each of the Secured Parties, and also confirm, reaffirm and restate the prior grant to Agent of, continuing security interests in and liens upon, and rights of setoff against, all of the Collateral.

10066135-v8

5.    <u>ADDITIONAL REPRESENTATIONS, WARRANTIES AND COVENANTS</u>.

In addition to the continuing representations, warranties and covenants heretofore and hereafter made by Borrowers to Agent and Lenders, whether pursuant to the Existing Financing Agreements or otherwise, and not in limitation thereof, each Borrower hereby represents, warrants and covenants to Agent and Lenders the following (which shall survive the execution and delivery of this Ratification Agreement), the truth and accuracy of which, or compliance with, to the extent such compliance does not violate the terms and provisions of the Bankruptcy Code, shall be a continuing condition of the making of Loans by Agent and Lenders or the issuance of Letters of Credit:

5.1.    <u>Financing Order</u>.  The Interim Financing Order (and, following the expiration of the Interim Financing Period defined therein, the Permanent Financing Order) has been duly entered, is valid, subsisting and continuing and has not been vacated, modified, reversed on appeal, or vacated or modified by any order of the Bankruptcy Court (other than as consented to by Agent) and is not subject to any pending appeal, stay or motion for reconsideration as to which an effective stay exists.

5.2.    <u>Use of Proceeds</u>.  All Loans provided by Agent or any Lender to Borrowers or Letters of Credit issued pursuant to the Financing Orders, the Credit Agreement or otherwise, shall be used by Borrowers only in accordance with the Budget as set forth in Section 5.3. Unless otherwise provided for in the Budget or authorized by the Bankruptcy Court and approved by Agent in writing, no portion of any administrative expense claim relating to the Chapter 11 Cases or any other claim against the Borrowers shall be paid with the proceeds of such Loans or Letters of Credit provided or issued by (or on behalf of) Agent and Lenders to Borrowers, other than those administrative claims and other claims relating to the Chapter 11 Cases directly attributable to the operation of the business of any Borrower or Parent in the ordinary course of such business in accordance with the Financing Agreements and the Budget.

5.3.    <u>Budget</u>.

(a)    Borrowers have prepared and delivered to Agent and Lenders a post-petition Budget covering the period commencing with the week beginning on September 30, 2015 and ending on December 25, 2015; provided that the Budget may be amended (to the extent such amended Budget is approved by Agent in writing).  The Budget has been thoroughly reviewed by the Borrowers, their management and their restructuring advisors and sets forth, for the periods covered thereby, projected weekly operating cash disbursements and cash receipts for each week covered by the Budget.

(b)    Not later than 5:00 p.m. (Eastern time) on the Wednesday of each week commencing on October 16, 2015, Borrowers shall furnish to Agent, in form and substance satisfactory to Agent, a report (the "Budget Compliance Report") that sets forth, on both a week by week basis and a cumulative, weekly roll-forward basis through the end of the immediately preceding week, a comparison of the actual cash disbursements to the projected cash disbursements and the actual cash receipts to the projected cash receipts, each as set forth in the Budget for such Measurement Period, together with a certification from the Borrowers' Chief Restructuring Officer that no Material Budget Deviation (as defined below) has occurred.

10

(c)       It shall constitute a Material Budget Deviation and an additional Event of Default under the Credit Agreement if (i) commencing with the week ending October 30, 2015, and each week thereafter, the actual aggregate cash receipts for the trailing four (4) week period are less than eighty percent (80%) of the projected aggregate cash receipts set forth in the Budget for such trailing four (4) week period; (ii) commencing with the week ending October 16, 2015 actual aggregate cash disbursements for any line item in the Budget for the immediately preceding week is more than one hundred and twenty (120%) percent of the projected weekly amount of such disbursements in the Budget; and (iii) commencing with the week ending October 23, 2015, actual aggregate cash disbursements each week on a trailing four (4) week basis (or for the period from the Petition Date through the week then ended if prior to the fourth week covered in the Budget) on an aggregate cumulative basis are more than one hundred and ten (110%) of the projected aggregate cash disbursements for such period set forth in the Budget.  For purposes hereof, the first week of the Budget shall be deemed to be the period beginning on the Petition Date and ending on October 9, 2015.

(d)       Each Debtor hereby confirms, acknowledges and agrees that, unless waived in writing by Agent, (i) a failure to maintain the deviations in the Budget as set forth in Section 5.3(c) hereof shall constitute a material deviation from the Budget and an additional Event of Default (each, a "Material Budget Deviation") and (ii) the failure to deliver any reports with respect to any Budget, in form and substance satisfactory to Agent, as provided in Section 5.3(b) hereof shall constitute an Event of Default.  Notwithstanding any approval by Agent or any Lender of the Budget or any subsequent or amended Budget(s), Agent and Lenders will not, and shall not be required to provide any Loans or Letters of Credit to the Borrowers pursuant to the Budget and shall provide only Loans in accordance with the terms and conditions set forth in the Credit Agreement as amended by this Ratification Agreement, the other Existing Financing Agreements and the Financing Order unless and until the Credit Agreement, as amended by this Ratification Agreement and the other Existing Financing Agreements and the Financing Order has been amended and supplemented to provide for the funding of the amounts provided for in the Budget.  Agent and Lenders are relying upon the Borrowers' delivery of, and compliance with, the Budget in accordance with this Section 5.3 in determining to enter into the post-petition financing arrangements provided for herein.

(e)       To the extent the amount of any Loans or Letters of Credit exceeds the formula set forth in the Credit Agreement as amended by this Ratification Agreement and the Financing Orders, such excess amounts shall be deemed to be Supplemental Loans.

(f)       Notwithstanding any projected amounts set forth in the Budget relating to the costs and expenses of Agent and Lenders that are reimbursable by Borrowers or any other amounts owing by Borrowers to Agent and Lenders (including, without limitation reasonable attorneys and consulting fees and expenses) in accordance with the Credit Agreement and the other Existing Financing Agreements, such projections shall not limit, impair, modify or waive the Borrowers' obligation to pay the actual amounts due to Agent and/or Lenders in respect of such costs, expenses and other amounts owing to Agent and Lenders in accordance with the Credit Agreement and the other Existing Financing Agreements.

5.4       Ratification of Blocked Account Agreements.  To the extent Agent deems it necessary in its discretion and upon Agent's reasonable request, Borrowers shall promptly use

11

their best efforts to provide Agent with evidence, in form and substance reasonably satisfactory to Agent, that all deposit account arrangements provided for under the Existing Financing Agreements (the "Blocked Account Agreements") have been ratified and amended by the parties thereto, or their respective successors in interest, in form and substance satisfactory to Agent, to reflect the commencement of the Chapter 11 Cases, that each Borrower, as Debtor and Debtor in Possession is the successor in interest to such Borrower, that the Obligations include both the Pre-Petition Obligations and the DIP Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for herein.

5.5    ERISA.  Each Borrower hereby represents and warrants with, to and in favor of Agent and Lenders that (a) there are no liens, security interests or encumbrances upon, in or against any assets or properties of any Borrower arising under ERISA, whether held by the Pension Benefit Guaranty Corporation (the "PBGC") or the contributing sponsor of, or a member of the controlled group thereof, any pension benefit plan of any Borrower and (b) no notice of lien has been filed by the PBGC (or any other Person) pursuant to ERISA against any assets or properties of any Borrower.

5.6.    DIP Facility Fee.  A Debtor in Possession facility fee of $50,000, on account of the financing provided by the Agent and Lenders in the Chapter 11 Cases, shall be fully earned and due and payable to Agent by the Debtors upon the entry of the Interim Order.

5.7    Sale Process.  Without the prior written consent of Agent:

(a)    Not later than two (2) Business Days after the Petition Date, Debtors shall have filed a motion or pleading (the "Sale Motion"), in each case, acceptable to Agent, seeking approval of (i) the bidding procedures for the sale of all or substantially all of the Debtors' assets in accordance with Section 363 of the Bankruptcy Code (the "Sale"); and (ii) providing that all cash proceeds generated by such Sale(s), less reasonable out of pocket fees, costs and expenses directly arising from, and required to be paid by the Loan Parties in connection with, such Sale(s), including without limitation, reasonable broker's and/or investment banker's fees incurred with respect to the Sale(s), in each case, pursuant to a retention agreement in form and substance acceptable to Agent, shall be remitted to Agent for application against, and in permanent reduction of, the Obligations.

(b)    Not later than thirty (30) days after the Petition Date, Debtors shall obtain the entry of an order of the Bankruptcy Court, in form and substance satisfactory to Agent, approving bid procedures, including, without limitation, an acceptable form of asset purchase agreement to be used for the Sale (the "Bid Procedures Order").

(c)    Not later than fifty-five (55) days after the Petition Date, Debtors shall conduct an auction (the "Auction") if more than one bona fide offer meeting the conditions set forth in the Bid Procedures Order is received.

(d)    Not later than seven (7) Business Days after the Auction, an order, in form and substance satisfactory to Agent, shall have been entered by the Bankruptcy Court approving the Sale(s) (the "Sale Order").

12

(e)    Not later than two (2) Business Days after the Sale Order is entered, the closing of the Bankruptcy Court-approved Sale(s) shall have occurred.

(f)    Debtors confirm, acknowledge and agree that notwithstanding anything to the contrary contained in the Credit Agreement, any failure to comply with the requirements set forth in this Section 5.7 shall constitute an additional immediate Event of Default under the Existing Financing Agreements.

6.    <u>AMENDMENTS TO EXISTING FINANCING AGREEMENTS</u>.

6.1    <u>Bankruptcy Code</u>.  The definition of "Bankruptcy Code" set forth in the Credit Agreement is hereby amended by deleting such definition in its entirety and replacing it with the following:

"Bankruptcy Code" shall mean the United States Bankruptcy Code, being Title 11 of the United States Code as enacted in 1978, as the same has heretofore been or may hereafter be amended, recodified, modified or supplemented, together with all rules, regulations and interpretations thereunder or related thereto.

6.2    <u>Interest Rate</u>.    The definition of "Applicable Margin" set forth in Schedule 1.1 of the Credit Agreement is hereby amended by deleting such definition in its entirety and replacing it with the following:

"'Applicable Margin' means, as of any date of determination and with respect to Base Rate Loans or LIBOR Rate Loans, as applicable, the applicable margin set forth below:

| Applicable Margin Relative to Base Rate Loans (the "Base Rate Margin") | Applicable Margin Relative to LIBOR Rate Loans (the "LIBOR Rate Margin") |
|---|---|
| 1.25% | 2.75%" |

6.3    <u>Maturity Date</u>.  The definition of "Maturity Date" set forth in Schedule 1.1 of the Credit Agreement is hereby deleting such definition in its entirety and replacing it with the following:

"'Maturity Date' means the date that is the earlier of three (3) months from the date of this Agreement or such later date to which Agent may consent in its sole and absolute discretion."

6.4    <u>Reserves</u>.  The definition of "Reserves" set forth in Schedule 1.1 of the Credit Agreement is hereby amended by (i) deleting the reference to the word "and" at the end of clause (a) of such definition; (ii) deleting the reference to the word "." at the end of clause (b) of such definition; and (iii) adding the following clause (c) at the end of the last sentence:

13

"; and (c) to reflect reserves provided for in the Financing Order, including, without limitation, in respect of the Professional Fee Carve Out and the other Carve Out Expenses (as each term is defined in the Financing Order)"

6.5    <u>Limits and Sublimits</u>.  Section 2.1 of the Credit Agreement is hereby amended by adding the following new clause (c) at the end thereof:

"(c)    All limits and sublimits set forth in this Agreement, and any formula or other provisions to which a limit or sublimit may apply shall, subject to Section 5.3(d) above, be subject to the Budget, giving effect to the variances and sublimits permitted in the Ratification Agreement."

6.6    <u>Payments</u>.  Section 2.3 of the Credit Agreement is hereby amended by adding the following new clause (d) at the end thereof:

"(g) Without limiting the generality of the foregoing, Agent may, in its discretion, apply any such payments or proceeds first to the Pre-Petition Obligations until such Pre-Petition Obligations are paid and satisfied in full; provided, that, Agent's and Lenders' failure to apply any payments or proceeds first to the Pre-Petition Obligations until such obligations are paid in full shall not limit or affect the gradual conversion of Pre-Petition Obligations into DIP Obligations to the extent of all payment or proceeds received by Agent and Lenders in accordance with the Financing Order and the Loan Documents."

6.7    <u>Letters of Credit</u>.

a.    The reference to the amount "$5,000,000" in clause (i) of Section 2.10(b) of the Credit Agreement is hereby deleted and replaced with "$4,000,000".

b.    Notwithstanding anything to the contrary contained in Section 2.10 of the Credit Agreement or otherwise, Agent and Lenders shall have absolutely no obligation whatsoever to issue any Letters of Credit under or in connection with this Agreement that are not, in the Agent's sole determination, to be assumed, cash collateralized, replaced or otherwise addressed, in each case, on terms and conditions acceptable to Agent in its sole discretion, in connection with any Sale provided for in Section 5.7 of the Ratification Agreement.

6.8    <u>Conditions Precedent to All Extensions of Credit</u>.  Section 3.2(a) of the Credit Agreement is hereby amended by deleting the section in its entirety and replacing it with the following:

10066135-v8

"(a)      the representations and warranties of Loan Parties and its Subsidiaries contained in this Agreement or in the other Loan Documents shall be true and correct, other than with respect to the Specified Defaults, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) on and as of the date of such extension of credit, as though made on and as of such date (except to the extent that such representations and warranties relate solely to an earlier date, in which case such representations and warranties shall be true and correct, other than with respect to the Specified Defaults, in all material respects (except, that, such materiality qualifier shall not be applicable to any representations and warranties that already are qualified or modified by materiality in the text thereof) as of such earlier date);"

6.9     <u>Maturity</u>.  Section 3.3 of the Credit Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

"3.3     This Agreement and the other Loan Documents shall continue in full force and effect for a term ending on the earlier to occur of (i) the Maturity Date, (ii) the confirmation of a plan of reorganization for any Borrower in the Chapter 11 Cases, (iii) the consummation of the sale or sales of all or substantially all of the Debtors' assets and properties or of all equity interests in Debtors, (iv) the last termination date set forth in the Interim Financing Order, unless the Permanent Financing Order has been entered prior to such date, and in such event, then the last termination date set forth in the Permanent Financing Order, or (v) the occurrence of an Event of Default (the earlier to occur of clauses (i), (ii), (iii), (iv) and (v) referred to herein as the "Termination Date").

6.10     <u>Additional Financial Reporting Requirements</u>.  Section 5.1 of the Credit Agreement is hereby amended by (i) deleting the reference to the word "and" at the end of clause (b), (ii) deleting the reference to the "." at the end of clause (c) and adding the following new clause (d) at the end thereof:

", and (d) deliver to Agent copies of all financial reports, schedules and other materials and information at any time furnished by or on behalf of any Borrower to the Bankruptcy Court, or the U.S. Trustee or to any creditors' committee or such Borrower's shareholders, concurrently with the delivery thereof to the Bankruptcy Court, creditors' committee, U.S. Trustee or shareholders, as the case may be."

6.11     <u>Borrowing Base and Other Reporting</u>.  Notwithstanding anything to the contrary in Schedule 5.2 of the Credit Agreement or otherwise, Borrowers shall provide to Agent, on a weekly basis, all items contemplated or described in clauses (iii) through and including (xiii) of Schedule 5.2 of the Credit Agreement.

6.12     <u>Financial Covenant</u>.  Section 7 of the Credit Agreement is hereby amended by deleting such section in its entirety and replacing it with the following:

15

"7.    **Reserved.**"

6.13    <u>Indebtedness</u>.    Notwithstanding anything to the contrary contained in Section 6.1 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, the Borrowers and Parent will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume, guarantee, or otherwise become directly or indirectly, liable with respect to any Indebtedness (other than (a) Permitted Indebtedness existing as of the Petition Date, (b) Indebtedness evidenced by the Credit Agreement and the other Existing Financing Agreements and (c) Permitted Indebtedness incurred after the Petition Date, <u>provided</u>, <u>that</u>, all such Permitted Indebtedness incurred after the Petition Date is specifically provided for in the Budget), without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

6.14    <u>Encumbrances</u>.    Notwithstanding anything to the contrary contained in Section 6.2 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, the Borrowers and Parent will not, and will not permit any Subsidiary, after the date hereof, to, create, incur, assume or suffer to exist, directly or indirectly, any lien on or with respect to any of its assets, of any kind, whether now owned or hereafter acquired, or any income or profits therefrom (other than (a) Permitted Liens existing on the Petition Date, (b) liens securing the Obligations, (c) liens arising after the Petition Date; provided, that, the priority of such liens are junior and subordinate to the priority of all liens securing the Obligations, and (d) any lien granted or permitted pursuant to the Financing Orders.

6.15    <u>Sale of Assets</u>.    Notwithstanding anything to the contrary contained in Section 6.4 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, the Borrowers and Parent may not convey, sell, lease, license, assign, transfer, or otherwise dispose of (or enter into an agreement to convey, sell, lease, license, assign, transfer, or otherwise dispose of) any portion of any Borrower's, Parent's or any Subsidiaries' Collateral or other assets including without limitation, assume, reject or assign any leasehold interest or enter into any agreement to return Inventory to vendor, whether pursuant to section 546 of the Bankruptcy Code or otherwise (other than Permitted Dispositions; provided that such sales or dispositions are permitted by Section 5.7 of the Ratification Agreement or are in accordance with the Budget) without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action , inaction or acquiescence by Agent or any Lender).

