**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------- x

In re:

ADVANCE WATCH COMPANY LTD., et al.,

              Debtors.[1]

---------------------------------------------------------------- x

: Chapter 11

: Case No. 15-12690 (MG)

: Jointly Administered

## ORDER (I) APPROVING ASSET PURCHASE AGREEMENT BETWEEN DEBTORS AND BUYER, (II) APPROVING SALE OF SUBSTANTIALLY ALL ASSETS AND ASSUMPTION OF CERTAIN LIABILITIES FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (III) APPROVING ASSUMPTION, ASSIGNMENT, AND SALE OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (IV) DETERMINING AMOUNTS NECESSARY TO CURE SUCH EXECUTORY CONTRACTS AND UNEXPIRED LEASES

Binda USA Holdings, Inc., Advance Watch Company Ltd., Sunburst Products, Inc., and GWG International, Ltd., the debtors and debtors-in-possession (collectively, the "**Debtors**") having filed their *Motion for Entry of Orders (I) Approving Sale Procedures for the Sale of Certain of the Debtors' Assets Free and Clear of All Liens, Claims, and Encumbrances Pursuant to Section 363 of the Bankruptcy Code, (II) Approving Certain Bidding Protections, (III) Approving the Form and Manner of Notice of the Sale and Assumption and Assignment of Executory Contracts and Unexpired Leases, (IV) Scheduling an Auction and Sale Hearing, and (V) Approving Such Sale* [Docket No. 17] (the "**Sale Motion**"), seeking, among other things, entry of an order (a) approving the sale of certain of the Debtors' assets pursuant to that certain Asset Purchase Agreement, dated September 29, 2015 (as amended, supplemented or modified,

---

[1] The Debtors in these Chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Advance Watch Company, Ltd. (8061); Binda USA Holdings, Inc. (8916); Sunburst Products, Inc. (5972), and GWG International, Ltd. (2468).

the "**Asset Purchase Agreement**"),[2] by and between the Debtors and Sunshine Time Inc. (the

"**Buyer**"); (b) providing, among other things, for the sale by the Debtors to the Buyer of the

Purchased Assets[3] and the assumption, assignment, and sale to Buyer of the Purchased Contracts

and Assumed Liabilities; and (c) authorizing the consummation of the transactions contemplated

therein (the "**Transaction**"); and this Court having entered an order on October 23, 2015

[Docket No. 105] (the "**Bidding Procedures Order**") approving, among other things, the

bidding procedures with respect to, and notice of, the Transaction; and an auction having been

set for **November 9, 2015, at 9:00 a.m. (Eastern Time)** in accordance with the Bidding

Procedures Order; and no Qualified Bidders (as that term is defined in the Bidding Procedures

Order) having submitted competing bids for the Debtors' assets; and the Debtors, after

consultation with the Official Committee of Unsecured Creditors (the "**Committee**"), having

determined that the Asset Purchase Agreement represents the highest or otherwise best bid for

the Purchased Assets, Purchased Contracts, Designation Rights Contracts (defined below), and

Assumed Liabilities; and a hearing having been held on **November 12, 2015, at 2:00 p.m.**

**(Eastern Time)** (the "**Sale Hearing**") to consider approval of the sale of the Purchased Assets to

the Buyer (as well as the assumption by the Debtors and assignment and sale to the Buyer of the

Purchased Contracts, and the designation of the Debtors' rights and obligations under the

Designation Rights Contracts) pursuant to the terms and conditions of the Asset Purchase

Agreement; and adequate and sufficient notice of the Sale Motion and Sale Hearing having been

given to all parties in interest in these cases; and all such parties having been afforded due

process and an opportunity to be heard with respect to the Sale Motion and all relief requested

---

[2]    A true and correct copy of the Asset Purchase Agreement is attached hereto as **Exhibit 1**.

[3]    All capitalized terms not otherwise defined shall have the same meaning as set forth in the Asset Purchase
       Agreement.

therein; and the Court having reviewed and considered: (a) the Sale Motion; (b) the objections to

the Sale Motion and the Debtors' reply thereto; and (c) the arguments of counsel made, and the

evidence proffered or adduced, at the Sale Hearing; and the Sale Hearing having been held; and

after due deliberation and sufficient cause appearing;

IT IS HEREBY FOUND AND DETERMINED THAT:[4]

A.      This Court has jurisdiction over the Sale Motion under 28 U.S.C. §§ 157 and

1334, and this matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  Venue of

these cases and Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.      The statutory bases for the relief requested herein are §§ 105, 363, 365, and 503

of title 11 of the United States Code (the "**Bankruptcy Code**"), Rules 2002, 6004, 6006, 9007,

and 9014 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**"), and Rule

9013-1(a) of the Local Bankruptcy Rules for the Southern District of New York (the "**Local

Bankruptcy Rules**").

C.      As evidenced by the affidavits of service on file with the Court, (i) due, proper,

timely, adequate, and sufficient notice and a reasonable opportunity to object or be heard with

respect to the Sale Motion and the relief requested therein has been provided in accordance with

the Bankruptcy Code, the Bankruptcy Rules, the Local Bankruptcy Rules, the Bidding

Procedures Order, and the Asset Purchase Agreement; (ii) such notice was good, sufficient, and

appropriate under the circumstances; and (iii) no other or further notice of the Sale Motion is

required.

D.      The bidding-related procedures established by the Bidding Procedures Order have

been complied with in all material respects by the Debtors and Buyer.   The Debtors, in

---

[4]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings
of fact where appropriate.  See Fed. R. Bankr. P. 7052.

consultation with the Committee, have determined that the Asset Purchase Agreement represents the highest or otherwise best bid for the Purchased Assets, Purchased Contracts, Designation Rights Contracts, and Assumed Liabilities.  No other Qualified Bidders submitted competing bids for the Debtors' assets.

E.      Upon entry of this Sale Order, the Debtors shall have full authority to consummate the Transaction contemplated by the Asset Purchase Agreement.

F.      Approval of the Asset Purchase Agreement and consummation of the Transaction is in the best interests of the Debtors, the Debtors' estates, the Debtors' creditors, and other parties in interest.  The Debtors have demonstrated good, sufficient, and sound business purposes and justifications for the sale to Buyer pursuant to § 363(b) of the Bankruptcy Code.

G.      The Asset Purchase Agreement was negotiated, proposed, and entered into by the Debtors and Buyer without collusion, in good faith, and from arm's-length bargaining positions. The Debtors and Buyer have not engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under § 363(n) of the Bankruptcy Code.

H.      The Buyer is a good faith purchaser under § 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby.  Buyer is acting in good faith within the meaning of § 363(m) in consummating the Transaction.

I.      The consideration to be provided by Buyer pursuant to the Asset Purchase Agreement (i) is fair and reasonable; (ii) is the highest or otherwise best offer for the Purchased Assets; (iii) will provide greater recovery for the Debtors' creditors than would be provided by any other practically available alternative; and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, and any state, territory, possession, and the District of Columbia.

J.        The transfer of the Purchased Assets to the Buyer will be a legal, valid, and effective transfer of the Purchased Assets and, except as provided in the Asset Purchase Agreement, will vest the Buyer with all right, title, and interest of the Debtors to the Purchased Assets free and clear of all liens, claims (other than Assumed Liabilities), encumbrances, interests, and other interests of any kind and every kind whatsoever (including liens, claims, encumbrances, and interests of any Governmental Body); provided, however, that all such liens, claims, encumbrances, and interests shall attach to the proceeds of the sale in order of priority.

K.        Subject to the provisions of this Sale Order and except as may be provided in the Asset Purchase Agreement, the Debtors may sell the Purchased Assets free and clear of all liens, claims, encumbrances, and interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in § 363(f)(1) through (5) of the Bankruptcy Code have been satisfied.

L.        The (i) transfer of Purchased Assets to the Buyer, (ii) assumption by the Debtors and assignment and sale to the Buyer of the Purchased Contracts, and (iii) designation of rights and obligations under the Designation Rights Contracts, as applicable, will not subject the Buyer to any liability whatsoever (including any successor liability) with respect to the operation of the Business prior to the Closing or by reason of such transfer, assignment, or designation, except that the Buyer shall remain liable for all Assumed Liabilities and any other liabilities that the Buyer has specifically agreed to assume pursuant to the Asset Purchase Agreement and this Order.

M.        The Asset Purchase Agreement is a valid and binding contract between the Debtors and Buyer, which is and shall be enforceable according to its terms.

N.       Notice of the Sale Motion has been provided to each non-debtor party to a Purchased Contract or Designation Rights Contract, together with a statement therein from the Debtors with respect to the amount, if any, to be paid to such non-debtor party to cure any defaults under, and to otherwise comply with the requirements of § 365 of the Bankruptcy Code with respect to the Purchased Contract to which such non-debtor is a party (the "**Cure Amounts**").   As to each Purchased Contract and Designation Rights Contract, payment of the Cure Amounts, as set forth in **Exhibit 2** hereto, is sufficient for the Debtors to comply fully with the requirements of § 365(b) of the Bankruptcy Code.   In addition, the Buyer has provided adequate assurance, within the meaning of § 365(c) of the Bankruptcy Code, of the Buyer's ability to perform its obligations under each of (i) the Purchased Contracts and (ii) the executory contracts and leases identified on Schedule 2.6(c) to the Asset Purchase Agreement (the "**Designation Rights Contracts**").   Therefore, the Purchased Contracts and Designation Rights Contracts may be assumed by the Debtors and assigned and sold to the Buyer.

O.       The sale of the Purchased Assets to the Buyer includes the transfer of "personally identifiable information" (as that term is defined in § 101(41)(A) of the Bankruptcy Code).   After due and proper notice and the Sale Hearing, the Court specifically finds that no consumer privacy ombudsman need be appointed under § 363(b)(1) of the Bankruptcy Code because the privacy policies in effect at the time of the Sale Hearing were the policies in effect at the time the Debtors collected the personally identifiable information from all of the customers whose information is being sold and that the Transaction is consistent in every way with the terms of such policies.   Further, the Buyer has agreed to use the customer information only in accordance with the privacy policies of the Debtors.

P.      There is other good and sufficient cause to grant the relief requested in the Sale

Motion and approve the Asset Purchase Agreement and the Transaction.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1.      The Sale Motion is GRANTED and approved in all respects.

2.      Any objections to the entry of this Sale Order or the relief granted herein and

requested in the Sale Motion that have not been withdrawn, waived, or settled, and all

reservations of rights included therein, are hereby DENIED and OVERRULED,

3.      The Asset Purchase Agreement, including all of its terms and conditions, and the

Transaction are hereby approved.

4.      Pursuant to §§ 363 and 365 of the Bankruptcy Code, the Debtors are authorized

and directed to execute, deliver, and perform under, consummate, and implement the Asset

Purchase Agreement together with all additional instruments and documents that are requested

by the Buyer and may be reasonably necessary or desirable to implement the Asset Purchase

Agreement, and to take any and all actions as it deems necessary, appropriate, or advisable for

the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer or

reducing to possession, the Purchased Assets, or as may be necessary or appropriate to the

performance of obligations as contemplated by the Asset Purchase Agreement, including,

without limitation, any and all actions reasonably requested by Buyer which are consistent with

the Asset Purchase Agreement.

5.      Notwithstanding anything in this Order or otherwise, on the Closing Date, the

proceeds of the Sale of Debtors' Assets shall be paid to Wells Fargo Bank, National Association

for permanent application and complete satisfaction of the Pre-Petition Obligations and DIP

Obligations (as defined in the *Final Order (I) Authorizing the Debtors to Obtain Postpetition*

*Financing and Grant Security Interests and Superpriority Administrative Expense Status; (II) Modifying the Automatic Stay; (III) Authorizing the Debtors to Enter into Agreements with Wells Fargo Bank, National Association; (IV) Scheduling a Final Hearing; and (V) Granting Related Relief* (the "**Final DIP Order**") entered contemporaneously with this Order).

6.      Pursuant to §§ 105(a), 363(f), and 365(b) of the Bankruptcy Code, upon the Closing: (i) the transfer of the Purchased Assets to the Buyer pursuant to the Asset Purchase Agreement shall constitute a legal, valid, and effective transfer of the Purchased Assets and shall vest the Buyer with all right, title, and interest in and to the Purchased Assets; (ii) the Purchased Assets shall be transferred to the Buyer free and clear of all Liens (other than Liens specifically assumed by Buyer and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and interests, and other interests of any kind and every kind whatsoever (including Liens, claims, encumbrances and interests of any Governmental Body) against such assets, in accordance with § 363(f) of the Bankruptcy Code, with any such Liens, claims, encumbrances and interests to attach to the proceeds of the Transaction, in the order of their priority, with the same validity, force, and effect which they had against the Purchased Assets prior to the entry of this Sale Order, subject to any rights, claims, and defenses the Debtors and all interested parties may possess with respect thereto; and (iii) each of the Purchased Contracts shall be deemed assumed by the Debtors and assigned and sold to the Buyer as of the Closing of the Transaction.

7.      This Sale Order is and shall be effective as a determination that all Liens, claims, encumbrances and interests shall be and are, without further action by any person or entity, released with respect to the Purchased Assets as of the Closing Date, except as may otherwise be set forth in the Asset Purchase Agreement.

8.      Buyer shall not be deemed or considered a successor to the Debtors or the Debtors' estates by reason of any theory of law or equity and Buyer has not assumed nor is in any way responsible for any liability or obligation of the Debtors or the Debtors' estates, except as otherwise expressly provided in the Asset Purchase Agreement or this Sale Order.

9.      Notwithstanding anything in this Sale Order or the Asset Purchase Agreement to the contrary, following the closing of the sale to the Buyer, the Debtors shall retain:

(i)     any and all causes of action and rights to recover or avoid transfers or to avoid any lien under chapter 5 of the Bankruptcy Code or applicable state law or otherwise, including, but not limited to, §§ 502, 506, 510, 522, 541, 542, 543, 544, 545, 546, 547, 548, 549, 550, 551 or 553 of the Bankruptcy Code, and the proceeds thereof, or otherwise to exercise the avoidance powers provided under the Bankruptcy Code, including any of the Debtors' or the estates' claim, counterclaim, setoff or offset rights (except for rights, claims or causes of action that arise under chapter 5 of the Bankruptcy Code against Jeffrey L. Gregg and Tadd Crane);

(ii)    the right to use rights, claims or causes of action of the Debtors  against third parties other than tax authorities relating to the assets, properties, Business or operations of the Debtors arising out of events occurring on or prior to the sale closing, other than causes of action under chapter 5 of the Bankruptcy Code, solely and for no other purpose than as a defense or objection to a proof of claim filed in the Bankruptcy Cases;

(iii)   direct or derivative claims or causes of action against any and all current and former officers, directors, shareholders, members, mangers, employees, affiliates

or insiders of the Debtors (<u>except</u> Jeffrey L. Gregg and Tadd Crane), including but not limited to for breach of fiduciary duty or aiding and abetting breach of fiduciary duty, or under and pursuant to any D&O or fiduciary insurance policies (including for bad faith) maintained by the Debtors;

(iv)    the right to seek a determination by the Bankruptcy Court of any tax, fine or penalty relating to a tax, or any addition to a tax, under § 505 of the Bankruptcy Code; and

(v)    all assets, rights, claims or causes of action not transferred to the Buyer pursuant to this Sale Order or the Asset Purchase Agreement, including but not limited to the Excluded Assets (as defined in the Asset Purchase Agreement).

10.    Pursuant to § 365 of the Bankruptcy Code, the Debtors are authorized to assume the Purchased Contracts designated in the Asset Purchase Agreement, cure the same (in the Cure Amounts set forth on **<u>Exhibit 2</u>** hereto, or by further order of the Court, with such Cure Amounts to be paid by Buyer) as set forth in the Asset Purchase Agreement, and assign and sell the Purchased Contracts to the Buyer.

11.    The Purchased Contracts, consistent with the provisions contained herein, shall be transferred to, and remain in full force and effect for the benefit of, the Buyer in accordance with their respective terms, notwithstanding any provision in any such Purchased Contract (including those of the type described in § 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to § 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to the Purchased Contracts (except as set forth in the Asset Purchase Agreement) after such assignment and sale to the Buyer.

12.    All defaults or other obligations of the Debtors under the Purchased Contracts arising or accruing prior to the Closing (without giving effect to any acceleration clauses or any default provisions of the kind specified in § 365(b)(2) of the Bankruptcy Code) shall be deemed cured, upon payment of the Cure Amount by the Buyer, and the Buyer shall have no liability or obligation arising or accruing under the Purchased Contracts on or prior to the Closing, except as otherwise provided in the Asset Purchase Agreement.  The non-debtor parties to the Purchased Contracts are barred from asserting against the Debtors, Buyer, and their respective successors and assigns, any default or unpaid obligation allegedly arising or occurring before the Closing, any pecuniary loss resulting from such default, or any other obligation under the Purchased Contracts arising or incurred prior to the Closing, other than the Cure Amounts.

13.    With respect to the Trademark License Agreement dated as of March 18, 2009 (as amended or modified, the "**TBG License**") with Tommy Bahama Group, Inc. ("**TBG**"), the Debtors may only assume and assign such agreement with the written consent of TBG.  If such written consent is provided at or prior to Closing, the TBG License shall be deemed and treated as a Purchased Contract.  To the extent that TBG does not provide such written consent prior to the Closing, the Buyer may direct the Debtors at or prior to the Closing, to add the TBG License to the list of Designated Rights Contracts and thereafter, the TBG License shall be deemed and treated as a Designated Rights Contract.

14.    Subject to the provisions of Asset Purchase Agreement and this Sale Order, the Debtors, with the written consent of Buyer, may add any Purchased Contract to the list of Designated Rights Contracts or any Designated Rights Contract to the list of Purchased Contracts at or prior to Closing and once added, any such contract shall be deemed and treated as a Designated Rights Contract or Purchased Contract, as the case may be.  To the extent that the

lists of Purchased Contracts and Designated Rights Contracts change from the date of this Sale

Order prior to Closing, the Debtors shall file with the Court promptly after the Closing, a revised

list of Purchased Contracts and Designated Rights Contracts.

15.    The following procedures are approved and shall apply with respect to the

Designation Rights Contracts:

a.    From the date of this Sale Order through the date that is the earlier of (i) one
hundred and twenty (120) days after the Petition Date and (ii) confirmation of a
plan of reorganization or liquidation in the Bankruptcy Cases, the Debtors will
provide Buyer, at Buyer's expense, with the rights and benefits under the
Designation Rights Contracts.  Buyer's access to and use of the real and personal
property subject to the Designation Rights Contracts will be subject to and
consistent with the Debtors' obligations, if any, to third parties with respect to
such Designation Rights Contracts; and Buyer will perform such obligations as
required and shall assume all liability for any damage or destruction to such real
and personal property as a result of such access and use.  In addition to the sale
proceeds, Buyer shall promptly pay the reasonable and actual incremental costs or
administrative claims incurred by Debtors as a result of providing such rights and
benefits to Buyer or due to the deferral of the decision to reject each such
Designation Rights Contract in order to provide such use or access and shall name
Debtors as an additional insured on any insurance policy (including liability and
casualty policies) covering such real and personal property.

b.    With respect to the landlord in Michigan (as defined in the objection filed under
docket number 147) (the "**Michigan Landlord**") only, Buyer shall pay any such
amounts directly to the Michigan Landlord to the Designation Rights Contract to
which the Michigan Landlord is a party (as may be amended from time to time,
the "**Michigan Lease**"), and any such payment shall not be property of the
Debtors' bankruptcy estates.  Notwithstanding anything in the Asset Purchase
Agreement (as amended from time to time) to the contrary, there has been and
shall be no novation or releases of Sellers' obligations under the Michigan Lease
unless or until the Michigan Lease is rejected by the Debtors.

c.    Buyer shall provide written notice to the Debtors, with a copy to the Committee,
that Buyer has elected to either (i) request that the Debtor(s) assume and assign to
Buyer a Designation Rights Contract (an "**Assignment Notice**"), or (ii) not
request the assumption and assignment of a Designation Rights Contract (a
"**Rejection Notice**" and together with the Assumption Notice, a "**Designation
Notice**").

d.      Upon Debtors' receipt of a Designation Notice from Buyer, the Debtors shall serve, by electronic mail, overnight mail or telecopy, the Designation Notice on the following parties (the "**Designation Notice Parties**"): (i) the affected contract counterparty (and any counsel of record); (ii) counsel to the Committee; and (iii) the Buyer.

e.      The following procedures shall apply following the Debtors' delivery of an Assignment Notice to the Designation Notice Parties:

   i.      Objections, if any, to the proposed assumption and assignment of a Designation Rights Contract or the Cure Amount stated in such Assumption Notice (an "**Assignment Objection**") must be filed by a Designation Notice Party and served on counsel to the Debtors and counsel to the Buyer so as to be received on or before ten (10) calendar days following the date of service of the Assumption Notice (the "**Assignment Objection Deadline**").  Assignment Objections, if any, filed by the affected contract counterparty prior to the date of this Sale Order are reserved and shall be deemed to be filed by the Assignment Objection Deadline.

   ii.     If an Assignment Objection is properly filed and served by the Assignment Objection Deadline as specified above, Debtors shall promptly schedule a hearing for the consideration of the Assignment Objection.  If such Assignment Objection is overruled or withdrawn, the Debtors' assumption and assignment of the applicable Designation Rights Contract (an "**Assigned Contract**") shall be deemed effective and final as of the date such Assignment Objection is overruled or withdrawn, as applicable, without further act or order of the Court (the "**Assignment Effective Date**").

   iii.    If no Assignment Objection is received on or before the Assignment Objection Deadline, the Debtors' assumption and assignment of the Assigned Contract to the Buyer will become effective and final on the Assignment Objection Deadline without further application to or order of this Court, and the Assignment Objection Deadline shall be the Assignment Effective Date for such Assigned Contract.

   iv.     On the Assignment Effective Date, the applicable Assigned Contract shall become a Purchased Contract in accordance with the provisions of the Asset Purchase Agreement and this Sale Order, and the Buyer shall promptly pay the Cure Payment, if any, stated in the Assignment Notice or determined by the Bankruptcy Court, as applicable, to the affected contract counterparty, and Debtors shall have no liability therefor or thereafter.

f.      The following procedures shall apply following the Debtors' delivery of a Rejection Notice to the Designation Notice Parties:

i.      Objections, if any, to the proposed rejection of a Designation Rights Contract must be filed by a Designation Notice Party and received by the Debtors' counsel so as to be received on or before ten (10) calendar days following the date of service of the Rejection Notice (the "**Rejection Objection Deadline**").

ii.     If an objection to the Rejection Notice (a "**Rejection Objection**") is properly filed and served by the Rejection Objection Deadline as specified above, the Debtors shall promptly schedule a hearing for the consideration of the Rejection Objection. If such Rejection Objection is overruled or withdrawn, the rejection of the affected Designation Rights Contract (a "**Rejected Contract**") shall be deemed effective on the Rejection Objection Deadline (the "**Rejection Effective Date**") and such rejection shall automatically become final without further act or order of the Court.

iii.    If no objection to the Rejection Notice is received on or before the Rejection Objection Deadline, the rejection of the Rejected Contract will become effective on the Rejection Effective Date and such rejection shall automatically become final without further act or order of the Court.

iv.    The Debtors will vacate and surrender any real property and turnover any personal property subject to a Rejected Contract on or before the Rejection Effective Date.

v.     The Debtors will make reasonable efforts to deliver the keys for any premises subject to a Rejected Contract directly to the landlord by or on the Rejection Effective Date. If the Debtors are unable to deliver the keys to the landlord, the Debtors will leave the keys with a third party designated by the applicable landlord by or on the Rejection Effective Date.

vi.    With respect to any personal property of the Debtors located at any premises subject to a Rejected Contract, the Debtors shall remove such property by or on the Rejection Effective Date; provided, however, if the Debtors determine that the value of the property at a premises subject to a Rejected Contract has a de minimis value or the cost of removing the property exceeds the value of such property, the Debtors shall generally describe the property in the applicable Rejection Notice and, absent a timely Rejection Objection, the property will be deemed abandoned to the landlord pursuant to § 554 of the Bankruptcy Code, as is, where is, effective as of the Rejection Effective Date.

vii.   The counterparty to a Rejected Contract shall have until thirty (30) days after the Rejection Effective Date to file a Proof of Claim for damages it may incur as a result of the Debtors' rejection of the Rejected Contract.

16.     The consideration (including the Purchase Price and Assumed Liabilities) provided by the Buyer for the Purchased Assets under the Asset Purchase Agreement is fair and reasonable and the Transaction may not be avoided under § 363(n) of the Bankruptcy Code.

17.     The Transaction is undertaken by the Buyer in good faith, as that term is used in § 363(m) of the Bankruptcy Code and, accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Transaction shall not affect the validity of the sale of the Purchased Assets to the Buyer, unless such authorization is duly stayed pending such appeal.  The Buyer is a good faith purchaser of the Purchased Assets and is entitled to all of the benefits and protections afforded by § 363(m) of the Bankruptcy Code.

18.     This Court shall retain exclusive jurisdiction to resolve any controversy or claim arising out of or related to this Sale Order, the Asset Purchase Agreement, or any related agreements, including without limitation: (a) any actual or alleged breach or violation of this Sale Order, the Asset Purchase Agreement or any related agreements and (b) the enforcement of any injunctive provision or relief granted in this Sale Order or otherwise, as set forth in the Asset Purchase Agreement.