6.16    <u>Restricted Payments</u>.    Notwithstanding anything to the contrary contained in Section 6.7 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, each Borrower and Parent shall not, directly or indirectly, declare or pay any dividends on account of any shares of any class of Capital Stock of such Borrower or Parent now or hereafter outstanding, or set aside or otherwise deposit or invest any sums for such purpose, or redeem, retire, defease, purchase or otherwise acquire any shares of any class of Capital Stock (or set aside or otherwise deposit or invest any sums for such purpose) for any consideration or apply or set apart any sum, or make any other distribution (by reduction of capital or otherwise) in respect of any such shares or agree to do any of the

16

foregoing, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender).

6.17    Investments; Controlled Investments.   Notwithstanding anything to the contrary contained in Section 6.9 of the Credit Agreement or any other provision of the Credit Agreement or any of the other Existing Financing Agreements, Borrowers and Parent will not, and will not permit any Subsidiary, after the date hereof, to, directly or indirectly, make or acquire any investment or incur any liabilities (including contingent obligations) for or in connection with any investment, without in each case the prior written consent of Agent (and no such consent shall be implied, from any other action, inaction or acquiescence by Agent or any Lender), except to the extent specifically set forth in the Budget.

6.18    Outstanding Loans.   Notwithstanding anything to the contrary contained in the Credit Agreement or otherwise, Agent and Lenders shall have no obligation whatsoever to make any Loan to the Borrowers to the extent that, immediately after giving effect to the making of such Loan, the then aggregate outstanding amount of Loans and other Obligations other than Letter of Credit Usage would exceed $15,000,000 as determined by Agent in its sole discretion.

6.19    Events of Default.   Section 8 of the Credit Agreement is hereby amended by adding the following the following:

"8.12    Financing Order.

(a) The occurrence of any condition or event which permits Agent, and Lenders to exercise any of the remedies set forth in the Financing Order, including, without limitation, any "Event of Default" (as defined in the Financing Order);

(b)  the termination or non-renewal of the DIP Loan Documents as provided for in the Financing Order;

(c)  any act, condition or event occurring after the Petition Date that has or would reasonably expect to result in the occurrence of a Material Adverse Effect upon the assets of any Borrower, or the Collateral, or the ability of any Debtor to perform under and comply with the Budget in accordance with the terms and conditions hereof, or the rights and remedies of the Secured Parties under the Credit Agreement or any other DIP Loan Documents or the Financing Order;

(d)  conversion of any Chapter 11 Case to a Chapter 7 case under the Bankruptcy Code;

(e)  dismissal of any Chapter 11 Case or any subsequent Chapter 7 case either voluntarily or involuntarily;

(f)  the grant of a lien on or other interest in any property of any Borrower, other than a lien permitted under Section 9.8 hereof

17

or a lien or encumbrance permitted by the Financing Order, which is superior to or ranks in parity with Agent's security interest in or lien upon the Collateral;

(g)  the grant of an administrative expense claim in any Chapter 11 Case, other than such administrative expense claim permitted by the Financing Order or the Ratification Agreement, which is superior to or ranks in parity with Agent's Superpriority Claim (as defined in the Financing Order);

(h)  the Financing Order shall be modified, reversed, revoked, remanded, stayed, rescinded, vacated or amended on appeal or by the Bankruptcy Court without the prior written consent of Agent (and no such consent shall be implied from any other authorization or acquiescence by Agent or any Lender);

(i)  the appointment of a trustee pursuant to Sections 1104(a)(1) or 1104(a)(2) of the Bankruptcy Code;

(j)  the appointment of an examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code;

(k)  the filing of a plan of reorganization or liquidation by or on behalf of any Borrower, to which Agent has not consented in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(l)  the confirmation of any plan of reorganization or liquidation in the Chapter 11 Case of any Borrower, to which Agent has not consented to in writing, which does not provide for payment in full in cash of all Obligations on the effective date thereof in accordance with the terms and conditions contained herein;

(m)  entry of an order granting relief from the automatic stay to the holder or holders of security interests to permit foreclosures (or granting similar relief) on any property of the Debtors having a value in excess of $1,000,000 without the prior written consent of the Agent and the Required Lenders;

(n)  the filing of a motion by any Debtor (or any Affiliate) that is not dismissed or denied within thirty (30) days after the date of filing such motion seeking, or the entry of any order permitting, recovery from any portion of the Collateral (or from Agent or any of the Lenders directly) any costs or expenses of preserving or

disposing of the Collateral under section 506(c) or section 552(b) of the Bankruptcy Code (or otherwise); or

(o) If a Borrower or any of its Subsidiaries suspends or discontinues or is enjoined, restrained, or in any way prevented by court order from continuing to conduct all or any material part of the business affairs of Borrowers and their Subsidiaries, taken as a whole, or a trustee, receiver or custodian is appointed for any Borrower or any of its Subsidiaries, or any of their respective properties, except to the extent such suspension or discontinuance of business occurs in accordance with the terms of the Ratification Agreement;"

6.20    Notices.    Section 11 of the Credit Agreement is hereby amended by changing the notice address of Otterbourg, P.C. to the following addresses:

<div style="margin-left:2em">

If to Agent with a copy to:    Otterbourg P.C.
230 Park Avenue
New York, New York  10169
Facsimile No.: (212) 682-6104
Attn: Jonathan N. Helfat, Esq.
    Daniel F. Fiorillo, Esq.

</div>

6.21    Governing Law; Choice of Forum; Service of Process; Jury Trial Waiver. Section 8(a) of the Credit Agreement is hereby amended by deleting the period and adding the following at the end thereof:  ", except to the extent that the provisions of the Bankruptcy Code are applicable and specifically conflict with the foregoing."

7.    RELEASE.

7.1    Release of Pre-Petition Claims.

(a)    Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, in consideration of the agreements of the Secured Parties contained herein and the making of any Loans by Agent and Lenders, each Borrower, pursuant to the Credit Agreement, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, on behalf of itself and its respective successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably releases, remises and forever discharges each of the Secured Parties and their respective successors and assigns, and their present and former shareholders, affiliates, subsidiaries, divisions, predecessors, directors, officers, attorneys, employees and other representatives (each of the Secured Parties and all such other parties, in their capacities as such, being hereinafter referred to collectively as the "Releasees" and individually as a "Releasee"), of and from all demands, actions, causes of action, suits, covenants, contracts, controversies, agreements, promises, sums of money, accounts, bills, reckonings, damages and any and all other claims, counterclaims, defenses, rights of set-off, demands and liabilities whatsoever

19

(individually, a "Pre-Petition Released Claim" and collectively, "Pre-Petition Released Claims") of every name and nature, known or unknown, suspected or unsuspected, both at law and in equity, which any Borrower, or any of their respective successors, assigns, or other legal representatives may now or hereafter own, hold, have or claim to have against the Releasees or any of them for, upon, or by reason of any nature, cause or thing whatsoever which arises at any time on or prior to the day and date of this Ratification Agreement, including, without limitation, for or on account of, or in relation to, or in any way in connection with the Credit Agreement, as amended and supplemented through the date hereof, and the other Existing Financing Agreements.

(b)     Upon the earlier of (i) the entry of the Permanent Financing Order or (ii) the entry of an Order extending the term of the Interim Financing Order beyond thirty (30) calendar days after the date of the Interim Financing Order, each Borrower, on behalf of itself and its successors, assigns, and other legal representatives, hereby absolutely, unconditionally and irrevocably, covenants and agrees with each Releasee that it will not sue (at law, in equity, in any regulatory proceeding or otherwise) any Releasee on the basis of any Pre-Petition Released Claim released, remised and discharged by each Borrower pursuant to this Section 7.1. If any Borrower violates the foregoing covenant, Borrowers agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

7.2     Release of Post-Petition Claims. Upon (a) the receipt by Agent, on behalf of itself and the other Lenders, of payment in full of all Obligations in cash or other immediately available funds, plus cash collateral or other collateral security acceptable to Agent to secure any Obligations that survive or continue beyond the termination of the Existing Financing Agreements, and (b) the termination of the Existing Financing Agreements (the "Payment Date"), in consideration of the agreements of the Secured Parties contained herein and the making of any Loans by Agent and Lenders, each Borrower hereby covenants and agrees to execute and deliver in favor of each of the Secured Parties a valid and binding termination and release agreement, in form and substance satisfactory to Agent. If any Borrower violates such covenant, the Borrowers agree to pay, in addition to such other damages as any Releasee may sustain as a result of such violation, all attorneys' fees and costs incurred by any Releasee as a result of such violation.

7.3     Releases Generally.

(a)     Each Borrower understands, acknowledges and agrees that the releases set forth above in Sections 8.1 and 8.2 hereof  may be pleaded as a full and complete defense and may be used as a basis for an injunction against any action, suit or other proceeding which may be instituted, prosecuted or attempted in breach of the provisions of such releases.

(b)     Each Borrower agrees that no fact, event, circumstance, evidence or transaction which could now be asserted or which may hereafter be discovered shall affect in any manner the final and unconditional nature of the releases set forth in Section 8.1 hereof and, when made, Section 8.2 hereof.

8.     CONDITIONS PRECEDENT.

In addition to any other conditions contained herein or the Credit Agreement, as in effect immediately prior to the Petition Date, with respect to the Loans and other financial accommodations available to Borrowers (all of which conditions, except as modified or made pursuant to this Ratification Agreement shall remain applicable to the Loans and be applicable to other financial accommodations available to Borrowers), the following are conditions to Agent's and Lenders' obligation to extend any Loans or other advances or financial accommodations to Borrowers pursuant to the Credit Agreement:

8.1     Borrowers and Parent shall furnish to Agent and Lenders all financial information, projections, budgets, business plans, cash flows and such other information as Agent and Lenders shall reasonably request from time to time;

8.2     as of the Petition Date, the Existing Financing Agreements shall not have been terminated;

8.3     no trustee, examiner with special powers pursuant to Section 1104(a) of the Bankruptcy Code or receiver or the like shall have been appointed or designated with respect to any Borrower, as Debtor and Debtor-in-Possession, or its respective business, properties and assets and no motion or proceeding shall be pending seeking such relief;

8.4     the execution and delivery of this Ratification Agreement and all other DIP Loan Documents by the Borrowers, Agent and Lenders, and the payment to Agent by Borrowers of the DIP Facility Fee;

8.5     the Interim Financing Order or other Order(s) of the Bankruptcy Court shall ratify and amend the deposit account arrangements of the Borrowers to reflect the commencement of the Chapter 11 Cases, that each Debtor, as Debtor and Debtor-in-Possession, is the successor in interest to such Borrower, as the case may be, that the Obligations include both the Pre-Petition Obligations and the DIP Obligations, and that the Collateral includes both the Pre-Petition Collateral and the Post-Petition Collateral as provided for in this Ratification Agreement;

8.6     the execution or delivery to Agent and Lenders of all other DIP Loan Documents, and other agreements, documents and instruments which, in the good faith judgment, of Agent are necessary or appropriate, and the implementation of the terms of this Ratification Agreement and the other DIP Loan Documents, as modified pursuant to this Ratification Agreement, all of which contain provisions, representations, warranties, covenants and Events of Default, as are satisfactory to Agent and its counsel;

8.7     Each Borrower shall comply in full with the notice and other requirements of the Bankruptcy Code and the applicable Bankruptcy Rules with respect to any relevant Financing Order in a manner prescribed by the Bankruptcy Code and the applicable Bankruptcy Rules, and an Interim Financing Order shall have been entered by the Bankruptcy Court (the "Interim Financing Order") authorizing the secured financing under the Existing Financing Agreements as ratified and amended hereunder on the terms and conditions set forth in this Ratification Agreement and, among other things, modifying the automatic stay, authorizing and granting the senior security interest in liens in favor of Agent described in this Ratification

21

Agreement and in the Financing Order, and granting super-priority expense claims to Agent and Lenders with respect to all obligations due Agent and Lenders.  The Interim Financing Order shall authorize post-petition financing under the terms set forth in this Ratification Agreement in an amount consistent with the Budget, and it shall contain such other terms or provisions as Agent and its counsel shall require;

8.8    with respect to further credit after expiration of the Interim Financing Order, on or before the expiration of the Interim Financing Order, the Bankruptcy Court shall have entered a Permanent Financing Order authorizing the secured financing on the terms and conditions set forth in this Ratification Agreement, granting to Agent (for the benefit of each of the Secured Parties) the senior security interests and liens described above and super-priority administrative expense claims described above (except as otherwise specifically provided in the Interim Financing Order), and modifying the automatic stay and other provisions required by Agent and its counsel (the "Permanent Financing Order").  Neither Agent nor any Lender shall provide any Loans (or other financial accommodations) other than those authorized under the Interim Financing Order unless, on or before the expiration of the Interim Financing Order, the Permanent Financing Order shall have been entered, and there shall be no appeal or other contest with respect to either the Interim Financing Order or the Permanent Financing Order with respect to which an effective stay exists;

8.9    other than the voluntary commencement of the Chapter 11 Cases, no material impairment of the priority of Agent's security interests in the Collateral shall have occurred from the date of the latest field examinations of Agent to the Petition Date; and

8.10   no Event of Default other than the Specified Defaults shall have occurred or be existing under any of the Existing Financing Agreements, as modified pursuant hereto, and assumed by Borrowers.

9.    <u>MISCELLANEOUS</u>.

9.1    <u>Amendments and Waivers</u>.  Neither this Ratification Agreement nor any other instrument or document referred to herein or therein may be changed, waived, discharged or terminated orally, but only by an instrument in writing signed by the party against whom enforcement of the change, waiver, discharge or termination is sought.

9.2    <u>Further Assurances</u>.  Each Borrower shall, at its expense, at any time or times duly execute and deliver, or shall use its best efforts to cause to be duly executed and delivered, such further agreements, instruments and documents, including, without limitation, additional security agreements, collateral assignments, UCC financing statements or amendments or continuations thereof, landlord's or mortgagee's waivers of liens and consents to the exercise by Agent and Lenders of all the rights and remedies hereunder, under any of the other Existing Financing Agreements, any Financing Order or applicable law with respect to the Collateral, and do or use its best efforts to cause to be done such further acts as may be reasonably necessary or proper in Agent's opinion to evidence, perfect, maintain and enforce the security interests of Agent and Lenders, and the priority thereof, in the Collateral and to otherwise effectuate the provisions or purposes of this Ratification Agreement, any of the other Existing Financing Agreements or the Financing Order.  Upon the request of Agent, at any time

and from time to time, each Borrower shall, at its cost and expense, do, make, execute, deliver and record, register or file updates to the filings of Agent and Lenders with respect to the Intellectual Property with the United States Patent and Trademark Office, the financing statements, mortgages, deeds of trust, deeds to secure debt, and other instruments, acts, pledges, assignments and transfers (or use its best efforts to cause the same to be done) and will deliver to Agent and Lenders such instruments evidencing items of Collateral as may be requested by Agent.

   9.3 <u>Headings</u>.  The headings used herein are for convenience only and do not constitute matters to be considered in interpreting this Ratification Agreement.

   9.4 <u>Counterparts</u>.  This Ratification Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, but all of which shall together constitute one and the same agreement.  In making proof of this Ratification Agreement, it shall not be necessary to produce or account for more than one counterpart thereof signed by each of the parties hereto.  Delivery of an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission shall have the same force and effect as delivery of an original executed counterpart of this Ratification Agreement.  Any party delivering an executed counterpart of this Ratification Agreement by telefacsimile or other electronic method of transmission also shall deliver an original executed counterpart of this Ratification Agreement, but the failure to deliver an original executed counterpart shall not affect the validity, enforceability, and binding effect of this Ratification Agreement as to such party or any other party.

   9.5 <u>Additional Events of Default</u>.  The parties hereto acknowledge, confirm and agree that the failure of any Borrower to comply with any of the covenants, conditions and agreements contained herein or in any other agreement, document or instrument at any time executed by such Borrower in connection herewith shall constitute an immediate Event of Default under the DIP Loan Documents.