19.     All persons and entities that are presently, or on Closing may be, in possession of some or all of the Purchased Assets are hereby directed to surrender possession of the Purchased Assets to the Buyer as of the Closing.

20.     This Sale Order is and shall be binding upon and shall govern acts of all entities including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of fees, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities, who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that the Buyer is the assignee of the Purchased Assets free and clear (all such entities being referred to as "**Recording Officers**").  All Recording Officers are authorized and specifically directed to strike recorded claims, liens, and interests against the Purchased Assets recorded prior to the date of this Sale Order that the Buyer is acquiring free and clear.

21.     No bulk sales law or any similar law of any state or other jurisdiction shall apply in any way to the Transaction authorized herein and in the Asset Purchase Agreement.

22.     Pursuant to § 1146(a) of the Bankruptcy Code, the Transaction authorized herein and in the Asset Purchase Agreement, and the delivery and recordation of any instrument, under, in furtherance of, or in connection therewith, shall not be subject to any stamp tax, real estate transfer tax or similar transfer fee or tax.

23.     On or before two (2) business days after the Closing, the Debtors, the Committee, and the Buyer shall enter into a Responsible Officer Agreement reasonably acceptable to the Debtors, the Committee, and the Buyer, pursuant to which, among other things: (i) Buyer shall provide the services of Tadd Crane to serve as the responsible officer of each of the Debtors (the "**Responsible Officer**") through the later of the effective date (the "**Effective Date**") of the Debtors' contemplated chapter 11 plan (the "**Plan**") or the date of the filing of the Debtors' final tax returns, which services shall be compensated at the rate of $400 per hour (plus expenses) to be paid to the Buyer by the Debtors' estates prior to the Effective Date and by the creditor recovery trust to be established under the Plan (the "**Creditor Trust**") on or after the Effective Date; (ii) the Responsible Officer shall have the powers and rights of the Chief Restructuring Officer retained in the Bankruptcy Proceeding; and (iii) the Responsible Officer shall be covered

under the Debtors' D&O policies and indemnified by the Debtors and their estates to the same

extent as the Chief Restructuring Officer.

24.    The Debtors are hereby authorized to execute, deliver, perform under and

implement the Responsible Officer Agreement pursuant to the terms outlined herein.

25.    The terms and provisions of the Asset Purchase Agreement, the ancillary

agreements, and this Sale Order shall be binding in all respects upon, and shall inure to the

benefit of, the Debtors, the Buyer, and their respective affiliates, successors and assigns, and any

affected third parties, notwithstanding any subsequent appointment of any trustee(s) under any

chapter of the Bankruptcy Code or conversion of this case to a case under chapter 7, as to which

trustee(s) such terms and provisions likewise shall be binding.  The Asset Purchase Agreement,

the Transaction, and this Sale Order shall be binding upon, and shall not be subject to rejection

or avoidance by, any Chapter 7 or Chapter 11 Trustee appointed in the Bankruptcy Cases.

Further, except as provided in the Term Sheet attached to the Final DIP Order (the "**Plan Term**

**Sheet**") nothing contained in any plan of reorganization (or liquidation) or any other order

entered in these cases shall conflict with or derogate from the provisions of the Asset Purchase

Agreement or the terms of this Sale Order.

26.    The Asset Purchase Agreement and any related agreements, documents, or other

instruments may be amended by the parties in a writing signed by such parties without further

order of the Court, provided that (i) any such amendment does not have a material adverse effect

on the Debtors or the Debtors' estates, (ii) any such amendment is not inconsistent with the terms

of the Plan Term Sheet, and (iii) the Committee has consented to the terms of such amendment.

27.    The failure to include specifically any particular provision of the Asset Purchase

Agreement in this Sale Order shall not diminish or impair the effectiveness of such provisions, it

being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

28.    To the extent of any inconsistency between the provisions of this Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith, the provisions contained in the Sale Order, the Asset Purchase Agreement, and any documents executed in connection therewith shall govern, in that order.

29.    To the extent permitted by the Asset Purchase Agreement, the Debtors shall file updated Schedules to the Asset Purchase Agreement as soon as practicable, but in no event later than five (5) Business Days following the Closing Date.

30.    The provisions of this Sale Order authorizing the sale and assignment of the Purchased Assets free and clear of all Liens (other than Liens specifically assumed and Permitted Exemptions), claims (other than Assumed Liabilities), encumbrances and interests, and other interests of any kind and every kind whatsoever (including Liens, claims, encumbrances and interests of any Governmental Body) against such assets shall be self-executing. Notwithstanding the failure of the Debtors, Buyer, or any other party to execute, file or obtain releases, termination statements, assignments, consents or other instruments to effectuate, consummate and/or implement the provisions hereof, all Liens (other than Liens specifically assumed or created by Designee and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and interests of any kind and every kind whatsoever (including Liens, claims, encumbrances, and interests of any Governmental Body) on or against such Purchased Assets, if any, shall be deemed released, discharged, and terminated.

31.    Notwithstanding the provisions of Bankruptcy Rule 6004(g) and 6006(d), this

Sale Order shall be effective and enforceable immediately and shall not be stayed.


**IT IS SO ORDERED.**
Dated:  November 16, 2015
          New York, New York


                                        _____**/s/Martin Glenn**_____
                                              MARTIN GLENN
                                        United States Bankruptcy Judge

**<u>EXHIBIT 1</u>**

**The Asset Purchase Agreement**

*Execution Version*

ASSET PURCHASE AGREEMENT

BY AND AMONG

BINDA USA HOLDINGS, INC.,

ADVANCE WATCH COMPANY LTD.,

SUNBURST PRODUCTS, INC.,

GWG INTERNATIONAL, LTD.

AND

SUNSHINE TIME INC.

Dated as of September 29, 2015

# TABLE OF CONTENTS

Page(s)

ARTICLE I        DEFINITIONS...................................................................................1

    Section 1.1        Certain Definitions.............................................................1

    Section 1.2        Other Definitional and Interpretive Matters ..........................9

ARTICLE II        PURCHASE AND SALE OF ASSETS; ASSUMPTION
OF LIABILITIES...........................................................................10

    Section 2.1        Purchase and Sale of Assets..............................................10

    Section 2.2        Excluded Assets................................................................12

    Section 2.3        Assumption of Liabilities; Excluded Liabilities ...................13

    Section 2.4        Purchased Assets...............................................................15

    Section 2.5        Further Conveyances and Assumptions...............................15

    Section 2.6        Transitional Matters ..........................................................15

    Section 2.7        Bulk Sales Laws................................................................15

ARTICLE III        CONSIDERATION .........................................................................16

    Section 3.1        Purchase Price; Assumed Liabilities...................................16

    Section 3.2        Deposit ............................................................................16

    Section 3.3        Purchase Price Adjustment ................................................16

ARTICLE IV        CLOSING AND TERMINATION....................................................17

    Section 4.1        Closing Date.....................................................................17

    Section 4.2        Deliveries by Sellers .........................................................17

    Section 4.3        Deliveries by Buyer ..........................................................17

    Section 4.4        Termination of Agreement.................................................17

    Section 4.5        Procedure Upon Termination..............................................19

    Section 4.6        Effect of Termination.........................................................20

i

ARTICLE V        REPRESENTATIONS AND WARRANTIES OF SELLERS......................20

    Section 5.1        Authorization of Agreement ........................................................20

    Section 5.2        Title to Purchased Assets ...........................................................21

    Section 5.3        Real Property ..............................................................................21

    Section 5.4        Tangible Personal Property .........................................................21

    Section 5.5        Intellectual Property....................................................................21

    Section 5.6        Financial Advisors ......................................................................22

    Section 5.7        Litigation.....................................................................................22

    Section 5.8        Compliance with Laws ...............................................................22

    Section 5.9        Permits ........................................................................................22

    Section 5.10      Inventory .....................................................................................22

    Section 5.11      Contracts .....................................................................................22

    Section 5.12      Taxes...........................................................................................23

    Section 5.13      Employee Benefits ......................................................................23

    Section 5.14      Labor Matters..............................................................................24

    Section 5.15      Sellers' Representations and Warranties Generally.....................24

ARTICLE VI        REPRESENTATIONS AND WARRANTIES OF BUYER............................24

    Section 6.1        Organization and Good Standing................................................25

    Section 6.2        Authorization of Agreement .......................................................25

    Section 6.3        Financial Advisors ......................................................................25

    Section 6.4        Litigation.....................................................................................25

    Section 6.5        Financial Capability ...................................................................25

    Section 6.6        Condition of the Business ...........................................................25

ARTICLE VII        BANKRUPTCY COURT APPROVAL............................................................26

    Section 7.1        Approval of Expense Reimbursement and Overbid Protection...........26

10011784-v14

Section 7.2        Competing Transaction ...................................................................26

Section 7.3        Bankruptcy Court Filings ...............................................................27

ARTICLE VIII      COVENANTS ........................................................................................27

Section 8.1        Access to Information ....................................................................27

Section 8.2        Further Assurances.........................................................................27

Section 8.3        Confidentiality ...............................................................................28

Section 8.4        Preservation of Records ................................................................28

Section 8.5        Publicity .........................................................................................29

Section 8.6        Operation of Business ....................................................................29

Section 8.7        Section 363(b)(1)(A)......................................................................29

Section 8.8        Adequate Assurances Regarding Purchased Contracts
                   and Certain Real Property Leases ..................................................29

Section 8.9        Material Adverse Effect..................................................................29

Section 8.10       Employee Matters ..........................................................................29

Section 8.11       Stayed Tax Liens............................................................................30

Section 8.12       Cooperation....................................................................................30

Section 8.13       Schedules .......................................................................................30

Section 8.14       Corporate Names ...........................................................................31

Section 8.15       Letters of Credit .............................................................................31

ARTICLE IX        CONDITIONS TO CLOSING .............................................................31

Section 9.1        Conditions Precedent to Obligations of Buyer .............................31

Section 9.2        Conditions Precedent to Obligations of Sellers ............................32

Section 9.3        Condition Precedent to Obligations of Buyer and Sellers .................33

Section 9.4        Frustration of Closing Conditions..................................................33

ARTICLE X         NO SURVIVAL.....................................................................................33

Section 10.1       No Survival of Representations and Warranties...................................33

iii

ARTICLE XI    TAX MATTERS...................................................................................34

    Section 11.1    Transfer Taxes ...................................................................34

    Section 11.2    Purchase Price Allocation.................................................34

    Section 11.3    Audits, Claims and Proceedings .......................................34

ARTICLE XII    MISCELLANEOUS .........................................................................34

    Section 12.1    Expenses ............................................................................34

    Section 12.2    Submission to Jurisdiction; Consent to Service of Process ................34

    Section 12.3    Waiver of Right to Trial by Jury.......................................35

    Section 12.4    Entire Agreement; Amendments and Waivers ..................35

    Section 12.5    Governing Law ..................................................................35

    Section 12.6    Notices ...............................................................................35

    Section 12.7    Severability .......................................................................37

    Section 12.8    Binding Effect; Assignment...............................................37

    Section 12.9    Counterparts......................................................................37

    Section 12.10    Attorney-Client Privilege..................................................37

iv

## EXHIBITS

Exhibit A                    Bidding Procedures Order
Exhibit B                    Sale Order

## SCHEDULES[1]

Schedule 1.1(a)              Contracts; Leases; Intellectual Property
Schedule 1.1(c)              Purchased Contracts
Schedule 1.1(d)              Purchased Intellectual Property
Schedule 2.1                 Additional Purchased Assets
Schedule 2.1(r)              Critical Trade Vendors
Schedule 2.2                 Additional Excluded Assets
Schedule 2.3(a)              Assumed Liabilities
Schedule 5.7                 Litigation
Schedule 5.12                Tax
Schedule 5.13                Employee Benefit Plans
Schedule 5.14(a)             Labor Matters
Schedule 5.14(e)             Employment and Consulting Agreements
Schedule 8.14                Seller Names
Schedule 9.1(f)              Cure Amounts

---

[1]    All Schedules to be delivered pursuant to <u>Section 8.13</u> of this Agreement.

10011784-v14

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT, dated as of September 29, 2015 (this "Agreement"), is entered into by and among Binda USA Holdings, Inc., a Delaware corporation ("Parent"), Advance Watch Company, Ltd., a Michigan corporation ("AWC"), Sunburst Products, Inc., a California corporation ("Sunburst"), and GWG International, Ltd., a Delaware corporation ("GWG" and, together with Parent, AWC and Sunburst, each a "Seller" and collectively, "Sellers"), and SUNSHINE TIME INC., a Delaware corporation ("Buyer").

## W I T N E S S E T H:

WHEREAS, promptly after the date hereof, Sellers shall commence cases (the "Bankruptcy Cases") under Chapter 11 of Title 11 of the United States Code (as it may be amended from time to time as applicable to the Bankruptcy Cases, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court") (the date of such commencement being referred to as the "Petition Date");

WHEREAS, Sellers shall retain possession of their assets and be authorized under the Bankruptcy Code to continue the operation of their businesses as debtors-in-possession;

WHEREAS, Sellers desire to sell, transfer and assign to Buyer, and Buyer desires to acquire and assume from Sellers, pursuant to Sections 363 and 365 of the Bankruptcy Code, the Purchased Assets and Assumed Liabilities as more specifically provided herein; and

WHEREAS, certain terms used in this Agreement are defined in Section 1.1.

NOW, THEREFORE, in consideration of the premises and the mutual covenants and agreements hereinafter contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.1    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings specified in this Section 1.1:

"Accounts Receivable" means all accounts, accounts receivable, contract rights to payment, notes, and notes receivable of Sellers related to the Business.

"Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Alternative Proposal" has the meaning set forth in Section 7.2.

"Assets" means collectively, the Purchased Assets and the Excluded Assets.

"Assumed L/Cs" has the meaning set forth in Section 2.3(d).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Auction" has the meaning set forth in the Bidding Procedures Order.

"Auction Working Capital" has the meaning set forth in Section 3.3(b).

"Bankruptcy Cases" has the meaning set forth in the Recitals.

"Bankruptcy Code" has the meaning set forth in the Recitals.

"Bankruptcy Court" has the meaning set forth in the Recitals.

"Benefit Plan" has the meaning set forth in Section 5.13(a).

"Bidding Procedures Order" means an Order of the Bankruptcy Court, in substantially the form attached hereto as Exhibit A or as otherwise mutually agreed by the Parties in good faith, approving the bid procedures with respect to the Auction, the Expense Reimbursement, the Breakup Fee and the Initial Minimum Overbid, and providing that if no qualified Competing Bid is received by the bid deadline established in accordance with the Auction, Buyer's bid shall be determined to be the winning bid for the Purchased Assets.

"Breakup Fee" has the meaning set forth in Section 7.1.

"Business" means the business and operations of Sellers relating to the wholesale and retail sale of clothing and accessories.

"Business Day" means any day of the year on which national banking institutions in New York are open to the public for conducting business and are not required or authorized to close.

"Buyer" has the meaning set forth in the Preamble.

"Buyer Documents" has the meaning set forth in Section 6.2.

"Cash Purchase Price" has the meaning set forth in Section 3.1.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Working Capital" has the meaning set forth in Section 3.3.

"COBRA" has the meaning set forth in Section 5.13(a).

"Code" means the Internal Revenue Code of 1986, as amended.

"Competing Bid" has the meaning set forth in Section 7.2(a).

2

"Contract" means any contract, agreement, indenture, note, bond, lease, Real Property Lease, Personal Property Lease or other agreement (including, without limitation, employment and consulting agreements) to which any Seller is a party, relating to the Business, as set forth on Schedule 1.1(a).

"Critical Trade Vendors" means those entities, if any, set forth on Schedule 2.1(r) (such schedule to be updated by Buyer in its sole and absolute discretion from time to time until one (1) Business Day prior to the Closing Date; provided, however, that no such update shall result in an adjustment of the Purchase Price).

"Critical Vendor Motion" means a critical vendor motion in form and substance satisfactory to Buyer in its sole and absolute discretion.

"Cure Amounts" means any and all amounts required, as a condition to assumption or assignment, to be paid to a non-debtor party to a Purchased Contract pursuant to Section 365(b) of the Bankruptcy Code.

"Cure Cap" has the meaning set forth in Section 3.1.

"Deposit" has the meaning set forth in Section 3.2.

"DIP Financing" means that certain Ratification and Amendment Agreement by and among Sellers and Wells Fargo Bank, National Association, as the same may be amended, restated, ratified, supplemented or modified from time to time.

"DIP Order" means any Order of the Bankruptcy Court authorizing and approving the DIP Financing.

"Documents" means all files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, technical documentation (design specifications, functional requirements, operating instructions, logic manuals, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials related to the Business and the Purchased Assets, in each case whether or not in electronic form.

"Dollars" or "$" means US Dollars.

"Employee Claims" means any claim, demand, action, cause of action, damage, loss, cost, Liability or expense, including legal costs, made or brought by any Employee, including, but not limited to, any Employment Claim made pursuant to any applicable Laws relating to employment standards, occupational health and safety, labor relations, workers compensation, pay equity, employment equity, the Americans with Disabilities Act, the Civil Rights Act of 1964, as amended, the Age Discrimination in Employment Act of 1967, the Older Workers Benefit Protection Act, the Family and Medical Leave Act or the Fair Labor Standards Act or any other federal, state or local, statutory or decisional Law regarding employment discrimination.

3

"Employee Obligations" means all wages, bonuses, vacation pay, sick time, pension payments, overtime pay, change of control payments, severance pay and any other termination or severance obligations and any other compensation or obligation which may be due by statute, contract or Law relating to the employment in respect of the Business of the Employees.

"Employees" means all individuals, as of the date hereof, whether or not actively at work as of the date hereof, who are employed by Sellers in connection with the Business, together with individuals who are hired in respect of the Business after the date hereof and prior to the Closing.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agreement" has the meaning set forth in Section 3.2.

"Excess Cure Amounts" has the meaning set forth in Section 3.1.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Contracts" means all Contracts other than Purchased Contracts.

"Excluded Liabilities" has the meaning set forth in Section 2.3.

"Expense Reimbursement" has the meaning set forth in Section 7.1.

"Far East" means Advance Watch Company (Far East) Limited, a company incorporated under the laws of Hong Kong.

"Final Order" means an Order, judgment, or other decree of the Bankruptcy Court that has not been vacated, reversed, modified, amended, or stayed, and for which the time to further appeal or seek review or rehearing has expired with no appeal, review or rehearing having been filed or sought.

"Furniture and Equipment" means all furniture, fixtures, furnishings, equipment, vehicles, leasehold improvements, and other tangible personal property owned or leased by Sellers in the conduct of the Business, including all artwork, desks, chairs, tables, computer and computer-related hardware (including, computers, file servers, facsimile servers, scanners, printers, and networks), copiers, telephone lines and numbers, telecopy machines and other telecommunication equipment, cubicles, cash registers, point-of-sale equipment, warehouse equipment, and miscellaneous office furnishings and supplies.

"GAAP" means generally accepted accounting principles in the United States.

"Governmental Body" means any government or governmental or regulatory body thereof, or political subdivision thereof, whether foreign, federal, state, or local, or any agency, instrumentality or authority thereof, or any court or arbitrator (public or private).

"Indebtedness" of any Person means, without duplication, (i) the principal and interest of, and premium (if any) in respect of, (A) indebtedness of such Person for money borrowed and (B) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the

4

payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable and other accrued liabilities arising in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of other Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Lien on any property or asset of such Person (whether or not such obligation is assumed by such Person).

"Intellectual Property" means all worldwide intellectual property rights used or useful by Sellers in connection with the Purchased Assets, including all (i) patents, patent applications and inventions, (ii) trademarks, service marks, trade names and trade dress, which expressly includes the goodwill and any common law rights associated with the foregoing, (iii) domain names, (iv) copyrights, including copyrights in computer software, (v) confidential and proprietary information, including trade secrets and know-how ("Trade Secrets"), (vi) licenses relating to any of the foregoing and (vi) registrations and applications for registration of the foregoing.

"Inventory" means all of Sellers' now owned or hereafter acquired inventory and goods, wherever located, relating to the Business including, without limitation, all inventory and goods that (a) are leased by any Seller as lessor, (b) are held by such Seller for sale or lease or to be furnished under a Contract of service, (c) are furnished by any Seller under a Contract of service, or (d) consist of raw materials, work in process, finished goods or material used or consumed in connection with the Business.

"Kenneth Cole License" means that certain Omnibus License Agreement Renewal among Kenneth Cole Productions (LIC), LLC, Kenneth Cole Productions, Inc. and AWC.

"Knowledge" means, with respect to Sellers, as to a particular matter, the actual knowledge as of the date of inquiry or verification, and without independent verification or investigation, of the Chief Restructuring Officer of Sellers.

"Law" means any federal, state, local or foreign law, statute, code, ordinance, rule or regulation or Order.

"Legal Proceeding" means any judicial, administrative or arbitral actions, suits, proceedings (public or private) or claims or any proceedings by or before a Governmental Body.

"Liability" means any debt, liability or obligation (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due), and including all costs and expenses relating thereto.

"Lien" means any lien, encumbrance, pledge, mortgage, deed of trust, security interest, claim, lease, option, right of first refusal, easement, servitude, proxy, voting trust or agreement, or transfer restriction under any shareholder or similar agreement or encumbrance; provided,

however, that Assumed Liabilities which pertain to particular Purchased Assets shall not constitute Liens.

"Material Adverse Effect" means a material adverse effect on the business, assets, results of operations or financial condition of Sellers (taken as a whole), the Business or the Purchased Assets (in each case except for the Bankruptcy Cases), other than (i) the effect of any change resulting from any action taken by Buyer or its Affiliates with respect to the transactions contemplated hereby or with respect to Sellers, or any effect resulting from the filing of the Bankruptcy Cases; (ii) a generally applicable change in applicable Law or GAAP or interpretation thereof; (iii) the effect of any change or action taken by any Person resulting from any public announcement of this Agreement; (iv) any actions or inactions by Sellers in accordance with this Agreement; (v) changes in conditions generally affecting the industries in which Sellers conduct the Business that do not affect the Business, the Purchased Assets or the Assumed Liabilities in a disproportionate manner when compared to the effect of the same on other Persons engaged in such industries; or (vi) general economic, political or financial market conditions.

"Order" means any order, injunction, judgment, decree, ruling, writ, assessment or arbitration award of a Governmental Body.

"Ordinary Course of Business" means the ordinary and usual course of normal day-to-day operations of the Business consistent with the past practice of the Business through the date hereof, subject to any duties, restrictions and obligations imposed on Sellers under the Bankruptcy Code, the DIP Financing and the DIP Order.

"Open Purchase Orders" has the meaning set forth in Section 2.1(v).

"Parties" means Sellers and Buyer.

"Permits" means any approvals, authorizations, consents, licenses, permits or certifications of a Governmental Body.

"Permitted Exceptions" means (i) all defects, exceptions, restrictions, easements, rights of way, encumbrances and Liens reflected in policies of title insurance which have been made available to or are obtained by Buyer and that would not interfere with the use of the Purchased Assets or conduct of the Business in accordance with historical practice; (ii) statutory Liens for current Taxes, assessments or other governmental charges not yet delinquent or the amount or validity of which is being contested in good faith by appropriate proceedings; (iii) mechanics', carriers', workers', repairers' and similar Liens arising or incurred in the Ordinary Course of Business; (iv) zoning, entitlement and other land use and environmental regulations by any Governmental Body provided that such regulations have not been violated; (v) title of a lessor under a capital or operating lease; and (vi) the Assumed Liabilities as pertain to particular Purchased Assets.

"Person" means any individual, corporation, partnership, limited liability company, firm, joint venture, association, joint-stock company, trust, unincorporated organization, Governmental Body or other entity.

6

"Personal Property Leases" has the meaning set forth in Section 5.4.

"Petition Date" has the meaning set forth in the Recitals.

"Prepaids" means, as of a particular date, all deposits with vendors or suppliers, all prepaid expenses, royalties and the like and all claims for refunds and rights of offset of Sellers that relate to the Purchased Assets.

"Products" means any and all products developed, manufactured, procured, marketed or sold by Sellers, whether work in progress or in final form, in connection with the Business.

"Prospective Employees" has the meaning set forth in Section 8.10(a).

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchased Contracts" means the Contracts set forth on Schedule 1.1(c), as such Schedule may be amended from time to time in accordance with this Agreement.

"Purchased Intellectual Property" means the Intellectual Property and related Software and Technology of the Sellers relating to the Business, all as set forth on Schedule 1.1(d).

"Purchased Names" has the meaning set forth in Section 8.14(a).

"Qualified Critical Trade Vendor" means any Critical Trade Vendor that agrees to the terms and conditions set forth in the Critical Trade Vendor Motion; provided, that the Critical Trade Vendor Motion has been approved by Final Order of the Bankruptcy Court.

"Real Property Leases" has the meaning set forth in Section 5.3.