   9.6 <u>Costs and Expenses</u>.  Borrowers shall pay to Agent and Lenders on demand all costs and expenses that Agent or Lenders pay or incur in connection with the negotiation, preparation, consummation, administration, enforcement, defense (whether in connection with any adversary proceeding or otherwise) and termination of this Ratification Agreement and the other DIP Loan Documents and the Financing Order, including, without limitation: (a) reasonable attorneys' and paralegals' fees and disbursements of counsel to, and reasonable fees and expenses of consultants, accountants and other professionals retained by, Agent and Lenders; (b) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) for any amendment, supplement, waiver, consent, or subsequent closing in connection with this Ratification Agreement, the other DIP Loan Documents, the Financing Order and the transactions contemplated thereby; (c) taxes, fees and other charges for recording any agreements or documents with any governmental authority, and the filing of UCC financing statements and continuations, and other actions to perfect, protect, and continue the security interests and liens of Agent in the Collateral; (d) sums paid or incurred to pay any amount or take any action required of the Borrowers and Parent under the DIP Loan Documents or the Financing Order that Borrowers and Parent fail to pay or take; (e) costs of appraisals, inspections and verifications of the Collateral and including reasonable travel, lodging, and meals for

<div align="center">23</div>

inspections of the Collateral and the Debtors' operations by Agent or its agent and to attend court hearings or otherwise in connection with the Chapter 11 Cases; (f) costs and expenses of preserving and protecting the Collateral; (g) all out-of-pocket expenses and costs heretofore and from time to time hereafter incurred by Agent during the course of periodic field examinations of the Collateral and Debtors' operations, plus a per diem charge at the rate of $950 per person per day for Agent's examiners in the field and office; and (h) costs and expenses (including reasonable attorneys' and paralegals' fees and disbursements) paid or incurred to obtain payment of the Obligations, enforce the security interests and liens of Agent, sell or otherwise realize upon the Collateral, defend against, or respond in connection with, any action or proceeding relating to the Debtors, the DIP Loan Documents or the Financing Order, and otherwise enforce the provisions of this Ratification Agreement, the other DIP Loan Documents and the Financing Order, or to defend any claims made or threatened against any of the Secured Parties arising out of the transactions contemplated hereby (including, without limitation, preparations for and consultations concerning any such matters).  The foregoing shall not be construed to limit any other provisions of the DIP Loan Documents regarding costs and expenses to be paid by Borrowers.  All sums provided for in this Section 9.6 shall be part of the Obligations, shall be payable on demand, and shall accrue interest after demand for payment thereof at the highest rate of interest then payable under the DIP Loan Documents.  Agent is hereby irrevocably authorized to charge any amounts payable hereunder directly to any of the account(s) maintained by Agent with respect to any Borrower.

       9.7    <u>Effectiveness</u>.  This Ratification Agreement shall become effective upon the execution hereof by Borrowers, Parent, Agent and Lenders and the entry of the Interim Financing Order.

[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]

24

IN WITNESS WHEREOF, the parties hereto have caused this Ratification Agreement to be duly executed as of the day and year first above written.

BORROWERS:

**ADVANCE WATCH COMPANY LTD.**

By: _____

Name: ___Jeffrey L. Gregg_____

Title: ___Chief Restructuring Officer___

**SUNBURST PRODUCTS, INC.**

By: _____

Name: ___Jeffrey L. Gregg_____

Title: ___Chief Restructuring Officer___

**GWG INTERNATIONAL, LTD.**

By: _____

Name: ___Jeffrey L. Gregg_____

Title: ___Chief Restructuring Officer___

GUARANTOR:

**BINDA USA HOLDINGS, INC.**

By: _____

Name: ___Jeffrey L. Gregg_____

Title: ___Chief Restructuring Officer___

**[SIGNATURES CONTINUED ON NEXT PAGE]**

[Signature Pages to Ratification and Amendment to Credit Agreement]

**[SIGNATURES CONTINUED FROM PREVIOUS PAGE]**

AGENT:

**WELLS FARGO BANK, NATIONAL
ASSOCIATION**, as Agent and as a Lender

By: _____

Name: Sang Kim

Title:  Authorized Signatory

## **Schedule 1.1**

Commercial Tort Claims


None

## **Exhibit 1**

### **Specified Defaults**

The shutdown of, and the appointment of a liquidator under the laws of Hong Kong for, Far East and all Events of Default arising therefrom.

The Loan Parties' failure to timely deliver the financial statements and certificates required pursuant to clauses (i), (ii), (iii), (iv), (v) and (vi) of Schedule 5.1 to the Credit Agreement.

The Loan Parties' failure to delivery on a monthly basis the reports required pursuant to clauses (xiii), (xiv) and (xv) of Schedule 5.2 to the Credit Agreement.

The Loan Parties' failure to comply with the financial covenant set forth in Section 7 of the Credit Agreement.

**Exhibit A**

**Budget**

| Cash Flow Forecast Week | | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 10-2 to 12-25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Ending Date (Friday) | | 10/2/2015 | 10/9/2015 | 10/16/2015 | 10/23/2015 | 10/30/2015 | 11/6/2015 | 11/13/2015 | 11/20/2015 | 11/27/2015 | 12/4/2015 | 12/11/2015 | 12/18/2015 | 12/25/2015 | Total |
| *Receipts* | | | | | | | | | | | | | | | |
| Collections | | 1,025,298 | 1,258,757 | 987,670 | 993,346 | 1,268,007 | 1,247,864 | 1,242,189 | 929,850 | - | - | - | - | - | 8,952,982 |
| Other | | | | | | | | | | | | | | | - |
| **Total Receipts** | | 1,025,298 | 1,258,757 | 987,670 | 993,346 | 1,268,007 | 1,247,864 | 1,242,189 | 929,850 | - | - | - | - | - | 8,952,982 |
| *Operating Disbursements* | | | | | | | | | | | | | | | |
| Inventory | | (706,958) | (445,602) | (924,097) | (78,715) | (296,211) | (238,859) | (191,302) | (14,468) | | | | | | (2,896,211) |
| Inventory - LC @ Sight | | (228,039) | | | | (38,158) | (216,140) | | (8,585) | | | | | | (490,922) |
| Inventory - Domestic Frt/Customs/Movements | | (65,516) | (154,382) | (44,560) | (92,410) | (7,872) | (33,437) | (45,500) | (19,130) | | | | | | (462,806) |
| Cash paid for salaries and related | | (230,761) | (428,000) | (45,761) | (428,000) | (190,761) | (468,000) | (65,761) | (748,000) | | | | | | (2,605,045) |
| Cash used for royalties | | | | | | | | | | | | | | | - |
| Cash used for operating expenses | | (592,102) | (364,453) | (161,572) | (395,844) | (225,344) | (523,564) | (433,450) | (215,637) | | | | | | (2,911,965) |
| Other | | | | | | | | | | | | | | | - |
| **Total Operating Disbursements** | | (1,823,375) | (1,392,437) | (1,175,991) | (994,968) | (758,345) | (1,480,000) | (736,014) | (1,005,820) | - | - | - | - | - | (9,366,950) |
| *Non-Operating Disbursements* | | | | | | | | | | | | | | | |
| Cash used for Restructuring Activities | | (199,000) | (275,000) | (75,000) | (50,000) | (700,000) | (200,000) | (50,000) | (585,000) | (100,000) | - | 75,000 | (25,000) | (215,000) | (2,399,000) |
| Interest and Fees | | (50,000) | (50,000) | | | (60,000) | | | | (60,000) | | | | | (220,000) |
| **Weekly Cash Paydown/(Need)** | | (1,047,077) | (458,679) | (263,320) | (51,622) | (250,339) | (432,136) | 456,176 | (985,970) | | | | | | (3,032,968) |
| **Cumulative Cash Paydown/(Need) - Prior to filing** | | (1,047,077) | | | | | | | | | | | | | (1,047,077) |
| **Cumulative Cash Paydown/(Need) - DIP Requirement** | | | (458,679) | (722,000) | (773,622) | (1,023,961) | (1,456,097) | (999,921) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) | (1,985,891) |
| **A/R** | | | | | | | | | | | | | | | |
| Beginning A/R | | 10,414,263 | 10,988,939 | 11,823,758 | 13,326,804 | 14,102,045 | 15,212,793 | 15,255,139 | 14,989,842 | | | | | | |
| A/R from Sales | | 1,599,974 | 2,093,576 | 2,490,716 | 1,768,588 | 2,378,754 | 1,290,211 | 976,892 | 1,868,333 | | | | | | |
| Collections (sales reduced by 12% for dilution & ineligibles) | | (1,025,298) | (1,258,757) | (987,670) | (993,346) | (1,268,007) | (1,247,864) | (1,242,189) | (929,850) | | | | | | |
| Subtotal - A/R | | 10,988,939 | 11,823,758 | 13,326,804 | 14,102,045 | 15,212,793 | 15,255,139 | 14,989,842 | 15,928,325 | - | - | - | - | - | |
| Ineligible | | 4,201,746 | 4,176,746 | 4,151,746 | 4,151,746 | 4,151,746 | 3,876,746 | 3,876,746 | 3,876,746 | - | - | - | - | - | |
| Eligible | | 6,787,194 | 7,647,012 | 9,175,058 | 9,950,300 | 11,061,048 | 11,378,394 | 11,113,096 | 12,051,580 | - | - | - | - | - | |
| ABL Eligibility | 85% | 5,769,115 | 6,499,961 | 7,798,799 | 8,457,755 | 9,401,890 | 9,671,635 | 9,446,132 | 10,243,843 | - | - | - | - | - | |
| **Inventory** | | | | | | | | | | | | | | | |
| Beginning Inventory | | 15,152,903 | 14,763,179 | 14,427,101 | 13,428,298 | 13,517,149 | 12,067,154 | 11,719,182 | 11,679,284 | | | | | | |
| Purchases | | 574,010 | 1,028,496 | 490,162 | 1,268,433 | 123,695 | 490,665 | 595,082 | 273,556 | | | | | | |
| COGS | | 963,733 | 1,364,574 | 1,488,965 | 1,179,582 | 1,573,690 | 838,637 | 634,980 | 1,222,817 | | | | | | |
| Subtotal - Inv | | 14,763,179 | 14,427,101 | 13,428,298 | 13,517,149 | 12,067,154 | 11,719,182 | 11,679,284 | 10,730,023 | - | - | - | - | - | |
| Ineligible | | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | 4,618,187 | | | | | | |
| Eligible | | 10,144,992 | 9,808,914 | 8,810,111 | 8,898,961 | 7,448,966 | 7,100,995 | 7,061,097 | 6,111,836 | - | - | - | - | - | |
| ABL Eligibility | 51% | 5,131,337 | 4,961,349 | 4,456,154 | 4,501,095 | 3,767,683 | 3,591,683 | 3,571,503 | 3,091,367 | - | - | - | - | - | |
| LC Availability | 51% | 327,761 | 212,419 | 212,419 | 515,899 | 819,379 | 1,002,398 | 1,095,395 | 1,171,265 | | | | | | |
| **ABL Over Advance (B)** | | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | 2,500,000 | | | | | | |
| **ABL Loan Availability - Gross** | | 13,728,213 | 14,173,728 | 14,967,372 | 15,974,749 | 16,488,957 | 16,765,716 | 16,613,029 | 17,006,474 | | | | | | |
| **ABL - Revolving Line of Credit** | | | | | | | | | | | | | | | |
| Funded Debt - Beg. Balance | | 11,944,896 | 12,991,973 | 13,450,653 | 13,713,973 | 13,765,595 | 14,015,934 | 14,448,070 | 13,991,894 | | | | | | - |
| Add: | | | | | | | | | | | | | | | |
| Advances | | 1,844,336 | 1,717,437 | 1,250,991 | 1,044,968 | 1,480,187 | 1,463,860 | 786,014 | 1,907,235 | | | | | | |
| LC @ Sight | | 228,039 | - | - | - | 38,158 | 216,140 | - | 8,585 | | | | | | |
| Less: | | | | | | | | | | | | | | | |
| Cash Sweep (Dominion) | | 1,025,298 | 1,258,757 | 987,670 | 993,346 | 1,268,007 | 1,247,864 | 1,242,189 | 929,850 | | | - | - | - | |
| Cash Balance at W/E | | | | | | | | | | | | | | | |
| **Funded Debt - End. Balance** | | 12,991,973 | 13,450,653 | 13,713,973 | 13,765,595 | 14,015,934 | 14,448,070 | 13,991,894 | 14,977,864 | - | - | - | - | - | |
| Net Availability / (Deficit) | | 736,240 | 723,076 | 1,253,399 | 2,209,154 | 2,473,023 | 2,317,647 | 2,621,135 | 2,028,611 | | | | | | |
| Beginning LC | | 1,779,459 | 1,551,419 | 1,551,419 | 2,151,419 | 2,751,419 | 3,113,261 | 3,297,121 | 3,447,121 | | | | | | |
| Issue/(Draw) | | (228,039) | - | 600,000 | 600,000 | 361,842 | 183,860 | 150,000 | (8,585) | | | | | | |
| **Ending LC** | | 1,551,419 | 1,551,419 | 2,151,419 | 2,751,419 | 3,113,261 | 3,297,121 | 3,447,121 | 3,438,536 | - | - | - | - | - | |
| Availability / (Deficit) including LC (A) | | (815,180) | (828,344) | (898,020) | (542,266) | (640,238) | (979,474) | (825,986) | (1,409,926) | | | | | | |
| Total Debt | | 14,543,393 | 15,002,072 | 15,865,392 | 16,517,014 | 17,129,195 | 17,745,191 | 17,439,015 | 18,416,400 | | | | | | |
| **Total Availability w/o Overadvance (A-B)** | | (3,315,180) | (3,328,344) | (3,398,020) | (3,042,266) | (3,140,238) | (3,479,474) | (3,325,986) | (3,909,926) | | | | | | |

1

# **EXHIBIT 2**

**Settlement Term Sheet**

**ADVANCE WATCH COMPANY, LTD.**
**BINDA USA HOLDINGS, INC.**
**SUNBURST PRODUCTS, INC.**
**GWG INTERNATIONAL, LTD.**

**November 15, 2015**

**Settlement Term Sheet**
**Among**
**The Debtors, Wells Fargo Bank, N.A.,**
**and**
**The Official Committee of**
**Unsecured Creditors**

**THIS SETTLEMENT TERM SHEET ("TERM SHEET") GENERALLY DESCRIBES THE TERMS OF THE DEBTORS' PROPOSED LIQUIDATING PLAN, SUBJECT TO ANY NECESSARY APPROVALS BY THE BANKRUPTCY COURT.**

The purpose of this Term Sheet is to outline the terms negotiated by the above-referenced debtors (the "**Debtors**"), Wells Fargo Bank, N.A. (the "**DIP Lender**"), and the Official Committee of Unsecured Creditors of Advance Watch Company, Ltd., *et al.* (the "**Committee**" and, together with the Debtors and the DIP Lender, the "**Parties**") to be implemented through a plan of liquidation (as the same may be amended from time to time, the "**Plan**") under title 11 of the United States Code (the "**Bankruptcy Code**") in the chapter 11 proceedings pending in the United States Bankruptcy Court for the Southern District of New York (the "**Bankruptcy Court**") captioned *In re Advance Watch Company Ltd., et al.*, Case No. 15-12690 (MG) (the "**Bankruptcy Proceeding**").

THIS TERM SHEET DOES NOT CONSTITUTE A SOLICITATION OF VOTES FOR A PLAN OF REORGANIZATION FOR PURPOSES OF SECTIONS 1125 AND 1126 OF THE BANKRUPTCY CODE OR AN OFFER WITH RESPECT TO ANY SECURITIES.  SUCH OFFER OR SOLICITATION MAY ONLY BE MADE IN COMPLIANCE WITH ALL APPLICABLE SECURITIES LAWS AND/OR PROVISIONS OF THE BANKRUPTCY CODE.

THIS TERM SHEET CONTAINS A SERIES OF ASSUMPTIONS, COMPROMISES AND SETTLEMENTS OF ISSUES AND DISPUTES THAT WILL BE RESOLVED IN CONNECTION WITH CONFIRMATION OF A CHAPTER 11 PLAN.  IN THE EVENT THE CHAPTER 11 PLAN CONTEMPLATED UNDER THIS TERM SHEET IS NOT CONFIRMED OR DOES NOT BECOME EFFECTIVE, OR IF THE SALE (AS DEFINED BELOW) IS NOT CONSUMMATED, NOTHING HEREIN SHALL BE CONSTRUED AS AN ADMISSION OF OR THE POSITIONS OF THE PARTIES WITH RESPECT TO THESE ISSUES OR DISPUTES.

| TERM SHEET SUMMARY | |
|---|---|
| **General Framework** | This Term Sheet describes principal proposed terms for the Debtors' Plan of liquidation under chapter 11 of the Bankruptcy Code.  This Term Sheet shall be approved by the parties and made an exhibit to the Final DIP Order.<br><br>The terms set forth herein are subject to memorialization and implementation in the Plan, which will be filed with the Bankruptcy Court and for which the Debtors will seek confirmation. |
| **Limited Substantive Consolidation** | The Plan provides for limited substantive consolidation of the Debtors' estates, but solely for the purposes of the Plan, including voting on the Plan by holders of claims.  The Debtors propose limited substantive consolidation to avoid inefficiencies of proposed voting in respect of Debtor-specific claims for which there would be no impact on distributions. |
| **DIP Credit Agreement** | Pursuant to the interim orders entered on October 6, 2015, October 23, 2015, November 2, 2015, and November 6, 2015 and the final order entered on November ___, 2015 (the "**Final DIP Order**"), the Bankruptcy Court approved the Debtors' postpetition debtor-in-possession financing agreement (the "**DIP Credit Agreement**").  See Docket Nos. 42, 104, 125 & ___.  Subject to the terms and conditions of the DIP Credit Agreement, the DIP Lender agreed to offer a senior secured superpriority revolving credit and letter of credit facility of up to $18,500,000, inclusive of revolving loans in excess of prepetition lending formula limits of up to $4,000,000.  In addition, the DIP Credit Agreement provides for the carve-out of certain administrative expenses (the "**Carve Out**") and a budget.  Subject to the terms and conditions of DIP Credit Agreement, the DIP Lender will continue to advance loans to the Debtors until immediately prior to the closing of the Sale (defined below), the proceeds of which will be used by the Debtors to fund the administrative expenses and priority claims of the estate through Sale closing and Plan confirmation in accordance with the Budget (as defined below) or as may otherwise be agreed to by all parties hereto. |
| **Sunshine Time APA, DIP Credit Agreement, and Final DIP Order** | On October 23, 2015 the Bankruptcy Court approved the Debtors' Bidding Procedures governing the sale of substantially all of the Debtors' assets (the "**Bidding Procedures**").  See Docket No. 105. Pursuant to the Bidding Procedures, Sunshine Time, Inc. ("**Sunshine**") is the stalking horse bidder for the proposed sale of substantially all of the Debtors' assets in accordance with that certain *Asset Purchase Agreement* by and between the Debtors and Sunshine dated as of September 29, 2015 (as the same may have been or may be amended, supplemented or modified from time to time in accordance with its |

terms, the "**APA**").  Id.  Additionally, under the Bidding Procedures, Sunshine is considered the Successful Bidder (as that term is defined in the Bidding Procedures) because no other potential purchaser submitted a Qualified Bid (as that term is defined in the Bidding Procedures) by 12:00 p.m. (noon) on November 4, 2015.  Id.; Doc. 138.