"Sale Order" means an Order of the Bankruptcy Court, in the substantially the form attached hereto as Exhibit B or as otherwise mutually agreed to by the Parties in good faith, approving this Agreement and all of the terms and conditions hereof, approving the sale and assignment to Buyer of all of the Purchased Assets (assuming that either Buyer is the winning bidder at the Auction contemplated hereby or no Competing Bid is submitted for the Purchased Assets by the deadline for such bids set forth in the Bidding Procedures Order), and approving and authorizing Sellers to consummate the transactions contemplated hereby. Without limiting the generality of the foregoing, such order shall find and provide, among other things, that (i) the Purchased Assets sold to Buyer pursuant to this Agreement shall be transferred to Buyer free and clear of all Liens (other than Liens specifically assumed or created by Buyer and Permitted Exceptions), claims (other than Assumed Liabilities), encumbrances and interests (including Liens, claims, encumbrances and interests of any Governmental Body), such Liens, claims, encumbrances and interests to attach to the proceeds of sale of the Purchased Assets (it being understood and agreed that the Sellers shall have the right to direct the Buyer to remit the net proceeds to the agent under the DIP Financing in satisfaction of the debt owing to the lenders under the DIP Financing by Sellers), (ii) the Purchased Contracts may be assumed by Sellers and assigned to Buyer under Section 365 of the Bankruptcy Code, (iii) Buyer has acted in "good

7

faith" within the meaning of Section 363(m) of the Bankruptcy Code, (iv) this Agreement was negotiated, proposed and entered into by the Parties without collusion, in good faith and from arm's length bargaining positions, (v) the Bankruptcy Court shall retain jurisdiction to resolve any controversy or claim arising out of or relating to this Agreement, or the breach hereof as provided in Section 12.2 hereof, and (vi) this Agreement and the transactions contemplated hereby are binding upon, and not subject to rejection or avoidance by, any chapter 7 or chapter 11 trustee of Sellers.

"Sale Procedures Motion" means the motion or motions of Sellers, in form and substance reasonably acceptable to Buyer and Sellers, to be filed with the Bankruptcy Court seeking approval and entry of the Bidding Procedures Order and, in the event that Buyer is the winning bidder at the Auction or no Competing Bid is submitted, the Sale Order.

"Schedule Delivery Deadline" means 5:00 pm Eastern time five (5) Business Days prior to the Auction.

"Sellers" has the meaning set forth in the Preamble.

"Seller Documents" has the meaning set forth in Section 5.1.

"Software" means, except to the extent generally available for purchase from third Persons, any and all (i) computer programs, including any and all software implementations of algorithms, models and methodologies, whether in source code or object code, (ii) databases and compilations, including any and all data and collections of data, whether machine readable or otherwise, (iii) descriptions, flow-charts and other work product used to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons and (iv) all documentation including user manuals and other training documentation related to any of the foregoing, in each case, relating to the Business.

"Stayed Tax Liens" has the meaning set forth in Section 5.12(b)(iii).

"Tax Return" means all returns, declarations, reports, estimates, information returns and statements required to be filed in respect of any Taxes.

"Taxes" means (i) all federal, state, local or foreign taxes, charges or other assessments, including, without limitation, all net income, gross receipts, capital, sales, use, ad valorem, value added, transfer, franchise, profits, Inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, property and estimated taxes, and (ii) all interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (i).

"Technology" means, collectively, all designs, formulae, algorithms, procedures, methods, techniques, ideas, know-how, research and development, technical data, programs, subroutines, tools, materials, specifications, processes, inventions (whether patentable or unpatentable and whether or not reduced to practice), apparatus, creations, improvements, works of authorship and other similar materials, and all recordings, graphs, drawings, reports, analyses, and other writings, and other tangible embodiments of the foregoing, in any form whether or not

8

specifically listed herein, and all related technology, that are used in, incorporated in, embodied in, displayed by or relate to, or are used or useful in the Business or in the design, development, reproduction, maintenance or modification of, any of the Products.

"Termination Date" has the meaning set forth in Section 4.4(d).

"Trade Secrets" has the meaning set forth in Section 1.1 (in the definition of Intellectual Property).

"Transfer Taxes" means sales, use, stamp, documentary stamp, recording, transfer or similar fees or Taxes or governmental charges (including any interest, fine, penalty, additions to Tax or additional amount thereon) payable in connection with the Sellers' transfer of the Purchased Assets to Buyer pursuant to this Agreement.

"Transferred Employees" has the meaning set forth in Section 8.10(b).

"Working Capital" has the meaning set forth in Section 3.3.

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, and any similar state Law related thereto.

"Working Capital Lower Target" has the meaning set forth in Section 3.3.

"Working Capital Upper Target" has the meaning set forth in Section 3.3.

Section 1.2    Other Definitional and Interpretive Matters.

(a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a non-Business Day, the period in question shall end on the next succeeding Business Day.

Exhibits/Schedules. The Exhibits and Schedules to this Agreement are hereby incorporated and made a part hereof and are an integral part of this Agreement. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any matter or item disclosed on one Schedule shall not be deemed to have been disclosed on any other Schedule unless explicitly cross-referenced thereto. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

9

Headings.  The provision of a Table of Contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in construing or interpreting this Agreement. All references in this Agreement to any "Section" are to the corresponding Section of this Agreement unless otherwise specified.

Herein.  The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation" and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(b)    The Parties hereto have participated jointly in the negotiation and drafting of this Agreement and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as jointly drafted by the Parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement.

## ARTICLE II
## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

Section 2.1    Purchase and Sale of Assets. On the terms and subject to the conditions set forth in this Agreement, at the Closing Buyer shall purchase, acquire and accept from Sellers, and Sellers shall sell, transfer, assign, convey and deliver to Buyer the Purchased Assets. "Purchased Assets" shall mean all of Sellers' right, title and interest in, to and under the following assets of Sellers (but excluding Excluded Assets) as of the Closing related to the Business:

(a)    all Accounts Receivable of Sellers;

(b)    all Inventory;

(c)    all customer deposits and security deposits (including, without limitation, all customer deposits and security deposits for rent, electricity, telephone or otherwise, but excluding customer and security deposits relating to Excluded Assets) and other prepaid charges and expenses of Sellers;

(d)    subject to the provisions of Section 9.1(g), all rights of Sellers under each Real Property Lease set forth on Schedule 1.1(c), together with Sellers' interests in and to all improvements and fixtures under each such Real Property Lease, and other appurtenances thereto, and Sellers' rights in respect thereof;

(e)    all Furniture and Equipment;

(f)    all Purchased Intellectual Property;

10

(g)    all Purchased Contracts;

(h)    all Sellers' Documents that are used in, held for use in or intended to be used in, or that arise out of, the Business, including Documents relating to accounts receivable, Products, services, marketing, advertising, promotional materials, Purchased Intellectual Property and all files, customer lists, files and documents (including credit information), supplier lists, records, literature and correspondence, whether or not physically located on any of the premises referred to in clause (d) above, excluding any Documents exclusively related to any Excluded Assets;

(i)    all Permits used by Sellers in the Business, to the extent transferable;

(j)    all supplies owned by Sellers and used in connection with the Business;

(k)    to the extent transferable, all insurance policies or rights to proceeds thereof relating to the Purchased Assets (other than any directors and officers or fiduciary insurance policy, each of which shall be an Excluded Asset);

(l)    all rights of Sellers under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents of Sellers or with third parties to the extent relating to the Business or the Purchased Assets (or any portion thereof);

(m)    all rights of Sellers under or pursuant to all warranties, representations and guarantees made by suppliers, manufacturers and contractors if and to the extent that such rights are assignable by operation of Law and relating to Products sold, or services provided, to Sellers or to the extent affecting any Purchased Assets other than any warranties, representations and guarantees pertaining exclusively to any Excluded Assets;

(n)    all goodwill and other intangible assets associated with the Business, including customer and supplier lists and the goodwill associated with the Purchased Intellectual Property owned by Sellers;

(o)    all Prepaids;

(p)    any cash refunds for Taxes received by Sellers after the Closing Date (inclusive of any interest received thereon, net of any Taxes incurred with respect thereto) with respect to Taxes paid on or prior to the Closing Date;

(q)    rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against the Critical Trade Vendors;

(r)    any rights, claims or causes of action of Sellers against third parties other than Tax authorities relating to assets, properties, Business or operations of Sellers arising out of events occurring on or prior to the Closing Date other than causes of action under Chapter 5 of Title 11 of the United States Code;

11

(s)    any rights, claims or causes of action of Sellers, including any rights or claims as arise under Chapter 5 of the Bankruptcy Code, against officers, directors, employees, shareholders, members and managers of the Sellers;

(t)    to the extent transferable, all Tax credits of Sellers;

(u)    to the extent that Buyer determines, in its sole and absolute discretion, to assume any Benefit Plan, any trust or other funding vehicle associated with such Benefit Plan;

(v)    all purchase orders for the purchase of Inventory that have been issued by the Sellers as of the Closing but have not been completely fulfilled as of the Closing (the "Open Purchase Orders") in an aggregate amount not to exceed Twelve Million Dollars ($12,000,000); and

(w)    the assets set forth on Schedule 2.1.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, amend the Purchased Assets so as to include additional assets in its sole and absolute discretion until three (3) Business Days prior to the Closing Date (except that Buyer may not add as a Purchased Asset anything specifically listed in Section 2.2 below as an Excluded Asset, other than Excluded Contracts and Intellectual Property rights); and provided, however, that no such addition shall result in any adjustment of the Purchase Price.

Section 2.2    Excluded Assets.  Nothing herein contained shall be deemed to sell, transfer, assign or convey the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under the Excluded Assets.  "Excluded Assets" shall mean all assets, properties, interests and rights of Sellers other than the Purchased Assets, including without limitation each of the following assets:

(a)    all cash, cash equivalents, bank deposits and similar cash items of Sellers;

(b)    all customer and security deposits relating to Real Property Leases that are Excluded Assets;

(c)    all Excluded Contracts;

(d)    all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed to or by any Seller to or by any Affiliate of any Seller;

(e)    any Intellectual Property rights of Sellers other than the Purchased Intellectual Property;

(f)    any (i) confidential personnel and medical records pertaining to any Employee; (ii) other books and records that Sellers are required by Law to retain or that Sellers determine are necessary or advisable to retain including, without limitation, Tax Returns, financial statements, and corporate or other entity filings; provided, however, that Buyer shall have, to the extent allowed by applicable Law, the right to make copies of any portions of such retained books and records that relate to the Business or any of the Assets; (iii) minute books,

12

stock or membership interest records and corporate seals; and (iv) documents relating to proposals to acquire the Business by Persons other than Buyer;

(g)    all claims of privilege or protection over pre-Closing communications between or among Venable LLP and Sellers, including, without limitation, as such claims relate to any Purchased Assets;

(h)    any causes of action under Chapter 5 of Title 11 of the United States Code, and proceeds deriving therefrom, other than causes of action of Sellers that are Purchased Assets;

(i)    all of Sellers' rights under this Agreement and/or other documents and agreements executed in connection with the transactions provided for herein;

(j)    any trust or other funding vehicle associated with any Benefit Plan that is not a Purchased Asset;

(k)    the Assets set forth on Schedule 2.2; and

(l)    any equity interests in any Seller, Far East or any subsidiary of any of the foregoing.

Notwithstanding anything herein to the contrary, Buyer may, from time to time, exclude additional assets from the Purchased Assets in its sole and absolute discretion until three (3) Business Days prior to the Closing Date; provided, however, that no such exclusion shall result in any adjustment of the Purchase Price.

Section 2.3    Assumption of Liabilities; Excluded Liabilities. On and subject to the terms and conditions of this Agreement, Buyer shall assume and become responsible for all of the Assumed Liabilities at the Closing. Buyer will not assume or have any responsibility, however, with respect to any other obligation or liability of Sellers not included within the definition of Assumed Liabilities, including, without limitation: (i) Taxes (x) imposed on any Seller for any period or (y) related to the Business or the Purchased Assets for all Tax periods (or portions thereof) ending on or prior to the Closing (except, in each case, as expressly provided below); (ii) any costs or expenses incurred in connection with, or related to, the administration of the Bankruptcy Cases, including, without limitation, any accrued professional fees and expenses of attorneys, accountants, financial advisors and other professional advisors related to the Bankruptcy Cases (except as expressly provided below); (iii) liabilities to the extent relating to the Excluded Assets, including Liabilities relating to Excluded Contracts; (iv) Liabilities and obligations of Sellers under this Agreement; (v) all Liabilities and obligations arising under any Purchased Contract (and all liabilities for any breach, act or omission under any Purchased Contract) arising prior to the Closing other than any Cure Amounts paid in respect thereof pursuant to Section 3.1; (vi) all obligations, Liabilities and Indebtedness, including any note Indebtedness, owed by any Seller to any Affiliate of any Seller; (vii) other than as set forth in Section 2.3(h), any Employee Obligations to any Employee arising out of such Employee's employment by Sellers prior to the Closing; (viii) any Employee Claim of any Employee arising out of such Employee's employment by Sellers prior to the Closing; and (ix) all other Liabilities and obligations for which Buyer does not expressly assume any liability (collectively, the

13

"Excluded Liabilities").  Buyer's assumption of the Assumed Liabilities shall in no way expand the rights or remedies of third parties against Buyer as compared to the rights and remedies which such parties would have had against Sellers had this Agreement not been consummated. From and after the Closing Date, Buyer shall pay, perform and discharge, as and when due or as may otherwise be agreed between Buyer and the obligee, all of the Assumed Liabilities.  The "Assumed Liabilities" are specifically as follows:

     (a)    all Liabilities of Sellers set forth on Schedule 2.3(a);

     (b)    all Cure Amounts required to be paid in respect of the Purchased Contracts;

     (c)    all Liabilities under the Purchased Contracts arising after the Closing;

     (d)    all Liabilities associated with any letters of credit securing Open Purchase Orders and other Purchased Contracts (the "Assumed L/Cs"), in an aggregate amount not to exceed Four Million Dollars ($4,000,000);

     (e)    all Liabilities arising from the sale of Products after the Closing pursuant to product warranties, product returns, rebates and otherwise;

     (f)    all Liabilities with respect to the Business or the Purchased Assets arising after the Closing;

     (g)    all allowed pre-petition Liabilities to Qualified Critical Trade Vendors to the extent that such Liabilities have not previously been paid by Sellers;

     (h)    all undisputed post-petition Liabilities to Critical Trade Vendors that have not agreed to the terms and conditions set forth in the Critical Trade Vendor Motion to the extent that such Liabilities have not previously been paid by Sellers;

     (i)    all Liabilities associated with (i) Employee vacation and sick leave accruals with respect to Transferred Employees and (ii) severance benefits, determined in accordance with Sellers' severance policy, for any Employee who is not a Transferred Employee, in each case only to the extent that any such Liability is an allowed administrative claim in the Bankruptcy Cases;

     (j)    all real property Taxes to the extent required for Buyer to assume any Real Property Lease that is a Purchased Contract;

     (k)    all Liabilities relating to amounts required to be paid by Buyer hereunder;

     (l)    Transfer Taxes; and

     (m)    all WARN Act Liabilities.

Notwithstanding anything herein to the contrary, Buyer may, from time to time and in its sole and absolute discretion, amend Schedule 2.3(a) so as to assume additional Liabilities of

14

Sellers until three (3) Business Days prior to the Closing Date. Buyer shall notify Sellers of any such amendments in writing. Any such additional Liabilities shall be Assumed Liabilities for all purposes hereunder.

Section 2.4    Purchased Assets. At Closing, pursuant to Section 363 and Section 365 of the Bankruptcy Code, Sellers shall sell or assume and assign to Buyer and Buyer shall buy or take an assignment from Sellers, as the case may be, the Purchased Assets and Assumed Liabilities.

Section 2.5    Further Conveyances and Assumptions.

(a)    From time to time following the Closing, Sellers and Buyer shall, and shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, as may be reasonably necessary or appropriate to assure fully to Buyer and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Buyer under this Agreement and the Seller Documents and to assure fully to Sellers and their respective Affiliates and their respective successors and assigns, the assumption of the liabilities and obligations intended to be assumed by Buyer under this Agreement and the Seller Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

(b)    If following the Closing, the Sellers receive or become aware that they hold any property, right, claim, demand or asset which constitutes a Purchased Asset then the Sellers shall transfer such property, right, claim, demand or asset to the Buyer as promptly as practicable for no additional consideration.

(c)    If following the Closing, the Buyer receives or becomes aware that it holds any property, right, claim, demand or asset which constitutes an Excluded Asset, then the Buyer shall transfer such property, right, claim, demand or asset to the Sellers as promptly as practicable for no additional consideration.

Section 2.6    Transitional Matters.

(a)    From and after Closing, Sellers shall retain full right and authority to use, enforce, pursue remedies and take actions with respect to any of the Excluded Assets and Excluded Liabilities.

(b)    Buyer will retain and make available to Sellers, for a period of six (6) years following the Closing Date (or longer if reasonably requested), the Documents delivered by Sellers to Buyer, if reasonably needed by Sellers for liquidation, winding up, Tax reporting or other proper purposes; provided, that Sellers will use reasonable efforts to retain copies of Documents and the Parties otherwise will reasonably cooperate to minimize inconvenience to Buyer.

Section 2.7    Bulk Sales Laws. Buyer hereby acknowledges that it has no objection to Sellers not complying with the requirements and provisions of any "bulk-transfer" Laws of any

15

jurisdiction that may otherwise be applicable with respect to the sale of any or all of the
Purchased Assets to Buyer.

## ARTICLE III
## CONSIDERATION

Section 3.1    Purchase Price; Assumed Liabilities.  In consideration of the transfer of
the Purchased Assets to Buyer and the other undertakings set forth herein, the purchase price (the
"Purchase Price") for the Purchased Assets shall be (i) (A) Fifteen Million Dollars ($15,000,000)
in cash, subject to adjustment in accordance with Section 3.3, minus (B) the Excess Cure
Amounts (the "Cash Purchase Price"), plus (ii) the assumption of the Assumed Liabilities by
Buyer at Closing.  The Cure Amounts, as determined by the Bankruptcy Court, if any, necessary
to cure all defaults, if any, and to pay all actual or pecuniary losses that have resulted from such
defaults under the Purchased Contracts assumed at Closing, shall be paid by Buyer on the
Closing Date, and Sellers shall have no liability therefor.  Any Cure Amounts in excess of Five
Hundred Thousand Dollars ($500,000) (the "Cure Cap") shall be classified as "Excess Cure
Amounts" and such Excess Cure Amounts shall reduce the Cash Purchase Price on a dollar for
dollar basis, as set forth in the first sentence of this section.  Notwithstanding the foregoing, if
Buyer requests the assumption and assignment of any Contracts that are not set forth on
Schedule 1.1(a), the Cure Amounts associated with any such Contracts shall not apply toward the
Cure Cap.

Section 3.2    Deposit.  Concurrently with the execution and delivery of this Agreement
by the Parties, Buyer shall deposit with Blackmore Escrow, Inc., pursuant to a mutually
acceptable escrow agreement (the "Escrow Agreement"), cash in an amount equal to Seven
Hundred Fifty Thousand Dollars ($750,000) as a deposit (the "Deposit").

Section 3.3    Purchase Price Adjustment.  Sellers and Buyer acknowledge and agree
that the Purchase Price has been based on a projected value of the gross Accounts Receivable
(without giving effect to any set-offs for any reserves, allowances, discounts or other deductions)
and Inventory (including all Inventory on hand, in-transit and for which a deposit or prepayment
has been made (in the case of any such deposit or prepayment, only to the extent of such deposit
or prepayment) (the "Working Capital") as of the Closing Date of $26,000,000, which projection
was determined by Sellers in good faith.  At least two (2) Business Days prior to the Closing
Date, Sellers shall prepare and deliver to Buyer a certificate setting forth their good faith
computation of Working Capital as of such date (the "Closing Working Capital").  Concurrently
with the delivery of such certificate, Sellers shall deliver reasonable supporting materials
providing the basis for the computation of Closing Working Capital as set forth in such
certificate and Sellers further agree to promptly provide any additional supporting documentation
as Buyer may reasonably request.  At the Closing, (i) if Closing Working Capital is less than
$24,700,000 (the "Working Capital Lower Target"), the Purchase Price shall be reduced dollar-
for-dollar by the amount by which Closing Working Capital is less than the Working Capital
Lower Target, or (ii) if Closing Working Capital is greater than $28,600,000 (the "Working
Capital Upper Target"), the Purchase Price shall be increased dollar-for-dollar by the amount by
which Closing Working Capital is greater than the Working Capital Upper Target.

16

# ARTICLE IV
# CLOSING AND TERMINATION

Section 4.1    Closing Date.  Subject to the satisfaction of the conditions set forth in Section 9.1, Section 9.2 and Section 9.3 hereof (or the waiver thereof by the Party entitled to waive that condition), the closing of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities provided for in Article II hereof (the "Closing") shall take place at the offices of Venable LLP (or at such other place as the Parties may designate in writing) as soon as practicable following the satisfaction or waiver of the conditions set forth in Article IX (other than conditions that by their nature are to be satisfied at the Closing, but subject to the satisfaction or waiver of such conditions) and no later than a date that is three (3) Business Days after the Sale Order becomes a Final Order, unless extended by mutual agreement of Sellers and Buyer.  The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date," and the Closing shall be deemed effective at the close of business on the Closing Date.

Section 4.2    Deliveries by Sellers.  At the Closing, Sellers shall deliver to Buyer:

(a)    a duly executed bill of sale and assignment;

(b)    duly executed assignments of the U.S. trademark registrations and applications included in the Purchased Intellectual Property, in a form suitable for recording in the U.S. patent and trademark office, and general assignments of all other Purchased Intellectual Property;

(c)    the officer's certificate required to be delivered pursuant to Section 9.1(a) and Section 9.1(b); and

(d)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Buyer, as may be necessary to convey the Purchased Assets to Buyer.

Section 4.3    Deliveries by Buyer.  At the Closing, Buyer shall deliver to Sellers:

(a)    the Cash Purchase Price (as adjusted pursuant to Section 3.3) less the Deposit;

(b)    the officer's certificate required to be delivered pursuant to Section 9.2(a) and Section 9.2(b); and

(c)    all other instruments of conveyance and transfer, in form and substance reasonably acceptable to Sellers, as may be necessary to convey the Purchased Assets to Buyer and for Buyer to assume the Assumed Liabilities.

Section 4.4    Termination of Agreement.  This Agreement may be terminated prior to the Closing as follows:

(a)    by mutual written consent of Sellers and Buyer;

10011784-v14

(b)    by Sellers or Buyer, as applicable, if any of the conditions set forth in Section 9.3 shall have become incapable of fulfillment other than as a result of a breach by the Sellers or Buyer, as applicable, of any covenant or agreement contained in this Agreement, and such condition is not waived by the non-breaching party;

(c)    by Sellers or Buyer if there shall be in effect a final Order or other nonappealable final action of a Governmental Body of competent jurisdiction permanently restraining, enjoining or otherwise prohibiting the consummation of all or materially all of the transactions contemplated hereby; it being agreed that the Parties hereto shall promptly appeal any adverse determination which is not nonappealable (and pursue such appeal with reasonable diligence);

(d)    by Buyer, if the Closing shall not have occurred on or before the close of business on the date which is seven (7) Business Days after the Sale Order becomes a Final Order or such later date as determined by mutual agreement of Sellers and Buyer (the "Termination Date"); provided, however, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a breach of any representation, warranty, covenant or agreement contained in this Agreement by Buyer or (2) a breach by Buyer of the obligations set forth in Section 8.2 hereof, or (b) (1) Sellers have not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Sellers have not breached the obligations set forth in Section 8.2 hereof, then Buyer may not terminate this Agreement pursuant to this Section 4.4(d);

(e)    by Buyer, if any of the conditions to the obligations of Buyer set forth in Section 9.1 shall have become incapable of fulfillment, other than as a result of a breach by Buyer of any covenant or agreement contained in this Agreement, and such condition is not waived by Buyer;

(f)    by Buyer, if there shall be a material breach by Sellers of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.1 or Section 9.3 and which breach cannot be cured or has not been cured by the later of (i) ten (10) Business Days after the giving of written notice by Buyer to Sellers of such breach and (ii) the Termination Date;

(g)    by Buyer or Sellers, if the Closing has not occurred within ninety (90) days after the Petition Date; provided that if a party is in breach of any representation, warranty, covenant or agreement contained in this Agreement, then such party shall not be entitled to terminate pursuant to this Section 4.4(h);

(h)    by Sellers, if any condition to the obligations of Sellers set forth in Section 9.2 shall have become incapable of fulfillment other than as a result of a breach by Sellers of any covenant or agreement contained in this Agreement, and such condition is not waived by Sellers;

(i)    by Sellers, if there shall be a material breach by Buyer of any representation or warranty, or any covenant or agreement contained in this Agreement which would result in a failure of a condition set forth in Section 9.2 or Section 9.3 and which breach

18

cannot be cured or has not been cured by the later of (i) ten (10) Business Days after the giving of written notice by Sellers to Buyer of such breach and (ii) the Termination Date;

(j)    by Sellers, if the Closing shall not have occurred on or before the Termination Date; provided, however, that if the Closing shall not have occurred on or before the Termination Date and either (a) such failure to close is due to (1) a breach of any representation, warranty, covenant or agreement contained in this Agreement by Sellers or (2) a breach by Sellers of the obligations set forth in Section 8.2 hereof, or (b) (1) Buyer has not materially breached any representation, warranties, covenants or agreements contained in this Agreement and (2) Buyer has not breached the obligations set forth in Section 8.2 hereof, then Sellers may not terminate this Agreement pursuant to this Section 4.4(j);

(k)    with no further action by either Party, if the Bankruptcy Court shall enter an Order approving a Competing Bid and the transaction contemplated by such Competing Bid is thereafter consummated;

(l)    [Reserved];

(m)    by either Buyer or Sellers, if one or more of the Bankruptcy Cases are dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or by Buyer if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Sellers is appointed in the Bankruptcy Cases;

(n)    by Buyer, if (i) the Bidding Procedures Order shall not have been submitted by Sellers to the Bankruptcy Court within thirty (30) days of the Petition Date (it being understood and agreed that Sellers shall use reasonable best efforts to have the order entered as soon as possible thereafter), or (ii) at any time after entry of the Bidding Procedures Order, such Bidding Procedures Order (including, without limitation, the provisions therein relating to the bid protections set forth in Section 7.1) is reversed, stayed, vacated or otherwise materially modified by the Bankruptcy Court; or

(o)    by either Buyer or Sellers, if the Bankruptcy Cases have not commenced within thirty (30) days after the date hereof; provided that if Sellers have not acted in good faith in delaying such commencement, then Sellers shall not be entitled to terminate pursuant to this Section 4.4(o).