Accordingly, Sunshine is the Successful Bidder (as that term is defined in the Bidding Procedures) and the APA is the Successful Bid (as that term is defined in the Bidding Procedures) for the sale of substantially all of the Debtors' assets (the "**Sale**").

The following provisions and/or schedules to the APA shall be modified pursuant to an amendment to the APA in substantially the form attached hereto as Exhibit A and/or the Bankruptcy Court order approving the Sale (the "**Sale Order**") shall specify that the following provisions and schedules are modified as follows:

- Schedule 2.1(r) to the APA, which sets forth the Critical Trade Vendors (as that term is defined in the APA), is renamed as "Schedule 2.1(q)" (with all references in the APA to be revised accordingly), and is replaced in its entirety to state "None.";

- Section 2.1(r) of the APA is replaced in its entirety with the following provision: "(r) any rights, claims or causes of action of Sellers against third parties other than Tax authorities relating to assets, properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date other than causes of action under Chapter 5 of Title 11 of the United States Code ('Third Party Claims'); provided however, that the Sellers shall retain the right to use such Third Party Claims solely (and for no other purpose than) as a defense or objection to a proof of claim filed in the Bankruptcy Cases ('Retained Third Party Claims');";

- Section 2.1(s) of APA is replaced in its entirety with the following provision: "(s) any rights, claims, or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against Jeffrey L. Gregg and Tadd Crane;";

- Section 8.4 of the APA is replaced in its entirety with the following provision: "Preservation of Records.  Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) and Buyer agree that each of them shall preserve and keep books and records held by it relating to the pre-Closing Business for a period of six (6) years from the Closing Date and

shall make books and records (and its personnel, representatives, attorneys, accountants and properties) available to, as applicable, Buyer (and its representatives), Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) and the Committee (and its representatives) (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings brought by, against or on behalf of, or Tax audits against, or governmental investigations of, Sellers, or Buyer or any of their Affiliates, or their estates, or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby. In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during the six (6) year period, such Party shall first give ninety (90) days' prior written notice to the other Party and the Committee and each of such other Party and the Committee shall have the right at its option and expense, upon prior written notice given to such Party within that ninety (90) day period, to take possession of the records within thirty (30) days after the date of such notice."; and

- Section 8.12 of the APA is replaced in its entirety with the following provision: "<u>Cooperation</u>. Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee), on the one hand, and Buyer, on the other hand, will provide each other with cooperation and information as either of them may reasonably request of the other in connection with the filing of any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or any right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes (such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax authorities). In addition, Buyer shall make available to Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) and Committee (and its representatives), without charge to Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee), such office

| | space and employee support reasonably necessary to assist Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) to wind up Sellers' operations following the Closing, resolve the Bankruptcy Cases, including the prosecution of any litigation and disputed claims, dissolve any or all of Sellers and prepare and file the Tax Returns. Any information obtained under this <u>Section 8.12</u> shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding." |
|---|---|
| **Sale Order, Final DIP Order, and DIP Credit Agreement** | The Committee agrees (a) not to object to or contest (i) the motions seeking entry of the Final DIP Order and/or the Sale Order, and/or (ii) the Sale; (b) to withdraw immediately any previously-filed objections specified in (a)(i)-(ii) above; and (c) upon closing of the Sale, will release, waive and discharge any and all rights to commence any action, claim, defense objection or complaint that seeks to challenge, contest or otherwise invalidate or reduce, whether by setoff, recoupment, counterclaim, deduction, disgorgement or claim of any kind: (i) the existence, validity or amount of the Pre-Petition Obligations (as defined in the Final DIP Order) or DIP Obligations (as defined in the Final DIP Order), or (ii) the extent, legality, validity, perfection or enforceability of DIP Loan Agent's (as defined in the Final DIP Order) and DIP Lender's pre-petition liens and security interests in the Pre-Petition Collateral (as defined in the Final DIP Order), or (iii) otherwise asserts or prosecutes an action for preferences, fraudulent transfers or conveyances, other avoidance powers or claims, counterclaims or causes of action, objections, contests or defenses against the DIP Loan Agent (as defined in the Final DIP Order) or DIP Lender in connection with any of the forgoing. <br><br> The Debtors, the Committee, and the DIP Lender agree to use commercially reasonable efforts to cause the Sale to be consummated on or prior to November 16, 2015, including obtaining relief from any applicable stay periods that would affect the Sale Order. <br><br> The DIP Credit Agreement and the DIP Loan Agent's (as defined in the Final DIP Order) obligations and DIP Lender's obligations under the Final DIP Order shall be terminated other than those provisions and obligations which survive termination. For the avoidance of doubt, the parties agree that DIP Lender shall have no obligation to fund Debtors, any administrative expenses of the Debtors' estates, or any expenses of the Committee following the closing of the Sale. |
| **Responsible Officer** | From and after the closing of the Sale through the later of the Effective Date or the date of the filing of the Debtors' final tax returns, Sunshine |

| | |
|---|---|
| | shall provide the services of Tadd Crane to serve as the responsible officer of each of the Debtors (the "**Responsible Officer**") pursuant to a Responsible Officer Agreement reasonably acceptable to the Debtors, the Committee, and Sunshine. The Responsible Officer shall have the powers and rights of the Chief Restructuring Officer retained in the Bankruptcy Proceeding. The Responsible Officer shall be compensated at the rate of $400 per hour, which compensation (and expenses) shall be paid to Sunshine out of the Budget and/or Plan Funding prior to the Effective Date and the Committee Allocation Payment after the Effective Date. The Responsible Officer shall be covered under the Debtors' D&O policies and indemnified by the Debtors and their estates to the same extent as the Chief Restructuring Officer. <br><br> The Debtors through the Responsible Officer, with the assistance of the Creditor Trust as necessary, shall use commercially reasonable efforts to cause the Debtors to dissolve on the Effective Date or promptly thereafter to the extent permitted by applicable law; provided that, notwithstanding any dissolution, the Debtors shall be deemed to remain in place for all purposes with respect to fee applications filed in these chapter 11 cases. |
| **Creditor Trust** | "**Creditor Trust**" means a creditor recovery trust to be established on the effective date of the Plan (the "**Effective Date**") pursuant to the terms of the Creditor Trust Agreement and Plan to effectuate the Plan. |
| **Creditor Trust Agreement** | The "**Creditor Trust Agreement**" is the trust agreement that documents the powers, duties and responsibilities of the Creditor Trustee, and which agreement will be materially consistent with the Plan and otherwise reasonably acceptable to the Debtors, the Committee, and the DIP Lender. The Creditor Trust Agreement will be filed with the Bankruptcy Court by the plan supplement filing date and incorporated in the confirmation order. |
| **Creditor Trustee** | The "**Creditor Trustee**" is the individual selected by the Committee who will administer the Creditor Trust. |
| **Avoidance Actions** | "**Avoidance Actions**" means any and all Causes of Action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise, including, but not limited to, sections 502, 506, 510, 522, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, and the proceeds thereof, or otherwise to exercise the avoidance powers provided under the Bankruptcy Code, including any of the Debtors' or the estates' claim, counterclaim, setoff or offset rights, *provided, however*, Avoidance Actions shall not include rights, claims or causes of action that arise under chapter 5 of the Bankruptcy Code against Jeffrey L. Gregg and Tadd Crane. |

6

| | |
|---|---|
| **Estate Claims** | "**Estate Claims**" means (1) the Avoidance Actions; and (2) the Retained Third Party Claims (as that term is defined in the APA); (3) direct or derivative claims or causes of action against any and all current and former officers, directors, shareholders, members, mangers, employees, affiliates or insiders of the Debtors (except Jeffrey L. Gregg and Tadd Crane), including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant to any D&O or fiduciary insurance policies (including for bad faith) maintained by the Debtors; (4) the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under section 505 of the Bankruptcy Code; and (5) all other rights, claims or causes of action not transferred to Sunshine pursuant to the Sale. |
| **Administration of the Creditor Trust** | The Creditor Trustee, together with its agents, representatives and professionals, will have the power to administer the Creditor Trust Assets and make distributions in accordance with the terms of the Plan. In such capacity, the Creditor Trustee shall have the sole authority to (1) establish  reserves and invest cash; (2) sell or otherwise liquidate non-cash assets of the Creditor Trust; (3) retain and pay professionals as necessary to carry out the purposes of the Creditor Trust; (4) prepare and file tax returns for the Creditor Trust; (5) prepare and file reports and other documents necessary to conclude and close these chapter 11 cases; (6) object to, reconcile, seek to subordinate, compromise or settle any or all claims and administer distributions to claims; (7) evaluate, file, litigate, settle, or otherwise pursue any Estate Claims; (8) abandon any property of the Creditor Trust that cannot be sold or distributed economically; (9) make interim and final distributions of Creditor Trust Assets; (10) wind-up the affairs of the Creditor Trust and dissolve it under applicable law; and (11) destruction of records. |
| **Sale Proceeds** | Upon the closing of the Sale, the Sale proceeds shall be immediately distributed to the DIP Lender in full and complete satisfaction of all Pre-Petition Obligations (as defined in the Final DIP Order) and DIP Obligations (as defined in the Final DIP Order). |
| **Remaining Chapter 11 Expenses and Plan Funding** | The amounts budgeted for the Debtors' operations and wind-down from the entry of the Final DIP Order through the Effective Date is $3,345,953 and shall be payable in accordance with the budget (as revised or modified, the "**Budget**") attached hereto as <u>Schedule A</u>.<br><br>The amounts budgeted for the Debtors' restructuring expenses through and following Plan confirmation is attached hereto as <u>Schedule B</u> ("**Restructuring Expenses Budget**").  Amounts payable in accordance with the Budget and the Restructuring Expenses Budget shall be paid from the Plan Funding and the Funded Plan Payments as applicable. |

Immediately prior to the Sale closing, the Debtors shall draw all funds available under the DIP Facility, inclusive of an additional overadvance of $175,000 to be made by the DIP Lender, such that the total outstanding balance under the DIP Facility at the Sale closing is $15,175,000, which funds shall be deposited into Debtors' accounts and under Debtors' control until the Effective Date. Post-closing operations and the Plan shall be funded by the funds drawn from the DIP Facility and pre-closing collections ("**Pre-Closing Collections**") and held in Debtors' accounts and shall be in the aggregate amount of no less than $3,345,953 (the "**Plan Funding**") as described herein.  In the event that the cash balance of the Pre-Closing Collections received by the Debtors from November 9, 2015 to the date of the Sale closing is less than $1,554,742 (the "**Pre-Closing Collections Target**"), Sunshine shall remit the difference between the Pre-Closing Collections and the Pre-Closing Collections Target received by Sunshine from post-Sale closing collections up to $355,000, which amounts shall be remitted to the Debtors upon Sunshine's receipt of such post-Sale closing collections or as soon thereafter as practicable.  If, on the other hand, the cash balance of the Pre-Closing Collections received by the Debtors from November 9, 2015 to the date of the Sale closing exceeds the Pre-Closing Collections Target, the Debtors shall pay the amount of Pre-Closing Collections in excess of the Pre-Closing Collections Target up to $355,000 to Sunshine upon the Sale closing and the Debtors shall keep any Pre-Closing Collections that exceed the Pre-Closing Collections Target by $355,000 or more.  Any remittance by Sunshine or payment by the Debtors pursuant to this paragraph shall be treated as an adjustment to the Purchase Price (as defined in the APA) for purposes of the APA.

The "**Funded Plan Payments**" means on the Effective Date the aggregate of (i) allowed administrative expense claims (other than the Committees' professionals' fees, which shall be funded from the Committee Allocation Payment), estimated by the Debtors to be in an amount equal to $2,520,953, (ii) allowed priority claims, estimated by the Debtors to be in an amount equal to $100,000, (iii) allowed secured claims, estimated by the Debtors to be in an amount equal to $0, and (iv) the Committee Allocation Payment held in the Committee Allocation Account in the amount of $725,000, as detailed in Schedule A.

The Plan shall specify that, on the Effective Date, the following claims shall be paid from the Plan Funding and in the following order of priority: (a) allowed and unpaid administrative expense claims (other than the Committees' professionals' fees, which shall be funded from the Committee Allocation Payment), (b) allowed and unpaid priority claims, and (c) allowed and unpaid secured claims.  Any remaining Plan

| | Funding, if any, after distributions in accordance with the Funded Plan Payments shall be distributed to the Creditor Trust. |
|---|---|
| **Committee Allocation Payment** | The "**Committee Allocation Payment**" is the sum of $725,000 which upon entry of the Final DIP Order shall be carved-out from the DIP Lender's collateral and deposited into a segregated escrow account (the "**Committee Allocation Account**") held by the Debtors requiring authorization by the Committee for its use or distribution and utilized solely as follows:<br>  (A)  paid to the Creditor Trust on the Effective Date to be utilized by the Creditor Trustee to (i) satisfy the allowed fees and expenses of the Committee's professionals incurred through the Effective Date of the Plan; (ii) administer the Creditor Trust Assets for the benefit of holders of general unsecured claims; and (iii) to the extent available after satisfaction of or establishing an appropriate reserve for (i) and (ii) above, to fund a distribution to holders of general unsecured claims; or<br>  (B)  in the event the Plan does not confirm or become effective on or before January 25, 2016, and unless otherwise ordered by the Bankruptcy Court, to (i) satisfy the allowed fees and expenses of the Committee's professionals incurred through the dismissal or conversion of the Chapter 11 cases; and (ii) effectuate and fund distributions to holders of general unsecured claims through a structured dismissal or another mechanism to be proposed by the Committee.<br><br>Upon entry of the Final DIP Order, the Committee Allocation Payment shall not be subject to any liens, claims or encumbrances, including any liens or claims of the DIP Lender. The Committee Allocation Payment shall not be used to satisfy (i) allowed administrative expense claims (other than the Committees' professionals' fees, which shall be funded from the Committee Allocation Payment), (ii) allowed priority claims, (iii) allowed secured claims (including claims of the DIP Lenders), and (iv) any other claim or expense that is not an allowed general unsecured claim or expense of administration of the Creditor Trust. For the avoidance of doubt, the Committee Allocation Payment shall not be used to satisfy any unsecured deficiency claims asserted by the DIP Lender, which claims are waived. |
| **Creditor Trust Assets** | The "**Creditor Trust Assets**" will be comprised of (i) the Estate Claims and the proceeds thereof, (ii) the Committee Allocation Payment held in the Committee Allocation Account, and (iii) the remaining Plan Funding, if any, after distributions in accordance with the Funded Plan Payments are made. |

9

|  | On the Effective Date, title to all Creditor Trust Assets shall vest in the Creditor Trust free and clear of all liens, encumbrances, or interests of any kind. |
|---|---|
| **Plan Documentation** | Documentation with respect to the Plan shall be in a form and substance satisfactory to the Committee, DIP Lender and Debtors. |
| **Timing** | The Parties will work to file a Plan and related Disclosure Statement by no later than November 20, 2015. |

[*Signature Pages Follow*]

Accepted and agreed to this 15th day of November, 2015.

**<u>DEBTORS</u>**

**ADVANCE WATCH COMPANY, LTD.**

By:    _____/s/ Jeffrey L. Gregg_____
         Jeffrey L. Gregg

    Its: Chief Restructuring Officer

**BINDA USA HOLDINGS, INC.**
**SUNBURST PRODUCTS, INC.**
**GWG INTERNATIONAL, LTD.**

By:    _____/s/ Jeffrey L. Gregg_____
         Jeffrey L. Gregg

    Their: Chief Restructuring Officer

**<u>COMMITTEE</u>**

**OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

By:  Arent Fox LLP, its counsel

By:    */s/ Robert Hirsh*

Name: Robert Hirsh, Esq.