Section 4.5    Procedure Upon Termination.

(a)    In the event of termination and abandonment by Buyer or Sellers, or both such Parties, pursuant to Section 4.4 hereof, written notice thereof shall forthwith be given to the other Party or Parties, and this Agreement shall terminate, and the purchase of the Purchased Assets hereunder shall be abandoned, without further action by Buyer or Sellers. If this Agreement is terminated as provided herein each Party shall return all documents, work papers and other material of any other Party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the Party furnishing the same.

(b)    If this Agreement is terminated:

19

(i)       pursuant to Sections 4.4(a), (d), (f), (g), or (o) (as to Section 4.4(g), only if Buyer is not in breach of any representation, warranty, covenant or agreement contained in this Agreement), Sellers shall pay the Expense Reimbursement to Buyer and immediately return the Deposit in accordance with the terms and conditions of the Escrow Agreement;

(ii)      pursuant to Section 4.4(k), Sellers shall pay the Expense Reimbursement and the Breakup Fee to Buyer and immediately return the Deposit in accordance with the terms and conditions of the Escrow Agreement; provided, that the Breakup Fee shall only be paid from the proceeds of a Competing Bid;

(iii)     pursuant to Section 4.4(i), Sellers shall retain the Deposit and such Deposit shall be the sole and exclusive remedy of the Sellers for any and all losses that may be suffered based upon, resulting from or arising out of the circumstances giving rise to such termination; or

(iv)     pursuant to Sections 4.4(b), (c), (e), (h), (j), (l), (m) or (n), Sellers shall immediately return the Deposit in accordance with the terms and conditions of the Escrow Agreement.

(c)       Following the termination of this Agreement, the Parties shall have no further obligations to one another except for any obligations that, by their terms, survive the termination of this Agreement, as described in Section 4.6(a).

Section 4.6     Effect of Termination.

(a)       In the event that this Agreement is validly terminated in accordance with Section 4.4, this Agreement shall terminate and each of the Parties shall be relieved of its respective duties and obligations arising under this Agreement after the date of such termination and such termination shall be without liability to Buyer or Sellers; provided, however, that this Section 4.6 and the obligations of the Parties set forth in Section 4.5, Section 8.3, Section 8.5 and Article XII hereof shall survive any such termination and shall be enforceable hereunder; and provided further, however, no termination shall relieve any party from liability for its breach or non-performance of its obligations hereunder prior to the date of such termination.

(b)       Remedies.  All remedies hereunder are cumulative and are not exclusive of any other remedies provided by Law.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer that:

Section 5.1     Authorization of Agreement.  Subject to the entry of the Sale Order: (a) each Seller has all requisite power, authority and legal capacity to execute and deliver this Agreement and each Seller has all requisite power, authority and legal capacity to execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by any Seller in connection with the consummation of the transactions contemplated by this Agreement (the "Seller Documents"), to perform their

20

respective obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby; and (b) this Agreement has been, and each of the Seller Documents will be at or prior to the Closing, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other Parties hereto and thereto and the entry of the Sale Order) this Agreement constitutes, and each of the Seller Documents when so executed and delivered will constitute, legal, valid and binding obligations of each Seller, enforceable against each Seller in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 5.2    Title to Purchased Assets.  Other than the real property subject to the Real Property Leases and the personal property subject to the Personal Property Leases, Sellers have good title to the Purchased Assets and, at the Closing, the Buyer, pursuant to the Sale Order, shall acquire good title in, to and under (subject to the Purchased Contracts (other than Purchased Contracts assumed or assigned post-Closing) being assumed and assigned in accordance with Section 2.1) all of such Purchased Assets, in each case free and clear of all Liens, other than Permitted Exceptions, to the fullest extent permissible under Section 363(f) of the Bankruptcy Code.  The Purchased Assets include all of the properties and assets required to operate, in all material respects, the Business in the Ordinary Course of Business.  For the sake of clarity, the right to use any assets included in the Purchased Assets in which Sellers have leasehold or non-ownership rights to use shall be assigned to Buyer only through the assumption and assignment of the Purchased Contracts in accordance with and subject to this Agreement.

Section 5.3    Real Property.  Schedule 1.1(a) sets forth a complete list of all real property and interests in real property leased by Sellers (individually, a "Real Property Lease" and collectively, the "Real Property Leases") as lessee or lessor in connection with the Business.  Sellers have a valid and enforceable leasehold interest under each Real Property Lease under which it is a lessee.

Section 5.4    Tangible Personal Property.  Schedule 1.1(a) sets forth all leases of personal property ("Personal Property Leases") relating to material personal property used by Sellers or to which any Seller is a party or by which the properties or assets of any Seller are bound, in each case relating to the Business.  Each Seller has a valid and enforceable leasehold interest under each Personal Property Lease under which it is a lessee.

Section 5.5    Intellectual Property.  Schedule 1.1(a) sets forth an accurate and complete list of all material Intellectual Property used in the Business.  To Sellers' Knowledge, Sellers own all right, title and interest to, or are licensees with respect to, the Purchased Intellectual Property, and can convey such property free and clear of Liens pursuant to the Sale Order.  To the Knowledge of Sellers, (i) no Person is engaging in any activity that materially infringes any Purchased Intellectual Property and (ii) no claim has been asserted to any Seller that the use of any Purchased Intellectual Property or the operation of the Business infringes or violates the Intellectual Property of any third party.

21

Section 5.6    <u>Financial Advisors</u>. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Sellers in connection with the transactions contemplated by this Agreement, and no Person is entitled to any fee or commission or like payment from Buyer or Sellers in respect thereof.

Section 5.7    <u>Litigation</u>. Except as set forth on <u>Schedule 5.7</u> and other than in connection with the Bankruptcy Cases, there is no material suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the Sellers' Knowledge, threatened against or relating to any Seller or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, is reasonably likely to adversely affect the ability of any Seller to enter into this Agreement or to consummate the transactions contemplated hereby and Sellers have no Knowledge of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

Section 5.8    <u>Compliance with Laws</u>. Sellers have conducted and are presently conducting the Business in compliance with all applicable Laws, except where such non-compliance would not result in a Material Adverse Effect.

Section 5.9    <u>Permits</u>. Sellers are in compliance with the material terms of all applicable Permits, and all such Permits are valid and in full force and effect, except in each case where such non-compliance or non-validity would not result in a Material Adverse Effect, and no proceeding is pending or, to the Knowledge of Sellers, threatened, the object of which is to revoke, limit or otherwise affect any such Permit.

Section 5.10    <u>Inventory</u>.

(a)    The Inventory is not materially damaged in any significant way, including, but not limited to, damage caused by water, except for any such damage which would not have a Material Adverse Effect on the Inventory taken as a whole;

(b)    To Sellers' Knowledge, the Inventory has not been part of a current or past product recall; and

(c)    The Inventory is in material compliance with United States federal guidelines for such products as of the date hereof, except for such compliance failure which would not have a Material Adverse Effect on the Inventory taken as a whole.

Section 5.11    <u>Contracts</u>. The Contracts set forth on <u>Schedule 1.1(a)</u> include all Contracts material to the ownership and/or operation of the Business. Except as set forth on <u>Schedule 5.7</u>, Sellers have not, and, to Sellers' Knowledge, no other party to any Purchased Contract has, commenced any action against any of the parties to any Purchased Contract or given or received any written notice of any default or violation under any Purchased Contract that has not been withdrawn or dismissed except to the extent such default or violation will be cured as a result of the payment of the applicable Cure Amounts. Each Purchased Contract is, or will be upon the Closing and payment of the applicable Cure Amounts, valid, binding and in full force and effect in accordance with its terms.

22

Section 5.12    Taxes.

(a)    All income Tax Returns required to have been filed by Sellers for each of the Sellers' tax years ended through March 31, 2014 have been filed.

(b)    Except as set forth on Schedule 5.12:

(i)    To the Knowledge of the Sellers, no federal or state income Tax Return audits are pending with respect to any Seller;

(ii)    No Seller has received written notice from any Governmental Body of future federal or state income Tax Return audits;

(iii)    There are no material liens with respect to Taxes upon any of the Purchased Assets, other than (A) Permitted Exceptions and (B) Liens that may arise to the extent payment of such Taxes is stayed as a result of the Bankruptcy Cases ("Stayed Tax Liens"); and

(iv)    No Seller has (A) waived any statute of limitations in respect of any Tax Returns that have not been filed as of the date hereof or (B) agreed to any extension of time with respect to the assessment of Taxes for which such Taxes have not been paid as of the date hereof, in each case other than pursuant to extensions of time to file Tax Returns obtained in the ordinary course of business.

Section 5.13    Employee Benefits.

(a)    Schedule 5.13 sets forth all "employee benefit plans", as defined in Section 3(3) of ERISA, and all other material employee benefit arrangements, employment agreements or payroll practices maintained by Sellers or to which Sellers contribute or are obligated to contribute thereunder for Employees (the "Benefit Plans"). Neither Sellers nor any of their affiliates and any trade or business (whether or not incorporated) which is or has ever been under common control, or which is or has ever been treated as a single employer, with any of them under Section 414(b), (c), (m) and (o) of the Code has in the last six years contributed or has been obligated to contribute to any "employee pension plans", as defined in Section 3(2) of ERISA, subject to Title IV of ERISA or Section 412 of the Code, including a "multiemployer plan", as defined in Section 3(37) of ERISA. None of the Seller Plans provide for post-employment life or health insurance, benefits or coverage for any participant or any beneficiary of a participant, except as may be required under the Consolidate Omnibus Budget Reconciliation Act of 1985, as amended, ("COBRA") and at the expense of the participant or the participant's beneficiary.

(b)    True, correct and complete copies of the following documents, with respect to each of the Benefit Plans, have been made available or delivered to Buyer by Sellers, to the extent applicable: (i) any plans, all amendments thereto and related trust documents, and amendments thereto; (ii) the most recent Forms 5500 and all schedules thereto; (iii) the most recent IRS determination letter; (iv) the most recent summary plan descriptions; (v) written communications to employees relating to the Benefit Plans; and (vi) written descriptions of all non-written agreements relating to the Benefit Plans.

23

(c)    The Benefit Plans have been maintained, in all material respects, in accordance with their terms and with all provisions of ERISA, the Code and other applicable federal and state laws and all contributions required to have been made under any of the Benefit Plans to any funds or trusts established thereunder or in connection therewith have been made, in all material respects, by the due date thereof (including any valid extension).

Section 5.14    <u>Labor Matters</u>.

(a)    Other than as set forth on <u>Schedule 5.14(a)</u>, (i) no Seller is a party to any labor or collective bargaining agreement with respect to its Employees, (ii) no Employee of any Seller is represented by any labor organization, (iii) no labor organization or group of Employees of any Seller has made a pending demand for recognition or request for certification, (iv) and there are no representation or certification proceedings or petitions seeking a representation election presently pending or, to the Knowledge of Sellers, threatened, to be brought or filed with the National Labor Relations Board or other labor relations tribunal involving any Seller.

(b)    There are no material strikes, lockouts, work stoppages or slowdowns pending or, to the Knowledge of Sellers, threatened against or involving any Seller.

(c)    Except as set forth on <u>Schedule 5.7</u>, there are no unfair labor practice charges, arbitrations, grievances or complaints pending or, to the Knowledge of Sellers, threatened in writing against any Seller relating to the employment or termination of employment of any individual by any Seller except those which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d)    Except as set forth on <u>Schedule 5.7</u>, there are no complaints, charges, administrative proceedings or claims against any Seller pending or, to the Knowledge of Sellers, threatened in writing to be brought or filed with any Governmental Body based on or arising out of the employment by any Seller of any Employee except those which, individually or in the aggregate would not reasonably be expected to have a Material Adverse Effect.

(e)    The employment of each Employee of Sellers is at-will.  <u>Schedule 5.14(e)</u> lists all written employment and consulting agreements to which any Seller is a party or by which it is bound.

Section 5.15    <u>Sellers' Representations and Warranties Generally</u>.  Sellers' representations and warranties herein (including as made or qualified in the Schedules hereto) are made by Sellers in their respective corporate or limited liability company capacity, without personal liability to Sellers' directors, officers, members or counsel, or Sellers' signatory, other than with respect to fraudulent or criminal activity with respect to the transactions contemplated hereby.

## ARTICLE VI
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer hereby represents and warrants to Sellers that:

10011784-v14

Section 6.1    Organization and Good Standing. Buyer is a corporation duly organized, validly existing and in good standing under the Laws of the State of Delaware.

Section 6.2    Authorization of Agreement. Buyer has full corporate or limited liability company power and authority to execute and deliver this Agreement and each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Buyer in connection with the consummation of the transactions contemplated hereby and thereby (the "Buyer Documents"), and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by Buyer of this Agreement and each Buyer Document have been duly authorized by all necessary action on behalf of Buyer. This Agreement has been, and each Buyer Document will be at or prior to the Closing, duly executed and delivered by Buyer, and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Buyer Document when so executed and delivered will constitute, legal, valid and binding obligations of Buyer, enforceable against Buyer, in accordance with their respective terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity).

Section 6.3    Financial Advisors. No Person has acted, directly or indirectly, as a broker, finder or financial advisor for Buyer in connection with the transactions contemplated by this Agreement and no person is entitled to any fee or commission or like payment in respect thereof, other than India Brook Partners, LLC.

Section 6.4    Litigation. There is no suit, action, litigation, arbitration proceeding or governmental proceeding or audit, including appeals and applications for review, in progress, pending or, to the best of Buyer's knowledge, threatened against or relating to Buyer or any judgment, decree, injunction, deficiency, rule or order of any court, governmental department, commission, agency, instrumentality or arbitrator which, in any case, is reasonably likely to adversely affect the ability of Buyer to enter into this Agreement or to consummate the transactions contemplated hereby and Buyer is not aware of any existing ground on which any such action, suit or proceeding may be commenced with any reasonable likelihood of success.

Section 6.5    Financial Capability. Buyer (i) has, or has firm commitments for, as of the date hereof, and will have as of the Closing, sufficient funds to pay the Purchase Price and the Cure Amounts, assume the Assumed Liabilities, and pay any expenses incurred by Buyer in connection with the transactions contemplated by this Agreement; (ii) has, as of the date hereof, and will have as of the Closing, the resources and capabilities (financial or otherwise) to perform its obligations hereunder and (iii) has not, as of the date hereof, and will not have as of the Closing, incurred any obligation, commitment, restriction or Liability of any kind which would impair or is reasonably likely to adversely affect such resources and capabilities.

Section 6.6    Condition of the Business. Notwithstanding anything contained in this Agreement to the contrary, Buyer acknowledges and agrees that Sellers and each of their directors, officers, employees, agents, shareholders, Affiliates, consultants, counsel, accountants and other representatives are not making any representation or warranty whatsoever, express or

25

10011784-v14

implied, beyond those expressly given by Sellers in Article V hereof (as modified by the Schedules hereto), and Buyer acknowledges and agrees that, except for the representations and warranties contained therein, the Purchased Assets and the Business are being transferred on a "WHERE IS" and, as to condition, "AS IS" basis.

## ARTICLE VII
## BANKRUPTCY COURT APPROVAL

Section 7.1    Approval of Expense Reimbursement and Overbid Protection. Subject to the entry of the Bidding Procedures Order, in consideration for Buyer having expended considerable time and expense in connection with this Agreement and the negotiation thereof and the identification and quantification of assets of Sellers, Sellers shall pay to Buyer promptly upon the effective date of termination of this Agreement in accordance with, and only to the extent provided in, Section 4.5 hereof (a) Buyer's reasonable fees, costs and expenses (including, without limitation, consultants' and attorneys' reasonable fees, costs and expenses) incurred in connection with the transactions contemplated by this Agreement through the date of termination, provided that the amount of such reimbursement does not exceed Three Hundred Thousand Dollars ($300,000) (the "Expense Reimbursement") and (b) a termination fee of Three Hundred Fifty Thousand Dollars ($350,000) (the "Breakup Fee"). In addition, the Bidding Procedures Order shall provide for (x) an initial minimum overbid equal to the aggregate of the Purchase Price, the Expense Reimbursement and the Breakup Fee, plus an initial minimum bid increment of One Hundred Fifty Thousand Dollars ($150,000), and (y) minimum bid increments thereafter of One Hundred Thousand Dollars ($100,000), and Buyer shall have the ability to credit bid at the Auction the amount of the Expense Reimbursement and the Breakup Fee (collectively).

Section 7.2    Competing Transaction.

(a)    This Agreement is subject to approval by the Bankruptcy Court and the consideration by Sellers of higher or better competing bids (each a "Competing Bid"). From the date hereof (and any prior time) and until the completion of the Auction or as otherwise directed by the Bankruptcy Court, Sellers are permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its Affiliates, agents and representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, Sellers shall be permitted to respond to any inquiries or offers to purchase all or any part of the Purchased Assets (each, an "Alternative Proposal"), provided that such Person enters into a non-disclosure agreement in favor of Sellers, and perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable law, including supplying information relating to the Business and the assets of Sellers to prospective buyers. No later than two (2) Business Days prior to the Auction, Sellers shall provide to Buyer a copy of any such Alternative Proposal and any written response of Sellers thereto and regularly update Buyer as to the status of any negotiations therewith.

(b)    Following completion of the Auction, Sellers are not permitted to cause their representatives and Affiliates to initiate contact with, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to Buyer and its agents and

26

representatives) in connection with any sale or other disposition of the Purchased Assets. In addition, unless otherwise directed by the Bankruptcy Court, Sellers shall not after completion of the Auction respond to any Alternative Proposal or perform any other acts related thereto, including supplying information relating to the Business and the assets of Sellers to prospective buyers of the Purchased Assets.

Section 7.3    Bankruptcy Court Filings. Sellers shall use commercially reasonable efforts (A) to file the Sale Procedures Motion with the Bankruptcy Court on or promptly after the Petition Date, and (B) to seek entry of the Bidding Procedures Order and the Sale Order. Buyer agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining entry of the Bidding Procedures Order and the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of demonstrating that Buyer is a "good faith" Buyer under Section 363(m) of the Bankruptcy Code. In the event the entry of the Bidding Procedures Order and the Sale Order shall be appealed, Sellers shall use commercially reasonable efforts to defend such appeal.

## ARTICLE VIII
## COVENANTS

Section 8.1    Access to Information. Sellers agree that, prior to the Closing Date, Buyer shall be entitled, through their respective officers, employees and representatives (including their respective legal advisors and accountants), to make such investigation of the properties, businesses and operations of the Business and such examination of the books, records and financial condition of the Business, the Purchased Assets and the Assumed Liabilities as they reasonably request and to make extracts and copies of such books and records. Any such investigation and examination shall be conducted during regular business hours upon reasonable advance written notice and under reasonable circumstances and shall be subject to restrictions under applicable Law. Sellers shall cause their respective officers, employees, consultants, agents, accountants, attorneys and other representatives to cooperate with Buyer and Buyer's representatives in connection with such investigation and examination, and Buyer and its representatives shall cooperate with Sellers and their respective representatives and shall use their reasonable efforts to minimize any disruption to the Business.

Section 8.2    Further Assurances. Each of Sellers and Buyer shall use commercially reasonable efforts to (a) take all actions necessary or appropriate to consummate the transactions contemplated by this Agreement on or prior to the Termination Date, (b) cause the fulfillment at the earliest practicable date of all of the conditions to their respective obligations to consummate the transactions contemplated by this Agreement and (c) promptly inform the other party at the earliest practicable date of such other party's deficiency, failure to perform or failure to fulfill a condition to consummation of the transactions contemplated by this Agreement, so that such other party may timely fulfill its obligations under clause (b) hereof. Notwithstanding anything in this Agreement to the contrary, including, without limitation this Section 8.2, where a party is permitted, pursuant to this Agreement, to act in its discretion, actions pursuant to such discretion shall not be subject to the provisions of clauses (a) or (b) of the prior sentence.

27

Section 8.3    Confidentiality.

(a)    Buyer acknowledges that the confidential information provided to them in connection with this Agreement, including under Section 8.1, and the consummation of the transactions contemplated hereby, is subject to the terms and conditions of that certain non-disclosure agreement between Sellers and Buyer.

(b)    Following the completion of the Auction, Sellers agree to maintain, and shall cause their respective Affiliates to maintain, unless disclosure is required by applicable Law, the confidentiality of any confidential information regarding the Business which is in Sellers' or any of their respective Affiliate's possession or of which Sellers or any of their respective Affiliates are aware.  Sellers hereby further agree, unless disclosure is required by applicable Law, to take all appropriate steps, consistent with Sellers' past practice, and to cause each of their respective Affiliates to take all appropriate steps, consistent with Sellers' past practice, to safeguard such confidential information and to protect it against disclosure, misuse, espionage, loss and theft.  In furtherance and not in limitation of the foregoing, Sellers shall not, and shall cause their respective Affiliates not to, unless required by applicable Law, disclose to any Person (a) any confidential information regarding the Business, provided, that confidential information shall not include information that becomes generally available to the public other than as a result of the breach of this Section 8.3(b) or information not otherwise known by the Sellers that becomes available to any Seller from a Person other than Buyer (provided that such third party Person is not and was not prohibited from disclosing such confidential information to such Seller by any legal, fiduciary or contractual obligation), or (b) any of the discussions or negotiations conducted with Buyer in connection with this Agreement, provided, that Sellers shall be entitled to disclose (i) any information required to be disclosed by Sellers to the Bankruptcy Court, the United States Trustee, parties in interest in the Bankruptcy Cases, other Persons bidding on assets of Sellers, (ii) any information required to be disclosed by Sellers pursuant to any applicable Law (including, without limitation, the Bankruptcy Code), Legal Proceeding or Governmental Authority, or (iii) any information to Sellers' counsel and financial advisor; provided, that, in each case, such disclosure shall be limited to the information that is so required to be disclosed and the Person(s) to whom such disclosure is required.  Notwithstanding anything in this Section 8.3 to the contrary, unless disclosure is required by applicable Law, the confidentiality of any Trade Secrets of the Business shall be maintained for so long as such Trade Secrets continue to be entitled to protection as Trade Secrets of the Business.

Section 8.4    Preservation of Records.  Sellers (or any subsequently appointed bankruptcy estate representative, including, but not limited to, a trustee, a creditor trustee or a plan administrator) and Buyer agree that each of them shall preserve and keep the books and records held by it relating to the pre-Closing Business for a period of six (6) years from the Closing Date and shall make such books and records available to the other parties (and permit such other party to make extracts and copies of such books and records at its own expense) as may be reasonably required by such party in connection with, among other things, any insurance claims by, Legal Proceedings or Tax audits against or governmental investigations of Sellers or Buyer or any of their respective Affiliates or in order to enable Sellers or Buyer to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Sellers, on the one hand, or Buyer, on the other hand, wish to destroy such records during such six (6) year period, such Party shall first

28

give twenty (20) days' prior written notice to the other and such other Party shall have the right at its option and expense, upon prior written notice given to such Party within that twenty (20) day period, to take possession of the records within thirty (30) days after the date of such notice.

Section 8.5    Publicity. Neither Sellers, on the one hand, nor Buyer, on the other hand, shall issue any press release or public announcement concerning this Agreement or the transactions contemplated hereby without obtaining the prior written approval of the other Parties hereto, which approval will not be unreasonably withheld or delayed, unless, in the sole judgment of Buyer or Sellers, disclosure is otherwise required by applicable Law or with respect to filings to be made with the Bankruptcy Court in connection with this Agreement. Notwithstanding the foregoing, the Parties may publicly disclose the existence of this Agreement.

Section 8.6    Operation of Business. Until the Closing, Sellers shall use commercially reasonable efforts, except as otherwise required, authorized or restricted pursuant to the Bankruptcy Code or an Order of the Bankruptcy Court, to operate the Business in the Ordinary Course of Business (among other things, Sellers will not incur unreasonable liabilities, including, without limitation, inappropriate increases in Inventory or factoring of accounts receivable). Sellers shall use commercially reasonable efforts to (A) preserve intact their respective business organizations, (B) maintain the Business and the Purchased Assets (normal wear and tear excepted), (C) keep available the services of their respective officers and Employees, (D) maintain satisfactory relationships with licensors, licensees, suppliers, contractors, distributors, consultants, customers and others having business relationships with Sellers in connection with the operation of the Business (other than payment of pre-petition claims), (E) pay all of their respective post-petition obligations in the Ordinary Course of Business, and (F) continue to operate the Business in all material respects in compliance with all Laws applicable to the Business and Sellers.