**<u>DIP LENDER</u>**

**WELLS FARGO BANK, NATIONAL ASSOCIATION**

By:  Otterbourg, P.C., its counsel

By: _____*/s/ Daniel F. Fiorillo*_____

Name: Daniel F. Fiorillo, Esq.

**<u>PURCHASER</u>**

WITH THE JOINDER OF SUNSHINE TIME, INC.,
FOR THE SOLE PURPOSE OF ACKNOWLEDGING
AND AGREEING TO THE TERM SHEET SECTIONS
TITLED "SUNSHINE TIME APA, DIP CREDIT
AGREEMENT, AND FINAL DIP ORDER,"
"RESPONSIBLE OFFICER", AND "REMAINING
CHAPTER 11 EXPENSES AND PLAN FUNDING"

**SUNSHINE TIME, INC.**

By:  Baker & Hostetler LLP, its counsel


By:   */s/ Marc E. Hirschfield*

Name: Marc E. Hirschfield, Esq.

14

## EXHIBIT A TO SETTLEMENT TERM SHEET

## Amendment No. 1 to Asset Purchase Agreement

*Venable Draft 11/13/15*

# AMENDMENT NO. 1 TO
# ASSET PURCHASE AGREEMENT

THIS AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT (this "Amendment"), dated as of November __, 2015, is entered into by and among Binda USA Holdings, Inc., a Delaware corporation ("Parent"), Advance Watch Company, Ltd., a Michigan corporation ("AWC"), Sunburst Products, Inc., a California corporation ("Sunburst"), and GWG International, Ltd., a Delaware corporation ("GWG" and, together with Parent, AWC and Sunburst, each a "Seller" and collectively, "Sellers"), and Sunshine Time Inc., a Delaware corporation ("Buyer").

## RECITALS

WHEREAS, Buyer and Sellers are parties to that certain Asset Purchase Agreement, dated as of September 29, 2015 (the "Purchase Agreement");

WHEREAS, the parties have determined that it is in their respective best interests to amend the Purchase Agreement as specified herein; and

WHEREAS, capitalized terms used, but not otherwise defined herein, shall have the meanings given to such terms in the Purchase Agreement.

NOW, THEREFORE, in consideration of the mutual promises herein made, and in consideration of the representations, warranties, and covenants herein contained, the parties hereby agree as follows:

## AGREEMENT

1.      Section 1.1 of the Purchase Agreement is hereby amended by adding the following definitions in appropriate alphabetical order:

"*"Designation Rights Contract*" has the meaning set forth in Section 2.6(c)."

"*"Pre-Closing Collections*" has the meaning set forth in Section 3.4(a)."

"*"Pre-Closing Collections Target*" has the meaning set forth in Section 3.4(a)."

"*"Retained Third Party Claims*" has the meaning set forth in Section 2.1(r)."

"*"Third Party Claims*" has the meaning set forth in Section 2.1(r)."

2.      Clause (r) of Section 2.1 of the Purchase Agreement is hereby amended by deleting the text thereof in its entirety and replacing it with the following:

"(r)      any rights, claims or causes of action of Sellers against third parties other than Tax authorities relating to assets, properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date, other than causes of action under Chapter 5 of Title 11 of the United States Code ("Third Party Claims"); provided, however, that Sellers shall retain the right to use such Third Party Claims solely (and for no other purpose than) as a defense or objection to a proof of claim filed in the Bankruptcy Cases ("Retained Third Party Claims");"

3.      Clause (s) of Section 2.1 of the Purchase Agreement is hereby amended by deleting the text thereof in its entirety and replacing it with the following:

"(s)      any rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against Jeffrey L. Gregg and Tadd Crane;"

4.      Section 2.6 of the Purchase Agreement is hereby amended by adding the following clause (c) at the end thereof:

"(c)      Designation Rights Contracts.  Sellers agree that from the date of this Agreement through the date that is the earlier of (i) one hundred and twenty (120) days after the Petition Date and (ii) confirmation of a plan of reorganization or liquidation in the Bankruptcy Cases, Sellers will provide Buyer, at Buyer's expense, with the rights and benefits under the Contracts identified on Schedule 2.6(c) (each, a "Designation Rights Contract").  Buyer's access to and use of the real and personal property subject to the Designation Rights Contracts will be subject to and consistent with the Sellers' obligations, if any, to third parties with respect to such Designation Rights Contracts; and Buyer will perform such obligations as required and shall assume all liability for any damage or destruction to such real and personal property as a result of such access and use. In addition to the Purchase Price, Buyer shall promptly pay the reasonable and actual incremental costs or administrative claims incurred by Sellers as a result of providing such rights and benefits to Buyer or due to the deferral of the decision to reject each such Designation Rights Contract in order to provide such use or access and shall name Sellers as an additional insured on any insurance policy (including liability and casualty policies) covering such real and personal property.  For the Landlord in Michigan [as defined in the Landlord Objection Docket 147] (the "Michigan Landlord") only, Buyer shall pay any such amounts directly to the Michigan Landlord under the Designation Rights Contract to which the Michigan Landlord is a party (the "Michigan Lease" as may be amended from time to time), and any such payment shall not be property of the Debtors' bankruptcy estates.  Notwithstanding anything in this Agreement (as amended from time to time) to the contrary, there has been and shall be no novation or release of Sellers' obligations under the Michigan Lease unless or until the

2

Michigan Lease is rejected by the Debtors.  As Buyer determines whether or not a Designation Rights Contract shall be assumed by Sellers and assigned to Buyer, Buyer and Sellers shall comply with the procedure for assuming and assigning or rejecting, as applicable, such Designation Rights Contract.  With respect to any Designation Rights Contract that Buyer determines to assume, the Cure Amount, as determined by the Bankruptcy Court, if any, necessary to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from any defaults under such Designation Rights Contract shall be paid by Buyer, and Sellers shall have no liability therefor or thereafter, and such Designation Rights Contract shall be deemed a Purchased Contract.  With respect to any Designation Rights Contract that Buyer determines shall not be assumed by Sellers and assigned to Buyer, Buyer shall have no further obligation with respect to such incremental costs or administrative claims after the effective date of the rejection of such Designation Rights Contract and any such Designation Rights Contract shall be deemed an Excluded Contract."

5.      Article III of the Purchase Agreement is hereby amended by adding the following Section 3.4 at the end thereof:

"3.4    Collections.  The Parties agree that:

(a)      In the event that the cash balance of pre-Closing collections of Accounts Receivable received by Sellers from November 9, 2015 until the Closing Date (the "Pre-Closing Collections") is less than $1,554,742 (the "Pre-Closing Collections Target"), the amount by which the Pre-Closing Collections Target exceeds the Pre-Closing Collections shall be remitted by Buyer to Sellers from Buyer's collection of Accounts Receivable following the Closing, which amounts shall be remitted to Sellers upon Buyer's receipt of such post-Closing collections or a soon thereafter as practicable; provided, that, that amount of post-Closing collections Buyer is required to remit to Sellers pursuant to this Section 3.4(a) shall not exceed $355,000.

(b)      In the event that the Pre-Closing Collections exceed the Pre-Closing Collections Target, the amount by which the Pre-Closing Collections exceeds the Pre-Closing Collections Target shall be remitted by Sellers to Buyer upon the Closing; provided, that the amount of Pre-Closing collections Sellers are required to remit to Buyers pursuant to this Section 3.4(b) shall not exceed $355,000; provided, further, that Sellers shall be entitled to retain any Pre-Closing Collections that exceed the Pre-Closing Collections Target by $355,000 or more.

(c)      Any payments made pursuant to this Section 3.4 shall be treated as an adjustment to the Purchase Price."

10254043-v9

6.      Section 8.4 of the Purchase Agreement is hereby amended by deleting the text thereof in its entirety and replacing it with the following:

"Section 8.4    Preservation of Records.  Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) and Buyer agree that each of them shall preserve and keep books and records held by it relating to the pre-Closing Business for a period of six (6) years from the Closing Date and shall make books and records (and its personnel, representatives, attorneys, accountants and properties) available to, as applicable, Buyer (and its representatives), Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) and the Committee (and its representatives) (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings brought by, against or on behalf of, or Tax audits against, or governmental investigations of, Sellers, or Buyer or any of their Affiliates, or their estates, or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during the six (6) year period, such Party shall first give ninety (90) days' prior written notice to the other Party and the Committee and each of such other Party and the Committee shall have the right at its option and expense, upon prior written notice given to such Party within that ninety (90) day period, to take possession of the records within thirty (30) days after the date of such notice."

7.      Section 8.12 of the Purchase Agreement is hereby amended by deleting the text thereof in its entirety and replacing it with the following:

"Section 8.12   Cooperation.  Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee), on the one hand, and Buyer, on the other hand, will provide each other with cooperation and information as either of them may reasonably request of the other in connection with the filing of any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or any right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes (such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax authorities).  In addition, Buyer shall make available to Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) and Committee (and its representatives), without charge to Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee), such office space and employee support reasonably necessary to assist Sellers (and their estates, successors, assignees and their respective representatives, including responsible officer and creditor trustee) to wind up Sellers' operations following

4

the Closing, resolve the Bankruptcy Cases, including the prosecution of any litigation and disputed claims, dissolve any or all of Sellers and prepare and file the Tax Returns.  Any information obtained under this Section 8.12 shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding."

8.      Article VIII of the Purchase Agreement is hereby amended by adding the following Section 8.16 at the end thereof:

"Section 8.16  Privacy Policy.  On the Closing Date, Buyer will adopt the privacy policy of Sellers."

9.      The Purchase Agreement is hereby amended by replacing the Schedules in their entirety and replacing them with the Schedules attached hereto as Annex A.

10.      Except as expressly set forth in this Amendment, the Purchase Agreement shall remain in full force and effect and shall not be deemed to have been modified or amended by this Amendment.  Each of the parties understands and agrees that by executing and delivering this Amendment the other parties do not hereby waive any of their respective rights or remedies under the Purchase Agreement.

11.      This Amendment, together with the Purchase Agreement, constitutes the entire understanding of the parties with respect to the subject matter hereof, and any other prior or contemporaneous agreements, whether written or oral, with respect thereto are expressly superseded hereby.

12.      This Amendment may be executed in two or more counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one and the same instrument.  Any signature delivered by facsimile or electronic mail shall be deemed to be an original signature hereunder.

*[Signature pages follow]*

5

IN WITNESS WHEREOF, the parties have caused this Amendment to be executed by their respective duly authorized signatories as of the date first above written.

**SELLERS:**                    BINDA USA HOLDINGS, INC.


By:    _____
           Name: Jeffrey L. Gregg
           Title:   Chief Restructuring Officer


ADVANCE WATCH COMPANY LTD.


By:    _____
           Name: Jeffrey L. Gregg
           Title:   Chief Restructuring Officer


SUNBURST PRODUCTS, INC.


By:    _____
           Name: Jeffrey L. Gregg
           Title:   Chief Restructuring Officer


GWG INTERNATIONAL, LTD.


By:    _____
           Name: Jeffrey L. Gregg
           Title:   Chief Restructuring Officer


[SIGNATURE PAGE TO AMENDMENT NO. 1 TO
ASSET PURCHASE AGREEMENT]

**<u>BUYER</u>:**                          SUNSHINE TIME INC.

By: _____
Name: _____
Title: _____

## **ANNEX A**

**SCHEDULES**

See attached.

## SCHEDULE 1.1(a)

### Contracts; Leases; Intellectual Property

1.  Omnibus License Agreement Renewal, dated as of January 1, 2012, by and among Advance Watch Company Ltd., Kenneth Cole Productions (LIC), and Kenneth Cole Productions, Inc.

2.  Trademark License Agreement, dated as of March 12, 2009, by and between Advance Watch Company Ltd. and Tommy Bahama Group, Inc., as extended by that certain Extension of Trademark License Agreement for Renewal Period dated September 11, 2012, as amended by that certain First Amendment to Trademark License Agreement dated March 22, 2012, as further amended by that certain Second Amendment to Trademark License Agreement dated May 5, 2015.

3.  License Agreement, dated as of November 7, 2007, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker, as amended by that certain First Amendment to License Agreement dated as of January 1, 2012, as further amended by that certain Second Amendment to License Agreement dated as of February 23, 2015.

4.  Commercial Street Contribution Agreement, dated December 19, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker.

5.  License Agreement, dated as of August 10, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Christian Casey L.L.C.

6.  Retail Product License Agreement, dated as of August 7, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NBA Properties, Inc., as amended by that certain First Amendment to Retail Product License Agreement dated August 24, 2014.

7.  License Agreement, dated as of April 1, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NFL Properties LLC.

8.  Retail License Agreement, dated July 18, 2013, by and among Advance Watch Company Ltd. d/b/a Game Time LLC, NHL Enterprises, L.P. and NHL Enterprises Canada, L.P.

9.  Standard Retail Product License Agreement, dated as of July 13, 2012, by and between Advance Watch Company Ltd. and Collegiate Licensing Company, as amended by that certain Addendum dated December 18, 2014.

10. Trademark License Agreement, dated as of May 22, 2012, by and between Advance Watch Company Ltd. and Michigan State University.

11. License Agreement, dated as of July 31, 1996, by and between Advance Watch Company Ltd. and Burwood Products Company, as amended by that certain Letter Agreement

dated February 6, 2006, as further amended by that certain Letter Agreement dated November 24, 2014.

12. Licensing Agreement, dated October 22, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and The Curtis Publishing Company, as amended by that certain Addendum to Licensing Agreement dated May 10, 2012, as further amended by that certain Addendum to Licensing Agreement dated January 13, 2014.

13. Licensing Agreement, dated as of December 20, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sundance Group.

14. License Agreement, dated as of January 1, 2015, by and between Geneva Watch Group, Inc. and Morning Glory Licensing, LLC.

15. License Agreement, dated August 13, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and KMJ Brand Holdings LLC.

16. License Agreement, dated as of January 1, 2015, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group and HBI Branded Apparel Enterprises.

17. License Agreement, dated as of September 1, 2011, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group, Sperry Top-Sider LLC and SR Holdings, LLC, as amended by that certain First Amendment to License Agreement dated December __, 2014.

18. License Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Steve Harvey Products, Inc./ Steve Harvey.

19. License Agreement, dated as of March 31, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and IP Holdings Unltd LLC, as amended by that certain Amendment to License Agreement dated March 11, 2011, as further amended by that certain Second Amendment to License Agreement dated January 8, 2014 by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and ZY Holdings LLC (by assignment from IP Holdings Unltd).

20. Letter Agreement, dated as of _____, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and US Lacrosse, Inc.

21. License Agreement, dated as of April 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Soccer United Marketing, LLC.

22. License Agreement for the period from January 1, 2014 through December 31, 2015 by and between Advance Watch Company Ltd. and Major League Baseball Properties, Inc.

23. Licensing Agreement Renewal for the period from July 1, 2015 to June 30, 2016 by and between Advance Watch Company Ltd. and The Ohio State University.

9942447-v10

24. Licensing Agreement Renewal through December 27, 2015 by and between Advance Watch Company Ltd. and University of Iowa.

25. Licensing Agreement Renewal to September 2016 by and between Advance Watch Company Ltd. and Fermata Partners.

26. Licensing Agreement Renewal for the period from 2015 to 2016 by and between Advance Watch Company Ltd. and Learfield Licensing Partners.

27. License Agreement between Surfline/Wavetrak, Inc. and Advance Watch Company Ltd. d/b/a Geneva Watch Group dated April 1, 2015.

28. Draft Endorsement Agreement between Sunburst Products, Inc. d/b/a Freestyle U.S.A. and Clark Little dated as of February 1, 2015.

29. Distribution Agreement between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Hang Ten Distribution SA dated November 1, 2014.

30. Distribution Agreement between  Advance Watch Company Ltd. d/b/a Geneva Watch Group and Roshan Commercial Corporation dated June 1, 2014.

31. Distribution Agreement between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Wake Action Sports Ltd. dated October __, 2013.

32. Agreement between Roma Industries LLC and Advance Watch Company Ltd d/b/a Geneva Watch Company Group dated September _, 2009.

33. Distribution Agreement, dated as of May 1, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Arista Singapore Pte Ltd.

34. Distribution Agreement, dated as of September 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Carmen Jewelers.

35. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and GDL Manufacturing Ltd.

36. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Global Tic Sales Inc.

37. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Priority Marketing PVT. Ltd.

38. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Timestore AG.

39. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Chronosoft PTE LTD.

40. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CNB Distributors, LLC.

41. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Comercializadora E-Akluck, S.A. de C.V.

42. Distribution Agreement, dated as of March 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Marlox AG.

43. Distribution Agreement, dated as of November 6, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Merkez Saat Tic.A.S.

44. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New City, Inc.

45. Distribution Agreement, dated as of June 15, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New Sense Development Ltd.

46. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and PT. Sukses Sinar Abadi.

47. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

48. Distribution Agreement, dated as of September 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

49. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and TBN Time Distribution LLC.

50. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Time Deco Corporation Limited, as amended by that certain First Amendment dated October 1, 2014.

51. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Paidel Watch Co., Ltd.

52. Distribution Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Styleright Global Corporation.

53. Letter Agreement, dated June 13, 2013, by and among Advance Watch Company Ltd., Kenneth Cole Productions, Inc. and Wells Fargo Bank, National Association.