Section 8.7    Section 363(b)(1)(A). Buyer shall honor and observe any and all policies of Sellers in effect on the Petition Date prohibiting the transfer of personally identifiable information about individuals and otherwise comply with the requirements of Section 363(b)(1)(A) of the Bankruptcy Code.

Section 8.8    Adequate Assurances Regarding Purchased Contracts and Certain Real Property Leases. With respect to each Purchased Contract and Real Property Lease set forth on Schedule 1.1(c), Buyer shall provide adequate assurance of the future performance of such Purchased Contract and Real Property Lease by Buyer as required by Sections 365(b)(1)(C) and/or 365(f)(2)(B) of the Bankruptcy Code, as applicable.

Section 8.9    Material Adverse Effect. Sellers shall promptly inform Buyer in writing of the occurrence of any event that has had, or is reasonably expected to have, a Material Adverse Effect.

Section 8.10    Employee Matters.

(a)    Sellers shall reasonably assist Buyer to engage, in Buyer's sole and absolute discretion, the services of Sellers' current employees ("Prospective Employees"), on

29

terms and conditions satisfactory to Buyer and such Prospective Employees. Buyer shall be provided access to, and be allowed to communicate with, such Prospective Employees. Sellers shall not, and shall not attempt to, engage or transfer the services of any of the Prospective Employees to any other business operated by Sellers or their successors; provided, however, that in the event Buyer engages and then later terminates the services of any Prospective Employee, Sellers may later re-engage the services of such individuals.

(b)       Buyer shall, in consultation with Sellers, identify the names of the Prospective Employees whose services it wishes to engage at least five (5) days prior to the Closing Date. Such individuals who accept such offer or otherwise continue employment with Buyer are hereinafter referred to as the "Transferred Employees." Nothing herein shall obligate Buyer to employ any Transferred Employee for any particular length of time following the Closing Date.

(c)       Effective as of the Closing Date, Buyer shall either (i) assume the Benefit Plans or (ii) provide the Transferred Employees with employee benefit plans substantially similar, in the aggregate, to the Benefit Plans provided to such Transferred Employees by Sellers immediately prior to Closing (which could include a combination of assumed Benefit Plans and newly established employee benefit plans) and such Transferred Employees shall be credited for service earned on and prior to the Closing Date with Sellers in addition to service earned with Buyer on or after the Closing Date to the extent that any Benefit Plan that is a Purchased Asset or the employee benefit plans of Buyer, as applicable, take into account service for purposes of eligibility, vesting or the calculation of vacation, sick days, severance, layoff and similar benefits (but not for purposes of pension benefit accruals).

Section 8.11    Stayed Tax Liens. Prior to the Closing, Sellers shall notify Buyer within three (3) Business Days after any Stayed Tax Lien arises.

Section 8.12    Cooperation. Sellers, on the one hand, and Buyer, on the other hand, will provide each other with such cooperation and information as either of them may reasonably request of the other in connection with filing any Tax Return, amended Tax Return or claim for refund, determining a liability for Taxes or a right to a refund of Taxes, or participating in or conducting any audit or other proceeding in respect of Taxes (such cooperation and information shall include providing copies of relevant Tax Returns or portions thereof, together with accompanying schedules, related work papers and documents relating to rulings and other determinations by Tax authorities). In addition, Buyer shall make available to Sellers, without charge to Sellers, such office space and employee support reasonably necessary to assist Sellers to wind up Sellers' operations following the Closing, resolve the Bankruptcy Cases, dissolve any or all of the Sellers and prepare and file the Tax Returns. Any information obtained under this Section 8.12 shall be kept confidential except as may be otherwise necessary in connection with the filing of Tax Returns or claims for refund or in conducting any audit or other proceeding.

Section 8.13    Schedules. On or before the Schedule Delivery Deadline, Sellers and Buyer shall deliver all Schedules to this Agreement not theretofore delivered, which Schedules shall be in form and substance satisfactory to Buyer and Sellers.

10011784-v14

Section 8.14    Corporate Names.

(a)    Sellers hereby acknowledge and agree that, as a Purchased Asset, Buyer is purchasing Sellers' rights to the names "Geneva Watch Group", "Advance Watch Company, Ltd.", "Sunburst Products, Inc." and "GWG International, Ltd." as well as the names set forth on Schedule 8.14 (the "Purchased Names"), and that Buyer shall have the exclusive right to obtain in its own name copyrights, trademarks and all other forms of protection with respect thereto. No Seller nor any of its Affiliates will at any time claim any right, title or interest to the Purchased Names.

(b)    Within one (1) Business Day after the Closing, Sellers shall make all necessary filings to change the corporate names of each Seller in their respective states of incorporation or organization and in all states in which they are authorized to transact business on the Closing Date, to a name that does not contain any words similar or reasonably likely to be confused with the Purchased Names.

Section 8.15    Letters of Credit.  Upon the Closing, Buyer shall replace, assume or provide a back-to-back letter of credit for each of the Assumed L/Cs that will be outstanding as of the Closing, as set forth on Schedule 8.15 (such schedule to be delivered by Sellers to Buyers at least five (5) days prior to the Closing); provided, that the aggregate amount of the Assumed L/Cs set forth on such schedule or otherwise shall not exceed Four Million Dollars ($4,000,000), in each case in a manner satisfactory to the issuing bank(s) of such Assumed L/Cs.

**ARTICLE IX**
**CONDITIONS TO CLOSING**

Section 9.1    Conditions Precedent to Obligations of Buyer.  The obligation of Buyer to consummate the transactions contemplated by this Agreement is subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived by Buyer in whole or in part to the extent permitted by applicable Law):

(a)    The representations and warranties of Sellers set forth in this Agreement qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materiality shall be true and correct and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(b)    Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them prior to the Closing Date, and Buyer shall have received a certificate signed by an authorized officer of each Seller, dated the Closing Date, to the forgoing effect in his or her corporate or limited liability company (not personal) capacity (it being acknowledged and agreed

31

that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(c)     Sellers shall have delivered, or caused to be delivered, to Buyer all of the items set forth in <u>Section 4.2</u>;

(d)     From the date hereof through the Closing Date, there shall have been no Material Adverse Effect;

(e)     The Purchased Contracts shall be sold and assumed and assigned to Buyer by Order of the Bankruptcy Court satisfactory to Buyer in its reasonable discretion, except for any Purchased Contracts to be assumed and assigned after the Closing;

(f)     The aggregate Cure Amounts as determined by the Bankruptcy Court shall not be more than 125% (exclusive of "Common Area Maintenance" adjustments for the applicable lease year in which the Closing occurs pursuant to the terms of Real Property Leases that are Purchased Assets) of the aggregate Cure Amounts set forth on <u>Schedule 9.1(f)</u>;

(g)     The Bidding Procedures Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer);

(h)     The Sale Order shall have become a Final Order (unless this condition shall have been waived in writing by Buyer);

(i)     Kenneth Cole Productions (LIC), LLC, Kenneth Cole Productions, Inc. (collectively, "<u>KC</u>") and Buyer shall have entered into a reasonably mutually agreeable license agreement on the terms and conditions previously agreed to by Buyer and KC, it being understood that, in connection therewith, Buyer shall pay to KC the amount of the Guaranteed Minimum Royalty and the minimum Advertising Fee (as such terms are defined in the Kenneth Cole License) that are otherwise due on October 1, 2015 under the Kenneth Cole License; and

(j)     The licenses set forth on <u>Schedule 9.1(j)</u> shall have each been assumed by Sellers and assigned to Buyer as of the Closing and any necessary consents in respect thereof shall have been obtained.

Section 9.2     <u>Conditions Precedent to Obligations of Sellers</u>. The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, prior to or on the Closing Date, of each of the following conditions (any or all of which may be waived by Sellers in whole or in part to the extent permitted by applicable Law):

(a)     The representations and warranties of Buyer set forth in this Agreement qualified as to materiality shall be true and correct, and those not so qualified shall be true and correct in all material respects, at and as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date (in which case such representations and warranties qualified as to materially shall be true and correct, and those not so qualified shall be true and correct in all material respects, on and as of such earlier date); and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability company (not personal) capacity (it

32

being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(b)    Buyer shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by Buyer on or prior to the Closing Date; and Sellers shall have received a certificate signed by an authorized officer of Buyer, dated the Closing Date, to the foregoing effect in his or her corporate or limited liability (not personal) capacity (it being acknowledged and agreed that the signatory to such certificate shall have no personal liability as a result of signing such certificate absent fraud);

(c)    To the extent that Buyer determines, in its sole and absolute discretion, to assign its rights, interests and obligations hereunder to one or more of its designees, such designee(s) shall deliver to Sellers the certificates required to be delivered pursuant to Section 9.2(a) and Section 9.2(b) hereof, certifying to such matters with respect to itself or themselves;

(d)    Buyer shall have delivered, or caused to be delivered, to Sellers the Purchase Price; and

(e)    the Sale Order shall have been entered and be effective, not subject to any stay.

Section 9.3    Condition Precedent to Obligations of Buyer and Sellers.  The respective obligations of Buyer and Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of the following conditions (which may be waived by Buyer and Sellers in whole or in part to the extent permitted by applicable Law):

(a)    there shall not be in effect any Order by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby.

Section 9.4    Frustration of Closing Conditions.  Neither Sellers nor Buyer may rely on the failure of any condition set forth in Section 9.1, Section 9.2 or Section 9.3, as the case may be, if such failure was caused by such Party's breach of this Agreement.

## ARTICLE X
## NO SURVIVAL

Section 10.1    No Survival of Representations and Warranties.  The Parties hereto agree that the representations and warranties contained in this Agreement shall not survive the Closing hereunder, and none of the Parties shall have any liability to each other after the Closing for any breach thereof.  The Parties hereto agree that the covenants contained in this Agreement to be performed after the Closing shall survive the Closing hereunder, and each Party hereto shall be liable to the other after the Closing for any breach thereof.

33

## ARTICLE XI
## TAX MATTERS

Section 11.1    Transfer Taxes.  Buyer shall be responsible for all Transfer Taxes.

Section 11.2    Purchase Price Allocation.  Within sixty (60) days after the Closing Date, Buyer and Sellers will agree to a certificate of allocation detailing the allocation of the Purchase Price  and Assumed Liabilities among the Purchased Assets.  Buyer and Sellers will treat Sellers' transfer of the Purchased Assets to Buyer as an exchange governed by Section 1001 and Section 1060 of the Code and, in accordance with such treatment, will each file an Internal Revenue Service Form 8594 "Asset Acquisition Statement under Section 1.1060-1" at the times and in the manner as required by Treasury Regulation 1060-1 consistent with the certificate of allocation.  The certificate of allocation will be conclusive and binding on the Parties for all purposes, including reporting and disclosure requirements under the Code and any foreign, state, or local Tax authority, except as provided by a change in applicable Tax Law or the good faith resolution of a Tax contest.

Section 11.3    Audits, Claims and Proceedings.  Sellers shall have the right to control the conduct of the defense of any audit, claim, proceeding, investigation, or other controversy relating to Taxes ("Tax Claim") of Sellers for any taxable period ending on or prior to, or including, the Closing Date; provided, however, that Sellers will not have the right to settle any such Tax Claim if the resolution or determination of such Tax Claim is reasonably likely to materially adversely affect Buyer without first obtaining Buyer's written consent, such consent to not be unreasonably withheld, conditioned or delayed.

## ARTICLE XII
## MISCELLANEOUS

Section 12.1    Expenses.  Except for the Expense Reimbursement that may be owed by Sellers to Buyer pursuant to Section 4.5, if any, each of Sellers and Buyer shall bear their own fees, costs and expenses incurred in connection with the negotiation and execution of this Agreement and each other agreement, document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

Section 12.2    Submission to Jurisdiction; Consent to Service of Process.

(a)    Without limiting any Party's right to appeal any order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (ii) any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 12.6 hereof; provided, however, that if the Bankruptcy Cases have not been commenced or have been closed, the Parties agree to unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York or the courts of the State of New York located in the County of New York and any appellate court thereof, for the

34

resolution of any such claim or dispute. The Parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties hereto agrees that a judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by Law.

(b)     Each of the Parties hereto hereby consents to process being served by any Party to this Agreement in any suit, action or proceeding by delivery of a copy thereof in accordance with the provisions of Section 12.6.

Section 12.3    Waiver of Right to Trial by Jury. Each Party to this Agreement waives any right to trial by jury in any action, matter or proceeding regarding this Agreement or any provision hereof.

Section 12.4    Entire Agreement; Amendments and Waivers. This Agreement (including the Schedules and Exhibits hereto) represents the entire understanding and agreement between the Parties hereto with respect to the subject matter hereof. This Agreement can be amended, supplemented or changed, and any provision hereof can be waived, only by written instrument making specific reference to this Agreement signed by the Party against whom enforcement of any such amendment, supplement, modification or waiver is sought or, if such amendment, supplement, modification or waiver can be so construed, by both Parties. No action taken pursuant to this Agreement, including any investigation by or on behalf of any Party, shall be deemed to constitute a waiver by the Party taking such action of compliance with any representation, warranty, covenant or agreement contained herein. The waiver by any Party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach. No failure on the part of any Party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such Party preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

Section 12.5    Governing Law. This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in the State of New York.

Section 12.6    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (i) when delivered personally by hand (with written confirmation of receipt), (ii) when sent by facsimile (with written confirmation of transmission) or electronic mail (and no notice of failure of delivery was received within a reasonable time after such message was sent) or (iii) one Business Day following the day sent by overnight courier (with written confirmation of receipt), in each case at the following addresses, facsimile numbers and e-mail addresses (or to such other address, facsimile number or e-mail address as a Party may have specified by notice given to the other Party pursuant to this provision):

35

If to Sellers, to:

    c/o Advance Watch Company Ltd.
    1407 Broadway Avenue, Suite 400
    New York, NY 10018
    Attention:  Jeff Gregg, CRO
    Fax:  (646) 304-8027
    Email:  JGregg@genevawg.com

with a copy to:

    Venable LLP
    2049 Century Park East, Suite 2100
    Los Angeles, CA  90067
    Attention:  Ronn S. Davids
    Fax:        (310) 229-9901
    Email:  RDavids@venable.com

with an additional copy to:

    Otterbourg P.C.
    230 Park Avenue
    New York, NY  10169
    Attention:  Daniel F. Fiorillo
    Fax:        (212) 682-6104
    Email:  DFiorillo@otterbourg.com

If to Buyer, to:

    C/O Time Watch Investments Limited
    27/F., CEO Tower, 77 Wing Hong Street
    Cheung Sha Wan, Kowloon, Hong Kong
    Attention: Ms. Clara Cheung ,Chief Financial Officer
    Fax:        (852) 2413 1103
    Email:   claracheung@timewatch.com.hk

with an additional copy to:

    Baker & Hostetler LLP
    45 Rockefeller Plaza
    New York, NY, 10024
    Attention:  Christoph Lange
    Fax:        (212) 589-4267
    Email:      clange@bakerlaw.com

10011784-v14

Each Party entitled to notice may change the address to which notices, requests, demands, claims and other communications hereunder are to be delivered by giving all other Parties notices in the manner herein set forth.

Section 12.7    Severability.  If any term or other provision of this Agreement is invalid, illegal, or incapable of being enforced by any Law or public policy, all other terms or provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal, or incapable of being enforced, the Parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in an acceptable manner in order that the transactions contemplated hereby are consummated as originally contemplated to the greatest extent possible.

Section 12.8    Binding Effect; Assignment.  This Agreement shall be binding upon and inure to the benefit of the Parties and their respective successors and permitted assigns, including, without limitation, any chapter 11 trustee hereinafter appointed for Sellers' estates or any trustee appointed in a chapter 7 case if the Bankruptcy Cases are converted from chapter 11. Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by either Sellers, on the one hand, or Buyer, on the other hand (by operation of law or otherwise), without the prior written consent of the other Parties hereto and any attempted assignment without the required consents shall be void; provided, however, that Buyer may, without the consent of Sellers, assign its rights, interests, and obligations hereunder to one or more of its designees; provided, that Buyer shall remain obligated as Buyer hereunder.

Section 12.9    Counterparts.  This Agreement may be executed in one or more counterparts (including by facsimile or electronic mail), each of which will be deemed to be an original copy of this Agreement and all of which, when taken together, will be deemed to constitute one and the same agreement.

Section 12.10    Attorney-Client Privilege.  The parties hereto hereby acknowledge that Venable LLP has acted as counsel to Sellers from time to time prior to the transactions contemplated by this Agreement as well as with respect thereto.  The following provisions in this Section 12.10 apply solely to the attorney-client relationship between (a) Sellers and Venable LLP prior to the Closing and (b) Sellers and Venable LLP following the Closing.  Subject to the exceptions below, each of the parties hereto agrees that:  (i) it will not seek to disqualify Venable LLP, based solely on its prior representation of Sellers, from acting and continuing to act as counsel to any of the Sellers either in the event of a dispute hereunder or in the course of the defense or prosecution of any claim relating to the transactions contemplated by this Agreement; (ii) Sellers have a reasonable expectation of privacy with respect to their communications (including any e-mail communications using Seller's email system) with Venable LLP prior to Closing to the extent that such communications were subject to the attorney-client privilege and/or the attorney work product doctrine; and (iii) Sellers (and, following the Closing, not Buyer or any of its Affiliates) shall have access to all such privileged communications (provided

37

that Buyer shall not be required to maintain Sellers' ongoing access to email or other electronic systems of the Business post-Closing).

Notwithstanding any of the foregoing:  (a) Sellers agree that they will not waive, or cause to be waived, any claim of privilege or protection over pre-Closing communications between or among Venable LLP and the Sellers, without first obtaining the written consent of Buyer, which consent shall not be unreasonably withheld; (b) nothing herein shall prevent Buyer from requesting, using or accessing all communications between or among Venable LLP and the Sellers in connection with any claim arising under or in connection with this Agreement or the transactions contemplated hereby or otherwise, so long as such communications are not subject to the attorney-client privilege or work product protection; and (c) in the event that a dispute or investigation or audit arises after the Closing between Buyer, on the one hand, and a third party, on the other hand, Buyer shall notify the Sellers if Buyer requires access to any privileged or protected pre-Closing communications between Venable LLP and Sellers in order to assist in the Buyer's response to or defense of the third-party claim, investigation, or audit, and such access shall not unreasonably be refused.

[*Signature Pages Follow*]

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first written above.

**SELLERS:**

BINDA USA HOLDINGS, INC.

By: _____

Name:  Jeffrey L. Gregg
Title:   Chief Restructuring Officer


ADVANCE WATCH COMPANY LTD.

By: _____

Name:  Jeffrey L. Gregg
Title:   Chief Restructuring Officer


SUNBURST PRODUCTS, INC.

By: _____

Name:  Jeffrey L. Gregg
Title:   Chief Restructuring Officer


GWG INTERNATIONAL, LTD.

By: _____

Name:  Jeffrey L. Gregg
Title:   Chief Restructuring Officer


[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

**BUYER:**

SUNSHINE TIME INC.

By: _____
Name: _Tung Koon Ming_
Title: _President_

[SIGNATURE PAGE TO ASSET PURCHASE AGREEMENT]

*Execution Version*

## SCHEDULE 1.1(a)

### Contracts; Leases; Intellectual Property

1. Omnibus License Agreement Renewal, dated as of January 1, 2012, by and among Advance Watch Company Ltd., Kenneth Cole Productions (LIC), and Kenneth Cole Productions, Inc.

2. Trademark License Agreement, dated as of March 12, 2009, by and between Advance Watch Company Ltd. and Tommy Bahama Group, Inc., as extended by that certain Extension of Trademark License Agreement for Renewal Period dated September 11, 2012, as amended by that certain First Amendment to Trademark License Agreement dated March 22, 2012, as further amended by that certain Second Amendment to Trademark License Agreement dated May 5, 2015.

3. License Agreement, dated as of November 7, 2007, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker, as amended by that certain First Amendment to License Agreement dated as of January 1, 2012, as further amended by that certain Second Amendment to License Agreement dated as of February 23, 2015.

4. Commercial Street Contribution Agreement, dated December 19, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker.

5. License Agreement, dated as of August 10, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Christian Casey L.L.C.

6. Retail Product License Agreement, dated as of August 7, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NBA Properties, Inc., as amended by that certain First Amendment to Retail Product License Agreement dated August 24, 2014.

7. License Agreement, dated as of April 1, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NFL Properties LLC.

8. Retail License Agreement, dated July 18, 2013, by and among Advance Watch Company Ltd. d/b/a Game Time LLC, NHL Enterprises, L.P. and NHL Enterprises Canada, L.P.

9. Standard Retail Product License Agreement, dated as of July 13, 2012, by and between Advance Watch Company Ltd. and Collegiate Licensing Company, as amended by that certain Addendum dated December 18, 2014.

10. Trademark License Agreement, dated as of May 22, 2012, by and between Advance Watch Company Ltd. and Michigan State University.

11. License Agreement, dated as of July 31, 1996, by and between Advance Watch Company Ltd. and Burwood Products Company, as amended by that certain Letter Agreement

dated February 6, 2006, as further amended by that certain Letter Agreement dated November 24, 2014.

12. Licensing Agreement, dated October 22, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and The Curtis Publishing Company, as amended by that certain Addendum to Licensing Agreement dated May 10, 2012, as further amended by that certain Addendum to Licensing Agreement dated January 13, 2014.

13. Licensing Agreement, dated as of December 20, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sundance Group.

14. License Agreement, dated as of January 1, 2015, by and between Geneva Watch Group, Inc. and Morning Glory Licensing, LLC.

15. License Agreement, dated August 13, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and KMJ Brand Holdings LLC.

16. License Agreement, dated as of January 1, 2015, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group and HBI Branded Apparel Enterprises.

17. License Agreement, dated as of September 1, 2011, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group, Sperry Top-Sider LLC and SR Holdings, LLC, as amended by that certain First Amendment to License Agreement dated December __, 2014.

18. License Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Steve Harvey Products, Inc./ Steve Harvey.

19. License Agreement, dated as of March 31, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and IP Holdings Unltd LLC, as amended by that certain Amendment to License Agreement dated March 11, 2011, as further amended by that certain Second Amendment to License Agreement dated January 8, 2014 by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and ZY Holdings LLC (by assignment from IP Holdings Unltd).

20. Letter Agreement, dated as of _____, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and US Lacrosse, Inc.

21. License Agreement, dated as of April 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Soccer United Marketing, LLC.

22. Distribution Agreement, dated as of May 1, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Arista Singapore Pte Ltd.

23. Distribution Agreement, dated as of September 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Carmen Jewelers.

9942447-v6

24. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and GDL Manufacturing Ltd.

25. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Global Tic Sales Inc.

26. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Priority Marketing PVT. Ltd.

27. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Timestore AG.

28. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Chronosoft PTE LTD.

29. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CNB Distributors, LLC.

30. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Comercializadora E-Akluck, S.A. de C.V.

31. Distribution Agreement, dated as of March 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Marlox AG.

32. Distribution Agreement, dated as of November 6, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Merkez Saat Tic.A.S.

33. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New City, Inc.

34. Distribution Agreement, dated as of June 15, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New Sense Development Ltd.

35. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and PT. Sukses Sinar Abadi.

36. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

37. Distribution Agreement, dated as of September 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

38. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and TBN Time Distribution LLC.

39. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Time Deco Corporation Limited.

9942447-v6

40. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Paidel Watch Co., Ltd.

41. Distribution Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Styleright Global Corporation.

42. Letter Agreement, dated June 13, 2013, by and among Advance Watch Company Ltd., Kenneth Cole Productions, Inc. and Wells Fargo Bank, National Association.

43. Credit Agreement, dated as of June 21, 2013, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, Sunburst Products, Inc., GWG International, Ltd., Binda USA Holdings, Inc., Wells Fargo Bank, National Association, and the Lenders that are parties thereto, as amended by that certain Amendment No. 1 to Credit Agreement dated as of June 30, 2014, as amended by that certain Amendment No. 2 to Credit Agreement dated as of August 17, 2015.

44. Standard Vendor Agreement for Merchandise, dated February 24, 2015, by and between Geneva Watch Group and Boscov's Department Store, LLC.

45. Vendor Agreement, dated _____, 2014, by and between Advance Watch Company Ltd. and Helzberg's Diamond Shops, Inc.

46. Amazon Vendor Terms and Conditions effective March 21, 2015 for various brands.

47. Freight Allowance Agreement No. 7409330, dated on or around April 1, 2015, by and between Geneva Clock Company and Amazon Fulfillment Services, Inc.

48. Freight Allowance Agreement No. 7178800, dated on or around April 1, 2015, by and between Breil Milano and Amazon Fulfillment Services, Inc.

49. Trading Terms Agreement, dated February 1, 2014, by and between Geneva Watch Group and The Nuance Group.

50. Letter Agreement regarding Acquisition of "Mathey Tissot" Trademark, dated March 11, 1996, by and among Geneva Watch Company, Mathey Tissot International, Ltd. and Mathey Tissot S.A.