54. Credit Agreement, dated as of June 21, 2013, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, Sunburst Products, Inc., GWG International, Ltd., Binda USA Holdings, Inc., Wells Fargo Bank, National Association, and the Lenders that are parties thereto, as amended by that certain Amendment No. 1 to

4

Credit Agreement dated as of June 30, 2014, as amended by that certain Amendment No. 2 to Credit Agreement dated as of August 17, 2015.

55. Standard Vendor Agreement for Merchandise, dated February 24, 2015, by and between Geneva Watch Group and Boscov's Department Store, LLC.

56. Vendor Agreement, dated _____,  2014, by and between Advance Watch Company Ltd. and Helzberg's Diamond Shops, Inc.

57. Amazon Vendor Terms and Conditions effective March 21, 2015 for various brands.

58. Freight Allowance Agreement No. 7409330, dated on or around April 1, 2015, by and between Geneva Clock Company and Amazon Fulfillment Services, Inc.

59. Freight Allowance Agreement No. 7178800, dated on or around April 1, 2015, by and between Breil Milano and Amazon Fulfillment Services, Inc.

60. Trading Terms Agreement, dated February 1, 2014, by and between Geneva Watch Group and The Nuance Group.

61. Letter Agreement regarding Acquisition of "Mathey Tissot" Trademark, dated March 11, 1996, by and among Geneva Watch Company, Mathey Tissot International, Ltd. and Mathey Tissot S.A.

62. Letter Agreement regarding Agreement regarding Mathey Tissot Watch Product, dated May 16, 1996, by and among Geneva Watch Company, JBM Venture Co., Inc. and Jan Bell Marketing, Inc.

63. Letter Agreement regarding grant of license, dated August 17, 2015, by and among Geneva Watch Group and LaCrosse Technology.

64. Agreement, dated August 26, 2015, by and among Advance Watch Company (Far East) Limited, Advance Watch Company Ltd., Wells Fargo Bank, National Association, Koo Chi Sum and Yen Ching Wai, David c/o Ernst and Young Transactions Limited.

65. Escrow Agreement, dated August 26, 2015, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, and Koo Chi Sum and Yen Ching Wai c/o Ernst & Young Transactions Limited.

66. Irrevocable Transferable Standby Letter of Credit, dated August 19, 2015, by and among Israel Discount Bank of New York and Allura Imports, Inc.

67. Corporate Services Commercial Account Agreement between American Express Travel Related Services Company, Inc. and Advance Group Inc. dated February 24, 2015.

Real Property Leases:

68. Lease Agreement, dated as of September 6, 2001, by and between Advance Watch Company Ltd. and 47440 Michigan Ave., LLC (as successor in interest to Tianz, Inc., successor in interest to Ashley Canton, LLC), as amended by that certain First Amendment dated April 15, 2002, that certain Second Amendment dated May 28, 2002, that certain Third Amendment dated June 18, 2006, that certain Fourth Amendment dated March 8, 2010, and that certain Fifth Amendment to Lease dated March 26, 2013, and that certain Sixth Amendment to Lease, dated as of October 28, 2015.

69. Lease, dated February 18, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and 1407 Broadway Real Estate, LLC, as assigned by landlord to SRI Eleven 1407 Broadway Operator, LLC.

70. Lease Agreement, dated September 28, 2011, by and between Geneva Watch Group and Pinnacle Plaza, LLC, as amended by that certain Addendum I to Original Lease dated October 3, 2012, as further amended by that certain Addendum II to Original Lease dated May 11, 2015.

71. Sublease Agreement, dated January 30, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Allura Imports, Inc.

72. Multi-Tenant Building Lease, dated May 1, 2009, by and between Advance Watch Company Ltd. and C.J. Segerstrom & Sons, as amended by that certain First Amendment of Lease Agreement dated May 22, 2012, and by that certain Second Amendment of Lease Agreement dated July 28, 2015.

73. Renewal Lease Form, dated July 10, 2015, by and between Binda USA Holdings Inc. and Columbus 60th Realty LLC.

Personal Property Leases:

74. Lease Agreement, dated July 21, 2014, by and between Advance Watch Company Ltd. and CIT Finance LLC.

75. Lease Agreement, dated July 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CIT Finance LLC.

76. Lease Agreement (Lease No. 001-007914733-002), dated August 5, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

77. Lease Agreement (Lease No. 001-007914733-003), dated September 8, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

78. ValuePlan Lease Agreement, dated March 16, 2015, by and between Geneva Watch Group and IBM Credit LLC.

79. Lease Agreement, dated May 28, 2013, by and between Advance Watch Company Ltd. and LDI Color Toolbox.

9942447-v10

Patents:

| Country Name | Status | Status Date | Application No. | Filing Date | Publication No. | Publication Date | Patent No. | Issue Date | Expiration Date | Application Title |
|---|---|---|---|---|---|---|---|---|---|---|
| United States of America | Granted | 29-Dec-2010 | 29/320106 | 20-Jun-2008 | | | D611378 | 09-Mar-2010 | 09-Mar-2024 | WATCH BAND RETAINER |
| United States of America | Granted | 05-Jun-2012 | 29/320107 | 20-Jun-2008 | | | D660725 | 29-May-2012 | 29-May-2026 | WATCH CASE |
| United States of America | Granted | 24-Mar-2014 | 29/391844 | 13-May-2011 | | | D701128 | 18-Mar-2014 | 18-Mar-2028 | WATCH |
| United States of America | Granted | 17-Sep-2014 | 12/911205 | 25-Oct-2010 | 2012/0099406 | 26-Apr-2012 | 8824245 | 02-Sep-2014 | 02-Jul-2032 | TOUCH SCREEN WATCH |
| Australia | Granted | 08-Nov-2013 | 14610/2013 | 13-Sep-2013 | | | 351413 | 21-Oct-2013 | 13-Sep-2023 | DISPLAY SCREEN SURROUNDED BY A WATCH CASE |
| China | Granted | 19-May-2014 | 2013304437 90.7 | 16-Sep-2013 | | | ZL2013304 43790.7 | 14-May-2014 | 16-Sep-2023 | WATCH DISPLAY WITH ICON |
| European Community | Granted | 13-Nov-2013 | 001384317-0001 | 13-Sep-2013 | | | 001384317-0001 | 13-Sep-2013 | 13-Sep-2038 | WATCH DISPLAY WITH ICON |
| India | Pending | 13-Sep-2013 | 256436 | 13-Sep-2013 | | | | | | WATCH DISPLAY WITH ICON |
| Japan | Granted | 09-Dec-2014 | 2013-021312 | 13-Sep-2013 | | | 1514206 | 21-Nov-2014 | 21-Nov-2034 | WATCH DISPLAY WITH ICON |
| United States of America | Pending | 18-Mar-2013 | 29/448824 | 14-Mar-2013 | | | | | | WATCH DISPLAY WITH ICON |

Trademarks:

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Argentina | ADVANCE CLASSIC | 2554827 | 2090769 | Registered | 16-Nov-2004 | 06-Jun-2006 | 06-Jun-2016 | 14 Int. | Advance Watch Company, Ltd. |
| Argentina | ADVANCE LTD | 2554828 | 2090771 | Registered | 16-Nov-2004 | 06-Jun-2006 | 06-Jun-2016 | 14 Int. | Advance Watch Company, Ltd. |
| Argentina | AQUATECH | 2554826 | 2090768 | Registered | 16-Nov-2004 | 06-Jun-2006 | 06-Jun-2016 | 14 Int. | Advance Watch Company, Ltd. |
| Argentina | EZ READ | 2555098 | 2149525 | Registered | 17-Nov-2004 | 28-Mar-2007 | 28-Mar-2017 | 14 Int. | Advance Watch Company, Ltd. |
| Argentina | SHARK TOOTH | 3368742 | | Pending | 18-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| Australia | ADVANCE | 516923 | A516,923 | Registered | 11-Aug-1989 | 04-Nov-1991 | 11-Aug-2016 | 14 Int. | Advance Watch Company, Ltd. |

8

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Australia | FREE STYLE | 433,074 | A433,074 | Registered | 12-Sep-1985 | 12-Sep-1985 | 12-Sep-2016 | 18 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Australia | FREESTYLE | 433073 | 433073 | Registered | 12-Sep-1985 | 04-Aug-1988 | 12-Sep-2016 | 14 Int. | Sunburst Products, Inc. |
| Australia | FYI | 1539093 | 1539093 | Registered | 05-Feb-2013 | 29-Oct-2014 | 05-Feb-2023 | 09 Int., 14 Int. | Advance Watch Company, Ltd. |
| Australia | SHARK FIN DESIGN | 630328 | 630328 | Registered | 20-May-1994 | 20-May-1994 | 20-May-2024 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Austria | FREESTYLE | 174,858 | 174,858 | Registered | 31-Mar-1998 | 31-Mar-1998 | 31-Mar-2018 | 14 Int., 18 Int. | Sunburst Products, Inc. |
| Bahamas | SHARK TOOTH | | | Pending | 19-Dec-2014 | | | 14 Int. | Sunburst Products, Inc. |
| Barbados | SHARK TOOTH | | | Pending | 31-Dec-2014 | | | 14 Int. | Sunburst Products, Inc. |
| Belize | SHARK TOOTH | | 1135414 | Registered | 11-Dec-2014 | 11-Dec-2014 | 11-Dec-2024 | 14 Int. | Sunburst Products, Inc. |
| Benelux | FREE STYLE | 435,452 | 435,452 | Registered | 21-May-1997 | 21-May-1997 | 21-May-2017 | 14 Int. | Sunburst Products, Inc. |
| Brazil | 2 COOL | 826810713 | | Pending | 13-Aug-2004 | | | 14 Int. | Advance Watch Company, Ltd. |
| Brazil | AQUATECH | 826810705 | 826810705 | Registered | 13-Aug-2004 | 06-Nov-2007 | 06-Nov-2017 | 14 Int. | Advance Watch Company, Ltd. |
| Brazil | AVANTI | 826810691 | 826810691 | Registered | 13-Aug-2004 | 20-Oct-2009 | 20-Oct-2019 | 14 Int. | Advance Watch Company, Ltd. |
| Brazil | FREE STYLE (Stylized) | 814626947 | 814626947 | Registered | 20-Dec-1988 | 13-Aug-1996 | 13-Aug-2016 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Brazil | FREESTYLE | 829753680 | 829753680 | Registered | 09-Jun-2008 | 22-Feb-2012 | 22-Feb-2022 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Brazil | FYI | 906268478 | | Published | 21-May-2013 | | | 14 Int. | Advance Watch Company, Ltd. |
| Brazil | FYI | 908623844 | | Pending | 19-Nov-2014 | | | 09 Int. | Advance Watch Company, Ltd. |
| Brazil | PANACHE | 826838774 | 826838774 | Registered | 25-Aug-2004 | 06-Nov-2007 | 06-Nov-2017 | 14 Int. | Advance Watch Company, Ltd. |
| Brazil | SHARK | 819223794 | 819223794 | Registered | 27-Mar-2001 | 27-Mar-2001 | 27-Mar-2021 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Brazil | SHARK FIN DESIGN | 829753745 | 829753745 | Registered | 09-Jun-2008 | 13-Sep-2011 | 13-Sep-2021 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Brazil | SHARK TOOTH | 908641435 | | Published | 24-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| California | FREESTYLE | | 104,154 | Renewed | | 25-Aug-1998 | 25-Aug-2018 | 25 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Canada | ADRENALINE | 1380337 | 788241 | Registered | 23-Jan-2008 | 21-Jan-2011 | 21-Jan-2026 | 00 WARES | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |

9

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Canada | ADVANCE | 581130 | 370,822 | Registered | 31-Mar-1987 | 20-Jul-1990 | 20-Jul-2020 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | ADVANCE TIME TECHNOLOGY | 1479258 | 861238 | Registered | 30-Apr-2010 | 25-Sep-2013 | 25-Sep-2028 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | AQUATECH | 626551 | 377,995 | Registered | 02-Mar-1989 | 11-Jan-1991 | 11-Jan-2021 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | AVANTI | 601996 | 370267 | Registered | 03-Mar-1988 | 06-Jul-1990 | 06-Jul-2020 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | FREE STYLE | 810,042 | 487,971 | Registered | 15-Apr-1996 | 21-Jan-1998 | 21-Jan-2028 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Canada | GC (Stylized) | 1390081 | 855574 | Registered | 04-Apr-2008 | 18-Jul-2013 | 18-Jul-2028 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | icvrd and Design | 1537399 | TMA888929 | Registered | 27-Jul-2011 | 29-Oct-2014 | 29-Oct-2029 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | JULES & JAMES | 1509266 | | Published | 23-Dec-2010 | | | 00 WARES | Advance Watch Company, Ltd. |
| Canada | MAKE A FACE | 1639271 | | Published | 13-Aug-2013 | | | 00 WARES | Advance Watch Company, Ltd. |
| Canada | NITRO | 1501239 | 806779 | Registered | 26-Oct-2010 | 14-Sep-2011 | 14-Sep-2026 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | PANACHE | 1206107 | 680331 | Registered | 11-Feb-2004 | 25-Jan-2007 | 25-Jan-2022 | 00 WARES | Advance Watch Company, Ltd. |
| Canada | SHARK | 728,343 | 444,553 | Registered | 06-May-1993 | 30-Jun-1995 | 30-Jun-2025 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Canada | SHARK TOOTH | 1703959 | | Published | 21-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| Canada | SLUMBERBUG | 1390080 | 797362 | Registered | 04-Apr-2008 | 12-May-2011 | 12-May-2026 | 00 WARES | Advance Watch Company, Ltd. |
| China | CONNECTEDEVICE | 12186430 | 12186430 | Registered | 22-Feb-2013 | 07-Feb-2015 | 06-Feb-2025 | 14 Int. | Advance Watch Company, Ltd. |
| China | FREESTYLE | 7175033 | 7175033 | Registered | 20-Jan-2009 | 21-Sep-2011 | 20-Sep-2021 | 14 Int. | Sunburst Products, Inc. |
| China | FREESTYLE with Chinese Characters and SHARK FIN DESIGN | 3336249 | 3336249 | Registered | 15-Oct-2002 | 07-Apr-2009 | 06-Apr-2019 | 14 Int. | Sunburst Products, Inc. |
| China | FREESTYLE with Chinese Characters and SHARK FIN DESIGN | 3336247 | 3336247 | Registered | 15-Oct-2002 | 07-Feb-2008 | 06-Feb-2018 | 25 Int. | Sunburst Products, Inc. |
| China | FYI | 12186431 | 12186431 | Registered | 22-Feb-2013 | 14-Dec-2014 | 13-Dec-2024 | 14 Int. | Advance Watch Company, Ltd. |

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| China | SHARK FIN DESIGN | 7175032 | 7175032 | Registered | 20-Jan-2009 | 21-Sep-2011 | 20-Sep-2021 | 14 Int. | Sunburst Products, Inc. |
| China | SHARK FIN DESIGN | 7175031 | 7175031 | Registered | 20-Jan-2009 | 21-Sep-2010 | 20-Sep-2020 | 25 Int. | Sunburst Products, Inc. |
| Colombia | SHARK TOOTH | 14264884 | | Published | 02-Dec-2014 | | | 14 Int. | Sunburst Products, Inc. |
| Costa Rica | FREESTYLE | 2008-003565 | 182887 | Registered | 18-Apr-2008 | 05-Dec-2008 | 05-Dec-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Costa Rica | SHARK | 2008-003564 | 182716 | Registered | 18-Apr-2008 | 21-Nov-2008 | 21-Nov-2018 | 14 Int. | |
| Costa Rica | SHARK FIN DESIGN | 2008-003563 | 182715 | Registered | 18-Apr-2008 | 21-Nov-2008 | 21-Nov-2018 | 14 Int. | |
| Costa Rica | SHARK TOOTH | 20140111035 | 244128 | Registered | 17-Dec-2014 | 01-Jun-2015 | 01-Jun-2025 | 14 Int. | Sunburst Products, Inc. |
| CTM | FREESTYLE | 7304413 | 7304413 | Registered | 10-Oct-2008 | 13-Oct-2011 | 10-Oct-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| CTM | FYI | 11545183 | 11545183 | Registered | 05-Feb-2013 | 28-Jun-2013 | 05-Feb-2023 | 09 Int., 14 Int. | Advance Watch Company, Ltd. |
| CTM | icvrd and Design | 10159747 | 10159747 | Registered | 28-Jul-2011 | 08-Dec-2011 | 28-Jul-2021 | 14 Int. | Advance Watch Company, Ltd. |
| CTM | NIGHT VISION | 752469 | 752469 | Registered | 19-Feb-1998 | 16-Jun-1999 | 19-Feb-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| CTM | SHARK | 253112 | 253112 | Registered | 03-May-1996 | 22-Sep-1998 | 03-May-2016 | 14 Int. | Sunburst Products, Inc. |
| CTM | SHARK FIN DESIGN | 6811996 | 6811996 | Registered | 09-Apr-2008 | 20-Jan-2009 | 09-Apr-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| CTM | SHARK TOOTH | 013477369 | | Opposed | 20-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| Dominican Republic | SHARK TOOTH | 201435635 | | Pending | 12-Dec-2014 | | | 14 Int. | Sunburst Products, Inc. |
| France | FREE STYLE | 641,106 | 1,409,671 | Registered | 20-May-1987 | 13-Nov-1987 | 20-May-2017 | 14 Int., 25 Int. | Sunburst Products, Inc. |
| France | FREE STYLE | 1217342 | 1217342 | Registered | 14-Aug-1992 | 28-Sep-1992 | 29-Sep-2022 | 18 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| France | SHARK TOOTH | 14/4135225 | 14/4135225 | Registered | 20-Nov-2014 | 13-Mar-2015 | 20-Nov-2024 | 14 Int. | Sunburst Products, Inc. |
| Germany | AFFINITY | 30458799.0 | 30458799 | Registered | 13-Oct-2004 | 23-Nov-2004 | 13-Oct-2024 | 14 Int. | Advance Watch Company, Ltd. |
| Germany | FREE STYLE | 397 11 407.9 | 39711407 | Registered | 31-Mar-1997 | 25-Feb-2000 | 31-Mar-2017 | 14 Int., 18 Int. | Sunburst Products, Inc. |
| Germany | SWERVE | 30458798.2 | 30458798 | Registered | 13-Oct-2004 | 23-Nov-2004 | 31-Oct-2024 | 14 Int. | Advance Watch Company, Ltd. |
| Germany | WHIZ KIDS | 30458800.8 | 30458800 | Registered | 13-Oct-2004 | 23-Nov-2004 | 13-Oct-2024 | 14 Int. | Advance Watch Company, Ltd. |