51. Letter Agreement regarding Agreement regarding Mathey Tissot Watch Product, dated May 16, 1996, by and among Geneva Watch Company, JBM Venture Co., Inc. and Jan Bell Marketing, Inc.

52. Letter Agreement regarding grant of license, dated August 17, 2015, by and among Geneva Watch Group and LaCrosse Technology.

53. Agreement, dated August 26, 2015, by and among Advance Watch Company (Far East) Limited, Advance Watch Company Ltd., Wells Fargo Bank, National Association, Koo Chi Sum and Yen Ching Wai, David c/o Ernst and Young Transactions Limited.

4

54. Escrow Agreement, dated August 26, 2015, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, and Koo Chi Sum and Yen Ching Wai c/o Ernst & Young Transactions Limited.

55. Irrevocable Transferable Standby Letter of Credit, dated August 19, 2015, by and among Israel Discount Bank of New York and Allura Imports, Inc.

Real Property Leases:

56. Lease Agreement, dated as of September 6, 2001, by and between Advance Watch Company Limited and Ashley Canton, LLC, as amended by that certain First Amendment dated April 15, 2002, as further amended by that certain Second Amendment dated May 28, 2002, that certain Third Amendment dated June 18, 2006, that certain Fourth Amendment dated March 8, 2010, and that certain Fifth Amendment to Lease dated March 26, 2013, as assigned by landlord to 47440 Michigan Ave, LLC.

57. Lease, dated February 18, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and 1407 Broadway Real Estate, LLC, as assigned by landlord to SRI Eleven 1407 Broadway Operator, LLC.

58. Lease Agreement, dated September 28, 2011, by and between Geneva Watch Group and Pinnacle Plaza, LLC, as amended by that certain Addendum I to Original Lease dated October 3, 2012, as further amended by that certain Addendum II to Original Lease dated May 11, 2015.

59. Sublease Agreement, dated January 30, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Allura Imports, Inc.

60. Multi-Tenant Building Lease, dated May 1, 2009, by and between Advance Watch Company Ltd. and C.J. Segerstrom & Sons, as amended by that certain First Amendment of Lease Agreement dated May 22, 2012, and by that certain Second Amendment of Lease Agreement dated July 28, 2015.

61. Renewal Lease Form, dated July 10, 2015, by and between Binda USA Holdings Inc. and Columbus 60th Realty LLC.

Personal Property Leases:

62. Lease Agreement, dated July 21, 2014, by and between Advance Watch Company Ltd. and CIT Finance LLC.

63. Lease Agreement, dated July 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CIT Finance LLC.

9942447-v6

64. Lease Agreement (Lease No. 001-007914733-002), dated August 5, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

65. Lease Agreement (Lease No. 001-007914733-003), dated September 8, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

66. ValuePlan Lease Agreement, dated March 16, 2015, by and between Geneva Watch Group and IBM Credit LLC.

67. Lease Agreement, dated May 28, 2013, by and between Advance Watch Company Ltd. and LDI Color Toolbox.

6

Patents:

| TITLE | OWNER | COUNTRY | APPLICATION NO. | FILE DATE | ISSUE DATE | PATENT NO. | STATUS |
|---|---|---|---|---|---|---|---|
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | USA | 29/448824 | 14-Mar-2013 | | | Pending |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | China (People's Republic) | 201330443790.7 | 16-Sep-2013 | 14-May-2014 | ZL201330443790.7 | Granted |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | Japan | 2013-021312 | 13-Sep-2013 | 21-Nov-2014 | 1514206 | Granted |
| WATCH BAND RETAINER | Advance Watch Company Ltd. | USA | 29/320106 | 20-Jun-2008 | 09-Mar-2010 | D611378 | Granted |
| WATCH CASE | Advance Watch Company Ltd. | USA | 29/320107 | 20-Jun-2008 | 29-May-2012 | D660725 | Granted |
| WATCH | Advance Watch Company Ltd. | USA | 29/391844 | 13-May-2011 | 18-Mar-2014 | D701128 | Granted |
| TOUCH SCREEN WATCH | Advance Watch Company Ltd. | USA | 12/911205 | 25-Oct-2010 | 02-Sept-2014 | 8824245 | Granted |
| WATCH | Advance Watch Company Ltd. | USA | 29/448819 | 14-Mar-2013 | | | Pending |
| WATCH | Advance Watch Company Ltd. | USA | 29/448820 | 14-Mar-2013 | | | Pending |
| WATCH | Advance Watch Company Ltd. | USA | 29/448825 | 14-Mar-2013 | | | Pending |
| WATCH | Advance Watch Company Ltd. | USA | 29/448827 | 14-Mar-2013 | | | Pending |
| DISPLAY SCREEN SURROUNDED BY A WATCH CASE | Advance Watch Company Ltd. | Australia | 14610/2013 | 13-Sept-2013 | 21-Oct-2013 | 351413 | Granted |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | European Community | 001384317-0001 | 13-Sep-2013 | 13-Sep-2013 | 001384317-0001 | Granted |

9942447-v6

| TITLE | OWNER | COUNTRY | APPLICATION NO. | FILE DATE | ISSUE DATE | PATENT NO. | STATUS |
|---|---|---|---|---|---|---|---|
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | China (People's Republic) | 201330443790.7 | 16-Sep-2013 | 14-May-2014 | ZL201330443790.7 | Granted |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | India | 256436 | 13-Sep-2013 | | | Pending |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | Japan | 2013-021312 | 13-Sep-2013 | | | Pending |
| WATCH DISPLAY WITH ICON | Advance Watch Company Ltd. | USA | 29/448824 | 14-Mar-2013 | | | Pending |
| WRISTWATCH HAVING ROTATABLE CROWN AND CROWN CAP | Advance Watch Company Ltd. | USA | 14/221876 | 21-Mar-2014 | | | Pending |
| WATCH CASE | Sunburst Products, Inc. | USA | 29/127486 | 04-Aug-2000 | 05-Jun-2001 | D443221 | Granted |
| WATCH CASE | Sunburst Products, Inc. | USA | 29/127487 | 04-Aug-2000 | 12-Jun-2001 | D443527 | Granted |

Trademarks:

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Argentina | ADVANCE CLASSIC | Advance Watch Company, Ltd. | 2554827 | 16-Nov-2004 | 2090769 | 06-Jun-2006 | Registered | 06-Jun-2016 |
| Argentina | ADVANCE LTD | Advance Watch Company, Ltd. | 2554828 | 16-Nov-2004 | 2090771 | 06-Jun-2006 | Registered | 06-Jun-2016 |
| Argentina | AQUATECH | Advance Watch Company, Ltd. | 2554826 | 16-Nov-2004 | 2090768 | 06-Jun-2006 | Registered | 06-Jun-2016 |
| Argentina | EZ READ | Advance Watch Company, Ltd. | 2555098 | 17-Nov-2004 | 2149525 | 28-Mar-2007 | Registered | 28-Mar-2017 |
| Argentina | SHARK TOOTH | Sunburst Products, Inc. | 3368742 | 18-Nov-2014 | | | Pending | |
| Australia | ADVANCE | Advance Watch Company, Ltd. | 516923 | 11-Aug-1989 | A516,923 | 04-Nov-1991 | Registered | 11-Aug-2016 |

8

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Australia | **FREE STYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 433,074 | 12-Sep-1985 | A433,074 | 12-Sep-1985 | Registered | 12-Sep-2016 |
| Australia | **FREESTYLE** | Sunburst Products, Inc. | 433073 | 12-Sep-1985 | 433073 | 04-Aug-1988 | Registered | 12-Sep-2016 |
| Australia | **FYI** | Advance Watch Company, Ltd. | 1539093 | 05-Feb-2013 | 1539093 | 29-Oct-2014 | Registered | 05-Feb-2023 |
| Australia | **SHARK FIN DESIGN** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 630328 | 20-May-1994 | 630328 | 20-May-1994 | Registered | 20-May-2024 |
| Austria | **FREESTYLE** | Sunburst Products, Inc. | 174,858 | 31-Mar-1998 | 174,858 | 31-Mar-1998 | Registered | 31-Mar-2018 |
| Bahamas | **SHARK TOOTH** | Sunburst Products, Inc. | | 19-Dec-2014 | | | Pending | |
| Barbados | **SHARK TOOTH** | Sunburst Products, Inc. | | 31-Dec-2014 | | | Pending | |
| Belize | **SHARK TOOTH** | Sunburst Products, Inc. | | 11-Dec-2014 | | | Pending | |
| Benelux | **FREE STYLE** | Sunburst Products, Inc. | 435,452 | 21-May-1997 | 435,452 | 21-May-1997 | Registered | 21-May-2017 |
| Brazil | **2 COOL** | Advance Watch Company, Ltd. | 826810713 | 13-Aug-2004 | | | Pending | |
| Brazil | **AQUATECH** | Advance Watch Company, Ltd. | 826810705 | 13-Aug-2004 | 826810705 | 06-Nov-2007 | Registered | 06-Nov-2017 |
| Brazil | **AVANTI** | Advance Watch Company, Ltd. | 826810691 | 13-Aug-2004 | 826810691 | 20-Oct-2009 | Registered | 20-Oct-2019 |
| Brazil | **FREE STYLE (Stylized)** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 814626947 | 20-Dec-1988 | 814626947 | 13-Aug-1996 | Registered | 13-Aug-2016 |
| Brazil | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 829753680 | 09-Jun-2008 | 829753680 | 22-Feb-2012 | Registered | 22-Feb-2022 |

9

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Brazil | **FYI** | Advance Watch Company, Ltd. | 906268478 | 21-May-2013 | | | Published | |
| Brazil | **FYI** | Advance Watch Company, Ltd. | 908623844 | 19-Nov-2014 | | | Pending | |
| Brazil | **PANACHE** | Advance Watch Company, Ltd. | 826838774 | 25-Aug-2004 | 826838774 | 06-Nov-2007 | Registered | 06-Nov-2017 |
| Brazil | **SHARK** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 819223794 | 27-Mar-2001 | 819223794 | 27-Mar-2001 | Registered | 27-Mar-2021 |
| Brazil | **SHARK FIN DESIGN** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 829753745 | 09-Jun-2008 | 829753745 | 13-Sep-2011 | Registered | 13-Sep-2021 |
| Brazil | **SHARK TOOTH** | Sunburst Products, Inc. | 908641435 | 24-Nov-2014 | | | Published | |
| California | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | | | 104,154 | 25-Aug-1998 | Renewed | 25-Aug-2018 |
| Canada | **ADRENALINE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 1380337 | 23-Jan-2008 | 788241 | 21-Jan-2011 | Registered | 21-Jan-2026 |
| Canada | **ADVANCE** | Advance Watch Company, Ltd. | 581130 | 31-Mar-1987 | 370,822 | 20-Jul-1990 | Registered | 20-Jul-2020 |
| Canada | **ADVANCE TIME TECHNOLOGY** | Advance Watch Company, Ltd. | 1479258 | 30-Apr-2010 | 861238 | 25-Sep-2013 | Registered | 25-Sep-2028 |
| Canada | **AQUATECH** | Advance Watch Company, Ltd. | 626551 | 02-Mar-1989 | 377,995 | 11-Jan-1991 | Registered | 11-Jan-2021 |
| Canada | **AVANTI** | Advance Watch Company, Ltd. | 601996 | 03-Mar-1988 | 370267 | 06-Jul-1990 | Registered | 06-Jul-2020 |
| Canada | **FREE STYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 810,042 | 15-Apr-1996 | 487,971 | 21-Jan-1998 | Registered | 21-Jan-2028 |
| Canada | **GC (Stylized)** | Advance Watch Company, Ltd. | 1390081 | 04-Apr-2008 | 855574 | 18-Jul-2013 | Registered | 18-Jul-2028 |

10

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Canada | icvrd and Design | Advance Watch Company, Ltd. | 1537399 | 27-Jul-2011 | TMA888929 | 29-Oct-2014 | Registered | 29-Oct-2029 |
| Canada | JULES & JAMES | Advance Watch Company, Ltd. | 1509266 | 23-Dec-2010 | | | Published | 20-Sep-2015 |
| Canada | MAKE A FACE | Advance Watch Company, Ltd. | 1639271 | 13-Aug-2013 | | | Published | 13-Aug-2016 |
| Canada | NITRO | Advance Watch Company, Ltd. | 1501239 | 26-Oct-2010 | 806779 | 14-Sep-2011 | Registered | 14-Sep-2026 |
| Canada | PANACHE | Advance Watch Company, Ltd. | 1206107 | 11-Feb-2004 | 680331 | 25-Jan-2007 | Registered | 25-Jan-2022 |
| Canada | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 728,343 | 06-May-1993 | 444,553 | 30-Jun-1995 | Registered | 30-Jun-2025 |
| Canada | SHARK TOOTH | Sunburst Products, Inc. | 1703959 | 21-Nov-2014 | | | Pending | |
| Canada | SLUMBERBUG | Advance Watch Company, Ltd. | 1390080 | 04-Apr-2008 | 797362 | 12-May-2011 | Registered | 12-May-2026 |
| China | CONNECTEDEVICE | Advance Watch Company, Ltd. | 12186430 | 22-Feb-2013 | 12186430 | 07-Feb-2015 | Registered | 06-Feb-2025 |
| China | FREESTYLE | Sunburst Products, Inc. | 7175033 | 20-Jan-2009 | 7175033 | 21-Sep-2011 | Registered | 20-Sep-2021 |
| China | FREESTYLE with Chinese Characters and SHARK FIN DESIGN | Sunburst Products, Inc. | 3336249 | 15-Oct-2002 | 3336249 | 07-Apr-2009 | Registered | 06-Apr-2019 |
| China | FREESTYLE with Chinese Characters and SHARK FIN DESIGN | Sunburst Products, Inc. | 3336247 | 15-Oct-2002 | 3336247 | 07-Feb-2008 | Registered | 06-Feb-2018 |
| China | FYI | Advance Watch Company, Ltd. | 12186431 | 22-Feb-2013 | 12186431 | 14-Dec-2014 | Registered | 13-Dec-2024 |
| China | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 7175032 | 20-Jan-2009 | 7175032 | 21-Sep-2011 | Registered | 20-Sep-2021 |

11

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| China | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 7175031 | 20-Jan-2009 | 7175031 | 21-Sep-2010 | Registered | 20-Sep-2020 |
| Colombia | SHARK TOOTH | Sunburst Products, Inc. | 14264884 | 02-Dec-2014 | | | Published | |
| Costa Rica | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-003565 | 18-Apr-2008 | 182887 | 05-Dec-2008 | Registered | 05-Dec-2018 |
| Costa Rica | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-003564 | 18-Apr-2008 | 182716 | 21-Nov-2008 | Registered | 21-Nov-2018 |
| Costa Rica | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-003563 | 18-Apr-2008 | 182715 | 21-Nov-2008 | Registered | 21-Nov-2018 |
| Costa Rica | SHARK TOOTH | Sunburst Products, Inc. | 20140111035 | 17-Dec-2014 | | | Pending | |
| CTM | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 7304413 | 10-Oct-2008 | 7304413 | 13-Oct-2011 | Registered | 10-Oct-2018 |
| CTM | FYI | Advance Watch Company, Ltd. | 11545183 | 05-Feb-2013 | 11545183 | 28-Jun-2013 | Registered | 05-Feb-2023 |
| CTM | icvrd and Design | Advance Watch Company, Ltd. | 10159747 | 28-Jul-2011 | 10159747 | 08-Dec-2011 | Registered | 28-Jul-2021 |
| CTM | NIGHT VISION | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 752469 | 19-Feb-1998 | 752469 | 16-Jun-1999 | Registered | 19-Feb-2018 |
| CTM | SHARK | Sunburst Products, Inc. | 253,112 | 03-May-1996 | 253,112 | 22-Sep-1998 | Registered | 03-May-2016 |

12

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| CTM | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 6811996 | 09-Apr-2008 | 6811996 | 20-Jan-2009 | Registered | 09-Apr-2018 |
| CTM | SHARK TOOTH | Sunburst Products, Inc. | 013477369 | 20-Nov-2014 | | | Opposed | |
| Dominican Republic | SHARK TOOTH | Sunburst Products, Inc. | 201435635 | 12-Dec-2014 | | | Pending | |
| France | FREE STYLE | Sunburst Products, Inc. | 641,106 | 20-May-1987 | 1,409,671 | 13-Nov-1987 | Registered | 20-May-2017 |
| France | FREE STYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 1217342 | 14-Aug-1992 | 1217342 | 28-Sep-1992 | Registered | 29-Sep-2022 |
| France | SHARK TOOTH | Sunburst Products, Inc. | 14/4135225 | 20-Nov-2014 | 14/4135225 | 13-Mar-2015 | Registered | 20-Nov-2024 |
| Germany | AFFINITY | Advance Watch Company, Ltd. | 30458799.0 | 13-Oct-2004 | 30458799 | 23-Nov-2004 | Registered | 13-Oct-2024 |
| Germany | FREE STYLE | Sunburst Products, Inc. | 397 11 407.9 | 31-Mar-1997 | 39711407 | 25-Feb-2000 | Registered | 31-Mar-2017 |
| Germany | SWERVE | Advance Watch Company, Ltd. | 30458798.2 | 13-Oct-2004 | 30458798 | 23-Nov-2004 | Registered | 31-Oct-2024 |
| Germany | WHIZ KIDS | Advance Watch Company, Ltd. | 30458800.8 | 13-Oct-2004 | 30458800 | 23-Nov-2004 | Registered | 13-Oct-2024 |
| Greece | FREE STYLE | Sunburst Products, Inc. | 133741 | 02-Jul-1997 | 133741 | 17-Nov-1999 | Registered | 02-Jul-2017 |
| India | FYI | Advance Watch Company, Ltd. | 2502139 | 25-Mar-2013 | | | Pending | |
| India | FYI | Advance Watch Company, Ltd. | 2645253 | 18-Dec-2013 | | | Pending | |
| Italy | FREE STYLE | Sunburst Products, Inc. | 499,591 | 04-Jun-1987 | 1276485 | 09-Nov-1988 | Registered | 04-Jun-2017 |
| Italy | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | RM2010C004146 | 25-Jun-2010 | 1423551 | 24-Feb-2011 | Registered | 25-Jun-2020 |

13

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Jamaica | **SHARK TOOTH** | Sunburst Products, Inc. | 66128 | 12-Dec-2014 | | | Pending | |
| Japan | **CONNECTEDEVICE** | Advance Watch Company, Ltd. | 2013-011011 | 19-Feb-2013 | 5606589 | 09-Aug-2013 | Registered | 09-Aug-2023 |
| Japan | **FREE STYLE** | Sunburst Products, Inc. | 2,495,556 | 29-Jan-1993 | 2,495,556 | 29-Jan-1993 | Registered | 29-Jan-2023 |
| Japan | **FREE STYLE in Katakana** | Sunburst Products, Inc. | 1,344,958 | 29-Sep-1998 | 1,344,958 | 29-Sep-1998 | Registered | 29-Sep-2018 |
| Japan | **FYI** | Advance Watch Company, Ltd. | 2013-011010 | 19-Feb-2013 | 5598680 | 12-Jul-2013 | Registered | 12-Jul-2023 |
| Japan | **SHARK** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2,529,554 | 28-Apr-1993 | 2,529,554 | 28-Apr-1993 | Registered | 28-Apr-2023 |
| Japan | **SHARK FIN DESIGN** | Sunburst Products, Inc. | 2008-029372 | 15-Apr-2008 | 5180897 | 14-Nov-2008 | Registered | 14-Nov-2018 |
| Japan | **SHARK TOOTH** | Sunburst Products, Inc. | 2014099168 | 25-Nov-2014 | 5751505 | 20-Mar-2015 | Registered | 20-Mar-2025 |
| Korea | **FREESTYLE** | Sunburst Products, Inc. | 40-2013-84520 | 17-Dec-2013 | 40-1064419 | 14-Oct-2014 | Registered | 14-Oct-2024 |
| Mexico | **2 COOL** | Advance Watch Company, Ltd. | 687598 | 12-Nov-2004 | 865120 | 10-Jan-2005 | Registered | 12-Nov-2024 |
| Mexico | **ADVANCE** | Advance Watch Company, Ltd. | 8122 | 14-Apr-1986 | 331,079 | 14-Apr-1986 | Registered | 14-Apr-2026 |
| Mexico | **ADVANCE LTD** | Advance Watch Company, Ltd. | 687599 | 12-Nov-2004 | 865121 | 10-Jan-2005 | Registered | 12-Nov-2024 |
| Mexico | **AQUALITE** | Advance Watch Company, Ltd. | 923032 | 27-Mar-2008 | 1036046 | 21-Apr-2008 | Registered | 27-Mar-2018 |
| Mexico | **AQUATECH** | Advance Watch Company, Ltd. | 687597 | 12-Nov-2004 | 865119 | 10-Jan-2005 | Registered | 12-Nov-2024 |
| Mexico | **BNY** | Advance Watch Company, Ltd. | 954848 | 14-Aug-2008 | 1103586 | 04-Jun-2009 | Registered | 14-Aug-2018 |
| Mexico | **DURANGO** | Advance Watch Company, Ltd. | 1099759 | 25-Jun-2010 | 1168885 | 15-Jul-2010 | Registered | 25-Jun-2020 |
| Mexico | **FOXY** | Advance Watch Company, Ltd. | 923031 | 27-Mar-2008 | 1036045 | 21-Apr-2008 | Registered | 27-Mar-2018 |
| Mexico | **FREESTYLE** | Sunburst Products, Inc. | 151,364 | 02-Oct-1992 | 659,825 | 02-Oct-1992 | Registered | 02-Oct-2022 |

14

9942447-v6

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Mexico | GC (Stylized) | Advance Watch Company, Ltd. | 925856 | 10-Apr-2008 | 1051824 | 31-Jul-2008 | Registered | 10-Apr-2018 |
| Mexico | GENEVA ART KLOK | Advance Watch Company, Ltd. | 1403665 | 15-Aug-2013 | 1458369 | 29-May-2014 | Registered | 15-Aug-2023 |
| Mexico | icvrd and Design | Advance Watch Company, Ltd. | 1199396 | 01-Aug-2011 | 1262191 | 24-Jan-2012 | Registered | 01-Aug-2021 |
| Mexico | LTD | Advance Watch Company, Ltd. | 1202494 | 11-Aug-2011 | 1260429 | 13-Jan-2012 | Registered | 11-Aug-2021 |
| Mexico | MAKE A FACE | Advance Watch Company, Ltd. | 1403661 | 15-Aug-2013 | 1445258 | 31-Mar-2014 | Registered | 15-Aug-2023 |
| Mexico | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 151,365 | 02-Oct-1992 | 539,626 | 07-Jan-1997 | Registered | 02-Oct-2022 |
| Mexico | SHARK TOOTH | Sunburst Products, Inc. | 1552647 | 26-Nov-2014 | 1515454 | 20-Feb-2015 | Registered | 26-Nov-2024 |
| Mexico | SLUMBERBUG | Advance Watch Company, Ltd. | 925855 | 10-Apr-2008 | 1051405 | 30-Jul-2008 | Registered | 10-Apr-2018 |
| New Zealand | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 787544 | 14-Apr-2008 | 787544 | 16-Oct-2008 | Registered | 14-Apr-2018 |
| New Zealand | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 787257 | 09-Apr-2008 | 787257 | 13-Aug-2009 | Registered | 09-Apr-2018 |
| Nicaragua | FREESTYLE | Sunburst Products, Inc. | 2014004294 | 18-Nov-2014 | | | Pending | |
| Nicaragua | SHARK TOOTH | Sunburst Products, Inc. | 2014004434 | 01-Dec-2014 | | | Pending | |
| Panama | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 176881 | 12-Nov-2008 | 176881 | 23-Jul-2009 | Registered | 12-Nov-2018 |
| Panama | SHARK | | 176882 | 12-Nov-2008 | 176882 | 12-Nov-2008 | Registered | 12-Nov-2018 |

15

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Panama | **SHARK FIN DESIGN** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 176883 | 12-Nov-2008 | 176883 | 23-Jul-2009 | Registered | 12-Nov-2018 |
| Panama | **SHARK TOOTH** | Sunburst Products, Inc. | 23747001 | 29-Dec-2014 | | | Pending | |
| Paraguay | **FREESTYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 6536/2009 | 02-Mar-2009 | | | Pending | |
| Peru | **FREESTYLE** | Sunburst Products, Inc. | 0355576-2008 | 30-May-2008 | 143111 | 17-Sep-2008 | Registered | 17-Sep-2018 |
| Peru | **SHARK** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 036733 | 15-Apr-1997 | 039643 | 26-Sep-1997 | Registered | 26-Sep-2017 |
| Peru | **SHARK FIN DESIGN** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 0355577-2008 | 30-May-2008 | 144027 | 09-Oct-2008 | Registered | 09-Oct-2018 |
| Peru | **SHARK FREESTYLE and Shark Fin Design** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 487054 | 16-Mar-2012 | 189011 | 18-Jun-2012 | Registered | 18-Jun-2022 |
| Peru | **SHARK TOOTH** | Sunburst Products, Inc. | 5989782014 | 05-Dec-2014 | 00222727 | 26-Mar-2015 | Registered | 26-Mar-2025 |
| Philippines | **SHARK TOOTH** | Sunburst Products, Inc. | 42014014359 | 19-Nov-2014 | | | Allowed | 09-Jul-2015 |
| Singapore | **FREE STYLE** | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 5691/83 | 28-Oct-1994 | 56911/83 | 28-Oct-1994 | Registered | 28-Oct-2024 |
| Singapore | **FREESTYLE** | Sunburst Products, Inc. | T97/03188A | 20-Mar-1997 | T97/03188A | 20-Mar-1997 | Registered | 20-Mar-2017 |
| South Africa | **FREE STYLE** | Sunburst Products, Inc. | 97/3990 | 14-Mar-1997 | 1997/03990 | 14-Mar-1997 | Registered | 14-Mar-2017 |