11

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Greece | FREE STYLE | 133741 | 133741 | Registered | 02-Jul-1997 | 17-Nov-1999 | 02-Jul-2017 | 14 Int., 18 Int. | Sunburst Products, Inc. |
| India | FYI | 2502139 | | Pending | 25-Mar-2013 | | | 14 Int. | Advance Watch Company, Ltd. |
| India | FYI | 2645253 | | Pending | 18-Dec-2013 | | | 09 Int. | Advance Watch Company, Ltd. |
| Italy | FREE STYLE | 499,591 | 1276485 | Registered | 04-Jun-1987 | 09-Nov-1988 | 04-Jun-2017 | 14 Int., 18 Int., 25 Int. | Sunburst Products, Inc. |
| Italy | FREESTYLE | RM2010C004146 | 1423551 | Registered | 25-Jun-2010 | 24-Feb-2011 | 25-Jun-2020 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Jamaica | SHARK TOOTH | 66128 | 66128 | Registered | 12-Dec-2014 | 12-Dec-2014 | 12-Dec-2024 | 14 Int. | Sunburst Products, Inc. |
| Japan | CONNECTEDEVICE | 2013-011011 | 5606589 | Registered | 19-Feb-2013 | 09-Aug-2013 | 09-Aug-2023 | 09 Int., 14 Int. | Advance Watch Company, Ltd. |
| Japan | FREE STYLE | 2,495,556 | 2,495,556 | Registered | 29-Jan-1993 | 29-Jan-1993 | 29-Jan-2023 | 14 Int. | Sunburst Products, Inc. |
| Japan | FREE STYLE in Katakana | 1,344,958 | 1,344,958 | Registered | 29-Sep-1998 | 29-Sep-1998 | 29-Sep-2018 | 23 Int. | Sunburst Products, Inc. |
| Japan | FYI | 2013-011010 | 5598680 | Registered | 19-Feb-2013 | 12-Jul-2013 | 12-Jul-2023 | 09 Int., 14 Int. | Advance Watch Company, Ltd. |
| Japan | SHARK | 2,529,554 | 2,529,554 | Registered | 28-Apr-1993 | 28-Apr-1993 | 28-Apr-2023 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Japan | SHARK FIN DESIGN | 2008-029372 | 5180897 | Registered | 15-Apr-2008 | 14-Nov-2008 | 14-Nov-2018 | 14 Int. | Sunburst Products, Inc. |
| Japan | SHARK TOOTH | 2014099168 | 5751505 | Registered | 25-Nov-2014 | 20-Mar-2015 | 20-Mar-2025 | 14 Int. | Sunburst Products, Inc. |
| Korea | FREESTYLE | 40-2013-84520 | 40-1064419 | Registered | 17-Dec-2013 | 14-Oct-2014 | 14-Oct-2024 | 14 Int. | Sunburst Products, Inc. |
| Mexico | 2 COOL | 687598 | 865120 | Registered | 12-Nov-2004 | 10-Jan-2005 | 12-Nov-2024 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | ADVANCE | 8122 | 331,079 | Registered | 14-Apr-1986 | 14-Apr-1986 | 14-Apr-2026 | 27 Int. | Advance Watch Company, Ltd. |
| Mexico | ADVANCE LTD | 687599 | 865121 | Registered | 12-Nov-2004 | 10-Jan-2005 | 12-Nov-2024 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | AQUALITE | 923032 | 1036046 | Registered | 27-Mar-2008 | 21-Apr-2008 | 27-Mar-2018 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | AQUATECH | 687597 | 865119 | Registered | 12-Nov-2004 | 10-Jan-2005 | 12-Nov-2024 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | BNY | 954848 | 1103586 | Registered | 14-Aug-2008 | 04-Jun-2009 | 14-Aug-2018 | 14 Int. | Advance Watch Company, Ltd. |

12

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Mexico | DURANGO | 1099759 | 1168885 | Registered | 25-Jun-2010 | 15-Jul-2010 | 25-Jun-2020 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | FOXY | 923031 | 1036045 | Registered | 27-Mar-2008 | 21-Apr-2008 | 27-Mar-2018 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | FREESTYLE | 151,364 | 659,825 | Registered | 02-Oct-1992 | 02-Oct-1992 | 02-Oct-2022 | 14 Int. | Sunburst Products, Inc. |
| Mexico | GC (Stylized) | 925856 | 1051824 | Registered | 10-Apr-2008 | 31-Jul-2008 | 10-Apr-2018 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | GENEVA ART KLOK | 1403665 | 1458369 | Registered | 15-Aug-2013 | 29-May-2014 | 15-Aug-2023 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | icvrd and Design | 1199396 | 1262191 | Registered | 01-Aug-2011 | 24-Jan-2012 | 01-Aug-2021 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | LTD | 1202494 | 1260429 | Registered | 11-Aug-2011 | 13-Jan-2012 | 11-Aug-2021 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | MAKE A FACE | 1403661 | 1445258 | Registered | 15-Aug-2013 | 31-Mar-2014 | 15-Aug-2023 | 14 Int. | Advance Watch Company, Ltd. |
| Mexico | SHARK | 151,365 | 539,626 | Registered | 02-Oct-1992 | 07-Jan-1997 | 02-Oct-2022 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Mexico | SHARK TOOTH | 1552647 | 1515454 | Registered | 26-Nov-2014 | 20-Feb-2015 | 26-Nov-2024 | 14 Int. | Sunburst Products, Inc. |
| Mexico | SLUMBERBUG | 925855 | 1051405 | Registered | 10-Apr-2008 | 30-Jul-2008 | 10-Apr-2018 | 14 Int. | Advance Watch Company, Ltd. |
| New Zealand | FREESTYLE | 787544 | 787544 | Registered | 14-Apr-2008 | 16-Oct-2008 | 14-Apr-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| New Zealand | SHARK FIN DESIGN | 787257 | 787257 | Registered | 09-Apr-2008 | 13-Aug-2009 | 09-Apr-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Nicaragua | FREESTYLE | 2014004294 | 2015109636 LM | Registered | 18-Nov-2014 | 28-May-2015 | 27-May-2025 | 14 Int. | Sunburst Products, Inc. |
| Nicaragua | SHARK TOOTH | 2014004434 | 2015110073 | Registered | 01-Dec-2014 | 02-Jul-2015 | 01-Jul-2025 | 14 Int. | Sunburst Products, Inc. |
| Panama | FREESTYLE | 176881 | 176881 | Registered | 12-Nov-2008 | 23-Jul-2009 | 12-Nov-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Panama | SHARK | 176882 | 176882 | Registered | 12-Nov-2008 | 12-Nov-2008 | 12-Nov-2018 | 14 Int. | |
| Panama | SHARK FIN DESIGN | 176883 | 176883 | Registered | 12-Nov-2008 | 23-Jul-2009 | 12-Nov-2018 | 14 Int. | |
| Panama | SHARK TOOTH | 23747001 | 237470-01 | Registered | 29-Dec-2014 | 29-Dec-2014 | 29-Dec-2024 | 14 Int. | Sunburst Products, Inc. |
| Paraguay | FREESTYLE | 6536/2009 | | Pending | 02-Mar-2009 | | | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Peru | FREESTYLE | 0355576-2008 | 143111 | Registered | 30-May-2008 | 17-Sep-2008 | 17-Sep-2018 | 14 Int. | Sunburst Products, Inc. |
| Peru | SHARK | 036733 | 039643 | Registered | 15-Apr-1997 | 26-Sep-1997 | 26-Sep-2017 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |

13

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| Peru | SHARK FIN DESIGN | 0355577-2008 | 144027 | Registered | 30-May-2008 | 09-Oct-2008 | 09-Oct-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Peru | SHARK FREESTYLE and Shark Fin Design | 487054 | 189011 | Registered | 16-Mar-2012 | 18-Jun-2012 | 18-Jun-2022 | 14 Int. | Sunburst Products, Inc. |
| Peru | SHARK TOOTH | 5989782014 | 005211 | Registered | 05-Dec-2014 | 26-Mar-2015 | 26-Mar-2025 | 14 Int. | Sunburst Products, Inc. |
| Philippines | SHARK TOOTH | 42014014359 | | Allowed | 19-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| Singapore | FREE STYLE | 5691/83 | 56911/83 | Registered | 28-Oct-1994 | 28-Oct-1994 | 28-Oct-2024 | 18 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Singapore | FREESTYLE | T97/03188A | T97/03188A | Registered | 20-Mar-1997 | 20-Mar-1997 | 20-Mar-2017 | 14 Int. | Sunburst Products, Inc. |
| South Africa | FREE STYLE | 97/3990 | 1997/03990 | Registered | 14-Mar-1997 | 14-Mar-1997 | 14-Mar-2017 | 14 Int. | Sunburst Products, Inc. |
| South Africa | FREE STYLE | 97/3991 | 1997/03991 | Registered | 14-Mar-1997 | 14-Mar-1997 | 14-Mar-2017 | 18 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| South Africa | SHARK | 97/3992 | 97/3992 | Registered | 14-Mar-1997 | 14-Mar-1997 | 14-Mar-2017 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| South Africa | SHARK TOOTH | 201432005 | | Pending | 24-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| UAE | FREESTYLE | 119136 | 164708 | Registered | 14-Sep-2008 | 22-Feb-2012 | 14-Sep-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| UAE | SHARK | 119135 | 164709 | Registered | 14-Sep-2008 | 22-Feb-2012 | 14-Sep-2018 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| UAE | SHARK TOOTH | 226098 | | Pending | 02-Feb-2015 | | | 14 Int. | Sunburst Products, Inc. |
| UK | FREESTYLE | 2499890 | 2499890 | Registered | 10-Oct-2008 | 01-May-2009 | 10-Oct-2018 | 14 Int., 25 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| Uruguay | SHARK TOOTH | 460253 | | Pending | 19-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| US | ADRENALINE | 75/413206 | 2358207 | Registered | 02-Jan-1998 | 13-Jun-2000 | 13-Jun-2020 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| US | ADVANCE | 73/079824 | 1070973 | Registered | 11-Mar-1976 | 09-Aug-1977 | 09-Aug-2017 | 14 Int. | Advance Watch Company, Ltd. |
| US | ADVANCE TIME TECHNOLOGY | 77/919310 | 3936428 | Registered | 25-Jan-2010 | 29-Mar-2011 | 29-Mar-2021 | 14 Int. | Advance Watch Company, Ltd. |
| US | AQUALITE | 75/002033 | 1998355 | Registered | 05-Oct-1995 | 03-Sep-1996 | 03-Sep-2016 | 14 Int. | Advance Watch Company, Ltd. |
| US | AQUATECH | 73/759275 | 1542449 | Registered | 24-Oct-1988 | 06-Jun-1989 | 06-Jun-2019 | 14 Int. | Advance Watch Company, Ltd. |
| US | AVANTI | 73/634245 | 1453155 | Registered | 08-Dec-1986 | 18-Aug-1987 | 18-Aug-2017 | 14 Int. | Advance Watch Company, Ltd. |
| US | CONNECT | 86/177431 | 4732697 | Registered | 28-Jan-2014 | 05-May-2015 | 05-May-2025 | 14 Int. | Advance Watch Company, Ltd. d/b/a Geneva Watch Gro |

14

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| US | DIGI-TOUCH | 85/024910 | | Published | 28-Apr-2010 | | | 14 Int. | Advance Watch Company, Ltd. |
| US | FIELD RANGER | 74/735783 | 2159260 | Registered | 29-Sep-1995 | 19-May-1998 | 19-May-2018 | 14 Int. | Advance Watch Company, Ltd. |
| US | FREE STYLE | 73/446900 | 1319293 | Registered | 06-Oct-1983 | 12-Feb-1985 | 12-Feb-2025 | 14 Int. | Sunburst Products, Inc. |
| US | FREESTYLE | 75/813941 | 2562830 | Registered | 05-Oct-1999 | 23-Apr-2002 | 23-Apr-2022 | 09 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| US | FREESTYLE | 86/552594 | | Pending | 04-Mar-2015 | | | 09 Int. | Sunburst Products, Inc. |
| US | FYI | 85/751862 | | Allowed | 11-Oct-2012 | | | 14 Int. | Advance Watch Company, Ltd. |
| US | GAME TIME | 77/201014 | 3489779 | Registered | 08-Jun-2007 | 19-Aug-2008 | 19-Aug-2018 | 14 Int. | Advance Watch Company, Ltd. |
| US | GC and Design | 77/304064 | 4215797 | Registered | 15-Oct-2007 | 02-Oct-2012 | 02-Oct-2022 | 14 Int. | Advance Watch Company, Ltd. |
| US | H HIP HOP and Design | 85/493571 | 4266995 | Registered | 13-Dec-2011 | 01-Jan-2013 | 01-Jan-2023 | 14 Int. | Advance Watch Company, Ltd. |
| US | HYDRO PUSHERS | 77/448206 | 3755354 | Registered | 15-Apr-2008 | 02-Mar-2010 | 02-Mar-2020 | 14 Int. | Advance Watch Company, Ltd. d/b/a Geneva Watch Gro |
| US | icvrd and Design | 85/267304 | 4089062 | Registered | 15-Mar-2011 | 17-Jan-2012 | 17-Jan-2022 | 14 Int. | Advance Watch Company, Ltd. |
| US | JULES + JAMES | 85/116591 | 4210628 | Registered | 26-Aug-2010 | 18-Sep-2012 | 18-Sep-2022 | 14 Int. | Advance Watch Company, Ltd. |
| US | MAKE A-FACE | 86/031576 | 4769332 | Registered | 07-Aug-2013 | 07-Jul-2015 | 07-Jul-2025 | 14 Int. | Advance Watch Company, Ltd. |
| US | MAKO | 75/335150 | 2250895 | Registered | 04-Aug-1997 | 08-Jun-1999 | 08-Jun-2019 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| US | NITRO | 85/182260 | 4119335 | Registered | 22-Nov-2010 | 27-Mar-2012 | 27-Mar-2022 | 14 Int. | Advance Watch Company, Ltd. |
| US | ORGANTICK | 77/863759 | 4056858 | Registered | 03-Nov-2009 | 15-Nov-2011 | 15-Nov-2021 | 14 Int. | Advance Watch Company, Ltd. |
| US | QUICKTOUCH | 77/967275 | | Opposed | 24-Mar-2010 | | | 14 Int. | Advance Watch Company, Ltd. |
| US | SHARK | 74/063824 | 1640415 | Registered | 29-May-1990 | 09-Apr-1991 | 09-Apr-2021 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |
| US | SHARK FIN DESIGN | 74/375056 | 1809077 | Registered | 01-Apr-1993 | 07-Dec-1993 | 07-Dec-2023 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle |
| US | SHARK TIDE | 75/335059 | 2578975 | Registered | 04-Aug-1997 | 11-Jun-2002 | 11-Jun-2022 | 14 Int. | Sunburst Products, Inc. d/b/a Freestyle U.S.A. |

15

| COUNTRY NAME | TRADEMARK | APP NO. | REG NO. | STATUS | FILED | REGISTERED | RENEWAL DUE | CLASS | OWNER |
|---|---|---|---|---|---|---|---|---|---|
| US | SHARK TOOTH | 86/452417 | | Allowed | 21-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| US | TIME READY TECHNOLOGY | 77/437047 | 3815024 | Registered | 01-Apr-2008 | 06-Jul-2010 | 06-Jul-2020 | 14 Int. | Advance Watch Company, Ltd. |
| US | TOUCH&GO | 85/001891 | | Published | 30-Mar-2010 | | | 14 Int. | Advance Watch Company, Ltd. |
| US | ULTIMATE | 74/489548 | 2018602 | Registered | 14-Feb-1994 | 26-Nov-1996 | 26-Nov-2016 | 14 Int. | Advance Watch Company, Ltd. |
| US | ULTRATECH | 75/738986 | 2422222 | Registered | 29-Jun-1999 | 16-Jan-2001 | 16-Jan-2021 | 14 Int. | Advance Watch Company, Ltd. |
| Venezuela | FREESTYLE | 2008-021598 | P305651 | Registered | 03-Nov-2008 | 06-Oct-2010 | 06-Oct-2025 | 14 Int. | Sunburst Products, Inc. |
| Venezuela | SHARK FIN DESIGN | 2008-021600 | P311764 | Registered | 03-Nov-2008 | 10-Nov-2011 | 10-Nov-2026 | 14 Int. | Sunburst Products, Inc. |
| Venezuela | SHARK TOOTH | 2014-017603 | | Pending | 14-Nov-2014 | | | 14 Int. | Sunburst Products, Inc. |
| | SHARK | | | Unfiled | | | | 14 Int. | |
| | WATCH DESIGN | | | Unfiled | | | | | Advance Watch Company, Ltd. |

16

## SCHEDULE 1.1(c)

### Purchased Contracts

1. Omnibus License Agreement Renewal, dated as of January 1, 2012, by and among Advance Watch Company Ltd., Kenneth Cole Productions (LIC), and Kenneth Cole Productions, Inc.