16

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| South Africa | FREE STYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 97/3991 | 14-Mar-1997 | 1997/03991 | 14-Mar-1997 | Registered | 14-Mar-2017 |
| South Africa | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 97/3992 | 14-Mar-1997 | 97/3992 | 14-Mar-1997 | Registered | 14-Mar-2017 |
| South Africa | SHARK TOOTH | Sunburst Products, Inc. | 201432005 | 24-Nov-2014 | | | Pending | |
| UAE | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 119136 | 14-Sep-2008 | 164708 | 22-Feb-2012 | Registered | 14-Sep-2018 |
| UAE | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 119135 | 14-Sep-2008 | 164709 | 22-Feb-2012 | Registered | 14-Sep-2018 |
| UAE | SHARK TOOTH | Sunburst Products, Inc. | 226098 | 02-Feb-2015 | | | Pending | |
| UK | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2499890 | 10-Oct-2008 | 2499890 | 01-May-2009 | Registered | 10-Oct-2018 |
| Uruguay | SHARK TOOTH | Sunburst Products, Inc. | 460253 | 19-Nov-2014 | | | Pending | |
| US | ADRENALINE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/413206 | 02-Jan-1998 | 2358207 | 13-Jun-2000 | Registered | 13-Jun-2020 |
| US | ADVANCE | Advance Watch Company, Ltd. | 73/079824 | 11-Mar-1976 | 1070973 | 09-Aug-1977 | Registered | 09-Aug-2017 |
| US | ADVANCE TIME TECHNOLOGY | Advance Watch Company, Ltd. | 77/919310 | 25-Jan-2010 | 3936428 | 29-Mar-2011 | Registered | 29-Mar-2021 |
| US | AQUALITE | Advance Watch Company, Ltd. | 75/002033 | 05-Oct-1995 | 1998355 | 03-Sep-1996 | Registered | 03-Sep-2016 |

9942447-v6

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---------|-----------|-------|---------|-------------|---------|----------|--------|-------------|
| US | AQUATECH | Advance Watch Company, Ltd. | 73/759275 | 24-Oct-1988 | 1542449 | 06-Jun-1989 | Registered | 06-Jun-2019 |
| US | AVANTI | Advance Watch Company, Ltd. | 73/634245 | 08-Dec-1986 | 1453155 | 18-Aug-1987 | Registered | 18-Aug-2017 |
| US | CONNECT | Advance Watch Company, Ltd. d/b/a Geneva Watch Group | 86/177431 | 28-Jan-2014 | 4732697 | 05-May-2015 | Registered | 05-May-2025 |
| US | DIGI-TOUCH | Advance Watch Company, Ltd. | 85/024910 | 28-Apr-2010 | | | Published | |
| US | FIELD RANGER | Advance Watch Company, Ltd. | 74/735783 | 29-Sep-1995 | 2159260 | 19-May-1998 | Registered | 19-May-2018 |
| US | FREE STYLE | Sunburst Products, Inc. | 73/446900 | 06-Oct-1983 | 1319293 | 12-Feb-1985 | Registered | 12-Feb-2025 |
| US | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/813941 | 05-Oct-1999 | 2562830 | 23-Apr-2002 | Registered | 23-Apr-2022 |
| US | FREESTYLE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 86/552594 | 04-Mar-2015 | | | Pending | 11-Dec-2015 |
| US | FYI | Advance Watch Company, Ltd. | 85/751862 | 11-Oct-2012 | | | Allowed | 05-Nov-2015 |
| US | GAME TIME | Advance Watch Company, Ltd. | 77/201014 | 08-Jun-2007 | 3489779 | 19-Aug-2008 | Registered | 19-Aug-2018 |
| US | GC and Design | Advance Watch Company, Ltd. | 77/304064 | 15-Oct-2007 | 4215797 | 02-Oct-2012 | Registered | 02-Oct-2022 |
| US | H HIP HOP and Design | Advance Watch Company, Ltd. | 85/493571 | 13-Dec-2011 | 4266995 | 01-Jan-2013 | Registered | 01-Jan-2023 |
| US | HYDRO PUSHERS | Advance Watch Company, Ltd. d/b/a Geneva Watch Gro | 77/448206 | 15-Apr-2008 | 3755354 | 02-Mar-2010 | Registered | 02-Mar-2020 |
| US | icvrd and Design | Advance Watch Company, Ltd. | 85/267304 | 15-Mar-2011 | 4089062 | 17-Jan-2012 | Registered | 17-Jan-2022 |
| US | JULES + JAMES | Advance Watch Company, Ltd. | 85/116591 | 26-Aug-2010 | 4210628 | 18-Sep-2012 | Registered | 18-Sep-2022 |

18

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---------|-----------|-------|---------|-------------|---------|----------|--------|-------------|
| US | LTD | Advance Watch Company, Ltd. | 74/495213 | 28-Feb-1994 | 1913219 | 22-Aug-1995 | Registered | 22-Aug-2015 |
| US | MAKE A FACE | Advance Watch Company, Ltd. | 86/031576 | 07-Aug-2013 | | | Allowed | |
| US | MAKO | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/335150 | 04-Aug-1997 | 2250895 | 08-Jun-1999 | Registered | 08-Jun-2019 |
| US | NITRO | Advance Watch Company, Ltd. | 85/182260 | 22-Nov-2010 | 4119335 | 27-Mar-2012 | Registered | 27-Mar-2022 |
| US | ORGANTICK | Advance Watch Company, Ltd. | 77/863759 | 03-Nov-2009 | 4056858 | 15-Nov-2011 | Registered | 15-Nov-2021 |
| US | QUICKTOUCH | Advance Watch Company, Ltd. | 77/967275 | 24-Mar-2010 | | | Opposed | |
| US | SHARK | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 74/063824 | 29-May-1990 | 1640415 | 09-Apr-1991 | Registered | 09-Apr-2021 |
| US | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 74/375056 | 01-Apr-1993 | 1809077 | 07-Dec-1993 | Registered | 07-Dec-2023 |
| US | SHARK TIDE | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 75/335059 | 04-Aug-1997 | 2578975 | 11-Jun-2002 | Registered | 11-Jun-2022 |
| US | SHARK TOOTH | Sunburst Products, Inc. | 86/452417 | 21-Nov-2014 | | | Published | |
| US | TIME READY TECHNOLOGY | Advance Watch Company, Ltd. | 77/437047 | 01-Apr-2008 | 3815024 | 06-Jul-2010 | Registered | 06-Jul-2020 |
| US | TOUCH&GO | Advance Watch Company, Ltd. | 85/001891 | 30-Mar-2010 | | | Published | |
| US | ULTIMATE | Advance Watch Company, Ltd. | 74/489548 | 14-Feb-1994 | 2018602 | 26-Nov-1996 | Registered | 26-Nov-2016 |
| US | ULTRATECH | Advance Watch Company, Ltd. | 75/738986 | 29-Jun-1999 | 2422222 | 16-Jan-2001 | Registered | 16-Jan-2021 |
| Venezuela | FREESTYLE | Sunburst Products, Inc. | 2008-021598 | 03-Nov-2008 | P305651 | 06-Oct-2010 | Registered | 06-Oct-2025 |

9942447-v6

| COUNTRY | TRADEMARK | OWNER | APP NO. | FILING DATE | REG NO. | REG DATE | STATUS | RENEWAL DUE |
|---|---|---|---|---|---|---|---|---|
| Venezuela | SHARK FIN DESIGN | Sunburst Products, Inc. d/b/a Freestyle U.S.A. | 2008-021600 | 03-Nov-2008 | P311764 | 10-Nov-2011 | Registered | 10-Nov-2026 |
| Venezuela | SHARK TOOTH | Sunburst Products, Inc. | 2014-017603 | 14-Nov-2014 | | | Pending | |

20

## SCHEDULE 1.1(c)

### Purchased Contracts

1.  Omnibus License Agreement Renewal, dated as of January 1, 2012, by and among Advance Watch Company Ltd., Kenneth Cole Productions (LIC), and Kenneth Cole Productions, Inc.

2.  Trademark License Agreement, dated as of March 12, 2009, by and between Advance Watch Company Ltd. and Tommy Bahama Group, Inc., as extended by that certain Extension of Trademark License Agreement for Renewal Period dated September 11, 2012, as amended by that certain First Amendment to Trademark License Agreement dated March 22, 2012, as further amended by that certain Second Amendment to Trademark License Agreement dated May 5, 2015.

3.  License Agreement, dated as of November 7, 2007, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker, as amended by that certain First Amendment to License Agreement dated as of January 1, 2012, as further amended by that certain Second Amendment to License Agreement dated as of February 23, 2015.

4.  Commercial Street Contribution Agreement, dated December 19, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and No Ordinary Designer Label Limited d/b/a Ted Baker.

5.  License Agreement, dated as of August 10, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Christian Casey L.L.C.

6.  Retail Product License Agreement, dated as of August 7, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NBA Properties, Inc., as amended by that certain First Amendment to Retail Product License Agreement dated August 24, 2014.

7.  License Agreement, dated as of April 1, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and NFL Properties LLC.

8.  Retail License Agreement, dated July 18, 2013, by and among Advance Watch Company Ltd. d/b/a Game Time LLC, NHL Enterprises, L.P. and NHL Enterprises Canada, L.P.

9.  Standard Retail Product License Agreement, dated as of July 13, 2012, by and between Advance Watch Company Ltd. and Collegiate Licensing Company, as amended by that certain Addendum dated December 18, 2014.

10. Trademark License Agreement, dated as of May 22, 2012, by and between Advance Watch Company Ltd. and Michigan State University.

11. License Agreement, dated as of September 1, 2011, by and among Advance Watch Company Ltd. d/b/a Geneva Watch Group, Sperry Top-Sider LLC and SR Holdings,

LLC, as amended by that certain First Amendment to License Agreement dated December __, 2014.

12. License Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Steve Harvey Products, Inc./ Steve Harvey.

13. Letter Agreement, dated as of _____, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and US Lacrosse, Inc.

14. License Agreement, dated as of April 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Soccer United Marketing, LLC.

15. Distribution Agreement, dated as of May 1, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Arista Singapore Pte Ltd.

16. Distribution Agreement, dated as of September 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Carmen Jewelers.

17. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and GDL Manufacturing Ltd.

18. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Global Tic Sales Inc.

19. Distribution Agreement, dated as of January 1, 2010, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Priority Marketing PVT. Ltd.

20. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Timestore AG.

21. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Chronosoft PTE LTD.

22. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CNB Distributors, LLC.

23. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Comercializadora E-Akluck, S.A. de C.V.

24. Distribution Agreement, dated as of March 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Marlox AG.

25. Distribution Agreement, dated as of November 6, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Merkez Saat Tic.A.S.

26. Distribution Agreement, dated as of July 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New City, Inc.

9942447-v6

27. Distribution Agreement, dated as of June 15, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and New Sense Development Ltd.

28. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and PT. Sukses Sinar Abadi.

29. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

30. Distribution Agreement, dated as of September 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Sung Won Co., Ltd.

31. Distribution Agreement, dated as of January 1, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and TBN Time Distribution LLC.

32. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Time Deco Corporation Limited.

33. Distribution Agreement, dated as of January 1, 2013, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Paidel Watch Co., Ltd.

34. Distribution Agreement, dated as of January 1, 2012, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Styleright Global Corporation.

35. Letter Agreement, dated June 13, 2013, by and among Advance Watch Company Ltd., Kenneth Cole Productions, Inc. and Wells Fargo Bank, National Association.

36. Credit Agreement, dated as of June 21, 2013, by and among Advance Watch Company Ltd., Advance Watch Company (Far East) Limited, Sunburst Products, Inc., GWG International, Ltd., Binda USA Holdings, Inc., Wells Fargo Bank, National Association, and the Lenders that are parties thereto, as amended by that certain Amendment No. 1 to Credit Agreement dated as of June 30, 2014, as amended by that certain Amendment No. 2 to Credit Agreement dated as of August 17, 2015.

37. Standard Vendor Agreement for Merchandise, dated February 24, 2015, by and between Geneva Watch Group and Boscov's Department Store, LLC.

38. Vendor Agreement, dated _____, 2014, by and between Advance Watch Company Ltd. and Helzberg's Diamond Shops, Inc.

39. Amazon Vendor Terms and Conditions effective March 21, 2015 for various brands.

40. Freight Allowance Agreement No. 7409330, dated on or around April 1, 2015, by and between Geneva Clock Company and Amazon Fulfillment Services, Inc.

41. Freight Allowance Agreement No. 7178800, dated on or around April 1, 2015, by and between Breil Milano and Amazon Fulfillment Services, Inc.

23

42. Trading Terms Agreement, dated February 1, 2014, by and between Geneva Watch Group and The Nuance Group.

43. Letter Agreement regarding Acquisition of "Mathey Tissot" Trademark, dated March 11, 1996, by and among Geneva Watch Company, Mathey Tissot International, Ltd. and Mathey Tissot S.A.

44. Letter Agreement regarding Agreement regarding Mathey Tissot Watch Product, dated May 16, 1996, by and among Geneva Watch Company, JBM Venture Co., Inc. and Jan Bell Marketing, Inc.

45. Letter Agreement regarding grant of license, dated August 17, 2015, by and among Geneva Watch Group and LaCrosse Technology.

46. Agreement, dated August 26, 2015, by and among Advance Watch Company (Far East) Limited, Advance Watch Company Ltd., Wells Fargo Bank, National Association, Koo Chi Sum and Yen Ching Wai, David c/o Ernst and Young Transactions Limited.

47. Irrevocable Transferable Standby Letter of Credit, dated August 19, 2015, by and among Israel Discount Bank of New York and Allura Imports, Inc.

Real Property Leases:

48. Lease Agreement, dated as of September 6, 2001, by and between Advance Watch Company Limited and Ashley Canton, LLC, as amended by that certain First Amendment dated April 15, 2002, as further amended by that certain Second Amendment dated May 28, 2002, that certain Third Amendment dated June 18, 2006, that certain Fourth Amendment dated March 8, 2010, and that certain Fifth Amendment to Lease dated March 26, 2013, as assigned by landlord to 47440 Michigan Ave, LLC.

49. Lease, dated February 18, 2009, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and 1407 Broadway Real Estate, LLC, as assigned by landlord to SRI Eleven 1407 Broadway Operator, LLC.

50. Sublease Agreement, dated January 30, 2015, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Allura Imports, Inc.

51. Multi-Tenant Building Lease, dated May 1, 2009, by and between Advance Watch Company Ltd. and C.J. Segerstrom & Sons, as amended by that certain First Amendment of Lease Agreement dated May 22, 2012, and by that certain Second Amendment of Lease Agreement dated July 28, 2015.

52. Renewal Lease Form, dated July 10, 2015, by and between Binda USA Holdings Inc. and Columbus 60th Realty LLC.

<u>Personal Property Leases</u>:

53. Lease Agreement, dated July 21, 2014, by and between Advance Watch Company Ltd. and CIT Finance LLC.

54. Lease Agreement, dated July 17, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and CIT Finance LLC.

55. Lease Agreement (Lease No. 001-007914733-002), dated August 5, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

56. Lease Agreement (Lease No. 001-007914733-003), dated September 8, 2014, by and between Advance Watch Company Ltd. d/b/a Geneva Watch Group and Dell Financial Services, L.L.C.

57. ValuePlan Lease Agreement, dated March 16, 2015, by and between Geneva Watch Group and IBM Credit LLC.

58. Lease Agreement, dated May 28, 2013, by and between Advance Watch Company Ltd. and LDI Color Toolbox.

## SCHEDULE 1.1(d)

## Purchased Intellectual Property

All Intellectual Property and related Software and Technology of the Sellers relating to the Business, including, without limitation, those items set forth on Schedule 1.1(a).

26

**SCHEDULE 2.1**

**Additional Purchased Assets**

None.

## SCHEDULE 2.1(r)

### Critical Trade Vendors

BROADVIEW NETWORKS

CHANG SHENG DA ENTERPRISE DEVE

DISPLAY & PACKAGING LIMITED

DOUG BROWN PACKAGING PRODUCTS

FEDEX

FEDEX FREIGHT

FEDEX TRUCKLOAD BROKERAGE

GLOBAL EXCHANGE SERVICES

HGC

INNOVATION INDUSTRIAL LTD.

INTELIGENCIA INC

INTERNATIONAL PACKAGING

JBC PLATFORM

JOLLY COME INTERNATIONAL LIMITED

KELVIN PRECISION PRODUCTS CO.,

NATIONALPAK LTD

PAC TEAM AMERICA, INC

PERFECT PRODUCTS CO LTD

PITNEY BOWES CREDIT CORP

PRECISION TIME

PRIME TIME INTERNATIONAL LIMITED

QUALIPAK MANUFACTURING LIMITED

RIVER RUN NETWORK

STINGMARS LIMITED

SUN'S UNION WATCH MANUFACTURER

TMH SECURITY SERVICE INCORPORATED

TOLL GLOBAL FORWARDING USA INC

X O COMMUNICATIONS

28

**SCHEDULE 2.2**

**Additional Excluded Assets**

None.

9942447-v6

**SCHEDULE 2.3(a)**

**Assumed Liabilities**

None.

## SCHEDULE 5.7

### Litigation

1. **Tissot SA**: Tissot SA opposed Advance Watch Company Ltd.'s trademark application, Serial #: 85024910, with the United States Patent and Trademark Office, Trademark Trial and Appeal Board, Case No.: 91197947-OPP, filed December 21, 2010.

2. **Staffing Network, LLC**: Staffing Network, LLC brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Staffing Network, LLC v. Advance Watch Company Ltd.,* Circuit Court of Cook County, Illinois, Case No.: 2015L007893.

3. **Aura Merchandising, Ltd.**: Aura Merchandising, Ltd. brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Aura Merchandising, Ltd. v. Advance Watch Company Ltd. d/b/a Geneva Watch Group*, Supreme Court of the State of New York, Index No.: 158041/2015, filed August 6, 2015.

4. **Talenthub Worldwide, Inc.**: Talenthub Worldwide, Inc. brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Talenthub Worldwide, Inc. v. Advance Watch Company Ltd., d/b/a Geneva Watch Group*, Supreme Court of the State of New York, Index No.: 157647/2015, filed July 27, 2015.

5. **LHI Liquidation Co., Inc.**: LHI Liquidation Co., Inc. brought a preference claim against Geneva Watch Group Inc., captioned *Peter S. Kravitz, Litigation Trustee For the LHI Liquidation Co., Inc. et al. Litigation Trust v. Geneva Watch Group, Inc.*, United States Bankruptcy Court, Southern District of New York, Case No.: 13-14050 (MG).

6. **Noreen Deleon-Moreno**: Noreen Deleon-Moreno brought a lawsuit against Advance Watch Company Ltd., d/b/a Geneva Watch Group, captioned *Noreen Deleon-Moreno v. Advance Watch Company Ltd., d/b/a Geneva Watch Group*, Civil Court of the City of New York, County of New York, Index No.: CV-019130-15/NY.

7. **KMJ Brand Holdings LLC**: A judgment was issued against Advance Watch Company Ltd., d/b/a Geneva Watch Company, captioned *KMJ Brand Holdings LLC v. Advance Watch Company Ltd., d/b/a Geneva Watch Company*, Supreme Court of the State of New York, Index No.: 159367/2015, filed September 18, 2015.

**SCHEDULE 5.12**

**Tax**

None.

## SCHEDULE 5.13

### Employee Benefit Plans

401(K) Plan

Medical Insurance provided through CIGNA

Dental Insurance provided through CIGNA

Vision Service Plan provided through CIGNA

Basic Life Insurance & Accidental Death & Dismemberment provided through CIGNA

Voluntary Life Insurance provided through CIGNA

Long Term Disability Insurance provided through CIGNA

Short Term Disability Insurance provided through CIGNA

Flexible Spending Accounts provided through ADP

Health Savings Accounts

The Company has a Compensated Time Off Allowance that provides each employee a number of paid days off, ranging between ten (10) and twenty-five (25), each calendar year depending on length of service with the Company.

The Company has ten (10) paid holidays scheduled each calendar year.

**SCHEDULE 5.14(a)**

**Labor Matters**

None.

9942447-v6

**SCHEDULE 5.14(e)**

**Employment and Consulting Agreements**

Consultant Agreement between the Company and Gary Bollinger.

Consultant Agreement between the Company and Peter Leung.

**SCHEDULE 9.1(f)**

**Cure Amounts**

The aggregate Cure Amount (exclusive of "Common Area Maintenance" adjustments for the applicable lease year in which the Closing occurs pursuant to the terms of Real Property Leases that are Purchased Assets) of the Purchased Contracts set forth on <u>Schedule 1.1 (c)</u> is $500,000.

### Schedule 9.1(j)

- Kenneth Cole
- Ted Baker
- Tommy Bahama
- Sperry
- Sean John
- The sports league licenses associated with the Game Time brand.

**<u>EXHIBIT 2</u>**

**Cure Amounts**

## CURE SCHEDULE

## Purchased Contracts

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|-----|-------------|---------------------|---------------------------|----------------|
| 1. | KENNETH COLE PRODUCTIONS, INC. | 603 WEST 50TH STREET NEW YORK NY 10019 | OMNIBUS LICENSE AGREEMENT RENEWAL, DATED AS OF JANUARY 1, 2012, BY AND AMONG ADVANCE WATCH COMPANY LTD., KENNETH COLE PRODUCTIONS (LIC), AND KENNETH COLE PRODUCTIONS, INC. | To Be Determined[2] |
| 2. | TOMMY BAHAMA GROUP, INC. | 1071 AVENUE OF THE AMERICAS 11TH FLOOR NEW YORK NY 10018 | TRADEMARK LICENSE AGREEMENT, DATED AS OF MARCH 18, 2009, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. AND TOMMY BAHAMA GROUP, INC., AS EXTENDED BY THAT CERTAIN EXTENSION OF TRADEMARK LICENSE AGREEMENT FOR RENEWAL PERIOD DATED SEPTEMBER 11, 2012, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO TRADEMARK LICENSE AGREEMENT DATED MARCH 22, 2012, AS FURTHER AMENDED BY THAT CERTAIN SECOND AMENDMENT TO TRADEMARK LICENSE AGREEMENT DATED MAY 5, 2015. | $78,000.00 |
| 3. | NO ORDINARY DESIGNER LABEL LIMITED D/B/A TED BAKER | THE UGLY BROWN BUILDING 6A ST. PANCRAS WAY LONDON  NW1 0TB UNITED KINGDOM | LICENSE AGREEMENT, DATED AS OF NOVEMBER 7, 2007, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND NO ORDINARY DESIGNER LABEL LIMITED D/B/A TED BAKER, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO LICENSE AGREEMENT DATED AS OF JANUARY 1, 2012, AS FURTHER AMENDED BY THAT CERTAIN SECOND AMENDMENT TO LICENSE AGREEMENT DATED AS OF FEBRUARY 23, 2015. | $74,801.46 |
| 4. | NO ORDINARY DESIGNER LABEL LIMITED D/B/A TED BAKER | THE UGLY BROWN BUILDING 6A ST. PANCRAS WAY LONDON  NW1 0TB UNITED KINGDOM | COMMERCIAL STREET CONTRIBUTION AGREEMENT, DATED DECEMBER 19, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND NO ORDINARY DESIGNER LABEL LIMITED D/B/A TED BAKER. | $9,750.00 |
| 5. | CHRISTIAN CASEY L.L.C. (SEAN JOHN) | DBA SEAN JOHN 1710 BROADWAY NEW YORK NY 10019 | LICENSE AGREEMENT, DATED AS OF AUGUST 10, 2012, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND CHRISTIAN CASEY L.L.C. | $22,721.38 |

---

[1]    Debtors' reserve the right to adjust the Cure Amounts to account for (i) amounts owed to the Debtors by the Counterparty, (ii) amounts that have not come due as of the closing of the sale, or (iii) any other circumstances that would affect such Cure Amounts.

[2]    The amount owing under this license agreement will be a liability of the buyer pursuant to the Asset Purchase Agreement and an amendment to the license agreement to be entered into between Kenneth Cole and the buyer immediately following the assignment of the existing license agreement.