2. Trademark License Agreement, dated as of March 12, 2009, by and between Advance Watch Company Ltd. and Tommy Bahama Group, Inc., as extended by that certain Extension of Trademark License Agreement for Renewal Period dated September 11, 2012, as amended by that certain First Amendment to Trademark License Agreement dated March 22, 2012, as further amended by that certain Second Amendment to Trademark License Agreement dated May 5, 2015.

3. License Agreement, dated as of November 7, 2007, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker, as amended by that certain First Amendment to License Agreement dated as of January 1, 2012, as further amended by that certain Second Amendment to License Agreement dated as of February 23, 2015.

4. Commercial Street Contribution Agreement, dated December 19, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker.

5. License Agreement, dated as of August 10, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Christian Casey L.L.C.

6. Retail Product License Agreement, dated as of August 7, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NBA Properties, Inc., as amended by that certain First Amendment to Retail Product License Agreement dated August 24, 2014.

7. License Agreement, dated as of April 1, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NFL Properties LLC.

8. Retail License Agreement, dated July 18, 2013, by and among Advance Watch Company Ltd. d/b/a Game Time LLC, NHL Enterprises, L.P. and NHL Enterprises Canada, L.P.

9. Standard Retail Product License Agreement, dated as of July 13, 2012, by and between Advance Watch Company Ltd. and Collegiate Licensing Company, as amended by that certain Addendum dated December 18, 2014.

10. License Agreement, dated as of September 1, 2011, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group, Sperry Top-Sider LLC and SR Holdings, LLC, as amended by that certain First Amendment to License Agreement dated December __, 2014.

9942447-v10

11. License Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Steve Harvey Products, Inc./ Steve Harvey.

12. License Agreement, dated as of April 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Soccer United Marketing, LLC.

13. License Agreement for the period from January 1, 2014 through December 31, 2015 by and between Advance Watch Company Ltd. and Major League Baseball Properties, Inc.

14. Licensing Agreement Renewal for the period from July 1, 2015 to June 30, 2016 by and between Advance Watch Company Ltd. and The Ohio State University.

15. Licensing Agreement Renewal through December 27, 2015 by and between Advance Watch Company Ltd. and University of Iowa.

16. Licensing Agreement Renewal for the period from 2015 to 2016 by and between Advance Watch Company Ltd. and Learfield Licensing Partners.

17. License Agreement between Surfline/Wavetrak, Inc. and Advance Watch Company Ltd. d/b/a Geneva Watch Group dated April 1, 2015.

18. Draft Endorsement Agreement between Sunburst Products, Inc. d/b/a Freestyle U.S.A. and Clark Little dated as of February 1, 2015.

19. Distribution Agreement between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Hang Ten Distribution SA dated November 1, 2014.

20. Distribution Agreement between  Advance Watch Company Ltd. d/b/a Geneva Watch Group and Roshan Commercial Corporation dated June 1, 2014.

21. Distribution Agreement between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Wake Action Sports Ltd. dated October __, 2013.

22. Agreement between Roma Industries LLC and Advance Watch Company Ltd d/b/a Geneva Watch Company Group dated September _, 2009.

23. Distribution Agreement, dated as of May 1, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Arista Singapore Pte Ltd.

24. Distribution Agreement, dated as of September 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Carmen Jewelers.

25. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and GDL Manufacturing Ltd.

26. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and GDL Manufacturing Ltd.

18

27. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Global Tic Sales Inc.

28. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Priority Marketing PVT. Ltd.

29. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Timestore AG.

30. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Chronosoft PTE LTD.

31. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CNB Distributors, LLC.

32. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Comercializadora E-Akluck, S.A. de C.V.

33. Distribution Agreement, dated as of March 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Marlox AG.

34. Distribution Agreement, dated as of November 6, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Merkez Saat Tic.A.S.

35. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New City, Inc.

36. Distribution Agreement, dated as of June 15, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New Sense Development Ltd.

37. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and PT. Sukses Sinar Abadi.

38. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

39. Distribution Agreement, dated as of September 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

40. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and TBN Time Distribution LLC.

41. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Time Deco Corporation Limited, as amended by that certain First Amendment dated October 1, 2014.

42. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Paidel Watch Co., Ltd.

43. Distribution Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Styleright Global Corporation.

44. Standard Vendor Agreement for Merchandise, dated February 24, 2015, by and between Geneva Watch Group and Boscov's Department Store, LLC.

45. Vendor Agreement, dated _____, 2014, by and between Advance Watch Company Ltd. and Helzberg's Diamond Shops, Inc.

46. Amazon Vendor Terms and Conditions effective March 21, 2015 for various brands.

47. Freight Allowance Agreement No. 7178800, dated on or around April 1, 2015, by and between Breil Milano and Amazon Fulfillment Services, Inc.

48. Trading Terms Agreement, dated February 1, 2014, by and between Geneva Watch Group and The Nuance Group.

49. Letter Agreement regarding Acquisition of "Mathey Tissot" Trademark, dated March 11, 1996, by and among Geneva Watch Company, Mathey Tissot International, Ltd. and Mathey Tissot S.A.

50. Letter Agreement regarding Agreement regarding Mathey Tissot Watch Product, dated May 16, 1996, by and among Geneva Watch Company, JBM Venture Co., Inc. and Jan Bell Marketing, Inc.

51. Letter Agreement regarding grant of license, dated August 17, 2015, by and among Geneva Watch Group and LaCrosse Technology.

52. Agreement, dated August 26, 2015, by and among Advance Watch Company (Far East) Limited, Advance Watch Company Ltd., Wells Fargo Bank, National Association, Koo Chi Sum and Yen Ching Wai, David c/o Ernst and Young Transactions Limited.

53. Irrevocable Transferable Standby Letter of Credit, dated August 19, 2015, by and among Israel Discount Bank of New York and Allura Imports, Inc.

54. Corporate Services Commercial Account Agreement between American Express Travel Related Services Company, Inc. and Advance Group Inc. dated February 24, 2015.

Real Property Leases:

55. Lease, dated February 18, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and 1407 Broadway Real Estate, LLC, as assigned by landlord to SRI Eleven 1407 Broadway Operator, LLC.

56. Sublease Agreement, dated January 30, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Allura Imports, Inc.

9942447-v10

57. Multi-Tenant Building Lease, dated May 1, 2009, by and between Advance Watch Company Ltd. and C.J. Segerstrom & Sons, as amended by that certain First Amendment of Lease Agreement dated May 22, 2012, and by that certain Second Amendment of Lease Agreement dated July 28, 2015.

58. Renewal Lease Form, dated July 10, 2015, by and between Binda USA Holdings Inc. and Columbus 60th Realty LLC.

<u>Employee Benefit Plans:</u>

1. Cigna Health and Life Insurance Co. and Geneva Watch Group, Inc., Policy No. 3329054, Effective Date 1/1/13 for Group Contract of Pre-Paid Dental Plan Services;

2. Cigna Health and Life Insurance Co. and Geneva Watch Group, Inc., Policy No. 3329054, Effective Date 1/1/13 for Cigna Dental Choice;

3. Cigna Health and Life Insurance Co. and Geneva Watch Group, Inc., Policy No. 3329054, Effective Date 1/1/13 for Cigna Medical, Dental and Vision;

4. Cigna Life Insurance Company of New York and Advanced Watch Company, LTD dba Geneva Watch Group, Policy No. FLY-960293, Effective Date 1/1/13 for Life Insurance benefits;

5. Cigna Life Insurance Company of New York and Advanced Watch Company, LTD dba Geneva Watch Group, Policy No. YOK-960306, Effective Date 1/1/13 for Accidental Death and Dismemberment benefits;

6. Cigna Life Insurance Company of New York and Advanced Watch Company, LTD dba Geneva Watch Group, Policy No. BNK-960100, Effective Date 1/1/13 for Long Term Disability benefits; and the last one is identified as

7. Administrative Services Agreement for Short Term Disability between Advanced Watch Company, LTD dba Geneva Watch Group and Life Insurance Company of North America, No. SHD-962248, Effective Date 1/1/13.

21

## SCHEDULE 1.1(d)

## Purchased Intellectual Property

All Intellectual Property and related Software and Technology of the Sellers relating to the Business, including, without limitation, those items set forth on Schedule 1.1(a).

22

**SCHEDULE 2.1**

**Additional Purchased Assets**

None.

## SCHEDULE 2.1(q)

## Critical Trade Vendors

None.

## SCHEDULE 2.2

### Additional Excluded Assets

None.

**SCHEDULE 2.3(a)**

**Assumed Liabilities**

| Counter Party | Description | Net Amount Owed |
|---|---|---|
| Dillard's Inc. | Net Customer Program Credit | $444,857 |

26

## SCHEDULE 2.6(c)

### Designation Rights Contracts

Real Property Lease:

Lease Agreement, dated as of September 6, 2001, by and between Advance Watch Company Ltd. and 47440 Michigan Ave., LLC (as successor in interest to Tianz, Inc., successor in interest to Ashley Canton, LLC), as amended by that certain First Amendment dated April 15, 2002, that certain Second Amendment dated May 28, 2002, that certain Third Amendment dated June 18, 2006, that certain Fourth Amendment dated March 8, 2010, and that certain Fifth Amendment to Lease dated March 26, 2013, and that certain Sixth Amendment to Lease, dated as of October 28, 2015.

Personal Property Leases:

Lease Agreement, dated July 21, 2014, by and between Advance Watch Company Ltd. and CIT Finance LLC.

Lease Agreement, dated July 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CIT Finance LLC.

Lease Agreement (Lease No. 001-007914733-002), dated August 5, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

Lease Agreement (Lease No. 001-007914733-003), dated September 8, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

ValuePlan Lease Agreement, dated March 16, 2015, by and between Geneva Watch Group and IBM Credit LLC.

Lease Agreement, dated May 28, 2013, by and between Advance Watch Company Ltd. and LDI Color Toolbox.

License Agreements:

Licensing Agreement Renewal to September 2016 by and between Advance Watch Company Ltd. and Fermata Partners.

Trademark License Agreement, dated as of May 22, 2012, by and between Advance Watch Company Ltd. and Michigan State University.

9942447-v10

## SCHEDULE 5.7

### Litigation

1.  **Tissot SA**: Tissot SA opposed Advance Watch Company Ltd.'s trademark application, Serial #: 85024910, with the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Case No.: 91197947-OPP, filed December 21, 2010.

2.  **Staffing Network, LLC**: Staffing Network, LLC brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Staffing Network, LLC v. Advance Watch Company Ltd.,* Circuit Court of Cook County, Illinois, Case No.: 2015L007893.

3.  **Aura Merchandising, Ltd.**: Aura Merchandising, Ltd. brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Aura Merchandising, Ltd. v. Advance Watch Company Ltd. d/b/a Geneva Watch Group*, Supreme Court of the State of New York, Index No.: 158041/2015, filed August 6, 2015.

4.  **Talenthub Worldwide, Inc.**: Talenthub Worldwide, Inc. brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Talenthub Worldwide, Inc. v. Advance Watch Company Ltd., d/b/a Geneva Watch Group*, Supreme Court of the State of New York, Index No.: 157647/2015, filed July 27, 2015.

5.  **LHI Liquidation Co., Inc.**: LHI Liquidation Co., Inc. brought a preference claim against Geneva Watch Group Inc., captioned *Peter S. Kravitz, Litigation Trustee For the LHI Liquidation Co., Inc. et al. Litigation Trust v. Geneva Watch Group, Inc.*, United States Bankruptcy Court, Southern District of New York, Case No.: 13-14050 (MG).

6.  **Noreen Deleon-Moreno**: Noreen Deleon-Moreno brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Noreen Deleon-Moreno v. Advance Watch Company Ltd., d/b/a Geneva Watch Group*, Civil Court of the City of New York, County of New York, Index No.: CV-019130-15/NY.

7.  **KMJ Brand Holdings LLC**: A judgment was issued against Advance Watch Company Ltd., d/b/a Geneva Watch Company, captioned *KMJ Brand Holdings LLC v. Advance Watch Company Ltd., d/b/a Geneva Watch Company*, Supreme Court of the State of New York, Index No.: 159367/2015, filed September 18, 2015.

9942447-v10

## SCHEDULE 5.12

### Tax

None.

## SCHEDULE 5.13

### Employee Benefit Plans

401(K) Plan

Medical Insurance provided through CIGNA

Dental Insurance provided through CIGNA

Vision Service Plan provided through CIGNA

Basic Life Insurance & Accidental Death & Dismemberment provided through CIGNA

Voluntary Life Insurance provided through CIGNA

Long Term Disability Insurance provided through CIGNA

Short Term Disability Insurance provided through CIGNA

Flexible Spending Accounts provided through ADP

Health Savings Accounts

The Company has a Compensated Time Off Allowance that provides each employee a number of paid days off, ranging between ten (10) and twenty-five (25), each calendar year depending on length of service with the Company.

The Company has ten (10) paid holidays scheduled each calendar year.

**SCHEDULE 5.14(a)**

**Labor Matters**

None.

## SCHEDULE 5.14(e)

### Employment and Consulting Agreements

Consultant Agreement between the Company and Gary Bollinger.

Consultant Agreement between the Company and Peter Leung.

9942447-v10

**SCHEDULE 9.1(f)**

**Cure Amounts**

The aggregate Cure Amount (exclusive of "Common Area Maintenance" adjustments for the applicable lease year in which the Closing occurs pursuant to the terms of Real Property Leases that are Purchased Assets) of the Purchased Contracts set forth on <u>Schedule 1.1 (c)</u> is $500,000.

## **Schedule 9.1(j)**

- Kenneth Cole
- Ted Baker
- Tommy Bahama
- Sperry
- Sean John
- The sports league licenses associated with the Game Time brand.

## SCHEDULE A TO SETTLEMENT TERM SHEET

Budget

**Schedule A**
**Funded Plan Payment**

|  | Projected Total |
|---|---|
| ***(i) Allowed Adminstaistrative Expense Claims*** | |
| Accounting | **80,000** |
| Commissions | **45,000** |
| Freight | **15,000** |
| HR | **2,700** |
| IT | **125,000** |
| Legal | **75,000** |
| Marketing | **20,000** |
| Miscellaneous | **2,000** |
| Insurances | **76,000** |
| Rent | **15,000** |
| Temporary Labor | **35,000** |
| Warehouse | **12,950** |
| Payroll | **397,500** |
| ADP (payroll processing) | **761** |
| T&E | **15,000** |
| Venable | **455,000** |
| 503(b) 9 Claims | **25,000** |
| Chief Restructuring Officer | **(50,000)** |
| Otterbourg | **200,000** |
| Imperial Capital | **400,000** |
| Claims Agent | **120,000** |
| Trustee Fees | **25,000** |
| Responsible Officer | **32,000** |
| Interest | **25,000** |
| Inventory Purchases via LC@Sight | **207,042** |
| Customs | **15,000** |
| Freight | **150,000** |
| ***Total*** | ***2,520,953*** |
| | |
| ***(ii) Allowed Priority Claims*** | |
| | |
| Shippers/ Utility/Tax/Admin Claims | **100,000** |
| ***Total*** | ***100,000*** |
| | |
| (iii) Allowed Secured Claims other than the DIP Financing | |
| None | - |
| | |
| (iii) Committee Allocation Payment | |
| UCC - Allocation Payment | **725,000** |
| | |
| ***Total Funded Plan Payments*** | ***3,345,953*** |

## SCHEDULE B TO SETTLEMENT TERM SHEET

Restructuring Expenses Budget

**Schedule B**
**Restructuring Expenses**

|  | Projected Total |
|---|---|
| **Restructuring expenses** | |
| Venable | **455,000** |
| Chief Restructuring Officer | **(50,000)** |
| Otterbourg | **200,000** |
| Imperial Capital | **400,000** |
| Claims Agent | **120,000** |
| 503(b) 9 Claims | **25,000** |
| Shippers/ Utility/Tax/Admin Claims | **100,000** |
| Trustee Fees | **25,000** |
| Responsible Officer | **32,000** |
| **Total** | **1,307,000** |