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|---|---|---|---|---|
| 6. | NBA PROPERTIES, INC. | 645 FIFTH AVENUE NEW YORK NY 10022 | RETAIL PRODUCT LICENSE AGREEMENT, DATED AS OF AUGUST 7, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND NBA PROPERTIES, INC., AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO RETAIL PRODUCT LICENSE AGREEMENT DATED AUGUST 24, 2014. | $20,000.00 |
| 7. | NFL PROPERTIES, INC. | 345 PARK AVENUE NEW YORK NY 10154 | LICENSE AGREEMENT, DATED AS OF APRIL 1, 2015, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND NFL PROPERTIES LLC. | $0.00 |
| 8. | NHL ENTERPRISES, L.P. AND NHL ENTERPRISES CANADA, L.P. | 1185 AVENUE OF THE AMERICAS NEW YORK NY 10036 | RETAIL LICENSE AGREEMENT, DATED JULY 18, 2013, BY AND AMONG ADVANCE WATCH COMPANY LTD. D/B/A GAME TIME LLC, NHL ENTERPRISES, L.P. AND NHL ENTERPRISES CANADA, L.P. | $14,447.00 |
| 9. | MAJOR LEAGUE BASEBALL PROPERTIES | 245 PARK AVENUE NEW YORK NY 10167 | LICENSE AGREEMENT MAJOR LEAGUE BASEBALL PROPERTIES, INC, AND ADVANCE WATCH COMPANY LTD DATED JANUARY 1, 2014 | $60,000.00 |
| 10. | COLLEGIATE LICENSING COMPANY | 290 INTERSTATE NORTH CIRCLE SUITE 200 ATLANTA GA 30339 | STANDARD RETAIL PRODUCT LICENSE AGREEMENT, DATED AS OF JULY 13, 2012, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. AND COLLEGIATE LICENSING COMPANY, AS AMENDED BY THAT CERTAIN ADDENDUM DATED DECEMBER 18, 2014. | $20,499.00 |
| 11. | THE OHIO STATE UNIVERSITY | 1100 KINNEAR ROAD SUITE 210 COLUMBUS OH 43212 | LICENSING AGREEMENT RENEWAL 7/1/2015 TO 6/30/2016 | $0 |
| 12. | UNIVERSITY OF IOWA | UNIVERISTY OF IOWA LICENSING PROGRAM 310 KHF BUILDING 446 IOWA CITY IA 52242 | LICENSING AGREEMENT - RENEWAL TO 12/27/2015 | $0 |
| 13. | LEARFIELD LICENSING PARTNERS | 442 CENTURY LANE SUITE 100 HOLLAND MI 49423 | LICENSING AGREEMENT RENEWAL 2015 TO 2016 | $0 |
| 14. | SPERRY TOP-SIDER LLC AND SR HOLDINGS, LLC | 191 SPRING STREET LEXINGTON MA 02420 | LICENSE AGREEMENT, DATED AS OF SEPTEMBER 1, 2011, BY AND AMONG ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP, SPERRY TOP-SIDER LLC AND SR HOLDINGS, LLC, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT TO LICENSE AGREEMENT. | $33,293.74 |
| 15. | STEVE HARVEY PRODUCTS, INC. / STEVE HARVEY | C/O ANDERSON & SMITH, P.C. ATTN: RICKY ANDERSON 7322 SOUTHWEST FREEWAY STE 2010 HOUSTON TX 77074 | LICENSE AGREEMENT, DATED AS OF JANUARY 1, 2012, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND STEVE HARVEY PRODUCTS, INC./ STEVE HARVEY. | $16,962.89 |

10252689

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|-----|-------------|---------------------|--------------------------|--------------|
| 16. | LACROSSE TECHNOLOGY | 2817 LOSEY BLVD SOUTH LA CROSSE WI 54601 | LETTER AGREEMENT REGARDING GRANT OF LICENSE, DATED AUGUST 17, 2015, BY AND AMONG GENEVA WATCH GROUP AND LACROSSE TECHNOLOGY. | $0 |
| 17. | SOCCER UNITED MARKETING. LLC | 420 5TH AVENUE 7TH FLOOR NEW YORK NY 10018 | LICENSE AGREEMENT, DATED AS OF APRIL 17, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND SOCCER UNITED MARKETING, LLC. | $1,134.15 |
| 18. | MATHEY TISSOT INTERNATIONAL, LTD, AND MATHEY TISSOT S.A. | MATHEY TISSOT S.A. C/O DAVID HELFANT, ESQ. 241 FIFTH AVENUE SUITE 302 NEW YORK NY 10016 | LETTER AGREEMENT REGARDING ACQUISITION OF "MATHEY TISSOT" TRADEMARK, DATED MARCH 11, 1996, BY AND AMONG GENEVA WATCH COMPANY, MATHEY TISSOT INTERNATIONAL, LTD. AND MATHEY TISSOT S.A. | $0 |
| 19. | JBM VENTURE CO. AND JAN BELL MARKETING, INC. | MATHEY TISSOT S.A. C/O DAVID HELFANT, ESQ. 241 FIFTH AVENUE SUITE 302 NEW YORK NY 10016 | LETTER AGREEMENT REGARDING AGREEMENT REGARDING MATHEY TISSOT WATCH PRODUCT, DATED MAY 16, 1996, BY AND AMONG GENEVA WATCH COMPANY, JBM VENTURE CO., INC. AND JAN BELL MARKETING, INC. | $0 |
| 20. | KOO CHI SUM AND YEN CHING WAI, DAVID C/O ERNST AND YOUNG TRANACTIONS LIMITED | LIMITED 62/F, ONE ISLAND EAST 18 WESTLANDS ROAD ISLAND EAST HONG KONG CHINA | AGREEMENT, DATED AUGUST 26, 2015, BY AND AMONG ADVANCE WATCH COMPANY (FAR EAST) LIMITED, ADVANCE WATCH COMPANY LTD., WELLS FARGO BANK, NATIONAL ASSOCIATION, KOO CHI SUM AND YEN CHING WAI, DAVID C/O ERNST AND YOUNG TRANSACTIONS LIMITED | $0 |
| 21. | 1407 BROADWAY REAL ESTATE, LLC AND SRI ELEVEN 1407 BROADWAY OPERATOR, LLC | C/O GETTINGER MANAGEMENT, LLC 1407 BROADWAY SUITE 3310 NEW YORK NY 10018 | LEASE, DATED FEBRUARY 18, 2009, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND 1407 BROADWAY REAL ESTATE, LLC, AS ASSIGNED BY LANDLORD TO SRI ELEVEN 1407 BROADWAY OPERATOR, LLC. | $4,441.02 |
| 22. | C.J. SEGERSTROM & SONS | ATTN:  CONTROLLER 3315 FAIRVIEW ROAD COSTA MESA CA 92626 | MULTI-TENANT BUILDING LEASE, DATED MAY 1, 2009, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. AND C.J. SEGERSTROM & SONS, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT OF LEASE AGREEMENT DATED MAY 22, 2012, AND BY THAT CERTAIN SECOND AMENDMENT OF LEASE AGREEMENT DATED JULY 28, 2015. | $255.68 |
| 23. | COLUMBUS 60TH REALTY LLC. | 1200 UNION TURNPIKE NEW YORK NY 11040 | RENEWAL LEASE FORM, DATED JULY 10, 2015, BY AND BETWEEN BINDA USA HOLDINGS INC. AND COLUMBUS 60TH REALTY LLC. | $0 |
| 24. | TIME DECO CORPORATION LIMITED | 9 RAMINTHRA 55/8 RAMINTHRA ROAD TARAENG, BANGKHEN BANGKOK 10230 THAILAND | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND TIME DECO CORPORATION LIMITED. | $0 |

10252689

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|---|---|---|---|---|
| 25. | AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. | 200 VESEY STREET WORLD FINANCIAL CENTER NEW YORK NY 10285 | UNSIGNED CORPORATE SERVICES COMMERCIAL ACCOUNT AGREEMENT BETWEEN AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC. ("AMEX") AND ADVANCE GROUP INC. DATED FEBRUARY 24, 2015 (NO STATED TERMINATION DATE) MAY NEVER HAVE BEEN AGREED TO | $0 |
| 26. | SURFLINE/WAVETRAK, INC | 300 SOUTH PCH SUITE 310 HUNTINGTON BEACH CA 92648 | LICENSE AGREEMENT BETWEEN SURFLINE/WAVETRAK, INC. AND ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP DATED APRIL 1, 2015 - SIGNED BY SURFLINE/WAVETRAK ONLY (TERMINATES JUNE 1, 2016) | $0 |
| 27. | CLARK LITTLE | 6/23 RICHLAND AVENUE COOPERS PLAINS, 4108 BRISBANE AUSTRALIA | DRAFT ENDORSEMENT AGREEMENT BETWEEN SUNBURST PRODUCTS, INC. D/B/A FREESTYLE U.S.A. AND CLARK LITTLE DATED AS OF FEBRUARY 1, 2015 (TERMINATES MARCH 31, 2017) | $0 |
| 28. | HANG TEN DISTRIBUTION SA | ENTRA LA GARITA 5TA CASA MANO DERECHA LA GARITA, SANTA CRUZ GUANACASTE, 5159 COSTA RICA | SIGNED DISTRIBUTION AGREEMENT BETWEEN  ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND HANG TEN DISTRIBUTION SA DATED NOVEMBER 1, 2014 (TERMINATES DECEMBER 31, 2017) (PERTAINING TO COSTA RICA AND NICARAGUA | $0 |
| 29. | ROSHAN COMMERCIAL CORPORATION | 104 SHAW BOULEVARD RCC CENTER 3RD FLOOR PASIG CITY PHILIPPINES | SIGNED DISTRIBUTION AGREEMENT BETWEEN  ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND ROSHAN COMMERCIAL CORPORATION DATED JUNE 1, 2014 (TERMINATES MARCH 31, 2017) (PERTAINING TO THE PHILIPPINES) | $0 |
| 30. | WAKE ACTION SPORTS LTD. | C/-628 GRENADA STREET PAPAMOA 3118 NEW ZEALAND | DISTRIBUTION AGREEMENT BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND WAKE ACTION SPORTS LTD. DATED OCTOBER __, 2013 - SIGNED BY DISTRIBUTOR ONLY (TERMINATES DECEMBER 31, 2016) (PERTAINING TO NEW ZEALAND AND THE PACIFIC ISLANDS) | $0 |
| 31. | ROMA INDUSTRIES LLC | 9 RAMINTHRA 55/8 RAMINTHRA ROAD TARAENG, BANGKHEN BANGKOK 10230 THAILAND | UNSIGNED AGREEMENT BETWEEN ROMA INDUSTRIES LLC AND ADVANCE WATCH COMPAYN LTD D/B/A GENEVA WATCH COMPANY GROUP DATED SEPTEMBER_ 2009 (NO STATED TERMINATION DATE) | $0 |
| 32. | ARISTA SINGAPORE PTE LTD. | 22, JALAN HITAM MANIS CHIP BEE GARDENS SINGAPORE 278436 SINGAPORE | DISTRIBUTION AGREEMENT, DATED AS OF MAY 1, 2009, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND ARISTA SINGAPORE PTE LTD. | $0 |

10252689

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|---|---|---|---|---|
| 33. | CARMEN JEWELERS | 5333 CASGRAIN AVENUE 7TH FLOOR MONTREAL QC H2T 1X3 CANADA | DISTRIBUTION AGREEMENT, DATED AS OF SEPTEMBER 1, 2010, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND CARMEN JEWELERS | $0 |
| 34. | GDL MANUFACTURING LTD. | 1/16 JARRAH DRIVE BRAESIDE VIC 3195 AUSTRALIA | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2010, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND GDL MANUFACTURING LTD. | $0 |
| 35. | GDL MANUFACTURING LTD. | 1/16 JARRAH DRIVE BRAESIDE VIC 3195 AUSTRALIA | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND GDL ACCESSORIES PTY LTD. | $0 |
| 36. | GLOBAL TIC SALES INC. | 835E A. MABINI STREET MANDALUYONG CITY PHILIPPINES | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2010, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND GLOBAL TIC SALES INC. | $0 |
| 37. | PRIORITY MARKETING PVT. LTD. | PLOT NO. D-6, LEVEL 3 STREET NO. #20, MAROL MIDC ANDHERI-EAST MUMBAI  400 093 INDIA | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2010, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND PRIORITY MARKETING PVT. LTD. | $0 |
| 38. | TIMESTORE AG. | WARTENBERGSTRASSE 15 BASEL 4052 SWITZERLAND | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND TIMESTORE AG. | $0 |
| 39. | CHRONOSOFT PTE LTD. | BLOCK 221, HENDERSON ROAD #05-15, HENDERSON BUILDING SINGAPORE 159557 SINGAPORE | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND CHRONOSOFT PTE LTD. | $0 |
| 40. | CNB DISTRIBUTORS, LLC | 1991 TIGER TAIL BOULEVARD SUITE A DANIA FL 33004 | DISTRIBUTION AGREEMENT, DATED AS OF JULY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND CNB DISTRIBUTORS, LLC. | $0 |
| 41. | COMERCIALIZADO RA E-AKLUCK, S.A. DE C.V. | LA BARCA 4861 COLONIA LOS ARCOS MONTERREY NL 64370 MEXICO | DISTRIBUTION AGREEMENT, DATED AS OF JULY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND COMERCIALIZADORA E-AKLUCK, S.A. DE C.V. | $0 |
| 42. | MARLOX AG. | HUNNENWEG 4 BIBERIST 4562 SWITZERLAND | DISTRIBUTION AGREEMENT, DATED AS OF MARCH 1, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND MARLOX AG. | $0 |

5

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|---|---|---|---|---|
| 43. | MERKEZ SAAT TIC. A.S. | MIMAR KEMALETTIN CD ERSOY HAN NO: 4 KAT: 4 D:7-10 SIRKECI ISTANBUL 34112 TURKEY | DISTRIBUTION AGREEMENT, DATED AS OF NOVEMBER 6, 2012, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND MERKEZ SAAT TIC.A.S. | $0 |
| 44. | NEW CITY, INC. | 21 SE 1ST AVENUE 4TH FLOOR MIAMI FL 33131 | DISTRIBUTION AGREEMENT, DATED AS OF JULY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND NEW CITY, INC. | $0 |
| 45. | NEW SENSE DEVELOPMENT LTD. | ROOM 1212, NEW TECH PLAZA 34 TAI YAU ST SAN PO KONG HONG KONG CHINA | DISTRIBUTION AGREEMENT, DATED AS OF JUNE 15, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND NEW SENSE DEVELOPMENT LTD. | $0 |
| 46. | PT. SUKSES SINAR ABADI | THE CITY TOWER 30TH FLOOR JL. THAMRIN 81 JAKARTA PUSAT 10310 INDONESIA | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND PT. SUKSES SINAR ABADI. | $0 |
| 47. | SUNG WON CO., LTD. | 4F SONGJUNG BLDG, 723-30 YEOKSAM-DONG GANGNAM-GU SEOUL 135-920 KOREA | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND SUNG WON CO., LTD. | $0 |
| 48. | SUNG WON CO., LTD. | 4F SONGJUNG BLDG, 723-30 YEOKSAM-DONG GANGNAM-GU SEOUL 135-920 KOREA | DISTRIBUTION AGREEMENT, DATED AS OF SEPTEMBER 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND SUNG WON CO., LTD. | $0 |
| 49. | TBN TIME DISTRIBUTION LLC. | 5 LETNIKOVSKAYA STR MOSCOW 115114 RUSSIA | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND TBN TIME DISTRIBUTION LLC. | $0 |
| 50. | TIME DECO CORPORATION LIMITED | 9 RAMINTHRA 55/8 RAMINTHRA ROAD TARAENG, BANGKHEN BANGKOK 10230 THAILAND | FIRST AMENDMENT DATED OCTOBER 1, 2014 TO DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND TIME DECO CORPORATION LIMITED, REGARDING THE KENNETH COLE BRAND IN THE MYANMAR TERRITORY FOR TRIAL PERIODS THROUGH SEPTEMBER 30, 2018. (SIGNED BY DISTRIBUTOR ONLY) | $0 |
| 51. | PAIDEL WATCH CO., LTD. | 5F-1, NO 296, SEC. 2 CHUNG SHAN ROAD CHUNG HO DIST NEW TAIPEI CITY 235 TAIWAN | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND PAIDEL WATCH CO., LTD. | $0 |

6

10252689

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|---|---|---|---|---|
| 52. | STYLERIGHT GLOBAL CORPORATION | 5F-1, NO 296, SEC. 3 CHUNG SHAN ROAD CHUNG HO DIST NEW TAIPEI CITY 235 TAIWAN ROC | DISTRIBUTION AGREEMENT, DATED AS OF JANUARY 1, 2012, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND STYLERIGHT GLOBAL CORPORATION. | $0 |
| 53. | ALLURA IMPORTS, INC. | 1407 BROADWAY AVENUE NEW YORK NY 10018 | IRREVOCABLE TRANSFERABLE STANDBY LETTER OF CREDIT, DATED AUGUST 19, 2015, BY AND AMONG ISRAEL DISCOUNT BANK OF NEW YORK AND ALLURA IMPORTS, INC. | $0 |
| 54. | ALLURA IMPORTS, INC. | 1407 BROADWAY AVENUE NEW YORK NY 10018 | SUBLEASE AGREEMENT, DATED JANUARY 30, 2015, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND ALLURA IMPORTS, INC. | $0 |
| 55. | CIGNA HEALTH AND LIFE INSURANCE CO. | P.O. BOX 644546 PITTSBURGH, PA 15264-4546 | CIGNA HEALTH AND LIFE INSURANCE CO. AND GENEVA WATCH GROUP, INC., POLICY NO. 3329054, EFFECTIVE DATE 1/1/13 FOR GROUP CONTRACT OF PRE-PAID DENTAL PLAN SERVICES AND ALL AMENDMENTS, EXHIBITS, ADDENDUMS, SCHEDULES, AND RATE CONFIRMATION SHEETS RELATED THERETO | $0 |
| 56. | CIGNA HEALTH AND LIFE INSURANCE CO. | P.O. BOX 644546 PITTSBURGH, PA 15264-4546 | CIGNA HEALTH AND LIFE INSURANCE CO. AND GENEVA WATCH GROUP, INC., POLICY NO. 3329054, EFFECTIVE DATE 1/1/13 FOR CIGNA DENTAL CHOICE AND ALL AMENDMENTS, EXHIBITS, ADDENDUMS, SCHEDULES, AND RATE CONFIRMATION SHEETS RELATED THERETO | $0 |
| 57. | CIGNA HEALTH AND LIFE INSURANCE CO. | P.O. BOX 644546 PITTSBURGH, PA 15264-4546 | CIGNA HEALTH AND LIFE INSURANCE CO. AND GENEVA WATCH GROUP, INC., POLICY NO. 3329054, EFFECTIVE DATE 1/1/13 FOR CIGNA MEDICAL, DENTAL AND VISION AND ALL AMENDMENTS, EXHIBITS, ADDENDUMS, SCHEDULES, AND RATE CONFIRMATION SHEETS RELATED THERETO | $0 |
| 58. | CIGNA LIFE INSURANCE COMPANY OF NEW YORK | LOCKBOX #7941 P.O. BOX 8500 PHILADELPHIA, PA 19178-7941 | CIGNA LIFE INSURANCE COMPANY OF NEW YORK AND ADVANCED WATCH COMPANY, LTD DBA GENEVA WATCH GROUP, POLICY NO. FLY-960293, EFFECTIVE DATE 1/1/13 FOR LIFE INSURANCE BENEFITS AND ALL AMENDMENTS, EXHIBITS, ADDENDUMS, SCHEDULES, AND RATE CONFIRMATION SHEETS RELATED THERETO | $0 |

10252689

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[1] |
|-----|--------------|----------------------|----------------------------|----------------|
| 59. | CIGNA LIFE INSURANCE COMPANY OF NEW YORK | LOCKBOX #7941 P.O. BOX 8500 PHILADELPHIA, PA 19178-7941 | CIGNA LIFE INSURANCE COMPANY OF NEW YORK AND ADVANCED WATCH COMPANY, LTD DBA GENEVA WATCH GROUP, POLICY NO. YOK-960306, EFFECTIVE DATE 1/1/13 FOR ACCIDENTAL DEATH AND DISMEMBERMENT BENEFITS AND ALL AMENDMENTS, EXHIBITS, ADDENDUMS, SCHEDULES, AND RATE CONFIRMATION SHEETS RELATED THERETO | $0 |
| 60. | CIGNA LIFE INSURANCE COMPANY OF NEW YORK | LOCKBOX #7941 P.O. BOX 8500 PHILADELPHIA, PA 19178-7941 | CIGNA LIFE INSURANCE COMPANY OF NEW YORK AND ADVANCED WATCH COMPANY, LTD DBA GENEVA WATCH GROUP, POLICY NO. BNK-960100, EFFECTIVE DATE 1/1/13 FOR LONG TERM DISABILITY BENEFITS AND ALL AMENDMENTS, EXHIBITS, ADDENDUMS, SCHEDULES, AND RATE CONFIRMATION SHEETS RELATED THERETO | $0 |
| 61. | LIFE INSURANCE COMPANY OF NORTH AMERICA | LOCKBOX #7941 P.O. BOX 8500 PHILADELPHIA, PA 19178-7941 | ADMINISTRATIVE SERVICES AGREEMENT FOR SHORT TERM DISABILITY BETWEEN ADVANCED WATCH COMPANY, LTD DBA GENEVA WATCH GROUP AND LIFE INSURANCE COMPANY OF NORTH AMERICA, NO. SHD-962248, EFFECTIVE DATE 1/1/13 AND ALL AMENDMENTS, EXHIBITS, ADDENDUMS, SCHEDULES, AND RATE CONFIRMATION SHEETS RELATED THERETO | $0 |
| | | | TOTAL: | $356,306.34 |

8

## Designated Rights Contracts

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[3] |
|---|---|---|---|---|
| 1. | FERMATA PARTNERS | FERMATA PARTNERS C/O CAA SPORTS 200 AVENUE OF THE STARS LOS ANGELES CA 90067 | LICENSING AGREEMENT - RENEWAL TO SEPT. 2016 | $0 |
| 2. | CIT FINANCE LLC. (DE LAGE) | C/O AVAYA 10201 CENTURION PARKWAY NORTH 100 JACKSONVILLE FL 32256 | LEASE AGREEMENT, DATED JULY 21, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. AND CIT FINANCE LLC. | $109.52 |
| 3. | CIT FINANCE LLC. | C/O AVAYA 10201 CENTURION PARKWAY NORTH 100 JACKSONVILLE FL 32256 | LEASE AGREEMENT, DATED JULY 17, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND CIT FINANCE LLC. | $0 |
| 4. | DELL FINANCIAL SERVICES | 99355 COLLECTIONS CENTER DRIVE CHICAGO IL 60693 | LEASE AGREEMENT (LEASE NO. 001-007914733-002), DATED AUGUST 5, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND DELL FINANCIAL SERVICES, L.L.C. | $2,275.76 |
| 5. | DELL FINANCIAL SERVICES | 99355 COLLECTIONS CENTER DRIVE CHICAGO IL 60693 | LEASE AGREEMENT (LEASE NO. 001-007914733-003), DATED SEPTEMBER 8, 2014, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. D/B/A GENEVA WATCH GROUP AND DELL FINANCIAL SERVICES, L.L.C. | $0 |
| 6. | IBM CREDIT LLC | IBM OFFICE 7100 HIGHLANDS PARKWAY SMYRNA GA 30082-4859 | VALUEPLAN LEASE AGREEMENT, DATED MARCH 16, 2015, BY AND BETWEEN GENEVA WATCH GROUP AND IBM CREDIT LLC. | $3,056.00 |
| 7. | ASHLEY CANTON, LLC AND 47440 MICHIGAN AVE, LLC | 9810 S. DORCHESTER AVENUE CHICAGO IL 60628 | LEASE AGREEMENT, DATED AS OF SEPTEMBER 6, 2001, BY AND BETWEEN ADVANCE WATCH COMPANY LIMITED AND ASHLEY CANTON, LLC, AS AMENDED BY THAT CERTAIN FIRST AMENDMENT DATED APRIL 15, 2002, AS FURTHER AMENDED BY THAT CERTAIN SECOND AMENDMENT DATED MAY 28, 2002, THAT CERTAIN THIRD AMENDMENT DATED JUNE 18, 2006, THAT CERTAIN FOURTH AMENDMENT DATED MARCH 8, 2010, AND THAT CERTAIN FIFTH AMENDMENT TO LEASE DATED MARCH 26, 2013, AS ASSIGNED BY LANDLORD TO 47440 MICHIGAN AVE, LLC. | $128,677.02 |
| 8. | LDI COLOR TOOLBOX | 50 JERICHO QUADRANGLE JERICHO, NY 11753 <br><br> 6704 VALJEAN AVE. VAN NUYS, CA 91406 | LEASE AGREEMENT, DATED MAY 28, 2013, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. AND LDI COLOR TOOLBOX | $0 |

---

[3] Debtors' reserve the right to adjust the Cure Amounts to account for (i) amounts owed to the Debtors by the Counterparty, (ii) amounts that have not come due as of the closing of the sale, or (iii) any other circumstances that would affect such Cure Amounts.

10252689

| No. | Counterparty | Counterparty Address | Title/Contract Description | Cure Amount[3] |
|---|---|---|---|---|
| 9. | MICHIGAN STATE UNIVERSITY | UNIVERSITY LICENSING PROGRAMS 13 MSU UNION EAST LANSING, MI 48824-1029 | TRADEMARK LICENSE AGREEMENT, DATED AS OF MAY 22, 2012, BY AND BETWEEN ADVANCE WATCH COMPANY LTD. AND MICHIGAN STATE UNIVERSITY | $0 |
| | | | TOTAL: | $134,118.30 |

10